Exhibit I

# Our Business

In 1970, Congress created Freddie Mac with a few important goals in mind:

- **Make sure that financial institutions have mortgage money to lend**
- **Make it easier for consumers to afford a decent house or apartment**
- **Stabilize residential mortgage markets in times of financial crisis**

To fulfill this mission, Freddie Mac conducts business in the U.S. secondary mortgage market – meaning we do not originate loans – and works with a national network of mortgage lending customers. We have three business lines: a Single Family Credit Guarantee Business for home loans; a Multifamily business for apartment financing; and an investment portfolio.

Single-Family Credit Guarantee Business
Multifamily Business
Investment Business
Benefits
Conservatorship
Foreclosure Prevention

## Single-Family Credit Guarantee Business



In our Single-Family business, we use mortgage securitization to fund millions of home loans every year. Securitization is a process by which we purchase home loans that lenders originate, put these loans into mortgage securities that are sold in global capital markets, and recycle the proceeds back to lenders. This recycling is designed to ensure that lenders have mortgage money to lend. During 2009, Freddie Mac guaranteed $475 billion in home loans, representing 2.2 million families who purchased or refinanced their homes. And at year-end 2009, our total outstanding obligations of mortgage-backed securities stood at $1.9 trillion.

What makes the securitization process work? Families paying their mortgages every month. Because once a family moves into their home, their monthly payments of mortgage principal and interest are transferred ultimately to securities investors. When a family stops making payments – often due to loss of income – Freddie Mac steps in and makes those payments to securities investors. Managing this risk, known as credit risk, is how we generate revenue. Each time we fund a loan, we collect a credit guarantee fee from the lender selling us the loan. This fee is intended to protect us in case of loan default.

Other features of this business line:

- We guarantee mortgages exclusively in the conventional conforming market, where we purchase loans only up to a certain dollar amount [PDF] (for 2010, $417,000 for most of the nation and $729,750 in high-cost areas)
- The vast majority of the loans we fund are long term, fixed rate mortgages
- We generally require third-party mortgage insurance on loans with low downpayments
- We have loan servicing operations that work with lenders to avoid foreclosure, where possible, for families in financial difficulty

## Multifamily Business

Since not everyone owns their own home, Freddie Mac supports renters, too. Through our Multifamily business, we work with a network of lenders to finance apartment buildings around the country. Like single-family loans, these lenders originate *and close loans that Freddie Mac later purchases; lenders then use the proceeds to originate additional loans.*

Unlike single-family loans, which are relatively small in dollar amount and standardized in their composition and underwriting, multifamily loans typically are several million dollars in size, have underwriting characteristics that vary from property to property, and require custom examination such as on-site property inspections and verification of income cash flows (i.e., rents). One other difference: while single-family borrowers are individual consumers, multifamily borrowers are property developers and/or managers.

In this business line, Freddie Mac finances most of its loan acquisitions by issuing corporate debt securities. We generate revenue by producing what is known as net interest income; that is, the difference between the interest payments we collect on the multifamily loans we own and the yields we pay securities investors for investing in our debt. Freddie Mac also funds



**10-CV-01952-RCPT**

some multifamily loans through securitization. And, market conditions permitting, we invest in certain commercial mortgage-backed securities that contain multifamily loans.

During 2009, Freddie Mac funded $16.6 billion in multifamily loans, which helped provide rental units for 250,000 families. At year-end 2009, the portfolio of multifamily loans outstanding was $99 billion.

## Investment Business

The investment portfolio invests in mortgage-related securities that are guaranteed by Freddie Mac and other financial institutions. The portfolio also invests in individual loans that are guaranteed by Freddie Mac but not immediately securitized. As a bidder in the market, the investment portfolio helps to make mortgage-related securities more liquid and mortgage funding more available.

We fund acquisition of mortgage securities by issuing debt securities, generating net interest income. During 2009, the investment portfolio acquired a net of $255 billion in mortgage-related securities. At year-end 2009, the investment portfolio had an outstanding balance of $755 billion. Roughly one-half of this balance includes Freddie Mac mortgage-backed securities, known as Participation Certificates, guaranteed by the Single-Family and Multifamily businesses. During 2010, the investment portfolio can be no larger than $810 billion, per our regulator.

## Benefits

The activities performed by Freddie Mac's business lines have certain public policy benefits.

First, we have been a consistent market presence, providing mortgage liquidity in a wide range of economic environments. This has become significant during the credit crunch that began in mid-2007 and resulted in the exit of most other mortgage funders from the market. Indeed, in 2009 Freddie Mac and Fannie Mae funded 72 percent of all new home loans and an even higher percentage of multifamily loans.

Second, consumers have enjoyed uninterrupted access to long term, fixed rate mortgages. Banks and other depositories tend to hold shorter term, floating rate assets in their loan portfolios. These institutions finance long-term, fixed-rate mortgages (i.e., 15-, 20- and 30-year terms) largely by selling them into the secondary market, where Freddie Mac and Fannie Mae securitize and guarantee the loans. In 2009, long term, fixed-rate mortgages comprised 97 of new home loans.

Third, consumers have typically paid less on home loans funded by Freddie Mac or Fannie Mae. Because investors usually place a greater value on our mortgage securities, we have been able to pass this premium ultimately along to homebuyers in the form of lower mortgage rates. During normal or flush markets, where there are many sources of mortgage funds, homebuyer savings on our loans have averaged about 0.30 percent (or 30 basis points) compared to loans that exceed our loan limits. During the credit crunch that began in 2007, however, mortgage rate savings have been high as 1.84 percent (or 184 basis points). At year-end 2009, consumers were paying 0.91 percent (or 91 basis points) less on loans backed by Freddie Mac and Fannie Mae.

Fourth, consumers are able to refinance their loans when mortgage rates decline. Because of the nature of long-term, fixed-rate mortgages, homeowners are protected against rising interest rates but are able to take advantage of declining rates through refinancing. In 2009, Freddie Mac refinanced $379 billion in home loans for 1.7 million families who reduced their annual mortgage payments by $2,600 on average. In other words, mortgage refinanced enabled by Freddie Mac in 2009 created $4.5 billion in homeowner savings.

Fifth, all these benefits accrue the most to families of modest financial means. The majority of home loans that we fund support low- and moderate-income families, reflecting affordable housing goals set forth by the federal government. Further, more than four in five multifamily loans support renters earn at or below the area median income where they live.

## Conservatorship

Since September 2008, Freddie Mac (and Fannie Mae) have been in conservatorship, operating under the direction of the Federal Housing Finance Agency       (FHFA). Conservatorship allows Freddie Mac to continue supporting mortgage markets while ensuring our financial solvency.

This status also allows Freddie Mac to implement key parts the Administration's Homeowner Affordability & Stability Plan. We are continuing to provide mortgage liquidity to the broad market, supporting homebuying and refinancing alike. We are enabling homeowners currently in Freddie Mac loans to refinance even more easily, including homeowners with low or negative home equity. And we are implementing the President's standards for modifying loans so that additional families can avoid foreclosure.

## Foreclosure Prevention

Freddie Mac is an established industry leader in identifying and addressing delinquencies before they become foreclosures. Since the beginning of 2005, we have provided foreclosure alternatives to more than 525,000 distressed borrowers. We do everything we can to keep borrowers in their homes, using a variety of workout options including loan modifications (including HAMP), repayment plans and forbearance agreements depending on each borrower's individual situation. However, sometimes it is not financially feasible for the borrower to remain in the home. In those cases, we help facilitate pre-foreclosure sales (short sales and deed-in-lieu).

In response to the housing crisis, Freddie Mac stepped up our foreclosure prevention efforts significantly in 2009 - helping more than 272,000 borrowers stay in their homes or sell their properties through the company's proprietary foreclosure avoidance programs and the Administration's Making Home Affordable program. Our efforts are focused on supporting our servicers and reaching out to borrowers.

### Supporting Servicers

- Increased staff by nearly 70%.
- Placed on-site specialists at servicer shops.
- Reimbursed servicers for document collection and signature services.
- Initiated a "second look" review program targeted at declined loan modifications.

### Borrower Outreach & Support

- Participated in more than 500 foreclosure prevention workshops, meeting with borrowers nationwide.
- Allowed foreclosed families – tenants and ex-owners – to rent back their homes.
- Introduced door-knocking programs to help borrowers complete the required trial period documentation.
- Launched the Borrower Help Network with national non-profits to provide discouraged borrowers with Freddie Mac mortgages one-on-one counseling over the phone.
- Opened Borrower Help Centers in four cities nationwide to provide free financial counseling for distressed borrowers.

### Our Lines of Business

- Single-Family
- Multifamily
- Mortgage Securities
- Debt Securities

### Related Links

- Freddie Mac FAQs
- Monthly Volume Summaries
- Supporting Housing Recovery
- Weekly Primary Mortgage Market Survey

### Media Room

Read the latest news and information about Freddie Mac's business.

© 2010 Freddie Mac

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON

**FOR PUBLICATION**

In re:

PETER A. JACOBSON and
MARIA E. JACOBSON,

            Debtors.

No.  08-45120

**DECISION ON RELIEF FROM STAY**[1]

Before the court is a motion for relief from the automatic stay of § 362(a)[2] to enforce a deed of trust on the Debtors' residence.  As it was neither brought in the name of the real party in interest, nor by anyone with standing, the motion for relief from stay will be DENIED.

---

[1]    Minor clerical changes have been made to the Decision, originally filed 6 March 2009, as reflected in the Notice of Clerical Changes filed herewith.  That version (docket no. 48) is superseded.

[2]    Absent contrary indication, all "Code," chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23.  "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "FRCP" and "FRE" references to the Federal Rules of Civil Procedure and the Federal Rules of Evidence, respectively.

"GR" references are to the Local Rules, U.S. District Court, W.D. Washington, and "LBR" to the Local Bankruptcy Rules, W.D. Washington.

"RCW" references are to the Revised Code of Washington.

(08-45120-Peter A. Jacobson and Maria E. Jacobson)
DECISION ON RELIEF FROM STAY - 1 of 18

# I.   History

Attached to the motion of "UBS AG, as servicing agent for ACT Properties, LLC ("Movant")" (docket no. 31) are unauthenticated copies of:

1.  The adjustable rate note purportedly executed on 14 November 2009 in Elkridge, Maryland, by Debtors in favor of Castle Point Mortgage, Inc., which bears an undated "without recourse" indorsement in blank by someone identified as "VP/CFO";

2.  A barely-legible copy of Debtors' deed of trust in favor of Castle Point Mortgage (as "lender"); the beneficiary is identified as Mortgage Electronic Registration Systems, Inc. ("MERS"), a separate corporation, "solely as nominee for lender and lender's successors and assigns," with an adjustable rate rider (executed in Pierce County, Washington, on the same day as the note, according to the acknowledgment);

3.  An apparently unrecorded "Assignment of Mortgage" to ACT Properties, LLC, referencing the deed of trust by parties, date, and recording number, executed by a director of MERS in December of 2008, according to the acknowledgment; and

4.  Debtors' real property and secured claims schedules (A and D, respectively, the latter identifying the secured creditor as "UBS").

The motion notes Debtors' bankruptcy petition, filed 7 October 2008, the attendant automatic stay, and goes on to recount the history of the loan, including its transfer "to Movant," stating that Wells

(08-45120-Peter A. Jacobson and Maria E. Jacobson)
DECISION ON RELIEF FROM STAY - 2 of 18

1 | Fargo Document Custody "has possession" of the original note in
2 | Minneapolis, Minnesota.  The narrative continues with Debtors' default
3 | and the commencement of non-judicial foreclosure proceedings, with sale
4 | set for 17 October 2008, (presumably by a predecessor in interest of ACT
5 | Properties, since it was pre-assignment; the foreclosing party is not
6 | identified).  The Debtors' filing automatically stayed the foreclosure,
7 | § 362(a); the motion indicates no foreclosure activity is pending.
8 | There follows a calculation of the amounts due and lack of equity, and
9 | sketchy argument that the Movant is entitled to relief under § 362(d)(1)
10 | for lack of adequate protection.

11 | The motion is supported by the declaration of a "bankruptcy
12 | specialist" (docket no. 32) which parrots the narrative set forth in the
13 | motion (or perhaps it is the other way around — the text respecting the
14 | history of the transaction and documentation is virtually identical, and
15 | both make the same mistake regarding the date the deed of trust was
16 | executed — they both state that the deed of trust was executed
17 | 8 December 2006, while the acknowledgment shows it as 14 November 2006).
18 | Declarant, too, declares that Wells Fargo Document Custody "has
19 | possession" of the original note in Minnesota, and indicates that true
20 | copies of the note, deed of trust, and assignment are attached, but
21 | there are no exhibits to the filed declaration.  The declaration was
22 | executed in Irvine, California.

23 | No evidence is provided, nor is any assertion even made, regarding
24 | UBS AG's authority to act for the holder of the note, beyond the
25 | unelaborated statements that it is "servicing agent for ACT Properties,
26 |
27 |
28 | (08-45120-Peter A. Jacobson and Maria E. Jacobson)
DECISION ON RELIEF FROM STAY - 3 of 18

1  LLC" in the motion, and "servicing agent for ACT Properties, LLC, its

2  successors and/or assigns" in the declaration.

3      Nor do the papers disclose what kind of an entity "UBS AG" is.

4  "AG" may indicate a corporate entity from Germany, Switzerland,

5  Liechtenstein, Austria, or perhaps elsewhere, and UBS is a major Swiss

6  financial institution.   See Nelson D. Schwartz, For Swiss Banks, an

7  Uncomfortable Spotlight, Int'l Herald Tribune, March 4, 2009,[3] and

8  UBS AG:  a Short History.[4]

9      This latter point became significant when Debtors, pro se (although

10  they have counsel), filed their Motion to Dismiss Movant's Motion for

11  Relief from Stay (docket no. 44), the thrust of which is that UBS

12  transferred the security in the real property to the Central Bank of

13  Switzerland in return for approximately $220,000, and referencing

14  numerous press and internet accounts respecting the Swiss bank.  Debtors

15  do not explicate how they reach the conclusion, from news stories about

16  the handling of toxic assets in the banking systems of this country and

17  Switzerland, that UBS (or UBS AG, which only claims to service the loan

18  for another holder) was paid an amount approximating the default alleged

19  in the motion.  That said, they raise a standing question.

20

21  _____

22      [3]   available at:

23      http://www.iht.com/articles/2009/03/04/business/04
       swiss.php (last visited 4 March 2009)
24
       [4]   available at:
25
       http://www.ubs.com/1/e/about/history/a_short_histo
26     ry.html?isPopup=yes (last visited 5 March 2009).

27

28  (08-45120-Peter A. Jacobson and Maria E. Jacobson)
    DECISION ON RELIEF FROM STAY - 4 of 18

1    UBS AG's counsel, while located in San Diego, California, is
2    admitted to practice in this district and electronically filed the
3    motion and supporting papers.  He continued the motion once and  then
4    confirmed the motion for hearing two days prior to the calendar, also
5    via the court's electronic filing system.  A local practitioner whose
6    role in the case was not disclosed in the docket appeared for UBS AG at
7    the continued hearing; Debtor Peter Jacobson appeared pro se.

8

9                            **II.   Jurisdiction**

10   This is a core proceeding within this court's jurisdiction.
11   28 U.S.C. §§ 1334(a) and (b), and 157(a) and (b)(2)(G); GR 7, ¶ 1.01,
12   Local Rules, W.D. Washington.

13

14                            **III.   Issues**

15   **A.   Appearances**

16   Were the parties properly represented at hearing?

17

18   **B.   Real Party in Interest**

19   Is a "servicing agent" the real party in interest in whose name a
20   relief from stay motion may be brought?

21

22   **C.   Standing**

23   Does UBS AG or Movant have standing to seek relief from stay to
24   enforce Debtors' deed of trust?

25

26

27

28   (08-45120-Peter A. Jacobson and Maria E. Jacobson)
     DECISION ON RELIEF FROM STAY - 5 of 18

### IV.  Analysis

**A.  <u>Appearances</u>**

Debtors were and still are represented by counsel in this case. Although they filed their response to the motion pro se, they indicate having informed counsel of their intent to file their response.  I infer counsel declined to argue their position.  Nevertheless, because I have an independent duty to determine jurisdiction, <u>see</u> part IV.C. below, the question is before me, and Mr. Jacobson appeared at the hearing.

GR 2(g)(1) permits the court to hear represented individuals, even though their counsel is not present:

> Whenever a party has appeared by attorney, the party cannot thereafter appear or act in his own behalf in the case, or take any step therein . . .; provided, that the court may in its discretion hear a party in open court, notwithstanding the fact that he has appeared, or is represented by attorney.

Respecting Movants' representation at the hearing, Rule 9010(b) provides that:

> [a]n attorney appearing for a party in a case under the Code <u>shall</u> file a notice of appearance with the attorney's name, office address and telephone number, unless the attorney's appearance is otherwise noted in the record.

(emphasis added).  In other words, an attorney must first file a notice of appearance containing the data specified in Rule 9010(b) to represent a party in a hearing.

In addition to Rule 9010(b), a local rule of the U.S. District Court for the Western District of Washington, which applies via LBR 9029-2,[5] requires:

---

[5]   Which provides:

The Local Rules of the United States District Court

1    An attorney eligible to appear may enter an appearance in a
     civil case by signing any pleading or other paper described in
2    Rule 5(a), Federal Rules of Civil Procedure, filed by or on
     behalf of the party the attorney represents, or by filing a
3    Notice of Appearance.

4  GR 2(h).  No formal notice of appearance is required so long as the new

5  attorney has somehow made his or her involvement in the case known prior

6  to the hearing, such as by signing and filing pleadings.

7    But once counsel has appeared, GR 2(g)(3) provides:

8    The authority and duty of attorneys of record shall continue
     until there shall be a substitution of some other attorney of
9    record, except as herein otherwise expressly provided, and
     shall continue after final judgment for all proper purposes.
10

11   And GR 2(g)(2)(B):

12   Where there has simply been a change or addition of counsel
     within the same law firm, an order of substitution is not
13   required; the new attorney will file a Notice of Appearance
     and the withdrawing attorney will file a Notice of Withdrawal.
14   However, where there is a change in counsel that effects a
     termination of one law office and the appearance of a new law
15   office, the substitution   must be effected . . . which
     requires leave of court.
16

17   And, of course, corporations must be represented by counsel in

18  federal court.  See Rowland v. California Men's Colony, 506 U.S. 194,

19  201-02 (1993).

20   The careful reader will have noticed that none of the foregoing

21  rules  directly  address  the  situation  where  the  original  attorney

22  continues as counsel of record, but another lawyer, not of the same

23  _____

24   for the Western District of Washington (herein
     "Local Rules W.D. Wash.") are rules of the United
25   States Bankruptcy Court for the Western District of
     Washington, except as they may be inconsistent with
26   Title 11, United States Code (herein "Bankruptcy
     Code"), the Federal Rules of Bankruptcy Procedure,
27   or these Local Bankruptcy Rules.

28  (08-45120-Peter A. Jacobson and Maria E. Jacobson)
    DECISION ON RELIEF FROM STAY - 7 of 18

1  firm, joins for some portion of the representation.  But, read together,
2  the requirement of corporate representation and the continuing role of
3  counsel of record preclude interloping counsel.  For other attorneys not
4  part of the same firm as record counsel to represent a party, something
5  must be done of record.  Customarily, this is accomplished by filing a
6  notice of association, and it is common when lead counsel is distant and
7  the use of local counsel for particular matters in the case will promote
8  efficiency, or the new counsel provides particular expertise.  Once the
9  notice of association is served and filed, all parties to the case are
10 aware of the changed representation, and associated counsel receives
11 *notice directly of events and filings in the case.*

12      The  practice  of  undisclosed  "appearance  attorneys"  creates
13 problems — other parties (and the court) are sandbagged, and the Debtor,
14 trustee,  other  creditors,  and  counsel  cannot  readily  communicate
15 regarding scheduling or substance.  In addition to the ramifications of
16 this practice, explored in In re Wright, 290 B.R. 145 (Bankr. C.D. Cal.
17 2003); Hon. Jim D. Pappas, Simple Solution = Big Problem, 46 The [Idaho]
18 Advocate 31 (Oct. 2003); and Neil M. Berman, Judge, This is Not My
19 Case . . ., Norton Bankr. L. Adviser 3 (May 2004), the lack of formal
20 association  could  raise  questions  about  the  informally-appearing
21 attorney's authority to speak for, and make judicial admissions on
22 behalf of, the client (the contrary suggestion would not be a promising
23 argument).

24      While this defect is not dispositive, clarity of representation on
25 the  record  is  important  to  judicial  economy  and  the  orderly
26 representation of other parties.  So I will require, absent emergency or
27
28 (08-45120-Peter A. Jacobson and Maria E. Jacobson)
   DECISION ON RELIEF FROM STAY - 8 of 18

1 significant hardship, formal notice of association to be filed not later

2 than the confirmation of the hearing.  And there is no remedy for self-

3 inflicted harm — law firms undertaking distant representations must be

4 prepared to appear or timely associate local counsel who will.  As

5 corporations must be represented by counsel in federal court, the

6 consequence of not having counsel of record at hearing will be that the

7 party's position may be deemed without merit.  <u>See</u> LBR 9013-1(e)(1).[6]

8 This is the flip side of Woody Allen's observation that "Eighty per cent

9 of success is showing up"[7] — if you (or your counsel of record if you are

10 a corporate entity) don't, your chance of success approaches zero.

11     In short, henceforth only counsel of record or individuals

12 representing themselves will be heard.

13

14     **B.    <u>Real Party in Interest</u>**

15     The moving party here is UBS AG, which claims only to be a servicer

16 for the holder of the note.  It neither asserts a beneficial interest in

17 the note, nor that it could enforce the note in its own right.  As noted

18 in <u>In re Hwang</u>, 396 B.R. 757, 766-67 (Bankr. C.D. Cal 2008), Rule 4001

19 makes stay relief a contested matter by providing that Rule 9014

20 governs.   That rule in turn applies Rule 7017, imposing FRCP 17's

21

22     [6]    Which provides:

23           [A]ppearance is required at all scheduled hearings.
              Failure to appear at the date and time appointed
24           for hearing may be deemed by the court to be an
              admission that the motion, or the opposition to the
25           motion, as the case may be, is without merit.

26     [7]    Quoted in Thomas J. Peters and Robert H. Waterman, <u>In Search</u>
27 <u>of Excellence</u>, Harper & Row 1982, at 119.

28 (08-45120-Peter A. Jacobson and Maria E. Jacobson)
   DECISION ON RELIEF FROM STAY - 9 of 18

1  requirement[8] that actions be prosecuted in the name of the real party

2  interest.

> [t]he right to enforce a note on behalf of a noteholder does not convert the noteholder's agent into a real party in interest. "As a general rule, a person who is an attorney-in-fact or an agent solely for the purpose of bringing suit is viewed as a nominal rather than a real party in interest and will be required to litigate in the name of his principal rather than in his own name."

7  Hwang, 396 B.R. at 767, quoting 6A Wright, Miller & Kane, Federal

8  Practice and Procedure:  Civil 2d § 1553.

9      The real party in interest in relief from stay is whoever is

10 entitled to enforce the obligation sought to be enforced.  Even if a

11 servicer or agent has authority to bring the motion on behalf of the

12 holder, it is the holder, rather than the servicer, which must be the

13 moving party, and so identified in the papers and in the electronic

14 docketing done by the moving party's counsel.

15     It follows that orders granting relief from stay must do so to the

16 holder of the obligation to be enforced — not the servicer or others, or

17 the collective "Movant," as in the proposed order UBS AG submitted.  Of

18 course, setting forth that the holder may act through agents, or may

19 later assign or transfer the interest, e.g., "ACT Properties, LLC, and

20 its agents, successors, and assigns," is appropriate.

---

[8]     Which provides in (a)(1):

> An action must be prosecuted in the name of the real party in interest. . . .

1    If UBS AG'S motion had merit, the standing deficiency could be

2 cured by joinder, as FRCP 17(a)(3),[9] applicable via Rules 9014 and 7017,

3 allows.  As will be seen, joinder would not salvage this motion.

4

5    **C.   Standing**

6    UBS AG has submitted no evidence that it is authorized to act for

7 whomever holds the note.  That deficiency puts its standing in question,

8 See In re Parrish, 326 B.R. 708, 720-21 (Bankr. N.D. Ohio 2005), and I

9 have an independent duty to determine whether I have jurisdiction over

10 matters that come before me.  FW/PBS, Inc. v. City of Dallas, 493 U.S.

11 215, 231 (1990).  I must therefore determine whether UBS AG (or Movant)

12 has standing to seek relief from stay.

13

14    **1.   Law:**  For a federal court to have jurisdiction, the litigant

15 must have constitutional standing, which requires an injury fairly

16 traceable to the defendant's allegedly unlawful conduct and likely to be

17 redressed by the requested relief.  United Food & Commercial Workers

18 Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 551 (1996).

19        [T]he question of standing is whether the litigant is
        entitled to have the court decide the merits of the dispute or
20      of particular issues. Standing doctrine embraces several
        judicially self-imposed limits on the exercise of federal
21

22    [9]   Which provides:

23        The court may not dismiss an action for failure to
        prosecute in the name of the real party in interest
24      until, after an objection, a reasonable time has
        been allowed for the real party in interest to
25      ratify, join, or be substituted into the action.
        After ratification, joinder, or substitution, the
26      action proceeds as if it had been originally
        commenced by the real party in interest.
27

28 (08-45120-Peter A. Jacobson and Maria E. Jacobson)
   DECISION ON RELIEF FROM STAY - 11 of 18

jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights . . . .

. . . .

Typically . . . the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.

Allen v. Wright, 468 U.S. 737, 750-52 (1984) (citations omitted). Constitutional standing, predicated on the "case or controversy" requirement of Article III of the Constitution, is a threshold jurisdictional requirement, and cannot be waived. Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co., 219 F.3d 895, 899-900 (9th Cir. 2000).

A litigant must also have "prudential standing," which stems from rules of practice limiting the exercise of federal jurisdiction to further considerations such as orderly management of the judicial system. Pershing Park, 219 F.3d at 899-900; In re Godon, 275 B.R. 555, 564-565 (Bankr. E.D. Cal. 2002) (citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541-42 (1986).

Generally, a party without the legal right under applicable substantive law to enforce the obligation at issue, or pursuing an interest outside those protected by the law invoked or abstract questions more appropriately addressed legislatively, lacks prudential standing. Doran v. 7-Eleven, Inc., 524 F.3d 1034, 1044 (9th Cir. 2008).

Under the Bankruptcy Code, a party seeking relief from stay must establish entitlement to that relief. § 362(d); see In re Hayes, 393 B.R. 259, 266-267 (Bankr. D. Mass. 2008). Foreclosure agents and servicers do not automatically have standing, In re Scott, 376 B.R. 285,

290 (Bankr. D. Idaho 2007); Hwang, 396 B.R. at 767, and must show authority to act for the party which does.

In Washington, only the holder of the obligation secured by the deed of trust is entitled to foreclose.   RCW 61.24.005(2) defines "beneficiary" under a deed of trust as the holder of the instrument or document evidencing the obligations secured by the deed of trust.[10]  See also Fidelity & Deposit Co. of Maryland v. Ticor Title Ins. Co., 88 Wash. App. 64, 943 P.2d 710 (1997). Having an assignment of the deed of trust is not sufficient, id. at 68-69, because the security follows the obligation secured, rather than the other way around.   This principle is neither new nor unique to Washington:

> [T]ransfer of the note carries with it the security, without any formal assignment or delivery, or even mention of the latter.

Carpenter v. Longan, 83 U.S. 271, 275 (1872).

It follows that, to have standing, UBS AG must establish its authority to act for the holder of Debtors' note.

**2.  Evidence:**  Some courts require a party moving for stay relief to provide admissible evidence tracing the identity of the various holders and servicers of the mortgage or deed of trust in question, and the holders of the note evidencing the underlying obligation. See Hayes, 393 B.R. at 269; and Parrish, 326 B.R. at 720-21. I need not here go so far, because UBS AG's proof neither shows who presently holds Debtors' note nor its own authority.

---

[10]    Which renders problematic the identification of MERS "solely as nominee . . ." as the beneficiary of Jacobsons' deed of trust.

(08-45120-Peter A. Jacobson and Maria E. Jacobson)
DECISION ON RELIEF FROM STAY - 13 of 18

1    While business records may provide the necessary proof, this

2 exception to the hearsay rule[11] requires that the records (1) be made at

3 or near the time by, or from information transmitted by, a person with

4 knowledge; (2) pursuant to a regular practice of the business activity;

5 (3) kept in the course of regularly conducted business activity; and

6 (4) the source, method, or circumstances of preparation must not indicate

7 lack of trustworthiness.   These elements must be established by the

8 testimony of a custodian or other qualified witness, and the documents

9 must be authenticated.   In re Vinhnee, 336 B.R. 437, 444 (9th Cir. BAP

10 2005).   Specifically, "the record being proffered must be shown to

11 continue to be an accurate representation of the record that originally

12 was created."   Id.; FRE 901(a).[12]   A declarant authenticating business

[11]   FRE 803(6) provides:

> Records of Regularly Conducted Activity.--A
> memorandum, report, record, or data compilation, in
> any form, of acts, events, conditions, opinions, or
> diagnoses, made at or near the time by, or from
> information transmitted by, a person with
> knowledge, if kept in the course of a regularly
> conducted business activity, and if it was the
> regular practice of that business activity to make
> the memorandum, report, record or data compilation,
> all as shown by the testimony of the custodian or
> other qualified witness, or by certification that
> complies with Rule 902(11), Rule 902(12), or a
> statute permitting certification, unless the source
> of information or the method or circumstances of
> preparation indicate lack of trustworthiness. The
> term "business" as used in this paragraph includes
> business, institution, association, profession,
> occupation, and calling of every kind, whether or
> not conducted for profit.

[12]   Which provides:

> The requirement of authentication or identification
> as a condition precedent to admissibility is
> satisfied by evidence sufficient to support a

1 records must be qualified.  The bare assertion that one works for the

2 company and is familiar with its recordkeeping procedures is not

3 sufficient:   "there needs to be enough information presented to

4 demonstrate that the person is sufficiently knowledgeable about the

5 subject of the testimony." Vinhnee, 336 B.R. at 448 (citation omitted).

6 The testimony must contain information warranting the conclusion that the

7 proffered records are what they purport to be.  Id.

8      The only evidence UBS AG has submitted is the declaration of one of

9 its bankruptcy specialists.  The initial paragraph of the declaration

10 reads:

> I am employed as a Bankruptcy Specialist by UBS AG, as
> servicing agent for ACT Properties LLC, its successors and/or
> assigns ("Movant").   In this capacity, I am one of the
> custodians of the books, records, files and banking records of
> Movant, as those books, records, files and banking records
> pertain to the loans and extensions of credit by Movant to
> Peter A. Jacobson and Maria E. Jacobson ("Debtors").   I have
> personally worked on said books, records, files and banking
> records and, as to the following facts, I know them to be true
> of my own knowledge or I have gained knowledge of them from
> *the Movant's business records, which were made at or about the
> time of the events which were recorded, and which are*
> maintained in the ordinary course of Movant's business.

18 Declaration in Support . . . (docket no. 32).

19      One hopes the declarant is not as unsure of his own identity as this

20 imprecision suggests:   is he employed as a bankruptcy specialist by

21 UBS AG only in its capacity as servicing agent for ACT Properties?  Or

22 for a successor or assignee of ACT?  Or is he a bankruptcy specialist for

23 UBS AG and its successors and/or assigns?  Is he one of the custodians

24 of "the books, records, files and banking records" of all of these

_____

> finding that the matter in question is what its
> proponent claims.

(08-45120-Peter A. Jacobson and Maria E. Jacobson)
DECISION ON RELIEF FROM STAY - 15 of 18

1  entities?  And since the motion must be brought in the name of the real

2  party in interest; i.e., the present holder of Debtors' note, what is the

3  relevance of a possible future successor or assignee?  Or if the

4  antecedent of "successors and/or assigns" is UBS AG, how does declarant

5  know he will be employed by whomever it is, or have access to its

6  records?

7       Setting aside for the moment that no business records are actually

8  proffered — the declarant recounts his conclusions, from whatever records

9  he consulted, and we are told that he is one of the custodians, that he

10  works on those records, that they were made at or about the time of the

11  events recorded, and that they are maintained in the ordinary course of

12  Movant's business.  While that formulaic recitation attempts to satisfy

13  FRE 901(a), it would not withstand an objection to admissibility:  there

14  is nothing meaningful regarding the declarant's qualifications to

15  authenticate business records, or the reliability of those records in

16  this instance.

17       That reliability is questionable, given obvious errors, such as the

18  date the Debtors executed the deed of trust and the assertion of a loan

19  or extension of credit "by Movant" to the Jacobsons — the lender (and the

20  payee of their note) was Castle Point Mortgage, Inc., not included in

21  either of the compositions of "Movant" set forth in UBS AG's papers.  And

22  which of the matters he recounts are things he knows to be true of his

23  own knowledge, and which did he gain from someone's business records?

24  More fundamentally, ACT Properties was assigned the deed of trust just

25  days before the motion was filed.  Why should credence be given to

26

27

28  (08-45120-Peter A. Jacobson and Maria E. Jacobson)
    DECISION ON RELIEF FROM STAY - 16 of 18

1 UBS AG's records "as servicing agent for ACT Properties" respecting
2 anything before that assignment?

3     But even if all of the deficiencies were overlooked or resolved in
4 Movant's favor, one emerges from the syntactical fog into an impassable
5 swamp.   The declaration of someone in California, apparently based on
6 business records, and perhaps predating his employer becoming servicing
7 agent, is that Debtor's note secured by the deed of trust is in "the
8 possession"[13] of a separate entity in Minnesota.   Assuming the exhibits
9 to the motion are authentic and are the same as those intended to have
10 been attached to the declaration, the note is indorsed in blank.   Without
11 more, that and possession (rather than mere custody) suggests that Wells
12 Fargo is the holder of the note.   RCW 62A.3-201[14] and 3-301[15].   Nothing

---

[13]   So in both the motion (at 3:11) and in the declaration (at ¶ 4).

[14]   Which provides:

> (a) "Negotiation" means a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder.

> (b) Except for negotiation by a remitter, if an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder. If an instrument is payable to bearer, it may be negotiated by transfer of possession alone.

[15]   Which provides:

> "Person entitled to enforce" an instrument means (i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to RCW 62A.3-309 or 62A.3-418(d).   A person may be a person entitled to enforce the instrument even though the person is

(08-45120-Peter A. Jacobson and Maria E. Jacobson)
DECISION ON RELIEF FROM STAY - 17 of 18

1 in the record establishes on whose behalf (if other than its own) Wells
2 Fargo Document Custody possesses the note; that (and verification of
3 current possession and present ability to produce the original, if
4 required) would have to come from Wells Fargo.

5     Nor does anything in the record establish UBS AG's authority to
6 enforce the Debtors' note, for whomever holds it; and thus to foreclose
7 the deed of trust.   The declaration states that UBS AG is "servicing
8 agent," a term with no uniform meaning, and no definition cited.  At a
9 minimum, there must be an unambiguous representation or declaration
10 setting forth the servicer's authority from the present holder of the
11 note to collect on the note and enforce the deed of trust.     If
12 questioned, the servicer must be able to produce and authenticate that
13 authority.

14     UBS AG has not shown that it has standing to bring the motion for
15 relief from stay or authority to act for whomever does.

16

17                         **V.   CONCLUSION**

18     As the motion was not brought in the name of the real party in
19 interest, nor has standing to bring it been established, it will be
20 **DENIED**.

21     **///  —  END OF DECISION  —  ///**

22                                          Philip H. Brandt
23                                          United States Bankruptcy Judge
                                            (Dated as of "Entered on Docket" date above)
24

25     _____

26             not the owner of the instrument or is in wrongful
27             possession of the instrument.

   (08-45120-Peter A. Jacobson and Maria E. Jacobson)
28 DECISION ON RELIEF FROM STAY - 18 of 18

**Entered on Docket**
**March 31, 2009**

Hon. Linda B. Riegle
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

\* \* \* \* \* \*

In re )     Case No. BK-S-07-16226-LBR
    )     Chapter 7
JOSHUA & STEPHANIE MITCHELL, )
    )
          Debtor(s). )
    )     DATE:    August 19, 2008
    )     TIME:     3:30 p.m.
    )

**MEMORANDUM OPINION**

     Mortgage Electronic Recording Systems, Inc. ("MERS") through various counsel has filed a number of motions to lift stay.[1] Some of the motions were filed in the name of MERS, while others have been filed in the name of MERS as the nominee for another entity. An order for joint briefing was entered because the substantially same issues were presented in the motions, and a joint hearing was held. *Mitchell* (#07-16226) has been designated as the lead case.[2] The trustee or counsel for the debtor in these cases has opposed the lift-stay motions on the

---

     [1]Motions have been filed in the following cases: #07-16226, #07-016333, #07-16645, #07-17577, #07-18851, #08-10427, 08-11007, #08-11860, #07-13593, #08-10108, #08-10778, #08-12255, #07-17468, #08-11245, #08-11608, #08-11668, #08-11725, #08-11819, #08-12206, #08-12242, #08-12317, #08-12319, #08-10052, #08-10072, #08-10718, #08-11499, #07-16519. Each of the judges will enter their own orders in the matters that are assigned to them.

     [2]The docket numbers mentioned in this opinion are to the *Mitchell* case unless otherwise noted.

1

1   grounds of standing and that MERS is not the real party in interest.

2           The initial response filed by MERS contained no evidentiary support. Rather it described

3   the role of MERS and its members by relying on law review articles and the recitation of facts in

4   other cases in other districts involving MERS. Prior to the initial argument, MERS attempted to

5   withdraw the motions filed in all but four of the cases. MERS then filed a declaration at the

6   court's direction explaining why the motions were withdrawn. The declaration of William

7   Hultman was filed in *Dart*.[3] The declaration, in addition to explaining MERS' rationale for

8   withdrawing the motions, also attached as exhibits copies of the MERS Membership

9   Application, the MERSCorp. Inc. Rules of Membership, the MERS Procedural Manual, and the

10  MERS Terms and Conditions of Membership.[4] The court also requested appropriate evidentiary

11  support for the allegations concerning the relationship between MERS and the entities for whom

12  the motions were brought. A supplemental declaration was filed in *Michell*, the lead case.[5]

13          As noted, MERS has attempted to withdraw all but four of its original motions, leaving

14  only *Dart* (#08-11007), *Hawkins* (#07-13593), *Ramirez-Furiati* (#08-10427), and *Zeigler* (#08-

15  10718). MERS admits that it failed to follow its own procedures in the motions it wants to

16  withdraw.[6] The debtor, the chapter 13 trustee, and MERS subsequently stipulated to a lift of stay

17  in *Ramirez-Furiati* which the court approved with the acknowledgment that the order contained

18  no finding about MERS' standing.[7] This court will discuss the issues raised in the motions that

19

20          [3]*Dart* (#08-11007).

21          [4]Docket #47 in *Dart*.

22
23          [5]Docket #74 in *Michell* ("Huntman Declaration"). The Declaration also incorporated the
    prior declaration filed by Mr. Hultman in *Dart*. References in this memorandum to the
24  declaration filed in *Michell* include the incorporated declaration and the exhibits thereto.

25          [6]Docket #74, Declaration of William Hultman ("Hultman Declaration"), Exhibit 1, pp. 4-
    5. "The fact that MERS chose to not go forward on these . . . motions was not a determination by
26  MERS that it does not have standing to move for relief from stay." Exhibit D to that Declaration
27  sets forth the name of the motions withdrawn and the reason for withdrawal.

28          [7]Docket #54 in #08-10427.

                                            2

1    MERS attempts to withdraw,[8] and by this order issues its ruling in *Dart* and *Hawkins*, which are

2    the two cases that are now pending before it.[9]

3         The court has advised the parties that it would consider any information contained on the

4    MERS website at http://www.mersinc.org/ unless an objection was made. No objection has been

5    filed by either party. The court thus takes judicial notice of the contents of the MERS website.

6    **WHAT IS MERS?**

7         MERS is a national electronic registration and tracking system that tracks the

8    beneficial ownership interests and servicing rights in mortgage loans.[10] The MERS website says

9    this:

10           MERS is an innovative process that simplifies the
             way mortgage ownership and servicing rights are
11           originated, sold and tracked. Created by the real
             estate finance industry, MERS eliminates the need
12           to prepare and record assignments when trading
             residential and commercial mortgage loans.
13

14        William Hultman, Secretary of MERS, has testified in his Declaration that loans are

15   registered to a "MERS Member" who has entered into the MERS Membership Agreement.

16   MERS Members enter into a contract with MERSCORP to electronically register and track

17   beneficial ownership interests and servicing rights in MERS registered mortgage loans.[11] MERS

18   Members agree to appoint MERS, which MERSCORP wholly owns, to act as their common

19   agent, or nominee, and to name MERS as the lienholder of record in a nominee capacity on all

20        [8]FED. R. BANKR. P. 9014 makes FED. R. BANKR. P. 7041 applicable to contested matters,

21   which includes lift stay motions, and FED. R. BANKR. P. 7041 incorporates FED. R. CIV. P. 41.
     Under these rules, a party can voluntarily dismiss a lift-stay motion without a court order only if
22   there is a stipulation to dismiss or the dismissal is filed *before* an opposition is filed, and neither
     *is* true here.
23

24        [9]Some cases were added to the argument calendar after the April 29, 2008 joint hearing
     order. Separate orders will be entered in each of those cases, which counsel agreed to continue
25   pending a ruling in the "test case." *See* Transcript (Docket # 83) pp. 9 and 76.

26        [10]MERS Response, Docket # 49, p. 3.

27        [11]"MERS Members" are mortgage lenders and other entities. ("Membership in MERS
28   Overview," filed with Hultman Declaration, Docket #74.)

3

1  recorded security instruments relating to the loans registered on the MERS System. When a

2  promissory note is sold by the original lender to others, the various sales of the notes are tracked

3  on the MERS System.[12]

4      Hultman goes on to say in his Declaration that once MERS becomes the beneficiary of

5  record as nominee, it remains the beneficiary when the beneficial ownership interests in the

6  promissory note or servicing rights are transferred by one MERS Member to another and that it

7  tracks the transfers electronically on the MERS System. So long as the sale of the note involves a

8  member of MERS, MERS remains the beneficiary of record on the deed of trust and continues to

9  act as nominee for the new beneficial owner.[13]

10  **STANDING**

11      MERS must have both constitutional and prudential standing,[14] and be the real party in

12  interest under FED. R. CIV. P. 17,[15] in order to be entitled to lift-stay relief.

13      Constitutional standing under Article III requires, at a minimum, that a party must have

14  suffered some actual or threatened injury as a result of the defendant's conduct, that the injury be

15  traced to the challenged action, and that it is likely to be redressed by a favorable decision. *Valley*

16  *Forge Christian Coll. v. Am. United for Separation of Church and State*, 454 U.S. 464, 472

17  (1982)(citations and internal quotations omitted).

18      Beyond the Article III requirements of injury in fact, causation, and redressibility, MERS

19  must also have prudential standing, which is judicially-created set of principles that places limits

20  on the class of persons who may invoke the courts' powers. *See Warth v. Seldin*, 422 U.S. 490,

21  _____

22      [12]Docket #74, Hultman Declaration at ¶ 3.

23      [13]Docket # 74, Hultman Declaration at ¶ 4.

24      [14]The standing doctrine "involves both constitutional limitations on federal-court

25  jurisdiction and prudential limitations on its exercise." *Kowalski v. Tesmer*, 543 U.S. 125, 128-29

26  (2004) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).

27      [15]Stay-relief requests are governed by FED. R. BANKR. P. 4001(a)(1), to which FED. R.

28  BANKR. P. 9014 is applicable. Rule 9014, in turn, incorporates Rule 7017, which makes FED. R.

    CIV. P. 17 applicable ("[a]n action must be prosecuted in the name of the real party in interest.").

4

1   499 (1975). As a prudential matter, a plaintiff must assert "his own legal interests as the real

2   party in interest," *Dunmore v. United States*, 358 F.3d 1107, 1112 (9th Cir. 2004), as found in

3   FED. R. CIV. P. 17, which provides "[a]n action must be prosecuted in the name of the real party

4   in interest."

5          MERS' primary contention is that it has standing by virtue of the fact that it was

6   named as the beneficiary under the deeds of trust and that the trustor (the maker of the note)

7   recognized MERS could take actions of the beneficiary or that it is the nominee of the

8   beneficiary. "In non-judicial foreclosure states, [MERS] must at least be the record beneficiary

9   under the Deed of Trust, with the powers expressly set forth therein, including the power of

10  foreclosure; in addition, as noted, it *may* become the holder on the note under some

11  circumstances. This procedure fully establishes standing under this court's rules and Nevada

12  law."[16] MERS argues in its supplemental brief: "It would be reasonable to hold that a motion that

13  pleads MERS is the of-record beneficiary on the deed of trust is prima facie evidence of standing

14  to move for relief from stay and contains an implied certification that MERS is able to discharge

15  the responsibilities of a movant."[17] MERS states that the issue of standing focuses on who can

16  foreclose and that MERS can foreclose on the properties as a "person authorized to make the sale

17  under the terms of the trust deed.[18]  (*See also*, Transcript, Docket # 83, pp. 14-15.)

18         MERS also argues that it has standing which follows principles set forth in the Uniform

19  Commercial Code that entitle a nominee holder of an instrument to sue to enforce the

20  instrument.[19] It is unclear whether MERS is arguing that it has standing in its own right, or as the

21  agent of the entity entitled to enforce the note, or both. Compare the following arguments, all

22

23  ────────────────

24         [16]MERS' Response, Docket #49, p. 9 (emphasis added).

25         [17]Supplemental Brief of MERS, Docket # 73, p. 10.

26         [18]Docket #49, p. 10. However, it is not the beneficiary that is authorized to make the sale

27  under the trust deed, it is the trustee.

28         [19]Docket #49, p. 10.

5

1  made in the same supplemental brief.[20] MERS argues at page 9 of the brief that "this evidence

2  demonstrates MERS right to enforce the note as the note's 'holder.'"[21] In the same brief, at page

3  8, it argues "[t]his evidence further demonstrates MERS authority *to act for* the current beneficial

4  owner of the loan or its servicer."[22] And at page 1 of the brief MERS argues this: "In the motions

5  at issue, MERS is the agent of the original lender and its successors and assigns for defined

6  purposes (such a relationship is termed a 'nominee.')."[23]

7  ### STANDING AS THE NAMED BENEFICIARY OR THE NOMINEE OF THE BENEFICIARY OR ITS ASSIGNEE

8
9      MERS does not have standing merely because it is the alleged beneficiary under the

10  deed of trust. It is not a beneficiary and, in any event, the mere fact that an entity is a named

11  beneficiary of a deed of trust is insufficient to enforce the obligation.

12      The deed of trust attempts to name MERS as both a beneficiary and a nominee. The

document first says this:

13
14          MERS is a separate corporation that is acting solely as a nominee
            for Lender and Lender's successors and assigns. MERS is the
            beneficiary under this Security Instrument.[24]

15  And later it says this:

16
17          The beneficiary of this Security Instrument is MERS (solely as
            nominee for Lender and Lenders successors and assigns) and the
            successors and assigns of MERS.[25]

18

19

20

21  _____

22  [20]Docket #73.

23  [21]Docket #73, p. 9.

24  [22]Docket # 73, p. 8. (Emphasis added.)

25  [23]Docket #73, p. 1.

26  [24]*In re Mitchell*, #07-16226, Motion to Lift Stay (Docket # 30), Exhibit B, p. 2, Subpart

27  (E).

28  [25]*In re Mitchell*, #07-16226, Motion to Lift Stay (Docket # 30), Exhibit B, p. 3.

6

1    MERS' "Terms and Conditions"[26] identifies MERS' interests. The Terms and Conditions

2    say this:

3       *MERS shall serve as mortgagee of record with respect to all such*
        *mortgage loans solely as a nominee, in an administrative*
4       *capacity, for the beneficial owner or owners thereof from time to*
        *time. MERS shall have no rights whatsoever to any payments*
5       *made on account of such mortgage loans, to any servicing rights*
        *related to such mortgage loans, or to any mortgaged properties*
6       *securing such mortgage loans.* MERS agrees not to assert any
        rights (other than rights specified in the Governing Documents)
7       with respect to such mortgage loans or mortgaged properties.
        References herein to "mortgage(s)" and "mortgagee of record"
8       shall include deed(s) of trust and beneficiary under a deed of trust
        and any other form of security instrument under applicable state
9       law.

10   (Emphasis added.)

11       A "beneficiary" is defined as "one designated to benefit from an appointment,

12   disposition, or assignment . . . or to receive something as a result of a legal arrangement or

13   instrument." BLACK'S LAW DICTIONARY 165 (8ᵗʰ ed. 2004). But it is obvious from the MERS'

14   "Terms and Conditions" that MERS is not a beneficiary as it has no rights whatsoever to any

15   payments, to any servicing rights, or to any of the properties secured by the loans. To reverse an

16   old adage, if it doesn't walk like a duck, talk like a duck, and quack like a duck, then it's not a

17   duck.[27]

18       But more importantly, even if MERS is the nominee of the beneficiary, or the motion was

19   brought by the beneficiary, that mere allegation is not sufficient to confer standing.

20       Under Nevada law a negotiable promissory note[28] is enforceable by: (1) the holder[29] of the

21   _____

22       [26]"MERS Terms and Conditions" filed in *Dart* (#08-11007) at ¶ 2, Docket #47-7.
23   (Emphasis added.)

24       [27]The court is aware of at least one case in this district, *Elias v. Homeeq Serv.*, 2009 WL
     481270 (D. Nev. 2009)(slip copy), in which MERS has been found to have standing to foreclose
25   as a nominee beneficiary of a deed of trust. While the court in *Elias* found the deeds of trust,
26   notices of foreclosure, and the trustee's deed upon sale established MERS' standing, there is
     nothing in the opinion to suggest that MERS lacked possession of the notes.
27
         [28]The court assumes, without deciding, that the notes in question are negotiable
28   instruments. If they aren't, then custom and practice will treat them as if they are. For example,

7

1  note, or (2) a nonholder in possession of the note who has the rights of a holder.[30]  Thus if MERS

2  is not the holder of the note, then to enforce it MERS must be a transferee in possession who is

3  entitled to the rights of a holder or have authority under state law to act for the holder. Simply

4  being a beneficiary or having an assignment of a deed of trust is not enough to be entitled to

5  foreclose on a deed of trust. For there to be a valid assignment for purposes of foreclosure both

6  the note and the deed of trust must be assigned. A mortgage loan consists of a promissory note

7  and a security instrument, typically a mortgage or a deed of trust.[31]  When the note is split from

8  the deed of trust, "the note becomes, as a practical matter, unsecured." RESTATEMENT (THIRD) OF

9  PROPERTY (MORTGAGES) § 5.4 cmt. a (1997). A person holding only a note lacks the power to

10  foreclose because it lacks the security, and a person holding only a deed of trust suffers no

11  default because only the holder of the note is entitled to payment on it. *See* RESTATEMENT

12  (THIRD) OF PROPERTY (MORTGAGES) § 5.4 cmt. e (1997). "Where the mortgagee has

13  'transferred' only the mortgage, the transaction is a nullity and his 'assignee,' having received no

14  interest in the underlying debt or obligation, has a worthless piece of paper." 4 RICHARD R.

15  POWELL, POWELL ON REAL PROPERTY, § 37.27[2] (2000).

16         Given this, it is troubling that MERS apparently believes that in states such as Nevada

17

18  _____

19  under N.R.S. § 104.9012(tt), Nevada's Article 9, an "instrument" is defined as a negotiable
   instrument, "or any other writing that evidences a right to the payment of a monetary
20  obligation . . . and is of a type that in ordinary course of business is transferred by delivery with
   any necessary endorsement or assignment." "Instruments" are thus defined somewhat broadly
21  according to ordinary business practices.

22
         [29]A "holder" is the person in possession of a negotiable instrument that is payable either
23  to a bearer or to an identified person who has possession. N.R.S. § 104.1201(u)

24
         [30]N.R.S. § 104.3301. A negotiable promissory is also enforceable under N.R.S.
25  § 104.3301(c) by a nonholder of a note that has been stolen, destroyed, or paid by mistake. There
   has been no allegation in this case making this provision relevant here.
26

27         [31]Nevada recognizes that parties may secure the performance of an obligation or the
   payment of a debt by means of a deed of trust. N.R.S. § 107.020. The maker of the note is the
28  trustor and the payee is the beneficiary.

8

1    possession of the note is not required if no deficiency is sought.[32]  Hultman says this in his

2    declaration:

> In non-judicial foreclosure states, if the Member chooses to have
> MERS foreclose under the power of sale provision in the security
> instrument and is not seeking a deficiency judgment, then the note
> does not need to be in the possession of the Member's MERS
> Certifying Officer when commencing the foreclosure action;
> provided, however, that under no circumstances may the Member
> allege that the note is in MERS possession and seek enforcement
> of the note unless MERS actually possesses the note.[33]

7

8         This distinction between judicial and non-judicial foreclosure states, or deficiency and

     non-deficiency ones, is one which MERS has designed out of whole cloth. In order to foreclose,
9
     MERS must establish there has been a sufficient transfer of both the note and deed of trust, or
10
     that it has authority under state law to act for the note's holder. *See* RESTATEMENT (THIRD) OF
11
     PROPERTY (MORTGAGES) § 5.4 cmt. c (1997). *See also*, *In re Vargas*, 396 B.R. 511, 516-17
12
     (Bankr. C.D. Calif. 2008).
13
### DOES MERS HAVE STANDING AS THE AGENT OF THE MEMBER OR IN ITS OWN RIGHT?
14

15        The mere statement that the movant is a member of MERS does nothing but lay the

16   groundwork for agency. In order to enforce rights as the agent of the holder, MERS must

17   establish that its principal is entitled to enforce the note. Motions brought by MERS as nominee

18   could meet the threshold test of standing, and MERS might be the "real party in interest" under

19   FED. R. CIV. P. 17, if MERS is the actual nominee of the present Member who is entitled to

20   enforce the note. Under Rule 17 a party in interest is any party to whom the relevant substantive

21   law grants a cause of action. *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1038 (9th Cir.

22   1986). Counsel for MERS acknowledged during oral argument that MERS is the agent for its

23

24   ——————————————

25        [32]Despite MERS' contention that the mere status as a beneficiary or nominee of a
     beneficiary is sufficient, MERS has tried to withdraw most of its motions because it could not
26   ascertain that its Member had possession of the note when the motion was filed. *See* Hultman
     Declaration at p. 4, Docket #74; Docket #49 at p.11; and Docket #47, Exhibit D in *Dart*).
27

28        [33]Hultman Declaration, Docket #74, ¶ 4.

9

1   members only.[34] If a note has been transferred to a non-member, then MERS cannot act as the

2   agent. One cannot assume that just because MERS was named as the initial nominee in the deed

3   of trust that it still retains that relationship with the holder of the note. Moreover, by virtue of the

4   fact that some of the motions were filed even after the note was transferred out of the MERS

5   system, it is apparent that MERS has not tracked (or been appropriately advised of) the

6   assignment of the note to a non-member. For example in *Moore*,[35] MERS brought a motion to

7   lift-stay in February 2008 as nominee for Quick Loan Funding.[36] Later, in July 2008, an amended

8   lift-stay motion was brought by GRP Loan in *Moore*.[37] Exhibit C to the amended motion shows

9   that an assignment of the deed of trust was made from MERS to GRP on February 27, 2007,

10  which pre-dates MERS' lift-stay motion.[38] Similarly, in *Mercado*,[39] a matter which was added to

11  the argument calendar after the order for joint briefing,[40] MERS brought a motion to lift-stay as

12  nominee for MILA.[41] However, as seen in a later stipulation to sell the property,[42] Homecomings

13  Financial Network was the entity who was entitled to enforce the note.

14          In the remaining cases, MERS has attempted to establish its standing through the

15  affidavits of "Certifying Officials." Under the Membership Agreement, MERS provides

16  Members a corporate resolution designating one or more employees of the Member a MERS

17  Certifying Officer. This resolution, among other things, appoints the individual as an assistant

---

18

19          [34]*See also*, Docket #74, Hultman Declaration at ¶ 4.

20          [35]*Moore (*#07-16333).

21          [36]Docket #37 in *Moore*.

22          [37]Docket #59 in *Moore*.

23          [38]Docket #59, Exhibit C.

24          [39]#07-17690.

25

26          [40]Docket #44 in *Mercado*.

27          [41]Docket #28 in *Mercado*.

28          [42]Docket # 50, Exhibit 1 in *Mercado*.

10

1  secretary and vice president of MERS. They are given the power to "take any and all actions and

2  execute all documents necessary to protect the interest of the Member, the beneficial owner of

3  such mortgage loan, or MERS in any bankruptcy proceeding regarding a loan registered on the

4  MERS System that is shown to be registered to the Member.[43] There appears to be absolutely no

5  requirement that these Certifying Officers have any knowledge of the loan in question. From the

6  MERS website it appears that the "Certifying Official" (the person who works for the holder of

7  the note) is not an employee of the servicer either.[44]

8           In *Hawkins* the motion was brought by MERS "solely as nominee for Fremont Investment

9  & Loan, its successors and/or assigns."[45] However, in his affidavit at ¶ 6, Victor Parisi[46] states

10  that the beneficial ownership interest in the *Hawkins* note was sold by Fremont Investment &

11  Loan and ownership was transferred by endorsement and delivery. While the affidavit goes on to

12  the say that MERS was a holder at the time the motion was filed, it is obvious that MERS has no

13  rights to bring the motion as nominee of Fremont given that Fremont no longer had any interest

14  in the note.

15           Similarly, in *Ziegler*[47] the motion was brought by MERS "solely as nominee for Meridias

16  Capital, Inc., its successors and/or assigns."[48] Yet the affidavit of Stacey Kranz at ¶ 6 states that

17  "the beneficial ownership interest in the Zeigler Note was sold by Meridias and ownership was

18  transferred by endorsement and delivery. The Zeigler Note was subsequently endorsed in

19

20  _____

21       [43]Form Corporate Resolution, attached to Exhibit C to the Hultman Declaration, filed in
    *Dart*, #08-11007.

22       [44]The website says that "[a]fter your mortgage loan closed, your lender more than likely
23  outsourced the job of managing your loan to another company called a SERVICER. This is the
    company you call when you have questions about your loan."

24
25       [45]Docket #28 in #07-13593.

26       [46]Docket #49, Exhibit C, and Docket #56, Exhibit A in *Mitchell*.

27       [47]#08-10718.

28       [48]#08-10718, Docket #21.

11

blank.”[49] An additional affidavit was filed by German Florez, the president of Meridias, who disavowed “any interest in the Note and Deed of Trust regarding the Subject Property.”[50]

A slightly different defect exists *Dart*. That motion was brought by MERS “solely as nominee for Centralbanc Mortgage, its successors and/or assigns.”[51] However, Ms. Mech, as Certifying Officer, testifies that the note is held by Bank of America, who is listed as the current servicer, and who “had (or has) physical possession of the note in its files.”[52] In a previous affidavit, Ms. Mech testified that “the beneficial ownership interest in the Dart Note was sold by Centralbanc and ownership was transferred by endorsement and delivery.  The Dart Note was subsequently endorsed in blank.”[53]

So while in each of these cases MERS may really be contending that is it entitled to enforce the note in its own right through possession, or as the nominee of the transferee, the motion was brought instead as nominee of an entity that no longer has any ownership interest in the note.

Additionally, each motion has been brought in the name of the lender and “its successors and/or assigns.” Under FED. R. CIV. P. 17 an action must be prosecuted in the name of the real party in interest. “As a general rule, a person who is an attorney-in-fact or an agent solely for the purpose of bringing suit is viewed as a nominal rather than a real party in interest and will be required to litigate in the name of his principal rather than in his own name.” 6A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE §1553 (2d ed. 1990). An agent with ownership interest in the subject matter of the suit is a real party in interest. *Id.* There is no evidence, however, of an agency relationship here or that MERS has any ownership interest

---

[49]Docket #56, Exhibit C-1 in *Mitchell*.

[50]Docket #56, Exhibit C-3 in *Mitchell*.

[51]Docket #25 in *Dart* (#08-11007).

[52]Docket #81-1 at ¶ 4 in *Mitchell*.

[53]Docket #49-1 at ¶ 6 in *Mitchell*.

12

1    making it the real party in interest under Rule 17.

2        **OTHER EVIDENCE PROBLEMS**

3        Even if the defects were ones of pure pleading,[54] the testimony in these cases is neither

4    competent nor admissible. Each of the affiants in the remaining cases testify as follows:

5            I have been appointed as Assistant Secretary of Mortgage
             Electronic Registration Systems., Inc. ("MERS") under a
6            Corporate Resolution that was executed on [date]. I make this
             affidavit in support of Movant. I have reviewed the loan file
7            relating to the above-referenced matter, and if called upon to testify
             as to the facts set forth in this Affidavit, I could and would testify
8            competently based upon my review.

9        The affiant then purports to set forth the history of the negotiation and transfer of the note

10   and who now has possession.[55]

11       First, this testimony is not admissible because there is no evidence that the affiants are

12   competent witnesses. The Federal Rules of Evidence apply in bankruptcy[56] yet there is no

13   evidence that these Certifying Officers have adequate personal knowledge of the facts under Fed.

14   R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to

15   support a finding that the witness has personal knowledge of the matter.").[57]

16   _____

17       [54]For example, Mr. Hultman has stated that a number of motions were withdrawn because
18   they identified MERS as the payee under the note. Hultman Declaration, Docket #74 in *Mitchell*.

19       [55]For example Ms. Mech testifies in her affidavit (Docket # 81-1) that at the time MERS
20   filed the motion to lift stay in *Dart*:

21           Bank or America, who is listed as the current servicer on the Dart
             (MIN: 100233602006080675) loan registered on the MERS System,
22           had (and has) physical possession of the original notes in its files.
             MERS in turn has possession of those documents through a
23           MERS Certifying Officer who is an employee of the member
24           listed as servicer on the MERS System.

25       [56]Fed. R. Bankr. P. 9017.

26       [57]Stacey Kranz, "an Assistant Secretary of [MERS] under a Corporate Resolution"
27   testifies in *Zeigler* (#08-10718) that "MERS was in physical possession of the Zeigler Note at the
     time MERS filed the motion . . . ."(Docket #73 in *Zeigler* #08-10718). Mr. Victor Parsi, similarly
28   appointed, testifies in *Hawkins* that "MERS was a holder of the Hawkins Note at the time the

13

1    Ms. Mech's bald assertion that she has "reviewed the loan file" is inadequate to show that

2    she is personally knowledgeable of the facts. Neither are the purported notes and deeds

3    admissible. For business records to be admissible as an exception from the hearsay rule under

4    FED. R. EVID. 803(6) there must be a showing that the records were:

5        (1) made at or near the time by, or from information transmitted by, a person with
         knowledge;
6        (2) made pursuant to a regular practice of the business activity;
         (3) kept in the course of regularly conducted business activity; and
7        (4) the source, method, or circumstances of preparation must not indicate lack of
         trustworthiness.
8
     These elements must be established either by the testimony of the custodian or other
9
     qualified witness or must meet certification requirements. *See In re Vee Vinhnee*, 336 B.R. 437,
10
     444 (B.A.P. 9th Cir. 2005).
11
         **CONCLUSION**
12
         The lift-stay motions in *Dart* and *Hawkins* are denied. MERS may not enforce the
13
     notes as the alleged beneficiary. While MERS may have standing to prosecute the motion in the
14
     name of its Member as a nominee, there is no evidence that the named nominee is entitled to
15
     enforce the note or that MERS is the agent of the note's holder. Indeed, the evidence is to the
16
     contrary, the note has been sold, and the named nominee no longer has any interest in the note.
17
     **IT IS SO ORDERED.**
18

19

20

21

22

23

24

25

26

27   _____

28   Motion for Relief was filed in MERS name. . . ."(Docket #56-2 filed in *Mitchell*.)

14

1   Copies noticed through ECF to:

2   MICHELLE L. ABRAMS
    JEREMY T BERGSTROM
3   RAYMOND A. CARDOZO
    LAURA L. FRITZ
4   THOMAS J. HOLTHUS
    EDDIE R. JIMENEZ
5   LENARD E. SCHWARTZER
    ELSIE L. SECOQUIAN
6   U.S. TRUSTEE - LV

7   Copies noticed through BNC to:

8   JOSHUA & STEPHANIE MITCHELL
    1081 NORTH CLIFF CREEK
9   MERIDAN, IO 83642

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              15