The Honorable Robert S Lasnik

JAMES MCDONALD
14840 119th PL NE
Kirkland, WA 98034
Phone (425) 210-0614
In Pro Per

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

In Re:                                )        NO.: C10-1952RSL
                                       )
                                       )
JAMES MCDONALD                         )
                Plaintiff              )
        v                              )        Motion for Temporary Restraining Order
ONEWEST BANK, FSB, et al.,             )        And Preliminary Injunction
                Defendants.            )
                                       )
_____)

TO:     CLERK OF THE U.S. DISTRICT COURT
        HEIDI E. BUCK, Attorney for Defendants

I. <u>Nature of Motions for Temporary Restraining Order and Preliminary Injunction and Relief</u>

<u>Requested</u>

Plaintiff James McDonald comes now before the Court and hereby moves for a temporary restraining order

and preliminary injunction, enjoining a pending non-judicial foreclosure sale of that Certain Deed of Trust

recorded under King County Records recording number 20070110002077. The three Defendants, against

whom the injunctive relief is sought, with brief description of the acts to be enjoined, are:

1.1 Defendant Northwest Trustee Services, Inc (hereafter Northwest Trustee) the reputed successor

        trustee, per the "Notice of Trustee Sale", recorded under King County Records No. 20100216001242,

        whom Plaintiff requests be enjoined from acting as successor trustee in regards to that certain Deed of

        Trust recorded under King County Records No. 20070110002077.

1.2 Defendant OneWest Bank, FSB (Hereafter OneWest), as the alleged successor in interest of Mortgage Electronic Registration System (hereafter MERS), whom Plaintiff requests be enjoined from ordering or requesting a non-judicial foreclosure as the reputed owner/holder/beneficiary of the Deed of Trust recorded under King County Records No. 20070110002077, together with the original note referenced therein, per the "Assignment of Deed of Trust" filed in King County Records No. 20100204000502; the "Notice of Trustee Sale" recorded under King County Recording No. 20100216001242; and the "Amended Notice of Trustee Sale" recorded under King County Recording No. 20101104001321.

1.3 Defendant MERS as the nominal beneficiary of the Deed of Trust recorded under King County Recording No. 20070110002077, together with the original note referenced therein and the "Assignment of Deed of Trust" filed in King County Records No. 20100204000502.

## II. Statement of Facts

2.1 **Original Lender was IndyMac Bank, FSB;  Identification of Original Borrowers and Trustee Named in Deed of Trust.** (EXHIBIT A)

The original lender on Loan No. 125049243 which is one of the subjects of this lawsuit was Indymac Bank, FSB.  The promissory note in that loan was secured by the deed of trust dated January 8, 2007 recorded in the King County Auditor Records January 8, 2007 Recording No. 20070110002077.  The trustee named in the deed of trust is Pacific Northwest Title Insurance Co, Inc.   The borrower (who signed the note) James McDonald is the sole owner of the real property in question.

2.2 **The Legal Description of the Property**

LOT 18, THE HIGH WOODLANDS DIV. NO. 3,

ACCORDING TO THE PLAT THEREOF RECORDED IN

VOLUME 85 OF PLATS, OAGES 30 THROUGH 32,

INCLUSIVE, IN KING COUNTY, WASHINGTON.

Tax Parcel Number: 328830-0180-03

Site Address: 14840 119th PL NE, Kirkland, WA 98034

2.3 **Deed of Trust Details**

That Deed of Trust stated that it secured payment of a promissory note also dated January 8, 2007 in the original principal amount of $389,481.60. The Deed of Trust named:

2.3.1 **Lender**: Indymac Bank, FSB

2.3.2 **Beneficiary:** Mortgage Electronic Registration Systems "MERS"

2.3.3 **Trustee**: Pacific Northwest Title Insurance Co., Inc

2.3.4 **Borrower**: James McDonald (who signed the note) as sole owner of the property.

## 2.4 ASSIGNMENT OF DEED OF TRUST, FILED BY ONEWEST BANK IN KING COUNTY RECORDS

### RECORD #20100204000501 SIGNED JANUARY 27, 2010 (EXHIBIT B)

2.4.1    This assignment was signed by Brian Burnett as Vice President of MERS. Brian Burnett is a known robo-signer.

2.4.2    Per San Pedro's declaration Brian Burnett is not in fact an employee of MERS but has a title and signing authority for MERS. However Defense has not provided any documentation proving this claim.

## 2.5 NOTICE OF DEFAULT DATED JANUARY 12, 2010 (EXHIBIT C)

2.5.1    Page 2 Section K states "The beneficiary of the deed of trust is ONEWEST BANK, FSB". This statement is false. Even assuming the assignment relied upon by Defendants is valid, which Plaintiff disputes, OneWest was not assigned any interests to the Deed of Trust until 15 days after the Notice of Default was executed. This is a blatant violation of the perquisites to a Trustee Sale provided in RCW 61.24.030(8):

> "That at least thirty days before notice of sale
> shall be recorded, transmitted or served, written
> notice of default shall be transmitted by the
> beneficiary…"

2.5.2    **Charges**

2.5.2.A Page 2 Section D lists a title report charge of $985. As plaintiff has a background in real estate this seems to be an extremely high fee for this type of service. Plaintiff is concerned that this may be an inaccurate and inflated charge.

2.5.3    **BENEFICIARY DECLARATION PURSUANT TO CHAPTER 61.24 RCW (SB 5810).**

2.5.3.A This declaration states that the beneficiary of the loan is OneWest Bank, FSB.

2.5.3.B It was signed on January 7, 2010. THIS WAS 20 DAYS BEFORE THE ASSIGNMENT OF DEED OF TRUST!

2.5.3.C It was signed UNDER PENALTY OF PERJURY by Erica A Johnson-Seck, one of the most notorious robo-signers in the industry.

2.5.3.D Seck declared in deposition that she does not personally review the documentation that she signs under oath *Indymac v Machado*.

2.5.3.D.1  The deposition mentioned above further disproves that San Pedro can make a true statement that all persons who conduct work on the loans at OneWest Bank have personal knowledge of the accuracy of the information.

2.5.3.E  The Notice of Default is in violation of RCW 61.24 by making false statements about who the beneficiary was at the time of its creation and execution.

## 2.6  Qualified Written Request and Debt Validation Demand (EXHIBIT D)

Plaintiff sent to Defendants a combined Qualified Written Request and a Debt Validation Demand (Exhibit D) sent via First Class Certified Mail on April 27, 2010. As part of the request, Plaintiff requested a complete and accurate chain of title of the Note showing any transfers of interests including copies of any Servicing and Pooling Agreement and any information regarding the loan's securitization and placement in an investment trust.

2.6.1 **The Certified Mail Receipt Numbers Are:**

2.6.1.A Indymac Bank, FSB #7009225000001615

2.6.1.B Indymac Mortgage Services #70092250000016152196

2.6.1.C MERS #70092250000016152264

2.6.2 MERS made no response

2.6.3 Indymac Bank, FSB did not respond.

2.6.4 On May 18th, 2010 OneWest responded on behalf of Indymac Mortgage Services to the request by declining to answer the questions set forth with the exception that Freddie Mac was the investor on the loan.

## 2.7  Freddie Mac Statement on Its Single Family Dwelling Lending (EXHIBIT E)

As previously stated in the original COMPLAINT, **Freddie Mac does not retain loans** it has purchased. According to Freddie Mac's website, "In our Single-Family business we use mortgage securitization to fund millions of home loans every year. Securitization is a process by which we purchase home loans that lenders originate, put these loans into mortgage securities that are SOLD in global capital markets, and recycle the proceeds back to lenders."

2.7.1 If Freddie Mac was the investor, they sold the loan as part of the process of doing business. Who was the loan sold to? What security was it sold in? Who now is the true owner of the mortgage? As LAW HERE states only the OWNER of the promissory note can initiate foreclosure proceedings. Who directed the agent/custodian to begin this process? And why have the Defendants not been forthwith with this information?

## 2.8 Freddie Mac's Home Assistance Program Shows (Exhibit F)

As provided in Complaint, Plaintiff verified that Freddie Mac, a non-party, claims to be the owner of the Promissory Note. However this too conflicts with their statement on their website that they resell mortgages that they have purchased. Therefore it is unlikely Freddie Mac is the current owner of the Note.

## III. Arguments

### 3.1 The Notice of Default is Invalid

3.1.1 The Notice of Default acts as the first step in the non-judicial foreclosure process in the state of Washington under RCW 61.24. Defendants OneWest Bank claimed to be the beneficiary on January 7, 2010 (see above). However the Assignment of the Deed of Trust, valid or invalid, was not signed until January 27th, 2010. This is a blatant violation of the perquisites to a non-judicial trustee sale defined in RCW 61.24.030(8). Plaintiff thereby moves the court to rule the Notice of Default is invalid and provide a preliminary injunction against Defendants for moving ahead with their attempts to conduct a trustee sale regarding 14840 119th PL NE, KIRKLAND, WA 98034.

3.1.2 **Erica A Johnson-Seck made a false statement under penalty of perjury.** Seck claimed and signed that OneWest Bank, FSB was the beneficiary of the obligation and security instrument on January 7, 2010. The Assignment of the Deed of Trust did not take place until 20 days after. Therefore Seck may have committed perjury. Plaintiff moves the court to rule whether or not Seck committed perjury and to take appropriate steps based on the ruling.

3.1.3 **The Notice of Default is in violation of RCW 61.24.030(8)(2).** This is true because the actual beneficiary at the time of the creation and execution of the document was not OneWest Bank, FSB. However, Defendant OneWest claimed to be the beneficiary and executed the declaration. As this is the initial requisite to trustee sale and does not comply with law, any and all other actions conducted by all Defendants in motion to conduct a trustee sale should be held as invalid.

> (2) A notice of default issued under RCW 61.24.030(8) must include a declaration, as provided in subsection (9) of this section, from the beneficiary or authorized agent that it has contacted the borrower as provided in subsection (1)(b) of this section, it has tried with due diligence to contact the borrower under subsection (5) of this section, or the borrower has surrendered the property to the trustee, beneficiary, or authorized agent. Unless the trustee has violated his or her duty under RCW 61.24.010(4), the trustee is entitled to rely on the declaration as evidence that the requirements of this section have been satisfied, and the trustee is not liable for the beneficiary's or its authorized agent's failure to comply with the requirements of this section.

3.1.4 In *Indymac Federal Bank, FSB, v Machado* (Fifteenth Circuit Court in and for Palm Beach County, Florida, Case No. 50 2008 CA 037322XXXX MB AW) admitted that she does not personally review the documentation relating to the case before signing documents. The following is an excerpt from the deposition.

Q. Okay. *How many documents would you say that you sign on a week on average, in a week on average?*

A. I could have given you that number if you had that question in there because I would brought the report. However, I'm going to guess, today I saw an e-mail that 1,073 docs are in the office for signing. So if we just — and there's about that a day. So let's say 6,000 a week and I do probably — let's see. There's eight of us signing documents, so what's the math?

Q. *Six thousand divided by eight, that gives me 750..*

A. *That sounds, that sounds about right.*

Q. Okay. That would be a reasonable estimate of how many you sign, you personally sign per week?

A. Yes.

Q. And that would include Lost Note Affidavits, Affidavits of Debt?

A. Yes.

Q. What other kinds of documents would be included in that?

A. Assignments, declarations. I can sign anything related to a bankruptcy or a foreclosure.

Q. *How long do you spend executing each document?*

A. *I have changed my signature considerably. It's just an E now.*

*So not more than 30 seconds.*

Q. *Is it true that you don't read each document before you sign it?*

A. *That's true.* [*Emphasis added*]

Q. Take me through the procedure for getting your actual signature on the documents once they've gone through this quality control process?

A. The documents are delivered to me for signature and I do a quick purview to make sure that I'm not signing for an entity that I cannot sign for. And I sign the document and I hand it to the Notary, who notarizes it, who then hands it back to LPS who uploads the document so that the firms know it's available and they send an original.

3.1.5 Seck goes on to admit in this disposition that the notary is not even in the same room with her when she signs the documents and they are not necessarily notarized on even the same day. As she states this is common practice for OneWest. Therefore all notarized documents from this company are questionable in authenticity.

James McDonald
14840 119th PL NE, Kirkland, WA 98034

1    Q. Are all the documents physically, that you were supposed to
     sign, are they physically on your desk?

2    A. Yes.

3    Q. You don't go somewhere else to sign documents?

4    A. No.

5    Q. *When you sign them, there's no one else in your office?*

6    A. *Sometimes.*

7    Q. *Well, the Notaries are not in your office, correct?*

8    A. *They don't sit in my office, no.*

9    Q. *And the witnesses who, if you need witnesses on the*
10   *document, are not sitting in your office?*

11   A. *That's right.*

12   Q. So you take your ten minutes and you sign them and then you
13   give them to the supervisor of the Notaries, correct?

14   A. I supervise the Notaries, so I just give them to a Notary.

15   Q. You give all, you give the whole group that you just signed to
     one Notary?

16   A. Yes. [*Emphasis added*]

17   Q. I'm mostly interested in how long it takes for the Notary to
18   notarize your signature.

19   A. I can't say categorically because the Notary, that's not the only
     job they do, so.

20   Q. In any event, it doesn't have to be the same day?

21   A. No.

22   Q. When they notarize it and they put a date that they're
23   notarizing it, is it the date that you signed it or is it the date that
     they're notarizing it?

24   A. I don't know.

25   Q. *When you execute a sworn document, do you make any kind*
26   *of a verbal acknowledgment or oath to anyone?*

27   A. *I don't know if I know what you're talking about. What's a*
     *sworn document?*

28

---

Motion for TRO & Preliminary Injunction         -7-              James McDonald
                                                       14840 119th PL NE, Kirkland, WA 98034

Q. Well, an affidavit.

A. Oh. No.

Q. *In any event, there's no Notary in the room for you to —*

A. *Right.*

Q. *— take an oath with you, correct?*

A. *No there is not.*

Q. *In fact, the Notaries can't see you sign the documents; is that correct?*

A. *Not unless that made it their business to do so?*

Q. *To peek into your office?*

A. *Yes. [Emphasis added]*

## 3.2 The Appointment of Successor Trustee contains false statements

3.2.1 Suchan Murray signed this document stating, "The undersigned present beneficiary WARRANTS and represents that, as of the date this Appointment of Successor Trustee has been executed and acknowledged, it is the OWNER and holder of the obligation...". This is false according to the Defendants evidence in the Declaration of San Pedro where he confirms Freddie Mac was or is the investor/owner of the mortgage.

3.2.2   As OneWest Bank was and is NOT the owner of the obligation, rather allegedly a servicer or agent of whoever the owner truly is, Plaintiff moves the court to rule on possible perjury against Suchan Murray.

3.2.3   Suchan Murray is a known "robo-signer" along with Seck and Brian Burnett.

## 3.3 OneWest Bank FSB claims to be in possession of the Note

3.3.1 While OneWest claims to be the holder and in possession of the Note, due to the FACTS identified above in the evidence the Defendants are relying upon, the veracity and authenticity of any documents presented by the Defendants should be seriously questioned by the Court.

3.3.2 OneWest provided a PHOTOCOPY of the Note in their list of exhibits contained within their Opposition. The Plaintiff also provided a PHOTOCOPY of the note in his exhibits within the Original Complaint. Where exactly is the original? Can Pedro testify he has personally seen the original? He does not declare it so it is unlikely. All the Defendants have shown is that they have a photocopy in their possession. Even if they have the original this does not by default grant them holder status.

3.3.3 In *Indymac v Machado* Seck testifies that the Note had to be requested from the trustee of the Security Pool in which it was a part of. If that is what happened in that case, how do we truly know that OneWest is indeed in possession?

3.3.4 It would appear from the above described declarations that OneWest Bank FSB would be holding the note in some capacity other than a "holder" as described in 3.4 below.

## 3.4 There are significant gaps in the "chain of title" to the Note

3.4.1 OneWest does not meet the conditions to be a holder or holder in due course according to RCW 62A.3-302.

3.4.1.A   (2) The holder took the instrument **(i) for value**, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in RCW 62A.3-306, and (vi) without notice that any party has a defense or claim in recoupment described in RCW 62A.3-305(a).

3.4.1.B OneWest states in the Declaration of JC San Pedro that it is not the owner of the Note. Therefore under 62A.3-302 it is not a true holder and has no rights therewith to enforce the financial instrument as it did not take the instrument for value. OneWest has yet to provide Plaintiff with adequate responses to Plaintiff's requests that it has the proper rights and authority to collect and/or foreclose and that the amounts OneWest is attempting to collect are accurate. If OneWest is, in fact, currently holding the signature original note it would appear that it would only be holding the note in an agency capacity and would therefore not be the "beneficiary" as defined in 61.24 *et seq* and "holder" as defined in 62A *et seq*. Nor has OneWest provided any evidence to show that it is authorized to act as an agent for the true owner and holder in due course.

3.4.2 The original lender on the Note was Indymac Bank FSB. However Indymac never recorded any assignments or indorsements to any party whatsoever.

3.4.3 If Indymac did indeed sell the loan to Freddie Mac, Freddie Mac did not record an assignment or indorsement to any party at the time it sold the Note. As stated above in 1.C.1 Freddie Mac does not retain mortgages but sells them. Due to the lack of a proper assignment it is unknown who Freddie Mac sold the loan to and as such which, if any, of the named Defendants has any lawful rights and/or authority to collect or foreclose. Until a full and complete "chain of title" of the note and proper accounting is given, Plaintiff is in danger of future parties coming with a real benefit interest.

3.4.4    Due to this lack of certainty as to which of the Defendants, if any, Freddie Mac or some unknown party holds both physical possession of the signature original note and is entitled

as the holder in due course and therefore has the proper rights and authority to foreclose provides Plaintiff relief under RCW 62A.3-309(c)

"The court may not enter judgment in favor of the person

seeking enforcement unless it finds that the person required to

pay the instrument is adequately protected against loss that

might occur by reason of a claim by another person to enforce

the instrument…"

3.5 **Defendants States that OneWest, as the holder of the Note, is the party who has "standing" and is entitled to foreclose is unproven.**

3.5.1 Defendants have failed to prove that OneWest is in possession of the original signed note. Their only claim to that is the questionable declaration provided in the Defendants' Opposition by JC San Pedro who does not state that he has personally seen the original signed Note.

3.5.2 Defendants maintain that RCW 61.24.005(2) gives them standing as beneficiary is incorrect. "Beneficiary" means the <u>holder</u> of the instrument or document evidencing the obligations secured by the deed of trust, excluding persons holding the same as security for a different obligation." OneWest may or may not be in possession of the Note but it is not qualified as a holder of the note.

3.5.2.A RCW 62A.3-302 states the definition of holder is a party that took the instrument for VALUE. OneWest is claiming no ownership rights, nor are they claiming they took the Note for value, therefore they do not qualify as a holder of the Note. At best, they are a custodian of the Note which as yet remains to be proven by the Defendants.

3.5.2.B In the event that OneWest is acting as a custodian or agent OneWest would need to have some agreement that establishes that authority. Furthermore, the party that provided OneWest with that authority would have to meet the requirements identified above to be the "holder" and "beneficiary" of the Note referenced in the Deed of Trust identified in this case.

3.6 **The Loan May Be Securitized**

3.6.1 In a mortgage backed security (MBS) that follows all applicable federal and state laws and applicable accounting principles it may be possible to foreclose on a property. However it remains to be seen if whatever MBS the Note was **sold** into follows proper procedures and who is authorized to act as its agent.

3.6.2 Most parties acting on behalf of an MBS Trust have their powers spelled out within the terms of the Pooling and Service Agreement ("PSA") or other governing documents for that Trust. Most PSA's grant only limited powers to MBS Trustee's. They do not grant them the power to stand in the shoes of the real party in interest unless there is a special document signed by at least a

certain percentage of the MBS certificate holders granting the MBS Trustee special powers pertaining to specific claims and litigation. Full authority to act on behalf of the Trust must include the authority to enter into compromise settlements in litigation.

3.6.3 Plaintiff has reason to believe the Note in question is part of a MBS. Plaintiff has shown in Freddie Mac's own words that they do not retain loans purchased from lenders but sells them into the global market. That in and of itself gives credence that the Note has been sold by Freddie Mac to an unknown party, most likely an investment trust

3.6.4 The only reason Plaintiff does not have a copy of the MBS that the loan was sold into is that Defendant OneWest refused to provide it (**EXHIBIT D**). If it is a MBS that complies with all federal and state laws as well as all accounting principles there should be no reason for OneWest to have withheld the information upon request. In fact this reluctance to provide documentation leads Plaintiff to believe there is some type of violation that Defendants are attempting to keep hidden from this Court and Plaintiff. If this is proven to be true it would most definitely be a violation of Defendants duty of good faith and honesty owed to Plaintiff per RCW 61.24.010(4).

3.6.5 Further, it remains to be seen that OneWest is entitled to act as an agent for the MBS or the trustee of the MBS as they have only asserted a servicing agreement for the time period that Freddie Mac may have owned the loan. They have made NO claim to have a servicing agreement with another party.

3.6.6 Pursuant to FRCP 17(a) and 19(a), the real party in interest is the only party that can proceed in this action on behalf of the beneficiary of the note in question and their joinder is required. FED.R.CIV.P.19 requires mandatory joinder of every person with an interest of every person with an interest in the note if not doing so could lead to inconsistent results in different proceedings affecting the same subject matter. *Kang Jin Hwang, supra at 7.* Foreclosure agents and servicers must prove they have authority to act for a party that has standing. *In re: Scott 376 B.R. 285 290 (Bankr. D. Idaho 2007), Kang Jin Hwang, 396 B.R. at 767; Jacobson, supra at 12.* A nominee or agent must also show that has actual authority from the true party in interest to act on its behalf and it cannot be assumed that it continues to have such authority even if granted it in the original deed of trust.

### 3.7 Defendant OneWest has provided no evidence that has an effective Servicing Agreement

3.7.1 In the Declaration of JC San Pedro for the Defendants' Opposition, San Pedro alleges a servicing agreement between OneWest and Freddie Mac exists, but does not provide

documentation to support that claim. In the event that such a document exists it is unclear what rights and privileges Freddie Mac has given to OneWest.

3.7.2 However, as stated in 3.6 above there is a strong likelihood that the note was sold into a MBS. San Pedro makes no claim to having any kind of agreement with the MBS or trustee of that MBS and therefore would have no right to collect payments or initiate a non-judicial foreclosure action on the real property as described above. In the unlikely event San Pedro forgot to mention such an agreement it is questionable whether OneWest would have the ability to initiate a non-judicial foreclosure as described further above in 3.6.

### 3.8 Defendant OneWest has violated RCW 61.24 et seq.

3.8.1 Defendant OneWest falsely claimed to be the beneficiary of the Deed of Trust on January 7, 2010 when issuing a beneficiary declaration for the Notice of Default thereby violating RCW 61.24.030(8).

3.8.2 OneWest violated RCW 61.24 et seq by causing Northwest Trustee Services to initiate non-judicial foreclosure proceedings on January 12, 2010 when it knew or should have known that no appointment of successor trustee had been signed or recorded.

### 3.9 Defendant Northwest Trustee has violated 61.24 et seq.

3.9.1 Northwest Trustee Services began duties as successor trustee before being legally appointed successor trustee as required by 61.24.010(2).

3.9.2 Plaintiff claims that Defendant Northwest Trustee Services has violated RCW 61.24.030 by not complying with the prerequisites required prior to issuing a Notice of Trustee Sale.

### 3.10 Northwest Trustee Services has Slandered Title

3.10.1 Plaintiff claims that Defendant Northwest Trustee Services has slandered title to the Real Property identified above by recording an unlawful Notice of Trustee Sale.

### 3.11 OneWest Bank FSB has Slandered Title

3.11.1 Plaintiff alleges that Defendant OneWest Bank have authorized Northwest Trustee Services to slander title to the Real Property identified above by recording an unlawful Notice of Trustee Sale.

3.11.2 Defendant OneWest slandered title by recording in King County records an Appointment of Successor Trustee by claiming to be the owner of the Note which according to the documents further described above it is not.

### 3.12 Defendants have used wrongful and unlawful foreclosure as an unfair and deceptive business practice

3.12.1 **Defendants have engaged in unfair and deceptive business practices**

3.12.1.A Plaintiff claims that Defendant(s) have all engaged together in a wrongful and unlawful foreclosure action as part of a plan executed between them by utilizing unfair and deceptive business practices in violation of RCW 19.86 *et seq*. The Defendants' unfair and deceptive business practices include:

> 3.12.1.A.1 Defendant Northwest Trustee failed to disclose it is associated with Defendant OneWest Bank's attorney firm and thereby has a conflict of interest.
>
> 3.12.1.A.2 Engaging an unauthorized party to initiate wrongful and unlawful foreclosure proceeding which is still scheduled under the wrongful and unlawful Notice of Trustee's Sale as per RCW 61.24 *et seq*.
>
> 3.12.1.A.3 Attempting to gain legal title to the Real Property concerned through the wrongful and unlawful foreclosure.

### 3.12.1.B Defendant Northwest Trustee has violated their duty of good faith

> 3.12.1.B.1 RCW 61.24.010(4) states "The trustee or successor trustee has a duty of good faith to the borrower, beneficiary and grantor".
>
> 3.12.1.B.2 Northwest Trustee Services prepared and served the Notice of Default described above dated January 12, 2010 (see I.A.v). However they were not appointed as successor trustee until January 27, 2010 (see I.A.i). They were not operating in good faith to Plaintiff as they had no right to act as trustee.
>
> 3.12.1.B.3 Routh, Crabtree and Olson lists Stephen Routh as the governing person with the Washington Department of Licenses and the Secretary of State (Exhibits G & H). Northwest Trustee Services lists Stephen Routh and David Fenell as the governing person(s) with the same departments (Exhibits I & J). Therefore both companies are owned in part or whole by Stephen Routh. All employees directly or indirectly report to Stephen Routh. Both companies are located at 3535 Factoria Blvd., Bellevue, Washington.
>
> 3.12.1.B.4 On or about January 15, Routh, Crabtree and Olson caused to be sent to the Plaintiff a letter identifying themselves as a "debt collector" for OneWest (Exhibit K). Northwest Trustee Services/RCO is in violation of this duty of good faith due to a serious conflict of interest. Stephen Routh obtains income for representing OneWest Bank and MERS for debt collection, legal representation and trustee services. There can be no good faith to all entities when Stephen Routh's companies are ganging up" with one side against another.

3.12.1.C **OneWest Bank caused to be issued a Notice of Default for a Deed of Trust in which it was not the beneficiary**

3.12.1.C.1 As described above in **3.1** OneWest attempted to deceive the Plaintiff by filing an invalid Notice of Default.

3.13 <u>Lack of Standing to Initiate or Take Part in a Non-Judicial Foreclosure</u>

3.13.1 Defendant MERS makes no claim to ownership of the Note and therefore has no standing to Foreclose.

3.13.2 Defendant Northwest Trustee makes no claim to ownership of the Note and therefore has no right to initiate non-judicial foreclosure proceedings.

3.13.3 Defendant OneWest does not have holder in due course status as stipulated in 62A.3-302 and therefore has no right to foreclose.

3.13.4 Further, OneWest has given no irrefutable evidence showing that there exists a Servicing Agreement between them and Freddie Mac giving them rights to Foreclose as an agent of Freddie Mac. Additionally, should Freddie Mac have SOLD the Note OneWest has not even made a claim to have such an agreement with the entity or individual that Freddie Mac sold the Note to. Therefore they cannot be considered an agent or custodian until such documentation is provided.

3.13.5 The holder of the note, identified as a "Beneficiary" in RCW 61.24 *et sec.* which is the only party with the proper standing to foreclosure, not the servicer or the collecting agent,  and as such must be so named in the pleadings. *Id; Kang Jin Hwang, supra; Vargas, supra.*

3.14 <u>Plaintiff Requests Strict Proof of Defendant's Claims of Right to Foreclose</u>

3.14.1 It has customarily been generally preferred in all Courts to not insist on strict application of the Rules of Evidence, in the interest of the efficient and inexpensive administration of justice. However, do to the facts identified above the veracity and authenticity of any documents presented by the Defendants should be seriously questioned by the court. It has been found that in the case of a "securtized" mortgage the governing documents of the securitization trust are not adequate to prove the authority to foreclosure  In a report dated Nov. 16, 2010, the Congressional Oversight Committee stated the following:

<u>Effects of Document Irregularities</u>

Effective transfers of real estate depend on parties' being able to answer seemingly straightforward questions: Who owns the property? How did they come to own it? Can

anyone make a competing claim to it? The irregularities have the potential to make these seemingly simple questions complex. As a threshold matter, a party seeking to enforce the rights associated with the mortgage must have standing in court, meaning that a party must have an interest in the property sufficient that a court will hear their claim and can provide them with relief.[28] For a mortgage, "[a] mortgage may be enforced only by, or in behalf of, a person who is entitled to enforce the obligation the mortgage secures."[29] Thus, the only party that may enforce the rights associated with the mortgage, with standing to take action on a mortgage in a court, must be legally able to act on the mortgage.30 Accordingly, standing is critical for a successful foreclosure, because if the party bringing the foreclosure does not have standing to enforce the rights attached to the mortgage and the note, that party may not be able to take the property with clear title that can be passed on to another buyer.31 Thus, if prior transfers of the mortgage were unsuccessful or improper, subsequent transfers of the property, such as a foreclosure or even an ordinary sale, could be affected. Further, failure to foreclose properly □ whether because the foreclosing party did not actually hold the mortgage and the note, or because robo-signing affected the homeowner's due process rights □ means that the prior homeowner may be able to assert claims against a subsequent owner of the property.32 In this way, documentation irregularities can affect title to a property at a number of stages…"

_Footnotes from Congressional Foreclosure Report._

[26] National Association of Attorneys General, _50 States Sign Mortgage Foreclosure Joint Statement_ (Oct.

13, 2010) (online at www.naag.org/joint-statement-of-the-mortgage-foreclosure-multistate-group.php) (hereinafter "50 State Sign Mortgage Foreclosure Joint Statement".)

[27] Cases involved suits against Bank of America (as the parent of loan originator Countrywide) claiming violations of representations and warranties and sought to enforce put-back provisions. _Greenwich Financial Services Distressed Fund 3 L.L.C. vs. Countrywide Financial Corp, et al._, 1:08-cv-11343-RJH (S.D.N.Y. Oct. 15, 2010);

*Footbridge Limited Trust and OHP Opportunity Trust vs. Bank of America*, CV00367 (S.D.N.Y. Oct 1, 2010).

[28] *See* Stephen R. Buchenroth and Gretchen D. Jeffries, *Recent Foreclosure Cases: Lenders Beware* (June 2007) (online at www.abanet.org/rppt/publications/ereport/2007/6/OhioForeclosureCases.pdf); *Wells Fargo v. Jordan, 914 N.E.2d 204 (Ohio 2009)* (If plaintiff has offered no evidence that it owned the note and mortgage when the complaint was filed, it would not be entitled to judgement as a matter of law."); Christopher Lewis Peterson, *Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System*, University of Cincinnati Law Review, Vol. 78, No. 4, at 1368-1371 (Summer 2010) (online at papers.ssrn.com/sol3/papers.cfm?abstract_id=1469749) (hereinafter "Cincinnati Law Review Paper on Foreclosure"); *MERSCORP, Inc. v. Romaine*, 861 N.E. 2d 81 (N.Y. 2006). Accordingly, a second set of problems relates to the chain of title on mortgages and the ability of the foreclosing party to prove that it has legal standing to foreclose. While these problems are not limited to the securitization market, they are especially acute for securitized loans because there are more complex chain of title issues involved.

[29] Restatement (Third) of Prop. (Mortgages) § 5.4(c) (1997). Only the proven mortgagee may maintain a foreclosure action. The requirement that a foreclosure action be brought only by the actual mortgagee is at the heart of the issues with foreclosure irregularities. If the homeowner or the court challenges the claim of the party bringing a foreclosure action that it is the mortgagee (and was when the foreclosure was filed), then evidentiary issues arise as to whether the party bringing the foreclosure can in fact prove that it is the mortgagee. The issues involved are highly complex areas of law, but despite the complexity of these issues, they should not be dismissed as mere technicalities. Rather, they are legal requirements that must be observed both as part of due process and as part of the contractual bargain made between borrowers and lenders.

[30] That party must either own the mortgage and the note or be legally empowered to act on the owner's behalf. Servicers acting on behalf of a trust or an originator do not own the mortgage, but by contract are granted the ability to act on behalf of the trust or the originator. *See* Federal Trade Commission, *Facts for Consumers(online at www.fic.gov/bcp/edu/pubs/consumer/homes/rea10.shtm) (accessed Nov. 12, 2010) ("In today's market, loans and the* rights to service them often are bought and sold. In many cases, the company that you send your payment to is not the company that owns your loan.") *See also* October 2010 SIGTARP Report, *supra* note 5, at 160 (describing clients of servicers).

[31] Laws governing the remedies available to a lender foreclosing on a property vary considerably. States also differ markedly in how long it takes the lender to foreclose depending on the available procedures. In general, claimants can seek to recover loan amounts by foreclosing on the property securing the debt. If the loan is "non-recourse," the lender only may foreclose upon the property, but if the loan is "recourse," the lender may foreclose upon the property and other borrower assets. Most states are recourse states. A loan in a recourse state allows a mortgagee to foreclose upon property securing a promissory note and, if that property is insufficient to discharge the debt, move against the borrower's other assets. In non-recourse states, recovery of the loan amount is limited to the loan collateral. Put another way, the lender cannot go after the borrower's other assets in a non-recourse state if the property is insufficient to discharge the debt. It is worth noting that even in recourse states, given the current economic climate, the mortgagees' recourse to the borrower's personal assets may be minimal relative to the costs and delay in pursuing and collecting on a deficiency judgments. *See* Andra C.Ghent and Marianna Kudlyak, *Recourse and Residential Mortgage Default: Theory and Evidence from U.S. States,* Federal Reserve Bank of Richmond Working Paper, No. 09-10, at 1-2 (July 7, 2009) (online at www.fhfa.gov/webfiles/15051/website_ghent.pdf).

[32] Christopher Lewis Peterson, associate dean for academic affairs and professor of law, S.J. Quinney College of Law, University of Utah, conversations with Panel staff (Nov. 8, 2010).

3.14.2 In addition, the Mass. Superior Court ruling referenced above which states:

"The judge did not err in concluding that the securitization documents submitted by the plaintiffs failed to demonstrate that they were the holders of the Ibanez and LaRace mortgages..."

Further in a separate writing to Mass. Superior court ruling above. Judge Cordy stated:

"I concur fully in the opinion of the court, and write separately only to underscore that what is surprising about these cases is not the statement of principles articulated by the court... but rather the utter carelessness with which the plaintiff banks documented the titles to their assets... the holder of an assigned mortgage needs to take care to ensure that his legal paperwork is in order. ... Foreclosure is a powerful act with significant consequences, and Massachusetts law has always required that it proceed strictly in accord with the statutes that govern it. As the opinion of the court notes, such strict compliance is necessary..."

3.14.3 **Plaintiff has identified significant gaps in proof of the history of ownership** and assignments of the Note that are necessary to prove the identity of the real party in interest and its connection to the party seeking to act on its behalf. These are so glaring that there must be strict compliance with the Rules of Evidence, such as those for competency of witness, personal knowledge, hearsay and authenticity, not to mention matters such as relevance of factual assertions contained in documents, and sufficiency of proof. Therefore, Plaintiff requests strict proof from any Defendant who claims the right to foreclose which proof should meet the following requirements:

    a.   The indorsements of the signature original promissory note were made to the proper entities at the proper time and in the proper sequence to show the history of transfers from the original lender/payee named on the note through to the current holder/owner of the note, all pursuant to applicable Washington State negotiable instruments law.

b.   That any assignments of the deed of trust were made to the same entities at the same time as any indorsements of the note secured by the deed of trust, so that the beneficial ownership of the deed of trust was not separated from the rightful ownership of the note.

That the person who claims the right to foreclose the deed of trust is either the real party in interest who owns and holds both the note and the deed of trust for its own benefit, or that is has authority to act and is acting for the rightful owner(s) and holder of the note and the beneficial interest in the deed of trust, whomever that may be

3.15 **Request for Temporary Restraining Order and Preliminary Injunction**

3.15.1 If Defendant Northwest Trustee Services is permitted to sell the property at a non-judicial sale, the rights and interests of the Plaintiff in the real property described above will be lost or otherwise thwarted, even though Plaintiff has filed this lawsuit. That will cause Plaintiff irreparable harm as described below in ( II.P.c.i ). Furthermore a non-judicial foreclosure sale is very unlikely to produce a reasonable value that will pay off the loan so whichever Defendant, if any, may be entitled to foreclose will lose by the foreclosure sale.  In any event, none of the Defendants are likely to be able to prove entitlement to foreclose, given the evidence apparently relied upon by Defendants.

3.15.2 **Based on the Violations and Invalidity of the Documents Described in II.A – II.O There is a Strong Likelihood of Success on the Merits with Respect to Plaintiff's Claims and a Preliminary Injunction is Appropriate**

Preliminary injunctions are appropriate where there is (1) a strong likelihood of success on the merits; (2) a possibility of irreparable injury not remediable by damages; (3) a balance of hardships in the Movant's favor; and (4) a public policy in favor of granting the relief. *Powell-Cerkoney v. TCR-Montana Ranch Joint Venture, II*, 176 Ariz. 275, 280, 860 P.2d 1328, 1333 (Ct App. 1993). This is further supported by one of the most cited federal appellate cases concerning the legal standard for issuance of preliminary injunctive relief is *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.,* 550 F.2d 189 (4th Cir. 1977), which concerned that plaintiff's appeal of the refusal of the Federal District Court to issue a

preliminary injunction under FRCP 65(a). The plaintiff was an authorized dealer of the defendant manufacturer.  The plaintiff's dealership was terminated by defendant in a manner that plaintiff claimed violated section 1 of the Sherman Act, and requested a preliminary injunction among other relief. The Court of Appeals reversed and remanded with instructions to issue a preliminary injunction. Id. 198.   The Court of Appeals, stated the fourfold equitable rules of thumb for the determination of whether preliminary injunctive relief should be granted under FRCP 65(a) as:

1)   Has the petitioner made a strong showing that it is likely to prevail upon the merits?

2)    Has the petitioner shown that without such relief it will suffer irreparable injury?

3)   Would the issuance of the injunction substantially harm other interested parties?

4)   Wherein lies the public interest?

The Court then discussed at length how the factors were to be weighed and evaluated by a trial court.  Id 192-197.  In essence, the Court ruled:

It is sufficient (to grant the motion) if the court is satisfied that there is a probable right and a probable danger, and that the right may be defeated, unless the injunction is issued, and considerable weight is given to the need for protection to the plaintiff as contrasted with probable injury to the defendant.

The Appellate Court in *Blackwelder,* 550, F.2d 194, 195 states:

The balance-of-hardship test correctly emphasizes that, where serious issues are before the court, it is a sound idea to maintain the status quo ante litem, provided that it can be done without imposing too excessive an interim burden upon the defendant, Munoz v. Porto Rico Light & Power Co., 83 F.2d 262, 269 (1st Cir. 1936); Benson Hotel Corp. v. Woods, 168 F.2d 694, 696 (8th Cir, 1948); Pratt v. Stout, 85 F.2d 172, 177 (8th Cir. 1936); Sinclair Refining Co., v. Midland Oil Co., supra, 55 F.2d at 45 (citing Blount v. Societe Anonyme Du Filtre, 53 F. 98, 101 (6th Cir. 1892)), for otherwise effective relief may become impossible:

The controlling reason for the existence of the judicial power to issue a temporary injunction is that the court may thereby prevent such a change in the relations and conditions of persons and

James McDonald
14840 119th PL NE, Kirkland, WA 98034

property as may result in irremediable injury to some of the parties before their claims can be investigated and adjudicated.

Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 743 n. 10 (2d Cir. 1953) (quoting Love v. Atchison, T. & S. F. Ry. Co., supra, 185 F. at 332).

The district court below erred in holding that plaintiff must first show "likelihood of success" in order to be entitled to preliminary relief. Instead, the first step in a Rule 65(a) situation is for the court to balance the "likelihood" of irreparable harm to the plaintiffs against the "likelihood" of harm to the defendant; and if a decided imbalance of hardship should appear in plaintiff's favor, then the likelihood-of-success test is displaced by Judge Jerome Frank's famous formulation:

(I)t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.

Hamilton Watch Co. v. Benrus Watch Co., supra, 206 F.2d at 740, 743; Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970).

The importance of probability of success increases as the probability of irreparable injury diminishes,

Delaware River Port Authority v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 923 (3rd Cir. 1974); Canal Authority of State of Florida v. Callaway, 489 F.2d 567, 576 (5th Cir. 1974); District 50, United Mine Workers v. United mine Workers, 134 U.S.App.D.C. 34, 412 F.2d 165, 168 (1969); Packard Instrument Co. v. ANS, Inc., 416 F.2d 943 (2d Cir. 1969);

and where the latter may be characterized as simply "possible," the former can be decisive. Even so, it remains merely one "strong factor" to be weighed alongside both the likely harm to the defendant and the public interest.

Dino De Laurentiis Cinematografica, SpA. V. D-150, Inc., 366 F.2d 373,375 (2d Cir. 1966) (quoting 3 Barron & Holtzoff, Federal Practice & Procedure, ¶ 1433 at 493 (1958)).

Among cases in accord see: *Abbott Laboratories v, Sandoz, Inc.,* 544 F.3d 1341, 1361, 1362, (Fed. Cir. 2008); *A&M Records v. Napster*, 239 F.3d 1004, 1013 (9th Cir. 2001); *L.J. By and Darr*

*v. Massinga*, 838 F.2d 118, 120-122, (4th Cir.1988);   *Smith International, Inc., v. Hughes Tool Company*, 718 F.2d 1573, 1577-1581, (Fed. Cir. 1983)

In *A&M Records v. Napster, supra,* at 239.F3d 1013, the Court stated:

      i.    Preliminary injunctive relief is available to a party who demonstrates either: (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardships tips in its favor.  Prudential Real Estate Affiliates, Inc. v. PRR Reality, Inc. 204 F.3d 867,874 (8th /Cir. 2000). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases

### 3.15.3 **Strong Likelihood of Success on the Merits**

3.15.3.A Plaintiff has shown that the Notice of Default does not meet the requirements as stated in RCW 61.24.030(8)(2) and therefore is invalid. All further steps taken by Defendants Northwest Trustee and OneWest are therefore also invalid as the initial pre-requisite step in a non-judicial foreclosure sale was not properly conducted.

3.15.3.B Plaintiff has shown that through the documentation provided by the Defendants that there are several misrepresentations of the facts throughout the evidence the Defendants rely upon for their defense. The Defendants have produced no tangible evidence supporting their rights to foreclose. Further discovery and evidentiary hearings will only continue to strengthen Plaintiff's case.

3.15.3.C The true Beneficiary of the Note, which according to Defendants supplied documentation, appears to be a securitized investment trust that Freddie Mac sold the note into.  Therefore there has never been a true and correct declaration from the "Beneficiary". This is simply another example of Defendants' complete disregard for the procedures established by the Legislature.

3.15.3.D Defendants have neglected to provide any real "chain of title" of the Note nor have they provided the alleged Servicing Agreement between OneWest and Freddie Mac. Once again, OneWest only claimed to have a Servicing Agreement between themselves

and Freddie Mac, not to whomever Freddie Mac sold the Note to. This further creates

doubt that OneWest has any authority to conduct any "ministerial acts" as Defense stated.

### 3.15.4 Possibility of Irreclosure Injury Not Remediable by Damages

3.15.4.A The real property in question is not an investment property, it is a home. If the

non-judicial foreclosure sale takes place and is completed there is no guarantee of the

home being restored to the Plaintiff. "Chateau Zen" as it is referred to by those that love it

cannot be replaced by a settlement check.

3.15.4.B Further if the property IS restored after successful completion of these procedures

there is no guarantee what condition the property will be in when it is regained. If it is left

empty, it could be vandalized. If it is occupied it may be damaged or not taken care of by

the temporary occupants. The only guarantee that it will remain well cared for is to remain

in the possession of the Plaintiff throughout the proceedings.


3.15.4.C According to *Sabin v. Rauch, 75 Ariz. 275, 280 (Ariz. 1953)*

When dealing with real property, a "…Court may assume the inadequacy of damages as a

remedy without the necessity of a showing to that effect."

### 3.15.5 Balance of Hardship in the Movants Favor

3.15.5.A The hardship to the Plaintiff is extreme compared to the hardship, if any even

exist, is miniscule to the Defendant(s). According to the facts presented above it appears

that the Plaintiff is the only real party of interest. Plaintiff will suffer substantial loss in equity

as a trustee sale is unlikely to gain full value of the home at auction, especially in the

slowest real estate time of the year while the country is still suffering from a recession.

Plaintiff will also be rendered homeless and may not be able to secure a residence thereby

forcing the Plaintiff to move out of state to be with family. This would drastically reduce

Plaintiff's ability to continue the proceedings in this lawsuit as Plaintiff would be less likely

to be able to attend future hearings due to extraordinary costs in travel.

3.15.5.A.1 Specific Damages that will be caused to the Plaintiff if the Defendants are allowed to eliminate Plaintiff's rights via this unlawful foreclosure:

    3.15.5.A.1.a Plaintiff will be left with little course of action but to move out of state and thereby be unable to properly prosecute this lawsuit.

    3.15.5.A.1.b Plaintiff will lose all rights and interests in the real property in question.

    3.15.5.A.1.c Plaintiff has over the course of the last 48 months since its acquisition of the property incurred considerable additional expense, which is not recoverable as it is the Plaintiff's time and efforts into updating, repairing and maintaining the residence.

3.15.6 **Apparent Damages to Defendants upon Granting of Temporary Restraining Order and Preliminary Injunction:**

3.15.6.A Defendant Northwest Trustee Services- According to the evidence relied upon by Defendants, Northwest Trustee Services is not a real party of interest nor an authorized and lawful party to any action associated with the Deed of Trust. In addition, the owner of Northwest Trustee Services is Stephen Routh who also owns Routh, Crabtree and Olsen the law firm representing the Defendants in this action. Therefore Stephen Routh is actually gaining by this lawsuit in billable hours to his clients. Furthermore any gain that Northwest Trustee Services would stand to make would be unjust enrichment received by damaging Plaintiff through an unlawful foreclosure sale.

3.15.6.B Defendant MERS – According to the evidence relied upon by Defendants, MERS is not a real party of interest and does not seem to have anything to lose whatsoever. Furthermore any gain that MERS would stand to make would be unjust enrichment received by damaging Plaintiff through an unlawful foreclosure sale.

3.15.6.C Defendant IndymacBank FSB – Indymac Bank as a company no longer exists and therefore does not stand to lose anything.

3.15.6.D Defendant OneWest Bank FSB – OneWest Bank does not appear to be anything more than a servicer by the evidence Defendants are relying upon and is therefore not a real party of interest. OneWest claims no ownership of the Note and therefore has very little to gain in the auction of the real property in question. Furthermore any gain that

OneWest would stand to make would be unjust enrichment received by damaging Plaintiff through an unlawful foreclosure sale.

3.15.6.E Defendants Doe 1-50 – No other party, individual, entity or company has come forward with a statement that they are a real party of interest having to do with the Note. Therefore they apparently do not see any hardship whatsoever if the TRO and Preliminary Injunction is granted. Furthermore any gain that the known or unknown party/parties would make would be unjust enrichment received by damaging Plaintiff through an unlawful foreclosure sale.

3.15.6.F Granting the Temporary Restraining Order and Preliminary Injunction will only delay the process pending a final resolution of this case. If anything, the delay may help the Defendant(s), in the extreme unlikely event that they are successful. Plaintiff will continue to lovingly care for the real property in question and historically winter months are the worst time to sell a property for strong value as there are fewer homebuyers active during the school year.

3.15.7 **Public Policy and Interest in Favor of Granting the Relief**

3.15.7.A As stated in the Notice of Trustee Sale and Amended Notice of Trustee Sale the Trustee will conduct an auction of the real property in question without disclosing that there is a Federal lawsuit related to it. This endangers any potential buyer to losing the property should the Plaintiff regain it. It also wastes the potential buyers time, energy and effort and could cause emotional harm which would be avoidable with the granting of the TRO and Preliminary Injunction.

3.15.7.B In addition to the statements from the US Congressional Oversight Panel, more fully described above in  the legislature has created a the Deed of Trust statute where the creditor was given an expedited remedy in exchange for *strict procedural safeguards.* The Defendants must be held to these procedures. The very least of these procedures is to properly authorize a party to conduct the process, put true and correct documents into the record, and ensure beyond the shadow of a doubt that the proper party, as defined in the statute, is authorizing and instructing the Trustee to begin the Trustee Sale process.

According to the documents relied upon by the Defendants the strict procedures have not been complied with. Property rights are crucial to our social system. A full exploration of possible infringements should be conducted before property owners, such as the Plaintiff is stripped of their property rights and equity.

Public Policy also favors equitable behavior. In the instant case, ALL of the Defendants; OneWest, MERS and Northwest Trustee Services have acted in a highly inequitable manner. They have omitted facts and true parties, misrepresented the true nature of their roles in the transaction, and completely disregarded the procedures defined by the legislature. The authenticity of ALL the documents presented or recorded by any of the Defendant(s) is highly questionable and the Plaintiff is aggressively researching and disputing any inaccuracies.

The Washington State Deed of Trust Act must be construed in favor of the borrower:

> "The Act must be construed in favor of borrowers
> because of the relative ease with which lenders can
> forfeit borrower' interests and the lack of judicial
> oversight in conducting non-judicial foreclosure sales."

Udall, __Wn.2d at__, 154 P.3d at 890. See also Amresco Independence Funding, Inc. v. SPS Properties, LLC, 129 Wn. App. 532, 536-37, 119 P.3d 884, 886 (2005) ("Because these statutes' remove many protections borrowers have under a mortgage, lenders must strictly comply with the statutes, and courts must strictly construe the statues in the borrower's favor")

## IV. CONCLUSION

The Defendants have engaged in unlawful and deceptive business practices and inequitable conduct. A Temporary Restraining Order is critical in maintaining the status quo and preventing an unlawful non-judicial trustee's sale that will irreparably damage the Plaintiff.

Further, a Preliminary Injunction is appropriate as described through Section II of this Response until discovery and an evidentiary hearing can take place to determine who is the true owner and holder in due course of the Note and whether or not the Deed of Trust has become nullified all pursuant to Plaintiff's request stated in II.O.

1         These actions by the Court will provide relief to the Plaintiff from the unlawful, unfair and

2  deceptive actions committed separately and jointly by the Defendants in attempting to complete an
   unlawful foreclosure sale that violates Washington State law.

3         Plaintiff hereby moves the Court to the following:

4             1. Grant Plaintiff's Motion for Temporary Restraining Order until such a time as a

5             Preliminary Injunction Hearing may take place.

6             2. Rule that the Defendant's Notice of Default as described above is invalid and

7             void due to the application and execution by unauthorized parties.

8

9  **V. PROPOSED ORDER**

10  Plaintiff will submit a proposed order providing for the relief requested herein.

11

12  **Dated: January 17, 2011**

13

14

15

16

17  James McDonald
    Pro Se

18

19

20

21

22

23

24

25

26

27

28

JAMES MCDONALD
14840 119th PL NE
Kirkland, WA 98034
Phone (425) 210-0614
In Pro Per

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

In Re:                                  )      NO.:  C10-1952RSL
                                        )
                                        )
JAMES MCDONALD                          )
                    Plaintiff           )      Notice of
          v                             )      Motion for Temporary Restraining Order
ONEWEST BANK, FSB, et al.,              )      and Preliminary Injunction
                    Defendants.         )
                                        )
-------------------------------------------   )

          PLEASE TAKE NOTICE THAT James McDonald, Pro Se, will bring before the above Court

located at 700 Stewart Street, Seattle, WA 98101, a motion for Temporary Restraining Order and

Preliminary Injunction from the civil case.

          IF YOU OPPOSE the Motion, you must file your written response with the Court Clerk, serve

two copies on the Judge's chambers, and deliver copies to the undersigned NOT LATER THAN THE

RESPONSE DATE, which is February 7, 2011.

          IF NO REPONSE IS TIMELY FILED AND SERVED, the Court may, in its discretion, GRANT

THE MOTION PRIOR TO THE HEARING, WITHOUT FURTHER NOTICE, and strike the hearing.


          DATED this 18 day of January, 2011.


                                        _____
                                        James McDonald, Pro Se


Notice of Motion for TRO                -1-                James McDonald

                                        14840 119th PL NE, Kirkland, WA 98034

                                        Phone: (425) 210-0614

1

JAMES MCDONALD
14840 119th PL NE
Kirkland, WA 98034
Phone (425) 210-0614
In Pro Per

2

3

4

5

UNITED STATES DISTRICT COURT

6

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

7

8

In Re:                                    )        NO.: C10-1952RSL
                                          )
9                                         )
JAMES MCDONALD                            )
10              Plaintiff                 )        Declaration of Service
              v                           )
11   ONEWEST BANK, FSB, *et al.*,         )
                        Defendants.       )
12   —————————————————————————————        )

13

14

                    CERTIFICATE OF MAILING

15       I hereby certify under penalty of perjury of the laws of the State of Washington that I mailed

16   a true and correct copy of the Notice of Motion for Temporary Restraining Order and Preliminary

17   Injunction, Motion for Temporary Restraining Order and Preliminary Injunction and Proposed Order

18   Granting Temporary Restraining Order and Preliminary Injunction by James McDonald, postage

19   pre-paid, regular first class or priority mail on the 18 day of January, 2011 to the parties listed on

20   the attached motion.

21

22       DATED this 18 day of January, 2011.

23

24                                                By:_____

25                                                              James McDonald
                                                                    Pro Se
26

27

28

Certificate of Mailing                    -1-                    James McDonald

                                              14840 119th PL NE, Kirkland, WA 98034

                                                     Phone: (425) 210-0614

1   **Routh Crabtree Olsen, P.S.**

2   **13555 SE 36th St, Suite 300**

3   **Bellevue, WA 98006**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Certificate of Mailing                                  -2-                                  James McDonald

14840 119th PL NE, Kirkland, WA 98034

Phone: (425) 210-0614

1
2
3

JAMES MCDONALD
14840 119th PL NE
Kirkland, WA 98034
Phone (425) 210-0614
In Pro Per

\

4

5          UNITED STATES DISTRICT COURT

6      FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

7

8  In Re:                          )    NO.: **C10-1952RSL**
                                    )
9                                   )
   JAMES MCDONALD                   )
10            Plaintiff             )
            v                       )    ORDER GRANTING PLAINTIFF'S MOTION
11 ONEWEST BANK, FSB, *et al.,*     )    FOR TEMPORARY RESTRAINING ORDER
                  Defendants.       )    AND PRELIMINARY INJUNCTION
12 _____  )

13

14          This matter came before the Court upon James McDonald's (PLAINTIFF)'s motion for

15  temporary restraining order and preliminary injunction. The Court considered the motion and any

16  opposition thereto and the matters on record. It appears for the reasons stated in the motion that

17  the temporary restraining order and preliminary injunction should be granted until such a time that

18  the Court renders a final judgment.

19          IT IS THEREFORE ORDERED that Defendants Northwest Trustee Services, MERS and

20  OneWest Bank, FSB cease and desist any and all actions leading towards the non-judicial

21  foreclosure sale of the Plaintiff's residence located at 14840 119th PL NE, Kirkland, WA 98034. It is

22  further ordered that the order shall be effective immediately and the order shall be effective as to

23  any chapter under which the present case may be converted absent further order of this Court.

24

25          Dated this _____ day of _____, 20___

26

27                                        _____
                                          Robert S. Lasnik, United States District Judge

28

Proposed Order for Removal Of Opposing Attorney   -1-                James McDonald

                                                          14840 119th PL NE, Kirkland WA 98034

                                                               Phone: 425-210-0614

1  **Presented by:**

2

3

4

5                                          James McDonald
                                                 Pro Se
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Proposed Order for Removal Of Opposing Attorney  -2-                   James McDonald

                                        14840 119th PL NE, Kirkland WA 98034

                                                 Phone: 425-210-0614

List of Exhibits – Motion for TRO

Exhibit A – Deed of Trust
Exhibit B – Assignment of Deed of Trust
Exhibit C – Notice of Default
Exhibit D – QWR
Exhibit E – Freddie Mac Statement
Exhibit F – Freddie Mac Ownership
Exhibit G – RCO WA License
Exhibit H – RCO Sec State
Exhibit I – NWT WA License
Exhibit J 0 NWT Sec State
Exhibit K – RCO Letter

# EXHIBIT A
# Deed of Trust

  
20070110002077.00

After recording please return to:
IndyMac Bank, F.S.B. c/o Document
Management
[Name of Natural Person]
901 E. 104th Street Building B
Suite 400(500)
Kansas City, MO 64131
[City, State Zip Code]



2007011000207 7
PACIFIC NW TIT DT
PAGE001 OF 025        57.00
01/10/2007 15:53
KING COUNTY, WA

Assessor's Property Tax Parcel or Account Number:   328830018003
Abbreviated Legal Description:
Lot 18, High Woodlands Div. 3, V85/P30 32

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
25/57

FILED BY PNWT

MIN 100055401250492438

DEFINITIONS

Trust 634468-4

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11,
13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)    "Security Instrument" means this document, which is dated        January 8, 2007        ,
together with all Riders to this document.

(B)    "Borrower" is James B McDonald a single man

. Borrower is the trustor under this Security Instrument.

(C)    "Lender" is  IndyMac Bank, F.S.B., a federally chartered savings bank

Lender is a         Federal Savings Bank                       organized and existing under the laws of
United States of America    . Lender's address is  155 North Lake Avenue, Pasadena,
CA 91101            .

(D)    "Trustee" is Pacific Northwest Title Insurance Co., Inc.

(E)    "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security

Loan No:     9243
Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                    Page 1 of 14             14301WA 08/00 Rev. 12/06
www.compliancesource.com                                        ©2000, The Compliance Source, Inc.

20070110002077 ···

Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F)    "Note" means the promissory note signed by Borrower and dated    January 8, 2007. The Note states that Borrower owes Lender    three hundred eighty nine thousand four hundred eighty one and 60/100ths                                          Dollars (U.S. $ 389,481.60         ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    February 1, 2037        .

(G)    "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)    "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)    "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [xx] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] 1-4 Family Rider | [ ] Revocable Trust Rider | |
| [ ] Other(s) [specify] | | |

(J)    "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)    "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)    "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)    "Escrow Items" means those items that are described in Section 3.

(N)    "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)    "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)    "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Loan No     9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                          Page 2 of 14                          14361WA  08/00 Rev. 11/06
www.compliancesource.com                                                          ©2006, The Compliance Source, Inc

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 2 of 25
Order: k Comment:

20070110002077

(Q)     "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)     "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

        The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS.  This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County                                of              King                     :
        [Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]
        See Exhibit A attached hereto and made a part hereof

which currently has the address of                    14840 119th Pl NE
                                                                    [Street]
KIRKLAND                                      ,    Washington            98034                              ("Property Address"):
                          [City]                                                    [Zip Code]

        TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

        BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

        THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Loan No:        9243
Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                              Page 3 of 14                                    14301WA  08/00 Rev. 11/04
www.compliancesource.com                                                                                  ©2000, The Compliance Source, Inc.

2007011002077.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender

Loan No:        9243

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 4 of 25
Order: k Comment:

20070110002077

receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens.   Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance.   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right

Loan No:        9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        MERS Modified Form 3048  01/01
—THE COMPLIANCE SOURCE, INC.—                                                                                        14301WA  08/00 Rev. 11/06
www.compliancesource.com                               Page 5 of 14                                                ©2000, The Compliance Source, Inc.

20070110002077

shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds.  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Loan No:        9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                        Page 6 of 14                         14301WA 08/00 Rev. 11/06
www.compliancesource.com                                                                    ©2000, The Compliance Source, Inc.

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 6 of 25
Order: k Comment:

2007011002077

7.   **Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   **Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.   **Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be

Loan No:        9243
Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
—THE COMPLIANCE SOURCE, INC.—                    Page 7 of 14                    MERS Modified Form 3048 01/01
www.compliancesource.com                                                                 14301WA 08/00 Rev. 11/06
©2006, The Compliance Source, Inc.

20070110002077

non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be

Loan No:        9243

2007011002077

reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.   Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.   Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.   Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not

Loan No.          9243
Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                                  Page 9 of 14                          MERS Modified Form 3048 01/01
www.compliancesource.com                                                                                  14301WA  08/00 Rev. 11/04
©2006, The Compliance Source, Inc.

20070110002077.3

be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15.  Notices.  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16.  Governing Law; Severability; Rules of Construction.  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument:  (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17.  Borrower's Copy.  Borrower shall be given one copy of the Note and of this Security Instrument.

18.  Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19.  Borrower's Right to Reinstate After Acceleration.  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such

Loan No:        9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3048  01/01
—THE COMPLIANCE SOURCE, INC.—                                      Page 10 of 14                                    14301WA  08/00 Rev. 11/06
www.compliancesource.com                                                                                      ©2006, The Compliance Source, Inc.

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 10 of 25
Order: k Comment:

20070110002077.05

other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Loan No:       9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                  Page 11 of 14                    14301WA  02/02 Rev. 11/06
www.compliancesource.com                                          ©2006, The Compliance Source, Inc.

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

22.  Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law.  If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

23.  Reconveyance.  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee.  Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it.  Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

24.  Substitute Trustee.  In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act.  Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25.  Use of Property. The Property is not used principally for agricultural purposes.

Loan No:      9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                                       Page 12 of 14                            14301WA, 08/00 Rev. 11/06
www.compliancesource.com                                                                                ©2006, The Compliance Source, Inc.

2007011000077.0

26. **Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees", whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                                                                    -Borrower
                                      James B McDonald              *[Printed Name]*

_____     _____ (Seal)
                                                                    -Borrower
                                                                    *[Printed Name]*

                                      _____ (Seal)
                                                                    -Borrower
                                                                    *[Printed Name]*

                                      _____ (Seal)
                                                                    -Borrower
                                                                    *[Printed Name]*

_____ *[Acknowledgment on Following Page]* _____

Loan No:        9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                          Page 13 of 14                     14301WA 08/00 Rev. 11/04
www.compliancesource.com                                                                ©2006, The Compliance Source, Inc.

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 13 of 25
Order: k Comment:

2007011002077.01

State of Washington

County of Snohomish

§
§ ss.:
§

I certify that I know or have satisfactory evidence that      James B McDonald

[name of person] is the person who appeared before me, and said person(s) acknowledged that (he/she/they) signed this instrument and acknowledged it to be (his/her/their) free and voluntary act for the uses and purposes mentioned in the instrument.

Dated: 01-08-07

(Seal)



_____
(Signature)

Notary Public , Michael Angeles
(Title of Office)                        (Printed Name)

Lake Stevens
Place of Residence of Notary Public

Loan No:      9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                                            Page 14 of 14
www.compliancesource.com

MERS Modified Form 3048 01/01
14301WA  08/00 Rev. 11/06
©2006, The Compliance Source, Inc.

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 14 of 25
Order: k Comment:

20070110002077.S

Order No. 634468

A.L.T.A. COMMITMENT
SCHEDULE A
Page 3

The land referred to in this commitment is situated in the State of Washington, and described as follows:

Lot 18, The High Woodlands Addition Div. No. 3, according to the plat thereof recorded in Volume 85 of Plats, pages 30 through 32, inclusive, in King County, Washington.

END OF SCHEDULE A

NOTE FOR INFORMATIONAL PURPOSES ONLY:

The following may be used as an abbreviated legal description on the documents to be recorded, per amended RCW 65.04. Said abbreviated legal description is not a substitute for a complete legal description within the body of the document.

Lot 18, High Woodlands Div. 3, Vol. 85, pgs. 30-32

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 15 of 25
Order: k Comment:

15

2007011002077.⸬

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this  8th  day of  January,   2007  , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to   IndyMac Bank, F.S.B., a federally chartered savings bank
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

14840 119th Pl NE, KIRKLAND, WA 98034
*[Property Address]*

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in Declaration of Covenants, Conditions, and Restrictions (the "Declaration"). The Property is a part of a planned unit development known as:

Kirkland/Kingsgate
*[Name of Planned Unit Development]*

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS.  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.  PUD Obligations.  Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B.  Property Insurance.  So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire,

Loan No:      9243                                              MIN: 100055401250492438
Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.—                                            Page 1 of 3                    14501MU 08/00 Rev. 11/04
www.compliancesource.com                                                                            ©2004, The Compliance Source, Inc.

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 16 of 25
Order: k Comment:

20070110002077:01

hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then:

(i)  Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii)  Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender.  Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C.  Public Liability Insurance.**  Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D.  Condemnation.**  The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.  Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E.  Lender's Prior Consent.**  Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i)  the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii)  any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii)  termination of professional management and assumption of self-management of the Owners Association; or (iv)  any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F.  Remedies.**  If Borrower does not pay PUD dues and assessments when due, then Lender may pay them.  Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument.  Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

—————————————— *[Signatures on Following Page]* ——————————————

Loan No:      9243

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.—       Page 2 of 3       14501MU #149 Rev. 11/04
www.compliancesource.com       ©2004, The Compliance Source, Inc.

20070110002077.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)        _____ (Seal)
James B McDonald                 -Borrower                                     -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                     -Borrower

[Sign Original Only]

Loan №        9243

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.—                        Page 3 of 3                                    14501MU 08/00 Rev. 11/04
www.compliancesource.com                                                                           ©2004, The Compliance Source, Inc.

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 18 of 25
Order: k Comment:

18

2007011002077.3.

# FIXED/ADJUSTABLE RATE RIDER
## INTEREST ONLY PERIOD
### (1-Year LIBOR Index - Rate Caps)
### (Assumable after Initial Period)
### ( 10 Year Interest Only Period)

Loan #          9243

MIN:   100055401250492438

THIS ADJUSTABLE RATE RIDER is made this 8th   day of January,  2007   , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to IndyMac Bank, F.S.B., a federally chartered savings bank

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

14840 119th Pl NE, KIRKLAND, WA 98034

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of          5.875       %. The Note provides for changes in the interest rate and the monthly payments as follows:

4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the first day of     February,  2012     , and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

IndyMac Bank
Fixed/Adjustable Rate Rider - WSJ 1 Yr. Libor - Interest Only Period - Multistate

8480831 (0506)

Page 1 of 5
VMP Mortgage Solutions, Inc. (800)521-7291

Form 5601
6/05

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 19 of 25
Order: k Comment:

2007011002077

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and 750/1000ths                                                percentage point(s)
(      2.750      %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.875   % or less than       2.750      %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than
two and NO/1000ths                                                percentage point(s)
(      2.000      %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than       10.875 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.



Loan No      :9243
8480831 (0506)                        Page 2 of 5                        Form 5601
6/05

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 20 of 25
Order: k Comment:

20070110002077 02

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
1. UNTIL BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE IN EFFECT AS FOLLOWS:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. AFTER BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1 ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND THE PROVISIONS OF UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE AMENDED TO READ AS FOLLOWS:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Loan No             9243
8480831 (0506)

Page 3 of 5

Form 5601
6/05

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 21 of 25
Order: k Comment:

21

20070110002077 ...

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Loan No        9243
8480831 (0506)

Page 4 of 5

Form 5601
6/05

20070110002077

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_James B McDonald_ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

Loan No:          9243
8480831 (0506)

Page 5 of 5

Form 5601
6/05

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 23 of 25
Order: k Comment:

23

20070110002077.58

# ADDENDUM TO FIXED/ADJUSTABLE RATE RIDER

Loan #:          9243

THIS ADDENDUM to the Fixed/Adjustable Rate Rider is made this  8th      day of January,  2007       , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") and Fixed/Adjustable Rate Rider of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to  IndyMac Bank, F.S.B., a federally chartered savings bank

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

14840 119th Pl NE, KIRKLAND, WA 98034

[Property Address]

ADDITIONAL COVENANTS. In Addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. Section 4(D) of the Fixed/Adjustable Rate Rider is modified as follows:

The interest rate I am required to pay at the first Change Date will not be greater than 10.875    % or less than      2.750      %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than two and NO/1000ths                         percentage point(s) (    2.000      %) from the rate of interest I have been paying for the preceding  12    months. My interest rate will never be greater than        10.875      % or less than      2.750      %.

--

IndyMac Bank
ARM Addendum to Fixed/Adjustable Rate Rider
Multistate
                                                          Page 1 of 2                                     1075
8480345 (0602)                              VMP Mortgage Solutions, Inc.                                  2/06

20070110002077

   2. All other provisions of the Fixed/Adjustable Rate Rider are unchanged by this
Addendum and remain in full force and effect.

Dated: 1/8/07

_____ (Seal)        _____ (Seal)
James B McDonald        -Borrower                                -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                                -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                                -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                                -Borrower

8480345 (0602)                    Page 2 of 2                    1075
                                                                 2/06

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 25 of 25
Order: k Comment:

25

# EXHIBIT B
# Assignment of
# Deed of Trust

d.

After Recording Return to:
OneWest Bank FSB
888 East Walnut Street
Pasadena, CA 91101

**2010 0204 000502**
14.00
TITLE COURT SE ADT
PAGE-001 OF 001
02/04/2010 12:13
KING COUNTY, WA

7523.21352/McDONALD, JAMES B.

## Assignment of Deed of Trust

For Value Received, the undersigned as Beneficiary, hereby grants, conveys, assigns and transfers to **OneWest Bank, FSB**, whose address is 888 East Walnut Street, Pasadena, CA 91101, all beneficial interest under that certain deed of trust, dated 01/08/07, executed by James B. McDonald, a single man, Grantors, to Pacific Northwest Title Insurance Co., Inc., Trustee, and recorded on 01/10/07, under Auditor's File No. 20070110002077, records of King County, Washington.

Together with note or notes therein described or referred to, the money due and to become due thereon, with interest, and all rights accrued or to accrue under said Deed of Trust.

Dated January 27, 20 10

Mortgage Electronic Registration Systems, Inc. "MERS"

By:
Title: Brian Burnett        Assistant Vice President

STATE OF Texas          )
                        ) ss.
COUNTY OF Travis        )

I certify that I know or have satisfactory evidence that Brian Burnett is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the Assistant Vice President of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. "MERS" to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: Jan. 27, 2010

NOTARY PUBLIC in and for the State of Texas
Residing at Travis
My commission expires 11/10/10

ALEX MCBRIDE
Notary Public, State of Texas
My Commission Expires
November 10, 2010

01

# EXHIBIT C
# NOTICE OF DEFAULT

# Notice of Default

**To:**

James B. McDonald
14840 119th Place Northeast
Kirkland, WA  98034

Unknown Spouse and/or Domestic Partner
of James B. McDonald
14840 119th Place Northeast
Kirkland, WA  98034

Regarding the real property "Property" located at:

**Property Address:**
14840 119th Place Northeast
Kirkland, WA  98034

**If you are the owner of this property and you occupy it as your residence, you should take care to protect your interest in your home. This notice of default (your failure to pay or otherwise perform) is the first step in a process that could result in you losing your home. You should carefully review your options. For example:**

**Can you pay and stop the foreclosure process?**
**Do you dispute the failure to pay?**
**Can you sell your property to preserve your equity?**
**Are you able to refinance this loan or obligation with a new loan or obligation from another lender with payments, terms, and fees that are more affordable?**
**Do you qualify for any government or private homeowner assistance programs?**
**Do you know if filing for bankruptcy is an option? What are the pros and cons of doing so?**

**Do not ignore this notice; because if you do nothing, you could lose your home at a foreclosure sale. (No foreclosure sale can be held any sooner than ninety days after a notice of sale is issued and a notice of sale cannot be issued until thirty days after this notice.) Also, if you do nothing to pay what you owe, be careful of people who claim they can help you. There are many individuals and businesses that watch for the notices of sale in order to unfairly profit as a result of borrowers' distress.**

**You may feel you need help understanding what to do. There are a number of professional resources available, including home loan counselors and attorneys, who may assist you. Many legal services are lower-cost or even free, depending on your ability to pay. If you desire legal help in understanding your options or handling this default, you may obtain a referral (at no charge) by contacting the county bar association in the county where your home is located. These legal referral services also provide information about lower-cost or free legal services for those who qualify.  You may contact the Department of Financial Institutions or the statewide civil legal aid hotline for possible assistance or referrals.**

A) **Property description:**

Lot 18, The High Woodlands Addition Div. No. 3, according to the Plat thereof recorded in Volume 85 of Plats, Pages 30 through 32, inclusive, in King County, Washington.

B) **Deed of Trust information:**  King County Auditor's File No.: 20070110002077;  Recording Date:  01/10/07

C) **Declaration of payment default:**  The beneficiary declares you in default for failing to make payments as required by your note and deed of trust.

**D) Itemized account of the arrears:**

| | |
|---|---|
| Delinquent monthly payments beginning with the 10/01/09 installment. | $9,575.44 |
| Late charges: | $286.02 |
| Lender's Fees and Costs | $22.00 |
| Trustee's fees | $508.00 |
| Costs | |
|     Title report (estimate) | $951.00 |
|     Recording | $30.00 |
|     Certified mail | $14.00 |
|     Posting | $70.00 |
|     Sale Costs | $0.00 |
| **Total arrears and costs due today** | **$11,426.46** |

**E) Itemized account of all other specific charges, costs or fees that grantor or borrower is or may be obliged to pay to reinstate the deed of trust before the recording of the notice of sale.**

| | |
|---|---|
| Additional monthly payment | $2,393.86 |
| Additional late charge | $95.34 |

**F) <u>Amount required to cure payment defaults before notice of sale recorded</u>: $13,915.66**
In addition, grantor or borrower must timely cure all other defaults before the note and deed of trust are deemed reinstated.

***Payments and late charges continue to accrue and additional advances may be made. <u>The sums stated above are estimates only.</u> Before attempting to reinstate the loan, call us at 425-586-1900 to learn the exact amounts of monetary defaults and actions required to cure possible other defaults.***

**G) Effect of failure to cure:** Failure to cure all alleged defaults within 30 days of mailing/personal service of this notice may lead to recordation, transmittal and publication of a notice of sale and the Property may be sold at public auction no less than 120 days from the date of this notice.

**H) Effect of recording, transmitting and publication of the notice of sale:** The effect of the recordation, transmittal and publication of the notice of sale will be to (i) increase the costs and fees and (ii) publicize the default and advertise the Property for sale.

**I) Effect of sale of the Property:** The Trustee's sale of the Property will deprive the borrower, grantor and any successor in interest of all their interest in the Property.

**J) Recourse to courts:** The borrower, grantor, any guarantor or any successor in interest has recourse to the courts pursuant to RCW 61.24.130 to contest the default(s) on any proper ground.

## K) Contact Information for Beneficiary (Note Owner) and Loan Servicer.

The beneficiary of the deed of trust is **OneWest Bank, FSB**, whose address and telephone number are:

888 East Walnut Street
Pasadena, CA 91101
800-669-2300

The loan servicer for this loan is OneWest Bank FSB, whose address and telephone number are:

888 East Walnut Street

Pasadena, CA  91101
800-669-2300

**L) Notice pursuant to the Federal Fair Debt Collection Practices Act:** If you are the consumer who originally contracted the debt or if you assumed the debt, then you are notified that:

1. As of the date of this notice you owe $398,736.08.  Because of interest, late charges, and other charges that may vary from day to day, the amount due on the day you pay may be greater.  Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your check.  For further information, write to the address provided in Section 5 below or call us at 425-586-1900.
2. The creditor to whom the debt is owed OneWest Bank, FSB/OneWest Bank FSB.
3. Unless within 30 days after receipt of this notice you dispute the debt or any portion of it, we will assume the debt to be valid.
4. If you notify us in writing within 30 days after receipt of this notice that you dispute the debt or any part of it, we will request that the creditor obtain verification of the debt and mail it to you.
5. If you request in writing within 30 days after receipt of this notice, we will request that the creditor provide you with the name and address of the original creditor, if different from the current creditor.
6. Written requests should be addressed to Northwest Trustee Services, Inc., Post Office Box 997, Bellevue, WA 98009-0997.

**Dated:  January 12, 2010**                   OneWest Bank, FSB
                                              By Northwest Trustee Services, Inc., its duly authorized agent

**This is an attempt to collect a debt and any information obtained will be used for that purpose.**

**NORTHWEST TRUSTEE SERVICES, INC.**
**P.O. BOX 997**
**BELLEVUE, WA 98009-0997**

**File No:** 7523.21352
**Borrower:** McDonald, James B.
**Client:** OneWest Bank, FSB

**VONNIE MCELLIGOTT**
**425-586-1900**
**FAX 425-586-1997**

## BENEFICIARY DECLARATION PURSUANT TO CHAPTER 61.24 RCW (SB 5810) AND "FORECLOSURE LOSS" MITIGATION FORM

Borrower(s):          McDONALD, JAMES
Beneficiary:          OneWest Bank, FSB
Loan Servicer:        OneWest Bank FSB
Property:             14840 119th Place Northeast, Kirkland, WA 98034
Loan No.:             1009111244

The undersigned beneficiary or authorized agent for the beneficiary hereby represents and declares under the penalty of perjury that [check the applicable box and fill in any blanks so that the trustee can insert, on the beneficiary's behalf, the applicable declaration in the notice of default required under chapter 61.24 RCW as specified in SB 5810/Chapter 292, 2009 Laws ("the act")]:  Regarding the above-referenced loan (check applicable box – only ONE choice should apply):

[✓] (1) The beneficiary or beneficiary's authorized agent has contacted the borrower under, and has complied with, section 2 of the act (contact provision to "assess the borrower's financial ability to pay the debt secured by the deed of trust and explore options for the borrower to avoid foreclosure").

[ ] (2) The beneficiary or beneficiary's authorized agent has exercised due diligence to contact the borrower as required in section 2(5) of the act and, after waiting fourteen days after the requirements in section 2 of this act were satisfied, the beneficiary or the beneficiary's authorized agent sent to the borrower(s), by certified mail, return receipt requested, the letter required under section 2 of the act.

[ ] (3) The borrower has surrendered the secured property as evidenced by either a letter confirming the surrender or by delivery of the keys to the secured property to the beneficiary, the beneficiary's authorized agent or to the trustee.

[ ] (4) Under section 2 of the act, the beneficiary or the beneficiary's authorized agent has verified information that, on or before the date of this declaration, the borrower(s) has filed for bankruptcy, and the bankruptcy stay remains in place, or the borrower has filed for bankruptcy and the bankruptcy court has granted relief from the bankruptcy stay allowing the enforcement of the deed of trust."

**SB 5810 Does NOT apply because, regarding the above-referenced loan:**

[  ] The deed of trust was made before January 1, 2003 or after December 31, 2007, inclusive; or

[  ] The property is not owner occupied as the principal residence of the borrower(s); or

[  ] The deed of trust secures a commercial loan; or

[  ] The deed of trust secures obligations of a grantor who is not the borrower or a guarantor; or

[  ] The deed of trust secures a purchaser's obligations under a seller-financed sale.

Dated _January 7, 2010_       _____
                              (Beneficiary's Authorized Agent's signature)

                              Erica A. Johnson-Seck    **Vice President**
                              _____
                              Print Name

# EXHIBIT D
# Qualified Written Request and
# Debt Validation Demand

After recording, return to:

JAMES BRADLEY MCDONALD
14840 119th Pl NE
Kirkland, WA 98034
TEL: (425) 210-0614

DATE: _____, 2010

Loan #125049243/1009111244
APN #328830-0180-03
Legal Description: See Attached Exhibit A

CONFORMED COPY

**201004280000527**

MCDONALD          MISC         76.00
PAGE-001 OF 015
04/28/2010 12:46

---

# CONSTRUCTIVE LEGAL NOTICE OF LAWFUL DEBT VALIDATION DEMAND

**Real Estate Settlement Procedures Act (RESPA) 12 U.S.C. § 2605(e);**
Regulation X at 24 C.F.R. § 3500 et seq.
**Truth-In-Lending-Act (TILA) § 1604(e), 15 U.S.C. §§ 1601 et seq. (1968) and 1692 et seq.**
**Fair Debt Collection Practices Act (FDCPA) 15 U.S.C. §1692c**

---

**GRANTOR(S):  JAMES BRADLEY MCDONALD**
14840 119th Pl NE
Kirkland, WA 98034

**GRANTEE(S):  INDYMAC BANK, F.S.B**
901 E. 104TH ST., BLDG B, STE 400/500
KANSAS CITY, MO 64131
USPS Certified Mail # ____ 7009 2250 0000 1615 2189

INDYMAC MORTGAGE SERVICES / Servicer
6900 BEATRICE DRIVE
KALAMAZOO, MI 49003-4045
USPS Certified Mail # ___ 7009 2250 0000 1615 2196

NORTHWEST TRUSTEE SERVICES, INC
P.O. BOX 997
BELLEVUE, WA 98009-0997
USPS Certified Mail # ___ 7009 2250 0000 1615 2226

You are now in receipt of this NOTICE under the authority of the Truth-In-Lending-Act (TILA) §
1604(e), 15 U.S.C. §§ 1601 et seq. (1968) and 1692 et seq., and the Fair Debt Collection Practices Act
(FDCPA) 15 U.S.C. §1692c, and the Real Estate Settlement Procedures Act (RESPA) 12 U.S.C. §
2605(e) and Regulation X at 24 C.F.R. § 3500 regarding loan number 125049243 / 1009111244. I dispute
the alleged mortgage debt in its entirety for being inaccurate and firmly believe that I have had fraud in
the factum committed against me for lack of full disclosure by the alleged Lender.

---

**NOTICE TO THE PRINCIPAL IS NOTICE TO THE AGENT,**
**NOTICE TO THE AGENT IS NOTICE TO THE PRINCIPAL.**

---

**THIS IS MY "QUALIFIED WRITTEN REQUEST": TILA REQUEST, RESPA REQUEST,
COMPLAINT OF PROBABLE FRAUD IN THE FACTUM, DISPUTE OF DEBT &
VALIDATION OF DEBT**

Reference:     Alleged Mortgage Loan # 125049243 / 1009111244
               Private Land & Chattel Property located at
               14840 119TH PL NE
               KIRKLAND. WASHINGTON

Attention Authorized Representative for the Above Referenced Companies / Corporations:

After several consultation meetings with Legal Counsel and knowledgeable accountants regarding this
matter, I am writing to formally complain about intentional accounting omissions and probable fraud in
the factum that took place at the closing in the purchase of my home. I need a clear understanding and
clarification (**FULL DISCLOSURE**) of the transactions that occurred at my signing of the initial
documents. the funding source. legal and beneficial ownership. charges, credits, debits. transactions.
reversals, actions. payments. analyses and records related to the servicing of this account from its
origination to the present date.

With our nation's mortgage default crisis and the mortgage scams that have occurred against millions of
American families. I am most concerned that potential fraudulent and deceptive practices have been
committed against me in the intentional omission of due consideration in the exchange of my promissory
note. my signing of the mortgage note and security agreement: including deceptive and fraudulent
servicing practices to enhance balance sheets: deceptive. abusive and fraudulent accounting tricks.

I hereby **DEMAND** absolute first-hand evidence from you and/or your legal department with regard to
the original signed promissory note and an uncertificated or certificated security concerning account
numbers 125049243 / 1009111244. In the event you refuse or fail to supply me with these documents it
will be positive confirmation on your part that INDYMAC BANK, F.S.B never really created and owned
a security. I also hereby **DEMAND** that a chain of transfer from you to wherever the security is now be
promptly sent to me as well. Absent the actual evidence of the security, I have no choice but to dispute the
validity of your lawful ownership, funding, entitlement right, and the current debt you allege I owe. By
debt. I am referring to the principal balance you claim I owe: the calculated monthly payment. calculated
escrow payment and any fees claimed to be owed by you or any trust or entity you may service or
subservice for.

**To independently validate this debt, I need to conduct a complete exam. audit. review and
accounting of this mortgage account from its inception through the present date. Upon receipt of
this QUALIFIED WRITTEN REQUEST, please refrain from reporting any negative credit
information [if any] to any credit reporting agency until you respond to each of the requests.**

I also request that you conduct your own investigation and audit of this account since its inception to
validate the debt you currently claim I owe. Upon receipt of your answers and production of documents. I
will contract with my CPA to do another audit for a secondary validation. I **DEMAND** that you validate
this debt so that it is accurate to the penny!

I firmly request that you do not rely on previous servicers or originators records, assurances or indemnity
agreements and refuse to conduct a full audit and investigation of this account. I understand that potential
abuses by you or previous servicers could have deceptively, wrongfully, unlawfully, and/or illegally:

   ◊    Increased the amounts of monthly payments:
   ◊    Increased the principal balance I owe:
   ◊    Increased escrow payments:

◊       Increased the amounts applied and attributed toward interest on this account;
◊       Decreased the proper amounts applied and attributed toward principal on this account;
◊       Assessed, charged and/or collected fees, expenses and misc. charges I am not legally obligated to pay under this mortgage, note and/or deed of trust.

I **DEMAND** that you demonstrate that I have not been the victim of such predatory, fraudulent servicing or lending practices that have occurred throughout the nation.

To ensure this, I have authorized a thorough review, examination, accounting and audit of mortgage account # 125049243 / 1009111244 by mortgage auditing and predatory servicing or lending experts. These exam and audit experts will review this mortgage account file from the date of initial contact with the mortgage provider, INDYMAC BANK, F.S.B. their applications and the origination of this account to the present date.

Again this is a **Qualified Written Request** under the Truth In Lending Act [TILA] 15 U.S.C. § 1601, et seq., the Fair Debt Collection Practices Act (FDCPA) and the Real Estate Settlement Procedures Act ("RESPA"), codified as Title 12 § 2605 (e)(1)(B) (e) and Reg. X § 3500.21(f)2 of the United States Code. TAKE NOTICE that RESPA provides substantial penalties and fines for non-compliance or failure to answer my questions & production of documents as requested in this letter within twenty [20] business days of its receipt.

In order to conduct the examination and audit of this loan, I need to have full and immediate disclosure including copies of all pertinent information regarding this loan. The documents requested and answers to my questions are needed for me and my audit experts to insure that this loan:

1. Was originated in lawful compliance with all federal and state laws, regulations including, but not limited to TILA, FDCPA, RESPA, HOEPA and other laws;

2. That any sale or transfer of this account or monetary instrument, was conducted in accordance with proper laws and was a lawful sale with complete disclosure to all parties with an interest;

3. That the claimed holder in due course of the monetary instrument/deed of trust/asset is holding such note in compliance with statutes, State and Federal laws and is entitled to the benefits of payments;

4. That all good faith and reasonable disclosures of transfers, sales, Power of Attorney, monetary instrument ownership, entitlements, full disclosure of actual funding source, terms, costs, commissions, rebates, kickbacks, fees etc., were and still are properly disclosed to me;

5. That each servicer and/or sub-servicers of this mortgage have serviced this mortgage in accordance with statute, laws and the terms of mortgage, monetary instrument/deed of trust;

6. That each servicer and sub-servicers of this mortgage have serviced this mortgage in compliance with local, state and federal statutes, laws and regulations;

7. That this mortgage account has properly been credited, debited, adjusted, amortized and charged correctly;

8. That interest and principal have been properly calculated and applied to this loan;

9. That any principal balance has been properly calculated, amortized and accounted for; that no charges, fees or expenses, not obligated by me in any agreement, have been charged, assessed or collected from this account;

In order to validate this debt and audit this account, I need copies of pertinent documents to be provided to me. I also need answers, certified, in writing, to various servicing questions. For each record kept on computer or in any other electronic file or format, please provide a paper copy of all information in each field or record in each computer system, program or database used by you that contains any information on this account number or my name.

As such, please mail to me, at the address above, copies of the documents requested below as soon as possible. Please provide copies of:

10. Any certificated or uncertificated security, front and back, used for the funding of account # 125049243.

11. Any and all "Pool Agreement(s)" including account # 125049243 between INDYMAC BANK, F.S.B and INDYMAC MORTGAGE SERVICES account # 1009111244 and any government sponsored entity, hereinafter (GSE).

12. Any and all "Deposit Agreement(s)" regarding account # 125049243 or the "Pool Agreement" including account # 125049243 between INDYMAC BANK, F.S.B and INDYMAC MORTGAGE SERVICES account # 1009111244 and any GSE.

13. Any and all "Servicing Agreement(s)" between INDYMAC BANK, F.S.B and INDYMAC MORTGAGE SERVICES and any GSE.

14. Any and all "Custodial Agreement(s)" between INDYMAC BANK, F.S.B and INDYMAC MORTGAGE SERVICES and any GSE.

15. Any and all "Master Purchasing Agreement(s)" between INDYMAC BANK, F.S.B and INDYMAC MORTGAGE SERVICES and any GSE.

16. Any and all "Issuer Agreement(s)" between INDYMAC BANK, F.S.B and INDYMAC MORTGAGE SERVICES and any GSE.

17. Any and all "Commitment to Guarantee" agreement(s) between INDYMAC BANK, F.S.B and INDYMAC MORTGAGE SERVICES and any GSE.

18. Any and all "Release of Document agreements" between INDYMAC BANK, F.S.B and INDYMAC MORTGAGE SERVICES and any GSE.

19. Any and all "Master Agreement(s) for servicer's Principle and Interest Custodial Account(s)" between INDYMAC BANK, F.S.B and any GSE.

20. Any and all "Servicers Escrow Custodial Account" between INDYMAC BANK, F.S.B and INDYMAC MORTGAGE SERVICES and any GSE.

21. Any and all "Release of Interest" agreements between INDYMAC BANK, F.S.B and INDYMAC MORTGAGE SERVICES and any GSE.

22. Any Trustee agreement(s) between INDYMAC BANK, F.S.B and INDYMAC MORTGAGE SERVICES trustee regarding account # 125049243 and or # 1009111244 or pool accounts with any GSE.

23. Please send to the requester a copy of any documentation evidencing any trust relationship regarding the Mortgage/Deed of Trust **and** any Note in this matter.

24. Please send to the requester a copy of any and all document(s) establishing any Trustee of record for the Mortgage/Deed of Trust **and** any Note.

25. Please send to the requester a copy of any and all document(s) establishing the date of any appointment of Trustee for this Mortgage/Deed of Trust **and** any Note. Please also include any and all assignments or transfers or nominees of any substitute trustee(s).

26. Please send to the requester a copy of any and all document(s) establishing any Grantor for this Mortgage/Deed of Trust **and** any Note.

27. Please send to the requester a copy of any and all document(s) establishing any Grantee for this Mortgage/Deed of Trust **and** any Note.

28. Please send to the requester a copy of any and all document(s) establishing any Beneficiary for this Mortgage/Deed of Trust **and** any Note.

29. Please send to the requester any documentation evidencing the Mortgage or Deed of trust is **not** a constructive trust or any other form of trust.

30. Please send to the requester a certified copy of the signed promissory note showing the front and back of the document.

31. All data, information, notations, text, figures and information contained in your mortgage servicing and accounting computer systems including, but not limited to Alltel or Fidelity CPI system, or any other similar mortgage servicing software used by you, any servicers, or sub-servicers of this mortgage account from the inception of this account to the date written above.

32. All descriptions and legends of all Codes used in your mortgage servicing and accounting system so that the examiners, auditors and experts retained to audit and review this mortgage account may properly conduct their work.

33. All assignments, transfers, allonges, or other document evidencing a transfer, sale or assignment of this mortgage, deed of trust, monetary instrument or other document that secures payment by me to this obligation in this account from the inception of this account to the present date including any such assignments on MERS.

34. All records, electronic or otherwise, of assignments of this mortgage, monetary instrument or servicing rights to this mortgage including any such assignments on MERS.

35. All deeds in lieu, modifications to this mortgage, monetary instrument or deed of trust from the inception of this account to the present date.

36. The front and back of each and every canceled check, money order, draft, debit or credit notice issued to any servicers of this account for payment of any monthly payment, other payment, escrow charge, fee or expense on this account.

37. All escrow analyses conducted on this account from the inception of this account until the date of this letter;

38. The front and back of each and every canceled check, draft or debit notice issued for payment of closing costs, fees and expenses listed on any and all disclosure statement(s) including, but not limited to, appraisal fees, inspection fees, title searches, title insurance fees, credit life insurance premiums, hazard insurance premiums, commissions, attorney fees, points, etc.

39. Front and back copies of all payment receipts, checks, money orders, drafts, automatic debits and written evidence of payments made by others or me on this account.

40. All letters, statements and documents sent to me by your company;

41. All letters, statements and documents sent to me by agents, attorneys or representatives of your company;

42. All letters, statements and documents sent to me by previous servicers, sub-servicers or others in your account file or in your control or possession or in the control or possession of any affiliate, parent company, agent, sub-servicers, servicers, attorney or other representative of your company.

43. All letters, statements and documents contained in this account file or imaged by you, any servicers or sub-servicers of this mortgage from the inception of this account to present date.

44. All electronic transfers, assignments, sales of the note/asset, mortgage, deed of trust or other security instrument.

45. All copies of my property inspection reports, appraisals, BPOs and reports done on the property.

46. All invoices for each charge such as inspection fees, BPOs, appraisal fees, attorney fees, insurance, taxes, assessments or any expense, which has been charged to this mortgage account from the inception of this account to the present date.

47. All checks used to pay invoices for each charge such as inspection fees, BPOs, appraisal fees, attorney fees, insurance, taxes, assessments or any expense which has been charged to this mortgage account from the inception of this account to the present date.

48. All agreements, contracts and understandings with vendors that have been paid for any charge on this account from the inception of this account to the present date.

49. All account servicing records, payment payoffs, payoff calculations, ARM audits, interest rate adjustments, payment records, transaction histories, account histories, accounting records, ledgers, and documents that relate to the accounting of this account from the inception of this account until the date of this RESPA request.

50. All account servicing transaction records, ledgers, registers and similar items detailing how this account has been serviced from the from the inception of this account until the date of this RESPA request.

Further, in order to conduct the audit and review of this account, and to determine all proper amounts due, I need the following answers to questions concerning the servicing and accounting of this mortgage account from its inception to the present date. Accordingly, please provide me, in writing, the answers to the following questions listed below.

## ACCOUNT ACCOUNTING & SERVICING SYSTEMS

51. Please identify for me each account accounting and servicing system used by you and any sub-servicers or previous servicers from the inception of this account to the present date so that the experts can decipher the data provided. I demand a certified Transaction Chart (T Chart) showing the GAAP journal entries made at the inception.

52. For each account accounting and servicing system identified by you and any sub-servicers or previous servicers from the inception of this account to the present date, please provide the name and address of the company or party that designed and sold the system.

53. For each account accounting and servicing system used by you and any sub-servicers or previous servicers from the inception of this account to the present date, please provide the complete transaction code list for each system so that I, and others can adequately audit this account.

## DEBITS & CREDITS

54. Pursuant to banking law 12 USCA § 1813, please provide me the deposit slip for the alleged borrower's promissory note(s) that were issued to INDYMAC BANK, F.S.B for processing through the Federal Reserve Bank in exchange for borrower's credit on January 8, 2007 and deposited on or around February 8, 2007.

55. In a spreadsheet form or in letter form in a columnar format, please detail for me each and every credit on this account and the date such credit was posted to this account as well as the date any credit was received.

56. Please provide the order authorizing the withdrawal of funds from the borrower's promissory note deposit account.

57. In a spreadsheet form or in letter form in a columnar format, please detail for me each and every debit on this account and the date debit was posted to this account as well as the date any debit was received.

58. For each debit or credit listed, please provide me with the definition for each corresponding transaction code you utilize?

59. For each transaction code, please provide us with the master transaction code list used by you or previous servicers.

## MORTGAGE & ASSIGNMENTS

60. Has each sale, transfer or assignment of this mortgage, monetary instrument, deed of trust or any other instrument I executed to secure this debt been recorded in the parish/county property records in the parish/county and state in which my land and chattel property is located from the inception of this account to the present date? Yes or No?

61. If not, why?

62. Is your company the servicers of this mortgage account or the holder in due course and beneficial owner of this mortgage, monetary instrument and/or deed of trust?

63. Have any sales, transfers or assignments of this mortgage, monetary instrument, deed of trust or any other instrument I executed to secure this debt been recorded in any electronic fashion such as MERS or other internal or external recording system from the inception of this account to the present date? Yes or No?

64. If yes, please detail for me the names of each seller, purchaser, assignor, assignee or any holder in due course to any right or obligation of any note, mortgage, deed or security instrument I executed securing the obligation on this account that was not recorded in the county records where my property is located whether they be mortgage servicing rights or the beneficial interest in the principal and interest payments.

## ATTORNEY FEES

65. For purposes of my questions below dealing with attorney fees, please consider the terms attorney fees and legal fees to be one in the same.

66. Have attorney fees ever been assessed to this account from the inception of this account to the present date?

67. If yes, please detail each separate assessment, charge and collection of attorney fees to this account from the inception of this account to the present date and the date of such assessment to this account?

68. Have attorney fees ever been charged to this account from the inception of this account to the present date?

69. If yes, please detail each separate charge of attorney fees to this account from the inception of this account to the present date and the date of such charge to this account?

70. Have attorney fees ever been collected from this account from the inception of this account to the present date?

71. If yes, please detail each separate collection of attorney fees from this account from the inception of this account to the present date and the date of such collection from this account?

72. Please provide for me the name and address of each attorney or law firm that has been paid any fees or expenses related to this account from the inception of this account to the present date?

73. Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, deed of trust or any agreement I signed which authorized the assessment, charge or collection of attorney fees.

74.  Please detail and list for me in writing each separate attorney fee assessed to this account and for which corresponding payment period or month such fee was assessed from the inception of this account to present date.

75.  Please detail and list for me in writing each separate attorney fee collected from this account and for which corresponding payment period or month such fee was collected from the inception of this account to present date.

76.  Please detail and list for me in writing any adjustments in attorney fees assessed and on what date such adjustment was made and the reasons for such adjustment.

77.  Please detail and list for me in writing any adjustments in attorney fees collected and on what date such adjustment(s) were made and the reasons for such adjustment(s).

78.  Has interest been charged on any attorney fee assessed or charged to this account? Yes or No?

79.  Is interest allowed to be assessed or charged on attorney fees charged or assessed to this account? Yes or No?

80.  How much in total attorney fees have been assessed to this account from the inception of this account until present date? $_____

81.  How much in total attorney fees have been collected on this account from the inception of this account until present date? $_____

82.  How much in total attorney fees have been charged to this account from the inception of this account until present date? $_____

83.  Please send to me copies of all invoices and detailed billing statements from any law firm or attorney that has billed such fees that have been assessed or collected from this account.

## SUSPENSE/UNAPPLIED ACCOUNTS

For purposes of this section, please treat the term suspense account and unapplied account as one and the same.

84.  Have there been any suspense or unapplied account transactions on this account from the inception of this account until present date?

85.  If yes, please explain the reason for each and every suspense transaction that occurred on this account? If no, please skip the questions in this section dealing with suspense and unapplied accounts.

86.  In a spreadsheet or in letter form in a columnar format, please detail for me each and every suspense or unapplied transaction, both debits and credits that have occurred on this account from the inception of this account until present date.

## LATE FEES

For purposes of my questions below dealing with late fees, please consider the terms late fees and late charges to be one in the same.

87.  Have you reported the collection of late fees on this account as interest in any statement to me or to the IRS? Yes or No?

88.  Has any previous servicers or sub-servicers of this mortgage reported the collection of late fees on this account as interest in any statement to me or to the IRS? Yes or No?

89.  Do you consider the payment of late fees as liquidated damages to you for not receiving payment on time? Yes or No?

90.   Are late fees considered interest? Yes or No?

91.   Please detail for me in writing what expenses and damages you incurred for any payment I made that was late.

92.   Were any of these expenses or damages charged or assessed to this account in any other way? Yes or No?

93.   If yes, please describe what expenses or charges were charged or assessed to this account.

94.   Please describe for me in writing what expenses you or others undertook due to any payment I made, which was late.

95.   Please describe for me in writing what damages you or others undertook due to any payment I made which was late.

96.   Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, deed of trust or any agreement I signed which authorized the assessment or collection of late fees.

97.   Please detail and list for me in writing each separate late fee assessed to this account and for which corresponding payment period or month such late fee was assessed from the inception of this account to present date.

98.   Please detail and list for me in writing each separate late fee collected from this account and for which corresponding payment period or month such late fee was collected from the inception of this account to present date.

99.   Please detail and list for me in writing any adjustments in late fees assessed and on what date such adjustment was made and the reasons for such adjustment.

100.  Has interest been charged on any late fee assessed or charged to this account? Yes or No?

101.  Is interest allowed to be assessed or charged on late fees charged or assessed to this account? Yes or No?

102.  Have any late charges been assessed to this account? Yes or No?

103.  If yes, how much in total late charges have been assessed to this account from the inception of this account until present date? $ _____

104.  Please provide me with the exact months or payment dates you or other previous servicers of this account claim I have been late with a payment from the inception of this account to the present date.

105.  Have late charges been collected on this account from the inception of this account until present date? Yes or No?

106.  If yes, how much in total late charges have been collected on this account from the inception of this account until present date? $ _____

## LAND & CHATTEL PROPERTY INSPECTIONS

107.  For purposes of this section property inspection and inspection fee refer to any inspection of property by any source and any related fee or expense charged, assessed or collected for such inspection.

108.  Have any property inspections been conducted on my land and chattel property from the inception of this account until the present date?

109. If your answer is no, you can skip the rest of these questions in this section concerning property inspections.

110. If yes, please tell me the date of each property inspection conducted on my land & chattel property that is the secured interest for this mortgage, deed or note?

111. Please tell me the price charged for each property inspection.

112. Please tell me the date of each property inspection.

113. Please tell me the name and address of each company and person who conducted each property inspection on my land & chattel property.

114. Please tell me why property inspections were conducted on my property.

115. Please tell me how property inspections are beneficial to me.

116. Please tell me how property inspections are protective of my land & chattel property.

117. Please explain to me your policy on property inspections.

118. Do you consider the payment of inspection fees as a cost of collection? Yes or No?

119. If yes, why?

120. Do you use property inspections to collect debts? Yes or No?

121. Have you used any portion of the property inspection process on my land & chattel property to collect a debt or inform me of a debt, payment or obligation I owe?

122. If yes, please answer when and why?

123. Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, deed of trust or any agreement I signed that authorized the assessment or collection of property inspection fees?

124. Have you labeled in any record or document sent to me a property inspection as a miscellaneous advance? Yes or No?

125. If yes, why?

126. Have you labeled in any record or document sent to me a property inspection as a legal fee or attorney fee? Yes or No?

127. If yes, why?

128. Please detail and list for me in writing each separate inspection fee assessed to this account and for which corresponding payment period or month such fee was assessed from the inception of this account to present date.

129. Please detail and list for me in writing each separate inspection fee collected from this account and for which corresponding payment period or month such fee was collected from the inception of this account to present date.

130. Please detail and list for me in writing any adjustments in inspection fees assessed and on what date such adjustment was made and the reasons for such adjustment.

131. Please detail and list for me in writing any adjustments in inspection fees collected and on what date such adjustment was made and the reasons for such adjustment.

132. Has interest been charged on any inspection fees assessed or charged to this account? Yes or No?

133. If yes, when and how much was charged?

134. Is interest allowed to be assessed or charged on inspection fees or assessed to this account? Yes or No?

135. How much in total inspection fees have been assessed to this account from the inception of this account until present date? $_____

136. How much in total inspection fees have been collected on this account from the inception of this account until present date? $_____

137. Please forward to me copies of all property inspections made on my property in this mortgage account file.

138. Has any fee charged or assessed for property inspections been placed into escrow account? Yes or no?

**BPO FEES**

139. Have any BPOs [Broker Price Opinions] been conducted on my land & chattel property?

140. If yes, please tell me the date of each BPO conducted on my land & chattel property that is the secured interest for this mortgage, deed or note?

141. Please tell me the price of each BPO.

142. Please tell me who conducted each BPO.

143. Please tell me why BPOs were conducted on my land & chattel property.

144. Please tell me how BPOs are beneficial to me.

145. Please tell me how BPOs are protective of my land & chattel property.

146. Please explain to me your policy on BPOs.

147. Have any BPO fees been assessed to this account? Yes or No?

148. If yes, how much in total BPO fees have been assessed to this account? $_____

149. Have any BPO fees been charged to this account? Yes or No?

150. If yes, how much in total BPO fees have been charged to this account? $_____

151. Please tell me specifically what clause, paragraph and sentence in the note, mortgage or deed of trust or any agreement I have executed allows you to assess, charge or collect a BPO fee from me.

152. Please send to me copies of all BPO reports that have been done on my land & chattel property.

153. Has any fee charged or assessed for a BPO been placed into escrow? Yes or no?

**FORCED-PLACED INSURANCE**

154. Have you placed or ordered any forced-placed insurance polices on my land & chattel property?

155. If yes, please tell me the date of each policy ordered or placed on my property that is the secured interest for this mortgage, deed or note.

156. Please tell me the price of each policy.

157. Please tell me the agent for each policy.

158. Please tell me why each policy was placed on my land & chattel property.

159. Please tell me how the policies are beneficial to me.

160. Please tell me how policies are protective of my land & chattel property.

161. Please explain to me your policy on forced-placed insurance.

162. Have any forced-placed insurance fees been assessed to this mortgage or escrow account? Yes or No?

163. If yes, how much in total forced-placed policy fees have been assessed to this account? $_____

164. Have any forced-placed insurance fees been charged to this mortgage or escrow account? Yes or No?

165. If yes, how much in total forced-placed insurance fees have been charged to this mortgage or escrow account? $_____

166. Please tell me specifically what clause, paragraph and sentence in the note, mortgage or deed of trust or any agreement I have executed allows you to assess, charge or collect forced-placed insurance fees from me.

167. Do you have any relationship with the agent or agency that placed any policies on my land and chattel property? If yes, please describe.

168. Do you have any relationship with the carrier that issued any policies on my land & chattel property? If yes, please describe.

169. Has the agency or carrier you used to place a forced-placed insurance policy on my land & chattel property provided you any service, computer system, discount on policies, commissions, rebates or any form of consideration? If yes, please describe.

170. Do you maintain a blanket insurance policy to protect your properties when customer policies have expired? If yes, please send me a copy of each such policy.

171. Please send to me copies of all forced-placed insurance policies that have been ordered on my land & chattel property.

**SERVICING RELATED QUESTIONS**

For each of the following questions listed below, please provide me with a detailed explanation in writing that answers each question. In addition, I need the following answers to questions concerning the servicing of this mortgage account from its inception to the present date. Accordingly, can you please provide me, in writing, the answers to the questions listed below:

172. Did the originator or previous servicers of this account have any financing agreements or contracts with your company or an affiliate of your company?

173. Did the originator of this account or previous servicers of this account have a warehouse account agreement or contract with your company?

174. Did the originator of this account or previous servicers of this account receive any compensation, fee, commission, payment, rebate or other financial consideration from your company or any affiliate of your company for handling, processing, originating or administering this loan? If yes, please describe and itemize each and every form of compensation, fee, commission, payment, rebate or other financial consideration paid to the originator of this account by your company or any affiliate.

175. Please identify for me where the originals of this entire account file are currently located and how they are being stored, kept and protected?

176. Where is the original monetary instrument (*promissory note*) or mortgage I signed located? Please describe its physical location and anyone holding this note as a custodian or trustee if applicable.

177. Where is the original deed of trust or mortgage and note I signed located? Please describe its physical location and anyone holding this note as a custodian or trustee if applicable.

178. Since the inception of this loan, has there been any assignment of my monetary instrument/asset to any other party? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that has received such assignment.

179. Since the inception of this loan, has there been any assignment of the deed of trust or mortgage and note to any other party? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that has received such assignment.

180. Since the inception of this loan, has there been any sale or assignment of servicing rights to this mortgage account to any other party? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that has received such assignment or sale.

181. Since the inception of this loan, have any sub-servicers serviced any portion of this mortgage loan? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that have sub-serviced this mortgage loan.

182. Has this mortgage account been made a part of any mortgage pool since the inception of this loan? If yes, identify for me each and every account mortgage pool that this mortgage has been a part of from the inception of this account to the present date.

183. Has each and every assignment of my asset/monetary instrument been recorded in the parish/county land records where the property associated with this mortgage account is located?

184. Has there been any electronic assignment of this mortgage with MERS [Mortgage Electronic Registration System] or any other computer mortgage registry service or computer program? If yes, identify the name and address of each and every individual, entity, party, bank, trust or organization or servicers that have been assigned the mortgage servicing rights to this account as well as the beneficial interest to the payments of principal and interest on this loan.

185. Have there been any investors [as defined in your industry] who have participated in any mortgage-backed security, collateral mortgage obligation or other mortgage security instrument that this mortgage account has ever been a part of from the inception of this mortgage to the present date? If yes, identify the name and address of each and every individual, entity, organization and/or trust involved.

186. Please identify for me the parties and their addresses to all sales contracts, servicing agreements, assignments, alonges, transfers, indemnification agreements, recourse agreements and any agreement related to this account from its inception to the current date written above.

187. Please provide me with copies of all sales contracts, servicing agreements, assignments, alonges, transfers, indemnification agreements, recourse agreements and any agreement related to this account from its inception to the current date written above.

188. How much was paid for this individual mortgage account by you?

189. If part of a mortgage pool, what was the principal balance used by you to determine payment for this individual mortgage loan.

190. If part of a mortgage pool, what was the percentage paid by you of the principal balance above used to determine purchase of this individual mortgage loan.

191. Who did you issue a check or payment to for this mortgage loan?

192. Please provide me copies with the front and back of canceled check.

193. Did any investor approve the foreclosure of my property?

194. Has HUD assigned or transferred foreclosure rights to you as required by 12 USC 3754?

195. Please identify all persons who approved the foreclosure of my property!

196. Has INDYMAC BANK, F.S.B and/or INDYMAC MORTGAGE SERVICES been paid any insurance claim based on requester's alleged default of mortgage agreement?

197. If so, provide the amount of insurance payment collect by INDYMAC BANK, F.S.B and/or INDYMAC MORTGAGE SERVICES $_____

198. If insurance has been paid, please provide document signed under the penalty of perjury showing where there is still alleged debt owed by James Bradley McDonald.

Under the Truth In Lending Act [TILA] 15 U.S.C. § 1601. et seq., the Fair Debt Collection Practices Act (FDCPA) and the Real Estate Settlement Procedures Act ("RESPA"), codified as Title 12 § 2605 (e)(1)(B) (e) and Reg. X § 3500.21(f)2 of the United States Code it is mandatory that you provide me full disclosure of the alleged debt that is said to be owed before proceeding any further with your collection action from twenty (20) days of receipt of this QUALIFIED WRITTEN REQUEST. If you do not provide all answers and production of documents requested in this Notice, you will be in fault, admitting no lawful claim and a default will be in order. Your admission of no lawful claim will be the basis for our Right to Cancel. A Notice of Right to Cancel will be issued twenty (20) days from the date of receipt of this CONSTRUCTIVE LEGAL NOTICE.

---

## AFFIDAVIT OF FACT

14840 119TH PL NE
KIRKLAND, WASHINGTON

STATE OF WASHINGTON )
COUNTY OF KING     ) ss.

I, James Bradley McDonald, hereafter Affiant, being of sound mind, competent and able to testify to the accuracy of this Affidavit, hereby confirms that all the facts stated and affirmed herein are true, correct, complete, and not misleading, admissible as evidence, and if testifying shall so state under the penalty of perjury:

1. That, Affiant makes this Affidavit based on first hand knowledge of all the facts stated herein, including the research of federal and state laws and public policy documents that govern monetary instruments related to banking and financial institutions.

2. That, Affiant did sign alleged loan documents with INDYMAC BANK, F.S.B at INTEGRATED ESCROW office in SEATTLE, WASHINGTON on January 8, 2007 concerning property located at 14840 119TH PL NE, KIRKLAND, WASHINGTON.

3. That, Affiant did sign a promissory note and issued to INDYMAC BANK, F.S.B for processing on January 8, 2007; the promissory note was for the sum of $389,482.

4. That, Affiant was rushed by INDYMAC BANK, F.S.B representatives to sign other alleged closing documents and was not provided time to review or provided a clear understanding of the terms and conditions of these documents that he was requested to sign.

5. That, since the above events and the exposure of this nation's mortgage default crisis, Affiant has recently learned that there has been possible fraud committed against him by INDYMAC BANK, F.S.B representatives in withholding FULL DISCLOSURE at the signing of closing documents and that it appears fraud in the factum has been committed against him regarding his signing the mortgage note and Deed of Trust.

6.  That, Affiant confirms that attorney firm NORTHWEST TRUSTEE SERVICES, INC allegedly hired by ONE WEST BANK has issued a Notice of Intent to Foreclose to Affiant dated JANUARY 15, 2010.

7.  That, Affiant affirms hereby that NORTHWEST TRUSTEE SERVICES, INC does not have first hand knowledge of the probable fraud in the factum committed by their alleged client, ONE WEST BANK.

8.  That, Affiant confirms and re-affirms his lawful and timely dispute and demands full compliance in providing FULL DISCLOSURE to all requested questions and provide all request for documentation per the LAWFUL DEBT VALIDATION DEMAND annexed hereto and made a part hereof.

9.  That, INDYMAC BANK, F.S.B registered agent and INDYMAC MORTGAGE SERVICES acting as servicer are being served this Affidavit and LAWFUL DEBT VALIDATION DEMAND.

I hereby state that the above is true to the best of my knowledge and understanding.

Date: 4 / 27 , 2010          BY: _____

JAMES BRADLEY MCDONALD
14840 119TH PL NE
KIRKLAND, WA 98034
TEL: (425) 210-0614


## Jurat

State of WASHINGTON

County of ___King___

Subscribed and sworn to (or affirmed) before me on this __27TH__ day of

____April____, 2010 by __James Bradley McDonald__, proved

to me on the basis of satisfactory evidence to be the person(s) who appeared before me.


_____          (Seal)
Signature of Notary Public

# EXHIBIT E
# Freddie Mac
# Statement

 

# Our Business

In 1970, Congress created Freddie Mac with a few important goals in mind:

- Make sure that financial institutions have mortgage money to lend
- Make it easier for consumers to afford a decent house or apartment
- Stabilize residential mortgage markets in times of financial crisis

To fulfill this mission, Freddie Mac conducts business in the U.S. secondary mortgage market – meaning we do not originate loans – and works with a national network of mortgage lending customers. We have three business lines: a Single Family Credit Guarantee business for home loans; a Multifamily business for apartment financing; and an investment portfolio.

Single-Family Credit Guarantee Business
Multifamily Business
Investment Business
Benefits
Conservatorship
Foreclosure Prevention

## Single-Family Credit Guarantee Business



In our Single-Family business, we use mortgage securitization to fund millions of home loans every year. Securitization is a process by which we purchase home loans that lenders originate, put these loans into mortgage securities that are sold in global capital markets, and recycle the proceeds back to lenders. This recycling is designed to ensure that lenders have mortgage money to lend. During 2009, Freddie Mac guaranteed $475 billion in home loans, representing 2.2 million families who purchased or refinanced their homes. And at year-end 2009, our total outstanding obligations of mortgage-backed securities stood at $1.9 trillion.

What makes the securitization process work? Families paying their mortgages every month. Because once a family moves into their home, their monthly payments of mortgage principal and interest are transferred ultimately to securities investors. When a family stops making payments – often due to loss of income – Freddie Mac steps in and makes those payments to securities investors. Managing this risk, known as credit risk, is how we generate revenue. Each time we fund a loan, we collect a credit guarantee fee from the lender selling us the loan. This fee is intended to protect us in case of loan default.

Other features of this business line:

- We guarantee mortgages exclusively in the conventional conforming market, where we purchase loans only up to a certain dollar amount [PDF] (for 2010, $417,000 for most of the nation and $729,750 in high-cost areas)
- The vast majority of the loans we fund are long term, fixed rate mortgages
- We generally require third-party mortgage insurance on loans with low downpayments
- We have loan servicing operations that work with lenders to avoid foreclosure, where possible, for families in financial difficulty

## Multifamily Business

Since not everyone owns their own home, Freddie Mac supports renters, too. Through our Multifamily business, we work with a network of lenders to finance apartment buildings around the country. Like single-family loans, these lenders originate and close loans that Freddie Mac later purchases; lenders then use the proceeds to originate additional loans.

Unlike single-family loans, which are relatively small in dollar amount and standardized in their composition and underwriting, multifamily loans typically are several million dollars in size, have underwriting characteristics that vary from property to property, and require custom examination such as on-site property inspections and verification of income cash flows (i.e., rents). One other difference: while single-family borrowers are individual consumers, multifamily borrowers are property developers and/or managers.

In this business line, Freddie Mac finances most of its loan acquisitions by issuing corporate debt securities. We generate revenue by producing what is known as net interest income; that is, the difference between the interest payments we collect on the multifamily loans we own and the yields we pay securities investors for investing in our debt. Freddie Mac also funds

some multifamily loans through securitization. And, market conditions permitting, we invest in certain commercial mortgage-backed securities that contain multifamily loans.

During 2009, Freddie Mac funded $16.6 billion in multifamily loans, which helped provide rental units for 250,000 families. At year-end 2009, the portfolio of multifamily loans outstanding was $99 billion.

## Investment Business

The investment portfolio invests in mortgage-related securities that are guaranteed by Freddie Mac and other financial institutions. The portfolio also invests in individual loans that are guaranteed by Freddie Mac but not immediately securitized. As a bidder in the market, the investment portfolio helps to make mortgage-related securities more liquid and mortgage funding more available.

We fund acquisition of mortgage securities by issuing debt securities, generating net interest income. During 2009, the investment portfolio acquired a net of $255 billion in mortgage-related securities. At year-end 2009, the investment portfolio had an outstanding balance of $755 billion. Roughly one-half of this balance includes Freddie Mac mortgage-backed securities, known as Participation Certificates, guaranteed by the Single-Family and Multifamily businesses. During 2010, the investment portfolio can be no larger than $810 billion, per our regulator.

## Benefits

The activities performed by Freddie Mac's business lines have certain public policy benefits.

First, we have been a consistent market presence, providing mortgage liquidity in a wide range of economic environments. This has become significant during the credit crunch that began in mid-2007 and resulted in the exit of most other mortgage funders from the market. Indeed, in 2009 Freddie Mac and Fannie Mae funded 72 percent of all new home loans and an even higher percentage of multifamily loans.

Second, consumers have enjoyed uninterrupted access to long term, fixed rate mortgages. Banks and other depositories tend to hold shorter term, floating rate assets in their loan portfolios. These institutions finance long-term, fixed-rate mortgages (i.e., 15-, 20- and 30-year terms) largely by selling them into the secondary market, where Freddie Mac and Fannie Mae securitize and guarantee the loans. In 2009, long term, fixed-rate mortgages comprised 97 of new home loans.

Third, consumers have typically paid less on home loans funded by Freddie Mac or Fannie Mae. Because investors usually place a greater value on our mortgage securities, we have been able to pass this premium ultimately along to homebuyers in the form of lower mortgage rates. During normal or flush markets, where there are many sources of mortgage funds, homebuyer savings on our loans have averaged about 0.30 percent (or 30 basis points) compared to loans that exceed our loan limits. During the credit crunch that began in 2007, however, mortgage rate savings have been high as 1.84 percent (or 184 basis points). At year-end 2009, consumers were paying 0.91 percent (or 91 basis points) less on loans backed by Freddie Mac and Fannie Mae.

Fourth, consumers are able to refinance their loans when mortgage rates decline. Because of the nature of long-term, fixed-rate mortgages, homeowners are protected against rising interest rates but are able to take advantage of declining rates through refinancing. In 2009, Freddie Mac refinanced $379 billion in home loans for 1.7 million families who reduced their annual mortgage payments by $2,600 on average. In other words, mortgage refinanced enabled by Freddie Mac in 2009 created $4.5 billion in homeowner savings.

Fifth, all these benefits accrue the most to families of modest financial means. The majority of home loans that we fund support low- and moderate-income families, reflecting affordable housing goals set forth by the federal government. Further, more than four in five multifamily loans support renters earn at or below the area median income where they live.

## Conservatorship

Since September 2008, Freddie Mac (and Fannie Mae) have been in conservatorship, operating under the direction of the Federal Housing Finance Agency (FHFA). Conservatorship allows Freddie Mac to continue supporting mortgage markets while ensuring our financial solvency.

This status also allows Freddie Mac to implement key parts the Administration's Homeowner Affordability & Stability Plan. We are continuing to provide mortgage liquidity to the broad market, supporting homebuying and refinancing alike. We are enabling homeowners currently in Freddie Mac loans to refinance even more easily, including homeowners with low or negative home equity. And we are implementing the President's standards for modifying loans so that additional families can avoid foreclosure.

## Foreclosure Prevention

Freddie Mac is an established industry leader in identifying and addressing delinquencies before they become foreclosures. Since the beginning of 2005, we have provided foreclosure alternatives to more than 525,000 distressed borrowers. We do everything we can to keep borrowers in their homes, using a variety of workout options including loan modifications (including HAMP), repayment plans and forbearance agreements depending on each borrower's individual situation. However, sometimes it is not financially feasible for the borrower to remain in the home. In those cases, we help facilitate pre-foreclosure sales (short sales and deed-in-lieu).

In response to the housing crisis, Freddie Mac stepped up our foreclosure prevention efforts significantly in 2009 - helping more than 272,000 borrowers stay in their homes or sell their properties through the company's proprietary foreclosure avoidance programs and the Administration's Making Home Affordable program. Our efforts are focused on supporting our servicers and reaching out to borrowers.

### Supporting Servicers

- Increased staff by nearly 70%.
- Placed on-site specialists at servicer shops.
- Reimbursed servicers for document collection and signature services.
- Initiated a "second look" review program targeted at declined loan modifications.

### Borrower Outreach & Support

- Participated in more than 500 foreclosure prevention workshops, meeting with borrowers nationwide.
- Allowed foreclosed families – tenants and ex-owners – to rent back their homes.
- Introduced door-knocking programs to help borrowers complete the required trial period documentation.
- Launched the Borrower Help Network with national non-profits to provide discouraged borrowers with Freddie Mac mortgages one-on-one counseling over the phone.
- Opened Borrower Help Centers in four cities nationwide to provide free financial counseling for distressed borrowers.

### Our Lines of Business

- Single-Family
- Multifamily
- Mortgage Securities
- Debt Securities

### Related Links

- Freddie Mac FAQs
- Monthly Volume Summaries
- Supporting Housing Recovery
- Weekly Primary Mortgage Market Survey

### Media Room

Read the latest news and information about Freddie Mac's business.

© 2010 Freddie Mac

# EXHIBIT F
# Freddie Mac
# HAMP Verification

Avoiding Foreclosure - Does Freddie Mac Own Your Mortgage?                    Page 1 of 2



Go straight to content.

- Home
- Terms and Conditions |
- Privacy Policy



Freddie Mac: Avoiding Foreclosure
Steps You Can Take Today to Protect Your Home

# Does Freddie Mac Own Your Mortgage?

Call your servicer -- the organization to which you make your mortgage payments -- immediately
if you are having difficulty paying your mortgage on time. The telephone number and mailing
address of your mortgage servicer should be listed on your monthly statement. There are also a
number of organizations that may be able to help you.

Your servicer should be able to tell you if your mortgage is owned by Freddie Mac. If you wish,
you may conduct a search using the secured look-up tool below. **Please enter your information
carefully** -- a spelling error or other small mistake could cause an uncertain result. Abbreviations,
typos, or including the "Street Type" in the "Street Name" field can lead to incorrect results.

## Self-Service Lookup

\* Indicates required fields

| | |
|---|---|
| First Name * | James |
| Last Name * | McDonald |
| House Number * | 14840 |
| Street Name * | 119th     Do not include "Street", "Avenue", "Drive", etc. |
| | in this form field. |
| Street Suffix | Other |
| Unit Number | |
| City * | kirkland |
| State * | WA |
| Zip Code * | Format: ##### |
| | 98034 |
| Last 4 Digits of Social Security Number * | Enter last 4 digits only. Format: #### |
| | Why do we ask for Social Security? |
| Verification * | ☑ By checking this box and clicking on the button below to submit this information, I confirm I am the owner of this property or have the consent of the owner to lookup this information. |

https://ww3.freddiemac.com/corporate/                                    9/19/2010

Avoiding Foreclosure - Does Freddie Mac Own Your Mortgage?                Page 2 of 2

[ Submit ]    [ Clear ]

Do you know what information you should have in front of you when you call your servicer?
Freddie Mac offers a variety of tips, information and resources for homeowners at
http://www.freddiemac.com/avoidforeclosure/stop_foreclosure.html.

© Freddie Mac

Case 2:10-cv-01952-RSL   Document 18   Filed 01/18/11   Page 92 of 104

Go straight to content.

- Home  |
- Terms and Conditions  |
- Privacy Policy



Freddie Mac
How to Get Help with Your Mortgage

# Yes. Our records show that Freddie Mac is the owner of your mortgage.

En Español

## What to Do Next

1. **For help with your mortgage, contact your lender and let them know you would like to pursue assistance through the federal Making Home Affordable program.**

   (Your lender is the company to which you make your mortgage payments, and may also be referred to as a mortgage servicer.)  Your lender can help you determine if you are eligible for the Making Home Affordable Program.

   a. **Through the Making Home Affordable program**, there are several options available to you:

      - A **Home Affordable Modification** to help you obtain more affordable mortage payments if you're behind in making your mortgage payments or believe you may be soon.

      - A **Home Affordable Refinance** to better position you for long-term homeownership success if you have been making timely mortgage payments but have been unable to refinance due to declining property values.

      - A **short sale** or **"deed-in-lieu of foreclosure"** to transition to more affordable housing if it is not realistic for you to keep your home.

      Freddie Mac is working with our mortgage servicers (your lenders) to offer these solutions to eligible borrowers with Freddie Mac-owned mortgages.  *Because Freddie Mac does not work directly with consumers, you will need to work with your lender to determine your best foreclosure prevention option.*

   b. **If you are not eligible for the Making Home Affordable program**, don't give up!  Ask your lender about other options to make your payments more affordable

# EXHIBIT G
# RCO Business License



# Search
BUSINESS & PROFESSIONAL LICENSES

**License Details**

**License Information:**

| | |
|---|---|
| **Entity Name:** | ROUTH CRABTREE OLSEN, P.S. |
| **Firm Name:** | ROUTH CRABTREE OLSEN, PS |
| **License Type:** | Washington State Business |
| **Entity Type:** | Professional Service Corporation |
| **UBI:** | 601840737    Business ID:001    Location ID:0002 |
| **Status:** | To check the status of this company, go to Secretary of State. |

**Location Address:**
13555 SE 36TH STE #120
BELLEVUE, WA, 98006

**Mailing Address:**
13555 SE 36TH STE #120
BELLEVUE, WA, 98006

**Governing People:**
STEPHEN ROUTH

**Registered Trade Names:**
ROUTH CRABTREE FENNELL, P.S.
ROUTH & FENNELL, P.S.
ROUTH CRABTREE FENNELL
ROUTH CRABTREE & FENNELL

Information Current as of 01/10/2011 4:50AM Pacific Time

[ New Search ]

Use of lists of individuals provided on this site for commercial purposes is prohibited under Chapter 42.56 of the Revised Code of Washington.

*This site is limited to searching for business and professional licenses issued by the Department of Licensing or through the Master License Service. See Other Licenses for information on licenses issued by other agencies.

Home | Privacy | Privacy | Conditions of Use | Conditions of Use | Other Licenses | Contact Us | Copyright © 2011 DOL

# EXHIBIT H
# RCO Sec of State

Contact Us | Connect:

SEARCH

**Division**

Exhibt RUC-B

**Corporations**

Home   Search   Apostiles   Domestic Partnerships   Awards Program   Public Notices

## Corporations Division - Registration Data Search

Neither the State of Washington nor any agency, officer, or employee of the State of Washington warrants the accuracy, reliability, or timeliness of any information in the Public Access System and shall not be liable for any losses caused by such reliance on the accuracy, reliability, or timeliness of such information. While every effort is made to ensure the accuracy of this information, portions may be incorrect or not current. Any person or entity who relies on information obtained from the System does so at his or her own risk.

**ROUTH CRABTREE OLSEN, P.S.**

| | |
|---|---|
| UBI Number | 601840737 |
| Category | PRO |
| Profit/Nonprofit | Profit |
| Active/Inactive | Active |
| State Of Incorporation | WA |
| WA Filing Date | 12/24/1997 |
| Expiration Date | 12/31/2011 |
| Inactive Date | |
| Registered Agent Information | |
| Agent Name | LANCE E OLSEN |
| Address | 13555 SE 36TH ST STE 300 |
| City | BELLEVUE |
| State | WA |
| ZIP | 98006 |
| Special Address Information | |
| Address | |
| City | |
| State | |
| Zip | |

**Governing Persons**

| Title | Name | Address |
|---|---|---|
| Secretary | ROUTH , STEPHEN | 13555 SE 36TH ST STE 300 BELLEVUE , WA |
| Treasurer | ROUTH , STEPHEN | 13555 SE 36TH ST STE 300 BELLEVUE , WA |
| President | ROUTH , STEPHEN | 13555 SE 36TH ST STE 300 BELLEVUE , WA |

Purchase Documents for this Corporation »

« Return to Search List

Translate our site into:

Phone Numbers | Privacy Policy | Accessibility
Washington Secretary of State · Corporations Division
801 Capitol Way South
PO Box 40234, Olympia WA 98504-0234
(360) 725-0377

Select Language          ▾
Powered by Google  Translate

# EXHIBIT I
# NWT Business License



Exhibit RDC-C

# Search
BUSINESS & PROFESSIONAL LICENSES

**License Details**

**License Information:**
- **Entity Name:** NORTHWEST TRUSTEE SERVICES PLLC
- **Firm Name:** NORTHWEST TRUSTEE SERVICES PLLC
- **License Type:** Washington State Business
- **Entity Type:**
- **UBI:** 602073255   Business ID:001   Location ID:0002
- **Status:** To check the status of this company, go to Secretary of State.

**Location Address:**
3535 FACTORIA BLVD SE # 200
BELLEVUE, WA, 98006

**Mailing Address:**
3535 FACTORIA BLVD SE # 200
BELLEVUE, WA, 98006

**Governing People:**
DAVID FENELL
STEPHEN D ROUTH

**Registered Trade Names:**
NORTHWEST TRUSTEE SERVICES PLLC

Information Current as of 01/10/2011 4:50AM Pacific Time

New Search

Use of lists of individuals provided on this site for commercial purposes is prohibited under Chapter 42.56 of the Revised Code of Washington.

*This site is limited to searching for business and professional licenses issued by the Department of Licensing or through the Master License Service. See Other Licenses for information on licenses issued by other agencies.

Home | Privacy | Privacy | Conditions of Use | Conditions of Use | Other Licenses | Contact Us | Copyright © 2011 DOL

# EXHIBIT J
# NWT Sec of State

Corporations Registration Data                                                                                    Page 1 of 1

Exhibit RVC-D          Contact Us | Connect:                                    SEARCH

# Corporations

## Division

## Corporations Division - Registration Data Search

Neither the State of Washington nor any agency, officer, or employee of the State of Washington warrants the accuracy, reliability, or timeliness of any information in the Public Access System and shall not be liable for any losses caused by such reliance on the accuracy, reliability, or timeliness of such information. While every effort is made to ensure the accuracy of this information, portions may be incorrect or not current. Any person or entity who relies on information obtained from the System does so at his or her own risk.

### NORTHWEST TRUSTEE SERVICES PLLC

| | |
|---|---|
| UBI Number | 602073255 |
| Category | PLC |
| Profit/Nonprofit | Profit |
| Active/Inactive | Inactive |
| State Of Incorporation | WA |
| WA Filing Date | 10/16/2000 |
| Expiration Date | 10/31/2004 |
| Inactive Date | 04/29/2004 |
| Registered Agent Information | |
| Agent Name | M GAIL RYDER |
| Address | 777 108TH AVE NE STE 1900 PO BOX C-90016 |
| City | BELLEVUE |
| State | WA |
| ZIP | 980099016 |
| Special Address Information | |
| Address | |
| City | |
| State | |
| Zip | |

### Governing Persons

| Title | Name | Address |
|---|---|---|
| Manager | FENELL , DAVID | BELLEVUE , WA |
| Member | ROUTH , STEPHEN | BELLEVUE , WA |

« Return to Search List

---

Phone Numbers | Privacy Policy | Accessibility
Washington Secretary of State - Corporations Division
801 Capitol Way South
PO Box 40234, Olympia WA 98504-0234
(360) 725-0377

Translate our site into:
Select Language
Powered by Google Translate

# EXHIBIT K
# RCO Letter
# To Plaintiff

Exhibt ROC -F

**ROUTH CRABTREE OLSEN, P.S.**
*A Law Firm and Professional Services Corporation*
3535 Factoria Blvd. SE, Suite 200
Bellevue, WA 98006
Telephone (425) 458-2121 ♦ Facsimile (425) 283-0938
www.rcolegal.com

THIS OFFICE IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. THE FOLLOWING LETTER IS A DISCUSSION OF ALTERNATIVES TO FORECLOSURE. IT IS OUR UNDERSTANDING THAT YOU ARE NOT CURRENTLY IN BANKRUPTCY. IF YOU ARE IN BANKRUPTCY, THEN PLEASE DISREGARD THIS LETTER IN ITS ENTIRETY AND HAVE YOUR ATTORNEY CONTACT OUR OFFICE AS SOON AS POSSIBLE.

Jan 15, 2010

Re:  Property:      14840 119th Place Northeast, Kirkland, WA 98034
     Loan No.:      1009111244
     Our File No.:  7523.21352

Dear Homeowner:

Please be advised that **Routh Crabtree Olsen, P.S.** is working with OneWest Bank FSB to help you keep your home. We represent your mortgage company and have received notice to commence foreclosure proceedings against your property. It is OneWest Bank FSB's mission to attempt to work out a solution to your loan situation, and they have asked us to open a line of communication with you.

## WE WANT YOU TO BE ABLE TO KEEP YOUR HOME!

You may be eligible for certain opportunities that will help you stay in your home. You may have had an unexpected expense or a circumstance beyond your control that has forced you to miss some mortgage payments. OneWest Bank FSB would like to discuss your situation with you to determine what you can do to bring your loan current.

These alternatives are voluntary and could include:

- **Forbearance Plan:** An agreement to temporarily let you pay less than the full amount of your mortgage payment, or pay nothing at all, during the forbearance period. Your lender may consider a forbearance when you can show that funds from a bonus, tax refund, or other source of future income will let you bring the mortgage current or qualify you for a repayment plan or loan modification at the end of the forbearance period.
- **Reinstatement of Your Loan:** You would pay the total amount past due in one lump sum by a specified date.
- **Repayment Plan:** An agreement that gives you a fixed amount of time to repay the amount you are behind by combining a portion of what is past due with your regular mortgage payment. At the end of the repayment period you will have gradually paid back the amount of your mortgage that was delinquent.

- Modification: This is a written agreement between you and the lender that permanently changes the terms of the loan that in some instances may make your payments more affordable. Common loan modifications include:
  1. Adding missed payments to your existing loan balance
  2. Making an adjustable-rate mortgage into a fixed-rate mortgage
  3. Extending the number of years you have to pay to a longer term

## WHAT IF YOU CAN NO LONGER AFFORD TO KEEP YOUR HOME?

If you cannot or do not want to keep your home, your lender can work with you to avoid foreclosure. This can help reduce the negative effect on your credit reputation. There are several different ways this might occur depending on your financial circumstances:

- Deed in Lieu of Foreclosure:  Under certain circumstances, you would voluntarily transfer ownership of your property to the lender in exchange for cancellation of your mortgage debt. In most cases, you must attempt to sell your home for its fair market value for at least 90 days.  You would be given a specific period of time to relocate. This option may not be available to you if there are other liens or judgments on your home.
- Short Payoff: If you can sell your house but the sales proceeds are less than the total amount you owe on your mortgage, your lender may agree to a short payoff and write off the portion of your mortgage that exceeds the net proceeds from the sale.
- Assumption of Your Loan: This option permits a qualified buyer to take over your mortgage debt and pay the payments, even if the mortgage is non-assumable.

## HOW DO YOU TAKE ADVANTAGE OF THESE ALTERNATIVES?

Complete the enclosed two-page financial form and return it in the enclosed self-addressed envelope. Time is of the essence: this information will enable us to determine what option is best suited to keep your account from being foreclosed upon. Please return the requested information via fax at (425) 283-0938, or mail to:

Routh Crabtree Olsen, P.S.
Attention: Antoinette Bartlein
P.O. Box 4143
Bellevue, WA 98009-4143

Please note that the foreclosure action will continue whether or not the form is completed and returned. The foreclosure action will continue unless your lender determines that you are eligible for one of these alternatives and an agreement is signed. You also have the right and should seek the advice of an attorney.

We hope that you will complete the enclosed forms so that we can work with you to consider alternatives to the pending foreclosure of your property.

Sincerely,
ROUTH CRABTREE OLSEN, P.S.