Consor & Associates
Reporting and Transcription, Inc.

1 (Pages 1 to 4)

Page 3

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN
AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 50 2008 CA 037322XXXX MB AW
INDYMAC FEDERAL BANK, FSB,

Plaintiff,

vs.

ISRAEL A. MACHADO; NEENA M. MACHADO;
ANY AND ALL UNKNOWN PARTIES CLAIMING BY,
THROUGH, UNDER, AND AGAINST THE HEREIN
NAMED INDIVIDUAL DEFENDANT(S) WHO ARE NOT
KNOWN TO BE DEAD OR ALIVE, WHETHER SAID
UNKNOWN PARTIES MAY CLAIM AN INTEREST AS
SPOUSES, HEIRS, DEVISEES, GRANTEES, OR OTHER
CLAIMANTS: TENANT #1, TENANT #2, TENANT #3,
and TENANT # 4, the names being fictitious
to account for parties in possession,

Defendants.
_____/

THE DEPOSITION OF
ERICA A. JOHNSON-SECK
VOLUME I
Pages 1 - 84

July 9, 2009
1655 Palm Beach Lakes Boulevard
West Palm Beach, Florida
12:54 p.m. - 2:59 p.m.

REPORTED BY:
Deborah H. Rodgers, CSR
Consor & Associates Reporting & Transcription
1655 Palm Beach Lakes Boulevard, Suite 500
West Palm Beach, Florida 33401
Phone:  561.682.0905

I N D E X

                                           PAGE
TESTIMONY OF ERICA A. JOHNSON-SECK
   Direct Examination by Mr. Ice      4
CERTIFICATE OF OATH                215
CERTIFICATE OF REPORTER               216
ERRATA SHEET             217
ERRATA CERTIFICATE            218
READ AND SIGN NOTIFICATION            219

E X H I B I T S
NUMBER                          PAGE
Defendants' Exhibits A - Q          4
Defendants' Exhibit R        88
Defendants' Exhibit S        113
Defendants' Exhibit T        114
Defendants' Exhibit U        162
Defendants' Exhibit V        167
Defendants' Exhibit W        174
Defendants' Exhibit X        179
Defendants' Exhibit Y        181
Defendants' Exhibit Z        204

Page 2

1   APPEARANCES:
2   On behalf of the Plaintiff:
3     JOSEPH MANCILLA, JR., ESQ.
       Florida Default Law Group, P.L.
4     9119 Corporate Lake Drive
       Suite 300
5     Tampa, Florida 33634
6   On behalf of the Defendants:
7     THOMAS E. ICE, ESQ.
       DUSTIN A. ZACKS, ESQ.
8     Ice legal, P.A.
       1975 Sansburys Way, Suite 104
9     West Palm Beach, Florida 33411
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1   THEREUPON,
2         (Thereupon, Defendants' Exhibits No. A
3     through Q were marked for identification.)
4   THEREUPON,
5         ERICA A. JOHNSON-SECK,
6   was called as a witness herein, and after being first
7     duly sworn, testified as follows:
8       THE WITNESS:  Yes.
9         DIRECT EXAMINATION
10  BY MR. ICE:
11    Q.  Could you state your full name for the
12  record, please.
13    A.  Erica Antoinette Johnson-Seck.
14    Q.  And what is your business address?
15    A.  7700 West Parmer Lane, P-A-R-M-E-R, Building
16  D, Austin, Texas, 78729.
17    Q.  And who is your employer?
18    A.  OneWest Bank.
19    Q.  How long have you been employed by OneWest
20  Bank?
21    A.  Since March 19th, 2009.
22    Q.  Prior to that you were employed by IndyMac
23  Federal Bank, FSB?
24    A.  Yes.
25    Q.  And prior to that you were employed by

Page 5

1 IndyMac Bank, FSB?
2    A.   Yes.
3    Q.   Your title with OneWest Bank is what?
4    A.   Vice president, bankruptcy and foreclosure.
5    Q.   That hasn't changed in all the various
6 IndyMac carnantions -- incarnations, I should say?
7    A.   No.
8    Q.   Now, the IndyMac Bank, FSB ceased to exist
9 July 11th of last year, correct?
10    A.   Yes.
11    Q.   That was taken over by the FDIC, correct?
12    A.   Yes.
13    Q.   And that's when IndyMac Federal Bank, Federal
14 Bank, FSB took over?
15    A.   Yes.
16    Q.   And then as of March 19th of this year,
17 OneWest came in and purchased the assets of IndyMac
18 Federal Bank?
19    A.   Yes.
20    Q.   Now, the plaintiff in this case is IndyMac
21 Federal Bank, FSB, correct?
22    A.   Yes.
23    Q.   When I say this case, I know we're scheduled
24 for two depositions.  I don't know if you know we're
25 starting with the Machado case.

Page 6

1    A.   Okay.
2    Q.   Would you agree with me that the plaintiff in
3 this case, the Machado case, no longer exists?
4    A.   Yes.
5    Q.   Are you also an officer of Mortgage
6 Electronic Registration Systems?
7    A.   No.
8    Q.   You have signing authority to sign on behalf
9 of Mortgage Electronic Registration Systems as a vice
10 president, correct?
11    A.   Yes.
12    Q.   Are you an officer of any other corporation?
13    A.   No.
14    Q.   Do you have signing authority for any other
15 corporation?
16    A.   Yes.
17    Q.   What corporations are those?
18    A.   IndyMac Federal Bank, IndyMac Bank, FSB, FDIC
19 as receiver for IndyMac Bank, FDIC as conservator for
20 IndyMac, Deutsche Bank, Bank of New York, U.S. Bank.
21 And that's all I can think of off the top of my head.
22    Q.   What was the one before U.S. Bank of New
23 York?
24    A.   Bank of New York.
25    Q.   Bank of New York.  Is that Bank of New York

Page 7

1 Mellon?
2    A.   I don't know.
3    Q.   When you say you have signing authority, is
4 your authority to sign as an officer of those
5 corporations?
6    A.   Some.  Deutsche Bank I have a POA to sign as
7 attorney-in-fact.  Others I sign as an officer.  The
8 FDIC I sign as attorney-in-fact.  IndyMac Bank and
9 IndyMac Federal Bank I now sign as attorney-in-fact.
10 And now I only sign as a vice president for OneWest.
11    Q.   As part of your job, how often do you give
12 depositions?
13    A.   Twice a month.
14    Q.   So you're familiar with the deposition
15 process and what the rules are and what the court
16 reporter is doing and that you're under oath?
17    A.   Yes.
18    Q.   Okay.  I don't need to explain all of those
19 things to you?
20    A.   No.
21    Q.   Your job duties include supervision of three
22 direct reports and 52 employees?
23    A.   It did.
24    Q.   Okay.  How's that changed?
25    A.   Let's see.  Now I have two direct reports and

Page 8

1 47 people with 17 openings.
2    Q.   Openings meaning you're looking for someone
3 to fill those positions?
4    A.   Yes.
5    Q.   Are you in charge of the loss mit department?
6    A.   No.
7    Q.   Who is?
8    A.   Karen Mastro is the senior vice president of
9 loss mit.
10    Q.   Can you spell the last name, please?
11    A.   M-A-S-T-R-O.  Oh, I'm sorry.  She is the
12 first vice president.
13    Q.   Is she nevertheless in charge of the loss mit
14 department?
15    A.   Yes.
16    Q.   Do you have the authority to settle any
17 foreclosure case?
18    A.   Up to a certain dollar amount of loss, yes.
19    Q.   How is that dollar amount of loss determined?
20    A.   It depends on what the settlement offer looks
21 like.  Are you asking me how -- I mean, it depends.
22    Q.   Who sets the dollar amount?
23    A.   The senior executive committee.
24    Q.   Of IndyMac?
25    A.   Of IndyMac, but it was adopted by IndyMac

Censor & Associates
Reporting and Transcription, Inc.

Page 9

1  Federal and has been adopted by OneWest, yes.
2      Q.  I'll probably be doing that all afternoon.
3  So thank you for correcting me.  If OneWest is the
4  correct answer to that, please feel free to let me
5  know.
6      As part of your job duties, you personally manage
7  the attorney network?
8      A.  Yes.
9      Q.  What other job duties do you have?
10     A.  I manage the bankruptcy and the foreclosure
11 process.  I also manage the breach process, the
12 compliance of the breach letters as changes are made by
13 different states and jurisdictions.  And I manage a
14 default, a forensic default group, research group that
15 handles everything that's high loss related, compliance
16 related, high level research.
17     Q.  Can you give me an example of what this
18 forensic group default would be researching?
19     A.  We foreclose on a property where the investor
20 won't cover the advances we've made.  So one of the
21 auditors would look to see if we got approval to make
22 that advance, if there's some reason we wouldn't be
23 getting approval for it, work with the investor to try
24 to get approval or work to bill it back to our
25 outsource vendor or one of the firms -- now, this is

Page 10

1  one of very many things that they do -- were at fault
2  for a reason why we can't claim for the advances;
3  taxes, let's say.
4      Q.  So when you say high loss, you're referring
5  to the losses that OneWest is experiencing versus the
6  investor that you're doing the work for?
7      A.  That's another facet of what's managed in
8  that group.  That example I gave you is not necessarily
9  a high-loss example.  High loss is anything with a loss
10 between the total debt and the current value of 250 or
11 more.  So those loans, whether it is owned by the bank
12 or owned by an investor, are scrutinized because the
13 losses are large.
14     Q.  And you said that's losses greater than
15 250,000?
16     A.  Yes.
17     Q.  If a property goes to foreclosure and the
18 ultimate recovery is more than $250,000 of the debt on
19 that property, is that something that the forensic
20 default group would study?
21     A.  Not from that perspective.
22     Q.  In other words, they're not concerned about
23 losses due to property values going down?
24     A.  That's economic, so it's baked into the
25 equation of what they would review, but an economic

Page 11

1  reason, like the property values going down in the
2  state of California, if something statistical, it
3  doesn't mean that they don't review it the same way
4  they would review something that was not statistical,
5  but we do -- we are keeping in mind that property
6  values are decreasing everywhere.  The high-loss value
7  used to be $100,000 when I first started working at
8  IndyMac Bank and has increased to 250,000 for that
9  reason.
10     Q.  Would it study a case where a voluntary
11 dismissal was entered and the opposing counsel had to
12 be paid fees?
13     A.  No.
14     Q.  No?
15     A.  No.
16     Q.  Any other job duties that we haven't talked
17 about?
18     A.  No.
19     Q.  One of your job duties is to sign documents?
20     A.  Yes.
21     Q.  Do you still spend an hour a day signing
22 documents?
23     A.  No.
24     Q.  Okay.  How much time do you spend a day now?
25     A.  Ten minutes, maybe.

Page 12

1      Q.  Is that because you're signing fewer
2  documents?
3      A.  Actually, from the last time we spoke, there
4  are more that have to be signed by the bank.  The FDIC
5  did not agree that our outsource vendor, who had power
6  of authority to sign for some docs, that they didn't
7  like that idea so all the docs came in-house.  We lost
8  a couple of VPs, which is why I, at that time, was the
9  main signer.  Now there are four VPs signing documents
10 or that can sign foreclosure documents, and most do,
11 and my supervisors are now approved signers.
12     Q.  Those are among the four that you mentioned?
13     A.  In addition to.
14     Q.  Okay.  So how many total in your department
15 have authority to sign documents?
16     A.  In my department, just specifically in my
17 department for foreclosure- and bankruptcy-related
18 documents, four of us, but my peers are alternative
19 signers to me, and I have three peers that can sign as
20 an alternative to my signature.
21     Q.  And when you say peers, these are
22 vice-presidents --
23     A.  Yes.
24     Q.  -- of other departments?
25     A.  Yes.

Censor & Associates
Reporting and Transcription, Inc.

Page 13

1      Q.   Okay.  How is the decision made as to who
2    will sign what documents?
3      A.   There really is not a matrix.  Only so many
4    of us can sign Lost Note Affidavits.  I happen to be
5    the only one in my department, besides my boss, that
6    can sign a Lost Note Affidavit, so all those would come
7    to me.  Other than that, there's not a -- I think they
8    just try to make it even.
9      Q.   Just distribute them evenly?
10     A.   Yes.
11     Q.   Okay.  How many documents would you say that
12   you sign on a week on average, in a week on average?
13     A.   I could have given you that number if you had
14   that question in there because I would have brought the
15   report.  However, I'm going to guess, today I saw an
16   e-mail that 1,073 docs are in the office for signing.
17   So if we just -- and there's about that a day.  So
18   let's say 6,000 a week and I do probably -- let's see.
19   There's eight of us signing documents, so what's the
20   math?
21     Q.   Six thousand divided by eight, that gives me
22   750.
23     A.   That sounds, that sounds about right.
24     Q.   Okay.  That would be a reasonable estimate of
25   how many you sign, you personally sign per week?

Page 14

1      A.   Yes.
2      Q.   And that would include Lost Note Affidavits,
3    Affidavits of Debt?
4      A.   Yes.
5      Q.   What other kind of documents would be
6    included in that?
7      A.   Assignments, declarations.  I can sign
8    anything related to a bankruptcy or a foreclosure.
9      Q.   How long do you spend executing each
10   document?
11     A.   I have changed my signature considerably.
12   It's just an E now.  So not more than 30 seconds.
13     Q.   Is it true that you don't read each document
14   before you sign it?
15     A.   That's true.
16     Q.   The procedure that we talked about last time,
17   and I will go over it again to see if that's still the
18   procedure, before you would sign an Affidavit of
19   Debt --
20     A.   Yes.
21     Q.   -- it goes to your foreclosure specialist who
22   makes sure that the information is correct?
23     A.   The figures are correct, yes.
24     Q.   It is fair to say that you don't personally
25   check the accuracy of anything in the documents that

Page 15

1    you're signing?
2      A.   Not, it's not clear that I don't check
3    anything.  The figures I don't, I do not check.  We
4    have a QC process around that used to be a 100 percent
5    of the Affidavits of Debts and any figures for loans
6    and bankruptcy, that have now been reduced to 10
7    percent because the errors were relatively low.  Now I
8    pay, what I pay most attention to is the jurat and what
9    entity I'm signing for, which is why I said 30 seconds
10   instead of two seconds.
11     Q.   Right.  Now, when you say 10 percent, that
12   means that they're spot checking 10 percent of the
13   documents to make sure that they're accurate?
14     A.   The outsource or our outsource vendor checks
15   the document completely.  I'm QCing my outsource vendor
16   with the 10 percent, yes.
17     Q.   When you say outsource vendor, you're talking
18   about LPS?
19     A.   Yes.
20     Q.   Does LPS put the figures in the affidavit?
21     A.   No.
22     Q.   Who puts the figures in the affidavit?
23     A.   It depends on what relationship we have with
24   our firms.  Usually we download the information through
25   process management, the system we use to communicate

Page 16

1    with our firms, and they will populate the document.
2    Or sometimes we get it in blank and a foreclosure or a
3    bankruptcy specialist would populate the document.
4      Q.   And when you say "they" would populate the
5    document, you're talking about the attorneys?
6      A.   Someone in the firm, yes.
7      Q.   Might be a paralegal, correct?
8      A.   Maybe.
9      Q.   Then those are sent, after they're populated
10   or filled out by someone at the law firm, those are
11   sent to LPS?
12     A.   They're sent -- they're uploaded into the
13   system, like an image copy, and then LPS prints it off,
14   and they go through their various checks and balances,
15   and then based on a matrix that we have provided, they
16   will look to see if this is an entity any of us can
17   sign for.  They may reject it back to the firm and say
18   Indy -- OneWest Bank can't sign for it, or they will
19   ship the document to our -- because these documents get
20   printed in Minnesota.  The documents get shipped to our
21   Austin office.  Those folks again look to make sure
22   it's something that an officer of OneWest Bank in
23   Austin can sign for it and, I mean, that's basically
24   how we get it.
25     Q.   When you say "those folks" check again,

Page 17

1  you're talking about your own staff when the documents
2  arrive?
3      A.  No, we have LPS on site.
4      Q.  In Austin?
5      A.  Yes.
6      Q.  Take me through the procedure for getting
7  your actual signature on the documents once they've
8  gone through this quality control process.
9      A.  The documents are delivered to me for
10  signature and I do a quick purview to make sure that
11  I'm not signing for an entity that I cannot sign for.
12  And I sign the document and I hand it to the Notary,
13  who notarizes it, who then hands it back to LPS, who
14  uploads the document so that the firms know it's
15  available and they send an original.
16      Q.  "They" being LPS?
17      A.  LPS, yes.
18      Q.  Are all the documents physically, that you
19  were supposed to sign, are they physically on your
20  desk?
21      A.  Yes.
22      Q.  In your office?
23      A.  Yes.
24      Q.  You don't go somewhere else to sign
25  documents?

Page 18

1      A.  No.
2      Q.  When you sign them, there's no one else in
3  your office?
4      A.  Sometimes.
5      Q.  Well, the Notaries are not in your office,
6  correct?
7      A.  They don't sit in my office, no.
8      Q.  And the witnesses who, if you need witnesses
9  on the document, are not sitting in your office?
10      A.  That's right.
11      Q.  So you take your ten minutes and you sign
12  them and then you give them to the supervisor of the
13  Notaries, correct?
14      A.  I supervise the Notaries, so I just give them
15  to a Notary.
16      Q.  You give all, you give the whole group that
17  you just signed to one Notary?
18      A.  Yes.
19      Q.  Last time we talked about that there were a
20  group of Notaries and that you had a supervisor that
21  manages a group of loans and passes them out to the
22  different Notaries.  Has that changed?
23      A.  It used to go to -- well, a little bit.  It
24  used to go -- and that's with the shift of people
25  leaving and people coming in with everything that's been

Page 19

1  going on with the bank.  All the documents went to one
2  of my supervisors, who manages the default forensic
3  group, and she would pass it out.  That's what I was
4  describing to you.
5      We don't have to have a process like that any more
6  now because everyone's in a groove now with what the
7  process should be.  So we don't have to manage someone
8  physically making sure everyone's notarizing.  So now I
9  just walk out of my office and hand them to one of my
10  folks that can notarize that don't report directly to
11  me.  They still report up to their supervisor and then
12  those direct reports report to me.
13      Q.  And does that Notary notarize all of those
14  documents, or does she then distribute them to various
15  Notaries?
16      A.  He or she would notarize all the documents I
17  handed them.
18      Q.  Do they still have the requirement of
19  returning them notarized within 24 hours?
20      A.  That got tough.  That is tough.  That's where
21  we would like to be but we aren't.  It takes us about a
22  week for it to go through the process of verifying the
23  information, getting it on my desk, me signing it,
24  getting it to a Notary, and getting uploaded.  So we
25  have document delays.

Page 20

1      Q.  I'm mostly interested in how long it takes
2  for the Notary to notarize your signature.
3      A.  I can't say categorically because the Notary,
4  that's not the only job they do, so.
5      Q.  In any event, it doesn't have to be the same
6  day?
7      A.  No.
8      Q.  When they notarize it and they put a date
9  that they're notarizing, is it the date that you signed
10  or is it the date that they're notarizing?
11      A.  I don't know.
12      Q.  When you execute a sworn document, do you
13  make any kind of a verbal acknowledgment or oath to
14  anyone?
15      A.  I don't know if I know what you're talking
16  about.  What's a sworn document?
17      Q.  Well, an affidavit.
18      A.  Oh.  No.
19      Q.  In any event, there's no Notary in the room
20  for you to --
21      A.  Right.
22      Q.  -- take an oath with you, correct?
23      A.  No, there is not.
24      Q.  In fact, the Notaries can't see you sign the
25  documents; is that correct?

Case 2:10-cv-01952-RSL   Document 32-1   Filed 02/12/11   Page 6 of 94

Page 21

1    A.   Not unless they made it their business to do
2  so.
3        Q.   To peek into your office?
4    A.   Yes.
5        Q.   At what point does the document get to the
6  witnesses for signature?
7        A.   The witnesses are, generally, are LPS
8  on-sites, but if it's a witness, like if it has to be
9  an authorized witness, then it would have my name and
10  one of my peer's names or my name and my boss's name.
11  And I would have a cover sheet on top of a stack that
12  would say Erica and Eric.  So after I signed, I would
13  walk them over to my boss for him to sign.
14        Q.   Okay.  But you're talking about documents
15  that have dual signatures?
16        A.   Some that require dual signatures.  If it's
17  just a witness, it doesn't have to be an authorized
18  signer, then other LPS on-sites will witness.
19        Q.   And do they do that before or after the
20  notarization?
21        A.   I don't know.  I want to say after, but I
22  really don't know.  I haven't picked apart this
23  process.
24        Q.   Well, it seems logically, when you get the
25  document, there's no witness signatures on there,

Page 22

1  correct?
2        A.   No.
3        Q.   And you said that you take them and you give
4  them to the Notary.  You don't give them to the witness
5  to sign, correct?
6        A.   That's right.
7        Q.   So logically it would have to go from the
8  Notary then to the witness?
9        A.   Well, yes.  Yes, that's logical.  I just
10  really don't know.
11        Q.   Let me jump back a moment to our discussion
12  about the quality control that goes on at LPS.  Do you
13  have any familiarity with what they do per the quality
14  control in Minnesota?
15        A.   I've been told what they do, yes.
16        Q.   And what is it that you were told that they
17  do?
18        A.   For each of their clients, they have a matrix
19  of who that client can sign for.  And the processors
20  that work in Minnesota, when they print the documents
21  off line, they're checking to see if it's a document
22  that their client can sign for.  They're checking to
23  see if that the document is aesthetically correct,
24  looks, you know, looks like it should look.  They check
25  to see that the document includes the number of pages

Page 23

1  that it's supposed to include.  They check that the
2  document has the appropriate cover letter with the loan
3  number on it and that document does not have the loan
4  number on it for states that have the privacy act.  I
5  went through a presentation with what they do, and I
6  want to say there was eight or nine different
7  checkpoints.
8        Q.   Did that presentation, was a report included
9  with that that you could read what they were saying?
10        A.   Yes, and there actually is a report that the
11  LPS folks use in Minnesota for what they reject back to
12  the firms because the documents aren't accurate.
13        Q.   Do you still have a copy of that report?
14        A.   I can find one.  You didn't list that in your
15  list of things.
16        Q.   Yeah.  I didn't mean do you have it in here,
17  but is it somewhere where you could get it for us if we
18  needed it?
19        A.   Yes.
20        Q.   Okay.  Did they say that they check the
21  numbers that are in the affidavits?
22        A.   There's no way they can check the numbers,
23  no.
24        Q.   Do they have access to the computer program
25  that tracks all the debt numbers?

Page 24

1        A.   LPS, in itself, has access to its client's
2  system mainframe because they do screen scrapes from
3  the systems to get data.  I don't know if the
4  individual person that does docs has that access.
5        Q.   Okay.  Do you know who over at LPS would know
6  that information?
7        A.   How high do you want to go?  Do you want the
8  president of, Scott Barns, president of default?
9        Q.   Okay.  I'd like to talk about the procedure
10  for referring a loan for foreclosure.  That's done in
11  your department, correct?
12        A.   Yes.
13        Q.   It's done by a person with the title of
14  foreclosure specialist?
15        A.   Yes.
16        Q.   And foreclosure specialists are folks that
17  report to you?
18        A.   They report to one of the supervisors who
19  reports to me, yes.
20        Q.   To one of your two direct reports?
21        A.   Yes.
22        Q.   The decision is made to send the case to LPS.
23  That's that first step in the procedure, correct?
24        A.   No.  The first step is to see if the loan is
25  ripe for referral; and, in conjunction with that, if

Page 25

1    that were following the investor's guidelines for its
2    prescribed plan to refer the loan.
3        Q.  When you say "ripe for referral," what sort
4    of things determine whether it's ripe?
5        A.  Is the loan delinquent.  How much contact
6    have we had with the, have we, at OneWest Bank, had
7    with the borrower.  Is there anything unresolved.  Did
8    the borrower call in and has been expecting a phone
9    call back, in which case we're not going to refer it
10   until the borrower received that phone call.  Is there
11   anything unresolved, like a payment plan, some
12   discussion about a payment plan and a payment was to be
13   expected, you know, three days from today, in which
14   case the referral specialist won't refer it because
15   we're expecting a payment.
16       So they're like, they are really the first
17   gatekeepers to insure that nothing gets referred that
18   shouldn't be, because then we pay attorney fees and we
19   have to take that out, you know, that comes straight
20   from the bottom line.
21       Q.  When you say whether it's delinquent, is
22   there a certain amount of time it has to be delinquent
23   before it qualifies for referral?
24       A.  Yes, depending on the investor.  Usually 60
25   days, but government loans go up to 120 days.

Page 26

1        Q.  How much for Deutsche Bank, if Deutsche Bank
2    is the investor?
3        A.  Deutsche Bank, we -- our PSA for Deutsche
4    Bank is that we service their loans as we would our
5    own.  So we refer it, we try to refer it no sooner than
6    day 60 of delinquency and no later than day 120, unless
7    there is a reason.  There has to be a reason it's
8    fallen out.
9        Q.  Okay.  When the decision is made to refer a
10   loan to foreclosure -- well, let me strike that.
11       Once the decision is made that it's ripe and all
12   of these conditions are met, then it gets sent to LPS?
13       A.  Yes.
14       Q.  And LPS, in return, refers it to an attorney?
15       A.  An attorney that we have advised them that we
16   want the file sent to, yes.
17       Q.  You have your own stable of preferred
18   attorneys?
19       A.  Yes.
20       Q.  In fact, that's part of your job to manage
21   that network?
22       A.  Yes.
23       Q.  At what point in this process does OneWest
24   start looking for the original note?
25       A.  For an original note in a state like Florida,

Page 27

1    as soon as the loan is referred to foreclosure because
2    the foreclosure attorney can't do what they need to do
3    without it.
4        Q.  So on the day that it's referred to LPS,
5    OneWest begins the process of getting a hold of the
6    original note?
7        A.  So what happens is it gets referred, and a
8    state like Florida, a loan in Florida goes to a queue.
9    It's also an LPS employee that's on site.  She's on
10   site in Pasadena, Sylvia Carballo.  It goes in her
11   queue and she begins ordering the original documents,
12   wherever they may be.  And she manages that process of
13   receiving the original documents, preparing the bailee
14   letters, getting then sent to the firms, and sending
15   that all to the firms.
16       Q.  At the point that OneWest is referring the
17   loan to LPS for foreclosure, is any kind of
18   representation made to LPS about whether the original
19   note cannot be found?
20       A.  Say that one more time.
21       Q.  Does OneWest tell LPS, when it's referring
22   the case for foreclosure, anything about the status of
23   the original note?
24       A.  No, it's the other way around.  So if Sylvia
25   learns that the original note cannot be found, that the

Page 28

1    doc custodian does not have record of the original
2    note, or it might be that there was a previous
3    foreclosure and the original note never made it back,
4    she is informed and she logs into a database.
5        Q.  Sylvia is that LPS on-site person?
6        A.  Yes.
7        Q.  And it's on site, but not on your site?
8        A.  She's in Pasadena, right.
9        Q.  OneWest has one main custodian, Deutsche
10   Bank?
11       A.  One bigger -- one of our biggest is Deutsche
12   Bank, yes.
13       Q.  That's where most of One --
14       A.  Yes.
15       Q.  -- West documents are housed?
16       A.  Yes.
17       Q.  And would that be the custodian for any
18   documents where Deutsche Bank and National Trust
19   Company is the investor?
20       A.  Not necessarily.
21       Q.  Is it the most probable custodian?
22       A.  Yes.
23       Q.  When Wells Fargo is the investor, there might
24   be a different custodian?
25       A.  Wells Fargo is a good example.  It could be

Censor & Associates
Reporting and Transcription, Inc.

## Page 29

1    at Wells Fargo or it could be at Deutsche Bank.
2        Q.   But what you're telling me, I just want to
3    make sure I understand, what you're telling me today is
4    that a loan where Deutsche Bank National Trust Company
5    is the investor, the custodian may be Deutsche Bank or
6    it may be Wells Fargo or someone else?
7        A.   Yes.
8        Q.   It's Sylvia with LPS who determines which
9    custodian to ask for the document?
10       A.   Based on information she receives from
11   OneWest Bank's computer system, yes.
12       Q.   When we talked last time, you said her name
13   was Sylvia Carballo?
14       A.   Yes.
15       Q.   Her supervisor was Luis Tena?
16       A.   Yes.
17       Q.   You had not --
18       A.   I'm sorry.
19       Q.   That's all right.  You hadn't had much
20   contact with Luis Tena.  I think he had just started
21   then?
22       A.   We are close friends now, yes.
23       Q.   He works in the LPS office, but he's employed
24   by OneWest?
25       A.   No, he works in the LPS office employed by

## Page 30

1    LPS, but supervises the on-sites in Pasadena.
2        Q.   And is that in Minnesota or Florida that he
3    does that?
4        A.   He lives in Jacksonville.  Excuse me.
5    Florida, yes.
6        Q.   And Sylvia is in the Pasadena office?
7        A.   Yes.
8        Q.   Okay.  The way that Sylvia would determine
9    who the custodian was, or what entity is functioning as
10   the custodian, is to look at a computer screen called
11   the MAS1 INV1?
12       A.   That's her beginning point, yes.  That
13   process has actually changed.
14       Q.   Okay.  What's the process today?
15       A.   What we discussed last time is still the
16   underlying, the foundation, but there's a database now
17   that goes out, and based on the loan numbers in her
18   queue, it pulls the original doc, the original document
19   custodian information and the original investor, to try
20   to help her determine faster where the document might
21   be, and it has eliminated some of the errors that we
22   found in the past.
23       Q.   So is it correct to say that that process has
24   been automated somewhat?
25       A.   Yes.

## Page 31

1        Q.   That screen -- and I'm saying it right?  Is
2    it MAS1?  How do you say that?
3        A.   MAS1 INV1.
4        Q.   INV1.  Okay.  It says who the investor is?
5        A.   Yes.
6        Q.   Sylvia, or whoever the specialist is that's
7    doing this job, then e-mails the custodian to ask for
8    the documents, correct?
9        A.   Yes.
10       Q.   And she e-mails you a copy of the list
11   because you have to approve it before the custodian
12   will release the records?
13       A.   That's changed too.
14       Q.   Okay.  What happens now?
15       A.   Now the list has to be approved by treasury.
16   Because of other things outside of the scope of, you
17   know, what's going on here, the doc custodians will now
18   only release them to one person and that person is in
19   treasury.
20       Q.   When you say treasury, you're talking about
21   United States Department of Treasury?
22       A.   No, at OneWest Bank's treasury department.
23       Q.   The what?
24       A.   OneWest Bank's treasury department.
25       Q.   Who is it at the treasury department they

## Page 32

1    release it to?
2        A.   Sandy Schneider.  Well, it's not that they
3    release it to her.  She has to -- she takes over that
4    whole approving it.
5        Q.   Right.  I'm sorry.  So Sandy Schneider --
6        A.   Schneider.
7        Q.   -- approves the release of the original
8    documents?
9        A.   Yes.
10       Q.   The custodians then will pull it from the
11   fireproof vault that it's required to be kept in?
12       A.   I hope so.
13       Q.   And they package it up and mail it to
14   OneWest?
15       A.   They ship it Fed Ex or UPS to Sylvia's
16   attention, and she sits outside of the office of one of
17   the corporate compliance VPs.  There is a room off to
18   the side that has a fireproof cabinet where she stores
19   the documents if she can't get them turned around and
20   out with the bailee letter to the firm via UPS or Fed
21   Ex the same day.
22       Q.   When the custodian ships the original
23   documents, do they ship it in a manner that can be
24   tracked?
25       A.   Yes.

Censor & Associates
Reporting and Transcription, Inc.

Page 33

1    Q.   And do you -- you, OneWest -- keep records of
2    that tracking?
3         A.   Yes.
4         Q.   Do you keep the records even if it's safely
5    made it from the custodian to OneWest?
6         A.   Yes.
7         Q.   How are those kept?
8         A.   In that database I mentioned.
9         Q.   So it's a computer record of it?
10        A.   Yes.
11        Q.   How does that record get into the database?
12        A.   Sylvia entered -- well, Sylvia or one of the
13   three people that work with her enters the information
14   in the database.
15        Q.   You mentioned that she gets -- wants to turn
16   around and get it out with the bailee letter to the
17   attorneys.
18        A.   Yes.
19        Q.   I imagine she also sends it in a way that it
20   can be tracked?
21        A.   Yes.
22        Q.   Is it UPS?
23        A.   UPS.
24        Q.   Okay.  The custodians can choose, use the UPS
25   or Fed Ex; is that right?

Page 34

1         A.   Yes.
2         Q.   Whatever they feel like using?
3         A.   Yes.
4         Q.   But OneWest uses UPS?
5         A.   Yes.
6         Q.   And you keep the records of that tracking,
7    correct?
8         A.   Yes.
9         Q.   If the note is not received from the
10   custodian in ten days, then you, OneWest, follows up
11   with the custodian?
12        A.   That's been changed.
13        Q.   Okay.  What's the new rule?
14        A.   Seven days.  There are three checkpoints back
15   to the doc custodian.  So that by day 21, after the doc
16   custodian has not returned it, Sylvia is looking for an
17   e-mail message or something in writing that explains,
18   you know, why can't you find it, where's the note, so
19   that we have better tracking, of not only the follow-up
20   attempts, but what the responses were.
21        Q.   Then is there a second follow-up?
22        A.   There's three follow-ups:  Seven-day, 14-day,
23   and 21-day.
24        Q.   What happens after the 21 or 21st day?
25        A.   Then we send a request to the firms to

Page 35

1    prepare a Lost Note Affidavit.
2         Q.   Before the first follow-up, or I should say
3    at the time of the first follow-up, does Sylvia notify
4    anyone else that the document hasn't shown up yet?
5         A.   No.
6         Q.   When is the first time that the law firm
7    would know that the original documents hadn't arrived
8    at OneWest?
9         A.   They would receive an issue through process
10   management to prepare a Lost Note Affidavit.  That
11   would be their indication.
12        Q.   So that would be on the 21st day?
13        A.   Or thereabouts, yes.
14        Q.   Is it still true that OneWest isn't satisfied
15   if the custodian just says they couldn't find it; in
16   other words, you want them to come back and tell you
17   why they couldn't find it?
18        A.   That's true, yes.
19        Q.   You would hope that they would tell you that
20   somebody checked it out and didn't return it?
21        A.   Yes.
22        Q.   The custodian is required to keep the
23   original documents in a special fireproof locked vault?
24        A.   Yes.
25        Q.   Is it pretty unusual that the original

Page 36

1    document doesn't show up?
2         A.   Unusual for whom or what?  I mean, at what
3    circumstances?
4         Q.   Let me rephrase that.  Is it unusual for the
5    custodian to report back that they don't have it?
6         A.   It happens.  Does that answer your question?
7    It's not that it's unusual.  It's not like warning
8    bells and whistles go off because the doc custodian
9    couldn't find one.  Because it happens with multiple
10   foreclosure filings, with the bankruptcy filing, where
11   an original document, and with the hand-offs and with a
12   bank like OneWest who has several locations, an
13   attorney might get the original document and send it to
14   Pasadena and it should have come to Austin and it sat
15   on someone's desk and no one opened the mail.  I mean
16   just, all the things that, you know, that managing a
17   mail system, that happens with managing a mail system.
18   So we try to make changes in our process to eliminate
19   some of the getting the notes back.  That's where we
20   have found we have the issue with a lot of our lost
21   notes, is that there was some legal action previous.
22        In some cases we found, after going back two and
23   three times to the doc custodian, that the document was
24   there.  It was the doc custodian who just, for whatever
25   reason, whoever they used to pull the document, that

Censor & Associates
Reporting and Transcription, Inc.

Page 37

1  person didn't pull the right document and we ended up
2  getting the document.  So I don't think it's unusual.
3      One of the things, though, from the last time we
4  spoke till now, I noticed a gap in our procedure.  I
5  think we were very aggressive at requesting a Lost Note
6  Affidavit at day ten, seven or ten, and with the
7  volumes happening all over the country, we probably
8  should have taken it out to 21 days a while ago because
9  the notes are there.  It just was they hadn't found it
10  by the time we already shot off the request to the
11  firms.
12      Q.  Well, when you say found it, it's not that it
13  was lost, you just hadn't got it transferred from --
14      A.  That's right.
15      Q.  -- the custodian to OneWest, correct?
16      A.  Yes.
17      Q.  I'm still trying to get a sense of how often
18  this happens, though.  Is it something that happens
19  every day at OneWest or --
20      A.  No.  No, but it happened more as we were
21  going through our transition with the feds taking over
22  and losing a significant amount of staff.  Now that we
23  are OneWest Bank, I can't even remember the last time I
24  saw a Lost Note Affidavit, honestly.
25      Q.  Over the last year, let's say, what

Page 38

1  percentage of the loans that you've been involved in
2  started out with being unable to find the original
3  note?
4      A.  What do you mean by involved in?
5      Q.  In your department.
6      A.  I don't know.
7      Q.  Do you have any sense?  Is it 1 percent, 5
8  percent, 10 percent?
9      A.  I don't know.  There was a time, before we,
10  you know, became less aggressive with our procedure to
11  do the Lost Note Affidavit, assuming that Deutsche Bank
12  couldn't locate it, that I signed Lost Note Affidavits
13  more frequently than I do now.  And I think changing
14  the procedure has made a big difference, because, like
15  I said, I can't even remember the last time I signed
16  one.  Or it could be now when I get one, I won't sign
17  it until I see that that custodian really can't find
18  it, which is something that I wasn't necessarily doing
19  before unless prompted to do so.
20      So I don't know, out of 77,000 loans in
21  foreclosure, well, then there was probably 60,000 loans
22  in foreclosure, I did several a week, but now I can't
23  even remember, I can't remember what that number is,
24  and now I do zero.
25      Q.  Well, you're giving me a total of the loans

Page 39

1  in foreclosure.  How many in foreclosure, how many new
2  ones in foreclosure each week?
3      A.  Today?
4      Q.  Yes.
5      A.  It depends on the time of the month because
6  of the investor guidelines with referrals, but I can
7  tell you that overall, across the nation, we referred
8  12,000 loans into foreclosure for the month of June.
9  California is our largest footprint, so 40 percent of
10  those were in California.
11      Q.  Now, some of those you wouldn't know whether
12  they needed a Lost Note Affidavit yet?
13      A.  That's right.
14      Q.  But so far, what your testimony is, is that
15  of the ones that you would know about, none have
16  requested a Lost Note Affidavit?
17      A.  It's been a long while.
18      Q.  More than a month?
19      A.  Yes, more than a month.
20      Q.  And it's certainly safe to say that it would
21  be untrue that a 100 percent of the loans that you have
22  in foreclosure had any lost original note?
23      A.  Right, that would be untrue.
24      Q.  The custodian normally has some sort of
25  checkout procedure that people can't just come in and

Page 40

1  take a note, take out a note without signing for it?
2      A.  Yes.
3      Q.  Is there a certain time frame that a
4  foreclosure suit must be filed after the borrower has
5  defaulted?
6      A.  Are you talking about the first legal action
7  in the foreclosure or what --
8      Q.  The filing, the actual filing of the suit, is
9  there a time frame required?
10      A.  See, okay, I'm dealing with 50 states in my
11  mind, so can you get more specific?  Are you talking
12  about the first legal action or --
13      Q.  Let's stick with Florida for right now.
14      A.  Okay.
15      Q.  But really the question is directed to your
16  investors and what their guidelines are and what you're
17  required to do.  Are you required to get a case filed
18  by 60 days, 120 days after default --
19      A.  I see what you're saying.
20      Q.  -- or you aren't complying with your job?
21      A.  Yes.  That's true, yes.
22      Q.  And is that governed by the PSA?
23      A.  Usually, but it's Fannie and Freddie
24  typically that have very strict guidelines about when a
25  file should be in foreclosure and very specific

Censor & Associates
Reporting and Transcription, Inc.

11 (Pages 41 to 44)

Page 41

1    guidelines for exceptions to that.
2        Q.   But when you say in foreclosure, that means
3    the actual filing of the lawsuit?
4        A.   It has to be referred, it just has to be
5    referred to foreclosure.
6        Q.   Are there any that require actual filing of
7    the lawsuit?
8        A.   No.
9        Q.   Does OneWest instruct its counsel to file a
10   lost note count regardless of whether the note is
11   actually lost?
12       A.   No.
13       Q.   It is true that the promissory note in this
14   case was never lost, correct?
15       A.   What are we doing?
16       Q.   This is Machado.
17       A.   No.
18       Q.   No, that's not correct?
19       A.   It was never lost.
20       Q.   Were you aware that on November 21st, 2008,
21   when this case was filed, your attorneys -- by your, I
22   mean, OneWest -- attorneys hired by OneWest --
23       A.   Yes.
24       Q.   -- in the Machado case represented to the
25   Court that the note had been lost?

Page 42

1        A.   Yes.
2        Q.   Let's put these out here in the middle.  I
3    had marked previous to your deposition some exhibits.
4    I had them premarked so we could hopefully move a
5    little faster.
6        MR. ICE:  Counsel, if you would like to
7        take a look at Exhibit 1 -- or A, I'm sorry.
8        MR. MANCILLA:  Okay.
9    BY MR. ICE:
10       Q.   You've been handed what's been marked as
11   Exhibit A to your deposition.  Do you recognize that as
12   the complaint in the Machado case?
13       A.   Yes.
14       Q.   In Count II, in paragraph 16, do you see in
15   the parens there, parentheses --
16       A.   Yes.
17       Q.   -- it says:  Plaintiff does not presently
18   have a copy of the note, but is seeking to obtain a
19   copy, and will file a copy with the Court when
20   obtained?
21       A.   Yes.
22       Q.   That is not an accurate representation,
23   correct?
24       A.   At the time it was.  At that time it was.
25       Q.   At the time, on November 21st, 2008, OneWest

Page 43

1    did not have access to the original note?
2        MR. MANCILLA:  If you know.  If you
3        don't, say you don't.
4        THE WITNESS:  I'm trying to separate the
5        cases in my mind.  Sorry.
6        MR. MANCILLA:  That's all right.  Is
7        there anything that you have with you that
8        you could look at?
9        THE WITNESS:  No, that's what I was
10       thinking about.
11       I don't, I don't know.
12   BY MR. ICE:
13       Q.   Well, you just finished telling me that the
14   note in this case was never lost at all, correct?
15       MR. MANCILLA:  She said it wasn't lost.
16       THE WITNESS:  It wasn't lost.
17       MR. MANCILLA:  Right.
18       THE WITNESS:  What I --
19       MR. MANCILLA:  Found ultimately.
20       THE WITNESS:  Yeah, because what I know
21       is the original note is with the firm today,
22       but --
23   BY MR. ICE:
24       Q.   What -- let you finish.  I'm sorry.
25       A.   But this was back when our procedure was,

Page 44

1    when it was different.  When we would have raised an
2    issue for a lost note at day ten, I believe it was,
3    because we hadn't had a response back from our doc
4    custodian, we were more aggressive then and today we're
5    not.  We don't raise that issue, that request until day
6    21.
7        Q.   Okay.  Do you know if November 21st, 2008 was
8    before or after the response from the custodian?
9        A.   We made -- those changes started -- we didn't
10   have the -- the changes weren't confirmed where they
11   were tested and airtight until this year, February of
12   this year.  We were still testing the process:  What
13   was the right point.  Should it be 14 days and then
14   open the issue.  Should it be 21 days.  Twenty-one days
15   happened to be the magic number.  So we were still
16   tweaking the process.
17       Q.   Let's step back a little bit because I'm
18   definitely confused.  You say that ultimately the note
19   was not lost in this case, correct?
20       A.   Right.
21       Q.   Did anyone at any time ever believe that the
22   note was lost?
23       A.   I don't know.
24       MR. MANCILLA:  How could she testify as
25       to anyone, what's in anyone's mind?  I mean,

Censor & Associates
Reporting and Transcription, Inc.

Page 45

1        I don't understand.
2   BY MR. ICE:
3        Q.   Well, you're the vice president of the
4   department of foreclosure at OneWest, correct?
5        A.   Yes.  I didn't check to see if an issue was
6   raised because you didn't write that in your paper.  So
7   I don't know at this moment if an issue was raised for
8   that.
9        Q.   Are you aware of any communication to the
10  attorney that the note had been lost?
11       A.   No, but -- well, no, I didn't, I didn't look,
12  I didn't look into the loss note aspect for these two
13  files.
14       Q.   When plaintiff says in this complaint that
15  they didn't have a copy, that's not true because a copy
16  is on the computer that can be printed out and attached
17  to the complaint, correct?
18       A.   Generally, yes.  Usually, yes.
19       Q.   Take a look at paragraph 18 of the complaint.
20  Do you see the last sentence there, it says:  After due
21  and diligent search, plaintiff has been unable to
22  obtain possession of the mortgage note?
23       A.   Yes.
24       Q.   What due and diligent search was performed in
25  this case?

Page 46

1        A.   Excuse me.  At that time the due and diligent
2   search would have consisted of an e-mail request to the
3   doc custodian, a time period for which to expect a
4   response back.  And at the conclusion of that time
5   period, ten days, I believe -- I'm not sure if it's
6   seven or ten days anymore -- that the assumption was
7   then made that the note could not be found.
8        Q.   Okay.  So what this is saying, then, is that
9   because it's after the due and diligent search, that
10  means all of that had been completed by the time the
11  attorney filed this on November 21st, 2008?
12       A.   Yes.
13       Q.   And your testimony is, as of that time, the
14  custodian was reporting that it was lost?
15       A.   Can I just look at the time line?
16       Q.   Sure.
17       A.   I'm sorry.  I want to check before I say I
18  don't know.  This complaint was filed on November --
19       Q.   Twenty-first.
20       A.   -- 21st.  Well, they breached this loan on
21  September 30th.  I have to do the math.  Florida is a
22  30-day breach state, so we wouldn't have had it in
23  foreclosure anytime sooner then October 30th.  And it's
24  possible, as we still have 21 days of play, and we were
25  too aggressive before with raising the issue to say

Page 47

1   that the note couldn't be found.
2        Q.   When was it decided back then, under the
3   rules back then, that the note couldn't be found?
4        A.   Just the initial didn't get a response from
5   Deutsche Bank within seven or ten days.
6        Q.   You had mentioned the ten days in the last
7   one.
8        A.   Is it ten days?  Okay.  I couldn't remember.
9   Ten days.  And as soon as she didn't get response on
10  that tenth day, Sylvia was to raise the issue with the
11  firm.  Now, the process management is real time.  So if
12  Sylvia raises the issue at 10:00 o'clock, at
13  11:00 o'clock in Florida -- well, she's in Pasadena at
14  10:00.  So at 12:00 o'clock in Florida they would have
15  been able to see that the note couldn't be found.
16       Q.   Is there a field somewhere in the computer
17  screen where she inputs that there's a problem finding
18  the note?
19       A.   The process then -- that process is true
20  today.  The process then was she just raised the issue
21  to the firm.  And what the issue says is prepare a Lost
22  Note Affidavit.  So the assumption is we need to
23  prepare this because we can't locate it.
24       Q.   So if I'm understanding your testimony, for
25  this count to be in the complaint, someone would have

Page 48

1   asked, Sylvia would have asked for a Lost Note
2   Affidavit?
3        A.   Yes.
4        Q.   Okay.  Did anyone ask for a Lost Note
5   Affidavit in this case?
6        A.   I don't know because I didn't look at that.
7   When I was reviewing the file, I was just looking at
8   the Affidavit of Debt.
9        Q.   Where would you go to look for that
10  information?
11       A.   In process management.
12       Q.   That's the computer program?
13       A.   Yes.
14       Q.   What screen would you look at?
15       A.   I would just pull up the loan number.  This
16  is LPS's system.  I would just pull up the account by
17  the loan number.  And within it there's different
18  modules.  There's a foreclosure module.  And then each
19  action is broken down by section.  So there would be an
20  original doc process, and that's where I would go to
21  see what happened during that process, if it was open
22  and closed.
23       Q.   I wasn't sure the court reporter got it.
24  What you said was that this program that you're
25  describing is an LPS system?

Censor & Associates
Reporting and Transcription, Inc.

Page 49

1     A.   Yes.
2     Q.   And is it just a notes field or something in
3   there that someone would type a message, or is it like
4   a yes/no toggle in the computer program?
5     A.   How can I -- I'm not a system person, so you
6   have to excuse the way I'm going to describe this.
7   It's kind of like template-based.  So you know that in
8   the state of Florida you're going to go through these
9   particular steps, and within these steps there might be
10  sub steps.  So in order to go on to the next step,
11  someone has to address the predecessor step.  So that
12  means that your yes/no question is accurate, but
13  there's also the capability to put notes.  So if you
14  raise an issue you can put notes.  There's a whole
15  notes screen.  You can send an e-mail from the system
16  which copies back over to the notes, and it's the
17  e-mail between our foreclosure counsel, the client,
18  which would be us, and the LPS reps.
19    Q.   I think you described the system as it was
20  back then.  What's the difference with how it is now?
21    A.   Their system?  The LPS's system?
22    Q.   Well, the reporting that the custodian was
23  not able to find the note to the law firm.
24    A.   The new database, that's ours.  That's
25  OneWest Bank's system, yes.

Page 50

1     Q.   And what's that system called?
2     A.   It's an access database.  It's not called
3   anything.  It's just an access database that one of my
4   analysts -- it was created by someone else.  One of my
5   analysts tweaked it and -- one of the analysts that
6   report directly to me tweaked it so that it's more
7   meaningful and has the controls in place that we
8   needed.
9        So now what it does, like I said, is it takes a
10  lot of the manual-ness out of it.  Sylvia doesn't have
11  to go TO MAS1 INV1.  The system looks at our, the
12  mainframe -- okay, I'm not a systems person, so, you
13  know -- where all the data is and it's scrubbing, based
14  on the loan number, to pull in who the doc custodian is
15  and then it creates the list.  Now, Sylvia doesn't have
16  to create a spreadsheet.  It creates a list that is
17  attached to the e-mail that Sandy approves that then
18  goes to the doc custodian to get the documents back.
19    And when the documents come in, there is a, like a
20  gun thing that they hook up to the computer, and so
21  from the bar codes from the Fed Ex or UPS or however
22  the doc, they can scan it and it puts the tracking
23  number on the system.  And she does the same thing when
24  she gets ready to send the document out.  So now we are
25  keeping track of, we have much better controls over the

Page 51

1   process and better follow-up and follow-through.
2     Q.   What does the attorney see of that to know
3   that there's a lost note?
4     A.   Today, nothing.  What we're working on,
5   however, we're just not quite there yet, is an overlay
6   of the back and forths, or whatever communication
7   Sylvia has to the firms, so that they know how many
8   attempts we made and, you know, ultimately where the
9   document is.  And it would probably -- the idea is to
10  upload this into process management, this document into
11  process management.
12    Q.   Okay.  What I'm understanding from you, then,
13  correct me if I'm wrong, the only time the attorney
14  would know that there's a lost note, either the way the
15  system was then or even the way it is today, is that
16  someone requests a Lost Note Affidavit?
17    A.   Yes.
18    Q.   Look back at paragraph 4 of the complaint.
19  It says:  Plaintiff is now the holder of the mortgage
20  note and mortgage and/or is entitled to enforce the
21  mortgage note and mortgage.  Do you see that?
22    A.   Yes.
23    Q.   Do you know which of those options it is,
24  whether it's they're the holder and entitled to enforce
25  the mortgage note and mortgage, or they're the holder

Page 52

1   or entitled to enforce the mortgage note and mortgage?
2     A.   I'm going to read this.  Okay.
3        In this case it is, or is entitled to enforce the
4   mortgage note and mortgage.
5     Q.   And why do you say that?
6     A.   Because Deutsche is the investor and we're
7   servicing, the servicing agent.
8     Q.   Right.  OneWest is not the holder of the
9   mortgage note and mortgage?
10    A.   Right.
11    Q.   And even if it was, it couldn't be the holder
12  of the mortgage note because the mortgage note was
13  lost?
14    A.   Is that a question?
15    Q.   Would you agree with that?
16        MR. MANCILLA:   No, the mortgage note
17        wasn't ultimately lost.  It may have been
18        missing or it may not have been found at the
19        time the complaint was filed, but it was
20        ultimately found.
21  BY MR. ICE:
22    Q.   My question is as of the time that the
23  attorney penned his name onto this complaint and made
24  these allegations to the Court, made factual
25  representations to the Court, as an officer of the

Censor & Associates
Reporting and Transcription, Inc.

14 (Pages 53 to 56)

Page 53

1    court, it wasn't holder of the note because it was
2    lost.  Would you agree with that?
3        A.  Well, I don't understand that No. 4 to be
4    that, to mean what you are saying.
5        Q.  Okay.  How do you understand it?
6        A.  I understand No. 4 to be the holder, as in
7    who rightfully can enforce the terms, not so much as
8    who physically had the document.  That's just my
9    understanding.
10       Q.  I would tend to agree with you on that.  I
11   think your attorneys might differ with you and
12   certainly differ with me.
13       All right.  You've kind of anticipated my next
14   series of questions, which was, it's true that OneWest
15   does not own the loan in this case?
16       A.  That's true.
17       Q.  Neither OneWest nor IndyMac Federal Bank, FSB
18   nor IndyMac Bank, FSB, none of those entities own the
19   loan in this case?
20       A.  That's right.
21       Q.  The loan has been securitized?
22       A.  Yes.
23       Q.  The loan is owned by a trust?
24       A.  Yes.
25       Q.  The trust is Deutsche Bank National Trust

Page 54

1    Company?
2        A.  Yes.
3        Q.  I should have said the trustee is Deutsche
4    Bank National Trust Company, correct?
5        A.  Let me just look at that real quick.  Yes.
6        Q.  In your computer systems, the owner of the
7    note is called the investor?
8        A.  Yes.
9        Q.  Your computer systems show that Deutsche Bank
10   National Trust Company is the investor?
11       A.  Yes.
12       Q.  Deutsche Bank National Trust Company is the
13   creditor under the Fair Debt Collection Practices Act?
14       A.  I don't, I don't know.
15       Q.  As your attorney mentioned earlier, I don't
16   want you to guess at anything.  If you don't know,
17   please just say you don't know.  However, if you can
18   estimate something for me and that's relevant, we would
19   like for you to do that.
20       The trust in this case, the Machado case, is the
21   IndyMac INDX Mortgage Trust 2006-AR4, mortgage
22   pass-through certificates series 2006-AR4.
23       A.  Yes.
24       Q.  The PSA that governs the relationship between
25   OneWest and the trustee is dated March 1st, 2006?

Page 55

1        A.  Yes.
2        Q.  Are there any terms of that particular PSA --
3    and for the benefit of the judge or a jury, whoever may
4    end up reading this, PSA stands for the Pooling and
5    Servicing Agreement?
6        A.  Yes.
7        Q.  Are there any terms of the Pooling and
8    Servicing Agreement that restrict the manner or amount
9    that a loan, that this loan may be modified?
10       A.  I don't know.  I don't know because I didn't
11   read the PSA for this loan.
12       Q.  Do you have it with you today?
13       A.  I don't.  Did you ask me to bring that?
14           MR. MANCILLA:  No.
15   BY MR. ICE:
16       Q.  Please, many times I'll ask you if you have
17   something because I see you have things in front of
18   you.  It's not intended to suggest that you were
19   supposed to bring anything with you.  I'm just, just
20   out of curiosity do you have it?
21       A.  I don't.
22       Q.  Okay.
23       A.  And -- well --
24       Q.  I'm sorry, do you have something to add to
25   your answer?

Page 56

1        A.  That question is even outside the realm of my
2    responsibility.  Like so in terms of like what's in the
3    PSA agreement, what I'm always looking for is how I can
4    vest and how I can do the action, where the loss mit
5    group is more looking at sections of the PSA that
6    govern what you're speaking to.
7        Q.  Okay.  When you go to look at the Pooling and
8    Servicing Agreement -- well, sorry, strike that.
9        Do you sometimes look at the Pooling and Servicing
10   Agreement as part of your job?
11       A.  Yes.
12       Q.  When you do that, do you pull it up on your
13   system or --
14       A.  Yes.
15       Q.  Do you ever look at what's available on the
16   Internet?
17       A.  No.
18       Q.  Are there any contractual restrictions
19   outside the PSA that you're aware of that restrict the
20   way that this loan may be modified?
21       A.  You mean from a loss mit perspective when you
22   say modify?
23       Q.  Yes.
24       A.  Today, yes.
25       Q.  What contractual provisions are those?

Censor & Associates
Reporting and Transcription, Inc.

Page 57

1    A.  Obama's HAMP program, and also the FDIC loss
2    mit program, but I'm not the subject matter expert on
3    any of those.  I just know that those now govern what
4    and how loans can be modified.
5    Q.  Do you have a general idea of what those
6    programs do?
7    A.  Yes.
8    Q.  Can you take me through the Obama one?
9    A.  This is rough, because I've already admitted
10   that's not my area of expertise.  So the HAMP program
11   that is administered by Fannie and Freddie, and it's on
12   those two investors that we are required to behave a
13   certain way, but for other investors, other investors
14   can opt in.  Of course, the President wants all the
15   loans to be looked at under his plan.  And so if there
16   is a -- let me try to get this right.
17   The DTI, debt to income, has to be 31 percent.
18   I'm probably about to get into trouble because I'm
19   trying to go somewhere that I don't know categorically.
20   And if it is and the borrower has, you know, the reason
21   for a default is catastrophic, or it doesn't have to be
22   catastrophic, but, you know, loss of income, divorce,
23   those such things, the borrower is put on a three-month
24   payment plan.  The payment may or may not be a full
25   payment.  It might be less than a full payment.  If the

Page 58

1    borrower does that for three months, then their loan is
2    modified to a lower interest rate.  And there's a range
3    for that lower interest rate, and I don't know exactly
4    what that range is.
5    And in some cases some of the principal balance is
6    not forgiven, but a separate loan is made out of it
7    that the borrower doesn't have to pay unless they sell
8    their home.  I'm foggy on that.  I'm foggy.
9    The FDIC modification plan I know less about, but
10   it is what Sheila Bair came out with when the FDIC took
11   over IndyMac Federal Bank.  It has the same general
12   idea.  The borrower has to meet this criteria of debt
13   to income, but the outcome is the same, without the
14   principal reduction.
15   The HAMP program, I'm going back to the other one,
16   also has an area that a borrower doesn't have to be
17   delinquent to qualify for it as long as the borrower
18   can show that they will become delinquent, severely
19   delinquent in the future because they just lost their
20   job yesterday.  So they don't have to be delinquent to
21   be approved.
22   Q.  Did I understand you correctly to say that to
23   your understanding the Obama program can involve
24   principal reductions, but the FDIC program does not?
25   A.  Yes.  And you said can.  You didn't say

Page 59

1    always.  Possible.
2    Q.  It's possible.
3    A.  Okay.
4    Q.  I think you told me last time Sheila Bair was
5    very much against principal reduction?
6    A.  And still is, yes.
7    Q.  But she doesn't call the shots at OneWest
8    anymore?
9    A.  She does not.
10   Q.  When it comes to principal reductions, or a
11   principal reduction in this case, ultimately that would
12   fall to Deutsche Bank to decide whether they want to do
13   that, correct?
14   A.  Well, since Deutsche Bank has, and the PSA
15   told us to service this loan diligently as we would our
16   own loans, then they are delegating that authority to
17   OneWest Bank.  Today a Deutsche Bank loan would go
18   through an FDIC model.  It would not go through a HAMP
19   model because today it's just the Fannies and Freddies
20   that are requiring that it is happening on.  That will
21   change.  It's just they're not there yet.
22   Q.  So it's safe to say that today OneWest is not
23   doing any modifications that involve principal
24   reductions?
25   A.  I didn't say that.

Page 60

1    Q.  Well, that's why I asked.
2    A.  I have seen loans in the HAMP program where
3    borrowers have received -- or they were offered.  I
4    don't know if one actually accepted, accepts the plan,
5    but they were offered one that had the principal.  And
6    it's not really a principal forgiveness.  It's there.
7    It's kind of just the borrower is making a payment, of
8    course, on a less, you know, their payment is much --
9    is greatly reduced because that piece of the principal
10   balance, that's not necessarily forgiven.  It's kind of
11   just moved into the shadows.
12   Q.  It's capitalized into the loan?
13   A.  No, it's not even capitalized into the loan.
14   It's like a second loan.  And if the borrower ever pays
15   their loan off, they have to pay back that money, but
16   if they're just going to live in the house forever,
17   they would always be making that lower payment.  That's
18   my understanding.  That's my loose understanding.
19   Q.  Is that an option for any loan owned by
20   Deutsche Bank?
21   A.  Today, no, but it could change tomorrow.  I'm
22   going into unchartered waters again.  When Obama came
23   out with this plan, the HAMP plan, it was required that
24   any Fannie and Freddie investor loan, it had to abide
25   by these rules.  It has taken time for the other

Censor & Associates
Reporting and Transcription, Inc.

16 (Pages 61 to 64)

Page 61

1    investors to be a part of the required.
2        OneWest Bank wants to help the borrowers stay in
3    their home.  Obviously, you know, OneWest Bank is not
4    in the business of taking homes back.  But we do have
5    some investors, and I can say this because of some of
6    the mediations I've gone where Deutsche Bank has been
7    the investor, where the loan can't go through the HAMP
8    plan, it has to go through the FDIC plan, which still
9    does not approve principal reductions.
10        The meeting that I was in yesterday morning is
11    that we are close to getting to a point where all the
12    investors will be included in the HAMP plan, but I
13    don't manage that process and I don't have any say-so.
14    I'm just waiting.
15        Q.   And the loss mit department is a separate
16    department from yours?
17        A.   Yes.
18        Q.   However, you would become aware of a
19    successful loss mit program or plan --
20        A.   Yes.
21        Q.   -- because it's no longer in foreclosure; is
22    that right?
23        A.   Yes.
24        Q.   And you have personally attended mediations
25    at which loan modifications were entered into?

Page 62

1        A.   Well, not entered into, but discussed.  You
2    know, when we go to a mediation in Florida, the
3    required mediation, the mediator, of course, wants to
4    know what it is we can do.  We come with everything
5    that it is we can do.  So I know that Deutsche Bank,
6    because of one of these mediations, those loans are
7    still going through the FDIC model.
8        Q.   And the way you described it before, is that
9    something that Deutsche Bank can sort of opt into and
10    say, I want to do the Obama program?
11        A.   Deutsche Bank could, yes, Deutsche Bank
12    could, any investor can do that and we would follow
13    suit.  We do have some investors, for example, Lehman,
14    we have a group of their loans that they service that
15    they want us to treat their loans through the HAMP
16    program.
17        Q.   Do you know how OneWest gets paid for the
18    service of servicing the loans for Deutsche Bank?
19        A.   No.
20        Q.   You don't know if it's a percentage of the
21    pool or anything like that?
22        A.   No.
23        Q.   Who would know that at OneWest?
24        A.   Someone in secondary marketing.
25        Q.   Do you have a name?

Page 63

1        A.   I want to say Aaron Wade, but I'm not sure if
2    he's there anymore.  It's in Pasadena.  I'm too busy
3    with all my foreclosures and bankruptcies.
4            MR. ICE:  I don't know if you, I'm about
5        to move to another exhibit, I don't know if
6        anybody wants to take a break?
7            MR. MANCILLA:  I'm all right.
8            THE WITNESS:  I'm okay.
9            MR. ICE:  Keep going.
10    BY MR. ICE:
11        Q.   Okay.  Take a look at Exhibit B to your
12    deposition.  Do you recognize that document?
13        A.   Yes.
14        Q.   What is it?
15        A.   It is the Affidavit of Debt in the Machado
16    loan, on the Machado loan.
17        Q.   Is that your signature on the final page?
18    When I say final, there's a service list that's
19    attached to my copy, but the final page of the
20    affidavit?
21        A.   Yes.
22        Q.   And that's the long form signature?
23        A.   Yes.
24        Q.   The old way you signed your name?
25        A.   Yes.

Page 64

1        Q.   Do you still use this old form of signature
2    for anything?
3        A.   No.
4        Q.   Okay.  Do you know who prepared this
5    affidavit?
6        A.   Someone at the firm.
7        Q.   The law firm?
8        A.   The law firm, yes.
9        Q.   In this case it would be Florida Default?
10        A.   Yes.
11        Q.   How do you know that?
12        A.   Because I'm sitting here with Joe and I know
13    I didn't transfer a file in the middle of a
14    foreclosure.
15        Q.   Okay.  And you see down at the bottom the
16    file number --
17        A.   Yes.
18        Q.   -- and the doc ID number?
19        Are you familiar enough with these documents to
20    recognize that as a Florida Default doc number, a file
21    number?
22        A.   No.
23        Q.   You don't know one way or the other?
24        A.   No.
25        Q.   Do you know why the numbers are treated there

Censor & Associates
Reporting and Transcription, Inc.

Page 65

1  in big, bold letters with the asterisks?
2     A.  No.
3     Q.  Is that some sort of computer scanning
4  process?
5     A.  I have no idea, because when I get it, it
6  doesn't have that on it.  Oh, yes it does.  Yes, it
7  does.  I'm sorry.  Sorry.
8     Q.  In paragraph 1 -- well, before I go into the
9  specifics, again, I know we covered some of this when
10  we were talking about Lost Note Affidavits and things
11  like that, but just to be clear, the process here is
12  the firm, the law firm, perhaps the affidavit, correct?
13     A.  Based on data that was provided to them from
14  our system of record.
15     Q.  Right.  And they have access to the computer
16  screens to fill in the numbers in the affidavit?
17     A.  Well, we actually give them copies of
18  computer screens, yes.
19     Q.  So they don't have -- they can't just log on
20  and see the same computer screens?
21     A.  No, they can't.
22     Q.  The numbers that are on the computer screen
23  come from where?
24     A.  Okay.  So when the file -- when the attorney
25  is about to do this part in the process, LPS will

Page 66

1  upload certain screen prints that we've already --
2        (Thereupon, there was a brief pause in
3        the proceedings, beginning 2:26 p.m, resuming
4        at 2:48 p.m.)
5        (Thereupon, the designated answer was
6        read back by the Reporter.)
7        THE WITNESS:  -- have told them need to
8        go with each packet every time a firm is
9        getting ready to do an Affidavit of Debt.
10        And then it's from those screen prints that
11        the firm can fill in the accurate
12        information, the accurate information.
13  BY MR. ICE:
14     Q.  So the screen prints aren't physically sent
15  to them, they're just on another system that they can
16  pull up the image?
17     A.  Both.  Well, I don't know.  Actually, I don't
18  know.  You definitely -- they definitely can pull up
19  the image, because when I was preparing for the case, I
20  copied the images and -- but I'm -- that makes the most
21  sense.  I'm sure they're not printing the things off
22  the system and mailing them.
23     Q.  Okay.  The numbers that are on those screen
24  prints are both calculated numbers and input numbers,
25  correct?

Page 67

1     A.  What are we talking about?
2     Q.  Well, I was trying to talk about all of them.
3     A.  The numbers usually come straight off of the
4  screen print, so they're not -- can we take one for an
5  example?
6     Q.  Yes.
7     A.  Which one do you want to take?
8     Q.  Principal.
9     A.  So that's an easy one.  That's just coming
10  straight off from the system and there's no calculation
11  involved.
12     Q.  Well, that's not original principal.  That's
13  principal still owing, correct?
14     A.  Right.
15     Q.  So at some point the computer has to subtract
16  whatever payments have been made?
17     A.  Oh, see, that's what you meant.  Okay.  When
18  you log onto the system and look at this loan, just at
19  a general information screen, what you will see is the
20  unpaid principal balance.  So the user doesn't have to
21  calculate anything, it's there.
22     Q.  Okay.  Someone originally had to put in the
23  amount of the original principal balance, the original
24  principal of the loan, correct?
25     A.  When the loan boarded?

Page 68

1     Q.  Yes.
2     A.  Yes.
3     Q.  And by boarded, I assume you meant it was put
4  into the system because it became part of OneWest's
5  servicing responsibility?
6     A.  Yes.  And I don't know that someone manually
7  did it.  I believe that happens by tape.
8     Q.  How does the information get onto the tape?
9     A.  I believe, this isn't my area of expertise, I
10  believe that if we're purchasing a loan, the
11  information is provided to us by tape from the seller
12  and then uploaded automatically into our computer
13  system.
14     Q.  Okay.  The original lender in this case was
15  IndyMac, correct?
16     A.  I think.  Let me just make sure.  Have to
17  look at my papers.  Because one of these we bought from
18  Aegis.  Yes, the original is IndyMac, yes.
19     Q.  So in this case, somebody from IndyMac, who's
20  now OneWest, would have at some point input --
21     A.  Yes.
22     Q.  -- the information physically into the
23  computer?
24     A.  Yes, that's true.
25     Q.  And we don't know who that was now?

**ensor & Associates**
Reporting and Transcription, Inc.

Page 69

1    A.   No.
2    Q.   Then the computer is programmed to, as
3   payments are made and logged into the computer, to
4   deduct principal --
5    A.   Yes.
6    Q.   -- from the original principal?
7    A.   Yes.
8    Q.   Which requires someone else to physically
9   type in when a payment is made, correct?
10    A.   Yes.
11    Q.   Are there any, like if it's an electronic
12   payment or something, does it go automatically into the
13   computer from the bank where the borrower is paying
14   from?
15    A.   I believe so.
16    Q.   The interest rate, again the -- or the
17   interest per diem that's calculated, the number here of
18   $16,088.21, is computed from the original terms of the
19   loan, correct?
20    A.   Well, the interest would be, in that
21   equation, it would be the unpaid principal balance, not
22   the original principal balance.
23    Q.   Right.  But at some point, someone had to put
24   in what the rate was going to be?
25    A.   Yes.

Page 70

1    Q.   And then the computer does the rest --
2    A.   Yes.
3    Q.   -- and calculates what that represents?
4    A.   Initially, or are we talking about if we were
5   to look at this today?
6    Q.   Right now I'm just asking about how these
7   numbers got onto this affidavit.
8    A.   So we have a workstation within our system of
9   record that generates payoff statements.  That's the
10   information that we provide to the firms because we can
11   put in an as-of date, and then the system, yes, based
12   on the interest rates that are already cataloged in the
13   system for prior months and future months will do the
14   calculations.
15    Q.   Because there's a time lag to get these into
16   the affidavit and for you to sign it, the computer
17   system is actually projecting ahead a little bit as to
18   how much interest is going to be due and owing on a
19   date in the future?
20    A.   It depends.  Let's see.  On this one, the
21   interest is, as of 2/9, 2009, so, yes, it was projected
22   out.  And as long as the interest rate is available,
23   meaning it's not an adjustable, a monthly adjustable
24   interest rate, then it will do that accurately.  There
25   are times when the system can be off if the interest

Page 71

1   rate is not available, depending on when this request
2   is made, and then what the system is going to do is use
3   the interest rate it has available to calculate.
4    Q.   And that's because the adjustables are
5   sometimes tied to rates that you can't possibly project
6   into the future?
7    A.   Right.  Right, once the U.S. Treasury
8   publishes them, then --
9    Q.   Okay.  So based on the screen print, someone
10   at the firm puts these numbers in and then they
11   transfer this to LPS or back to OneWest, or, pardon me,
12   I think you said it's uploaded to the computer?
13    A.   It's uploaded back, because the document has
14   to be signed, it now goes through its -- and I don't
15   know what kind of QC process it goes through on the
16   firm side, so just speaking from what I know, the firm
17   would upload it back through LPS's system for the
18   document to get signed.
19    Q.   And it gets printed out in Austin for you to
20   sign?
21    A.   It gets printed in Minnesota --
22    Q.   Okay.  You said that.
23    A.   -- and gets shipped to Austin.
24    Q.   And at that point you sign this without any
25   kind of your personal verification that any of these

Page 72

1   numbers are correct?
2    A.   There will be a sticky on it, on this.  And
3   what I have is okay to sign by the foreclosure
4   specialist that owns this digit.  And based on that, I
5   won't double check the numbers.
6    Q.   Do you ever double check any of the numbers?
7    A.   No, because our QC process that used to be a
8   100 percent that's now 10 percent, it has really zero
9   level of error because the numbers are really coming
10   right off of -- no one's manually doing this.  So I
11   just look for that sticky so that I know that the
12   person I charged with checking it is doing what I'm
13   expecting them to do.
14    Q.   So when the firm prepares this, is this
15   somehow drawing from the bank's computer system to put
16   these numbers in here or is there a paralegal somewhere
17   and typing these in?
18    A.   I don't know.  I don't know, which is why I
19   have a specialist double check to make sure.  I mean,
20   they're to look at this and say, if I was doing this
21   all from the beginning, would I come up with the same
22   number.  That's why we have that double check.
23        But I don't want to represent that errors aren't
24   made and errors aren't caught and we don't take losses
25   because of errors.

Censor & Associates
Reporting and Transcription, Inc.

Page 73

1    Q.   Do you know whether this was prepared during
2    the 100 percent QC phase or the 10 percent QC phase?
3        A.   This would have -- the 100 percent QC phase.
4        Q.   So someone at OneWest would have checked
5    these numbers before giving them to you?
6        A.   Yes.  Let me backtrack, make sure that I was
7    clear.  A 100 percent of the time someone has to double
8    check these numbers before I sign.
9        Q.   Right.
10        A.   We have a QC process on top of that, that
11    they were QCing how many times we had to reject the
12    document because the numbers were incorrect.  That
13    process has gone from a 100 percent to 10 percent, but
14    a 100 percent of the time a specialist looks at these
15    numbers before I sign.
16        Q.   Okay.  But both back then and today, the
17    numbers, OneWest checks every single number every
18    single time?
19        A.   Back then and, yes, today.
20        Q.   However, you're not the one doing that?
21        A.   No.  As the vice president of the department,
22    no, I don't.  I have employees that report to me that
23    do that.
24        Q.   Right.  And do you have any way of knowing
25    who did it on this document?

Page 74

1        A.   I don't.
2        Q.   In the first line you say:  This affidavit is
3    submitted in support of Plaintiff's Motion for Final
4    Judgment for the purpose of showing:  That there is no
5    genuine issue as to any material fact, that plaintiff
6    is entitled to enforce the note and mortgage and
7    plaintiff is entitled to a judgment as a matter of law.
8    Do you see that?
9        A.   Yes.
10        Q.   Is there anywhere in the affidavit where you
11    actually declare that OneWest -- the basis for OneWest
12    being entitled to enforce the note and mortgage?
13        A.   I'm sorry, what now?
14        Q.   In other words, the way I read it, that's
15    sort of an introductory paragraph as to why this is
16    being filed.
17        A.   Okay.
18        Q.   So my question is, do you say anywhere in
19    here as to what the basis is for plaintiff, which is
20    IndyMac Federal Bank, FSB, being entitled to enforce
21    the note and mortgage?
22        A.   Being entitled to enforce.  I'm looking for
23    the sentence that says -- if you say No. 1 is an
24    introductory paragraph, then I don't see a statement
25    that categorically refers back to the fact that OneWest

Page 75

1    can enforce the note, but I'm not reading it like an
2    introductory paragraph because it's numbered.
3        Q.   Okay.  Yeah, you don't have to adopt my
4    interpretation of it.
5        A.   So, no.
6        Q.   The question is, regardless, viewing the
7    document as a whole, any paragraph, where do you give
8    the basis that the plaintiff is entitled to enforce the
9    note and mortgage?
10        A.   It's not given in this particular affidavit.
11        Q.   Even though it says that that's the reason
12    that this is being given?
13        A.   It's in support of our motion, the motion,
14    yes.
15        Q.   Right.  At the time this was signed, IndyMac
16    Bank was the servicer -- IndyMac -- strike that.
17        Who -- what company was -- the plaintiff is
18    IndyMac Federal Bank, FSB, correct?
19        A.   Yes.
20        Q.   But your affidavit is talking about IndyMac
21    Bank as servicer of the loan.  Would that be incorrect,
22    in paragraph 2?
23        A.   I don't know that that -- I think that's an
24    interpretation of whether that is necessarily incorrect
25    because it doesn't -- the plaintiff says IndyMac

Page 76

1    Federal Bank.  I signed in the capacity as IndyMac
2    Federal Bank in No. 5, so I think paragraph 2 doesn't
3    go to the validity of the document.  I think it's an
4    error.  What do you call those?  Scribner error.
5        Q.   Right.  It should be IndyMac Federal Bank,
6    correct?
7        A.   I would like to have seen it be IndyMac
8    Federal Bank, yes.
9        Q.   Because when we started this whole
10    deposition, you agreed with me that IndyMac Bank ceased
11    to exist in July of last year.
12        A.   Yes, but the plaintiff is IndyMac Federal
13    Bank on the document.
14        Q.   Right.  So as of December 15th, 2008, when
15    you signed it, IndyMac Bank wasn't the servicer of the
16    loan.  They didn't even exist; is that correct?
17        A.   That's right.
18        Q.   Is that something that your QC people look
19    for?
20        A.   It is my understanding that it is a QC point
21    for Fidelity -- LPS, yes.
22        Q.   Going on in paragraph 2, it says that you are
23    familiar with the books of account.  What are books of
24    account?
25        A.   The system records.

Censor & Associates
Reporting and Transcription, Inc.

Page 77

1    Q.  So what you're talking about is the computer
2  programs that we have been discussing?
3    A.  Yes.
4    Q.  It says that you have examined all the books,
5  records, and documents kept at IndyMac Bank, FSB
6  concerning the transactions alleged in the complaint,
7  correct?
8    A.  Yes.
9    Q.  Again, IndyMac Bank didn't have any books,
10  records, or documents at that time, correct?
11    A.  Correct.
12    Q.  Secondly, you didn't examine anything?  It
13  was somewhere else?
14    A.  Someone that reports to me, yes.
15    Q.  When you say, all the transactions alleged in
16  the complaint, when you signed this, did you know what
17  transactions were alleged in the complaint?
18    A.  I know when I sign an Affidavit to Amounts
19  Due and Owing what I'm signing, so.  And I'm signing
20  that as of the date that this is referring to, that is
21  what the borrower owed.
22    Q.  Did you have a copy of the complaint there to
23  review to know what transactions were being alleged in
24  the complaint?
25    A.  I don't need to have -- no, I didn't.

Page 78

1    Q.  Do you know whether or not it had a lost note
2  count in it at the time you signed this?
3    A.  No.
4    Q.  Continuing on in paragraph 2:  All of these
5  books, records, and documents are kept by IndyMac Bank,
6  FSB in the regular course of its business as servicer
7  of the loan transaction and are made at or near the
8  time by, and from information transmitted by, persons
9  with personal knowledge of the facts such as your
10  affiant.
11    What personal knowledge do you have that the books
12  and records and documents that are kept by, should be
13  IndyMac Federal Bank at that time, are in the regular
14  course of its business?
15    A.  Because as a servicer and as a bank, the
16  records are customary.  The financial records are
17  customary.  Did I get that -- maybe I didn't understand
18  the question.  Let me read it.
19    Yes, as a bank and as a servicer, it is customary
20  to keep financial records and customer logs and copies
21  of documents.
22    Q.  How did you confirm that the records that you
23  were looking at were made at or near the time by, and
24  from information transmitted by, persons with personal
25  knowledge?

Page 79

1    A.  My staff, when they check the figures,
2  they're going to do it based on the effective dates
3  shown here as a check and balance that as of that time,
4  as of, in this case, February 9th, 2009, that's what
5  the principal balance was and that's what the interest
6  rate was.
7    Q.  Well, I'm focused on the idea that the
8  entries into this computer system you say are made by,
9  or from information transmitted by, persons with
10  personal knowledge of the facts.  You know, we've
11  already talked about some of the entries, some of the
12  data comes from tape.  Do you know in this particular
13  case, did this come from tape or somebody who typed it
14  into the computer?
15    A.  I don't know.
16    Q.  You don't know -- because you don't know
17  that, you don't know whether it was made at or near the
18  time that the records came to be, right?
19    A.  I do know that working for a bank we are
20  strongly regulated and that this is the normal course
21  of business, and because of reg A and B and other regs,
22  we wouldn't, as a business, OneWest Bank wouldn't
23  represent that we're doing these things if it weren't
24  happening in the normal course of business.
25    Q.  Well, IndyMac was the original lender,

Page 80

1  correct?
2    A.  Yes.
3    Q.  But it was probably done through some sort of
4  a mortgage broker?
5    A.  Yes.
6    Q.  Do you have any way of knowing today who that
7  was?
8    A.  I looked at that.  I don't know if I brought
9  it with me.  I can't remember.  It wasn't a name that's
10  standing out for me, either.  I didn't print it.  I
11  don't know for sure.
12    Q.  So sitting here today, you don't know who
13  that was that sat down with my client and signed the
14  loan?
15    A.  Well, let me just double check.  I don't
16  know.
17    Q.  I presume there would have been an
18  underwriter at IndyMac who would have approved what the
19  mortgage broker was doing?
20    A.  That's not my area of expertise.  I'm not
21  sure what the requirements are when they -- I don't
22  know.  I don't know.
23    Q.  Okay.  Among the folks I've talked about so
24  far, the mortgage broker, whoever at IndyMac was
25  overseeing that process, did any of them, were any of

Censor & Associates
Reporting and Transcription, Inc.

21 (Pages 81 to 84)

Page 81

1     them the people who put the information into the
2     computer?
3         A.  It's possible.  Probably not the mortgage
4     broker.  My best guess is it would have been an IndyMac
5     Bank employee.
6         Q.  And would that have been based on the
7     documents that were physically signed and physically
8     delivered to IndyMac?
9         A.  That would be my understanding, but, again,
10    that's -- I don't know the front end.
11        Q.  And when that was done, whether it was close
12    to the time of the loan or a long time from the time of
13    the loan, you would have no personal knowledge of,
14    correct?
15        A.  No.  I mean, personal knowledge in this case
16    of when, how, or when the documents were uploaded?
17        Q.  Right.
18        A.  No, I don't.
19        Q.  You have no personal knowledge of that?
20        A.  I have no personal knowledge.
21        Q.  In paragraph 4 you say:  Plaintiff, IndyMac
22    Federal Bank, FSB, is owed the following sums of money.
23        A.  Um-um.  Yes.
24        Q.  The truth is, is that that money was owed to
25    Deutsche Bank, correct?

Page 82

1         A.  I guess it depends on how you interpret that
2     word "owed."  As the servicing agent for Deutsche Bank,
3     OneWest Bank would be collecting the funds.
4         Q.  For Deutsche Bank?
5         A.  To pass through to Deutsche Bank.
6         Q.  And it's really the same for this foreclosure
7     action, too.  IndyMac is the plaintiff, but if you win
8     this lawsuit, it's Deutsche Bank that collects the
9     proceeds or the house at the end of the day, correct?
10        A.  Yes.
11        Q.  Okay.  Let's just see what's been marked as
12    Exhibit C to your deposition, ask you if you recognize
13    that document?
14        A.  Yes.
15        Q.  What is it?
16        A.  The responses to the interrogatories.
17        Q.  Do you recognize the signature on that
18    document?
19        A.  That's my new signature.
20        Q.  The new and improved?
21        MR. MANCILLA:  The new and shortened,
22    anyway.
23    BY MR. ICE:
24        Q.  Are those the only two signatures that you
25    use?

Page 83

1         A.  Yes.
2         Q.  And this is the one you use from now on on
3     everything?
4         A.  Yes, except for my checkbook.
5         Q.  And on these interrogatories you signed as
6     attorney-in-fact.  Do you see that?
7         A.  Yes.
8         Q.  Who are you the attorney-in-fact for?
9         A.  IndyMac Federal Bank.
10        Q.  Why did you not sign as the vice president of
11    IndyMac Federal Bank?
12        A.  At the time that I signed this -- does that
13    say May 29th, 2009?
14        Q.  I think so.
15        A.  As of March 19th, I could only do
16    attorney-in-fact for IndyMac, IndyMac Federal, and FDIC
17    as receiver, and FDIC as conservator.
18        Q.  But at that time it had already become
19    OneWest, correct?
20        A.  Yes, but since the action -- yes.  But since
21    the action, the plaintiff in the action was IndyMac
22    Federal, I can still sign for IndyMac Federal as
23    attorney-in-fact until 2010.
24        Q.  Who granted you the power of attorney to sign
25    for a nonexistent entity?

Page 84

1         A.  FDIC.
2         Q.  Do you have that power of attorney with you?
3         A.  I do.  I brought it just for you.
4         Q.  Thank you.
5         A.  Hold on.  I'm trying to make sure I give you
6     the right one.  Hold on.  I'm sorry.
7             THE WITNESS:  Are we going to break
8     right now?
9             MR. MANCILLA:  Yes.
10            MR. ICE:  Okay.
11            (Thereupon, there was a brief pause in
12    the proceedings, beginning at 2:59 p.m.,
13    resuming at 3:14 p.m.)
14            (Continued at Volume II)
15
16
17
18
19
20
21
22
23
24
25

Censor & Associates
Reporting and Transcription, Inc.

Page 85

**A**

**Aaron** 63:1
**abide** 60:24
**able** 47:15 49:23
**accepted** 60:4
**accepts** 60:4
**access** 23:24
  24:1,4 43:1
  50:2,3 65:15
**account** 1:11
  48:16 76:23,24
**accuracy** 14:25
**accurate** 15:13
  23:12 42:22
  49:12 66:11,12
**accurately**
  70:24
**acknowledgm...**
  20:13
**act** 23:4 54:13
**action** 36:21
  40:6,12 48:19
  56:4 82:7
  83:20,21,21
**actual** 17:7 40:8
  41:3,6
**add** 55:24
**addition** 12:13
**address** 4:14
  49:11
**adjustable**
  70:23,23
**adjustables** 71:4
**administered**
  57:11
**admitted** 57:9
**adopt** 75:3
**adopted** 8:25
  9:1
**advance** 9:22
**advances** 9:20
  10:2
**advised** 26:15
**Aegis** 68:18

**aesthetically**
  22:23
**affiant** 78:10
**affidavit** 13:6
  14:18 15:20,22
  20:17 35:1,10
  37:6,24 38:11
  39:12,16 47:22
  48:2,5,8 51:16
  63:15,20 64:5
  65:12,16 66:9
  70:7,16 74:2
  74:10 75:10,20
  77:18
**affidavits** 13:4
  14:2,3 15:5
  23:21 38:12
  65:10
**afternoon** 9:2
**agent** 52:7 82:2
**aggressive** 37:5
  38:10 44:4
  46:25
**ago** 37:8
**agree** 6:2 12:5
  52:15 53:2,10
**agreed** 76:10
**agreement** 55:5
  55:8 56:3,8,10
**ahead** 70:17
**airtight** 44:11
**ALIVE** 1:9
**allegations**
  52:24
**alleged** 77:6,15
  77:17,23
**alternative**
  12:18,20
**amount** 8:18,19
  8:22 25:22
  37:22 55:8
  67:23
**Amounts** 77:18
**analysts** 50:4,5
  50:5

**and/or** 51:20
**answer** 9:4 36:6
  55:25 66:5
**anticipated**
  53:13
**Antoinette** 4:13
**anybody** 63:6
**anymore** 46:6
  59:8 63:2
**anyone's** 44:25
**anytime** 46:23
**anyway** 82:22
**apart** 21:22
**APPEARAN...**
  2:1
**appropriate**
  23:2
**approval** 9:21
  9:23,24
**approve** 31:11
  61:9
**approved** 12:11
  31:15 58:21
  80:18
**approves** 32:7
  50:17
**approving** 32:4
**area** 57:10 58:16
  68:9 80:20
**arrive** 17:2
**arrived** 35:7
**asked** 48:1,1
  60:1
**asking** 8:21 70:6
**aspect** 45:12
**assets** 5:17
**Assignments**
  14:7
**Associates** 1:23
**assume** 68:3
**assuming** 38:11
**assumption** 46:6
  47:22
**asterisks** 65:1
**as-of** 70:11

**attached** 45:16
  50:17 63:19
**attempts** 34:20
  51:8
**attended** 61:24
**attention** 15:8
  32:16
**attorney** 9:7
  25:18 26:14,15
  27:2 36:13
  45:10 46:11
  51:2,13 52:23
  54:15 65:24
  83:24 84:2
**attorneys** 16:5
  26:18 33:17
  41:21,22 53:11
**attorney-in-fact**
  7:7,8,9 83:6,8
  83:16,23
**auditors** 9:21
**Austin** 4:16
  16:21,23 17:4
  36:14 71:19,23
  79:8
**authority** 6:8,14
  7:3,4 8:16 12:6
  12:15 59:16
**authorized** 21:9
  21:17
**automated**
  30:24
**automatically**
  68:12 69:12
**available** 17:15
  56:15 70:22
  71:1,3
**average** 13:12
  13:12
**AW** 1:3
**aware** 41:20
  45:9 56:19
  61:18

**B**

**B** 3:11 63:11

  79:21
**back** 9:24 16:17
  17:13 22:11
  23:11 25:9
  28:3 34:14
  35:16 36:5,19
  36:22 43:25
  44:3,17 46:4
  47:2,3 49:16
  49:20 50:18
  51:6,18 58:15
  60:15 61:4
  66:6 71:11,13
  71:17 73:16,19
  74:25
**backtrack** 73:6
**bailee** 27:13
  32:20 33:16
**Bair** 58:10 59:4
**baked** 10:24
**balance** 58:5
  60:10 67:20,23
  69:21,22 79:3
  79:5
**balances** 16:14
**bank** 1:4 4:18
  4:20,23 5:1,3,8
  5:13,14,18,21
  6:18,18,19,20
  6:20,20,22,24
  6:25,25 7:6,8,9
  10:11 11:8
  12:4 16:18,22
  19:1 25:6 26:1
  26:1,3,4 28:10
  28:12,18 29:1
  29:4,5 36:12
  37:23 38:11
  47:5 53:17,18
  53:25 54:4,9
  54:12 58:11
  59:12,14,17,17
  60:20 61:2,3,6
  62:5,9,11,11
  62:18 69:13

Reporting and Transcription, Inc.

74:20 75:16,18
75:21 76:1,2,5
76:8,10,13,15
77:5,9 78:5,13
78:15,19 79:19
79:22 81:5,22
81:25 82:2,3,4
82:5,8 83:9,11
**bankruptcies**
63:3
**bankruptcy** 5:4
9:10 14:8 15:6
16:3 36:10
**bankruptcy-r...**
12:17
**bank's** 29:11
31:22,24 49:25
72:15
**bar** 50:21
**Barns** 24:8
**based** 16:15
29:10 30:17
50:13 65:13
70:11 71:9
72:4 79:2 81:6
**basically** 16:23
**basis** 74:11,19
75:8
**Beach** 1:2,19,20
1:24,24 2:9
**beginning** 30:12
66:3 72:21
84:12
**begins** 27:5,11
**behalf** 2:2,6 6:8
**behave** 57:12
**believe** 44:2,21
46:5 68:7,9,10
69:15
**bells** 36:8
**benefit** 55:3
**best** 81:4
**better** 34:19
50:25 51:1
**big** 38:14 65:1

**bigger** 28:11
**biggest** 28:11
**bill** 9:24
**bit** 18:23 44:17
70:17
**blank** 16:2
**boarded** 67:25
68:3
**bold** 65:1
**books** 76:23,23
77:4,9 78:5,11
**borrower** 25:7,8
25:10 40:4
57:20,23 58:1
58:7,12,16,17
60:7,14 69:13
77:21
**borrowers** 60:3
61:2
**boss** 13:5 21:13
**boss's** 21:10
**bottom** 25:20
64:15
**bought** 68:17
**Boulevard** 1:19
1:24
**breach** 9:11,12
46:22
**breached** 46:20
**break** 63:6 84:7
**brief** 66:2 84:11
**bring** 55:13,19
**broken** 48:19
**broker** 80:4,19
80:24 81:4
**brought** 13:14
80:8 84:3
**Building** 4:15
**business** 4:14
21:1 61:4 78:6
78:14 79:21,22
79:24
**busy** 63:2

——— **C** ———

**C** 82:12
**CA** 1:3
**cabinet** 32:18
**calculate** 67:21
71:3
**calculated** 66:24
69:17
**calculates** 70:3
**calculation**
67:10
**calculations**
70:14
**California** 11:2
39:9,10
**call** 25:8,9,10
59:7 76:4
**called** 4:6 30:10
50:1,2 54:7
**capability** 49:13
**capacity** 76:1
**capitalized**
60:12,13
**Carballo** 27:10
29:13
**carnantions** 5:6
**case** 1:3 5:20,23
5:25 6:3,3 8:17
11:10 24:22
25:9,14 27:22
40:17 41:14,21
41:24 42:12
43:14 44:19
45:25 48:5
52:3 53:15,19
54:20,20 59:11
64:9 66:19
68:14,19 79:4
79:13 81:15
**cases** 36:22 43:5
58:5
**cataloged** 70:12
**catastrophic**
57:21,22
**categorically**
20:3 57:19

74:25
**caught** 72:24
**ceased** 5:8 76:10
**certain** 8:18
25:22 40:3
57:13 66:1
**certainly** 39:20
53:12
**CERTIFICA...**
3:5,6,8
**certificates**
54:22
**change** 59:21
60:21
**changed** 5:5
7:24 14:11
18:22 30:13
31:13 34:12
**changes** 9:12
36:18 44:9,10
**changing** 38:13
**charge** 8:5,13
**charged** 72:12
**check** 14:25
15:2,3 16:25
22:24 23:1,20
23:22 45:5
46:17 72:5,6
72:19,22 73:8
79:1,3 80:15
**checkbook** 83:4
**checked** 35:20
73:4
**checking** 15:12
22:21,22 72:12
**checkout** 39:25
**checkpoints**
23:7 34:14
**checks** 15:14
16:14 73:17
**choose** 33:24
**CIRCUIT** 1:1,1
**circumstances**
36:3
**claim** 1:9 10:2

**CLAIMANTS**
1:10
**CLAIMING** 1:7
**clear** 15:2 65:11
73:7
**client** 22:19,22
49:17 80:13
**clients** 22:18
**client's** 24:1
**close** 29:22
61:11 81:11
**closed** 48:22
**codes** 50:21
**collecting** 82:3
**Collection** 54:13
**collects** 82:8
**come** 13:6 35:16
36:14 39:25
50:19 62:4
65:23 67:3
72:21 79:13
**comes** 25:19
59:10 79:12
**coming** 18:25
67:9 72:9
**committee** 8:23
**communicate**
15:25
**communication**
45:9 51:6
**company** 28:19
29:4 54:1,4,10
54:12 75:17
**complaint** 42:12
45:14,17,19
46:18 47:25
51:18 52:19,23
77:6,16,17,22
77:24
**completed** 46:10
**completely**
15:15
**compliance** 9:12
9:15 32:17
**complying**

40:20
**computed** 69:18
**computer** 23:24
  29:11 30:10
  33:9 45:16
  47:16 48:12
  49:4 50:20
  54:6,9 65:3,15
  65:18,20,22
  67:15 68:12,23
  69:2,3,13 70:1
  70:16 71:12
  72:15 77:1
  79:8,14 81:2
**concerned** 10:22
**concerning** 77:6
**conclusion** 46:4
**conditions** 26:12
**confirm** 78:22
**confirmed** 44:10
**confused** 44:18
**conjunction**
  24:25
**conservator**
  6:19 83:17
**considerably**
  14:11
**consisted** 46:2
**Consor** 1:23
**contact** 25:5
  29:20
**Continued**
  84:14
**Continuing** 78:4
**contractual**
  56:18,25
**control** 17:8
  22:12,14
**controls** 50:7,25
**copied** 66:20
**copies** 49:16
  65:17 78:20
**copy** 16:13
  23:13 31:10
  42:18,19,19

45:15,15 63:19
  77:22
**corporate** 2:4
  32:17
**corporation**
  6:12,15
**corporations**
  6:17 7:5
**correct** 5:9,11
  5:21 6:10 9:4
  14:22,23 16:7
  18:6,13 20:22
  20:25 22:1,5
  22:23 24:11,23
  30:23 31:8
  34:7 37:15
  41:14,18 42:23
  43:14 44:19
  45:4,17 51:13
  54:4 59:13
  65:12 66:25
  67:13,24 68:15
  69:9,19 72:1
  75:18 76:6,16
  77:7,10,11
  80:1 81:14,25
  82:9 83:19
**correcting** 9:3
**correctly** 58:22
**counsel** 11:11
  41:9 42:6
  49:17
**count** 41:10
  42:14 47:25
  78:2
**country** 37:7
**COUNTY** 1:2
**couple** 12:8
**course** 57:14
  60:8 62:3 78:6
  78:14 79:20,24
**court** 1:1 7:15
  41:25 42:19
  48:23 52:24,25
  53:1

**cover** 9:20 21:11
  23:2
**covered** 65:9
**create** 50:16
**created** 50:4
**creates** 50:15,16
**creditor** 54:13
**criteria** 58:12
**CSR** 1:23
**curiosity** 55:20
**current** 10:10
**custodian** 28:1,9
  28:17,21,24
  29:5,9 30:9,10
  30:19 31:7,11
  32:22 33:5
  34:10,11,15,16
  35:15,22 36:5
  36:8,23,24
  37:15 38:17
  39:24 44:4,8
  46:3,14 49:22
  50:14,18
**custodians**
  31:17 32:10
  33:24
**customary**
  78:16,17,19
**customer** 78:20

---

**D**

**D** 3:1 4:16
**data** 24:3 50:13
  65:13 79:12
**database** 28:4
  30:16 33:8,11
  33:14 49:24
  50:2,3
**date** 20:8,9,10
  70:11,19 77:20
**dated** 54:25
**dates** 79:2
**day** 11:21,24
  13:17 20:6
  26:6,6 27:4

32:21 34:15,24
  35:12 37:6,19
  44:2,5 47:10
  82:9
**days** 25:13,25
  25:25 34:10,14
  37:8 40:18,18
  44:13,14,14
  46:5,6,24 47:5
  47:6,8,9
**DEAD** 1:9
**dealing** 40:10
**Deborah** 1:23
**debt** 10:10,18
  14:3,19 23:25
  48:8 54:13
  57:17 58:12
  63:15 66:9
**Debts** 15:5
**December** 76:14
**decide** 59:12
**decided** 47:2
**decision** 13:1
  24:22 26:9,11
**declarations**
  14:7
**declare** 74:11
**decreasing** 11:6
**deduct** 69:4
**default** 2:3 9:14
  9:14,18 10:20
  19:2 24:8
  40:18 57:21
  64:9,20
**defaulted** 40:5
**Defendants** 1:12
  2:6 3:13,13,14
  3:14,15,15,16
  3:16,17,17 4:2
**DEFENDAN...**
  1:8
**definitely** 44:18
  66:18,18
**delays** 19:25
**delegating** 59:16

**delinquency**
  26:6
**delinquent** 25:5
  25:21,22 58:17
  58:18,19,20
**delivered** 17:9
  81:8
**department** 8:5
  8:14 12:14,16
  12:17 13:5
  24:11 31:21,22
  31:24,25 38:5
  45:4 61:15,16
  73:21
**departments**
  12:24
**depending**
  25:24 71:1
**depends** 8:20,21
  15:23 39:5
  70:20 82:1
**deposition** 1:14
  7:14 42:3,11
  63:12 76:10
  82:12
**depositions** 5:24
  7:12
**describe** 49:6
**described** 49:19
  62:8
**describing** 19:4
  48:25
**designated** 66:5
**desk** 17:20
  19:23 36:15
**determine** 25:4
  30:8,20
**determined** 8:19
**determines** 29:8
**Deutsche** 6:20
  7:6 26:1,1,3,3
  28:9,11,18
  29:1,4,5 38:11
  47:5 52:6
  53:25 54:3,9

Censor & Associates
Reporting and Transcription, Inc.

54:12 59:12,14
59:17 60:20
61:6 62:5,9,11
62:11,18 81:25
82:2,4,5,8
**DEVISEES** 1:10
**diem** 69:17
**differ** 53:11,12
**difference** 38:14
49:20
**different** 9:13
18:22 23:6
28:24 44:1
48:17
**digit** 72:4
**diligent** 45:21
45:24 46:1,9
**diligently** 59:15
**direct** 3:4 4:9
7:22,25 19:12
24:20
**directed** 40:15
**directly** 19:10
50:6
**discussed** 30:15
62:1
**discussing** 77:2
**discussion** 22:11
25:12
**dismissal** 11:11
**distribute** 13:9
19:14
**divided** 13:21
**divorce** 57:22
**doc** 28:1 30:18
31:17 34:15,15
36:8,23,24
44:3 46:3
48:20 50:14,18
50:22 64:18,20
**docs** 12:6,7
13:16 24:4
**document** 14:10
14:13 15:15
16:1,3,5,19

17:12,14 18:9
19:25 20:12,16
21:5,25 22:21
22:23,25 23:2
23:3 29:9
30:18,20 35:4
36:1,11,13,23
36:25 37:1,2
50:24 51:9,10
53:8 63:12
71:13,18 73:12
73:25 75:7
76:3,13 82:13
82:18
**documents**
11:19,22 12:2
12:9,10,15,18
13:2,11,19
14:5,25 15:13
16:19,20 17:1
17:7,9,18,25
19:1,14,16
20:25 21:14
22:20 23:12
27:11,13 28:15
28:18 31:8
32:8,19,23
35:7,23 50:18
50:19 64:19
77:5,10 78:5
78:12,21 81:7
81:16
**doing** 7:16 9:2
10:6 31:7
38:18 41:15
59:23 72:10,12
72:20 73:20
79:23 80:19
**dollar** 8:18,19
8:22
**double** 72:5,6,19
72:22 73:7
80:15
**download** 15:24
**drawing** 72:15

**Drive** 2:4
**DTI** 57:17
**dual** 21:15,16
**due** 10:23 45:20
45:24 46:1,9
70:18 77:19
**duly** 4:7
**DUSTIN** 2:7
**duties** 7:21 9:6,9
11:16,19

**E**

**E** 2:7 3:1,11
14:12
**earlier** 54:15
**easy** 67:9
**economic** 10:24
10:25
**effective** 79:2
**eight** 13:19,21
23:6
**either** 51:14
80:10
**electronic** 6:6,9
69:11
**eliminate** 36:18
**eliminated**
30:21
**employed** 4:19
4:22,25 29:23
29:25
**employee** 27:9
81:5
**employees** 7:22
73:22
**employer** 4:17
**ended** 37:1
**enforce** 51:20,24
52:1,3 53:7
74:6,12,20,22
75:1,8
**entered** 11:11
33:12 61:25
62:1
**enters** 33:13

**entities** 53:18
**entitled** 51:20
51:24 52:1,3
74:6,7,12,20
74:22 75:8
**entity** 15:9
16:16 17:11
30:9 83:25
**entries** 79:8,11
**equation** 10:25
69:21
**Eric** 21:12
**Erica** 1:15 3:3
4:5,13 21:12
**ERRATA** 3:7,8
**error** 72:9 76:4
76:4
**errors** 15:7
30:21 72:23,24
72:25
**ESQ** 2:3,7,7
**estimate** 13:24
54:18
**evenly** 13:9
**event** 20:5,19
**everyone's** 19:6
19:8
**Ex** 32:15,21
33:25 50:21
**exactly** 58:3
**Examination**
3:4 4:9
**examine** 77:12
**examined** 77:4
**example** 9:17
10:8,9 28:25
62:13 67:5
**exceptions** 41:1
**excuse** 30:4 46:1
49:6
**execute** 20:12
**executing** 14:9
**executive** 8:23
**exhibit** 3:13,14
3:14,15,15,16

3:16,17,17
42:7,11 63:5
63:11 82:12
**exhibits** 3:13 4:2
42:3
**exist** 5:8 76:11
76:16
**exists** 6:3
**expect** 46:3
**expected** 25:13
**expecting** 25:8
25:15 72:13
**experiencing**
10:5
**expert** 57:2
**expertise** 57:10
68:9 80:20
**explain** 7:18
**explains** 34:17
**e-mail** 13:16
34:17 46:2
49:15,17 50:17
**e-mails** 31:7,10

**F**

**facet** 10:7
**fact** 20:24 26:20
74:5,25
**facts** 78:9 79:10
**factual** 52:24
**fair** 14:24 54:13
**fall** 59:12
**fallen** 26:8
**familiar** 7:14
64:19 76:23
**familiarity**
22:13
**Fannie** 40:23
57:11 60:24
**Fannies** 59:19
**far** 39:14 80:24
**Fargo** 28:23,25
29:1,6
**faster** 30:20
42:5

Censor & Associates
Reporting and Transcription, Inc.

**fault** 10:1
**FDIC** 5:11 6:18
6:19 7:8 12:4
57:1 58:9,10
58:24 59:18
61:8 62:7
83:16,17 84:1
**February** 44:11
79:4
**Fed** 32:15,20
33:25 50:21
**Federal** 1:4 4:23
5:13,13,18,21
6:18 7:9 9:1
53:17 58:11
74:20 75:18
76:1,2,5,8,12
78:13 81:22
83:9,11,16,22
83:22
**feds** 37:21
**feel** 9:4 34:2
**fees** 11:12 25:18
**fewer** 12:1
**fictitious** 1:11
**Fidelity** 76:21
**field** 47:16 49:2
**FIFTEENTH**
1:1
**figures** 14:23
15:3,5,20,22
79:1
**file** 26:16 40:25
41:9 42:19
48:7 64:13,16
64:20 65:24
**filed** 40:4,17
41:21 46:11,18
52:19 74:16
**files** 45:13
**filing** 36:10 40:8
40:8 41:3,6
**filings** 36:10
**fill** 8:3 65:16
66:11

**filled** 16:10
**final** 63:17,18
63:19 74:3
**financial** 78:16
78:20
**find** 23:14 34:18
35:15,17 36:9
38:2,17 49:23
**finding** 47:17
**finish** 43:24
**finished** 43:13
**fireproof** 32:11
32:18 35:23
**firm** 16:6,10,17
32:20 35:6
43:21 47:11,21
49:23 64:6,7,8
65:12,12 66:8
66:11 71:10,16
71:16 72:14
**firms** 9:25 15:24
16:1 17:14
23:12 27:14,15
34:25 37:11
51:7 70:10
**first** 4:6 8:12
11:7 24:23,24
25:16 35:2,3,6
40:6,12 74:2
**Florida** 1:2,20
1:24 2:3,5,9
26:25 27:8,8
30:2,5 40:13
46:21 47:13,14
49:8 62:2 64:9
64:20
**focused** 79:7
**foggy** 58:8,8
**folks** 16:21,25
19:10 23:11
24:16 80:23
**follow** 62:12
**following** 25:1
81:22
**follows** 4:7

34:10
**follow-through**
51:1
**follow-up** 34:19
34:21 35:2,3
51:1
**follow-ups**
34:22
**footprint** 39:9
**foreclose** 9:19
**foreclosure** 5:4
8:17 9:10
10:17 12:10,17
14:8,21 16:2
24:10,14,16
26:10 27:1,2
27:17,22 28:3
36:10 38:21,22
39:1,1,2,8,22
40:4,7,25 41:2
41:5 45:4
46:23 48:18
49:17 61:21
64:14 72:3
82:6
**foreclosures**
63:3
**forensic** 9:14,18
10:19 19:2
**forever** 60:16
**forgiven** 58:6
60:10
**forgiveness** 60:6
**form** 63:22 64:1
**forths** 51:6
**found** 27:19,25
30:22 36:20,22
37:9,12 43:19
46:7 47:1,3,15
52:18,20
**foundation**
30:16
**four** 12:9,12,18
**frame** 40:3,9
**Freddie** 40:23

57:11 60:24
**Freddies** 59:19
**free** 9:4
**frequently**
38:13
**friends** 29:22
**front** 55:17
81:10
**FSB** 1:4 4:23 5:1
5:8,14,21 6:18
53:17,18 74:20
75:18 77:5
78:6 81:22
**full** 4:11 57:24
57:25
**functioning** 30:9
**funds** 82:3
**future** 58:19
70:13,19 71:6

——————
**G**
**gap** 37:4
**gatekeepers**
25:17
**general** 57:5
58:11 67:19
**generally** 21:7
45:18
**generates** 70:9
**genuine** 74:5
**getting** 9:23
17:6 19:23,24
19:24 27:5,14
36:19 37:2
61:11 66:9
**give** 7:11 9:17
18:12,14,16,16
22:3,4 65:17
75:7 84:5
**given** 13:13
75:10,12
**gives** 13:21
**giving** 38:25
73:5
**go** 14:17 16:14

17:24 18:23,24
19:22 22:7
24:7 25:25
36:8 48:9,20
49:8,10 50:11
56:7 57:19
59:17,18 61:7
61:8 62:2 65:8
66:8 69:12
76:3
**goes** 10:17 14:21
22:12 27:8,10
30:17 50:18
71:14,15
**going** 10:23 11:1
13:15 19:1
25:9 31:17
36:22 37:21
49:6,8 52:2
58:15 60:16,22
62:7 63:9
69:24 70:18
71:2 76:22
79:2 84:7
**good** 28:25
**govern** 56:6
57:3
**governed** 40:22
**government**
25:25
**governs** 54:24
**granted** 83:24
**GRANTEES**
1:10
**greater** 10:14
**greatly** 60:9
**groove** 19:6
**group** 2:3 9:14
9:14,18 10:8
10:20 18:16,20
18:21 19:3
56:5 62:14
**guess** 13:15
54:16 81:4
82:1

Censor & Associates
Reporting and Transcription, Inc.

Page  90

**guidelines** 25:1
39:6 40:16,24
41:1
**gun** 50:20

**H**

**H** 1:23 3:11
**HAMP** 57:1,10
58:15 59:18
60:2,23 61:7
61:12 62:15
**hand** 17:12 19:9
**handed** 19:17
42:10
**handles** 9:15
**hands** 17:13
**hand-offs** 36:11
**happen** 13:4
**happened** 37:20
44:15 48:21
**happening** 37:7
59:20 79:24
**happens** 27:7
31:14 34:24
36:6,9,17
37:18,18 68:7
**head** 6:21
**HEIRS** 1:10
**help** 30:20 61:2
**high** 9:15,16
10:4,9 24:7
**high-loss** 10:9
11:6
**hired** 41:22
**hold** 27:5 84:5,6
**holder** 51:19,24
51:25 52:8,11
53:1,6
**home** 58:8 61:3
**homes** 61:4
**honestly** 37:24
**hook** 50:20
**hope** 32:12
35:19
**hopefully** 42:4

**hour** 11:21
**hours** 19:19
**house** 60:16
82:9
**housed** 28:15
**How's** 7:24

**I**

**Ice** 2:7,8 3:4
4:10 42:6,9
43:12,23 45:2
52:21 55:15
63:4,9,10
66:13 82:23
84:10
**ID** 64:18
**idea** 12:7 51:9
57:5 58:12
65:5 79:7
**identification**
4:3
**II** 42:14 84:14
**image** 16:13
66:16,19
**images** 66:20
**imagine** 33:19
**improved** 82:20
**incarnations** 5:6
**include** 7:21
14:2 23:1
**included** 14:6
23:8 61:12
**includes** 22:25
**income** 57:17,22
58:13
**incorrect** 73:12
75:21,24
**increased** 11:8
**indication** 35:11
**individual** 1:8
24:4
**INDX** 54:21
**Indy** 16:18
**IndyMac** 1:4
4:22 5:1,6,8,13

5:17,20 6:18
6:18,19,20 7:8
7:9 8:24,25,25
11:8 53:17,18
54:21 58:11
68:15,18,19
74:20 75:15,16
75:18,20,25
76:1,5,7,10,12
76:15 77:5,9
78:5,13 79:25
80:18,24 81:4
81:8,21 82:7
83:9,11,16,16
83:21,22
**information**
14:22 15:24
19:23 24:6
29:10 30:19
33:13 48:10
66:12,12 67:19
68:8,11,22
70:10 78:8,24
79:9 81:1
**informed** 28:4
**initial** 47:4
**Initially** 70:4
**input** 66:24
68:20
**inputs** 47:17
**instruct** 41:9
**insure** 25:17
**intended** 55:18
**interest** 1:9 58:2
58:3 69:16,17
69:20 70:12,18
70:21,22,24,25
71:3 79:5
**interested** 20:1
**Internet** 56:16
**interpret** 82:1
**interpretation**
75:4,24
**interrogatories**
82:16 83:5

**introductory**
74:15,24 75:2
**investor** 9:19,23
10:6,12 25:24
26:2 28:19,23
29:5 30:19
31:4 39:6 52:6
54:7,10 60:24
61:7 62:12
**investors** 40:16
57:12,13,13
61:1,5,12
62:13
**investor's** 25:1
**involve** 58:23
59:23
**involved** 38:1,4
67:11
**INV1** 30:11 31:3
31:4 50:11
**in-house** 12:7
**ISRAEL** 1:7
**issue** 35:9 36:20
44:2,5,14 45:5
45:7 46:25
47:10,12,20,21
49:14 74:5

**J**

**Jacksonville**
30:4
**job** 7:11,21 9:6,9
11:16,19 20:4
26:20 31:7
40:20 56:10
58:20
**Joe** 64:12
**Johnson-Seck**
1:15 3:3 4:5,13
**JOSEPH** 2:3
**JR** 2:3
**judge** 55:3
**judgment** 74:4,7
**JUDICIAL** 1:1
**July** 1:19 5:9

76:11
**jump** 22:11
**June** 39:8
**jurat** 15:8
**jurisdictions**
9:13
**jury** 55:3

**K**

**Karen** 8:8
**keep** 33:1,4 34:6
35:22 63:9
78:20
**keeping** 11:5
50:25
**kept** 32:11 33:7
77:5 78:5,12
**kind** 14:5 20:13
27:17 49:7
53:13 60:7,10
71:15,25
**know** 5:23,24,24
7:2 9:5 17:14
20:11,15,15
21:21,22 22:10
22:24 24:3,5,5
25:13,19 31:17
34:18 35:7
36:16 38:6,9
38:10,20 39:11
39:15 43:2,11
43:20 44:7,23
45:7 46:18
48:6 49:7,8
50:13 51:2,7,8
51:14,23 54:14
54:16,17 55:10
55:10 57:3,19
57:20,22 58:3
58:9 60:4,8
61:3 62:2,4,5
62:17,20,23
63:4,5 64:4,11
64:12,23,25
65:9 66:17,18

68:6,25 71:15
71:16 72:11,18
72:18 73:1
75:23 77:16,18
77:23 78:1
79:10,12,15,16
79:16,17,19
80:8,11,12,16
80:22,22 81:10
**knowing** 73:24
80:6
**knowledge** 78:9
78:11,25 79:10
81:13,15,19,20
**KNOWN** 1:9

——— **L** ———
**lag** 70:15
**Lake** 2:4
**Lakes** 1:19,24
**Lane** 4:15
**large** 10:13
**largest** 39:9
**law** 2:3 16:10
35:6 49:23
64:7,8 65:12
74:7
**lawsuit** 41:3,7
82:8
**learns** 27:25
**leaving** 18:25
**legal** 2:8 36:21
40:6,12
**Lehman** 62:13
**lender** 68:14
79:25
**letter** 23:2 32:20
33:16
**letters** 9:12
27:14 65:1
**let's** 7:25 10:3
13:18,18 37:25
40:13 42:2
44:17 70:20
82:11

**level** 9:16 72:9
**line** 22:21 25:20
46:15 74:2
**list** 23:14,15
31:10,15 50:15
50:16 63:18
**little** 18:23 42:5
44:17 70:17
**live** 60:16
**lives** 30:4
**loan** 23:2,3
24:10,24 25:2
25:5 26:10
27:1,8,17 29:4
30:17 46:20
48:15,17 50:14
53:15,19,21,23
55:9,9,11
56:20 58:1,6
59:15,17 60:12
60:13,14,15,19
60:24 61:7,25
63:16,16 67:18
67:24,25 68:10
69:19 75:21
76:16 78:7
80:14 81:12,13
**loans** 10:11 15:5
18:21 25:25
26:4 38:1,20
38:21,25 39:8
39:21 57:4,15
59:16 60:2
62:6,14,15,18
**locate** 38:12
47:23
**locations** 36:12
**locked** 35:23
**log** 65:19 67:18
**logged** 69:3
**logical** 22:9
**logically** 21:24
22:7
**logs** 28:4 78:20
**long** 4:19 14:9

20:1 39:17
58:17 63:22
70:22 81:12
**longer** 6:3 61:21
**look** 9:21 16:16
16:21 22:24
30:10 42:7
43:8 45:11,12
45:19 46:15
48:6,9,14
51:18 54:5
56:7,9,15
63:11 67:18
68:17 70:5
72:11,20 76:18
**looked** 57:15
80:8
**looking** 8:2
26:24 34:16
48:7 56:3,5
74:22 78:23
**looks** 8:20 22:24
22:24 50:11
73:14
**loose** 60:18
**losing** 37:22
**loss** 8:5,9,13,18
8:19 9:15 10:4
10:9,9 45:12
56:4,21 57:1
57:22 61:15,19
**losses** 10:5,13,14
10:23 72:24
**lost** 12:7 13:4,6
14:2 35:1,10
36:20 37:5,13
37:24 38:11,12
39:12,16,22
41:10,11,14,19
41:25 43:14,15
43:16 44:2,19
44:22 45:10
46:14 47:21
48:1,4 51:3,14
51:16 52:13,17

53:2 58:19
65:10 78:1
**lot** 36:20 50:10
**low** 15:7
**lower** 58:2,3
60:17
**LPS** 15:18,20
16:11,13 17:3
17:13,16,17
21:7,18 22:12
23:11 24:1,5
24:22 26:12,14
27:4,9,17,18
27:21 28:5
29:8,23,25
30:1 48:25
49:18 65:25
71:11 76:21
**LPS's** 48:16
49:21 71:17
**Luis** 29:15,20

——— **M** ———
**M** 1:7
**Machado** 1:7,7
5:25 6:3 41:16
41:24 42:12
54:20 63:15,16
**magic** 44:15
**mail** 32:13 36:15
36:17,17
**mailing** 66:22
**main** 12:9 28:9
**mainframe** 24:2
50:12
**making** 19:8
60:7,17
**manage** 9:6,10
9:11,13 19:7
26:20 61:13
**managed** 10:7
**management**
15:25 35:10
47:11 48:11
51:10,11

**manages** 18:21
19:2 27:12
**managing** 36:16
36:17
**MANCILLA**
2:3 42:8 43:2,6
43:15,17,19
44:24 52:16
55:14 63:7
82:21 84:9
**manner** 32:23
55:8
**manually** 68:6
72:10
**manual-ness**
50:10
**March** 4:21 5:16
54:25 83:15
**marked** 4:3 42:3
42:10 82:11
**marketing**
62:24
**Mastro** 8:8
**MAS1** 30:11
31:2,3 50:11
**material** 74:5
**math** 13:20
46:21
**matrix** 13:3
16:15 22:18
**matter** 57:2 74:7
**MB** 1:3
**mean** 8:21 11:3
16:23 23:16
36:2,15 38:4
41:22 44:25
53:4 56:21
72:19 81:15
**meaning** 8:2
70:23
**meaningful** 50:7
**means** 15:12
41:2 46:10
49:12
**meant** 67:17

Censor & Associates
Reporting and Transcription, Inc.

68:3
**mediation** 62:2
   62:3
**mediations** 61:6
   61:24 62:6
**mediator** 62:3
**meet** 58:12
**meeting** 61:10
**Mellon** 7:1
**mentioned**
   12:12 33:8,15
   47:6 54:15
**message** 34:17
   49:3
**met** 26:12
**middle** 42:2
   64:13
**mind** 11:5 40:11
   43:5 44:25
**Minnesota**
   16:20 22:14,20
   23:11 30:2
   71:21
**minutes** 11:25
   18:11
**missing** 52:18
**mit** 8:5,9,13
   56:4,21 57:2
   61:15,19
**model** 59:18,19
   62:7
**modification**
   58:9
**modifications**
   59:23 61:25
**modified** 55:9
   56:20 57:4
   58:2
**modify** 56:22
**module** 48:18
**modules** 48:18
**moment** 22:11
   45:7
**money** 60:15
   81:22,24

**month** 7:13 39:5
   39:8,18,19
**monthly** 70:23
**months** 58:1
   70:13,13
**morning** 61:10
**mortgage** 6:5,9
   45:22 51:19,20
   51:21,21,25,25
   52:1,1,4,4,9,9
   52:12,12,16
   54:21,21 74:6
   74:12,21 75:9
   80:4,19,24
   81:3
**motion** 74:3
   75:13,13
**move** 42:4 63:5
**moved** 60:11
**multiple** 36:9
**M-A-S-T-R-O**
   8:11

――――――――
**N**

**N** 3:1
**name** 4:11 8:10
   21:9,10,10
   29:12 52:23
   62:25 63:24
   80:9
**NAMED** 1:8
**names** 1:11
   21:10
**nation** 39:7
**National** 28:18
   29:4 53:25
   54:4,10,12
**near** 78:7,23
   79:17
**necessarily** 10:8
   28:20 38:18
   60:10 75:24
**need** 7:18 18:8
   27:2 47:22
   66:7 77:25

**needed** 23:18
   39:12 50:8
**NEENA** 1:7
**Neither** 53:17
**network** 9:7
   26:21
**never** 28:3 41:14
   41:19 43:14
**nevertheless**
   8:13
**new** 6:20,22,24
   6:25,25 34:13
   39:1 49:24
   82:19,20,21
**nine** 23:6
**nonexistent**
   83:25
**normal** 79:20,24
**normally** 39:24
**Notaries** 18:5,13
   18:14,20,22
   19:15 20:24
**notarization**
   21:20
**notarize** 19:10
   19:13,16 20:2
   20:8
**notarized** 19:19
**notarizes** 17:13
**notarizing** 19:8
   20:9,10
**Notary** 17:12
   18:15,17 19:13
   19:24 20:2,3
   20:19 22:4,8
**note** 13:4,6 14:2
   26:24,25 27:6
   27:19,23,25
   28:2,3 34:9,18
   35:1,10 37:5
   37:24 38:3,11
   38:12 39:12,16
   39:22 40:1,1
   41:10,10,13,25
   42:18 43:1,14

43:21 44:2,18
   44:22 45:10,12
   45:22 46:7
   47:1,3,15,18
   47:22 48:1,4
   49:23 51:3,14
   51:16,20,21,25
   52:1,4,9,12,12
   52:16 53:1
   54:7 65:10
   74:6,12,21
   75:1,9 78:1
**notes** 36:19,21
   37:9 49:2,13
   49:14,15,16
**noticed** 37:4
**NOTIFICATI...**
   3:9
**notify** 35:3
**November**
   41:20 42:25
   44:7 46:11,18
**number** 3:12
   13:13 22:25
   23:3,4 38:23
   44:15 48:15,17
   50:14,23 64:16
   64:18,20,21
   69:17 72:22
   73:17
**numbered** 75:2
**numbers** 23:21
   23:22,25 30:17
   64:25 65:16,22
   66:23,24,24
   67:3 70:7
   71:10 72:1,5,6
   72:9,16 73:5,8
   73:12,15,17

――――――――
**O**

**oath** 3:5 7:16
   20:13,22
**Obama** 57:8
   58:23 60:22

62:10
**Obama's** 57:1
**obtain** 42:18
   45:22
**obtained** 42:20
**Obviously** 61:3
**October** 46:23
**offer** 8:20
**offered** 60:3,5
**office** 13:16
   16:21 17:22
   18:3,5,7,9 19:9
   21:3 29:23,25
   30:6 32:16
**officer** 6:5,12
   7:4,7 16:22
   52:25
**Oh** 8:11 20:18
   65:6 67:17
**okay** 6:1 7:18,24
   11:24 12:14
   13:1,11,24
   21:14 23:20
   24:5,9 26:9
   30:8,14 31:4
   31:14 33:24
   34:13 40:10,14
   42:8 44:7 46:8
   47:8 48:4
   50:12 51:12
   52:2 53:5
   55:22 56:7
   59:3 63:8,11
   64:4,15 65:24
   66:23 67:17,22
   68:14 71:9,22
   72:3 73:16
   74:17 75:3
   80:23 82:11
   84:10
**old** 63:24 64:1
**once** 17:7 26:11
   71:7
**ones** 39:2,15
**OneWest** 4:18

4:19 5:3,17
7:10 9:1,3 10:5
16:18,22 25:6
26:23 27:5,16
27:21 28:9
29:11,24 31:22
31:24 32:14
33:1,5 34:4,10
35:8,14 36:12
37:15,19,23
41:9,22,22
42:25 45:4
49:25 52:8
53:14,17 54:25
59:7,17,22
61:2,3 62:17
62:23 68:20
71:11 73:4,17
74:11,11,25
79:22 82:3
83:19
**OneWest's** 68:4
**one's** 72:10
**on-site** 28:5
**on-sites** 21:8,18
30:1
**open** 44:14
48:21
**opened** 36:15
**openings** 8:1,2
**opposing** 11:11
**opt** 57:14 62:9
**option** 60:19
**options** 51:23
**order** 49:10
**ordering** 27:11
**original** 17:15
26:24,25 27:6
27:11,13,18,23
27:25 28:1,3
30:18,18,19
32:7,22 35:7
35:23,25 36:11
36:13 38:2
39:22 43:1,21

48:20 67:12,23
67:23 68:14,18
69:6,18,22
79:25
**originally** 67:22
**outcome** 58:13
**outside** 31:16
32:16 56:1,19
**outsource** 9:25
12:5 15:14,14
15:15,17
**overall** 39:7
**overlay** 51:5
**overseeing**
80:25
**owed** 77:21
81:22,24 82:2
**owing** 67:13
70:18 77:19
**owned** 10:11,12
53:23 60:19
**owner** 54:6
**owns** 72:4
**o'clock** 47:12,13
47:14

_____

**P**
**package** 32:13
**packet** 66:8
**page** 3:2,12
63:17,19
**pages** 1:17 22:25
**paid** 11:12 62:17
**Palm** 1:2,19,20
1:24,24 2:9
**paper** 45:6
**papers** 68:17
**paragraph**
42:14 45:19
51:18 65:8
74:15,24 75:2
75:7,22 76:2
76:22 78:4
81:21
**paralegal** 16:7

72:16
**pardon** 71:11
**parens** 42:15
**parentheses**
42:15
**Parmer** 4:15
**part** 7:11 9:6
26:20 56:10
61:1 65:25
68:4
**particular** 49:9
55:2 75:10
79:12
**parties** 1:7,9,11
**Pasadena** 27:10
28:8 30:1,6
36:14 47:13
63:2
**pass** 19:3 82:5
**passes** 18:21
**pass-through**
54:22
**pause** 66:2
84:11
**pay** 15:8,8 25:18
58:7 60:15
**paying** 69:13
**payment** 25:11
25:12,12,15
57:24,24,25,25
60:7,8,17 69:9
69:12
**payments** 67:16
69:3
**payoff** 70:9
**pays** 60:14
**peek** 21:3
**peers** 12:18,19
12:21
**peer's** 21:10
**penned** 52:23
**people** 8:1 18:24
18:25 33:13
39:25 76:18
81:1

**percent** 15:4,7
15:11,12,16
38:7,8,8 39:9
39:21 57:17
72:8,8 73:2,2,3
73:7,13,13,14
**percentage** 38:1
62:20
**performed**
45:24
**period** 46:3,5
**person** 24:4,13
28:5 31:18,18
37:1 49:5
50:12 72:12
**personal** 71:25
78:9,11,24
79:10 81:13,15
81:19,20
**personally** 9:6
13:25 14:24
61:24
**persons** 78:8,24
79:9
**perspective**
10:21 56:21
**phase** 73:2,2,3
**phone** 1:25 25:8
25:10
**physically** 17:18
17:19 19:8
53:8 66:14
68:22 69:8
81:7,7
**picked** 21:22
**piece** 60:9
**place** 50:7
**plaintiff** 1:5 2:2
5:20 6:2 42:17
45:14,21 51:19
74:5,7,19 75:8
75:17,25 76:12
81:21 82:7
83:21
**Plaintiff's** 74:3

**plan** 25:2,11,12
57:15,24 58:9
60:4,23,23
61:8,8,12,19
**play** 46:24
**please** 4:12 8:10
9:4 54:17
55:16
**POA** 7:6
**point** 21:5 26:23
27:16 30:12
44:13 61:11
67:15 68:20
69:23 71:24
76:20
**pool** 62:21
**Pooling** 55:4,7
56:7,9
**populate** 16:1,3
16:4
**populated** 16:9
**positions** 8:3
**possession** 1:11
45:22
**possible** 46:24
59:1,2 81:3
**possibly** 71:5
**power** 12:5
83:24 84:2
**Practices** 54:13
**predecessor**
49:11
**preferred** 26:17
**premarked** 42:4
**prepare** 35:1,10
47:21,23
**prepared** 64:4
73:1
**prepares** 72:14
**preparing** 27:13
66:19
**prescribed** 25:2
**presentation**
23:5,8
**presently** 42:17

president 5:4
6:10 7:10 8:8
8:12 24:8,8
45:3 57:14
73:21 83:10
presume 80:17
pretty 35:25
previous 28:2
36:21 42:3
principal 58:5
58:14,24 59:5
59:10,11,23
60:5,6,9 61:9
67:8,12,13,20
67:23,24 69:4
69:6,21,22
79:5
print 22:20 67:4
71:9 80:10
printed 16:20
45:16 71:19,21
printing 66:21
prints 16:13
66:1,10,14,24
prior 4:22,25
70:13
privacy 23:4
probable 28:21
probably 9:2
13:18 37:7
38:21 51:9
57:18 80:3
81:3
problem 47:17
procedure 14:16
14:18 17:6
24:9,23 37:4
38:10,14 39:25
43:25
proceedings
66:3 84:12
proceeds 82:9
process 7:15
9:11,11 15:4
15:25 17:8

19:5,7,22
21:23 26:23
27:5,12 30:13
30:14,23 35:9
36:18 44:12,16
47:11,19,19,20
48:11,20,21
51:1,10,11
61:13 65:4,11
65:25 71:15
72:7 73:10,13
80:25
processors
22:19
program 23:24
48:12,24 49:4
57:1,2,10
58:15,23,24
60:2 61:19
62:10,16
programmed
69:2
programs 57:6
77:2
project 71:5
projected 70:21
projecting 70:17
promissory
41:13
prompted 38:19
property 9:19
10:17,19,23
11:1,5
provide 70:10
provided 16:15
65:13 68:11
provisions 56:25
PSA 26:3 40:22
54:24 55:2,4
55:11 56:3,5
56:19 59:14
publishes 71:8
pull 32:10 36:25
37:1 48:15,16
50:14 56:12

66:16,18
pulls 30:18
purchased 5:17
purchasing
68:10
purpose 74:4
purview 17:10
put 15:20 20:8
42:2 49:13,14
57:23 67:22
68:3 69:23
70:11 72:15
81:1
puts 15:22 50:22
71:10
P-A-R-M-E-R
4:15
P.A 2:8
P.L 2:3
p.m 1:20,20 66:3
66:4 84:12,13
———————
       Q
QC 15:4 71:15
72:7 73:2,2,3
73:10 76:18,20
QCing 15:15
73:11
qualifies 25:23
qualify 58:17
quality 17:8
22:12,13
question 13:14
36:6 40:15
49:12 52:14,22
56:1 74:18
75:6 78:18
questions 53:14
queue 27:8,11
30:18
quick 17:10 54:5
quite 51:5
———————
       R
R 3:13

raise 44:5 47:10
49:14
raised 44:1 45:6
45:7 47:20
raises 47:12
raising 46:25
range 58:2,4
rate 58:2,3
69:16,24 70:22
70:24 71:1,3
79:6
rates 70:12 71:5
read 3:9 14:13
23:9 52:2
55:11 66:6
74:14 78:18
reading 55:4
75:1
ready 50:24
66:9
real 47:11 54:5
really 13:3
21:22 22:10
25:16 38:17
40:15 60:6
72:8,9 82:6
realm 56:1
reason 9:22 10:2
11:1,9 26:7,7
36:25 57:20
75:11
reasonable
13:24
receive 35:9
received 25:10
34:9 60:3
receiver 6:19
83:17
receives 29:10
receiving 27:13
recognize 42:11
63:12 64:20
82:12,17
record 4:12 28:1
33:9,11 65:14

70:9
records 31:12
33:1,4 34:6
76:25 77:5,10
78:5,12,16,16
78:20,22 79:18
recovery 10:18
reduced 15:6
60:9
reduction 58:14
59:5,11
reductions
58:24 59:10,24
61:9
refer 25:2,9,14
26:5,5,9
referral 24:25
25:3,14,23
referrals 39:6
referred 25:17
27:1,4,7 39:7
41:4,5
referring 10:4
24:10 27:16,21
77:20
refers 26:14
74:25
reg 79:21
regardless 41:10
75:6
Registration 6:6
6:9
regs 79:21
regular 78:6,13
regulated 79:20
reject 16:17
23:11 73:11
related 9:15,16
14:8
relationship
15:23 54:24
relatively 15:7
release 31:12,18
32:1,3,7
relevant 54:18

Censor & Associates
Reporting and Transcription, Inc.

**remember** 37:23 38:15,23 38:23 47:8 80:9
**rephrase** 36:4
**report** 13:15 19:10,11,12 23:8,10,13 24:17,18 36:5 50:6 73:22
**REPORTED** 1:22
**reporter** 3:6 7:16 48:23 66:6
**reporting** 1:23 46:14 49:22
**reports** 7:22,25 19:12 24:19,20 77:14
**represent** 72:23 79:23
**representation** 27:18 42:22
**representations** 52:25
**represented** 41:24
**represents** 70:3
**reps** 49:18
**request** 34:25 37:10 44:5 46:2 71:1
**requested** 39:16
**requesting** 37:5
**requests** 51:16
**require** 21:16 41:6
**required** 32:11 35:22 40:9,17 40:17 57:12 60:23 61:1 62:3
**requirement** 19:18

**requirements** 80:21
**requires** 69:8
**requiring** 59:20
**research** 9:14,16
**researching** 9:18
**response** 44:3,8 46:4 47:4,9
**responses** 34:20 82:16
**responsibility** 56:2 68:5
**rest** 70:1
**restrict** 55:8 56:19
**restrictions** 56:18
**resuming** 66:3 84:13
**return** 26:14 35:20
**returned** 34:16
**returning** 19:19
**review** 10:25 11:3,4 77:23
**reviewing** 48:7
**right** 13:23 15:11 18:10 20:21 22:6 28:8 29:19 31:1 32:5 33:25 37:1,14 39:13,23 40:13 43:6,17 44:13 44:20 52:8,10 53:13,20 57:16 61:22 63:7 65:15 67:14 69:23 70:6 71:7,7 72:10 73:9,24 75:15 76:5,14,17 79:18 81:17 84:6,8

**rightfully** 53:7
**ripe** 24:25 25:3 25:4 26:11
**Rodgers** 1:23
**room** 20:19 32:17
**rough** 57:9
**rule** 34:13
**rules** 7:15 47:3 60:25

—————
**S**
**S** 3:11,14
**safe** 39:20 59:22
**safely** 33:4
**Sandy** 32:2,5 50:17
**Sansburys** 2:8
**sat** 36:14 80:13
**satisfied** 35:14
**saw** 13:15 37:24
**saying** 23:9 31:1 40:19 46:8 53:4
**says** 31:4 35:15 42:17 45:14,20 47:21 51:19 74:23 75:11,25 76:22 77:4
**say-so** 61:13
**scan** 50:22
**scanning** 65:3
**scheduled** 5:23
**Schneider** 32:2 32:5,6
**scope** 31:16
**Scott** 24:8
**scrapes** 24:2
**screen** 24:2 30:10 31:1 47:17 48:14 49:15 65:22 66:1,10,14,23 67:4,19 71:9
**screens** 65:16,18

65:20
**Scribner** 76:4
**scrubbing** 50:13
**scrutinized** 10:12
**search** 45:21,24 46:2,9
**second** 34:21 60:14
**secondary** 62:24
**Secondly** 77:12
**seconds** 14:12 15:9,10
**section** 48:19
**sections** 56:5
**securitized** 53:21
**see** 7:25 9:21 13:18 14:17 16:16 20:24 22:21,23,25 24:24 38:17 40:10,19 42:14 45:5,20 47:15 48:21 51:2,21 55:17 64:15 65:20 67:17,19 70:20 74:8,24 82:11 83:6
**seeking** 42:18
**seen** 60:2 76:7
**sell** 58:7
**seller** 68:11
**send** 17:15 24:22 34:25 36:13 49:15 50:24
**sending** 27:14
**sends** 33:19
**senior** 8:8,23
**sense** 37:17 38:7 66:21
**sent** 16:9,11,12 26:12,16 27:14 66:14

**sentence** 45:20 74:23
**separate** 43:4 58:6 61:15
**September** 46:21
**series** 53:14 54:22
**service** 26:4 59:15 62:14,18 63:18
**servicer** 75:16 75:21 76:15 78:6,15,19
**servicing** 52:7,7 55:5,8 56:8,9 62:18 68:5 82:2
**sets** 8:22
**settle** 8:16
**settlement** 8:20
**seven** 34:14 37:6 46:6 47:5
**Seven-day** 34:22
**severely** 58:18
**shadows** 60:11
**sheet** 3:7 21:11
**Sheila** 58:10 59:4
**shift** 18:24
**ship** 16:19 32:15 32:23
**shipped** 16:20 71:23
**ships** 32:22
**shortened** 82:21
**shot** 37:10
**shots** 59:7
**show** 36:1 54:9 58:18
**showing** 74:4
**shown** 35:4 79:3
**side** 32:18 71:16
**sign** 3:9 6:8 7:4 7:6,7,8,9,10

11:19 12:6,10
12:15,19 13:2
13:4,6,12,25
13:25 14:7,14
14:18 16:17,18
16:23 17:11,12
17:19,24 18:2
18:11 20:24
21:13 22:5,19
22:22 38:16
70:16 71:20,24
72:3 73:8,15
77:18 83:10,22
83:24
**signature** 12:20
14:11 17:7,10
20:2 21:6
63:17,22 64:1
82:17,19
**signatures** 21:15
21:16,25 82:24
**signed** 12:4
18:17 20:9
21:12 38:12,15
63:24 71:14,18
75:15 76:1,15
77:16 78:2
80:13 81:7
83:5,12
**signer** 12:9
21:18
**signers** 12:11,19
**significant**
37:22
**signing** 6:8,14
7:3 11:21 12:1
12:9 13:16,19
15:1,9 17:11
19:23 40:1
77:19,19
**single** 73:17,18
**sit** 18:7
**site** 17:3 27:9,10
28:7,7
**sits** 32:16

**sitting** 18:9
64:12 80:12
**Six** 13:21
**somebody** 35:20
68:19 79:13
**someone's** 36:15
**somewhat** 30:24
**soon** 27:1 47:9
**sooner** 26:5
46:23
**sorry** 8:11 29:18
32:5 42:7 43:5
43:24 46:17
55:24 56:8
65:7,7 74:13
84:6
**sort** 25:3 39:24
62:9 65:3
74:15 80:3
**sounds** 13:23,23
**speaking** 56:6
71:16
**special** 35:23
**specialist** 14:21
16:3 24:14
25:14 31:6
72:4,19 73:14
**specialists** 24:16
**specific** 40:11,25
**specifically**
12:16
**specifics** 65:9
**spell** 8:10
**spend** 11:21,24
14:9
**spoke** 12:3 37:4
**spot** 15:12
**SPOUSES** 1:10
**spreadsheet**
50:16
**stable** 26:17
**stack** 21:11
**staff** 17:1 37:22
79:1
**standing** 80:10

**stands** 55:4
**start** 26:24
**started** 11:7
29:20 38:2
44:9 76:9
**starting** 5:25
**state** 4:11 11:2
26:25 27:8
46:22 49:8
**statement** 74:24
**statements** 70:9
**states** 9:13 23:4
31:21 40:10
**statistical** 11:2,4
**status** 27:22
**stay** 61:2
**step** 24:23,24
44:17 49:10,11
**steps** 49:9,9,10
**stick** 40:13
**sticky** 72:2,11
**stores** 32:18
**straight** 25:19
67:3,10
**strict** 40:24
**strike** 26:10
56:8 75:16
**strongly** 79:20
**study** 10:20
11:10
**sub** 49:10
**subject** 57:2
**submitted** 74:3
**subtract** 67:15
**successful** 61:19
**suggest** 55:18
**suit** 40:4,8 62:13
**Suite** 1:24 2:4,8
**sums** 81:22
**supervise** 18:14
**supervises** 30:1
**supervision** 7:21
**supervisor**
18:12,20 19:11
29:15

**supervisors**
12:11 19:2
24:18
**support** 74:3
75:13
**supposed** 17:19
23:1 55:19
**sure** 14:22 15:3
16:21 17:10
19:8 29:3 46:5
46:16 48:23
63:1 66:21
68:16 72:19
73:6 80:11,21
84:5
**sworn** 4:7 20:12
20:16
**Sylvia** 27:10,24
28:5 29:8,13
30:6,8 31:6
33:12,12 34:16
35:3 47:10,12
48:1 50:10,15
51:7
**Sylvia's** 32:15
**system** 15:25
16:13 24:2
29:11 36:17,17
48:16,25 49:5
49:15,19,21,21
49:25 50:1,11
50:23 51:15
56:13 65:14
66:15,22 67:10
67:18 68:4,13
70:8,11,13,17
70:25 71:2,17
72:15 76:25
79:8
**systems** 6:6,9
24:3 50:12
54:6,9

---
**T**
---
**T** 3:11,14

**take** 17:6 18:11
20:22 22:3
25:19 40:1,1
42:7 45:19
57:8 63:6,11
67:4,7 72:24
**taken** 5:11 37:8
60:25
**takes** 19:21 20:1
32:3 50:9
**talk** 24:9 67:2
**talked** 11:16
14:16 18:19
29:12 79:11
80:23
**talking** 15:17
16:5 17:1
20:15 21:14
31:20 40:6,11
65:10 67:1
70:4 75:20
77:1
**Tampa** 2:5
**tape** 68:7,8,11
79:12,13
**taxes** 10:3
**tell** 27:21 35:16
35:19 39:7
**telling** 29:2,3
43:13
**template-based**
49:7
**ten** 11:25 18:11
34:10 37:6,6
44:2 46:5,6
47:5,6,8,9
**Tena** 29:15,20
**TENANT** 1:10
1:10,10,11
**tend** 53:10
**tenth** 47:10
**terms** 53:7 55:2
55:7 56:2
69:18
**tested** 44:11

Censor & Associates
Reporting and Transcription, Inc.

**testified** 4:7
**testify** 44:24
**testimony** 3:3
  39:14 46:13
  47:24
**testing** 44:12
**Texas** 4:16
**thank** 9:3 84:4
**thereabouts**
  35:13
**thing** 50:20,23
**things** 7:19 10:1
  23:15 25:4
  31:16 36:16
  37:3 55:17
  57:23 65:10
  66:21 79:23
**think** 6:21 13:7
  29:20 37:2,5
  38:13 49:19
  53:11 59:4
  68:16 71:12
  75:23 76:2,3
  83:14
**thinking** 43:10
**THOMAS** 2:7
**thousand** 13:21
**three** 7:21 12:19
  25:13 33:13
  34:14,22 36:23
  58:1
**three-month**
  57:23
**tied** 71:5
**till** 37:4
**time** 11:24 12:3
  12:8 14:16
  18:19 25:22
  27:20 29:12
  30:15 35:3,6
  37:3,10,23
  38:9,15 39:5
  40:3,9 42:24
  42:24,25 44:21
  46:1,3,4,10,13

46:15 47:11
  51:13 52:19,22
  59:4 60:25
  66:8 70:15
  73:7,14,18
  75:15 77:10
  78:2,8,13,23
  79:3,18 81:12
  81:12,12 83:12
  83:18
**times** 36:23
  55:16 70:25
  73:11
**title** 5:3 24:13
**today** 13:15
  25:13 29:3
  30:14 39:3
  43:21 44:4
  47:20 51:4,15
  55:12 56:24
  59:17,19,22
  60:21 70:5
  73:16,19 80:6
  80:12
**toggle** 49:4
**told** 22:15,16
  59:4,15 66:7
**tomorrow** 60:21
**top** 6:21 21:11
  73:10
**total** 10:10
  12:14 38:25
**tough** 19:20,20
**track** 50:25
**tracked** 32:24
  33:20
**tracking** 33:2
  34:6,19 50:22
**tracks** 23:25
**transaction** 78:7
**transactions**
  77:6,15,17,23
**Transcription**
  1:23
**transfer** 64:13

71:11
**transferred**
  37:13
**transition** 37:21
**transmitted**
  78:8,24 79:9
**treasury** 31:15
  31:19,20,21,22
  31:24,25 71:7
**treat** 62:15
**treated** 64:25
**trouble** 57:18
**true** 14:13,15
  35:14,18 40:21
  41:13 45:15
  47:19 53:14,16
  68:24
**trust** 28:18 29:4
  53:23,25,25
  54:4,10,12,20
  54:21
**trustee** 54:3,25
**truth** 81:24
**try** 9:23 13:8
  26:5 30:19
  36:18 57:16
**trying** 37:17
  43:4 57:19
  67:2 84:5
**turn** 33:15
**turned** 32:19
**tweaked** 50:5,6
**tweaking** 44:16
**Twenty-first**
  46:19
**Twenty-one**
  44:14
**Twice** 7:13
**two** 5:24 7:25
  15:10 24:20
  36:22 45:12
  57:12 82:24
**type** 49:3 69:9
**typed** 79:13
**typically** 40:24

**typing** 72:17

_____
**U**
_____
**U** 3:15
**ultimate** 10:18
**ultimately** 43:19
  44:18 51:8
  52:17,20 59:11
**Um-um** 81:23
**unable** 38:2
  45:21
**unchartered**
  60:22
**underlying**
  30:16
**understand** 29:3
  45:1 53:3,5,6
  58:22 78:17
**understanding**
  47:24 51:12
  53:9 58:23
  60:18,18 76:20
  81:9
**underwriter**
  80:18
**United** 31:21
**UNKNOWN**
  1:7,9
**unpaid** 67:20
  69:21
**unresolved** 25:7
  25:11
**untrue** 39:21,23
**unusual** 35:25
  36:2,4,7 37:2
**upload** 51:10
  66:1 71:17
**uploaded** 16:12
  19:24 68:12
  71:12,13 81:16
**uploads** 17:14
**UPS** 32:15,20
  33:22,23,24
  34:4 50:21
**use** 15:25 23:11

33:24 64:1
  71:2 82:25
  83:2
**user** 67:20
**uses** 34:4
**usually** 15:24
  25:24 40:23
  45:18 67:3
**U.S** 6:20,22 71:7

_____
**V**
_____
**V** 3:15
**validity** 76:3
**value** 10:10 11:6
**values** 10:23
  11:1,6
**various** 5:5
  16:14 19:14
**vault** 32:11
  35:23
**vendor** 9:25
  12:5 15:14,15
  15:17
**verbal** 20:13
**verification**
  71:25
**verifying** 19:22
**versus** 10:5
**vest** 56:4
**vice** 5:4 6:9 7:10
  8:8,12 45:3
  73:21 83:10
**vice-presidents**
  12:22
**viewing** 75:6
**Volume** 1:16
  84:14
**volumes** 37:7
**voluntary** 11:10
**VPs** 12:8,9
  32:17
**vs** 1:6

_____
**W**
_____
**W** 3:16

Censor & Associates
Reporting and Transcription, Inc.

Page 98

**Wade** 63:1
**waiting** 61:14
**walk** 19:9 21:13
**want** 21:21 23:6
  24:7,7 26:16
  29:2 35:16
  46:17 54:16
  59:12 62:10,15
  63:1 67:7
  72:23
**wants** 33:15
  57:14 61:2
  62:3 63:6
**warning** 36:7
**wasn't** 38:18
  43:15,16 48:23
  52:17 53:1
  76:15 80:9
**waters** 60:22
**way** 2:8 11:3
  23:22 27:24
  30:8 33:19
  49:6 51:14,15
  56:20 57:13
  62:8 63:24
  64:23 73:24
  74:14 80:6
**week** 13:12,12
  13:18,25 19:22
  38:22 39:2
**Wells** 28:23,25
  29:1,6
**went** 19:1 23:5
**weren't** 44:10
  79:23
**West** 1:20,24
  2:9 4:15 28:15
**we're** 5:23,24
  25:9,15 44:4
  51:4,5 52:6
  68:10 79:23
**we've** 9:20 66:1
  79:10
**whistles** 36:8
**win** 82:7

**witness** 4:6,8
  21:8,9,17,18
  21:25 22:4,8
  43:4,9,16,18
  43:20 63:8
  66:7 84:7
**witnesses** 18:8,8
  21:6,7
**word** 82:2
**words** 10:22
  35:16 74:14
**work** 9:23,24
  10:6 22:20
  33:13
**working** 11:7
  51:4 79:19
**works** 29:23,25
**workstation**
  70:8
**wouldn't** 9:22
  39:11 46:22
  79:22,22
**write** 45:6
**writing** 34:17
**wrong** 51:13

**X**

**X** 3:1,11,16

**Y**

**Y** 3:17
**Yeah** 23:16
  43:20 75:3
**year** 5:9,16
  37:25 44:11,12
  76:11
**yesterday** 58:20
  61:10
**yes/no** 49:4,12
**York** 6:20,23,24
  6:25,25

**Z**

**Z** 3:17
**ZACKS** 2:7

**zero** 38:24 72:8

**$**

**$100,000** 11:7
**$16,088.21**
  69:18
**$250,000** 10:18

**#**

**#1** 1:10
**#2** 1:10
**#3** 1:10

**0**

**037322XXXX**
  1:3

**1**

**1** 1:17 38:7 42:7
  65:8 74:23
**1st** 54:25
**1,073** 13:16
**10** 15:6,11,12,16
  38:8 72:8 73:2
  73:13
**10:00** 47:12,14
**100** 15:4 39:21
  72:8 73:2,3,7
  73:13,14
**104** 2:8
**11th** 5:9
**11:00** 47:13
**113** 3:14
**114** 3:14
**12,000** 39:8
**12:00** 47:14
**12:54** 1:20
**120** 25:25 26:6
  40:18
**14** 44:13
**14-day** 34:22
**15th** 76:14
**16** 42:14
**162** 3:15
**1655** 1:19,24

**167** 3:15
**17** 8:1
**174** 3:16
**179** 3:16
**18** 45:19
**181** 3:17
**19th** 4:21 5:16
  83:15
**1975** 2:8

**2**

**2** 75:22 76:2,22
  78:4
**2/9** 70:21
**2:26** 66:3
**2:48** 66:4
**2:59** 1:20 84:12
**2006** 54:25
**2006-AR4** 54:21
  54:22
**2008** 1:3 41:20
  42:25 44:7
  46:11 76:14
**2009** 1:19 4:21
  70:21 79:4
  83:13
**2010** 83:23
**204** 3:17
**21** 34:15,24 37:8
  44:6,14 46:24
**21st** 34:24 35:12
  41:20 42:25
  44:7 46:11,20
**21-day** 34:23
**215** 3:5
**216** 3:6
**217** 3:7
**218** 3:8
**219** 3:9
**24** 19:19
**250** 10:10
**250,000** 10:15
  11:8
**29th** 83:13

**3**

**3:14** 84:13
**30** 14:12 15:9
**30th** 46:21,23
**30-day** 46:22
**300** 2:4
**31** 57:17
**33401** 1:24
**33411** 2:9
**33634** 2:5

**4**

**4** 1:11 3:4,13
  51:18 53:3,6
  81:21
**40** 39:9
**47** 8:1

**5**

**5** 38:7 76:2
**50** 1:3 40:10
**500** 1:24
**52** 7:22
**561.682.0905**
  1:25

**6**

**6,000** 13:18
**60** 25:24 26:6
  40:18
**60,000** 38:21

**7**

**750** 13:22
**77,000** 38:20
**7700** 4:15
**78729** 4:16

**8**

**84** 1:17
**88** 3:13

**9**

**9** 1:19
**9th** 79:4

Consor & Associates
Reporting and Transcription, Inc.

**9119** 2:4

Consor & Associates
Reporting and Transcription, Inc.

1 (Pages 85 to 88)

Page 87

```
 1              I N D E X
 2                          PAGE
 3   TESTIMONY OF ERICA A. JOHNSON-SECK
 4     Direct Examination by Mr. Ice      4
 5   CERTIFICATE OF OATH           215
 6   CERTIFICATE OF REPORTER            216
 7   ERRATA SHEET           217
 8   ERRATA CERTIFICATE            218
 9   READ AND SIGN NOTIFICATION         219
10
11           E X H I B I T S
12   NUMBER                   PAGE
13   Defendants' Exhibits A - Q        4
     Defendants' Exhibit R           88
14   Defendants' Exhibit S          113
     Defendants' Exhibit T          114
15   Defendants' Exhibit U          162
     Defendants' Exhibit V          167
16   Defendants' Exhibit W          174
     Defendants' Exhibit X          179
17   Defendants' Exhibit Y          181
     Defendants' Exhibit Z          204
18
19
20
21
22
23
24
25
```

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN
AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 50 2008 CA 037322XXXX MB AW
INDYMAC FEDERAL BANK, FSB,
        Plaintiff,
vs.
ISRAEL A. MACHADO; NEENA M. MACHADO;
ANY AND ALL UNKNOWN PARTIES CLAIMING BY,
THROUGH, UNDER, AND AGAINST THE HEREIN
NAMED INDIVIDUAL DEFENDANT(S) WHO ARE NOT
KNOWN TO BE DEAD OR ALIVE, WHETHER SAID
UNKNOWN PARTIES MAY CLAIM AN INTEREST AS
SPOUSES, HEIRS, DEVISEES, GRANTEES, OR OTHER
CLAIMANTS: TENANT #1, TENANT #2, TENANT #3,
and TENANT # 4, the names being fictitious
to account for parties in possession,

        Defendants.
_____/

THE DEPOSITION OF
ERICA A. JOHNSON-SECK
VOLUME II
Pages 85 - 219

July 9, 2009
1655 Palm Beach Lakes Boulevard
West Palm Beach, Florida.
3:14 p.m. - 6:45 p.m.

REPORTED BY:
Deborah H. Rodgers, CSR
Consor & Associates Reporting & Transcription
1655 Palm Beach Lakes Boulevard, Suite 500
West Palm Beach, Florida  33401
Phone:  561.682.0905

Page 86

```
 1   APPEARANCES:
 2   On behalf of the Plaintiff:
 3     JOSEPH MANCILLA, JR., ESQ.
       Florida Default Law Group, P.L.
 4     9119 Corporate Lake Drive
       Suite 300
 5     Tampa, Florida 33634
 6   On behalf of the Defendants:
 7     THOMAS E. ICE, ESQ.
       DUSTIN A. ZACKS, ESQ.
 8     Ice legal, P.A.
       1975 Sansburys Way, Suite 104
 9     West Palm Beach, Florida 33411
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 88

```
 1   THEREUPON,
 2         (Witness hands document.)
 3         MR. ICE:  Thank you.  Could I get a copy
 4   of this so we can attach it as an exhibit?
 5         THE WITNESS:  That's yours.
 6   BY MR. ICE:
 7     Q.  Oh, you brought this for me, just for me?
 8     A.  Just for you.
 9         MR. ICE:  Let's go ahead and mark this,
10   I guess we're going to have to mark it at the
11   end since these are all premarked, R, Exhibit
12   R.
13         (Thereupon, Defendants' Exhibit No. R
14   was marked for identification.)
15   BY MR. ICE:
16     Q.  I'm going to hand you what's been marked as
17   Exhibit R to your deposition and ask you if you can
18   identify that document for me, please.
19     A.  This is the LPOA giving me and a few others
20   signing authority to sign on behalf of the FDIC.
21     Q.  Is it -- well, giving you authority to sign
22   on behalf of, as an attorney-in-fact, for IndyMac
23   Federal Bank?
24     A.  Yes, and IndyMac Bank.
25     Q.  Is it your testimony that that provides you
```

Page 89

1 the authority to sign a set of interrogatories as the
2 attorney-in-fact for IndyMac Federal Bank, FSB?
3     A.  It is.
4     Q.  Can you point to the provision in there that
5 grants you the power to sign interrogatory answers on
6 behalf of Indymac Federal Bank, FSB?
7     A.  It is my understanding this document allows
8 me to sign for IndyMac Federal Bank and IndyMac Bank.
9 And as it was prepared by the FDIC, I did not critique
10 it.
11         MR. MANCILLA:  She did not know what's
12     in it.
13         THE WITNESS:  But reading paragraph 2 --
14     I mean paragraph 1 it talks about
15     transferring property.  Paragraph 2 is the
16     closest I can come to, for the purposes of
17     your question, to get to my permission to do
18     so.
19 BY MR. ICE:
20     Q.  Paragraph 1 actually says that it allows you
21 to execute documents that evidence the sale and
22 transfer of any asset pursuant to the Servicing
23 Business Asset Purchase Agreement of OneWest; in other
24 words, the purchase agreement where OneWest bought
25 IndyMac Federal Bank, FSB, correct?

Page 90

1     A.  Yes.
2     Q.  And all two says is you can sign any other
3 documents that needed --
4         MR. MANCILLA:  Needed to be signed,
5     including the interrogatories.
6 BY MR. ICE:
7     Q.  -- to effect the powers granted by the
8 Limited Power of Attorney.
9         MR. MANCILLA:  That's my interpretation
10     of it.
11         MR. ICE:  Well, it's --
12         MR. MANCILLA:  But we didn't write it,
13     so we don't know.
14         MR. ICE:  Right.  I guess that's going
15     to have to be a legal question for the judge.
16 BY MR. ICE:
17     Q.  But your understanding, this is the document
18 you're relying on?
19     A.  Yes.
20     Q.  Let's put this on the bottom, then.
21     Okay.  Well, let's look at No. 1.  First question
22 was:  What's the name and the address of the person
23 answering these interrogatories.  The answer was:  The
24 undersigned counsel for the plaintiff, who is James
25 Spanolios, and the undersigned affiant, which would be

Page 91

1 you, correct?
2     A.  Yes.
3     Q.  Other than signing this document, did you
4 participate in the answering of these interrogatories?
5     A.  Not personally, because an interrogatory is
6 something else that I'm going to give to the
7 foreclosure specialist who's handling the case to
8 answer specific questions that are usually about the
9 file itself.
10     Q.  You personally did not provide any of the
11 answers in this document; is that correct?
12     A.  Not me personally.
13     Q.  And is this true, as with the Affidavits of
14 Indebtedness, that you do not read the questions and
15 answers before you sign your name to this document?
16     A.  Not if I have a seal of approval from one of
17 my specialists that they have read each question and
18 answer before I sign it.
19     Q.  Is that a process that's different than your
20 Affidavit of Indebtedness?
21     A.  No.
22     Q.  What is this seal of approval?  Is it a
23 sticky or something?
24     A.  Yes, it's a sticky with their okay to sign.
25     Q.  Every document you sign has some sort of

Page 92

1 Post-it that says it's okay to sign?
2     A.  Not every one.  There are some substitutions
3 of trustees that no one is -- anything that requires --
4 anything that has a figure in it or anything that
5 requires a response from the bank.
6     Q.  So the procedure would be, because this is
7 the answers to interrogatories, there would be a sticky
8 saying that someone had reviewed these answers?
9     A.  Yes.
10     Q.  As you're sitting here today, can you say
11 whether or not there was in fact a sticky on this
12 particular document?
13     A.  I can't, no.
14     Q.  Can you say who it was that would have
15 approved this for signature?
16     A.  No.
17     Q.  And that's because you don't know who it was?
18     A.  I could guess, but I don't want to guess.
19     Q.  I don't want you to guess.  Is it one of
20 several people?
21     A.  Yes.
22     Q.  In No. 3, your answer -- there's this
23 question and answer:  Please identify all the persons
24 and/or entities who are current legal owners of, or who
25 have a legal interest in, the promissory note and

Page 93

1    mortgage.  Answer:  IndyMac Federal Bank, FSB.
2        From everything you have said so far in this
3    deposition, that is incorrect, correct?
4        A.  No, it's not incorrect.  It's just not the
5    complete answer.  It should say Indymac Federal Bank
6    and Deutsche Bank.
7        Q.  Well, IndyMac Federal Bank is not, when this
8    was signed, was not the current legal owner of the
9    promissory note?
10        A.  No.
11        Q.  Deutsche Bank was the current legal owner of
12    the promissory note?
13        A.  Yes.
14        Q.  And still is today?
15        A.  Yes.
16        Q.  IndyMac Bank, as opposed to IndyMac Federal
17    Bank, was the mortgagee at the time this document was
18    filed -- was signed?
19        A.  OneWest Bank?
20        Q.  I'm sorry?
21        A.  What was your question?  What did you say?
22    IndyMac Bank was the mortgagee?
23        Q.  Yes.
24        A.  At the time the document was --
25        Q.  Yes.

Page 94

1        A.  Indymac Federal Bank.
2        Q.  Right.  IndyMac Federal Bank was the
3    mortgagee as of the time that this was executed by
4    virtue of an assignment that you yourself signed,
5    correct?
6        A.  I don't know.
7        THE WITNESS:  Did I sign an assignment?
8        MR. MANCILLA:  I don't know.  If you
9    didn't, if you don't remember signing one,
10    say so.
11        THE WITNESS:  I don't think -- I think
12    the action started with IndyMac Federal Bank.
13    So I wouldn't have completed an assignment
14    from IndyMac Bank.  I don't know.
15    BY MR. ICE:
16        Q.  Well, I corrected my question.  I want to
17    make sure that we're on the same page here.
18        My question is that at the time that this was
19    signed, IndyMac Federal Bank, FSB was the mortgagee by
20    virtue of an assignment that you yourself signed?
21        MR. MANCILLA:  She says she doesn't
22    remember.
23        MR. ICE:  Well, I just want to make
24    sure.
25        THE WITNESS:  I don't remember.

Page 95

1    BY MR. ICE:
2        Q.  We will get to that.
3        A.  Okay.
4        Q.  In answer to -- question No. 2.  I'm sorry.
5    Please identify all the persons and/or entities who are
6    the current beneficial owners of, or who have a
7    beneficial or equitable interest in the promissory note
8    and mortgage.  Answer:  Indymac Federal, FSB.
9        Do you agree with that answer?
10        A.  Yes, but it's an incomplete answer.  It
11    should also include Deutsche Bank.
12        Q.  Does IndyMac Federal Bank, FSB have any
13    beneficial or equitable interest in the promissory note
14    and mortgage?
15        A.  Yes, yes.
16        Q.  What is their beneficial and equitable
17    interest?
18        A.  Well, as the servicing agent, IndyMac Federal
19    Bank does get a servicing fee for this loan, although
20    it's owned by Deutsche Bank.
21        Q.  Okay.  I want to hand you what's been marked
22    as Exhibit D to your deposition.
23        A.  Okay.
24        Q.  Do you recognize that document?
25        A.  Yes.

Page 96

1        Q.  Have you ever seen it before?
2        A.  I don't know.
3        Q.  So when you say you recognize it, you just
4    mean it's a kind of a document that you see all the
5    time?
6        A.  Yes.
7        MR. MANCILLA:  It's not signed, by the
8    way.
9        MR. ICE:  It's not signed because it's
10    not -- there are no answers.
11    BY MR. ICE:
12        Q.  Those are, I'll represent to you, those are
13    the questions from which we've been reading in
14    Exhibit -- what's the exhibit?  C?  Exhibit C.
15        As you can see from that document, there were some
16    definitions and instructions that went with those
17    interrogatories.
18        Have you ever seen those instructions and
19    definitions before?
20        A.  D is for this case?
21        Q.  IndyMac Federal Bank versus Machado.
22        A.  No.
23        Q.  Do you see the definition in No. 8?
24        A.  Yes.
25        Q.  Definition for these answers to

Page 97

1   interrogatories of a "beneficial or equitable interest"
2   means that ownership interest in the promissory note
3   which entitles the holder of that interest, be it an
4   investor, lender, or other person and/or entity, to
5   keep the proceeds of the promissory note or any
6   recovery in this case, without any requirement to
7   forward such proceeds to another person or entity.  It
8   excludes any agent or other entity that is acting on
9   behalf of another person or entity which is ultimately
10  entitled to the proceeds.
11      Were you aware of that, that when this question
12  was asked, that's what that question meant?
13      A.  No.
14      Q.  Now knowing that that's what the question
15  meant, would you still agree with the answer?
16      A.  I'm just going to read it again.
17      Q.  Okay.
18      A.  For any recovery in this case?  My answer
19  stays the same.
20      Q.  It's your testimony that IndyMac Federal Bank
21  would get to keep all the proceeds from this
22  foreclosure action?
23      A.  No.  The or any recovery in this case.
24      Q.  Right.  What would they get to keep from the
25  recovery in this case?

Page 98

1       A.  Well, I mean, I don't know because we're
2   talking -- we haven't gotten to that point, but my
3   understanding of this definition and of that question
4   is that we wouldn't keep the proceeds of the promissory
5   note, but we may be entitled to recovery in this case,
6   whatever that may be, that's outside of the proceeds
7   from the promissory note.
8       Q.  Well, let's talk about that, because when you
9   transferred this case to your attorneys, you
10  specifically instruct them that the title of the
11  property, when judgment is issued eventually at the end
12  of the case where you're successful, the title of the
13  property is put in the name of Deutsche Bank National
14  Trust Company; isn't that right?
15      A.  At the conclusion of the foreclosure?
16      Q.  Yes.
17      A.  Yes.
18      Q.  Yes.  So from the very beginning, before this
19  case ever starts, you know, the attorneys know,
20  everyone knows that the entity that's going to get the
21  house at the end of the day is Deutsche Bank National
22  Trust Company, not OneWest, right?
23      A.  The house or the proceeds from the sale of
24  the REO.
25      Q.  The house, title of the house is going into

Page 99

1   the name of Deutsche Bank?
2       A.  That's correct.
3       Q.  In fact, one of the things that's commonly
4   done is there's a transfer of bid after the judgment --
5       A.  Yes.
6       Q.  -- over to the real owner of the note,
7   correct?
8       A.  Yes.
9       Q.  So when the attorney filled this out, drafted
10  this for you, he knew that at the end of the day the
11  proceeds of the note, whether that be money or house,
12  is going to go to Deutsche Bank; isn't that right?
13      A.  Yes.
14      Q.  Let's look at No. 4.  If you contend that you
15  are the current legal and/or beneficial owner of the
16  promissory note, please identify with sufficient
17  specificity for a Request for Production, the current
18  accounting statements or other documents that list the
19  promissory note debt as an asset on the books of the
20  company.
21      Your attorney objected to that question, but the
22  truth of the matter is, the promissory note is not a
23  debt on the assets of the books -- on the asset books
24  of IndyMac Federal Bank, FSB?
25      A.  I don't know that to categorically be true.

Page 100

1       Q.  Is the note an asset of Deutsche Bank
2   National Trust Company or of OneWest?
3       A.  But I'm not sure of what the terms of the
4   Pooling and Servicing Agreement is for this loan or
5   even if the loan was reconstituted into another deal or
6   I don't know without researching it that that's true.
7   In theory, that's correct, but I don't know
8   specifically that that's true in this case.
9       Q.  Are you saying that as you're sitting here
10  today, after having signed these interrogatories and
11  signing the Affidavit of Debt, you don't know who
12  really owns this loan?
13      A.  I know who owns this loan.
14      Q.  And that's Deutsche Bank?
15      A.  That's Deutsche Bank.
16      Q.  Not OneWest?
17      A.  Not OneWest.
18      Q.  If it's an asset on the books of any company,
19  it's going to be Deutsche Bank National Trust Company?
20          MR. MANCILLA:  Well, that isn't what she
21      said.  She doesn't know, you know, who has it
22      on the books.
23          THE WITNESS:  I don't, yeah, that part I
24      just don't know a 100 percent.
25  BY MR. ICE:

Sensor & Associates
Reporting and Transcription, Inc.

Page 101

1    Q.  No. 5 asks:  Please identify the current
2  investor or investors with an interest in the mortgage
3  loan.  Again, your attorney objected, but you know the
4  answer to that question, don't you?
5    A.  Yes.
6    Q.  And the answer is?
7    A.  Deutsche Bank.
8    Q.  No. 6 identifies you as one of the persons
9  with full authority to settle, including authority to
10  write down the principal of the promissory note.  Do
11  you see that?
12    A.  Yes.
13    Q.  And that's not true, either?
14      MR. MANCILLA:  I'm not sure she
15      understands it.
16      THE WITNESS:  I have full settlement
17      authority.  I do.
18      MR. MANCILLA:  And she already testified
19      that there may be a reduction of the
20      principal, sometime there was, but this never
21      got to this stage yet.  She's doesn't know.
22      MR. ICE:  Well, my understanding of her
23      testimony is that Deutsche Bank does not
24      allow principal reductions right now.
25  BY MR. ICE:

Page 102

1    Q.  And in any event, you would have to get
2  permission from them to get any kind of a principal
3  write-down; isn't that right?
4    A.  Well, what I said or meant to say is that,
5  you know, from a loss mitigation perspective, this loan
6  would go under the FDIC model, which does not allow
7  principal reductions.  But that's a loss mit
8  perspective.  When we start talking about a legal
9  perspective, then my settlement authority is different
10  than what it would be for loss mit.  I don't manage
11  loss mit, so I don't have the authority to settle from
12  a loss mit perspective, but I do from a legal
13  perspective.
14    Q.  And you have the authority to write down
15  principal of a loan?
16    A.  In effect, because if I make a settlement for
17  less than the total amount due, then in effect I'm
18  doing that.
19    Q.  Have you ever done that?
20    A.  Yes.
21    Q.  What were the circumstances that you did
22  that?
23    A.  I think that might be client, attorney-client
24  privilege in the times that I've had to do that.
25      MR. MANCILLA:  It may be, I mean.

Page 103

1      THE WITNESS:  The file would have been
2      litigated.  I mean, there are some times when
3      the file is not litigated and I am presented
4      with a settlement offer that I do a net
5      present value calculation and make a
6      determination about whether or not to settle.
7  BY MR. ICE:
8    Q.  And sometimes that's -- and you have done
9  that on occasion where the amount that you've settled
10  for is less than the full value of the loan?
11    A.  Less than the total debt?  Normally it's,
12  normally --
13      THE WITNESS:  If I do this on a
14      litigated case, am I free to share, I mean --
15      MR. MANCILLA:  Well, you know, there's
16      two types of litigated cases, one of which
17      just has the people representing themselves,
18      which I think you could talk about, but the
19      other kind I don't know.
20      THE WITNESS:  If I do a net -- if I am
21      approached with a settlement agreement -- and
22      of course it has to be a bona fide settlement
23      agreement, not something because the borrower
24      just wants something because we all want
25      something -- what I go through is a net

Page 104

1  present value calculation to determine what
2  the losses look like.  If I go through the
3  entire process -- of course I'm weighing this
4  for the reason for the settlement.  If I go
5  through the entire foreclosure process of how
6  REO -- what REO would have to spend to market
7  the property, and if, at the end of that
8  analysis, it makes better sense to accept the
9  settlement than to take it through the
10  process, I will --
11      MR. MANCILLA:  Can you explain what REO
12  is for the record?
13      THE WITNESS:  Real estate owned.
14      -- so in order to keep from having to
15  take the property back at foreclosure sale.
16  BY MR. ICE:
17    Q.  How many cases have you done that in?
18    A.  Maybe -- not that often, but then I'm not the
19  only person with settlement authority so I don't see
20  them all.
21    Q.  How many is that?
22    A.  I think, since I've been at IndyMac Bank, I
23  probably -- well, I used to manage the litigation
24  department, so just give me a second to -- probably, in
25  two and a half years, probably one a month.  Maybe

Page 105

1  around 20.
2      Q.  Were there confidentiality agreements
3  associated with any of those settlements?
4      A.  Yes.
5      Q.  Are there con --
6      A.  The litigated ones, yes.
7      Q.  Out of those 20, how many would you say had
8  confidentiality agreements?
9      A.  More than not probably 90 percent of them.
10      Q.  Were any of those in Florida?
11      A.  Not that I can recall.
12      Q.  Was the reason for your settlement in any of
13  these cases was because of fraud committed by the bank?
14      A.  I don't think I can, I don't think I can talk
15  to that.
16      Q.  Did any of these cases that you've settled,
17  have there been an allegation of fraud committed by the
18  bank?
19      A.  I don't think I can talk about that, either.
20      Q.  In any of the cases that you settled, had
21  there been an allegation of a TILA violation, T-I-L-A?
22      A.  I feel like all of that, all those questions
23  I can't respond to.  Not because I am not -- you know,
24  I always answer your questions.  I just, I'm concerned
25  about the attorney-client privilege.

Page 106

1      Q.  These litigated cases, the allegations would
2  have been filed in the public records of wherever they
3  were filed, right?
4      A.  If it got that far.
5      Q.  Some of these were not filed?
6      A.  Maybe.
7          MR. MANCILLA:  Well, she's just doing
8      her best, I mean.
9          THE WITNESS:  I mean, if we can just
10      talk in general, the case doesn't have to --
11      it doesn't have to be that the borrower
12      actually filed something in court for us to
13      take, for us not to take something seriously.
14      So if a borrower has a concern or a claim or
15      whatever, we're going to take it seriously
16      and approach it the same way we would a case
17      that was actually filed in court.  So it
18      would not necessarily -- they would not have
19      had to necessarily file an answer to any of
20      our actions or record a lawsuit in court.
21  BY MR. ICE:
22      Q.  Did any of these cases involve cases where
23  you had already filed foreclosure?
24      A.  Yes.
25      Q.  Getting back to my question, in the cases

Page 107

1  where either you had filed the case or they had filed a
2  case against IndyMac, OneWest, whoever the entity was
3  at the time, those would be in the public record of
4  that state or county or wherever it was filed, correct?
5          MR. MANCILLA:  Well, they may or may not
6      be.  She said she --
7          THE WITNESS:  May or may not be.
8  BY MR. ICE:
9      Q.  Well, my question is intended, it wasn't the
10  most artful, question, I'll admit that, but it was
11  intended to restrict itself just to those cases that
12  had actually been filed.  Not the ones that was
13  negotiated outside of court, but there was a pleading
14  filed in the case.  Those would be on file and those
15  would be public record, correct?
16      A.  Right.
17      Q.  I'm just trying to understand where the idea
18  that there's an attorney-client privilege comes from?
19      A.  Whatever the terms of the settlement
20  agreement are.
21      Q.  Okay.  But that would be a confidentiality
22  agreement as opposed to some sort of an attorney-client
23  communication, right?
24      A.  Well, the settlement agreements -- okay.
25  Sure.

Page 108

1      Q.  Because presumably, the settlement terms are
2  known by the other side, correct?
3      A.  Yes.  Correct.
4          MR. MANCILLA:  Yeah.
5  BY MR. ICE:
6      Q.  So I just want to make it clear, because we
7  may have to go to the Court to compel production of
8  documents related to this, so I want to make clear that
9  what you're refusing to answer, declining to answer,
10  let's put it that way, is confidentiality agreements
11  with respect to those settlements?
12      A.  The ones that I was involved in that may or
13  may not have had the eyeball of our internal counsel,
14  which would then make it attorney-client privileged?
15      Q.  Like I said, I don't know see how the terms
16  of an agreement that are known by the other side can
17  be --
18          MR. MANCILLA:  It would be
19      confidentiality.
20          THE WITNESS:  Okay.  Confidentiality.
21  BY MR. ICE:
22      Q.  So that's what you're going to stand on --
23      A.  That's what I'm going to stand on.
24      Q.  -- today?
25          MR. ICE:  That's what you're going to

Censor & Associates
Reporting and Transcription, Inc.

Page 109

1    stand on today?
2        MR. MANCILLA:  Maybe.
3        MR. ICE:  He's sitting, I'm not
4    standing.  Okay.  Then we cleared that up.
5    BY MR. ICE:
6        Q.  Where were we?  I'm having so much fun.
7        A.  We were on six.
8        Q.  Yeah.  No. 7:  Please identify the trust in
9    which the subject loan has been securitized, as well as
10   the trustee, and the applicable Pooling and Servicing
11   Agreement.  Answer:  The mortgage is not securitized.
12       That is flatout wrong, correct?
13       A.  Yes.
14       Q.  No. 8:  Please state whether there are any
15   terms of the applicable Pooling and Servicing Agreement
16   that restrict or limit your authority to modify the
17   subject loan.  I'm going to skip down to the answer
18   because the answer is:  There is no applicable Pooling
19   and Servicing Agreement.
20       Once again, that answer is flatout wrong?
21       A.  That's right.
22       Q.  So to the extent that someone looked at this
23   for you to determine its accuracy, apparently they
24   failed at getting the correct answers in there?
25       A.  I have a training issue that I will be

Page 110

1    addressing, yes.
2        Q.  But beyond that, the attorney's the one who
3    drafted this for you; isn't that right?
4        A.  Yes.
5        Q.  And he certainly knew that the mortgage was
6    securitized, correct?
7        MR. MANCILLA:  Maybe he didn't; maybe he
8        did.  She doesn't know.  Maybe he thought he
9        was telling the truth.
10   BY MR. ICE:
11       Q.  Well, we're going to get into your
12   transmittal letter in a second, but you know that your
13   transmittal letter tells your counsel who owns the
14   loan.  And in fact, in this case it says Deutsche Bank
15   National Trust Company, right?
16       A.  Yes.
17       Q.  They knew from day one that the loan was
18   securitized, they knew who the trustee was, they knew
19   who the Pooling and Servicing -- what Pooling and
20   Servicing Agreement governed the trust; isn't that
21   right?
22       A.  Yes.
23       Q.  Let's go to Exhibit D.  Oh, I'm sorry, we
24   already covered D.
25       Let's move on to E.  Do you recognize what has

Page 111

1    been marked as Exhibit E to your deposition?
2        A.  Yes.
3        Q.  What is that document?
4        A.  The assignment from MERS to IndyMac Federal
5    Bank.
6        Q.  Does this refresh your recollection that you
7    in fact signed the mortgage from MERS to your own
8    company in this case?
9        A.  Yes.
10       Q.  Okay.  And in doing so, you signed it as the
11   vice president, not of OneWest, not of IndyMac, not of
12   IndyMac Federal, but of Mortgage Electronic
13   Registrations Systems, Inc., right?
14       A.  Right.
15       Q.  As you said earlier, you are not an officer
16   of MERS, correct?
17       A.  No.
18       Q.  You have what you call signing authority to
19   sign as an officer of MERS?
20       A.  I have signing authority as an officer of
21   OneWest Bank to sign for MERS.
22       Q.  But when you signed this, you signed vice
23   president, and in doing so, you represented to the
24   world that you were the vice president of Mortgage
25   Electronic Registration Systems, Inc., correct?

Page 112

1        A.  When I signed this document, my understanding
2    was that I will sign as the vice president of IndyMac
3    Federal Bank and not, I was not representing myself as
4    a vice president of MERS.
5        Q.  Well, is that your signature there where it
6    says by?
7        A.  Yes.
8        Q.  Okay.  And directly above that it says
9    Mortgage Electronic Registration Systems, Inc., for
10   IndyMac Bank, FSB, a Federally Chartered Savings Bank?
11       A.  Yes.
12       Q.  It doesn't say OneWest there or IndyMac or
13   IndyMac Federal, right?
14       A.  No, for IndyMac Bank.
15       Q.  So isn't your representation there that you
16   are the vice president of that company?
17       A.  IndyMac Bank.
18       Q.  It's your testimony that that signature under
19   Mortgage Electronic Registration Systems, Inc. is not a
20   representation that you are the vice president of MERS?
21       A.  That is my understanding when I signed this
22   document.
23       Q.  Okay.  Do you have the signing authority for
24   MERS?
25       A.  I do.  And that is your copy.

Censor & Associates
Reporting and Transcription, Inc.

Page 113

1    Q.  Thank you.
2         MR. ICE:  Before we get to that, I'm
3    going to have this marked as Exhibit S.
4         (Thereupon, Defendants' Exhibit No. S
5    was marked for identification.)
6    BY MR. ICE:
7    Q.  I'm going to hand you what's been marked as
8    Exhibit S to your deposition in the Machado case.  Do
9    you recognize that document?
10   A.  Yes.
11   Q.  What is it?
12   A.  It's an Assignment of Mortgage from MERS to
13   IndyMac Federal Bank.
14   Q.  And who signed that?
15   A.  I did.
16   Q.  That's your long signature again?
17   A.  Yes.
18   Q.  Once again, you, under your name, it says
19   vice president, correct?
20   A.  Yes.
21   Q.  And above your name, it says Mortgage
22   Electronic Registration Systems, Inc., as nominee for
23   Aegis Wholesale Corporation, correct?
24   A.  Yes.
25   Q.  So in this particular case, and I'll

Page 114

1    represent to you that this is the assignment in the
2    DeBenedetti case that we will be deposing you on next,
3    the name IndyMac doesn't appear anywhere near your
4    name; isn't that right?
5    A.  That's right.
6    Q.  So again, you're representing to the world
7    that you are the vice president of Mortgage Electronic
8    Registration Systems, correct?
9    A.  My understanding, when I signed this
10   document, is that I'm saying I'm the vice president of
11   IndyMac Federal Bank and -- that's my understanding.
12   Q.  Is this a copy for me?
13   A.  That's for you.
14        MR. ICE:  Mark that as Exhibit T.
15        (Thereupon, Defendants' Exhibit No. T
16   was marked for identification.)
17   BY MR. ICE:
18   Q.  Just for identification purposes, can you
19   tell me what has been marked as Exhibit T to your
20   deposition?
21   A.  This is the Corporate Resolution that shows I
22   have signing authority for MERS.
23   Q.  And that Corporate Resolution is made out to
24   Indymac Federal Bank, FSB, not OneWest, correct?
25   A.  I have the OneWest one, but because of the

Page 115

1    dates, I pulled the one for Indymac Federal.
2    Q.  Would you read into the record the first line
3    of that document?
4    A.  What is the first word?  There's a hole
5    punch.
6         MR. MANCILLA:  Be it resolved.
7         THE WITNESS:  Be it resolved that the
8    attached list of candidates are employees of
9    IndyMac Federal Bank, FSB, a member of
10   Mortgage Electronic Registration Systems,
11   Inc., MERS, and are hereby appointed as
12   assistant secretaries and vice-presidents of
13   MERS, and, as such, are authorized to.
14   BY MR. ICE:
15   Q.  Okay.  Does that refresh your recollection
16   that what your signing authority does is give you the
17   right to sign as a vice president or assistant
18   secretary of MERS?
19   A.  Yes.
20   Q.  And in fact, that's what you're doing when
21   you signed Exhibit E, you signed as the vice president
22   of MERS?
23   A.  Yes.
24   Q.  I guess while we're on this exhibit, so we
25   don't have to come back to it, its a two-page exhibit.

Page 116

1    On the second page your name is one of the certifying
2    officers, correct?
3    A.  Yes.
4    Q.  Now, given our last exchange, I'm sure you
5    will agree that you are not a vice president of MERS in
6    any sense of the word other than being authorized to
7    sign as one?
8    A.  Yes.
9    Q.  You are not --
10   A.  Sorry.
11   Q.  That's all right.  You are not paid by MERS?
12   A.  No.
13   Q.  You have no job duties as a vice president of
14   MERS?
15   A.  No.
16   Q.  You don't attend any board meetings of MERS?
17   A.  No.
18   Q.  You don't attend any meetings at all of MERS?
19   A.  No.
20   Q.  You don't report to the president of MERS?
21   A.  No.
22   Q.  Who is the president of MERS?
23   A.  I have no idea.
24   Q.  You're not involved in any governance of
25   MERS?

Censor & Associates
Reporting and Transcription, Inc.

Page 117

1    A.  No.
2    Q.  The authority you have also says that you can
3 be an assistant secretary, right?
4    A.  Yes.
5    Q.  And yet you don't report to the secretary --
6    A.  No.
7    Q.  -- of MERS?
8       You don't have any MERS' employees who report to
9 you?
10   A.  No.
11   Q.  You don't have any vote or say in any
12 corporate decisions of MERS?
13   A.  No.
14   Q.  Do you know where the MERS' offices are
15 located?
16   A.  No.
17   Q.  Do you know how many offices they have?
18   A.  No.
19   Q.  Do you know where they're headquartered?
20   A.  No.
21   Q.  I take it then you've never been to their
22 headquarters?
23   A.  No.
24   Q.  Do you know how many employees they have?
25   A.  No.

Page 118

1    Q.  But you do know that you have counterparts
2 all over the country signing as MERS' vice-presidents
3 and assistant secretaries?
4    A.  Yes.
5    Q.  Some of them are employees of third-party
6 foreclosure service companies, like LPS?
7    A.  Yes.
8    Q.  Why does MERS appoint you as a vice president
9 or assistant secretary as opposed to a manager or an
10 authorized agent to sign in that capacity?
11   A.  I don't know.
12   Q.  Why does MERS give you any kind of a title?
13   A.  I don't know.
14   Q.  Take me through the procedure for drafting
15 and -- the drafting and execution of this Assignment of
16 Mortgage, which is Exhibit E.
17   A.  It is drafted by our firms, uploaded into
18 process management, downloaded by LPS staff in
19 Minnesota, shipped to Austin where we sign and notarize
20 it, and hand it back to an LPS employee, who then ships
21 it back to Minnesota, who uploads a copy and mails the
22 original to the firm.
23   Q.  Very similar to all the other document,
24 preparation of all the other documents?
25   A.  (Nods head.)

Page 119

1    Q.  Was that a yes?  You were shaking your head.
2    A.  Yes.
3    Q.  As with the other documents, you personally
4 don't review any of the information that's on here --
5    A.  No.
6    Q.  -- other than to make sure that you are
7 authorized to sign as the person you're signing for?
8    A.  Yes.
9    Q.  Okay.  And as with the other documents, you
10 signed these and took them out to be notarized just to
11 a Notary that's outside your office?
12   A.  Yes.
13   Q.  And they will get it notarized as soon as
14 they can.  It may or may not be the same day that you
15 executed it?
16   A.  That's true.
17   Q.  In fact, up at the top where it says -- well,
18 sort of in the middle:  In witness whereof, assignor
19 has executed and delivered this instrument on 12/2,
20 2008.  Do you see that?
21   A.  11/20?  November 20th?
22   Q.  I think you may be looking at the DeBenedetti
23 one.
24   A.  12/2, yes.
25   Q.  That's not your handwriting, correct?

Page 120

1    A.  No.
2    Q.  That's filled in by the Notary, correct?
3    A.  I don't know who filled that in.  The
4 printing looks similar to the Notaries.
5    Q.  So what that means is we don't know whether
6 you actually executed this on December 2nd of 2008?
7    A.  That's right.
8    Q.  In this case, the firm that prepared this
9 document is listed at the bottom.  It's Florida Default
10 Law Group?
11   A.  Yes.
12   Q.  Did you take any steps to assure yourself in
13 executing this assignment that the assignee was the
14 correct recipient for this mortgage?
15   A.  No.
16   Q.  Do you know what steps, if any, that your law
17 firm, Florida Default, took to ensure that this was
18 being drafted such that the proper assignee was on the
19 assignment?
20   A.  I don't know.
21   Q.  Do you know if anyone in the chain, whether
22 it's you, your department, your attorneys, LPS, checks
23 the records that MERS keeps as to who should be the
24 proper owner of this mortgage?
25   A.  I don't know, but I believe that with MERS'

Censor & Associates
Reporting and Transcription, Inc.

Page 121

1 documents, they're a little bit different because the
2 data comes directly from MERS, but I can't be certain.
3     Q. How is the assignee determined?
4     A. If it's a MERS' document, it has -- MERS has
5 to recognize the entity. That much I know, because
6 when OneWest acquired IndyMac Federal, paperwork had to
7 be filed with MERS so that when these documents came
8 out it was in the MERS' system that OneWest Bank now
9 acquired the loans.
10     So I don't really know who -- I don't know how a
11 MERS' document is prepared. I don't know if they go
12 into the MERS' system and pull it out. I don't know
13 that, but I do know that you could look up this loan in
14 MERS and know that on that date that's who it would say
15 who the property was assigned to, the assignee.
16     Q. You think the MERS' records would show that
17 this was assigned to IndyMac Federal Bank, FSB on
18 December 12th, 2008 (sic)?
19     A. I think that on that date it would say that
20 IndyMac Federal Bank was the assignee.
21     Q. Well, we have the records with us and we'll
22 be looking at those later.
23     A. Okay.
24     Q. But before we get there, do you know how the
25 assignee for this document is determined?

Page 122

1     A. I don't know, other than to say that for
2 MERS' documents, that the information -- I mean, that's
3 the whole purpose for MERS is to keep track of all of
4 this. So the information, for MERS' documents, the
5 information is in MERS and that's what should be
6 replicated here.
7     Q. Should the assignee be the owner of the note?
8     A. The owner on record, yes. Well, I don't
9 know. I think -- I don't know. I don't know enough
10 about MERS to -- I'd be dangerous with that.
11     Q. That's fair enough. Isn't the answer to my
12 question simply that your attorneys are going to put
13 your name, meaning OneWest, IndyMac, whoever the
14 plaintiff is, in there as the assignee so they can
15 foreclose and take my client's property?
16     A. I don't know what the attorneys are going to
17 do.
18     MR. MANCILLA: Good answer.
19     THE WITNESS: I know that we don't want
20     to take your client's property.
21     MR. MANCILLA: Just want to get paid for
22     it.
23     MR. ICE: Let me restate the question.
24 BY MR. ICE:
25     Q. Isn't the purpose of this document to make it

Page 123

1 so that IndyMac, in this case, IndyMac Federal Bank,
2 FSB, can foreclose in its own name, regardless of who
3 the real owner of the note is?
4     A. The purpose of this document is everything
5 you said, but I will add to that, that we cannot
6 foreclose in the name of MERS, which is why we have to
7 assign it out of MERS for the legal action.
8     Q. Nor can you foreclose in the name of Deutsche
9 Bank National Trust Company; isn't that true?
10     A. It used to be. Recently, we have been given
11 approval to action in the name of Deutsche Bank and
12 foreclosing in the name of Deutsche Bank, but up until,
13 I can't remember the exact date, early June, we had to
14 action in our name and vest in Deutsche's name.
15     Q. Do you have that new document with you?
16     A. No.
17     Q. So isn't that the purpose of this whole
18 charade is that you can't foreclose in the name of the
19 real owner of the note, you can't foreclose in the name
20 of the real owner of the mortgage, so IndyMac goes in
21 pretending to be the real owner of the note and the
22 mortgage?
23     MR. MANCILLA: Objection to the form of
24     the question. Go ahead and answer it, if you
25     can.

Page 124

1     THE WITNESS: I don't know how to answer
2     that question.
3     MR. MANCILLA: Thank you. Ask him to
4     rephrase it or ask it again. Don't try to
5     guess if you don't understand it. I didn't
6     understand it either, anyway.
7     THE WITNESS: Most investors dictate
8     that we do the foreclosure action in our name
9     and not in the investor's name. It's in the
10     PSA or the regs. That's with Fannie and
11     Freddie. So we go through the action as a
12     servicing agent for the investor.
13 BY MR. ICE:
14     Q. And yet you never tell the Court, in any of
15 the documents that we've seen, never told the Court,
16 and even sworn documents, sworn things like these
17 answers to interrogatories, that the real owner of the
18 loan, real owner of the note is Deutsche Bank; isn't
19 that right?
20     A. In everything that you've shown me, that is
21 correct.
22     Q. Is there anything you can point to, any of
23 the pleadings in this case anywhere, where IndyMac, now
24 OneWest, has been up front with the Court in saying
25 we're just the servicer, the real owner is Deutsche

Censor & Associates
Reporting and Transcription, Inc.

11 (Pages 125 to 128)

Page 125

1 Bank?
2     A.  No.
3     Q.  You don't have the authority to see the
4 information that's in the MERS' tracking records,
5 right?
6     A.  Not me personally.
7     Q.  Did you ask anyone else to take a look at
8 that information for you?
9     A.  In this case?
10    Q.  Yes.
11    A.  No.
12    Q.  In any case?
13    A.  Yes.
14    Q.  You've asked for that in other cases?
15    A.  I've had to, yes.  Well, not because it was
16 contested, just because someone had a question about it
17 so I had someone pull information for me.
18    Q.  I want you to look at the date that's now up
19 at the top in the first line where it says, For value
20 received on or before November 14th, 2008.
21    A.  Where am I?
22    Q.  You're on Exhibit E.
23    A.  On the top line.  Yes.
24    Q.  For value received.
25    A.  Yes.

Page 126

1     Q.  And there's a date there, November 14th,
2 2008.  Who put that date in there?
3         MR. MANCILLA:  If you know.
4         THE WITNESS:  I don't know.
5 BY MR. ICE:
6     Q.  If you know.
7     A.  I don't know.
8     Q.  Is it most likely the Florida Default Law
9 Group that prepared this?
10    A.  I don't know.  That sounds reasonable.
11    Q.  What happened on November 14th, 2008?
12    A.  I don't know.
13    Q.  Do you know how that date was determined?
14    A.  I don't.
15    Q.  Did any physical transfer of the mortgage
16 take place on that date?
17    A.  Physical transfer of the mortgage.  The
18 actual mortgage document?
19    Q.  Yes.
20    A.  No.
21    Q.  What value did MERS receive for transferring
22 the mortgage to IndyMac Federal Bank, FSB on
23 November 14th, 2008?
24         MR. MANCILLA:  If you know.
25         THE WITNESS:  I don't know.

Page 127

1 BY MR. ICE:
2     Q.  Are you aware of any transfer in value to
3 MERS for the transfer of this mortgage at any time?
4     A.  No, I don't know.
5     Q.  I'm sure you'll agree with me that this
6 assignment is not an affidavit?
7     A.  Yes.
8     Q.  Okay.  You did not swear to its contents?
9     A.  That's true.
10    Q.  The Notary, when she notarizes this, doesn't
11 take an oath from you?
12    A.  No.
13    Q.  All that you're acknowledging is that you're
14 signing this instrument as an officer of MERS?
15    A.  Yes.
16    Q.  Okay.  You're not swearing that anything
17 happened on November 14th of 2008?
18    A.  What does swearing mean again?
19    Q.  It's under oath.  Not the other kind of
20 swearing which may take place later.
21    A.  I didn't swear.
22    Q.  And you have no personal knowledge that
23 anything happened on November 14th, 2008?
24    A.  That's right.
25    Q.  Isn't it true that this case was filed on

Page 128

1 November 21st, 2008?
2     A.  Hold on.  Hold on.  When did you say?
3     Q.  November 21st, 2008.  If this is of any help,
4 you can now look at this very --
5     A.  Thank you.
6     Q.  -- damp Exhibit A to your deposition.
7     A.  Okay.  Yes, that's true.
8     Q.  So the effective date -- scratch that.
9     So the date that's on the top, where it says, on
10 or before, at the top of the Assignment of Mortgage,
11 the date of November 14th, 2008, is one week before
12 this case was filed?
13    A.  Yes.
14    Q.  And isn't it true that the plaintiff, IndyMac
15 Federal Bank, needed to be the mortgagee on that date
16 in order to bring this action?
17    A.  No.
18    Q.  Isn't it true that the date of November 14th,
19 2008 was chosen in order to retroactively create a
20 cause of action for plaintiff?
21    A.  No, I don't believe so.
22    Q.  But you have no explanation for that date?
23    A.  I don't have an explanation for that.
24    Q.  Further on down, right after the legal
25 description, do you see where it says that the mortgage

Page 129

1  was transferred together with the note?
2      A.  Yes.
3      Q.  Would you agree that it's not true that the
4  note was transferred on November 14th, 2008?
5          MR. MANCILLA:  If you know.
6          THE WITNESS:  Okay.  Where it says may
7      have been amended from time to time; together
8      with the note and indebtedness secured
9      thereby?
10         MR. ICE:  Yes.
11         MR. MANCILLA:  It doesn't really say
12     it's transferred, does it?
13         THE WITNESS:  I don't understand that to
14     mean it was transferred.
15  BY MR. ICE:
16     Q.  Well, it's a very long run-on sentence, but I
17  think if you read it, it says that MERS assigned,
18  transferred and conveyed to IndyMac Federal Bank all
19  title and interest in a certain mortgage encumbering
20  real property, with this legal address, together with
21  the note and indebtedness secured thereby.  Isn't that
22  what it says?
23         MR. MANCILLA:  But it doesn't say it was
24     done simultaneously with the execution of
25     this document.

Page 130

1          MR. ICE:  Well, the whole sentence
2      starts, on or before November 14th, 2008.
3          MR. MANCILLA:  Um-um.
4  BY MR. ICE:
5      Q.  So would you agree with me that the plain
6  English, although it might not be so plain because it's
7  quite a long sentence, but the meaning of it is, is
8  that on or before November 14th, 2008, the note and
9  indebtedness was transferred along with the mortgage?
10         MR. MANCILLA:  I don't know if it means
11     that or not.  I didn't write it.
12         MR. ICE:  Okay.
13         MR. MANCILLA:  I think it's ambiguous.
14  BY MR. ICE:
15     Q.  Well, you're the witness.
16     A.  What he said.  No, I don't understand it to
17  mean that.  And I thought a little bit about your
18  question about the date on here.
19     Q.  Okay.
20     A.  That may be the date we referred the file to
21  the firm, but I'd have to confirm that, which could be
22  a week or more before the actual complaint was filed.
23     Q.  Okay.  Getting back to the question about the
24  note, regardless of when, regardless of your
25  interpretation of when the note was transferred, would

Page 131

1  you agree with me that it's saying the note was
2  transferred?
3      A.  Let me just read it.  Yes.
4      Q.  We know that that's false because why?
5      A.  Is this a test?
6      Q.  See if I need to lead you on this one.
7      A.  Because MERS didn't have the note.
8      Q.  Exactly.
9          MR. MANCILLA:  But that doesn't mean
10     it's false because it doesn't say that MERS
11     is transferring anything here in terms of the
12     note.
13         MR. ICE:  Yeah.  Well, I don't know how
14     else you could read it, but that's up to the
15     judge, I guess.
16  BY MR. ICE:
17     Q.  MERS was never the owner or holder of the
18  note, never had anything to transfer with respect to
19  the note, correct?
20     A.  Correct.
21     Q.  Let's move on to Exhibit F.  I'm going to
22  hand you now what's been marked as Exhibit F to your
23  deposition, ask you if you recognize that document?
24     A.  No.
25     Q.  Okay.  Have you ever seen it before?

Page 132

1      A.  No.
2      Q.  But you've seen documents like this?
3      A.  Yes.
4      Q.  Who's Roger Stotts?
5      A.  One of my peers.  He is --
6      Q.  I'm sorry.  Go ahead.
7      A.  He is the CAO, chief administration officer.
8      Q.  He's also a vice president of IndyMac Federal
9  Bank, FSB?
10     A.  At the time that he signed, yes, he's vice
11  president of IndyMac Federal Bank.
12     Q.  Do you see that these interrogatory questions
13  are aimed at getting additional information about the
14  Assignment of Mortgage that you signed?
15     A.  Yes.
16     Q.  Okay.  Do you know why Roger Stotts ended up
17  signing this instead of you?
18     A.  Well, if I go back to the system that LPS has
19  to pass all the documents for signature, it most likely
20  just ended up in a stack of items to sign.
21     Q.  So there's no effort to try to, since these
22  have something to do with what you have signed, to get
23  you to sign this?
24     A.  That would make sense, but I don't believe
25  that the LPS, since my name isn't on the document, I

**Page 133**

1 don't believe that LPS would have made the connection.
2 To them, it's just a document.  It's just a document
3 that they're trying to prep for signature.
4     Q.   I'd like you to take a look at Exhibit G to
5 your deposition, ask you if you have ever seen those
6 before?
7     A.   They look like the other document we saw
8 earlier.
9     Q.   I will represent to you that those are the
10 interrogatories that Exhibit -- which was, the last one
11 was -- Exhibit F were intended to respond to.
12     A.   Okay.
13     Q.   I give you that because if you look at
14 question 3 on Exhibit F and question 3 on Exhibit G,
15 you'll see there's a slight difference.
16         MR. MANCILLA:  She said she never saw
17         this before so she can't answer that.
18 BY MR. ICE:
19     Q.   Do you see what the difference is?
20     A.   Yes.
21     Q.   The date has been left out of the answer,
22 right?
23     A.   Yes.
24     Q.   And the date that was left out is the
25 November 14th of 2008, which is the date on the

**Page 134**

1 assignment that we've been talking about, correct?
2     A.   Yes.
3     Q.   So this was my effort to get some information
4 about the assignment that we're getting today but
5 didn't get with those answers to interrogatories.
6     I'd like for you to read the -- well, I'll read
7 the question and answer.  Question was:  Please
8 describe the reason the date, should say November 14th,
9 2008, appears in the Assignment of Mortgage attached to
10 the Amended Complaint in this case, including but not
11 limited to, all events that occurred on that date with
12 respect to the transfer of the subject promissory note
13 and mortgage.  Some of the same questions I asked you
14 earlier.
15     Answer:  Plaintiff is without knowledge as to this
16 interrogatory as the Assignment of Mortgage was not
17 executed by the plaintiff.
18     Are you comfortable with that answer?
19     A.   No.
20     Q.   Because the Assignment of Mortgage was
21 executed by you?
22     A.   Right.
23     Q.   And you are the vice president of the
24 plaintiff?
25     A.   Yes.

**Page 135**

1     Q.   The answer that was just read was prepared by
2 Florida Default Law Group, correct?
3     A.   I don't know.  I'm assuming so.  I don't
4 know.
5     Q.   Well, it has their very recognizable file
6 number and doc ID number at the bottom, correct?
7     A.   Oh, okay.  So what was your question again?
8     Q.   Well, this document, it's called Plaintiff's
9 Response to Defendants' Request for Interrogatories,
10 it's marked as Exhibit F to your deposition, has at the
11 bottom the traditional file number and doc ID number of
12 Florida Default.
13     A.   Yes.
14     Q.   And if you look on the last page, it was
15 served on me -- well, actually it doesn't say it's
16 served on anyone.  It just says it was furnished by
17 mail to blank dated May 12th, 2009 and signed by James
18 Spanolios, correct?
19     A.   Yes.
20     Q.   And James Spanolios is with Florida Default
21 Law Group?
22     A.   Correct.
23     Q.   So it's also true that Florida Default Law
24 Group not only prepared the assignment that you signed,
25 which is Exhibit E to this deposition, they also

**Page 136**

1 prepared the responses to the interrogatories, which is
2 Exhibit F to your deposition?
3     A.   Yes.
4     Q.   So certainly they knew or should have known
5 that you signed the Assignment of Mortgage?
6     A.   Yes.
7     Q.   Let's take a look at Exhibit H.  Have you
8 ever seen that document before?
9     A.   No.
10     Q.   Have you seen documents like it?
11     A.   Yes.
12     Q.   Do you recognize it to be a pleading or a
13 response to discovery filed by your attorney in this
14 case?
15     A.   Yes.
16     Q.   And that by your attorneys, I'm referring to
17 Florida Default Law Group?
18     A.   Yes.
19     Q.   Have you ever seen documents like those that
20 are attached to this --
21     A.   Yes, I have.
22     Q.   -- response?
23     A.   Yes.
24     Q.   And what are those?
25     A.   It shows the transfer of a file from MERS.

Censor & Associates
Reporting and Transcription, Inc.

Page 137

1    Q.  When you say a file, you mean a mortgage
2  loan?
3    A.  Yes.
4    Q.  Have you seen these particular documents
5  before?
6    A.  No.
7    Q.  I want to take you back to the first page
8  about midway through the No. 2 response.
9    A.  Okay.
10   Q.  Do you see the line that says:  A "transfers
11  of beneficial ownership" means that the promissory note
12  was endorsed and delivered by one member to another?
13   A.  Yes.
14   Q.  Now, that's something that was executed by
15  your attorneys on behalf of IndyMac Federal Bank,
16  correct?
17   A.  Yes.
18   Q.  Do you agree with that statement?
19   A.  Theoretically.
20   Q.  It's not a trick question.  I want you to
21  agree with it.  Do you know what it means when they say
22  one member, what does a member mean?
23   A.  My understanding of that is could be anybody,
24  fill in the blank.  So because we're talking about
25  MERS, I'm thinking one entity, servicing entity or

Page 138

1  lender to another.
2    Q.  Do you have an understanding that MERS is a
3  membership organization?
4    A.  Yes, yes.
5    Q.  And the members are --
6    A.  Yes.
7    Q.  -- banking entities such as OneWest?
8    A.  Yes.
9    Q.  In fact, OneWest is a member of MERS?
10   A.  Yes.
11   Q.  Is Deutsche Bank National Trust Company a
12  member of MERS?
13   A.  I don't know.
14   Q.  Most of the major banking institutions in the
15  United States, at least, are members of MERS, correct?
16   A.  That sounds right.
17   Q.  It's owned and operated by banking
18  institutions?
19   A.  I'm not a big -- I don't, I don't know that
20  much about the ins and outs of MERS.  I'm sorry.  I
21  understand what it's for, but I don't know, I don't
22  understand the nitty-gritty.
23   Q.  What is it for?
24   A.  To track the transfer of doc -- of interest
25  from one entity to another.  I know that it was

Page 139

1  initially created so that a servicer did not have to
2  record the assignments, or if they didn't, there was
3  still a system to keep track of the transfer of the
4  property.
5    Q.  Does it also have a function to hold the
6  mortgage separate and apart from the note so the note
7  can be transferred from entity to entity, entity,
8  bank to bank to bank --
9    A.  That sounds right.
10   Q.  -- without ever having to rerecord the
11  mortgage?
12   A.  That sounds right.
13   Q.  So it's a savings device.  It makes it more
14  efficient to transfer notes?
15   A.  Yes.
16   Q.  And cheaper?
17   A.  Yes.
18   Q.  Let's just take a look at the milestones
19  page.  And I don't think that you're disputing any of
20  the information on here, but I do want to run through
21  it real quick to get your take on it.  Take a look at
22  the transfer for beneficial rights, one from the
23  bottom.
24   A.  Okay.
25   Q.  The bottom one is registration, and then as

Page 140

1  you go up in time, the next one is transfer of
2  beneficial rights on March 18th of 2006.  Do you see
3  that?
4    A.  Yes.
5    Q.  If you look in the right column, it says that
6  the new investor is Lehman Brothers Holdings, Inc.,
7  correct?
8    A.  Yes.
9    Q.  The old investor was FDIC as receiver for
10  IndyMac Federal Bank, FSB?  It's part of that same
11  block.
12   A.  Yes.
13   Q.  Would you agree with me that what that's
14  recording, documenting, again, using the definition
15  that's in part 2 of your attorney's response, what a
16  transfer of beneficial ownership is, that that's
17  showing a transfer of the original note from IndyMac,
18  who was the original lender, to Lehman Brothers on
19  March 18th, 2006?
20   A.  Yes.
21   Q.  Going up one line to April 1st, a couple
22  weeks later, you will see that the new investor is
23  Deutsche Bank National Trust Company as trustee?
24   A.  Yes.
25   Q.  And not surprisingly, the old investor is

Censor & Associates
Reporting and Transcription, Inc.

Page 141

1   Lehman Brothers Holdings, Inc.?
2       A.   Yes.
3       Q.   So that records another transfer two weeks
4   later, or approximately two weeks later, to Deutsche
5   Bank National Trust Company?
6       A.   Yes.
7       Q.   Do you see any other transfers of the note
8   recorded there in the MERS tracking information?
9       A.   I see the servicing rights, beneficial
10  rights.
11          THE WITNESS:  Is this a trick question?
12          MR. MANCILLA:  No.
13          MR. ICE:  No, I want you to say no.
14          THE WITNESS:  No, I don't see anything.
15  BY MR. ICE:
16      Q.   The only other interesting thing on there is
17  that on March 29th, the FDIC registered OneWest Bank as
18  the new servicer on this loan?
19      A.   Yes.
20      Q.   Which makes perfect sense, correct?
21      A.   Yes.
22      Q.   So would you agree with me that this
23  accurately reflects what your understanding is of what
24  happened to the loan?  It went from IndyMac as original
25  lender, passed through Lehman Brothers, over to

Page 142

1   Deutsche Bank National Trust Company, and IndyMac
2   continued to serve as the servicer throughout its
3   different incarnations?
4       A.   Yes.
5       Q.   Okay.  Take a look at Exhibit I.  Have you
6   ever seen that document before?
7       A.   No.
8       Q.   But you have seen documents like it?
9       A.   Yes.
10      Q.   Once again, do you recognize the file number
11  and doc ID number of your attorneys, Florida Default
12  Law Group, upon this document?
13      A.   It looks like the others, yes.
14      Q.   And you see where it contains the signature
15  of your attorney, James Spanolios, of Florida Default
16  Law Group?
17      A.   Yes.
18      Q.   Let's take a look at Exhibit J, which, to
19  speed things up, I'll just represent to you that those
20  are the Request for Admissions to which Exhibit I is
21  intended to respond to.
22      A.   Okay.
23      Q.   So you will see that there's 12 requests for
24  admissions in our original request and there's 12
25  responses.

Page 143

1       A.   Yes.
2       Q.   The title indicates that you're responding to
3   the defendants' Assignment of Mortgage Requests for
4   Admissions, which is the title of this document.  Do
5   you see all that?
6       A.   Yes.
7       Q.   Okay.  No. 6, and I'm sorry you've got to
8   jump between the two documents, but they didn't put
9   them together.  So you've got to look at six to see
10  what the request was.
11          Admit that MERS did not physically transfer the
12  subject note or mortgage to plaintiff on or before
13  November 14th, 2008.  Do you see that the response on
14  behalf of your company was denied?
15      A.   Yes.
16      Q.   So that would mean, the interpretation, the
17  only interpretation I can come up with is that MERS did
18  physically transfer the subject note or mortgage to
19  plaintiff on or before November 14th, 2008.  Would you
20  agree that that's what it means?
21      A.   Either that or they denied to answer the
22  question.  I don't know.
23          MR. MANCILLA:  Yeah, this is a Request
24      for Admissions.  She's not really familiar
25      with what it means.

Page 144

1   BY MR. ICE:
2       Q.   Well, I think your attorney would tell you if
3   you're denying it, you're refusing to admit that MERS
4   did not physically transfer the subject note or
5   mortgage to plaintiff on or before November 14th, 2008.
6       A.   Okay.
7       Q.   Do you agree with that?  Do you agree that
8   that should be denied?
9           THE WITNESS:  Referring to this one?
10          MR. MANCILLA:  No.
11      (Reporter requests clarification.)
12          MR. ICE:  I don't care.  They can
13      mumble.
14          MR. MANCILLA:  I don't know if this
15      refers to MERS or not.  I can't tell.  The
16      only assignment of the note was referred to
17      in one assignment, but --
18          MR. ICE:  I think he's just advising his
19      client.  It doesn't have to be on the record.
20          THE WITNESS:  Okay.  I think I'm getting
21      lost in the legalese.
22  BY MR. ICE:
23      Q.   Let me take you through a few questions and
24  maybe that one will be easier to answer.
25      A.   Okay.

Sensor & Associates
Reporting and Transcription, Inc.

Page 145

1    Q.  Because I think you'll agree, MERS never
2  physically transferred anything to anybody?
3    A.  That's true.
4    Q.  MERS never had the note, so it didn't
5  physically transfer the note?
6    A.  True.
7    Q.  And as the signing officer of MERS, you know
8  that the only thing that happened with respect to that
9  mortgage is that you executed an assignment?
10    A.  Assignment, yes.
11    Q.  You didn't physically transfer the mortgage
12  to anyone?
13    A.  No.
14    Q.  The MERS records that we just went through,
15  they don't show the mortgage being physically
16  transferred to anyone?
17    A.  No.
18    Q.  Can you come up with a reason why your
19  company would deny that MERS did not physically
20  transfer the subject note or mortgage?
21    A.  But this wasn't prepared by -- these are
22  not -- okay.  Wait.
23        MR. MANCILLA:  Maybe the lawyer didn't
24      understand it.  I don't understand it, so
25      maybe he didn't.

Page 146

1        THE WITNESS:  I -- I don't know.  I
2      wasn't there.
3        MR. MANCILLA:  Yeah.  Well, if you don't
4      know, you don't know.
5  BY MR. ICE:
6    Q.  Okay.  Well, you know, we can speculate that
7  the lawyer misunderstood, but as you're sitting here
8  today, can you provide a reason yourself why that
9  should be denied?
10    A.  No.
11    Q.  No. 9 says:  Admit that plaintiff is not the
12  entity identified as the investor in the MERS' system.
13  That was denied.
14        MR. MANCILLA:  Without knowledge.
15        THE WITNESS:  Without knowledge and
16      therefore denied.
17  BY MR. ICE:
18    Q.  Now, we just went over the MERS' records.
19  That response is absolutely false, isn't it?
20    A.  Admit that plaintiff is not identified -- we
21  are identified as the servicer.
22        MR. MANCILLA:  That's the investor.
23        THE WITNESS:  But not as the investor.
24        MR. MANCILLA:  Yeah, so that's correct.
25  BY MR. ICE:

Page 147

1    Q.  And yet it was denied?
2        MR. MANCILLA:  No, but it says here
3      that, Admit that the plaintiff is not the
4      entity identified as the investor in the
5      MERS' system, and she's saying, and I agree
6      that we're identified as the servicer.
7      That's not the investor, so that's correct.
8        MR. ICE:  It's correct that it should
9      have been admitted.
10        MR. MANCILLA:  No.
11        MR. ICE:  The plaintiff is not the
12      entity, admit that plaintiff is not the
13      entity.
14        MR. MANCILLA:  Okay, yeah.  That's
15      right, yeah.
16  BY MR. ICE:
17    Q.  Okay.  Would you agree that that should have
18  been admitted?
19    A.  Normal language, please.
20        MR. MANCILLA:  These things are very
21      confusing the way they're written.  I would
22      object to them all the way they're written,
23      but --
24  BY MR. ICE:
25    Q.  Let me ask the question this way, and let's

Page 148

1  just say I'm asking this question in my deposition
2  today --
3    A.  Okay.
4    Q.  -- Admit that plaintiff is not the entity
5  identified as the investor in the MERS system.  Do you
6  admit or deny that?
7    A.  Mr. Ice, then I would say, can you please
8  rephrase that question?
9    Q.  Is the plaintiff identified as the investor
10  in the MERS' system records?
11    A.  No.
12    Q.  So you admit that plaintiff is not
13  identified?
14    A.  Yes.
15    Q.  And you also admit that it should never have
16  been denied?
17    A.  I don't see why it was denied.
18        MR. MANCILLA:  Except he maybe didn't
19      understand it.
20        THE WITNESS:  Confusing question, yes.
21  BY MR. ICE:
22    Q.  No. 10, admit that plaintiff did not acquire
23  an interest in the mortgage prior to the filing of the
24  complaint.  Answer:  Denied.
25    A.  Okay.  I got it this time.

Censor & Associates
Reporting and Transcription, Inc.

Page 149

1    Q. Do you see that answer and response?
2    A. Yes.
3    Q. This response is also incorrect, isn't it?
4    A. Yes.
5    Q. Okay.
6    A. Now that I understand the tone of the
7  questions, I got it.
8    Q. Okay. Let's look at Exhibits K and L
9  together because, like the others, one is the answer
10  and one is the response.
11    For the record, Exhibit L is Defendants Israel
12  Machado and Neena Machado's Request for Production
13  Regarding the Assignment of Mortgage. K is Plaintiff's
14  Response to Defendants' Request for Production
15  regarding Assignment of Mortgage.
16    Have you ever seen either of these documents
17  before?
18    A. I don't think so.
19    Q. Did you participate in any way in providing
20  the responses?
21    A. I don't remember.
22    Q. Do you think that you would remember if you
23  had been asked?
24    A. No.
25    Q. Are you asked to help provide discovery in a

Page 150

1  lot of cases?
2    A. Yes.
3    Q. Where you have to go get documents?
4    A. Yes.
5    Q. Okay. I'd like you to look at No. 2, which
6  asks for, Any and all documents that evidence an
7  equitable transfer of the mortgage from the original
8  mortgagee, MERS, to plaintiff on or before
9  November 14th, 2008.
10    A. Are we supposed to be on L and K?
11    Q. Yes.
12    A. L and K.
13        MR. MANCILLA: Yeah, these are the
14    questions, these are the answers.
15        THE WITNESS: Okay. Yes. Okay.
16  BY MR. ICE:
17    Q. Okay. The response was: All requested
18  documents in the plaintiff's possession, custody or
19  control will be produced, except those documents which
20  are privileged, confidential or work product. Do you
21  see that answer?
22    A. Yes.
23    Q. Do you have any documents to be produced?
24    A. Yes.
25    Q. In response to that question?

Page 151

1    A. Yes.
2    Q. Did you bring any of them with you today?
3    A. It was all -- we -- Christy got everything,
4  but you have something.
5        MR. MANCILLA: Well, we have the MERS
6    tracking thing. The MERS' tracking report?
7        MR. ICE: No. I can represent to you
8    that the only thing that was produced with
9    this attached, is your Assignment of
10    Mortgage, which we already had.
11        THE WITNESS: Oh, okay. The intention
12    was to, would have been to get you the
13    tracking report from MERS.
14        MR. MANCILLA: Which you got from
15    somewhere. I don't know where you got it
16    from.
17        MR. ICE: Well, it was a separate
18    request. That was a separate request.
19  BY MR. ICE:
20    Q. But you've already looked at those and you've
21  already told me that there's no evidence of any
22  equitable transfer on those documents on or before
23  November 14th, 2008?
24    A. That's right.
25    Q. So that wouldn't be responsive to No. 2?

Page 152

1    A. That's right.
2    Q. As you're sitting here now, do you know of
3  any documents that will be produced in response to this
4  question?
5        MR. MANCILLA: If you know.
6        THE WITNESS: The assignment.
7  BY MR. ICE:
8    Q. Well, that's already been produced.
9    A. Oh, no. I don't, I don't think so. I can't
10  think of anything.
11    Q. Okay. Do you know of any documents that are
12  being withheld based on privilege, confidentiality, or
13  work product?
14    A. No.
15    Q. No. 3 is, Any and all documents that evidence
16  a physical transfer of the mortgage from MERS to the
17  plaintiff on or before November 14th, 2008. The
18  response was: All requested documents in plaintiff's
19  possession, custody or control will be produced, except
20  those documents which are privileged, confidential or
21  work product.
22    Correct me if I'm wrong, I think your testimony
23  already today was there was never a physical transfer
24  of the mortgage from MERS?
25    A. That's right.

Page 153

1    Q.  So you would have no documents responsive to
2  that?
3        A.  That's right.
4        Q.  Do you know of any documents that
5  Mr. Spanolios has that he will be producing?
6        A.  No.
7        Q.  Do you know of any documents in your
8  possession or Mr. Spanolios' position that are being
9  withheld due to privilege, confidentiality, or work
10  product objections?
11       A.  I can't answer for Mr. Spanolios, but I
12  don't.
13       Q.  And you're not aware of any?
14       A.  And I'm not aware of anything.
15       Q.  Exhibit M is a document that you saw before
16  in your last deposition, correct?
17       A.  Yes.
18       Q.  It's an opinion from Judge Schack up in New
19  York --
20       A.  Yes.
21       Q.  -- correct?
22  You're familiar with that?
23       A.  Yes.
24       Q.  In it, he says that you signed an Assignment
25  of Mortgage as the vice president of MERS, correct --

Page 154

1        A.  Yes.
2        Q.  -- just as you did in this case?
3  Judge Schack also says that you executed an
4  affidavit as an officer of Deutsche Bank National Trust
5  Company, correct?
6        A.  Yes.
7        Q.  And is that true, you executed an affidavit
8  for Deutsche Bank in that case?
9        A.  That is not true.
10       Q.  You never executed a document as an officer
11  of Deutsche Bank National Trust Company in that case,
12  Judge Schack's case?
13       A.  Let me just read it so I can -- I have to
14  refresh my memory completely.
15       Q.  Okay.
16       A.  I don't remember.  Most likely.
17       Q.  That you did?
18       A.  It sounds reasonable that I may have.  I
19  don't remember, and since it's not attached, I can't
20  say.
21       Q.  And as a result, Judge Schack wanted to know
22  if you were engaged in self-dealing by wearing two
23  corporate hats?
24       A.  Yes.
25       Q.  And the court was concerned that there may be

Page 155

1  fraud on the part of the bank?
2        A.  I guess.
3        Q.  I mean, he said that, right?
4        A.  Oh, okay.  I didn't read the whole thing.
5  Okay.
6        Q.  Okay.  The court ordered Deutsche Bank to
7  produce an affidavit from you describing your
8  employment history for the past three years, correct?
9        A.  That's what this says.
10       Q.  Did you do that?
11       A.  No, because we were never -- no affidavit
12  ever existed and no request ever came to produce such a
13  document.  The last time we spoke, I told you that
14  in-house counsel was reviewing the whole issue and
15  that's kind of where -- and we still haven't received
16  any communication to produce an affidavit.
17       Q.  From your counsel?
18       A.  From anywhere.
19       Q.  Well, you're reading Judge Schack's opinion.
20  He seems to want one.  Isn't that pretty clear on its
21  face?
22       A.  We didn't get -- we never even got a copy of
23  this.
24       Q.  Okay.  But now you have it --
25       A.  And --

Page 156

1        Q.  -- and you had it when we met at our
2  deposition back in February 5th.
3        A.  And our in-house counsel's response to this
4  is we were never -- this was never requested of me and
5  it was his recommendation not to comply.
6        Q.  What has become of that case?
7        A.  I don't know.
8        Q.  Was it settled?
9        A.  I don't know.
10       Q.  You've testified in court before?
11       A.  Yes.
12       Q.  Has a Federal Bankruptcy Court written an
13  opinion saying that it disbelieves your testimony?
14       A.  Not quite like that.  It's as it relates to
15  me being an officer of Freddie Mac.
16       Q.  Okay.  But the Court actually wrote an
17  opinion that's now in the public record that says he
18  disbelieves your testimony, right?
19       A.  Not the entire testimony.  It was as it
20  related to me being able to come into the court when
21  Freddie Mac was the investor for the loan.
22       Q.  I'd like you to take a look at Exhibit N to
23  your deposition.  Do you recognize that opinion?
24       A.  You showed it to me the last time.  I didn't
25  read it in full then and I still haven't.  I can Google

Sensor & Associates
Reporting and Transcription, Inc.

Page 157

1    my name and see all these comments.
2        Q.  Right.  You didn't get along too well with
3    this judge; is that right?
4        A.  I got along fine with him.  Yeah, this is
5    Bufford.  I got along fine with him.
6        Q.  Okay.  And on page 5, just above the III,
7    Discussion, do you see that paragraph?
8        A.  Um-um.
9        Q.  That's where it says Ms. Johnson-Sect --
10       A.  Yes.
11       Q.  -- C-T, but that's you, right?
12       A.  Yes.
13       Q.  -- also testified that IndyMac has brought
14   this motion as the duly authorized servicing agent for
15   the new owner of the note.  The Court disbelieves this
16   testimony.
17           And that would be your testimony, right?
18       A.  Because Freddie Mac was the owner of the
19   note.
20       Q.  Right.  He said, particularly in view of her
21   testimony that she does not know who owns the note at
22   the present time.
23       A.  If you read the court docket, which is public
24   knowledge, then you'd see that we, of course we knew.
25   Freddie Mac made me go to the hearing.  So, I mean,

Page 158

1    these things, you can take them anyway you want.
2        Q.  Okay.  Well, and the judge in this case will,
3    but my question was simply did a bankruptcy federal
4    court judge write an opinion saying he disbelieved your
5    testimony?
6        A.  Yes, he did.
7           MR. ICE:  This is a good place for a
8        break because I'm going to get into the
9        documents that were provided to me in advance
10       and so it's kind of a shift.  So quick break?
11          MR. MANCILLA:  All right.
12          (Thereupon, there was a brief pause in
13       the proceedings beginning at 4:01 p.m.,
14       resuming at 4:15 p.m.)
15          MR. ICE:  So are we ready?
16          THE WITNESS:  Okay.
17   BY MR. ICE:
18       Q.  I'm going to hand you what's been marked as
19   Exhibit O to your deposition and ask you if you
20   recognize that document?
21       A.  Yes.
22       Q.  What is it?
23       A.  That is the order telling me to come for the
24   deposition and what the questions would be.
25       Q.  Okay.  And attached to it is Exhibit A which

Page 159

1    lists the documents that we asked for you to bring
2    today?
3        A.  Yes.
4        Q.  Okay.  What I'm going to do is ask you to
5    kind of keep that list open, because I was provided a
6    stack of documents that weren't clearly delineated as
7    to what corresponded to what.  All of the documents
8    that we're going to talk about that were previously
9    provided by your counsel I've marked as Exhibit P.  And
10   I've taken a stab at connecting them to the item
11   request based on a number that was jotted down on the
12   top left-hand corner by someone.
13       A.  Okay.
14       Q.  And I'm going to start with the assumption
15   that that was intended to comply with whatever number
16   is in the corner.  If it's not and these are not
17   correlating, please let me know as we go along.
18       A.  Okay.
19       Q.  So let's start with the duces tecum part of
20   your notice, which is the list of documents.  No. 1
21   was:  The affidavit of the last three years of
22   deponent's employment provided to Judge Schack in
23   response to the order dated January 31st, 2008 in the
24   case of Deutsche Bank National Trust Company vs. Maraj,
25   Case No. 25981-07, Supreme Court of New York.

Page 160

1           We talked about that earlier.  There is no such
2    affidavit, correct?
3        A.  Correct.
4        Q.  By the way, why was IndyMac permitted to
5    bring the case in Deutsche Bank's name in that case?
6        A.  I don't -- I don't know.  Now, errors have
7    been made.
8        Q.  No. 2:  The affidavit of the deponent
9    provided to Judge Schack in response to the order dated
10   February 6th, 2009 in the case of IndyMac Bank, FSB vs.
11   Bethley, 2009 New York Slip Opinion 50186, New York
12   Supreme Court 2/6/09, "explaining," and this is in
13   quotes, "her employment history for the past three
14   years; and, why a conflict of interest does not exist
15   in how she acted as vice president of assignee Indymac
16   Bank, FSB in the instant action, and vice president of
17   both Mortgage Electronic Registration Systems, Inc. and
18   Deutsche Bank in Deutsche Bank vs. Maraj," and it gives
19   the citation and that's the case that was referred to
20   in item 1 of our request.
21          Do you have that affidavit with you here today?
22       A.  No.
23       Q.  Were you aware of that second opinion where
24   Judge Schack asks for a second affidavit?
25       A.  Nope.  Where is Judge Schack sending these?

Page 161

1    Q.  Presumably to your counsel.
2    A.  I wonder if he has the right address.  Maybe
3  that's what we should do, send Judge Schack the most
4  recent, and I will gladly show up in his court and
5  provide him everything he wants.
6    Q.  Okay.  Well, I sent you this back in March.
7  Have you or your counsel or in-house counsel at IndyMac
8  pursued that?
9    A.  No.
10   Q.  No. 3 asks for, The deponent's most recent
11 curriculum vitae.  And if you look at -- this should
12 say P3.
13     I hand you what's been marked as Exhibit P sub 3
14 to your deposition and ask you if that is a copy of
15 your most recent curriculum vitae?
16   A.  Yes.
17   Q.  And that's what was provided in response to
18 No. 3 on our Exhibit A to your subpoena duces tecum?
19   A.  Yes.
20   Q.  I see that it still has you working at
21 Indymac Bank, so you haven't updated it to reflect --
22   A.  I haven't.
23   Q.  Does that mean you're not looking for a job?
24   A.  (No response.)
25   Q.  No. 4 was:  All documents authorizing

Page 162

1  deponent to sign as vice president of, and it lists
2  three companies:  Deutsche Bank National Trust Company,
3  Bank United, FSB, and Mortgage Electronic Registration
4  Systems, which is MERS.
5      Exhibit No. 4, P4, sorry, would you take a look at
6  that and tell me whether that's intended to be
7  responsive to No. 4?
8    A.  Well, this is the MERS' one.  Looks like
9  we're missing the Deutsche Bank.  Can I give that to
10 you now?
11   Q.  Sure.
12   A.  And I don't believe one exists for Bank
13 United.
14   Q.  Okay.
15   A.  Okay.  There's three different ones:  There's
16 the Deutsche Bank when we were IndyMac Federal, there's
17 the most current Deutsche Bank, and then there's the
18 Deutsche Bank when we were IndyMac Bank.
19     MR. ICE:  Let's just mark this as
20     Composite Exhibit U.
21     (Thereupon, Defendants' Exhibit No. U
22     was marked for identification.)
23 BY MR. ICE:
24   Q.  Okay.  I'm going to hand you what's been
25 marked as Exhibit U to your deposition and ask you to

Page 163

1  identify three documents that are collected together in
2  that exhibit.
3    A.  It's the LPOA for Deutsche Bank dated
4  April 22nd, 2008, the LPOA for IndyMac Federal Bank
5  dated October 9th, 2008, and then the Deutsche Bank
6  LPOA for OneWest Bank dated April 6th, 2009.
7    Q.  And this is the Limited Power of Attorney
8  that we were discussing earlier that actually prohibits
9  OneWest or IndyMac from suing in the name of Deutsche
10 Bank National Trust Company, correct?
11   A.  It's in the PSA that they prohibit, that
12 LPOA -- I'm not sure that it's actually in that LPOA.
13   Q.  Did you look to see if the trust that's
14 involved in this litigation is in the list of trusts?
15   A.  I did.
16   Q.  And it is?
17   A.  It is.
18   Q.  I have my own copy that we'll get to later
19 where we can talk specifically about what powers it
20 provides you --
21   A.  Okay.
22   Q.  -- so we'll just put that aside.
23   No. 5 was:  The specific "books, records, and
24 documents kept by IndyMac Bank, FSB concerning the
25 transactions alleged in the complaint" which you

Page 164

1  personally examined according to the Affidavit as to
2  Amounts Due and Owing, paragraph 2.
3      Did you bring any documents with you --
4    A.  I did.
5    Q.  -- today that are responsive to that?
6    A.  Well, I'm assuming you were sent documents,
7  but I have some too that are probably a copy of what
8  you have.
9    Q.  I wasn't able to identify anything
10 correlating with that, so maybe if you could show me or
11 you can also look at -- also these are the exhibits
12 here, if you see them there.
13   A.  So this is the Affidavit of Amounts Due and
14 Owing and these are the corresponding screen prints of
15 where the data came from.
16   Q.  Okay.  I think why there was these -- these
17 are later in Exhibit P, but I think the reason these
18 were not produced with respect to No. 5 is because you
19 didn't personally review these when you signed the
20 affidavit?
21   A.  That's right.
22   Q.  So why don't you just hold on to those and
23 we'll get to that.
24     Just to make sure we're clear, do you have any
25 books or records and documents kept by IndyMac Bank,

Page 165

1    FSB concerning the transactions alleged in the
2    complaint which you personally examined in the
3    preparation of the Affidavit as to Amounts Due and
4    Owing?
5        A.  No.
6        Q.  No. 6 is, All documents, computer entries,
7    digital images, electronic correspondence or other
8    written materials you personally reviewed in
9    preparation for making the statement -- again, this is
10   the statement in that affidavit -- "have personal
11   knowledge of the facts regarding the sums of money
12   which are due and owing to IndyMac Federal Bank."
13   That's your affidavit in paragraph 3.
14       A.  I don't have personal knowledge, but the
15   person who checked the figures did that works for me.
16       Q.  Okay.  The only document that had the No. 6
17   on here was the adjustable rate note.
18       A.  No, that's not right.  Can I look through
19   here to see if --
20       Q.  Yes.
21       A.  It would have been all this.
22       Q.  Those are the same screen prints that we were
23   just talking about?
24       A.  Yes.
25       Q.  Okay.  We'll get to that, but just for the

Page 166

1    record, you were referring to Exhibits P8 -- turn this
2    so you can see -- P8, P9, P10, and that's it, right?
3        A.  Yes.  There might be a few missing, though.
4        Q.  P12, as well?
5        A.  Yes.
6        Q.  And --
7        A.  P14.
8        Q.  -- P14?
9        A.  That should be everything, but I have to go
10   through them all.
11       Q.  No. 7 had to do with your statement that the
12   foreclosure case was uncontested.
13       A.  Um-um.
14       Q.  I didn't see any documents produced with
15   respect to that.
16       A.  Because it wasn't -- because we don't
17   consider a case contested unless there are answers
18   filed to our motion.  And in this case, at the time
19   that the -- as we're going through -- at the time that
20   I signed the affidavit, it was uncontested.
21       Q.  Yeah, but your affidavit predated our
22   appearance at all, much less an answer.
23       No. 8 was, All documents, computer entries,
24   digital images, electronic correspondence or other
25   written materials you personally reviewed in

Page 167

1    preparation for making the statement that the principal
2    balance of the note is $399,095.97.
3        A.  Again, I didn't personally review it, but my
4    staff did.
5        Q.  And the computer screen that your staff would
6    have looked at to verify the numbers that were already
7    in the affidavit, right?
8        A.  (Hands document.)
9            MR. ICE:  Okay.  Let's go ahead and mark
10       this as the next exhibit.
11           (Thereupon, Defendants' Exhibit No. V
12       was marked for identification.)
13   BY MR. ICE:
14       Q.  I hand you what's been marked as Exhibit V to
15   your deposition and ask you to identify that.
16       A.  It is a screen shot on the Machado loan that
17   shows the records on the account affecting the way the
18   account looks since the last payment was made.
19       Q.  When is that screen shot made?
20       A.  I made this copy for myself this week.  No,
21   this is the one that I pulled that was given to the
22   firms.  I made a screen shot for myself, but then I
23   thought you would ask me that question, so I used the
24   same screen shots that were uploaded for the firms.  So
25   probably 8/13/08.  Yes, that's the date.

Page 168

1        Q.  Okay.  So this is the same image that would
2    have been provided to your counsel when the case was
3    transmitted for foreclosure?
4        A.  Yes.
5        Q.  Can you take me quickly through what these
6    numbers mean and how to read this document?
7        A.  So at the top, on all the green screens,
8    there will be the borrower's name, Social Security
9    number.  This says what kind of loan it is and what the
10   interest rate is.
11       Q.  That stands for the conventional residential?
12       A.  Um-um.  ARM.  MAN code F.  F means that the
13   loan is in foreclosure.  These are the numbers we have
14   on the system.
15       Q.  Phone numbers?
16       A.  Phone numbers to call the borrower, property
17   address.  And then you get into these blocks of time.
18   This is what the loan is due for, the August 1st, 2008
19   payment.  This is payment.  The P's for taxes,
20   insurance.  There's a shortage for taxes.  That's the
21   total payment.  This shows the last few transactions
22   that were recorded on the account.  So a check was paid
23   for hazard -- there's forced placed hazard insurance on
24   the account, and the last installment of taxes that
25   were paid.

Page 169

1        This section right here are the late charges that
2    were due at the time this was pulled.
3        Q.  So for the record, LC stands for late charge?
4        A.  Yes.  And then other fees would include a
5    bounced check fee if there was one.  We try not to use
6    things like other and miscellaneous, so that you'll
7    rarely see anything there because we try not to use
8    buttons like that.  The pending payment, that's the
9    new -- the payment change.  They're due for the next
10   interest rate change, and the February of 2009 payment
11   would be this.
12       Q.  Okay.
13       A.  That's the principal balance at the time that
14   this was pulled.  That's the negative escrow account
15   balance at the time this was pulled.  If the borrower
16   had a credit on their account it would be in suspense.
17   If there was any damage to the property, the funds
18   would go in restricted escrow to be used specifically
19   for the damage to the property.
20       Q.  So restrict -- RES, space, ESC stands for
21   restricted escrow?
22       A.  Yes.  And then the analyzed section right
23   here says that this loan is analyzed for taxes and
24   insurance once every 12 months.  That was the last time
25   it was analyzed.

Page 170

1        Q.  What does COUP stand for?
2        A.  I don't know.
3        Q.  And MO is month?
4        A.  Month.  Um-um.  And then this is kind of a
5    snapshot of the last monthly statement that they
6    received.  Well, not -- yeah, not really a statement
7    but bill, more like their coupon.  And then how much
8    they paid on principal year-to-date, taxes year-to-date
9    and interest year-to-date.
10       This down here is just, again, it tells the viewer
11   that the loan is active in foreclosure.  The loan has a
12   foreclosure stop 1.  The foreclosure process has a
13   foreclosure -- a foreclosure stop 1 tells me that the
14   only thing that's happened on this account is that we
15   filed the first legal action and we haven't done
16   anything else.  A foreclosure stop 3 means it's
17   scheduled for foreclosure sale.  So we haven't gotten
18   past first legal action.
19       The no notice stop says the loan is in MAN code F.
20   It's delinquent, don't send any more notices, don't
21   send any more statements because they're going to be
22   incorrect because they won't include attorney's fees or
23   things like such as that.  Process stop F tells the
24   world that the loan is in foreclosure, so don't apply
25   funds to the account without someone in the foreclosure

Page 171

1    department making sure it's not going to invalidate the
2    foreclosure or making sure we have the correct
3    stipulations in place to allow accepting funds and
4    apply them to the loan.  And it's saying that at this
5    time the loan was past due four months.
6        Q.  Okay.  So does LN stand for loan in
7    foreclosure?
8        A.  Yes.
9        Q.  And the point of that is that OneWest can't
10   accept any payments during the foreclosure process
11   because that would invalidate the foreclosure process?
12       A.  Well, we can accept payments if the borrower
13   were on a stipulated repay plan, meaning you recognize
14   that you are delinquent, we're going to accept a
15   payment for the next ten months, but if at any time you
16   default on this payment plan, we'll pick up where we
17   left on the foreclosure action so we, you know, so we
18   don't have to restart the action.  And while the loan
19   is in foreclosure, it's just the way to warn
20   collections, customer service, loss mit that there's
21   someone else to check.  It's in a legal action.
22   Something's happened with this loan, so don't just
23   treat the loan like you would a current borrower
24   because there are, you know, other things going on.
25       Q.  So when you make these kind of deals where

Page 172

1    you're accepting payments sort of on a temporary basis,
2    the foreclosure is put on hold?
3        A.  It depends.  Yes, in effect, yes, but if the
4    borrower makes -- their first payment on their payment
5    plan happens after the first legal action -- we're
6    talking about Florida, but you know, in my mind I'm
7    going with several different states at the same time.
8        There are some processes where as soon you file
9    the first legal action other things have to happen.
10   Those have-to-happens will happen because the fees and
11   costs would have included that action because it's all
12   happening at the same time, so, but then at that point
13   it would be on hold.
14       So we're talking about Florida.  In this case, if
15   the borrower were on a payment plan, we just put the
16   file on hold wherever we were.  And if we had a hearing
17   date scheduled, we would postpone it based on the
18   outcome of the payment plan, payment arrangement.
19       Q.  If a borrower just sends in a payment without
20   getting this kind of a payment plan in place, what
21   happens to it?
22       A.  The payment goes back to the borrower.
23       Q.  Okay.  Anything else responsive to No. 8,
24   which is basically what you reviewed or what someone
25   reviewed to determine the principal balance?

Censor & Associates
Reporting and Transcription, Inc.

Page 173

1      A.  No.
2      Q.  Okay.  Take a look at what's been marked as
3  P8 to your deposition and ask if you can identify what
4  that is?
5      A.  This is the first page of a payoff statement.
6      Q.  This is printed out in November, on
7  November 13th of 2008?
8      A.  The whole -- it actually comes with several
9  pages, but it looks like this is also a part of what
10  was provided to the firm at the time of the referral,
11  yes.
12      Q.  And I see there that there is a principal
13  balance figure that matches the figure in your
14  affidavit?
15      A.  Yes.
16      Q.  No. 9 was asking for whatever materials you
17  reviewed to make this statement of what interest was
18  due and owing.
19      A.  Same idea.  I didn't personally look, but my
20  staff did.  It would be the screen that says -- hold
21  on, let's see.  Just in case you don't have it there,
22  it's going to be one of the payoff screens.  There it
23  is, right here.  Pay 4, if you have one that says pay 4
24  at the top, like this says pay 1?  If you don't, if you
25  don't, here's one.

Page 174

1      Q.  That doesn't look familiar.
2          MR. ICE:  Let's go ahead and mark that
3      as the next exhibit.
4          (Thereupon, Defendants' Exhibit No. W
5          was marked for identification.)
6  BY MR. ICE:
7      Q.  I'm going to hand you what's been marked as
8  Exhibit W to your deposition and ask if you can
9  identify that document?
10      A.  This shows what the interest was due and
11  owing as of the date that the affidavit was supposed to
12  calculate the indebtedness.
13      Q.  Okay.  This was as of February 9th, 2009?
14      A.  Yes.
15      Q.  And your affidavit said that those figures
16  were --
17      A.  Yes.
18      Q.  -- valid as of February 9th, 2009?
19      A.  Yes.
20      Q.  I'm going to hand you what's been marked as
21  P9 to your deposition and ask you what that is?
22      A.  This is also a pay 4 screen.  And the
23  difference between both of these is this is interest as
24  of March 18th, 2009, so -- and this one, this is like
25  someone just pulled it this day.  This one was pulled

Page 175

1  on April 8th, 2009, where this came from the data that
2  was downloaded for the firms.
3      Q.  Okay.  Just for the record, P9 was what was
4  provided to us, among the documents that were provided
5  us before the deposition as responsive to our duces
6  tecum request.
7      I see a notice on here that says multiple IR
8  change periods crossed, calculations are suspect.  What
9  does that mean?
10      A.  Okay.  So I kind of alluded to this.  The
11  April -- this was printed on April 8th, so the system
12  is working real time, even if you put a back date here.
13  So what the system is saying is, now because that
14  number matches that number, it means that the person
15  who pulled this for you didn't change it, because if
16  they had, that's hard coded.  You can't do anything
17  there.  That's green, so.  That's green and the date's
18  green.  And then that comment will come up that says
19  that it's suspect and you match it here to see if
20  someone fooled, tried to trick the system.
21      But if -- I mean, because sometimes you do.  You
22  might quote a reinstatement quote or payoff in the
23  future for a borrower because they know they're going
24  to pay off the home 60 days from now, so this happens.
25  There's no interest rate for April, so the system

Page 176

1  doesn't know how to calculate it.  So what it's doing
2  is it's just taking the data it has and trying to
3  forecast.
4      Q.  When you say, was the term you used green?
5      A.  Green screen, yes.  There are areas on the
6  system that can be manipulated.  In the pay screens --
7  you'd have to -- I mean, you'd have to kind of take my
8  word for it, I guess.  This date is green, meaning the
9  user can change the date.
10      Q.  Change it?
11      A.  What's also green -- but this is a different
12  screen.  See how these screens don't look exactly the
13  same, although they both say pay 4?
14      Q.  Right.
15      A.  This is when you're actually trying to create
16  a payoff.  This is like a dummy workstation to this for
17  if you're trying to quote something on the phone.  Not
18  that you're actually going to print a payoff.  On this
19  screen, you can -- this is green, the 16,228.30.  So if
20  I know that the interest rate is really 16,088, I could
21  type over that.
22      But here is where you -- that's not green.  So
23  that's how, as a manager, if I'm researching something,
24  I can tell if the system was manipulated with whatever
25  data the borrower was given.  If the borrower sends me

Sensor & Associates
Reporting and Transcription, Inc.

Page 177

1 information, I can tell if it's been manipulated
2 because I know the screens and I've been working in the
3 same system for 18 years.
4     Q.  This one says that it's printed by, it has a
5 code number at the bottom.  Do you know who that code
6 belongs to?
7     A.  Not off the top of my head, but it's one of
8 my staff.
9     Q.  Okay.  Do you know, what is the name of the
10 program that this, all this data is kept in?
11     A.  MSP Fidelity.  I think they may have just
12 changed their name again to LPS, different from LPS
13 Default Solutions, which is our outsource vendor.
14     Q.  A mere coincidence that the names are the
15 same?
16     A.  No, no, they used to be the same.  It was all
17 the same company under MSP Fidelity, and the outsource
18 vendor was Fidelity and the system was Fidelity, but we
19 would refer to the system as MSP to differentiate.  So
20 I just get in the habit of not saying the full LPS
21 Default Solutions is the outsource vendor and Lender
22 Processing Services is our system of record.
23     Q.  Is this program owned by LPS, a third-party
24 vendor?
25     A.  I think at one time it was the other way

Page 178

1 around, the system owned Default Solutions.
2     Q.  The software company --
3     A.  Yes.
4     Q.  -- that developed the program --
5     A.  Yes.
6     Q.  -- owned the third-party vendor foreclosure
7 services provider?
8     A.  At some point in the past but they're
9 separate now.
10     Q.  And is that the company that wrote the
11 program?
12     A.  I assume so.
13     Q.  Does IndyMac buy the program or they just
14 license it --
15     A.  We're a licensed user.
16     Q.  -- to use it?
17     A.  OneWest Bank is a licensed user.
18     Q.  No. 10 was whatever you personally reviewed
19 just to make the statement that the late charges due
20 and owing were $253.44.
21     A.  That's that same, the same printout.  And you
22 see that as of the date that was put in here, because
23 the late charge -- if you -- in the affidavit it said
24 that the late charges were as of November 14th, 2008,
25 so that's how that number gets calculated.

Page 179

1     Q.  So because the principal and interest are
2 projected forward and the late fees are not, you have
3 to do two different type screens; is that right?
4     A.  Yes, but it's because of the way the
5 affidavit reads.  It reads that these are as of such
6 and such date, but then it kind of says late charges
7 are just as of.
8         MR. ICE:  Let's go ahead and mark this
9     as the next exhibit.
10         (Thereupon, Defendants' Exhibit No. X
11     was marked for identification.)
12 BY MR. ICE:
13     Q.  I'm going to hand you what's been marked as
14 Exhibit X to your deposition and ask you to identify
15 that document.
16     A.  This is another screen in the pay 4
17 workstation that was used to get what the true late
18 charge was as of November 14th, 2008.
19     Q.  I'm going to hand you what's been marked as
20 Exhibit P10 to your deposition and ask you if that's --
21 ask you to identify that document.
22     A.  This is a system -- I mean, a screen on the
23 system that you can use to calculate late charges that
24 have been assessed to the loan.  The problem with using
25 this for an Affidavit of Indebtedness is the system

Page 180

1 only goes back so far and when there are other --
2 there's only so much room on the screen.  One of the
3 issues with still using green screen, instead of a
4 web-based type application.  So you can't correctly
5 depict to the penny what's due.
6         The other thing is the borrower can make a payment
7 and pay some late charge.  So if you're just going
8 to pick up the raw, this is what was assessed to the
9 loan, you would miss any credits that were paid to late
10 charges, where this is a better representation of going
11 back in history through a date.
12     Q.  How are the late charges computed?
13     A.  Did I print that?  I think I have it on my
14 desk.  There's actually a screen that says what the
15 percentage is for this loan and how it's computed.  And
16 I didn't, I didn't bring it with me, but I can -- I
17 didn't bring it with me.  I can show you that, though.
18 We have it.  It's another green screen.  You put in the
19 loan number and it says for this particular loan this
20 is the calculation that's used, this is the percentage
21 that's used for that payment to get this late charge.
22     Q.  And that information ultimately came from the
23 original note and --
24     A.  Yes.
25     Q.  -- mortgage?

ansor & Associates
Reporting and Transcription, Inc.

25 (Pages 181 to 184)

Page 181

1    A.  Yes, yes, yes.
2    Q.  What screen would you ask for to show you
3  what the algorithm is being used to compute the late
4  charge?
5    A.  MAS1, LTE1.  Similar to MAS1.  MAS1 means
6  master file, and then there's the second code that gets
7  you to certain specific areas you want to see.
8    Q.  You don't have a printout of that with you
9  today, do you?
10    A.  I don't, but I can get you that.
11    Q.  No. 11 was materials that you personally
12  reviewed in preparation for making the statement that
13  inspections conducted on the property cost $33.
14    A.  I think I saw it in something that you
15  already have, but I have a copy here too.
16    Q.  Would this be --
17    A.  That's the actual bill.  The system shows the
18  bill that was, when the bill was assessed, when it was
19  ordered and when the charge was assessed to what
20  account.
21      MR. ICE:  Let's mark this as the next
22    exhibit.
23      (Thereupon, Defendants' Exhibit No. Y
24      was marked for identification.)
25  BY MR. ICE:

Page 182

1    Q.  Hand you what's now been marked as Exhibit Y
2  to your deposition and ask you to identify that
3  document, please.
4    A.  This is, this workstation is called DDCH and
5  it shows all of the fees that have been applied to the
6  borrower's corporate advance account.
7    Q.  What does DDCH stand for?
8    A.  I don't know.  Somebody in 1962 came up with
9  that.
10    Q.  Can you tell me what these codes here,
11  starting with L, stand for?
12    A.  I have to think about that for a second.  No,
13  I can get that information for you, though, because I
14  don't work in these screens all the time.  I know how
15  to get to them.  I know what they do, but I own the
16  foreclosure and the bankruptcy workstations and another
17  business owner owns the accounting ones.
18    Q.  Down here, the C/A payee, what does that
19  stand for?
20    A.  I think, I believe that the person who pays
21  the bill, who would have paid this bill for this BPO,
22  would put a code in here so that there's a running
23  balance of what was paid and how.
24    Q.  And TRAN?
25    A.  I think those are just the, maybe the batch

Page 183

1  numbers, the trans, the transaction codes.
2    Q.  Are there supposed to be numbers or
3  figures --
4    A.  No.
5    Q.  -- in there?
6    Why are these all sort of blank lines?
7    A.  Because it's a green screen, very old.  So if
8  you're entering in data, and everyone doesn't have
9  access to do that, if you're entering in data, those
10  would be green so you can do that.  For a normal user
11  that's just viewing, you wouldn't be able to manipulate
12  any data here.  It would be just for informational
13  purposes.  All you could really do is print the screen.
14    Q.  In the, where the columns of information
15  actually begin, you have TRN, that stands for
16  transaction?
17    A.  Transaction.
18    Q.  They have numbers but some of the numbers are
19  repeated?
20    A.  The user, what it's saying is how -- who --
21  that field is being used to say who the bill is paid or
22  how the bill was being paid.  NIV stands for new
23  invoice which is the invoicing system that LPS created
24  that we use to pay for services that they render.  We
25  order our BPOs from LPS Default Solutions so that's why

Page 184

1  it says new invoice.  Our property inspections used to
2  go through First American, but now go through Field
3  Services and that's what that acronym means, FS -- FFS.
4    Q.  So even though the title is USR, which sounds
5  like user, those aren't initials of any particular
6  person?
7    A.  No.
8    Q.  And the transaction 631 just means that
9  that's an inspection?
10    A.  I believe so.  I don't know.  They might use
11  that as the batch code, so if anyone had to ever go
12  look at the work, the actual line item, the backup for
13  this, I think that's how -- what they do with these.
14  It's to see what type of batch of work on that day you
15  would find the backup.
16    Q.  What does FBIF inspection fee stand for?
17    A.  This is just a description of what was paid.
18    Q.  What is FBIF?
19    A.  I don't know.
20    Q.  COIF?
21    A.  I don't know what that means.
22    Q.  PCIP?
23    A.  I don't know.  I know that there are some --
24  let's see, what did I do with -- let's see if I have
25  something that I can show you.  It might tell the type

Censor & Associates
Reporting and Transcription, Inc.

Page 185

1    of inspection that was ordered.  Let me see if I can
2    just pick up that.  No, I don't know.  That could be
3    the person that actually did the transaction.  I don't
4    know.
5        Q.   Let's take a look at P11 and ask if you can
6    identify that document.
7        A.   That is the actual bill for the property
8    inspection.
9        Q.   And that bill is from LPS Field Services?
10       A.   Yes.
11       Q.   According to this, there was a property
12   inspection on March 18th of 2009?
13       A.   Yes.
14       Q.   The report was that it was occupied by name
15   unknown, right?
16       A.   Yes.
17       Q.   And the description was property inspection,
18   no contact inspection invoiced, right?
19       A.   Right.
20       Q.   What are they doing there?
21       A.   We have some -- the type of property
22   inspections we order on loans and foreclosure and
23   bankruptcy are the general no contact property
24   inspection, meaning go to the house, make sure it's not
25   burnt down, make sure the grass is not ten feet high,

Page 186

1    and bring us that information if it is, or if the
2    property is for sale or if it's occupied and how you
3    knew it was occupied, but don't knock on the door and
4    contact the borrower.
5        We have some campaigns where we do want the
6    borrower contacted, some loss mit campaigns where
7    they'll leave door knockers so that the borrower knows
8    that we're trying to reach out to you some kind of loss
9    mit.  But a normal foreclosure or bankruptcy property
10   inspection outside of the campaigns is just a don't
11   knock on the door and, you know, get anyone upset, just
12   inspect the property, make sure it's still there.
13       Q.   Does LPS have a local office where they
14   somebody that does this?
15       A.   I believe they contract out to, because it's
16   Maintenance Nationwide, so I believe they have
17   contractors.  I don't, I don't manage the property
18   preservation.
19       Q.   So from this, we don't know who actually
20   drove by the property?
21       A.   No, there is something that tells -- oh, you
22   see how this one on here says door hanger?  That's what
23   I was referring to.  It's not on here, but there is
24   something in the system because the folks in the credit
25   prop pres department can always tell who did what.

Page 187

1        Q.   In the what department?
2        A.   Prop pres, property preservation.
3        Q.   How often are these ordered?
4        A.   We want a property inspection completed one
5    every 30 days, but I believe the order cycle is sooner
6    than that.  It like orders -- I can't be for sure
7    because I don't manage this process.  I want to say the
8    order goes out, it might, it can even be every 20 days.
9    It's less than the 30-day threshold, to be sure that
10   every month the property gets inspected.  If the
11   inspector sees that the property was just inspected,
12   like if the orders overlapped for some strange reason,
13   a short month or something like a February happened,
14   then the property inspector won't inspect the property.
15   The idea is to get one once a month.
16       Q.   Okay.  No. 12 was the materials you reviewed
17   in preparation for making the statement that the BPO
18   cost $145.
19       A.   That's here.
20       Q.   And "here," you're referring to an entry on
21   Exhibit Y to your deposition?
22       A.   Yes.
23       Q.   I'm going to hand you what's been marked as
24   Exhibit P12 to your deposition and ask you if you can
25   identify that?

Page 188

1        A.   This is the DDCH again.  It's a cover, it's a
2    cover to the difference between the one I provided you,
3    and this one is that this was generated when the
4    affidavit was done, and this was generated after lots
5    of things happened.  So we're paying attorneys fees and
6    other things.  Attached to it is the actual broker's
7    price opinion, BPO.
8        Q.   Do you order a broker's price opinion in
9    every foreclosure case?
10       A.   Yes.  Well, we order a reconciled value on
11   every foreclosure case.  I'm trying to, I'm trying to
12   say this simply.  There are times when the broker comes
13   back with a value where the variance here, where it
14   says 24 percent?  Okay.  Can you read it?
15       What actually was ordered on here was the
16   reconciled value is this first grade, the second grade
17   line, right?
18       Q.   Okay.
19       A.   And what that reconciled value is this
20   desktop value, which is a desk appraiser value, and the
21   BPO.  So what we actually order is this reconciled
22   value on every property and so it gives us a better
23   indication of that market.  It's not just one
24   independent broker's opinion.
25       Q.   Well, the document that we have here with the

Censor & Associates
Reporting and Transcription, Inc.

Page 189

1 pictures and the graphs in it, is that the BPO itself
2 or the reconciled value?
3     A.  It's everything.  It's everything, but it's
4 highlighting, the BPO is 250, but the reconciled value
5 is 190.  And down where it says reconciliation
6 comments, it will explain why that appraiser valued it
7 the way that it was.
8     Q.  Does this tell you who did the appraisal?
9     A.  Somewhere it should.  Again, I don't manage
10 this group, so I can't get to it -- I mean, I can't
11 flip to it quick or anything.  And this is hard on my
12 eyes.  They would know, someone in this group would
13 know how to get down to who actually completed the
14 value.
15     Q.  Does someone physically go out to the house
16 to do this?
17     A.  Yes.
18     Q.  That's how they get these pictures?
19     A.  Yes.
20     Q.  I still didn't understand your answer.  Do
21 you order a broker's price opinion in every case or
22 not?
23     A.  We order a reconciled value in every case.  A
24 reconciled value includes a broker's price opinion.
25     Q.  If we wanted to see this in other cases, what

Page 190

1 would we ask for?
2     A.  You want me to -- are you going to pay me to
3 tell you how to do your work?  Just any -- you could
4 just ask for how -- what our current value is, the
5 backup for our current value, and we'll pull whatever
6 we have.  If you said BPO, you might get just a BPO.
7 You could say reconciled value.
8     Q.  Do you have other means for determining
9 value?
10     A.  None, none that we like to do.  I mean, I
11 mean, there are AVMs are available.  We just don't like
12 to use those.  They're not as reliable.
13     Q.  What's an AVM?
14     A.  Those are, big companies do them, like if you
15 go to Realtor.com and you put your property address, it
16 will give you a value.  It's kind of databased on
17 recent sales, but the property --
18     Q.  Talking like GoZilla?
19     A.  Like that, yes.  So we don't like to depend
20 on -- we get them as a service with our prop pres
21 company -- I mean, our evaluation company, but we don't
22 use them.  We don't make business decisions on it.
23     Q.  And you call that AVM?
24     A.  Yes.
25     Q.  Do you know what that stands for?

Page 191

1     A.  No.
2     Q.  No. 13 was asking for whatever you reviewed
3 for making the statement that plaintiff has employed
4 the services of Florida Default Law Group.
5     A.  The referral transmittal.
6     Q.  Okay.  And that is Exhibit P13, correct?
7     A.  Yes.
8     Q.  The top of this form says FIS Desktop.  That
9 is referring to your outsource vendor?
10     A.  Yes, at that time.  See, I pulled that in
11 November.  Now they are LPS.  At this time they were
12 FIS.
13     Q.  This is a document that's issued by FIS, now
14 LPS, to the attorney?
15     A.  Yes.
16     Q.  An attorney in your approved network?
17     A.  Yes.
18     Q.  And this is what transmits the beginning of
19 the case?
20     A.  Yes.
21     Q.  Okay.  It tells them, your counsel, whose
22 name to sue in, correct?
23     A.  Yes.
24     Q.  In this case, it instructed Florida Default
25 Law Group to sue in the name of IndyMac Federal Bank,

Page 192

1 FSB, correct?
2     A.  Yes.
3     Q.  And then it tells them to vest title in
4 Deutsche Bank National Trust Company --
5     A.  Yes.
6     Q.  -- as trustee, et cetera, et cetera, correct?
7     A.  Yes.
8     Q.  What does that mean, to vest title in them?
9     A.  At the conclusion of the foreclosure action,
10 to put the final deed in the name of Deutsche Bank
11 National Trust.
12     Q.  The instruction, mortgage currently held by
13 and foreclosure should be in the name of, is not
14 correct because as of the date of this transfer, or
15 transmittal package, the mortgage was still in the name
16 of MERS, correct?
17     A.  But we can't, we can't do the action in the
18 name of MERS, which is why a default's to IndyMac
19 Federal Bank.
20     Q.  But the idea that the mortgage currently held
21 by IndyMac is incorrect?
22     A.  Right, that shouldn't say "and."  It probably
23 should say "and/or."
24     Q.  Is there anything on this document that tells
25 your counsel that the note is lost?

**Censor & Associates**
Reporting and Transcription, Inc.

Page 193

1    A.  No, we wouldn't, no one would know that at
2  the time this is generated.
3    Q.  Do you have any involvement in negotiating
4  the contracts for the attorneys that are in your
5  network?
6    A.  No, we don't have a contract with our
7  attorneys.  It's a business relationship.  LPS does
8  have contracts with the firms for use of the technology
9  and the bank is not party to that contract.
10    Q.  So you select them, but you don't have any
11  direct contract with the attorneys?  And when I say
12  you, I'm talking about OneWest, of course.
13    A.  That's right.
14    Q.  Their contracts are with FIS or LPS?
15    A.  Right, for the technology, yes.  Use of their
16  proprietary system, yes.
17    Q.  But I'm interested in the contracts to
18  represent IndyMac or OneWest as their attorney.
19    A.  We don't have contracts for that.
20    Q.  The legal service contracts are with LPS?
21    A.  Those aren't with LPS, either.
22    Q.  Who are those with?
23    A.  There are no contracts between OneWest Bank
24  and Florida Default Law.  It's all built on
25  relationships and scorecards and -- and -- I'm looking

Page 194

1  for a word.  It escaped me.  So there's no contract.
2  Our expectation is -- now, we do have expectations, but
3  there's no contract.
4    Q.  Well, how do they know what to bill you?
5    A.  They always -- the firms have to bill
6  according to Fannie or Freddie guideline, even if the
7  loan is not Fannie or Freddie.  Usually we adopt Fannie
8  Mae's billing maximum bid.  Fannie Mae have already
9  gone out and said for a fale in California you can't
10  charge more than X dollars and the firms cannot charge
11  us more than that, and it doesn't matter who the
12  investor is.
13    Q.  You mentioned scorecards.  What information
14  is used for the scorecards?
15    A.  Data like our -- it's -- I don't know.  I
16  don't know.  It's data --
17    THE WITNESS:  Are you putting that in
18  there?
19    (Thereupon, there was an off-the-record
20  discussion held.)
21    MR. ICE:  You can take it out.  That's
22  okay.
23    THE WITNESS:  Data like, it's hard data.
24  We referred ten files to the firm.  We have
25  expectations that the first legal action,

Page 195

1  once they get the referral, if there's no
2  reason, if it's a normal foreclosure process,
3  an uncontested foreclosure, our expectation
4  is that the first legal action be filed
5  within ten days.  If it's filed within ten
6  days, and for that particular line item they
7  would have 100 percent that month.
8    But if something fell outside of that,
9  we have states where if all the assignments
10  aren't recorded prior to the first legal
11  action, then we can't proceed, like in New
12  York.  So there will be a delay to get those
13  first, to get those intervening assignments
14  recorded.  And then that delay, of course,
15  would affect their score.  It's not really
16  their fault, but that's the way it works.  So
17  it kind of grades different areas in the
18  process.
19  BY MR. ICE:
20    Q.  But essentially you're scoring how quickly
21  your counsel can get through the foreclosure process?
22    A.  No.  Fannie Mae has and Freddie Mac, they
23  have a per -- like the fee schedule.  They also say the
24  foreclosure in California -- and this is based on that
25  state's laws, too -- should not take longer than 120

Page 196

1  days.  There's no reason for it to take longer than 120
2  days because the state dictates that this is filed at
3  this point and this is filed at this point and this is
4  filed.
5    So the idea isn't to get through the process as
6  quickly as you can, unless if the property or the
7  borrower has abandoned it, the borrower has told us
8  they don't want the property; otherwise, IndyMac Bank,
9  IndyMac Federal Bank, OneWest Bank's perspective is how
10  do we keep the borrower in their home.  So we don't
11  look at time lines.  They're there, they're a guide and
12  it's the industry standard, but no one's being graded
13  on time lines.
14    Even the servicer isn't even being graded on time
15  lines like we were in the past.  Fannie Mae would say,
16  Erica, what's going on in California because you're
17  20 percent outside of time, time lines.  So we don't
18  have that same kind of oversight today.
19    Q.  Well, let's try to narrow it down to your
20  Florida attorneys and how things run today.
21    A.  Okay.
22    Q.  Are the attorneys for the banks, for OneWest,
23  scored on how quickly they get the foreclosure through
24  the process?
25    A.  It's too broad of a question.  No.  Generally

Censor & Associates
Reporting and Transcription, Inc.

Page 197

1  no, because there are controllable delays and
2  noncontrollable delays.  So, of course, a
3  noncontrollable delay is bankruptcy, a noncontrollable
4  delay is a payment plan, review for loan modification,
5  deed in lieu, DIL review, because in a deed in lieu the
6  investor requires that the property is marketed for six
7  months, so noncontrollable delay.  So those are carved
8  out of the time line, so.
9        And the firms are not incented on getting them
10  through the process as fast as they can.  In a state
11  like Florida, specifically since this is a judicial
12  state, there are always court delays, there are the
13  mediations.  Those are all uncontrollable delays.
14  Nothing in Florida is happening like a foreclosure
15  might happen two years ago.  Now it's like what, plus
16  nine months.
17        So no one, there is not this mindset of getting
18  through the process as fast as you can.  As a matter of
19  fact, it's quite the opposite.  We know we're not going
20  to -- you know, the courts are backlogged, the
21  mediators are backlogged.  Let's try to work this out
22  now before the mediator calls us to the table.
23        Q.  I just want to be very, very clear because
24  what you just said is very counterintuitive to
25  everything that we have experienced on our side of the

Page 198

1  table.  You're telling us that as far as your attorneys
2  are concerned, there's absolutely no incentive to file
3  the cases as quickly as possible and get them through
4  the system?
5        A.  No, we don't incent the attorneys.  No, we
6  don't incent the attorneys to get it through the system
7  as fast as they can.
8        Q.  How about file as quickly as they can?
9        A.  We have an expectation that the first legal
10  is filed within ten days of referral.  And so with
11  every state, once you file the first legal, the state
12  law takes over.  As soon as that happens, you know, the
13  next step happens as a result of the first legal
14  action.  And I'm not just speaking of Indymac.  Only
15  OneWest Bank, right?
16        Q.  Right.
17        A.  Just not all servicers, just OneWest.
18        Q.  Well, I don't mind telling you on the record,
19  the reason why I'm asking that question, I think a lot
20  of the things that are problematic in this case for
21  you, like the assignment, could have been avoided had
22  they just done the assignment first, got you to sign it
23  and then filed the case.  I don't understand.  Maybe
24  you can explain it to me, why there's this rush to get
25  it filed and then assign the mortgage after the case is

Page 199

1  filed, which in Florida is a big problem.  Do you have
2  any explanation for that?  And this isn't --
3        A.  Are we going back to the MERS?
4        Q.  Yeah, the MERS' Assignment of Mortgage.
5        A.  Okay.  The reason, the idea is that MERS,
6  sometimes Deutsche in the past Fannie and Freddie,
7  would like for us to do the action in our name.  That
8  doesn't mean that we cannot do the action in any of
9  those four entities names.  The result, however, of
10  doing an action in their name, when their guide, the
11  investor guideline is that we not, is that if there's
12  any loss, we may be responsible for that loss.
13        If any lawsuit happens, like in this case, your
14  lawsuit is not against Deutsche, your lawsuit is
15  against IndyMac Federal.  It's for that reason that
16  investors usually don't want you to do the action in
17  their name.  It's there, it's for their protection, but
18  it doesn't mean that we don't, we categorically cannot.
19  It happens because it happens in error.  It happens
20  because someone didn't realize this was a Fannie Mae
21  loan and thought it was an IndyMac Bank loan and -- I
22  mean, I'm sorry, vice versa -- and actually filed the
23  action in Fannie Mae's name.
24        So there's nothing -- we don't -- there are
25  guides, but the guides are loose and they're gray.  So

Page 200

1  the guide says, don't start this action in the name of
2  MERS, but it doesn't say what's going to happen if you
3  do.
4        Q.  Okay.  That's kind of addressing a different
5  question, but before I get back to my original question
6  I want to make sure.  I didn't understand why the
7  Deutsche Bank, for example, in this case would object
8  to having the case brought in its own name?
9        A.  Well, I can't speak for Deutsche, so what I'm
10  repeating to you is my understanding.  And I did work
11  for Fannie Mae before, eight and a half years at --
12  what did you call my resume, duces tecum?  So I can
13  tell you from my previous experience and being in this
14  industry for 18 years, that generally the investor does
15  not want their name tied, they don't want to be pulled
16  into the lawsuit.  Their expectation of the servicer is
17  that they service the loan, which includes the good and
18  the bad, and that if for any reason there's ever a
19  lawsuit, then the bank would handle it.
20        So I'm going to go back to using Fannie Mae
21  because I worked there before.  If this were a Fannie
22  Mae loan and we were paying excessive attorney fees and
23  costs because of the contested litigation, Fannie Mae
24  is not going to reimburse OneWest Bank for those fees.
25  OneWest Bank would eat the fees in that case because

sor & Associates
Reporting and Transcription, Inc.

Page 201

1    Fannie Mae's expectation is, you're the servicer and,
2    you know, if it's contested, then, you know, you got to
3    fix it. That's part of the agreement, so.
4        Q.   Those cases that you mentioned before that
5    you had settled, the difference that you settled it
6    for, did OneWest end up, as you say, eating the
7    difference?
8        A.   Yes.
9        Q.   Now, going back to my original question,
10   which is about, not about whose name to bring it in,
11   but the timing. Do you have an explanation why this
12   case would get filed before the Assignment of Mortgage
13   was in place such that IndyMac Federal Bank would be
14   the mortgagee at the time of filing?
15       A.   I need to go look at the dates again. When
16   was it filed, the first legal action?
17       Q.   The case was filed November 21st --
18       A.   IndyMac Federal Bank.
19       Q.   -- 2008 in the name of IndyMac Federal Bank.
20       A.   And the MERS assignment?
21       Q.   The MERS assignment was dated December 2nd,
22   2008. By waiting one week, could have been in
23   place by the time the lawsuit was filed.
24       A.   I mean, I can -- again, this is based on my
25   experience. I can come up with reasons why that's

Page 202

1    possible. It's not ideal. Is it against the law in
2    Florida to start the action in the name, you know, one
3    way or the other, I don't know. I think that's
4    arguable, but in this case, in this particular case --
5            MR. ICE: Joe's got the argument.
6            MR. MANCILLA: It will be argued.
7            THE WITNESS: In this particular case, a
8        lot of these actions happen simultaneously.
9        The loan is referred, someone's trying to
10       order the original docs, someone's trying to
11       prep the assignments, well, it's going down
12       three different paths. The companies, the
13       last time we spoke, I was the only one
14       signing them. I could have gotten that
15       document, but I can't tell you now. But I
16       can tell you when that document was
17       originally sent to OneWest Bank for
18       signature. It could have been sent to
19       OneWest Bank on November 15th and it just
20       took me that long and the process that long
21       to get it back and it just, the items
22       crossed.
23   BY MR. ICE:
24       Q.   But I want you to assume for the purposes of
25   my question, and Joe's free to argue it later, that you

Page 203

1    need, you need to be the mortgagee when you file your
2    complaint, which, as an attorney, if I was working for
3    the bank, I would just make sure I had this document in
4    my hand before I went down -- and by this document, I
5    mean the Assignment of Mortgage -- before I went down
6    to file my complaint. I mean, it's not that difficult
7    to say I need A before I do B.
8        Do you have any explanation why that doesn't
9    happen in 99 percent of the cases?
10       A.   No, if I did, this is off the record, I would
11   have won the lottery if I had those kind of answers.
12   No, I don't know. I mean, the only thing I can offer
13   is that I think some of these processes are happening
14   simultaneously and things are getting crossed and maybe
15   someone -- maybe there's -- I don't know. I don't
16   know. I can't really say.
17       Q.   And the same question with the lost note
18   counts, I think we have about 50 or so cases with
19   Florida Default Law Group, and I can tell you that in
20   certainly much more than 50 percent there's a lost note
21   count. And from everything you've said today, that's
22   not true, that there's not 50 percent of the notes
23   getting lost out there.
24       A.   Are you talking -- are all these OneWest
25   Bank?

Page 204

1            MR. MANCILLA: No.
2    BY MR. ICE:
3        Q.   No, they're not all OneWest Bank. But would
4    you agree that by holding off on filing the complaint
5    for a few days might reduce the number of lost note
6    counts because the note would show up at OneWest, or
7    whoever the servicer is?
8        A.   Yes, I agree.
9        Q.   So No. 14: Printout of the MAS INV1 for the
10   subject loan from the MSP Fidelity program.
11       A.   Did you get that? I should have highlighted
12   it. And that's MAS1 INV1.
13           (Thereupon, Defendants' Exhibit No. Z
14       was marked for identification.)
15   BY MR. ICE:
16       Q.   I'm handing you what's been marked as Exhibit
17   Z to your deposition and ask you to identify that
18   document.
19       A.   This is a screen print of the master file
20   that shows who the investor is for this loan, the
21   Machado loan.
22       Q.   I'm going to hand you what has been marked as
23   P14 to your deposition and ask you is that the same
24   document?
25       A.   It is, yes.

Censor & Associates
Reporting and Transcription, Inc.

31 (Pages 205 to 208)

Page 205

1      Q.   And the investor indicated on there is
2  Deutsche Bank?
3      A.   Yes.
4      Q.   What does HDR INDX stand for?
5      A.   I think that HDR means holder.  And index is
6  part of that full name.  The system can't hold the full
7  name, all of that.
8      Q.   And you say it's the full name of the trust.
9      A.   The trust.  So that INDX is a piece of the
10  full name.
11      Q.   Right.  And so it's 2006-AR4?
12      A.   Yes.
13      Q.   What is the address that's underneath that?
14      A.   I believe that is when this PSA, at the time
15  of the PSA of the loan that's under this agreement,
16  that's the address in the PSA document for the bank,
17  for Deutsche Bank.
18      Q.   Up at the top has MSP Loan Master Maintenance
19  & Display.  That's the name of this document or this
20  print, this screen?
21      A.   Yes.
22      Q.   Below that, type 13, what does that stand
23  for?
24      A.   It means that the first -- it kind of tells
25  you right there.  It's a first mortgage.  A one means

Page 206

1  first mortgage, three means conventional.
2      Q.   And W/O INS is without insurance?
3      A.   Yes.
4      Q.   Meaning it's not being escrowed for
5  insurance?
6      A.   No, I think that means no MI.
7      Q.   Mortgage insurance?
8      A.   Yes.
9      Q.   ARM, meaning it's an adjustable rate
10  mortgage?
11      A.   Yes.
12      Q.   What does group stand for?
13      A.   I don't know.  I don't think it's something
14  that we use, either.
15      Q.   What is INV1 on the next line?
16      A.   That is the sub-screen in the master
17  workstation.
18      Q.   INV and then the line below that?
19      A.   That's the investor code.  Right next to it
20  is the category code.  That is how, within the system,
21  that is how the sales are tagged.
22      Q.   Does 753 stand for Deutsche Bank?
23      A.   Probably.
24      Q.   And do you know what 665 in the category
25  stands for?

Page 207

1      A.   I don't know, but any loan that came up with
2  this would always come up with this as the investor.
3      Q.   Let me show you what's been marked as Exhibit
4  P15 to your deposition and ask you if recognize that?
5      A.   Yes, I do.
6      Q.   What is that?
7      A.   The Affidavit as to Amounts Due and Owing.
8      Q.   This appears to be the same one as you
9  signed, only the name is blank, correct?
10      A.   Yes.
11      Q.   Who fills in your name on the affidavit?
12      A.   The firm.
13      Q.   Okay.  So you would never have seen something
14  that looks like this with your name still blank?
15      A.   I know for sure I would never see any -- no,
16  I wouldn't ever see anything blank.
17      Q.   How does the attorney who is preparing this
18  know to fill it out for your name?
19      A.   Generally, because of the relationship, they
20  know that I'm the vice president of bankruptcy and
21  foreclosure and I would be the one answering rogs from
22  a bankruptcy or foreclosure contested matter.
23      Q.   Okay.  But that is the Affidavit of Amounts
24  Due and Owing.
25      A.   Sorry.  Same thing.  Because I am the vice

Page 208

1  president of bankruptcy and foreclosure, they know to
2  put my name down.
3      Q.   Didn't you tell us earlier that there's
4  several people in your department now who sign?
5      A.   Yes, there are now.
6      Q.   So how do they know to choose you over them
7  when they put their name in it?
8      A.   Well, they're always going to put my name,
9  and because my name is here, this would be one of the
10  documents I would always get, kind of like with the
11  Lost Note Affidavit, because they're going to put that
12  in before it gets to me.  So that's won't go to Roger
13  because it has my name in it.
14      Q.   So all the Affidavits as to Amounts Due and
15  Owing come to you?
16      A.   If my name is there, it's going to come to
17  me, yes.
18      Q.   Well, now back to how do they know to put
19  your name there?
20      A.   Because of the relationship we have.
21      Q.   So are you saying that all the Affidavits as
22  to Amounts Due and Owing prepared by Florida Default
23  would have your name on it?
24      A.   Most likely, except for -- there's an
25  exception.  If I'm on vacation, which I haven't had one

Censor & Associates
Reporting and Transcription, Inc.

Page 209

1   of those in two years -- that was off the record -- and
2   they know Roger's going to sign, then it will get to
3   the LPS folks with my name.  They're going to reject it
4   and tell the firm they need to put a different name in
5   because I'm out of the office.
6       Q.   If you turn further back in the pages that
7   are marked as Exhibit P15, do you see another copy of
8   Exhibit A to your notice of deposition duces tecum?
9       A.   Yes.
10      Q.   Have you seen that version before?
11      A.   I don't know.
12      Q.   By version, I mean do you see that somebody
13  made some markings on there?
14      A.   Okay.  I don't think I've seen anything with
15  markings on it before.
16      Q.   You didn't make those marks, correct?
17      A.   No.
18      Q.   And you don't know who did?
19      A.   No.
20      Q.   Do you know what NOD stands for?
21      A.   Notice of default.
22      Q.   Do you know why that's written next to No. 5?
23      A.   Whoever wrote it was probably thinking a
24  complaint was a notice of default, and that terminology
25  isn't true in the foreclosures in Florida, but in the

Page 210

1   foreclosures in California.
2       Q.   Take a look at P16, please.
3       A.   Yes.
4       Q.   That was produced along with all the other
5   documents?
6       A.   Yes.
7       Q.   Do you know what that is?
8       A.   Yes, this is the procedure, that I'm sure
9   you've read it, like where it says, do a total payoff
10  on pay 4, it's like the procedure of how to get the
11  figures for the Affidavit of Indebtedness or judgment
12  figures.
13      Q.   Is this instructions to your counsel?
14      A.   Oh, no, no, no.  This is instructions to --
15  it's not instructions to anyone.  It's the procedure.
16  It's saying, LPS, when we are ready for the firm to do
17  a judgment, pull down these screen prints for the firm.
18  I'm sorry.  Not even pull them down because it's
19  automatic.
20      As soon as we refer it, these screens that I've
21  given you automatically upload to LPS's system.  So
22  when is this dated?  This is probably a long time ago
23  before we automated that process.  So at one point they
24  may have been, maybe before my time, they may have been
25  actually going in and printing the screens.  That

Page 211

1   doesn't happen today.
2       Q.   Do you know why this was included in the
3   materials that were --
4       A.   No.
5       Q.   -- produced for your deposition?
6       A.   I don't know, unless it was some reference to
7   how the figures, how we come up with the figures.
8   That's the only thing I can think of.
9       Q.   No. Q, please.
10      A.   Okay.
11      Q.   This should be very similar to the Limited
12  Power of Attorney that you produced earlier --
13      A.   Yes.
14      Q.   -- giving IndyMac the right to sign on behalf
15  of Deutsche Bank, correct?
16      A.   Okay.
17      Q.   This particular one was recorded by Kahane &
18  Associates, not by Florida Default.
19      A.   Okay.
20      Q.   Can I see your version?  Yeah.  This one has
21  the highlighting.
22      I wanted to call your attention to the top of page
23  4, and I've highlighted the words, Nothing contained
24  herein shall, then it's a couple of things that jump to
25  No. 2, be construed to grant the servicer the power to

Page 212

1   initiate or defend any suit, litigation or proceeding
2   in the name of Deutsche Bank National Trust Company
3   except as specifically provided for herein.
4       A.   Okay.  Yes.
5       Q.   Going back to my earlier question, does this
6   refresh your recollection as to where the restriction
7   is that keeps IndyMac from filing in the name of
8   Deutsche Bank?
9       A.   Yes.
10      Q.   And that would be in the Limited Power of
11  Attorney that Deutsche Bank gives to IndyMac, correct?
12      A.   Yes.
13      Q.   And then when I turn back to page 8, I've
14  highlighted INDX 2006-AR4.
15      A.   Yeah, you see that category code, 665?  Right
16  here.
17      Q.   Right.  So this trust that you've identified
18  in your documents as being the owner, as being aware
19  that a note is securitized, is among those trusts for
20  which Deutsche Bank has given IndyMac Limited Power of
21  Attorney?
22      A.   Yes.
23      Q.   And that's all shown in Exhibit Q, correct?
24      A.   Yes.
25          MR. ICE:  All right.  May I confer with

## Page 213

1  my associate?
2      MR. MANCILLA:  Sure.
3      MR. ICE:  I think that's about it.
4      MR. MANCILLA:  I want her to read and
5  sign.  Do you want to enter into a
6  stipulation for the record?
7      MR. ICE:  We have agreed, because of the
8  late hour today, that there was a second
9  deposition scheduled in the IndyMac Federal
10  Bank, FSB vs. Monica DeBenedetti and others,
11  a second deposition of our deponent here in
12  this case, we have agreed that the questions
13  and answers in this deposition can be used in
14  the DeBenedetti case, and for the specific
15  purpose of shortening the deposition, that we
16  will now agree to take by phone at a later
17  date.
18      MR. MANCILLA:  Fine.
19      MR. ICE:  We're not waiving the right to
20  take the deposition.  We have some documents
21  that are specific to the DeBenedetti case,
22  but we will not ask all of the general
23  questions that were asked in this deposition
24  based on the stipulation that we'll be able
25  to use those in the DeBenendetti case.

## Page 214

1      MR. MANCILLA:  That's fine.
2      (Transcript order taken by Reporter.)
3      MR. ICE:  No, we want this.  Heck, she
4  came all the way down here, I want to see
5  every word.
6      MR. MANCILLA:  Copy, no extra.
7      MR. ICE:  All electronic.  No, no extra
8  exhibits.
9      MR. MANCILLA:  Yes, copy of exhibits.
10      (Thereupon, the foregoing proceedings
11  concluded at 6:45 p.m.)

## Page 215

C E R T I F I C A T E   O F   O A T H
STATE OF FLORIDA      )
                     ) ss
COUNTY OF PALM BEACH  )
    I, the undersigned authority, certify that
ERICA A. JOHNSON-SECK personally appeared before me on
the 9th day of July, 2009 and was duly sworn.

    WITNESS my hand and official seal this 16th
day of July, 2009.

_____
DEBORAH H. RODGERS, CSR
Notary Public, State of Florida
My Commission DD496368 Expires 1/22/10

## Page 216

C E R T I F I C A T E
STATE OF FLORIDA      )
                     ) ss
COUNTY OF PALM BEACH  )
    I, Deborah H. Rodgers, Certified Court Reporter
and Notary Public in and for the State of Florida at
Large, do hereby certify that I was authorized to and
did stenographically report the deposition of ERICA A.
JOHNSON-SECK; that a review of the transcript was
requested; and that the foregoing pages numbered 1
through 220 inclusive are a true and correct
transcription of my stenographic notes of said
deposition.
    I further certify that said deposition was taken
at the time and place hereinabove set forth and that
the taking of said deposition was commenced and
completed as hereinabove set out.
    I further certify that I am not an attorney or
counsel of any of the parties, nor am I a relative or
employee of any attorney or counsel of party connected
with the action, nor am I financially interested in the
action.
    DATED this 16th day of July, 2009.

_____
DEBORAH H. RODGERS, CSR
Notary Public, State of Florida
My Commission DD496368 Expires 1/22/10

Consor & Associates
Reporting and Transcription, Inc.

Page 217

```
1              ERRATA SHEET
2    Re:   IndyMac Federal Bank, FSB vs.
            Israel A. Machado, et al., etc.
3
4    Witness:  Erica A. Johnson-Seck

5    Date:    July 9, 2009

6    Reporter: Deborah H. Rodgers, CSR

7    PAGE  LINE      REMARKS
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21
22        _____
              Erica A. Johnson-Seck
23
24
25
```

Page 219

```
1    July 16, 2009
2    Ms. Erica A. Johnson-Seck
     c/o Joseph Mancilla,Jr., Esq.
3    Florida Default Law Group, P.L.
     9119 Corporate Lake Drive, Suite 300
4    Tampa, Florida 33634
5    Re: IndyMac Federal Bank, FSB vs.
          Israel A. Machado, et al., etc.
6
7    Dear Ms. Johnson-Seck:

8         Please take notice that on July 9th, 2009, you
     gave your deposition in the above-referred matter.  At
     that time, you did not waive signature.  It is now
9    necessary that you sign your deposition.
          Please call our office at the below-listed number
10   to schedule an appointment between the hours of 9 a.m.
     and 4:30 p.m., Monday through Friday.
11        If you do not read and sign the deposition within
     a reasonable time, the original, which has already been
12   forwarded to the ordering attorney, may be filed with
     the Clerk of the Court.  If you wish to waive your
13   signature, sign your name in the blank at the bottom of
     this letter and return it to us.
14
                    Very truly yours,
15
               _____
16             Deborah H. Rodgers, CSR
               Consor & Associates
17             1655 Palm Beach Lakes Boulevard
               Suite 500
18             West Palm Beach, Florida  33401
               561.682.0905
19
20   I do hereby waive my signature
               _____
21   Erica A. Johnson-Seck
22   cc via transcript:  Thomas E. Ice, Esq.
23   File copy
24
25
```

Page 218

```
1          C E R T I F I C A T E
2              - - - - - -
3    STATE OF FLORIDA      )
4    COUNTY OF PALM BEACH )

5
6         I HEREBY CERTIFY that I have read the
7    foregoing deposition by me given, and that the
8    statements contained herein are true and correct to the
9    best of my knowledge and belief, with the exception of
10   any corrections or notations made on the errata sheet,
11   if one was executed.
12
13        DATED this _____ day of_____, _____.
14
15
16        _____
            Erica A. Johnson-Seck
17
18
19
20
21
22
23
24
25
```

**A**

**abandoned** 196:7
**able** 156:20 164:9 183:11 213:24
**above-referred** 219:8
**absolutely** 146:19 198:2
**accept** 104:8 171:10,12,14
**accepting** 171:3 172:1
**access** 183:9
**account** 85:11 167:17,18 168:22,24 169:14,16 170:14,25 181:20 182:6
**accounting** 99:18 182:17
**accuracy** 109:23
**accurately** 141:23
**acknowledging** 127:13
**acquire** 148:22
**acquired** 121:6 121:9
**acronym** 184:3
**acted** 160:15
**acting** 97:8
**action** 94:12 97:22 123:7,11 123:14 124:8 124:11 128:16 128:20 160:16 170:15,18 171:17,18,21 172:5,9,11 192:9,17 194:25 195:4

195:11 198:14 199:7,8,10,16 199:23 200:1 201:16 202:2 216:20,21
**actions** 106:20 202:8
**active** 170:11
**actual** 126:18 130:22 181:17 184:12 185:7 188:6
**add** 123:5
**additional** 132:13
**address** 90:22 129:20 161:2 168:17 190:15 205:13,16
**addressing** 110:1 200:4
**adjustable** 165:17 206:9
**administration** 132:7
**admissions** 142:20,24 143:4,24
**admit** 107:10 143:11 144:3 146:11,20 147:3,12 148:4 148:6,12,15,22
**admitted** 147:9 147:18
**adopt** 194:7
**advance** 158:9 182:6
**advising** 144:18
**Aegis** 113:23
**affect** 195:15
**affiant** 90:25
**affidavit** 91:20 100:11 127:6 154:4,7 155:7

155:11,16 159:21 160:2,8 160:21,24 164:1,13,20 165:3,10,13 166:20,21 167:7 173:14 174:11,15 178:23 179:5 179:25 188:4 207:7,11,23 208:11 210:11
**Affidavits** 91:13 208:14,21
**agent** 95:18 97:8 118:10 124:12 157:14
**ago** 197:15 210:22
**agree** 95:9 97:15 116:5 127:5 129:3 130:5 131:1 137:18 137:21 140:13 141:22 143:20 144:7,7 145:1 147:5,17 204:4 204:8 213:16
**agreed** 213:7,12
**agreement** 89:23,24 100:4 103:21,23 107:20,22 108:16 109:11 109:15,19 110:20 201:3 205:15
**agreements** 105:2,8 107:24 108:10
**ahead** 88:9 123:24 132:6 167:9 174:2 179:8
**aimed** 132:13

**al** 217:2 219:5
**algorithm** 181:3
**ALIVE** 85:9
**allegation** 105:17,21
**allegations** 106:1
**alleged** 163:25 165:1
**allow** 101:24 102:6 171:3
**allows** 89:7,20
**alluded** 175:10
**ambiguous** 130:13
**amended** 129:7 134:10
**American** 184:2
**amount** 102:17 103:9
**Amounts** 164:2 164:13 165:3 207:7,23 208:14,22
**analysis** 104:8
**analyzed** 169:22 169:23,25
**and/or** 92:24 95:5 97:4 99:15 192:23
**answer** 90:23 91:8,18 92:22 92:23 93:1,5 95:4,8,9,10 97:15,18 101:4 101:6 105:24 106:19 108:9,9 109:11,17,18 109:20 122:11 122:18 123:24 124:1 133:17 133:21 134:7 134:15,18 135:1 143:21 144:24 148:24

149:1,9 150:21 153:11 166:22 189:20
**answering** 90:23 91:4 207:21
**answers** 89:5 91:11,15 92:7 92:8 96:10,25 109:24 124:17 134:5 150:14 166:17 203:11 213:13
**anybody** 137:23 145:2
**anyway** 124:6 158:1
**apart** 139:6
**apparently** 109:23
**appear** 114:3
**appearance** 166:22
**APPEARAN...** 86:1
**appeared** 215:5
**appears** 134:9 207:8
**applicable** 109:10,15,18
**application** 180:4
**applied** 182:5
**apply** 170:24 171:4
**appoint** 118:8
**appointed** 115:11
**appointment** 219:10
**appraisal** 189:8
**appraiser** 188:20 189:6
**approach** 106:16
**approached**

103:21
**approval** 91:16
91:22 123:11
**approved** 92:15
191:16
**approximately**
141:4
**April** 140:21
163:4,6 175:1
175:11,11,25
**areas** 176:5
181:7 195:17
**arguable** 202:4
**argue** 202:25
**argued** 202:6
**argument** 202:5
**ARM** 168:12
206:9
**arrangement**
172:18
**artful** 107:10
**aside** 163:22
**asked** 97:12
125:14 134:13
149:23,25
159:1 213:23
**asking** 148:1
173:16 191:2
198:19
**asks** 101:1 150:6
160:24 161:10
**assessed** 179:24
180:8 181:18
181:19
**asset** 89:22,23
99:19,23 100:1
100:18
**assets** 99:23
**assign** 123:7
198:25
**assigned** 121:15
121:17 129:17
**assignee** 120:13
120:18 121:3
121:15,20,25

122:7,14
160:15
**assignment** 94:4
94:7,13,20
111:4 113:12
114:1 118:15
120:13,19
127:6 128:10
132:14 134:1,4
134:9,16,20
135:24 136:5
143:3 144:16
144:17 145:9
145:10 149:13
149:15 151:9
152:6 153:24
198:21,22
199:4 201:12
201:20,21
203:5
**assignments**
139:2 195:9,13
202:11
**assignor** 119:18
**assistant** 115:12
115:17 117:3
118:3,9
**associate** 213:1
**associated** 105:3
**Associates** 85:23
211:18 219:16
**assume** 178:12
202:24
**assuming** 135:3
164:6
**assumption**
159:14
**assure** 120:12
**attach** 88:4
**attached** 115:8
134:9 136:20
151:9 154:19
158:25 188:6
**attend** 116:16
116:18

**attention** 211:22
**attorney** 90:8
99:9,21 101:3
136:13 142:15
144:2 163:7
191:14,16
193:18 200:22
203:2 207:17
211:12 212:11
212:21 216:17
216:19 219:12
**attorneys** 98:9
98:19 120:22
122:12,16
136:16 137:15
142:11 188:5
193:4,7,11
196:20,22
198:1,5,6
**attorney's** 110:2
140:15 170:22
**attorney-client**
102:23 105:25
107:18,22
108:14
**attorney-in-fact**
88:22 89:2
**August** 168:18
**Austin** 118:19
**authority** 88:20
88:21 89:1
101:9,9,17
102:9,11,14
104:19 109:16
111:18,20
112:23 114:22
115:16 117:2
125:3 215:4
**authorized**
115:13 116:6
118:10 119:7
157:14 216:6
**authorizing**
161:25
**automated**

210:23
**automatic**
210:19
**automatically**
210:21
**available** 190:11
**AVM** 190:13,23
**AVMs** 190:11
**avoided** 198:21
**AW** 85:3
**aware** 97:11
127:2 153:13
153:14 160:23
212:18
**a.m** 219:10

**B**

**B** 87:11 203:7
**back** 104:15
106:25 115:25
118:20,21
130:23 132:18
137:7 156:2
161:6 172:22
175:12 180:1
180:11 188:13
199:3 200:5,20
201:9 202:21
208:18 209:6
212:5,13
**backlogged**
197:20,21
**backup** 184:12
184:15 190:5
**bad** 200:18
**balance** 167:2
169:13,15
172:25 173:13
182:23
**bank** 85:4 88:23
88:24 89:2,6,8
89:8,25 92:5
93:1,5,6,7,11
93:16,17,19,22
94:1,2,12,14

94:19 95:11,12
95:19,20 96:21
97:20 98:13,21
99:1,12,24
100:1,14,15,19
101:7,23
104:22 105:13
105:18 110:14
111:5,21 112:3
112:10,10,14
112:17 113:13
114:11,24
115:9 121:8,17
121:20 123:1,9
123:11,12
124:18 125:1
126:22 128:15
129:18 132:9
132:11 137:15
138:11 139:8,8
139:8 140:10
140:23 141:5
141:17 142:1
154:4,8,11
155:1,6 159:24
160:10,16,18
160:18 161:21
162:2,3,9,12
162:16,17,18
162:18 163:3,4
163:5,6,10,24
164:25 165:12
178:17 191:25
192:4,10,19
193:9,23 196:8
196:9 198:15
199:21 200:7
200:19,24,25
201:13,18,19
202:17,19
203:3,25 204:3
205:2,16,17
206:22 211:15
212:2,8,11,20
213:10 217:2

219:5
**banking** 138:7
138:14,17
**bankruptcy**
156:12 158:3
182:16 185:23
186:9 197:3
207:20,22
208:1
**banks** 196:22
**Bank's** 160:5
196:9
**based** 152:12
159:11 172:17
195:24 201:24
213:24
**basically** 172:24
**basis** 172:1
**batch** 182:25
184:11,14
**Beach** 85:2,19
85:20,24,24
86:9 215:3
216:3 218:4
219:17,18
**beginning** 98:18
158:13 191:18
**behalf** 86:2,6
88:20,22 89:6
97:9 137:15
143:14 211:14
**belief** 218:9
**believe** 120:25
128:21 132:24
133:1 162:12
182:20 184:10
186:15,16
187:5 205:14
**belongs** 177:6
**below-listed**
219:9
**beneficial** 95:6,7
95:13,16 97:1
99:15 137:11
139:22 140:2

140:16 141:9
**best** 106:8 218:9
**Bethley** 160:11
**better** 104:8
180:10 188:22
**beyond** 110:2
**bid** 99:4 194:8
**big** 138:19
190:14 199:1
**bill** 170:7 181:17
181:18,18
182:21,21
183:21,22
185:7,9 194:4
194:5
**billing** 194:8
**bit** 121:1 130:17
**blank** 135:17
137:24 183:6
207:9,14,16
219:13
**block** 140:11
**blocks** 168:17
**board** 116:16
**bona** 103:22
**books** 99:19,23
99:23 100:18
100:22 163:23
164:25
**borrower**
103:23 106:11
106:14 168:16
169:15 171:12
171:23 172:4
172:15,19,22
175:23 176:25
176:25 180:6
186:4,6,7
196:7,7,10
**borrower's**
168:8 182:6
**bottom** 90:20
120:9 135:6,11
139:23,25
177:5 219:13

**bought** 89:24
**Boulevard**
85:19,24
219:17
**bounced** 169:5
**BPO** 182:21
187:17 188:7
188:21 189:1,4
190:6,6
**BPOs** 183:25
**break** 158:8,10
**brief** 158:12
**bring** 128:16
151:2 159:1
160:5 164:3
180:16,17
186:1 201:10
**broad** 196:25
**broker** 188:12
**broker's** 188:6,8
188:24 189:21
189:24
**Brothers** 140:6
140:18 141:1
141:25
**brought** 88:7
157:13 200:8
**Bufford** 157:5
**built** 193:24
**burnt** 185:25
**business** 89:23
182:17 190:22
193:7
**buttons** 169:8
**buy** 178:13

───────
**C**
───────
**C** 96:14,14
215:1,1 216:1
216:1 218:1,1
**CA** 85:3
**calculate** 174:12
176:1 179:23
**calculated**
178:25

**calculation**
103:5 104:1
180:20
**calculations**
175:8
**California** 194:9
195:24 196:16
210:1
**call** 111:18
168:16 190:23
200:12 211:22
219:9
**called** 135:8
182:4
**calls** 197:22
**campaigns**
186:5,6,10
**candidates**
115:8
**CAO** 132:7
**capacity** 118:10
**care** 144:12
**carved** 197:7
**case** 85:3 91:7
96:20 97:6,18
97:23,25 98:5
98:9,12,19
100:8 103:14
106:10,16
107:1,2,14
110:14 113:8
113:8,25 114:2
120:8 123:1
124:23 125:9
125:12 127:25
128:12 134:10
136:14 154:2,8
154:11,12
156:6 158:2
159:24,25
160:5,5,10,19
166:12,17,18
168:2 172:14
173:21 188:9
188:11 189:21

189:23 191:19
191:24 198:20
198:23,25
199:13 200:7,8
200:25 201:12
201:17 202:4,4
202:7 213:12
213:14,21,25
**cases** 103:16
104:17 105:13
105:16,20
106:1,22,22,25
107:11 125:14
150:1 189:25
198:3 201:4
203:9,18
**categorically**
99:25 199:18
**category** 206:20
206:24 212:15
**cause** 128:20
**cc** 219:22
**certain** 121:2
129:19 181:7
**certainly** 110:5
136:4 203:20
**CERTIFICA...**
87:5,6,8
**Certified** 216:4
**certify** 215:4
216:6,13,17
218:6
**certifying** 116:1
**cetera** 192:6,6
**chain** 120:21
**change** 169:9,10
175:8,15 176:9
176:10
**changed** 177:12
**charade** 123:18
**charge** 169:3
178:23 179:18
180:7,21 181:4
181:19 194:10
194:10

Censor & Associates
Reporting and Transcription, Inc.

charges 169:1 178:19,24 179:6,23 180:10,12
Chartered 112:10
cheaper 139:16
check 168:22 169:5 171:21
checked 165:15
checks 120:22
chief 132:7
choose 208:6
chosen 128:19
Christy 151:3
CIRCUIT 85:1 85:1
circumstances 102:21
citation 160:19
claim 85:9 106:14
CLAIMANTS 85:10
CLAIMING 85:7
clarification 144:11
clear 108:6,8 155:20 164:24 197:23
cleared 109:4
clearly 159:6
Clerk 219:12
client 102:23 144:19
client's 122:15 122:20
closest 89:16
code 168:12 170:19 177:5,5 181:6 182:22 184:11 206:19 206:20 212:15
coded 175:16

codes 182:10 183:1
COIF 184:20
coincidence 177:14
collected 163:1
collections 171:20
column 140:5
columns 183:14
come 89:16 115:25 143:17 145:18 156:20 158:23 175:18 201:25 207:2 208:15,16 211:7
comes 107:18 121:2 173:8 188:12
comfortable 134:18
commenced 216:15
comment 175:18
comments 157:1 189:6
Commission 215:13 216:24
committed 105:13,17
commonly 99:3
communication 107:23 155:16
companies 118:6 162:2 190:14
company 98:14 98:22 99:20 100:2,18,19 110:15 111:8 112:16 123:9 138:11 140:23 141:5 142:1

143:14 145:19 154:5,11
159:24 162:2 163:10 177:17 178:2,10 190:21,21 192:4 212:2
compel 108:7
complaint 130:22 134:10 148:24 163:25 165:2 203:2,6 204:4 209:24
complete 93:5
completed 94:13 187:4 189:13 216:16
completely 154:14
comply 156:5 159:15
Composite 162:20
compute 181:3
computed 180:12,15
computer 165:6 166:23 167:5
con 105:5
concern 106:14
concerned 105:24 154:25 198:2
concerning 163:24 165:1
concluded 214:11
conclusion 98:15 192:9
conducted 181:13
confer 212:25
confidential 150:20 152:20
confidentiality

105:2,8 107:21 108:10,19,20 152:12 153:9
confirm 130:21
conflict 160:14
confusing 147:21 148:20
connected 216:19
connecting 159:10
connection 133:1
consider 166:17
Consor 85:23 219:16
construed 211:25
contact 185:18 185:23 186:4
contacted 186:6
contained 211:23 218:8
contains 142:14
contend 99:14
contents 127:8
contested 125:16 166:17 200:23 201:2 207:22
continued 142:2
contract 186:15 193:6,9,11 194:1,3
contractors 186:17
contracts 193:4 193:8,14,17,19 193:20,23
control 150:19 152:19
controllable 197:1
conventional 168:11 206:1

conveyed 129:18
copy 88:3 112:25 114:12 118:21 155:22 161:14 163:18 164:7 167:20 181:15 209:7 214:6,9 219:23
corner 159:12 159:16
corporate 86:4 114:21,23 117:12 154:23 182:6 219:3
Corporation 113:23
correct 89:25 91:1,11 93:3 94:5 99:2,7 100:7 107:4,15 108:2,3 109:12 109:24 110:6 111:16,25 113:19,23 114:8,24 116:2 119:25 120:2 120:14 124:21 131:19,20 134:1 135:2,6 135:18,22 137:16 138:15 140:7 141:20 146:24 147:7,8 152:22 153:16 153:21,25 154:5 155:8 160:2,3 163:10 171:2 191:6,22 192:1,6,14,16 207:9 209:16 211:15 212:11 212:23 216:10 218:8
corrected 94:16

**corrections** 218:10
**correctly** 180:4
**correlating** 159:17 164:10
**corresponded** 159:7
**correspondence** 165:7 166:24
**corresponding** 164:14
**cost** 181:13 187:18
**costs** 172:11 200:23
**counsel** 90:24 108:13 110:13 155:14,17 159:9 161:1,7 161:7 168:2 191:21 192:25 195:21 210:13 216:18,19
**counsel's** 156:3
**count** 203:21
**counterintuitive** 197:24
**counterparts** 118:1
**country** 118:2
**counts** 203:18 204:6
**county** 85:2 107:4 215:3 216:3 218:4
**COUP** 170:1
**couple** 140:21 211:24
**coupon** 170:7
**course** 103:22 104:3 157:24 193:12 195:14 197:2
**court** 85:1 106:12,17,20

107:13 108:7 124:14,15,24 154:25 155:6 156:10,12,16 156:20 157:15 157:23 158:4 159:25 160:12 161:4 197:12 216:4 219:12
**courts** 197:20
**cover** 188:1,2
**covered** 110:24
**create** 128:19 176:15
**created** 139:1 183:23
**credit** 169:16 186:24
**credits** 180:9
**critique** 89:9
**crossed** 175:8 202:22 203:14
**CSR** 85:23 215:12 216:23 217:5 219:16
**current** 92:24 93:8,11 95:6 99:15,17 101:1 162:17 171:23 190:4,5
**currently** 192:12,20
**curriculum** 161:11,15
**custody** 150:18 152:19
**customer** 171:20
**cycle** 187:5
**C-T** 157:11
**C/A** 182:18
**c/o** 219:2

— **D** —

**D** 87:1 95:22

96:20 110:23 110:24
**damage** 169:17 169:19
**damp** 128:6
**dangerous** 122:10
**data** 121:2 164:15 175:1 176:2,25 177:10 183:8,9 183:12 194:15 194:16,23,23
**databased** 190:16
**date** 121:14,19 123:13 125:18 126:1,2,13,16 128:8,9,11,15 128:18,22 130:18,20 133:21,24,25 134:8,11 167:25 172:17 174:11 175:12 176:8,9 178:22 179:6 180:11 192:14 213:17 217:4
**dated** 135:17 159:23 160:9 163:3,5,6 201:21 210:22 216:22 218:13
**dates** 115:1 201:15
**date's** 175:17
**day** 98:21 99:10 110:17 119:14 174:25 184:14 215:6,9 216:22 218:13
**days** 175:24 187:5,8 195:5 195:6 196:1,2

198:10 204:5
**DDCH** 182:4,7 188:1
**DD496368** 215:13 216:24
**DEAD** 85:9
**deal** 100:5
**deals** 171:25
**Dear** 219:6
**DeBenedetti** 114:2 119:22 213:10,14,21
**DeBenendetti** 213:25
**Deborah** 85:23 215:12 216:4 216:23 217:5 219:16
**debt** 99:19,23 100:11 103:11
**December** 120:6 121:18 201:21
**decisions** 117:12 190:22
**declining** 108:9
**deed** 192:10 197:5,5
**default** 86:3 120:9,17 126:8 135:2,12,20,23 136:17 142:11 142:15 171:16 177:13,21 178:1 183:25 191:4,24 193:24 203:19 208:22 209:21 209:24 211:18 219:3
**default's** 192:18
**defend** 212:1
**defendants** 85:12 86:6 87:13,13,14,14 87:15,15,16,16

87:17,17 88:13 113:4 114:15 135:9 143:3 149:11,14 162:21 167:11 174:4 179:10 181:23 204:13
**DEFENDAN...** 85:8
**definition** 96:23 96:25 98:3 140:14
**definitions** 96:16,19
**delay** 195:12,14 197:3,4,7
**delays** 197:1,2 197:12,13
**delineated** 159:6
**delinquent** 170:20 171:14
**delivered** 119:19 137:12
**denied** 143:14 143:21 144:8 146:9,13,16 147:1 148:16 148:17,24
**deny** 145:19 148:6
**denying** 144:3
**department** 104:24 120:22 171:1 186:25 187:1 208:4
**depend** 190:19
**depends** 172:3
**depict** 180:5
**deponent** 160:8 162:1 213:11
**deponent's** 159:22 161:10
**deposing** 114:2
**deposition** 85:14 88:17 93:3

95:22 111:1
113:8 114:20
128:6 131:23
133:5 135:10
135:25 136:2
148:1 153:16
156:2,23
158:19,24
161:14 162:25
167:15 173:3
174:8,21 175:5
179:14,20
182:2 187:21
187:24 204:17
204:23 207:4
209:8 211:5
213:9,11,13,15
213:20,23
216:7,12,13,15
218:7 219:8,9
219:11
**describe** 134:8
**describing**
155:7
**description**
128:25 184:17
185:17
**desk** 180:14
188:20
**desktop** 188:20
191:8
**determination**
103:6
**determine** 104:1
109:23 172:25
**determined**
121:3,25
126:13
**determining**
190:8
**Deutsche** 93:6
93:11 95:11,20
98:13,21 99:1
99:12 100:1,14
100:15,19

101:7,23
110:14 123:8
123:11,12
124:18,25
138:11 140:23
141:4 142:1
154:4,8,11
155:6 159:24
160:5,18,18
162:2,9,16,17
162:18 163:3,5
163:9 192:4,10
199:6,14 200:7
200:9 205:2,17
206:22 211:15
212:2,8,11,20
**Deutsche's**
123:14
**developed** 178:4
**device** 139:13
**DEVISEES**
85:10
**dictate** 124:7
**dictates** 196:2
**difference**
133:15,19
174:23 188:2
201:5,7
**different** 91:19
102:9 121:1
142:3 162:15
172:7 176:11
177:12 179:3
195:17 200:4
202:12 209:4
**differentiate**
177:19
**difficult** 203:6
**digital** 165:7
166:24
**DIL** 197:5
**direct** 87:4
193:11
**directly** 112:8
121:2

**disbelieved**
158:4
**disbelieves**
156:13,18
157:15
**discovery**
136:13 149:25
**discussing** 163:8
**discussion** 157:7
194:20
**Display** 205:19
**disputing**
139:19
**doc** 135:6,11
138:24 142:11
**docket** 157:23
**docs** 202:10
**document** 88:2
88:18 89:7
90:17 91:3,11
91:15,25 92:12
93:17,24 95:24
96:4,15 111:3
112:1,22 113:9
114:10 115:3
118:23 120:9
121:4,11,25
122:25 123:4
123:15 126:18
129:25 131:23
132:25 133:2,2
133:7 135:8
136:8 142:6,13
143:4 153:15
154:10 155:13
158:20 165:16
167:8 168:6
174:9 179:15
179:21 182:3
185:6 188:25
191:13 192:24
202:15,16
203:3,4 204:18
204:24 205:16
205:19

**documenting**
140:14
**documents**
89:21 90:3
99:18 108:8
118:24 119:3,9
121:1,7 122:2
122:4 124:15
124:16 132:2
132:19 136:10
136:19 137:4
142:8 143:8
149:16 150:3,6
150:18,19,23
151:22 152:3
152:11,15,18
152:20 153:1,4
153:7 158:9
159:1,6,7,20
161:25 163:1
163:24 164:3,6
164:25 165:6
166:14,23
175:4 202:12
208:10 210:5
212:18 213:20
**doing** 102:18
106:7 111:10
111:23 115:20
176:1 185:20
199:10
**dollars** 194:10
**door** 186:3,7,11
186:22
**downloaded**
118:18 175:2
**drafted** 99:9
110:3 118:17
120:18
**drafting** 118:14
118:15
**Drive** 86:4 219:3
**drove** 186:20
**duces** 159:19
161:18 175:5

200:12 209:8
**due** 102:17
153:9 164:2,13
165:3,12
168:18 169:2,9
171:5 173:18
174:10 178:19
180:5 207:7,24
208:14,22
**duly** 157:14
215:6
**dummy** 176:16
**DUSTIN** 86:7
**duties** 116:13

**E**
**E** 86:7 87:1,11
110:25 111:1
115:21 118:16
125:22 135:25
215:1,1 216:1
216:1 218:1,1
219:22
**earlier** 111:15
133:8 134:14
160:1 163:8
208:3 211:12
212:5
**early** 123:13
**easier** 144:24
**eat** 200:25
**eating** 201:6
**effect** 90:7
102:16,17
172:3
**effective** 128:8
**efficient** 139:14
**effort** 132:21
134:3
**eight** 200:11
**either** 101:13
105:19 107:1
124:6 143:21
149:16 193:21
206:14

**electronic** 111:12,25 112:9,19 113:22 114:7 115:10 160:17 162:3 165:7 166:24 214:7
**employed** 191:3
**employee** 118:20 216:19
**employees** 115:8 117:8,24 118:5
**employment** 155:8 159:22 160:13
**encumbering** 129:19
**ended** 132:16,20
**endorsed** 137:12
**engaged** 154:22
**English** 130:6
**ensure** 120:17
**enter** 213:5
**entering** 183:8,9
**entire** 104:3,5 156:19
**entities** 92:24 95:5 138:7 199:9
**entitled** 97:10 98:5
**entitles** 97:3
**entity** 97:4,7,8,9 98:20 107:2 121:5 137:25 137:25 138:25 139:7,7,7 146:12 147:4 147:12,13 148:4
**entries** 165:6 166:23
**entry** 187:20
**equitable** 95:7 95:13,16 97:1

150:7 151:22
**Erica** 85:15 87:3 196:16 215:5 216:7 217:3,22 218:16 219:2 219:21
**errata** 87:7,8 217:1 218:10
**error** 199:19
**errors** 160:6
**ESC** 169:20
**escaped** 194:1
**escrow** 169:14 169:18,21
**escrowed** 206:4
**Esq** 86:3,7,7 219:2,22
**essentially** 195:20
**estate** 104:13
**et** 192:6,6 217:2 219:5
**evaluation** 190:21
**event** 102:1
**events** 134:11
**eventually** 98:11
**evidence** 89:21 150:6 151:21 152:15
**exact** 123:13
**exactly** 131:8 176:12
**Examination** 87:4
**examined** 164:1 165:2
**example** 200:7
**exception** 208:25 218:9
**excessive** 200:22
**exchange** 116:4
**excludes** 97:8
**execute** 89:21
**executed** 94:3

119:15,19 120:6 134:17 134:21 137:14 145:9 154:3,7 154:10 218:11
**executing** 120:13
**execution** 118:15 129:24
**exhibit** 87:13,14 87:14,15,15,16 87:16,17,17 88:4,11,13,17 95:22 96:14,14 96:14 110:23 111:1 113:3,4 113:8 114:14 114:15,19 115:21,24,25 118:16 125:22 128:6 131:21 131:22 133:4 133:10,11,14 133:14 135:10 135:25 136:2,7 142:5,18,20 149:11 153:15 156:22 158:19 158:25 159:9 161:13,18 162:5,20,21,25 163:2 164:17 167:10,11,14 174:3,4,8 179:9,10,14,20 181:22,23 182:1 187:21 187:24 191:6 204:13,16 207:3 209:7,8 212:23
**exhibits** 87:13 149:8 164:11 166:1 214:8,9
**exist** 160:14

**existed** 155:12
**exists** 162:12
**expectation** 194:2 195:3 198:9 200:16 201:1
**expectations** 194:2,25
**experience** 200:13 201:25
**experienced** 197:25
**Expires** 215:13 216:24
**explain** 104:11 189:6 198:24
**explaining** 160:12
**explanation** 128:22,23 199:2 201:11 203:8
**extent** 109:22
**extra** 214:6,7
**eyeball** 108:13
**eyes** 189:12

**F**

**F** 131:21,22 133:11,14 135:10 136:2 168:12,12 170:19,23 215:1,1 216:1 218:1
**face** 155:21
**fact** 92:11 99:3 110:14 111:7 115:20 119:17 138:9 197:19
**facts** 165:11
**failed** 109:24
**fair** 122:11
**false** 131:4,10 146:19

**familiar** 143:24 153:22 174:1
**Fannie** 124:10 194:6,7,7,8 195:22 196:15 199:6,20,23 200:11,20,21 200:23 201:1
**far** 93:2 106:4 180:1 198:1
**fast** 197:10,18 198:7
**fault** 195:16
**FBIF** 184:16,18
**FDIC** 88:20 89:9 102:6 140:9 141:17
**February** 156:2 160:10 169:10 174:13,18 187:13
**federal** 85:4 88:23 89:2,6,8 89:25 93:1,5,7 93:16 94:1,2 94:12,19 95:8 95:12,18 96:21 97:20 99:24 111:4,12 112:3 112:13 113:13 114:11,24 115:1,9 121:6 121:17,20 123:1 126:22 128:15 129:18 132:8,11 137:15 140:10 156:12 158:3 162:16 163:4 165:12 191:25 192:19 196:9 199:15 201:13 201:18,19 213:9 217:2 219:5

Ransor & Associates
Reporting and Transcription, Inc.

**Federally**
   112:10
**fee** 95:19 169:5
   184:16 195:23
**feel** 105:22
**fees** 169:4
   170:22 172:10
   179:2 182:5
   188:5 200:22
   200:24,25
**feet** 185:25
**fell** 195:8
**FFS** 184:3
**fictitious** 85:11
**fide** 103:22
**Fidelity** 177:11
   177:17,18,18
   204:10
**field** 183:21
   184:2 185:9
**FIFTEENTH**
   85:1
**figure** 92:4
   173:13,13
**figures** 165:15
   174:15 183:3
   210:11,12
   211:7,7
**file** 91:9 103:1,3
   106:19 107:14
   130:20 135:5
   135:11 136:25
   137:1 142:10
   172:8,16 181:6
   194:9 198:2,8
   198:11 203:1,6
   204:19 219:23
**filed** 93:18 106:2
   106:3,5,12,17
   106:23 107:1,1
   107:4,12,14
   121:7 127:25
   128:12 130:22
   136:13 166:18
   170:15 195:4,5

196:2,3,4
   198:10,23,25
   199:1,22
   201:12,16,17
   201:23 219:12
**files** 194:24
**filing** 148:23
   201:14 204:4
   212:7
**fill** 137:24
   207:18
**filled** 99:9 120:2
   120:3
**fills** 207:11
**final** 192:10
**financially**
   216:20
**find** 184:15
**fine** 157:4,5
   213:18 214:1
**firm** 118:22
   120:8,17
   130:21 173:10
   194:24 207:12
   209:4 210:16
   210:17
**firms** 118:17
   167:22,24
   175:2 193:8
   194:5,10 197:9
**first** 90:21 115:2
   115:4 125:19
   137:7 170:15
   170:18 172:4,5
   172:9 173:5
   184:2 188:16
   194:25 195:4
   195:10,13
   198:9,11,13,22
   201:16 205:24
   205:25 206:1
**FIS** 191:8,12,13
   193:14
**fix** 201:3
**flatout** 109:12

109:20
**flip** 189:11
**Florida** 85:2,20
   85:24 86:3,5,9
   105:10 120:9
   120:17 126:8
   135:2,12,20,23
   136:17 142:11
   142:15 172:6
   172:14 191:4
   191:24 193:24
   196:20 197:11
   197:14 199:1
   202:2 203:19
   208:22 209:25
   211:18 215:2
   215:13 216:2,5
   216:24 218:3
   219:3,4,18
**folks** 186:24
   209:3
**fooled** 175:20
**forced** 168:23
**forecast** 176:3
**foreclose** 122:15
   123:2,6,8,18
   123:19
**foreclosing**
   123:12
**foreclosure** 91:7
   97:22 98:15
   104:5,15
   106:23 118:6
   124:8 166:12
   168:3,13
   170:11,12,12
   170:13,13,16
   170:17,24,25
   171:2,7,10,11
   171:17,19
   172:2 178:6
   182:16 185:22
   186:9 188:9,11
   192:9,13 195:2
   195:3,21,24
**fun** 109:6

196:23 197:14
   207:21,22
   208:1
**foreclosures**
   209:25 210:1
**foregoing**
   214:10 216:9
   218:7
**form** 123:23
   191:8
**forth** 216:14
**forward** 97:7
   179:2
**forwarded**
   219:12
**four** 171:5 199:9
**fraud** 105:13,17
   155:1
**Freddie** 124:11
   156:15,21
   157:18,25
   194:6,7 195:22
   199:6
**free** 103:14
   202:25
**Friday** 219:10
**front** 124:24
**FS** 184:3
**FSB** 85:4 89:2,6
   89:25 93:1
   94:19 95:8,12
   99:24 112:10
   114:24 115:9
   121:17 123:2
   126:22 132:9
   140:10 160:10
   160:16 162:3
   163:24 165:1
   192:1 213:10
   217:2 219:5
**full** 101:9,16
   103:10 156:25
   177:20 205:6,6
   205:8,10
**fun** 109:6

**function** 139:5
**funds** 169:17
   170:25 171:3
**furnished**
   135:16
**further** 128:24
   209:6 216:13
   216:17
**future** 175:23

------

**G**

**G** 133:4,14
**general** 106:10
   185:23 213:22
**generally**
   196:25 200:14
   207:19
**generated** 188:3
   188:4 193:2
**getting** 106:25
   109:24 130:23
   132:13 134:4
   144:20 172:20
   197:9,17
   203:14,23
**give** 91:6 104:24
   115:16 118:12
   133:13 162:9
   190:16
**given** 116:4
   123:10 167:21
   176:25 210:21
   212:20 218:7
**gives** 160:18
   188:22 212:11
**giving** 88:19,21
   211:14
**gladly** 161:4
**go** 88:9 99:12
   102:6 103:25
   104:2,4 108:7
   110:23 121:11
   123:24 124:11
   132:6,18 140:1
   150:3 157:25

159:17 166:9
167:9 169:18
174:2 179:8
184:2,2,11
185:24 189:15
190:15 200:20
201:15 208:12
**goes** 123:20
172:22 180:1
187:8
**going** 88:10,16
90:14 91:6
97:16 98:20,25
99:12 100:19
106:15 108:22
108:23,25
109:17 110:11
113:3,7 122:12
122:16 131:21
140:21 158:8
158:18 159:4,8
159:14 162:24
166:19 170:21
171:1,14,24
172:7 173:22
174:7,20
175:23 176:18
179:13,19
180:7,10
187:23 190:2
196:16 197:19
199:3 200:2,20
200:24 201:9
202:11 204:22
208:8,11,16
209:2,3 210:25
212:5
**good** 122:18
158:7 200:17
**Google** 156:25
**gotten** 98:2
170:17 202:14
**governance**
116:24
**governed**

110:20
**GoZilla** 190:18
**grade** 188:16,16
**graded** 196:12
196:14
**grades** 195:17
**grant** 211:25
**granted** 90:7
**GRANTEES**
85:10
**grants** 89:5
**graphs** 189:1
**grass** 185:25
**gray** 199:25
**green** 168:7
175:17,17,18
176:4,5,8,11
176:19,22
180:3,18 183:7
183:10
**group** 86:3
120:10 126:9
135:2,21,24
136:17 142:12
142:16 189:10
189:12 191:4
191:25 203:19
206:12 219:3
**guess** 88:10
90:14 92:18,18
92:19 115:24
124:5 131:15
155:2 176:8
**guide** 196:11
199:10 200:1
**guideline** 194:6
199:11
**guides** 199:25
199:25

_____
**H**
**H** 85:23 87:11
136:7 215:1,12
216:4,23 217:5
219:16

**habit** 177:20
**half** 104:25
200:11
**hand** 88:16
95:21 113:7
118:20 131:22
158:18 161:13
162:24 167:14
174:7,20
179:13,19
182:1 187:23
203:4 204:22
215:8
**handing** 204:16
**handle** 200:19
**handling** 91:7
**hands** 88:2
167:8
**handwriting**
119:25
**hanger** 186:22
**happen** 172:9,10
197:15 200:2
202:8 203:9
211:1
**happened**
126:11 127:17
127:23 141:24
145:8 170:14
171:22 187:13
188:5
**happening**
172:12 197:14
203:13
**happens** 172:5
172:21 175:24
198:12,13
199:13,19,19
199:19
**hard** 175:16
189:11 194:23
**hats** 154:23
**have-to-happe...**
172:10
**hazard** 168:23

168:23
**HDR** 205:4,5
**head** 118:25
119:1 177:7
**headquartered**
117:19
**headquarters**
117:22
**hearing** 157:25
172:16
**Heck** 214:3
**HEIRS** 85:10
**held** 192:12,20
194:20
**help** 128:3
149:25
**hereinabove**
216:14,16
**high** 185:25
**highlighted**
204:11 211:23
212:14
**highlighting**
189:4 211:21
**history** 155:8
160:13 180:11
**hold** 128:2,2
139:5 164:22
172:2,13,16
173:20 205:6
**holder** 97:3
131:17 205:5
**holding** 204:4
**Holdings** 140:6
141:1
**hole** 115:4
**home** 175:24
196:10
**hour** 213:8
**hours** 219:10
**house** 98:21,23
98:25,25 99:11
185:24 189:15

_____
**I**

**Ice** 86:7,8 87:4
88:3,6,9,15
89:19 90:6,11
90:14,16 94:15
94:23 95:1
96:9,11 100:25
101:22,25
103:7 104:16
106:21 107:8
108:5,21,25
109:3,5 110:10
113:2,6 114:14
114:17 115:14
122:23,24
124:13 126:5
127:1 129:10
129:15 130:1,4
130:12,14
131:13,16
133:18 141:13
141:15 144:1
144:12,18,22
146:5,17,25
147:8,11,16,24
148:7,21
150:16 151:7
151:17,19
152:7 158:7,15
158:17 162:19
162:23 167:9
167:13 174:2,6
179:8,12
181:21,25
194:21 195:19
202:5,23 204:2
204:15 212:25
213:3,7,19
214:3,7 219:22
**ID** 135:6,11
142:11
**idea** 107:17
116:23 173:19
187:15 192:20
196:5 199:5
**ideal** 202:1

**identification**
88:14 113:5
114:16,18
162:22 167:12
174:5 179:11
181:24 204:14
**identified**
146:12,20,21
147:4,6 148:5
148:9,13
212:17
**identifies** 101:8
**identify** 88:18
92:23 95:5
99:16 101:1
109:8 163:1
164:9 167:15
173:3 174:9
179:14,21
182:2 185:6
187:25 204:17
**II** 85:16
**III** 157:6
**image** 168:1
**images** 165:7
166:24
**incarnations**
142:3
**incent** 198:5,6
**incented** 197:9
**incentive** 198:2
**include** 95:11
169:4 170:22
**included** 172:11
211:2
**includes** 189:24
200:17
**including** 90:5
101:9 134:10
**inclusive** 216:10
**incomplete**
95:10
**incorrect** 93:3,4
149:3 170:22
192:21

**indebtedness**
91:14,20 129:8
129:21 130:9
174:12 179:25
210:11
**independent**
188:24
**index** 205:5
**indicated** 205:1
**indicates** 143:2
**indication**
188:23
**INDIVIDUAL**
85:8
**industry** 196:12
200:14
**INDX** 205:4,9
212:14
**IndyMac** 85:4
88:22,24 89:2
89:6,8,8,25
93:1,5,7,16,16
93:22 94:1,2
94:12,14,19
95:8,12,18
96:21 97:20
99:24 104:22
107:2 111:4,11
111:12 112:2
112:10,12,13
112:14,17
113:13 114:3
114:11,24
115:1,9 121:6
121:17,20
122:13 123:1,1
123:20 124:23
126:22 128:14
129:18 132:8
132:11 137:15
140:10,17
141:24 142:1
157:13 160:4
160:10,15
161:7,21

162:16,18
163:4,9,24
164:25 165:12
178:13 191:25
192:18,21
193:18 196:8,9
198:14 199:15
199:21 201:13
201:18,19
211:14 212:7
212:11,20
213:9 217:2
219:5
**information**
119:4 122:2,4
122:5 125:4,8
125:17 132:13
134:3 139:20
141:8 177:1
180:22 182:13
183:14 186:1
194:13
**informational**
183:12
**initially** 139:1
**initials** 184:5
**initiate** 212:1
**ins** 138:20 206:2
**inspect** 186:12
187:14
**inspected**
187:10,11
**inspection** 184:9
184:16 185:1,8
185:12,17,18
185:24 186:10
187:4
**inspections**
181:13 184:1
185:22
**inspector**
187:11,14
**installment**
168:24
**instant** 160:16

**institutions**
138:14,18
**instruct** 98:10
**instructed**
191:24
**instruction**
192:12
**instructions**
96:16,18
210:13,14,15
**instrument**
119:19 127:14
**insurance**
168:20,23
169:24 206:2,5
206:7
**intended** 107:9
107:11 133:11
142:21 159:15
162:6
**intention** 151:11
**interest** 85:9
92:25 95:7,13
95:17 97:1,2,3
101:2 129:19
138:24 148:23
160:14 168:10
169:10 170:9
173:17 174:10
174:23 175:25
176:20 179:1
**interested**
193:17 216:20
**interesting**
141:16
**internal** 108:13
**interpretation**
90:9 130:25
143:16,17
**interrogatories**
89:1 90:5,23
91:4 92:7
96:17 97:1
100:10 124:17
133:10 134:5

135:9 136:1
**interrogatory**
89:5 91:5
132:12 134:16
**intervening**
195:13
**INV** 206:18
**invalidate** 171:1
171:11
**investor** 97:4
101:2 124:12
140:6,9,22,25
146:12,22,23
147:4,7 148:5
148:9 156:21
194:12 197:6
199:11 200:14
204:20 205:1
206:19 207:2
**investors** 101:2
124:7 199:16
**investor's** 124:9
**invoice** 183:23
184:1
**invoiced** 185:18
**invoicing** 183:23
**involve** 106:22
**involved** 108:12
116:24 163:14
**involvement**
193:3
**INV1** 204:9,12
206:15
**in-house** 155:14
156:3 161:7
**IR** 175:7
**Israel** 85:7
149:11 217:2
219:5
**issue** 109:25
155:14
**issued** 98:11
191:13
**issues** 180:3
**item** 159:10

160:20 184:12
195:6
**items** 132:20
202:21

_____
**J**

**J** 142:18
**James** 90:24
135:17,20
142:15
**January** 159:23
**job** 116:13
161:23
**Joe's** 202:5,25
**Johnson-Seck**
85:15 87:3
215:5 216:8
217:3,22
218:16 219:2,6
219:21
**Johnson-Sect**
157:9
**Joseph** 86:3
219:2
**jotted** 159:11
**JR** 86:3
**judge** 90:15
131:15 153:18
154:3,12,21
155:19 157:3
158:2,4 159:22
160:9,24,25
161:3
**judgment** 98:11
99:4 210:11,17
**judicial** 85:1
197:11
**July** 85:19 215:6
215:9 216:22
217:4 219:1,7
**jump** 143:8
211:24
**June** 123:13

_____
**K**

**K** 149:8,13
150:10,12
**Kahane** 211:17
**keep** 97:5,21,24
98:4 104:14
122:3 139:3
159:5 196:10
**keeps** 120:23
212:7
**kept** 163:24
164:25 177:10
**kind** 96:4 102:2
103:19 118:12
127:19 155:15
158:10 159:5
168:9 170:4
171:25 172:20
175:10 176:7
179:6 186:8
190:16 195:17
196:18 200:4
203:11 205:24
208:10
**knew** 99:10
110:5,17,18,18
136:4 157:24
186:3
**knock** 186:3,11
**knockers** 186:7
**know** 89:11
90:13 92:17
94:6,8,14 96:2
98:1,19,19
99:25 100:6,7
100:11,13,21
100:21,24
101:3,21 102:5
103:15,19
105:23 108:15
110:8,12
117:14,17,19
117:24 118:1
118:11,13
120:3,5,16,20
120:21,25

121:5,10,10,11
121:12,13,14
121:24 122:1,9
122:9,9,16,19
124:1 126:3,4
126:6,7,10,12
126:13,24,25
127:4 129:5
130:10 131:4
131:13 132:16
135:3,4 137:21
138:13,19,21
138:25 143:22
144:14 145:7
146:1,4,4,6
151:15 152:2,5
152:11 153:4,7
154:21 156:7,9
157:21 159:17
160:6 170:2
171:17,24
172:6 175:23
176:1,20 177:2
177:5,9 182:8
182:14,15
184:10,19,21
184:23,23
185:2,4 186:11
186:19 189:12
189:13 190:25
193:1 194:4,15
194:16 197:19
197:20 198:12
201:2,2 202:2
202:3 203:12
203:15,16
206:13,24
207:1,15,18,20
208:1,6,18
209:2,11,18,20
209:22 210:7
211:2,6
**knowing** 97:14
**knowledge**
127:22 134:15

146:14,15
157:24 165:11
165:14 218:9
**known** 85:9
108:2,16 136:4
**knows** 98:20
186:7

_____
**L**

**L** 149:8,11
150:10,12
182:11
**Lake** 86:4 219:3
**Lakes** 85:19,24
219:17
**language** 147:19
**Large** 216:6
**late** 169:1,3
178:19,23,24
179:2,6,17,23
180:7,9,12,21
181:3 213:8
**law** 86:3 120:10
120:16 126:8
135:2,21,23
136:17 142:12
142:16 191:4
191:25 193:24
198:12 202:1
203:19 219:3
**laws** 195:25
**lawsuit** 106:20
199:13,14,14
200:16,19
201:23
**lawyer** 145:23
146:7
**LC** 169:3
**lead** 131:6
**leave** 186:7
**left** 133:21,24
171:17
**left-hand** 159:12
**legal** 86:8 90:15
92:24,25 93:8

93:11 99:15
102:8,12 123:7
128:24 129:20
170:15,18
171:21 172:5,9
193:20 194:25
195:4,10 198:9
198:11,13
201:16
**legalese** 144:21
**Lehman** 140:6
140:18 141:1
141:25
**lender** 97:4
138:1 140:18
141:25 177:21
**letter** 110:12,13
219:13
**let's** 88:9 90:20
90:21 98:8
99:14 108:10
110:23,25
131:21 136:7
139:18 142:18
147:25 149:8
159:19 162:19
167:9 173:21
174:2 179:8
181:21 184:24
184:24 185:5
196:19 197:21
**license** 178:14
**licensed** 178:15
178:17
**lieu** 197:5,5
**limit** 109:16
**limited** 90:8
134:11 163:7
211:11 212:10
212:20
**line** 115:2
125:19,23
137:10 140:21
184:12 188:17
195:6 197:8

Censor & Associates
Reporting and Transcription, Inc.

206:15,18
217:7
**lines** 183:6
196:11,13,15
196:17
**list** 99:18 115:8
159:5,20
163:14
**listed** 120:9
**lists** 159:1 162:1
**litigated** 103:2,3
103:14,16
105:6 106:1
**litigation** 104:23
163:14 200:23
212:1
**little** 121:1
130:17
**LN** 171:6
**loan** 95:19 100:4
100:5,12,13
101:3 102:5,15
103:10 109:9
109:17 110:14
110:17 121:13
124:18 137:2
141:18,24
156:21 167:16
168:9,13,18
169:23 170:11
170:11,19,24
171:4,5,6,18
171:22,23
179:24 180:9
180:15,19,19
194:7 197:4
199:21,21
200:17,22
202:9 204:10
204:20,21
205:15,18
207:1
**loans** 121:9
185:22
**local** 186:13

**located** 117:15
**long** 113:16
129:16 130:7
202:20,20
210:22
**longer** 195:25
196:1
**look** 90:21 99:14
104:2 121:13
125:7,18 128:4
133:4,7,13
135:14 136:7
139:18,21
140:5 142:5,18
143:9 149:8
150:5 156:22
161:11 162:5
163:13 164:11
165:18 173:2
173:19 174:1
176:12 184:12
185:5 196:11
201:15 210:2
**looked** 109:22
151:20 167:6
**looking** 119:22
121:22 161:23
193:25
**looks** 120:4
142:13 162:8
167:18 173:9
207:14
**loose** 199:25
**loss** 102:5,7,10
102:11,12
171:20 186:6,8
199:12,12
**losses** 104:2
**lost** 144:21
192:25 203:17
203:20,23
204:5 208:11
**lot** 150:1 198:19
202:8
**lots** 188:4

**lottery** 203:11
**LPOA** 88:19
163:3,4,6,12
163:12
**LPS** 118:6,18,20
120:22 132:18
132:25 133:1
177:12,12,20
177:23 183:23
183:25 185:9
186:13 191:11
191:14 193:7
193:14,20,21
209:3 210:16
**LPS's** 210:21
**LTE1** 181:5

─────────

**M**

**M** 85:7 153:15
**Mac** 156:15,21
157:18,25
195:22
**Machado** 85:7,7
96:21 113:8
149:12 167:16
204:21 217:2
219:5
**Machado's**
149:12
**Mae** 194:8
195:22 196:15
199:20 200:11
200:20,22,23
**Mae's** 194:8
199:23 201:1
**mail** 135:17
**mails** 118:21
**Maintenance**
186:16 205:18
**major** 138:14
**making** 165:9
167:1 171:1,2
181:12 187:17
191:3
**MAN** 168:12

170:19
**manage** 102:10
104:23 186:17
187:7 189:9
**management**
118:18
**manager** 118:9
176:23
**MANCILLA**
86:3 89:11
90:4,9,12 94:8
94:21 96:7
100:20 101:14
101:18 102:25
103:15 104:11
106:7 107:5
108:4,18 109:2
110:7 115:6
122:18,21
123:23 124:3
126:3,24 129:5
129:11,23
130:3,10,13
131:9 133:16
141:12 143:23
144:10,14
145:23 146:3
146:14,22,24
147:2,10,14,20
148:18 150:13
151:5,14 152:5
158:11 202:6
204:1 213:2,4
213:18 214:1,6
214:9
**Mancilla,Jr**
219:2
**manipulate**
183:11
**manipulated**
176:6,24 177:1
**Maraj** 159:24
160:18
**March** 140:2,19
141:17 161:6

174:24 185:12
**mark** 88:9,10
114:14 162:19
167:9 174:2
179:8 181:21
**marked** 88:14
88:16 95:21
111:1 113:3,5
113:7 114:16
114:19 131:22
135:10 158:18
159:9 161:13
162:22,25
167:12,14
173:2 174:5,7
174:20 179:11
179:13,19
181:24 182:1
187:23 204:14
204:16,22
207:3 209:7
**market** 104:6
188:23
**marketed** 197:6
**markings**
209:13,15
**marks** 209:16
**MAS** 204:9
**master** 181:6
204:19 205:18
206:16
**MAS1** 181:5,5,5
204:12
**match** 175:19
**matches** 173:13
175:14
**materials** 165:8
166:25 173:16
181:11 187:16
211:3
**matter** 99:22
194:11 197:18
207:22 219:8
**maximum** 194:8
**MB** 85:3

Censor & Associates
Reporting and Transcription, Inc.

**mean** 89:14 96:4
98:1 102:25
103:2,14 106:8
106:9 122:2
127:18 129:14
130:17 131:9
137:1,22
143:16 155:3
157:25 161:23
168:6 175:9,21
176:7 179:22
189:10 190:10
190:11,21
192:8 199:8,18
199:22 201:24
203:5,6,12
209:12
**meaning** 122:13
130:7 171:13
176:8 185:24
206:4,9
**means** 97:2
120:5 130:10
137:11,21
143:20,25
168:12 170:16
175:14 181:5
184:3,8,21
190:8 205:5,24
205:25 206:1,6
**meant** 97:12,15
102:4
**mediations**
197:13
**mediator** 197:22
**mediators**
197:21
**meetings** 116:16
116:18
**member** 115:9
137:12,22,22
138:9,12
**members** 138:5
138:15
**membership**

138:3
**memory** 154:14
**mentioned**
194:13 201:4
**mere** 177:14
**MERS** 111:4,7
111:16,19,21
112:4,20,24
113:12 114:22
115:11,13,18
115:22 116:5
116:11,14,16
116:18,20,22
116:25 117:7,8
117:12,14
118:2,8,12
120:23,25
121:2,4,4,7,8
121:11,12,14
121:16 122:2,3
122:4,5,10
123:6,7 125:4
126:21 127:3
127:14 129:17
131:7,10,17
136:25 137:25
138:2,9,12,15
138:20 141:8
143:11,17
144:3,15 145:1
145:4,7,14,19
146:12,18
147:5 148:5,10
150:8 151:5,6
151:13 152:16
152:24 153:25
162:4,8 192:16
192:18 199:3,4
199:5 200:2
201:20,21
**met** 156:1
**MI** 206:6
**middle** 119:18
**midway** 137:8
**milestones**

139:18
**mind** 172:6
198:18
**mindset** 197:17
**Minnesota**
118:19,21
**miscellaneous**
169:6
**missing** 162:9
166:3
**misunderstood**
146:7
**mit** 102:7,10,11
102:12 171:20
186:6,9
**mitigation** 102:5
**MO** 170:3
**model** 102:6
**modification**
197:4
**modify** 109:16
**Monday** 219:10
**money** 99:11
165:11
**Monica** 213:10
**month** 104:25
170:3,4 187:10
187:13,15
195:7
**monthly** 170:5
**months** 169:24
171:5,15 197:7
197:16
**mortgage** 93:1
95:8,14 101:2
109:11 110:5
111:7,12,24
112:9,19
113:12,21
114:7 115:10
118:16 120:14
120:24 123:20
123:22 126:15
126:17,18,22
127:3 128:10

128:25 129:19
130:9 132:14
134:9,13,16,20
136:5 137:1
139:6,11 143:3
143:12,18
144:5 145:9,11
145:15,20
148:23 149:13
149:15 150:7
151:10 152:16
152:24 153:25
160:17 162:3
180:25 192:12
192:15,20
198:25 199:4
201:12 203:5
205:25 206:1,7
206:10
**mortgagee**
93:17,22 94:3
94:19 128:15
150:8 201:14
203:1
**motion** 157:14
166:18
**move** 110:25
131:21
**MSP** 177:11,17
177:19 204:10
205:18
**multiple** 175:7
**mumble** 144:13

——— N ———

**N** 87:1 156:22
**name** 90:22
91:15 98:13
99:1 113:18,21
114:3,4 116:1
122:13 123:2,6
123:8,11,12,14
123:14,18,19
124:8,9 132:25
157:1 160:5

163:9 168:8
177:9,12
185:14 191:22
191:25 192:10
192:13,15,18
199:7,10,17,23
200:1,8,15
201:10,19
202:2 205:6,7
205:8,10,19
207:9,11,14,18
208:2,7,8,9,13
208:16,19,23
209:3,4 212:2
212:7 219:13
**NAMED** 85:8
**names** 85:11
177:14 199:9
**narrow** 196:19
**National** 98:13
98:21 100:2,19
110:15 123:9
138:11 140:23
141:5 142:1
154:4,11
159:24 162:2
163:10 192:4
192:11 212:2
**Nationwide**
186:16
**near** 114:3
**necessarily**
106:18,19
**necessary** 219:9
**need** 131:6
201:15 203:1,1
203:7 209:4
**needed** 90:3,4
128:15
**Neena** 85:7
149:12
**negative** 169:14
**negotiated**
107:13
**negotiating**

193:3
net 103:4,20,25
network 191:16
  193:5
never 101:20
  117:21 124:14
  124:15 131:17
  131:18 133:16
  145:1,4 148:15
  152:23 154:10
  155:11,22
  156:4,4 207:13
  207:15
new 123:15
  140:6,22
  141:18 153:18
  157:15 159:25
  160:11,11
  169:9 183:22
  184:1 195:11
nine 197:16
nitty-gritty
  138:22
NIV 183:22
NOD 209:20
Nods 118:25
nominee 113:22
noncontrollable
  197:2,3,3,7
Nope 160:25
normal 147:19
  183:10 186:9
  195:2
normally 103:11
  103:12
Notaries 120:4
notarize 118:19
notarized
  119:10,13
notarizes 127:10
Notary 119:11
  120:2 127:10
  215:13 216:5
  216:24
notations

218:10
note 92:25 93:9
  93:12 95:7,13
  97:2,5 98:5,7
  99:6,11,16,19
  99:22 100:1
  101:10 122:7
  123:3,19,21
  124:18 129:1,4
  129:8,21 130:8
  130:24,25
  131:1,7,12,18
  131:19 134:12
  137:11 139:6,6
  140:17 141:7
  143:12,18
  144:4,16 145:4
  145:5,20
  157:15,19,21
  165:17 167:2
  180:23 192:25
  203:17,20
  204:5,6 208:11
  212:19
notes 139:14
  203:22 216:11
notice 159:20
  170:19 175:7
  209:8,21,24
  219:7
notices 170:20
NOTIFICATI...
  87:9
November
  119:21 125:20
  126:1,11,23
  127:17,23
  128:1,3,11,18
  129:4 130:2,8
  133:25 134:8
  143:13,19
  144:5 150:9
  151:23 152:17
  173:6,7 178:24
  179:18 191:11

201:17 202:19
number 87:12
  135:6,6,11,11
  142:10,11
  159:11,15
  168:9 175:14
  175:14 177:5
  178:25 180:19
  204:5 219:9
numbered 216:9
numbers 167:6
  168:6,13,15,16
  183:1,2,18,18

—————
O
—————
O 158:19 215:1
  215:1
oath 87:5 127:11
  127:19
object 147:22
  200:7
objected 99:21
  101:3
Objection
  123:23
objections
  153:10
occasion 103:9
occupied 185:14
  186:2,3
occurred 134:11
October 163:5
offer 103:4
  203:12
office 119:11
  186:13 209:5
  219:9
officer 111:15
  111:19,20
  127:14 132:7
  145:7 154:4,10
  156:15
officers 116:2
offices 117:14
  117:17

official 215:8
off-the-record
  194:19
oh 88:7 110:23
  135:7 151:11
  152:9 155:4
  186:21 210:14
okay 90:21
  91:24 92:1
  95:3,21,23
  97:17 107:21
  107:24 108:20
  109:4 111:10
  112:8,23
  115:15 119:9
  121:23 127:8
  127:16 128:7
  129:6 130:12
  130:19,23
  131:25 132:16
  133:12 135:7
  137:9 139:24
  142:5,22 143:7
  144:6,20,25
  145:22 146:6
  147:14,17
  148:3,25 149:5
  149:8 150:5,15
  150:15,17
  151:11 152:11
  154:15 155:4,5
  155:6,24
  156:16 157:6
  158:2,16,25
  159:4,13,18
  161:6 162:14
  162:15,24
  163:21 164:16
  165:16,25
  167:9 168:1
  169:12 171:6
  172:23 173:2
  174:13 175:3
  175:10 177:9
  187:16 188:14

188:18 191:6
  191:21 194:22
  196:21 199:5
  200:4 207:13
  207:23 209:14
  211:10,16,19
  212:4
old 140:9,25
  183:7
once 109:20
  113:18 142:10
  169:24 187:15
  195:1 198:11
ones 105:6
  107:12 108:12
  162:15 182:17
OneWest 89:23
  89:24 93:19
  98:22 100:2,16
  100:17 107:2
  111:11,21
  112:12 114:24
  114:25 121:6,8
  122:13 124:24
  138:7,9 141:17
  163:6,9 171:9
  178:17 193:12
  193:18,23
  196:9,22
  198:15,17
  200:24,25
  201:6 202:17
  202:19 203:24
  204:3,6
one's 196:12
open 159:5
operated 138:17
opinion 153:18
  155:19 156:13
  156:17,23
  158:4 160:11
  160:23 188:7,8
  188:24 189:21
  189:24
opposed 93:16

Censor & Associates
Reporting and Transcription, Inc.

107:22 118:9
**opposite** 197:19
**order** 104:14
128:16,19
158:23 159:23
160:9 183:25
185:22 187:5,8
188:8,10,21
189:21,23
202:10 214:2
**ordered** 155:6
181:19 185:1
187:3 188:15
**ordering** 219:12
**orders** 187:6,12
**organization**
138:3
**original** 118:22
140:17,18
141:24 142:24
150:7 180:23
200:5 201:9
202:10 219:11
**originally**
202:17
**outcome** 172:18
**outs** 138:20
**outside** 98:6
107:13 119:11
186:10 195:8
196:17
**outsource**
177:13,17,21
191:9
**overlapped**
187:12
**oversight**
196:18
**owing** 164:2,14
165:4,12
173:18 174:11
178:20 207:7
207:24 208:15
208:22
**owned** 95:20

104:13 138:17
177:23 178:1,6
**owner** 93:8,11
99:6,15 120:24
122:7,8 123:3
123:19,20,21
124:17,18,25
131:17 157:15
157:18 182:17
212:18
**owners** 92:24
95:6
**ownership** 97:2
137:11 140:16
**owns** 100:12,13
110:13 157:21
182:17

---

**P**

**P** 159:9 161:13
164:17
**package** 192:15
**page** 87:2,12
94:17 116:1
135:14 137:7
139:19 157:6
173:5 211:22
212:13 217:7
**pages** 85:17
173:9 209:6
216:9
**paid** 116:11
122:21 168:22
168:25 170:8
180:9 182:21
182:23 183:21
183:22 184:17
**Palm** 85:2,19,20
85:24,24 86:9
215:3 216:3
218:4 219:17
219:18
**paperwork**
121:6
**paragraph**

89:13,14,15,20
157:7 164:2
165:13
**part** 100:23
140:10,15
155:1 159:19
173:9 201:3
205:6
**participate** 91:4
149:19
**particular** 92:12
113:25 137:4
180:19 184:5
195:6 202:4,7
211:17
**particularly**
157:20
**parties** 85:7,9
85:11 216:18
**party** 193:9
216:19
**pass** 132:19
**passed** 141:25
**paths** 202:12
**pause** 158:12
**pay** 173:23,23
173:24 174:22
175:24 176:6
176:13 179:16
180:7 183:24
190:2 210:10
**payee** 182:18
**paying** 188:5
200:22
**payment** 167:18
168:19,19,21
169:8,9,10
171:15,16
172:4,4,15,18
172:18,19,20
172:22 180:6
180:21 197:4
**payments**
171:10,12
172:1

**payoff** 173:5,22
175:22 176:16
176:18 210:9
**pays** 182:20
**PCIP** 184:22
**peers** 132:5
**pending** 169:8
**penny** 180:5
**people** 92:20
103:17 208:4
**percent** 100:24
105:9 188:14
195:7 196:17
203:9,20,22
**percentage**
180:15,20
**perfect** 141:20
**periods** 175:8
**permission**
89:17 102:2
**permitted** 160:4
**person** 90:22
97:4,7,9
104:19 119:7
165:15 175:14
182:20 184:6
185:3
**personal** 127:22
165:10,14
**personally** 91:5
91:10,12 119:3
125:6 164:1,19
165:2,8 166:25
167:3 173:19
178:18 181:11
215:5
**persons** 92:23
95:5 101:8
**perspective**
102:5,8,9,12
102:13 196:9
**phone** 85:25
168:15,16
176:17 213:16
**physical** 126:15

126:17 152:16
152:23
**physically**
143:11,18
144:4 145:2,5
145:11,15,19
189:15
**pick** 171:16
180:8 185:2
**pictures** 189:1
189:18
**piece** 205:9
**place** 126:16
127:20 158:7
171:3 172:20
201:13,23
216:14
**placed** 168:23
**plain** 130:5,6
**plaintiff** 85:5
86:2 90:24
122:14 128:14
128:20 134:15
134:17,24
143:12,19
144:5 146:11
146:20 147:3
147:11,12
148:4,9,12,22
150:8 152:17
191:3
**plaintiff's** 135:8
149:13 150:18
152:18
**plan** 171:13,16
172:5,15,18,20
197:4
**pleading** 107:13
136:12
**pleadings**
124:23
**please** 88:18
92:23 95:5
99:16 101:1
109:8,14 134:7

147:19 148:7
159:17 182:3
210:2 211:9
219:7,9
**plus** 197:15
**point** 89:4 98:2
124:22 171:9
172:12 178:8
196:3,3 210:23
**Pooling** 100:4
109:10,15,18
110:19,19
**position** 153:8
**possession** 85:11
150:18 152:19
153:8
**possible** 198:3
202:1
**postpone** 172:17
**Post-it** 92:1
**power** 89:5 90:8
163:7 211:12
211:25 212:10
212:20
**powers** 90:7
163:19
**predated** 166:21
**premarked**
88:11
**prep** 133:3
202:11
**preparation**
118:24 165:3,9
167:1 181:12
187:17
**prepared** 89:9
120:8 121:11
126:9 135:1,24
136:1 145:21
208:22
**preparing**
207:17
**pres** 186:25
187:2 190:20
**present** 103:5

104:1 157:22
**presented** 103:3
**preservation**
186:18 187:2
**president**
111:11,23,24
112:2,4,16,20
113:19 114:7
114:10 115:17
115:21 116:5
116:13,20,22
118:8 132:8,11
134:23 153:25
160:15,16
162:1 207:20
208:1
**presumably**
108:1 161:1
**pretending**
123:21
**pretty** 155:20
**previous** 200:13
**previously**
159:8
**price** 188:7,8
189:21,24
**principal** 101:10
101:20,24
102:2,7,15
167:1 169:13
170:8 172:25
173:12 179:1
**print** 176:18
180:13 183:13
204:19 205:20
**printed** 173:6
175:11 177:4
**printing** 120:4
210:25
**printout** 178:21
181:8 204:9
**prints** 164:14
165:22 210:17
**prior** 148:23
195:10

**privilege** 102:24
105:25 107:18
152:12 153:9
**privileged**
108:14 150:20
152:20
**probably** 104:23
104:24,25
105:9 164:7
167:25 192:22
206:23 209:23
210:22
**problem** 179:24
199:1
**problematic**
198:20
**procedure** 92:6
118:14 210:8
210:10,15
**proceed** 195:11
**proceeding**
212:1
**proceedings**
158:13 214:10
**proceeds** 97:5,7
97:10,21 98:4
98:6,23 99:11
**process** 91:19
104:3,5,10
118:18 170:12
170:23 171:10
171:11 187:7
195:2,18,21
196:5,24
197:10,18
202:20 210:23
**processes** 172:8
203:13
**Processing**
177:22
**produce** 155:7
155:12,16
**produced**
150:19,23
151:8 152:3,8

152:19 164:18
166:14 210:4
211:5,12
**producing** 153:5
**product** 150:20
152:13,21
153:10
**production**
99:17 108:7
149:12,14
**program** 177:10
177:23 178:4
178:11,13
204:10
**prohibit** 163:11
**prohibits** 163:8
**projected** 179:2
**promissory**
92:25 93:9,12
95:7,13 97:2,5
98:4,7 99:16
99:19,22
101:10 134:12
137:11
**prop** 186:25
187:2 190:20
**proper** 120:18
120:24
**property** 89:15
98:11,13 104:7
104:15 121:15
122:15,20
129:20 139:4
168:16 169:17
169:19 181:13
184:1 185:7,11
185:17,21,23
186:2,9,12,17
186:20 187:2,4
187:10,11,14
187:14 188:22
190:15,17
196:6,8 197:6
**proprietary**
193:16

**protection**
199:17
**provide** 91:10
146:8 149:25
161:5
**provided** 158:9
159:5,9,22
160:9 161:17
168:2 173:10
175:4,4 188:2
212:3
**provider** 178:7
**provides** 88:25
163:20
**providing**
149:19
**provision** 89:4
**PSA** 124:10
163:11 205:14
205:15,16
**public** 106:2
107:3,15
156:17 157:23
215:13 216:5
216:24
**pull** 121:12
125:17 190:5
210:17,18
**pulled** 115:1
167:21 169:2
169:14,15
174:25,25
175:15 191:10
200:15
**punch** 115:5
**purchase** 89:23
89:24
**purpose** 122:3
122:25 123:4
123:17 213:15
**purposes** 89:16
114:18 183:13
202:24
**pursuant** 89:22
**pursued** 161:8

Censor & Associates
Reporting and Transcription, Inc.

**put** 90:20 98:13
108:10 122:12
126:2 143:8
163:22 172:2
172:15 175:12
178:22 180:18
182:22 190:15
192:10 208:2,7
208:8,11,18
209:4
**putting** 194:17
**P's** 168:19
**P.A** 86:8
**P.L** 86:3 219:3
**p.m** 85:20,20
158:13,14
214:11 219:10
**P10** 166:2
179:20
**P11** 185:5
**P12** 166:4
187:24
**P13** 191:6
**P14** 166:7,8
204:23
**P15** 207:4 209:7
**P16** 210:2
**P3** 161:12
**P4** 162:5
**P8** 166:1,2 173:3
**P9** 166:2 174:21
175:3

─────────────

**Q**

**question** 89:17
90:15,21 91:17
92:23 93:21
94:16,18 95:4
97:11,12,14
98:3 99:21
101:4 106:25
107:9,10
122:12,23
123:24 124:2
125:16 130:18

130:23 133:14
133:14 134:7,7
135:7 137:20
141:11 143:22
147:25 148:1,8
148:20 150:25
152:4 158:3
167:23 196:25
198:19 200:5,5
201:9 202:25
203:17 212:5
**questions** 91:8
91:14 96:13
105:22,24
132:12 134:13
144:23 149:7
150:14 158:24
213:12,23
**quick** 139:21
158:10 189:11
**quickly** 168:5
195:20 196:6
196:23 198:3,8
**quite** 130:7
156:14 197:19
**quote** 175:22,22
176:17
**quotes** 160:13

─────────────

**R**

**R** 87:13 88:11
88:12,13,17
215:1 216:1
218:1
**rarely** 169:7
**rate** 165:17
168:10 169:10
175:25 176:20
206:9
**raw** 180:8
**reach** 186:8
**read** 87:9 91:14
91:17 97:16
115:2 129:17
131:3,14 134:6

134:6 135:1
154:13 155:4
156:25 157:23
168:6 188:14
210:9 213:4
218:6 219:11
**reading** 89:13
96:13 155:19
**reads** 179:5,5
**ready** 158:15
210:16
**real** 99:6 104:13
123:3,19,20,21
124:17,18,25
129:20 139:21
175:12
**realize** 199:20
**really** 100:12
121:10 129:11
143:24 170:6
176:20 183:13
195:15 203:16
**Realtor.com**
190:15
**reason** 104:4
105:12 134:8
145:18 146:8
164:17 187:12
195:2 196:1
198:19 199:5
199:15 200:18
**reasonable**
126:10 154:18
219:11
**reasons** 201:25
**recall** 105:11
**receive** 126:21
**received** 125:20
125:24 155:15
170:6
**receiver** 140:9
**recipient** 120:14
**recognizable**
135:5
**recognize** 95:24

96:3 110:25
113:9 121:5
131:23 136:12
142:10 156:23
158:20 171:13
207:4
**recollection**
111:6 115:15
212:6
**recommendat...**
156:5
**reconciled**
188:10,16,19
188:21 189:2,4
189:23,24
190:7
**reconciliation**
189:5
**reconstituted**
100:5
**record** 104:12
106:20 107:3
107:15 115:2
122:8 139:2
144:19 149:11
156:17 166:1
169:3 175:3
177:22 198:18
203:10 209:1
213:6
**recorded** 141:8
168:22 195:10
195:14 211:17
**recording**
140:14
**records** 106:2
120:23 121:16
121:21 125:4
141:3 145:14
146:18 148:10
163:23 164:25
167:17
**recovery** 97:6
97:18,23,25
98:5

**reduce** 204:5
**reduction**
101:19
**reductions**
101:24 102:7
**refer** 177:19
210:20
**reference** 211:6
**referral** 173:10
191:5 195:1
198:10
**referred** 130:20
144:16 160:19
194:24 202:9
**referring** 136:16
144:9 166:1
186:23 187:20
191:9
**refers** 144:15
**reflect** 161:21
**reflects** 141:23
**refresh** 111:6
115:15 154:14
212:6
**refusing** 108:9
144:3
**regarding**
149:13,15
165:11
**regardless** 123:2
130:24,24
**registered**
141:17
**registration**
111:25 112:9
112:19 113:22
114:8 115:10
139:25 160:17
162:3
**Registrations**
111:13
**regs** 124:10
**reimburse**
200:24
**reinstatement**

Censor & Associates
Reporting and Transcription, Inc.

175:22
reject 209:3
related 108:8
  156:20
relates 156:14
relationship
  193:7 207:19
  208:20
relationships
  193:25
relative 216:18
reliable 190:12
relying 90:18
REMARKS
  217:7
remember 94:9
  94:22,25
  123:13 149:21
  149:22 154:16
  154:19
render 183:24
REO 98:24
  104:6,6,11
repay 171:13
repeated 183:19
repeating
  200:10
rephrase 124:4
  148:8
replicated 122:6
report 116:20
  117:5,8 151:6
  151:13 185:14
  216:7
REPORTED
  85:22
Reporter 87:6
  144:11 214:2
  216:4 217:5
Reporting 85:23
represent 96:12
  114:1 133:9
  142:19 151:7
  193:18
representation

112:15,20
  180:10
represented
  111:23
representing
  103:17 112:3
  114:6
request 99:17
  135:9 142:20
  142:24 143:10
  143:23 149:12
  149:14 151:18
  151:18 155:12
  159:11 160:20
  175:6
requested
  150:17 152:18
  156:4 216:9
requests 142:23
  143:3 144:11
requirement
  97:6
requires 92:3,5
  197:6
rerecord 139:10
RES 169:20
researching
  100:6 176:23
residential
  168:11
Resolution
  114:21,23
resolved 115:6,7
respect 108:11
  131:18 134:12
  145:8 164:18
  166:15
respond 105:23
  133:11 142:21
responding
  143:2
response 92:5
  135:9 136:13
  136:22 137:8
  140:15 143:13

146:19 149:1,3
  149:10,14
  150:17,25
  152:3,18 156:3
  159:23 160:9
  161:17,24
responses 136:1
  142:25 149:20
responsible
  199:12
responsive
  151:25 153:1
  162:7 164:5
  172:23 175:5
restart 171:18
restate 122:23
restrict 107:11
  109:16 169:20
restricted
  169:18,21
restriction
  212:6
result 154:21
  198:13 199:9
resume 200:12
resuming
  158:14
retroactively
  128:19
return 219:13
review 119:4
  164:19 167:3
  197:4,5 216:8
reviewed 92:8
  165:8 166:25
  172:24,25
  173:17 178:18
  181:12 187:16
  191:2
reviewing
  155:14
right 90:14 94:2
  97:24 98:14,22
  99:12 101:24
  102:3 106:3

107:16,23
  109:21 110:3
  110:15,21
  111:13,14
  112:13 114:4,5
  115:17 116:11
  117:3 120:7
  124:19 125:5
  127:24 128:24
  133:22 134:22
  138:16 139:9
  139:12 140:5
  147:15 151:24
  152:1,25 153:3
  155:3 156:18
  157:2,3,11,17
  157:20 158:11
  161:2 164:21
  165:18 166:2
  167:7 169:1,22
  173:23 176:14
  179:3 185:15
  185:18,19
  188:17 192:22
  193:13,15
  198:15,16
  205:11,25
  206:19 211:14
  212:15,17,25
  213:19
rights 139:22
  140:2 141:9,10
Rodgers 85:23
  215:12 216:4
  216:23 217:5
  219:16
Roger 132:4,16
  208:12
Roger's 209:2
rogs 207:21
room 180:2
run 139:20
  196:20
running 182:22
run-on 129:16

rush 198:24

─────────

**S**

S 87:11,14 113:3
  113:4,8
sale 89:21 98:23
  104:15 170:17
  186:2
sales 190:17
  206:21
Sansburys 86:8
savings 112:10
  139:13
saw 133:7,16
  153:15 181:14
saying 92:8
  100:9 114:10
  124:24 131:1
  147:5 156:13
  158:4 171:4
  175:13 177:20
  183:20 208:21
  210:16
says 89:20 90:2
  92:1 94:21
  110:14 112:6,8
  113:18,21
  117:2 119:17
  125:19 128:9
  128:25 129:6
  129:17,22
  135:16 137:10
  140:5 146:11
  147:2 153:24
  154:3 155:9
  156:17 157:9
  168:9 169:23
  170:19 173:20
  173:23,24
  175:7,18 177:4
  179:6 180:14
  180:19 184:1
  186:22 188:14
  189:5 191:8
  200:1 210:9

Consor & Associates
Reporting and Transcription, Inc.

**Schack** 153:18 154:3,21 159:22 160:9 160:24,25 161:3
**Schack's** 154:12 155:19
**schedule** 195:23 219:10
**scheduled** 170:17 172:17 213:9
**score** 195:15
**scorecards** 193:25 194:13 194:14
**scored** 196:23
**scoring** 195:20
**scratch** 128:8
**screen** 164:14 165:22 167:5 167:16,19,22 167:24 173:20 174:22 176:5 176:12,19 179:16,22 180:2,3,14,18 181:2 183:7,13 204:19 205:20 210:17
**screens** 168:7 173:22 176:6 176:12 177:2 179:3 182:14 210:20,25
**seal** 91:16,22 215:8
**second** 104:24 110:12 116:1 160:23,24 181:6 182:12 188:16 213:8 213:11
**secretaries** 115:12 118:3

**secretary** 115:18 117:3,5 118:9
**section** 169:1,22
**secured** 129:8 129:21
**securitized** 109:9,11 110:6 110:18 212:19
**Security** 168:8
**see** 96:4,15,23 101:11 104:19 108:15 119:20 125:3 128:25 131:6 132:12 133:15,19 137:10 140:2 140:22 141:7,9 141:14 142:14 142:23 143:5,9 143:13 148:17 149:1 150:21 157:1,7,24 161:20 163:13 164:12 165:19 166:2,14 169:7 173:12,21 175:7,19 176:12 178:22 181:7 184:14 184:24,24 185:1 186:22 189:25 191:10 207:15,16 209:7,12 211:20 212:15 214:4
**seen** 96:1,18 124:15 131:25 132:2 133:5 136:8,10,19 137:4 142:6,8 149:16 207:13 209:10,14
**sees** 187:11

**select** 193:10
**self-dealing** 154:22
**send** 161:3 170:20,21
**sending** 160:25
**sends** 172:19 176:25
**sense** 104:8 116:6 132:24 141:20
**sent** 161:6 164:6 202:17,18
**sentence** 129:16 130:1,7
**separate** 139:6 151:17,18 178:9
**seriously** 106:13 106:15
**serve** 142:2
**served** 135:15 135:16
**service** 118:6 171:20 190:20 193:20 200:17
**servicer** 124:25 139:1 141:18 142:2 146:21 147:6 196:14 200:16 201:1 204:7 211:25
**servicers** 198:17
**services** 177:22 178:7 183:24 184:3 185:9 191:4
**servicing** 89:22 95:18,19 100:4 109:10,15,19 110:19,20 124:12 137:25 141:9 157:14
**set** 89:1 216:14 216:16

**settle** 101:9 102:11 103:6
**settled** 103:9 105:16,20 156:8 201:5,5
**settlement** 101:16 102:9 102:16 103:4 103:21,22 104:4,9,19 105:12 107:19 107:24 108:1
**settlements** 105:3 108:11
**shaking** 191:5
**share** 103:14
**sheet** 87:7 217:1 218:10
**shift** 158:10
**shipped** 118:19
**ships** 118:20
**short** 187:13
**shortage** 168:20
**shortening** 213:15
**shot** 167:16,19 167:22
**shots** 167:24
**show** 121:16 145:15 161:4 164:10 180:17 181:2 184:25 204:6 207:3
**showed** 156:24
**showing** 140:17
**shown** 124:20 212:23
**shows** 114:21 136:25 167:17 168:21 174:10 181:17 182:5 204:20
**sic** 121:18
**side** 108:2,16 197:25

**sign** 87:9 88:20 88:21 89:1,5,8 90:2 91:15,18 91:24,25 92:1 94:7 111:19,21 112:2 115:17 116:7 118:10 118:19 119:7 132:20,23 162:1 198:22 208:4 209:2 211:14 213:5 219:9,11,13
**signature** 92:15 112:5,18 113:16 132:19 133:3 142:14 202:18 219:8 219:13,20
**signed** 90:4 93:8 93:18 94:4,19 94:20 96:7,9 100:10 111:7 111:10,22,22 112:1,21 113:14 114:9 115:21,21 119:10 132:10 132:14,22 135:17,24 136:5 153:24 164:19 166:20 207:9
**signing** 88:20 91:3 94:9 100:11 111:18 111:20 112:23 114:22 115:16 118:2 119:7 127:14 132:17 145:7 202:14
**similar** 118:23 120:4 181:5 211:11
**simply** 122:12

158:3 188:12
**simultaneously** 129:24 202:8 203:14
**sitting** 92:10 100:9 109:3 146:7 152:2
**six** 109:7 143:9 197:6
**skip** 109:17
**slight** 133:15
**Slip** 160:11
**snapshot** 170:5
**Social** 168:8
**software** 178:2
**Solutions** 177:13,21 178:1 183:25
**somebody** 182:8 186:14 209:12
**someone's** 202:9 202:10
**Something's** 171:22
**soon** 119:13 172:8 198:12 210:20
**sooner** 187:5
**sorry** 93:20 95:4 110:23 116:10 132:6 138:20 143:7 162:5 199:22 207:25 210:18
**sort** 91:25 107:22 119:18 172:1 183:6
**sounds** 126:10 138:16 139:9 139:12 154:18 184:4
**space** 169:20
**Spanolios** 90:25 135:18,20 142:15 153:5,8

153:11
**speak** 200:9
**speaking** 198:14
**specialist** 91:7
**specialists** 91:17
**specific** 91:8 163:23 181:7 213:14,21
**specifically** 98:10 100:8 163:19 169:18 197:11 212:3
**specificity** 99:17
**speculate** 146:6
**speed** 142:19
**spend** 104:6
**spoke** 155:13 202:13
**SPOUSES** 85:10
**ss** 215:2 216:2
**stab** 159:10
**stack** 132:20 159:6
**staff** 118:18 167:4,5 173:20 177:8
**stage** 101:21
**stand** 108:22,23 109:1 170:1 171:6 182:7,11 182:19 184:16 205:4,22 206:12,22
**standard** 196:12
**standing** 109:4
**stands** 168:11 169:3,20 183:15,22 190:25 206:25 209:20
**start** 102:8 159:14,19 200:1 202:2
**started** 94:12

**starting** 182:11
**starts** 98:19 130:2
**state** 107:4 109:14 196:2 197:10,12 198:11,11 215:2,13 216:2 216:5,24 218:3
**statement** 137:18 165:9 165:10 166:11 167:1 170:5,6 173:5,17 178:19 181:12 187:17 191:3
**statements** 99:18 170:21 218:8
**states** 138:15 172:7 195:9
**state's** 195:25
**stays** 97:19
**stenographic** 216:11
**stenographica...** 216:7
**step** 198:13
**steps** 120:12,16
**sticky** 91:23,24 92:7,11
**stipulated** 171:13
**stipulation** 213:6,24
**stipulations** 171:3
**stop** 170:12,13 170:16,19,23
**Stotts** 132:4,16
**strange** 187:12
**sub** 161:13
**subject** 109:9,17 134:12 143:12 143:18 144:4

145:20 204:10
**subpoena** 161:18
**substitutions** 92:2
**sub-screen** 206:16
**successful** 98:12
**sue** 191:22,25
**sufficient** 99:16
**suing** 163:9
**suit** 212:1
**Suite** 85:24 86:4 86:8 219:3,17
**sums** 165:11
**supposed** 150:10 174:11 183:2
**Supreme** 159:25 160:12
**sure** 94:17,24 100:3 101:14 107:25 116:4 119:6 127:5 162:11 163:12 164:24 171:1,2 185:24,25 186:12 187:6,9 200:6 203:3 207:15 210:8 213:2
**surprisingly** 140:25
**suspect** 175:8,19
**suspense** 169:16
**swear** 127:8,21
**swearing** 127:16 127:18,20
**sworn** 124:16,16 215:6
**system** 121:8,12 132:18 139:3 146:12 147:5 148:5,10 168:14 175:11

175:13,20,25
176:6,24 177:3
177:18,19,22
178:1 179:22
179:23,25
181:17 183:23
186:24 193:16
198:4,6 205:6
206:20 210:21
**Systems** 111:13 111:25 112:9 112:19 113:22 114:8 115:10 160:17 162:4

**T**

**T** 87:11,14 114:14,15,19 215:1,1,1 216:1,1 218:1 218:1
**table** 197:22 198:1
**tagged** 206:21
**take** 104:9,15 106:13,13,15 117:21 118:14 120:12 122:15 122:20 125:7 126:16 127:11 127:20 133:4 136:7 137:7 139:18,21,21 142:5,18 144:23 156:22 158:1 162:5 168:5 173:23 176:7 185:5 194:21 195:25 196:1 210:2 213:16,20 219:7
**taken** 159:10 214:2 216:13
**takes** 198:12

Ensor & Associates
Reporting and Transcription, Inc.

**talk** 98:8 103:18
105:14,19
106:10 159:8
163:19
**talked** 160:1
**talking** 98:2
102:8 134:1
137:24 165:23
172:6,14
190:18 193:12
203:24
**talks** 89:14
**Tampa** 86:5
219:4
**taxes** 168:19,20
168:24 169:23
170:8
**technology**
193:8,15
**tecum** 159:19
161:18 175:6
200:12 209:8
**tell** 114:19
124:14 144:2
144:15 162:6
176:24 177:1
182:10 184:25
186:25 189:8
190:3 200:13
202:15,16
203:19 208:3
209:4
**telling** 110:9
158:23 198:1
198:18
**tells** 110:13
170:10,13,23
186:21 191:21
192:3,24
205:24
**temporary**
172:1
**ten** 171:15
185:25 194:24
195:5,5 198:10

**TENANT** 85:10
85:10,10,11
**term** 176:4
**terminology**
209:24
**terms** 100:3
107:19 108:1
108:15 109:15
131:11
**test** 131:5
**testified** 101:18
156:10 157:13
**testimony** 87:3
88:25 97:20
101:23 112:18
152:22 156:13
156:18,19
157:16,17,21
158:5
**Thank** 88:3
113:1 124:3
128:5
**Theoretically**
137:19
**theory** 100:7
**thing** 141:16
145:8 151:6,8
155:4 170:14
180:6 203:12
207:25 211:8
**things** 99:3
124:16 142:19
147:20 158:1
169:6 170:23
171:24 172:9
188:5,6 196:20
198:20 203:14
211:24
**think** 94:11,11
102:23 103:18
104:22 105:14
105:14,19
119:22 121:16
121:19 122:9
129:17 130:13

139:19 144:2
144:18,20
145:1 149:18
149:22 152:9
152:10,22
164:16,17
166:21 177:11
177:25 180:13
181:14 182:12
182:20,25
184:13 198:19
202:3 203:13
203:18 205:5
206:6,13
209:14 211:8
213:3
**thinking** 137:25
209:23
**third-party**
118:5 177:23
178:6
**Thomas** 86:7
219:22
**thought** 110:8
130:17 167:23
199:21
**three** 155:8
159:21 160:13
162:2,15 163:1
202:12 206:1
**threshold** 187:9
**tied** 200:15
**TILA** 105:21
**time** 93:17,24
94:3,18 96:5
107:3 127:3
129:7,7 132:10
140:1 148:25
155:13 156:24
157:22 166:18
166:19 168:17
169:2,13,15,24
171:5,15 172:7
172:12 173:10
175:12 177:25

182:14 191:10
191:11 193:2
196:11,13,14
196:17,17
197:8 201:14
201:23 202:13
205:14 210:22
210:24 216:14
219:8,11
**times** 102:24
103:2 188:12
**timing** 201:11
**title** 98:10,12,25
118:12 129:19
143:2,4 184:4
192:3,8
**today** 92:10
93:14 100:10
108:24 109:1
134:4 146:8
148:2 151:2
152:23 159:2
160:21 164:5
181:9 196:18
196:20 203:21
211:1 213:8
**told** 124:15
151:21 155:13
196:7
**tone** 149:6
**top** 119:17
125:19,23
128:9,10
159:12 168:7
173:24 177:7
191:8 205:18
211:22
**total** 102:17
103:11 168:21
210:9
**track** 122:3
138:24 139:3
**tracking** 125:4
141:8 151:6,6
151:13

**traditional**
135:11
**training** 109:25
**TRAN** 182:24
**trans** 183:1
**transaction**
183:1,16,17
184:8 185:3
**transactions**
163:25 165:1
168:21
**transcript** 214:2
216:8 219:22
**transcription**
85:23 216:11
**transfer** 89:22
99:4 126:15,17
127:2,3 131:18
134:12 136:25
138:24 139:3
139:14,22
140:1,16,17
141:3 143:11
143:18 144:4
145:5,11,20
150:7 151:22
152:16,23
192:14
**transferred** 98:9
129:1,4,12,14
129:18 130:9
130:25 131:2
139:7 145:2,16
**transferring**
89:15 126:21
131:11
**transfers** 137:10
141:7
**transmits**
191:18
**transmittal**
110:12,13
191:5 192:15
**transmitted**
168:3

**treat** 171:23
**trick** 137:20
  141:11 175:20
**tried** 175:20
**TRN** 183:15
**true** 91:13 99:25
  100:6,8 101:13
  119:16 123:9
  127:9,25 128:7
  128:14,18
  129:3 135:23
  145:3,6 154:7
  154:9 179:17
  203:22 209:25
  216:10 218:8
**truly** 219:14
**trust** 98:14,22
  100:2,19 109:8
  110:15,20
  123:9 138:11
  140:23 141:5
  142:1 154:4,11
  159:24 162:2
  163:10,13
  192:4,11 205:8
  205:9 212:2,17
**trustee** 109:10
  110:18 140:23
  192:6
**trustees** 92:3
**trusts** 163:14
  212:19
**truth** 99:22
  110:9
**try** 124:4 132:21
  169:5,7 196:19
  197:21
**trying** 107:17
  133:3 176:2,15
  176:17 186:8
  188:11,11
  202:9,10
**turn** 166:1 209:6
  212:13
**two** 90:2 103:16

  104:25 141:3,4
  143:8 154:22
  179:3 197:15
  209:1
**two-page** 115:25
**type** 176:21
  179:3 180:4
  184:14,25
  185:21 205:22
**types** 103:16
**T-I-L-A** 105:21

_____ **U** _____
**U** 87:15 162:20
  162:21,25
**ultimately** 97:9
  180:22
**Um-um** 130:3
  157:8 166:13
  168:12 170:4
**uncontested**
  166:12,20
  195:3
**uncontrollable**
  197:13
**underneath**
  205:13
**undersigned**
  90:24,25 215:4
**understand**
  107:17 124:5,6
  129:13 130:16
  138:21,22
  145:24,24
  148:19 149:6
  189:20 198:23
  200:6
**understanding**
  89:7 90:17
  98:3 101:22
  112:1,21 114:9
  114:11 137:23
  138:2 141:23
  200:10
**understands**

  101:15
**United** 138:15
  162:3,13
**unknown** 85:7,9
  185:15
**updated** 161:21
**upload** 210:21
**uploaded**
  118:17 167:24
**uploads** 118:21
**upset** 186:11
**use** 169:5,7
  178:16 179:23
  183:24 184:10
  190:12,22
  193:8,15
  206:14 213:25
**user** 176:9
  178:15,17
  183:10,20
  184:5
**USR** 184:4
**usually** 91:8
  194:7 199:16

_____ **V** _____
**V** 87:15 167:11
  167:14
**vacation** 208:25
**valid** 174:18
**value** 103:5,10
  104:1 125:19
  125:24 126:21
  127:2 188:10
  188:13,16,19
  188:20,20,22
  189:2,4,14,23
  189:24 190:4,5
  190:7,9,16
**valued** 189:6
**variance** 188:13
**vendor** 177:13
  177:18,21,24
  178:6 191:9
**verify** 167:6

**versa** 199:22
**version** 209:10
  209:12 211:20
**versus** 96:21
**vest** 123:14
  192:3,8
**vice** 111:11,22
  111:24 112:2,4
  112:16,20
  113:19 114:7
  114:10 115:17
  115:21 116:5
  116:13 118:8
  132:8,10
  134:23 153:25
  160:15,16
  162:1 199:22
  207:20,25
**vice-presidents**
  115:12 118:2
**view** 157:20
**viewer** 170:10
**viewing** 183:11
**violation** 105:21
**virtue** 94:4,20
**vitae** 161:11,15
**VOLUME**
  85:16
**vote** 117:11
**vs** 85:6 159:24
  160:10,18
  213:10 217:2
  219:5

_____ **W** _____
**W** 87:16 174:4,8
**Wait** 145:22
**waiting** 201:22
**waive** 219:8,12
  219:20
**waiving** 213:19
**want** 92:18,19
  94:16,23 95:21
  103:24 108:6,8
  122:19,21

  125:18 137:7
  137:20 139:20
  141:13 155:20
  158:1 181:7
  186:5 187:4,7
  190:2 196:8
  197:23 199:16
  200:6,15,15
  202:24 213:4,5
  214:3,4
**wanted** 154:21
  189:25 211:22
**wants** 103:24
  161:5
**warn** 171:19
**wasn't** 107:9
  145:21 146:2
  164:9 166:16
**way** 86:8 96:8
  106:16 108:10
  147:21,22,25
  149:19 160:4
  167:17 171:19
  177:25 179:4
  189:7 195:16
  202:3 214:4
**wearing** 154:22
**web-based**
  180:4
**week** 128:11
  130:22 167:20
  201:22
**weeks** 140:22
  141:3,4
**weighing** 104:3
**went** 96:16
  141:24 145:14
  146:18 203:4,5
**weren't** 159:6
**West** 85:20,24
  86:9 219:18
**we'll** 121:21
  163:18,22
  164:23 165:25
  171:16 190:5

Sensor & Associates
Reporting and Transcription, Inc.

Page 242

213:24
**we're** 88:10
  94:17 98:1
  106:15 110:11
  115:24 124:25
  134:4 137:24
  147:6 159:8
  162:9 164:24
  166:19 171:14
  172:5,14
  178:15 186:8
  188:5 197:19
  213:19
**we've** 96:13
  124:15 134:1
**whereof** 119:18
**Wholesale**
  113:23
**wish** 219:12
**withheld** 152:12
  153:9
**witness** 88:2,5
  89:13 94:7,11
  94:25 100:23
  101:16 103:1
  103:13,20
  104:13 106:9
  107:7 108:20
  115:7 119:18
  122:19 124:1,7
  126:4,25 129:6
  129:13 130:15
  141:11,14
  144:9,20 146:1
  146:15,23
  148:20 150:15
  151:11 152:6
  158:16 194:17
  194:23 202:7
  215:8 217:3
**won** 203:11
**wonder** 161:2
**word** 115:4
  116:6 176:8
  194:1 214:5

**words** 89:24
  211:23
**work** 150:20
  152:13,21
  153:9 182:14
  184:12,14
  190:3 197:21
  200:10
**worked** 200:21
**working** 161:20
  175:12 177:2
  203:2
**works** 165:15
  195:16
**workstation**
  176:16 179:17
  182:4 206:17
**workstations**
  182:16
**world** 111:24
  114:6 170:24
**wouldn't** 94:13
  98:4 151:25
  183:11 193:1
  207:16
**write** 90:12
  101:10 102:14
  130:11 158:4
**write-down**
  102:3
**written** 147:21
  147:22 156:12
  165:8 166:25
  209:22
**wrong** 109:12
  109:20 152:22
**wrote** 156:16
  178:10 209:23
**W/O** 206:2

---

**X**

**X** 87:1,11,16
  179:10,14
  194:10

---

**Y**

**Y** 87:17 181:23
  182:1 187:21
**yeah** 100:23
  108:4 109:8
  131:13 143:23
  146:3,24
  147:14,15
  150:13 157:4
  166:21 170:6
  199:4 211:20
  212:15
**years** 104:25
  155:8 159:21
  160:14 177:3
  197:15 200:11
  200:14 209:1
**year-to-date**
  170:8,8,9
**York** 153:19
  159:25 160:11
  160:11 195:12

---

**Z**

**Z** 87:17 204:13
  204:17
**ZACKS** 86:7

---

**$**

**$145** 187:18
**$253.44** 178:20
**$33** 181:13
**$399,095.97**
  167:2

---

**#**

**#1** 85:10
**#2** 85:10
**#3** 85:10

---

**0**

**037322XXXX**
  85:3

---

**1**

**1** 89:14,20 90:21
  159:20 160:20
  170:12,13
  173:24 216:9
**1st** 140:21
  168:18
**1/22/10** 215:13
  216:24
**10** 148:22
  178:18
**100** 100:24
  195:7
**104** 86:8
**11** 181:11
**11/20** 119:21
**113** 87:14
**114** 87:14
**12** 142:23,24
  169:24 187:16
**12th** 121:18
  135:17
**12/2** 119:19,24
**120** 195:25
  196:1
**13** 191:2 205:22
**13th** 173:7
**14** 204:9
**14th** 125:20
  126:1,11,23
  127:17,23
  128:11,18
  129:4 130:2,8
  133:25 134:8
  143:13,19
  144:5 150:9
  151:23 152:17
  178:24 179:18
**15th** 202:19
**16** 219:1
**16th** 215:8
  216:22
**16,088** 176:20
**16,228.30**
  176:19
**162** 87:15

**1655** 85:19,24
  219:17
**167** 87:15
**174** 87:16
**179** 87:16
**18** 177:3 200:14
**18th** 140:2,19
  174:24 185:12
**181** 87:17
**190** 189:5
**1962** 182:8
**1975** 86:8

---

**2**

**2** 89:13,15 95:4
  137:8 140:15
  150:5 151:25
  160:8 164:2
  211:25
**2nd** 120:6
  201:21
**2/6/09** 160:12
**20** 105:1,7 187:8
  196:17
**20th** 119:21
**2006** 140:2,19
**2006-AR4**
  205:11 212:14
**2008** 85:3
  119:20 120:6
  121:18 125:20
  126:2,11,23
  127:17,23
  128:1,3,11,19
  129:4 130:2,8
  133:25 134:9
  143:13,19
  144:5 150:9
  151:23 152:17
  159:23 163:4,5
  168:18 173:7
  178:24 179:18
  201:19,22
**2009** 85:19
  135:17 160:10

Censor & Associates
Reporting and Transcription, Inc.

160:11 163:6
169:10 174:13
174:18,24
175:1 185:12
215:6,9 216:22
217:4 219:1,7
**204** 87:17
**21st** 128:1,3
201:17
**215** 87:5
**216** 87:6
**217** 87:7
**218** 87:8
**219** 85:17 87:9
**22nd** 163:4
**220** 216:10
**24** 188:14
**250** 189:4
**25981-07** 159:25
**29th** 141:17

---

**3**
**3** 92:22 133:14
133:14 152:15
161:10,13,18
165:13 170:16
**3:14** 85:20
**30** 187:5
**30-day** 187:9
**300** 86:4 219:3
**31st** 159:23
**33401** 85:24
219:18
**33411** 86:9
**33634** 86:5
219:4

---

**4**
**4** 85:11 87:4,13
99:14 161:25
162:5,7 173:23
173:23 174:22
176:13 179:16
210:10 211:23
**4:01** 158:13

**4:15** 158:14
**4:30** 219:10

---

**5**
**5** 101:1 157:6
163:23 164:18
209:22
**5th** 156:2
**50** 85:3 203:18
203:20,22
**500** 85:24
219:17
**50186** 160:11
**561.682.0905**
85:25 219:18

---

**6**
**6** 101:8 143:7
165:6,16
**6th** 160:10 163:6
**6:45** 85:20
214:11
**60** 175:24
**631** 184:8
**665** 206:24
212:15

---

**7**
**7** 109:8 166:11
**753** 206:22

---

**8**
**8** 96:23 109:14
166:23 172:23
212:13
**8th** 175:1,11
**8/13/08** 167:25
**85** 85:17
**88** 87:13

---

**9**
**9** 85:19 146:11
173:16 217:4
219:10
**9th** 163:5 174:13

174:18 215:6
219:7
**90** 105:9
**9119** 86:4 219:3
**99** 203:9