The Honorable Robert S Lasnik

**JAMES MCDONALD**
**14840 119th PL NE**
**Kirkland, WA 98034**
**Phone (425) 210-0614**
**In Pro Per**

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON**

**AT SEATTLE**

| | |
|---|---|
| In Re: ) | **NO.: C10-1952RSL** |
| ) | |
| ) | |
| **JAMES MCDONALD** ) | **Plaintiff's Reply to Defendants Opposition** |
| **Plaintiff** ) | **to Plaintiff's Motion for Partial Summary** |
| v ) | **Judgment** |
| **ONEWEST BANK, FSB, *et al.*,** ) | |
| **Defendants.** ) | **Noting Date: March 30, 2012** |

-----------------------------------------------------------

## I.      Introduction

**COMES NOW**, Plaintiff James McDonald and respectfully submits to this Court his Reply[1] to the Defendants Opposition to his Motion for Partial Summary Judgment.

## II.      Defendants "Facts"

1.  §II.P2 Par.3: It should be clearly pointed out that the party that sold Plaintiff's note, whether to Freddie Mac or another party, was Indymac Bank, FSB. **It was not Indymac Federal Bank, FSB** which was created after the takeover by the FDIC**.**

2.  §II.P2 Par.4: None of the Exhibits mentioned in this paragraph specifically mention Plaintiff's Note and therefore fails to pass the FRE 402 Relevance Test and confuses the issue at hand per FRE 403. **Therefore Plaintiff Moves the Court to Strike** Purchase and Assumption Agreement.

3.  §II.P2 Par.5: Defendants state, "…and sold **most** (emphasis added) of the assets including the rights to service the loan presently at issue to OneWest Bank, FSB". However, the Defendants have provided no authenticated evidence of this. There is nothing in the Court Record, including Defendants Exhibits: Master Purchase Agreement, Loan Sale Agreement and Servicing Business Asset Purchase Agreement that identify Plaintiff's loan. Plaintiff's First

---

[1] Plaintiff thanks the Court for granting his Motion to File Over Length Brief

Request to Produce requested all addendums and schedules of these agreements, **which the Defendants never produced**, that specifically identified Plaintiff's Note. As OneWest has already admitted, it never purchased the Note (Dec. of Charles Boyle, Dkt. 123). Therefore the Loan Sale Agreement and Master Purchase Agreements fail to pass the Test of Relevance under FRE 401. As they do not pass the relevance test, they can only confuse the issue as described in FRE 403. For the reasons listed herein, **Plaintiff moves the Court to Strike:** the Master Purchase Agreement, Loan Sale Agreement and Servicing Business Asset Purchase Agreement.

4. §II.P3.Par.1: Plaintiff disputes that OneWest Bank is the current servicer of the real party of interest. There is no evidence within the Court Record that OneWest Bank is the servicer for the actual owner of the Note. Indeed, Plaintiff requested the schedules as described supra and Defendants failed to provide evidence to their claim. Further, even if OneWest Bank IS the current servicer for the actual owner, they do not service it on behalf of Freddie Mac as the owner of the Note. Freddie Mac's servicing guide only gives a servicer the right to Foreclose if Freddie Mac is the owner (Freddie Mac Servicing Guide Ch. 66.16). Freddie Mac is **not the owner** or holder in due course of Plaintiff's Note. As the subpoenaed information from DBNTC states, the loan was placed into a pool named IN070227 in or about February 27, 2007 (Exhibit 1). Further the cover letter to the information from Shawn Hynes confirms that the Note was part of a trust. Freddie Mac's website also states:

> In our Single-Family business, we use mortgage securitization to fund millions of home loans every year. Securitization is a process by which we purchase home loans that lenders originate, put these loans into mortgage securities that are **sold** in global capital markets…"

The Defendants have never made a plausible defense over how this one Note was different from Freddie Mac's business model. The evidence clearly shows that the loan was part of a trust. Indeed, the Defendants' own counsel has agreed stating, "Placing loans in a subpool, however, is simply a method of organizing and structuring a pool of securitized loans.." (Dkt 71, P.6 L19).

5. §II.P3.Par.2: This entire paragraph is simply a misrepresentation of the facts. The FACTS are the Custodial Agreement implicitly states that OneWest has no benefit of any notes released to it. Ergo they are not the beneficiary of any notes that are released to it (See Dkt. 103, §2.1.1.1). The alleged note, which Plaintiff disputes is the actual original Note, was not "in possession" of OWB until October 6, 2010, well after the foreclosure process had begun. Even if their possession argument did not fail as a mater of law, which it does, they were not

in possession of anything at the time the majority of the violations occurred and were
contractually obligated to hold the Note for the benefit of another party who is not a party to
this lawsuit.

6. §II.P4.Par1: The Plaintiff has never been notified of a default by the actual beneficiary of the
note as is required by RCW 61.24.031. As discussed supra, OWB has no benefit to the Note.

7. §II.P4.Par2: Plaintiff disputes this entire paragraph. Plaintiff never received these alleged
letters from OWB. Plaintiff had never before viewed these alleged letters that were sent until
he saw them in the Defendants Motion for Summary Judgment (Dkt. 121). Further, the
Declaration of Charles Boyle that these letters were sent is hearsay. Mr. Boyle is only viewing
an electronic record that he does not claim to have been present at the time it was initiated,
whenever that actually was, nor can he honestly attest that the letter was printed, put in an
envelope and placed in the mail to Plaintiff. As Plaintiff never received these two letters, he
disputes that they were ever sent. **Therefore Plaintiff moves the Court to strike**.

8. §II.P4.Par3: This is true. Northwest Trustee did serve a falsely stated Notice of Default and
falsely sworn Beneficiary's Declaration to Plaintiff while working as a vendor/agent for OWB
instead of maintaining a separate unbiased relationship and solely working as a trustee.

9. §II.P4.Par4: This is also true. MERS did in fact, without any authorization from the principle
in which they were the nominee for, Assign Beneficial Interest in the Deed of Trust to OWB.
They also purported to assign benefit of the Note which they did not own. Further this
document was signed by Brian Burnett who had no signing authority per the MERS Corporate
Resolution (Exhibit 2) under the penalty of perjury. Therefore Brian Burnett, OWB and
MERS violated criminal code RCW 40.16.030 by recording false statements. NWTS also
violated the statute by recording the document when they knew, or should have known, that
MERS neither owns nor has beneficial interest in any Note.

10. §II.P4.Par5: This statement is true. OWB did indeed file an Appointment for Successor
Trustee signed and sworn under oath by Suchan Murray and claimed to be the **owner and
holder** of the Note. As OWB admitted in these proceedings, they are not the owner. Therefore
Suchan Murray and OWB violated criminal code RCW 40.16.030 by making and recording
false statements into publicly recorded records.

11. §II.P5.Par1: Plaintiff did indeed mail the document and OWB did respond that Freddie Mac
was the "investor". They did not respond to who the actual owner was. In the mortgage

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

industry, which Plaintiff has been a part of, an investor is the party referred to who's guidelines as followed in underwriting a loan and often is only the initial purchaser or potential purchaser.

### III.     Reply to Defendants Arguments

**A. Defendants Claims of Evidence being unauthenticated is incorrect.**

**1.      Response Letter by Deutsche Bank National Trust Company (DBNTC) is authenticated** by the Court records as allowed by FRE 901(b)(3). Defendants utilized the Custodian Agreement in their original MSJ (Dkt 49). They did not specify when the alleged Note was requested from DBNTC in their Motion or Reply. Plaintiff issued a subpoena to DBNTC on May 13, 2011. It was received on May 16, 2011 (Exhibit 3). Plaintiff received the response from DBNTC on May 23, 2011 (Dec. of James McDonald, Dkt. 64). Plaintiff first utilized the Letter in his Motion for Leave to Add Supplemental Information on May 26, 2011 (Dkt #63). In Defendants' opposition to this MSJ they utilize a Declaration of Charles Boyle that states, "On or about October 1, 2010, OneWest requested that the Custodian deliver the Note to OneWest". This date aligns with the information on the Exhibit in question. Plaintiff would have had no knowledge of this date prior to originally utilizing it had he not received the evidence as stated. Further, the letter itself was authentication of the subpoenaed information, which was the enclosure to the letter. As Miss Buck stated, "However, a proper foundation need not be established through personal knowledge but can rest on any manner permitted by Federal Rule of Evidence 901(b) or 902." Therefore taken with all the circumstances described herein, the evidence is authenticated under FRE 901(b)(3) as the Defendants confirmed information contained therein through their own testimony.

"The requirement of authentication "is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims," id. This finding may be based entirely on circumstantial evidence, including "[a]ppearance, contents, substance ... and other distinctive characteristics" of the writing, id. 901(b)(4)."  *USA v Bagaric*. 706 F.2d 42  (NY 2983)

**Letter from AG McKenna to NWTS is authentic.** Defendants question the veracity and the inclusion of NWTS in the letter Plaintiff utilizes as Exhibit #12 in his MSJ . The letter can be found at the AG website at http://www.atg.wa.gov/pressrelease.aspx?id=27748. The press release states, "In addition, the office sent a letter today to all trustees operating in the state that notifies them of their obligations." NWTS is a trustee operating in the state, therefore received the letter.

**B. Plaintiff has established he is entitled to judgment as a mater of law as to his claims for violations of the DTA, CPA, Declaratory Relief, Lack of Standing and Injunction.**

**1. Violations of the Deed of Trust Act (RCW 61.24 *et seq*)**

In Plaintiff's original complaint (Dkt. 1), Plaintiff filed both a claim for Wrongful Foreclosure and claims for Violations of the Deed of Trust Act. Here, Miss Buck is attempting to merge those claims into one, where in reality Plaintiff is not requesting summary judgment on a Wrongful Foreclosure claim but on the Deed of Trust Act Violations.

**1.A** Counsel for the Defense has brought up the most common cases cited in trying to paint Plaintiff's claims in the most unfavorable light. It is therefore necessary to analyze the cases she is utilizing.

**1.A.1** Krienke v. Chase Home Fin., LLC, 140 Wn. App. 1032, 2007 WL 2713737 at 5 (Wash. Ct. App. 2007) Here the Krienke's filed a complaint through their attorney, Melissa Huelsman. The claims were for wrongful foreclosure and preliminary injunction. No specific claims were made on the DOTA. Shortly after the litigation began, Huelsman withdrew citing irreconcilable differences. The Krienke's ended up pursuing claims against Huelsman. During the rest of the litigation they conducted no discovery, provided no evidence other than a Declaration by Mrs. Krienke and failed to make sufficient pleadings to avoid a dismissal of the case in an MSJ. The Krienke's did try to make an appeal but again provided no evidence or any sufficient pleading.

One of the biggest problems in this case at appeal was the fact that Krienke stated their claim was for the "wrongful institution of foreclosure". That statement has led to a string of incomplete judgments on these matters. Later cases rely on the Krienke case as the base for making judgments, when in fact this case was truly terribly argued. The Court chose for a reason to not publish the Opinion. The failings of this case should never be construed as the basis for legal standard.

Black's Law defines foreclosure by stating it is, "The process by which a mortgagor of real or personal property, or other owner of property subject to a lien, is deprived of his interest therein" (*Black's Law Dictionary*, 6ᵗʰ Ed., West 2009 P.646). A process is a "series of actions, motions, or occurrences." (*Black's* P.1324). Therefore the actual trustee sale is the finale in the process of foreclosure. Fixation on a singular action in a process does nothing but ignore the rest of the series of actions.

"Washington's deed of trust act should be construed to further three basic objectives. *See* Comment, *Court Actions Contesting the Nonjudicial Foreclosure of Deeds of Trust in*

*Washington,* 59 Wash. L. Rev. 323, 330 (1984). First, the nonjudicial foreclosure process should remain efficient and inexpensive. *Peoples Nat'l Bank v. Ostrander,*6 Wn.App. 28, 491 P.2d 1058 (1971). Second, the process should provide an adequate opportunity for interested parties to prevent wrongful foreclosure. Third, the process should promote the stability of land titles." (*Cox v Helenius* 103 Wn.2d 383 (1985).

In keeping with the WA Supreme Court's decision in Cox, preventing wrongful foreclosure is applicable to the DOTA (RCW 61.24.030). However, a temporary restraining order or preliminary injunction is simply that. Temporary. The permanent solution is a ruling against the parties in which the action is brought against and declaring the allegations unlawful and barring the Defendants from using the same fact pattern in the future. **Plaintiff's permanent injunction request is very specific to this "fact" pattern**, not an overall ban.

In Plaintiff's case, he specifically identifies the individual claims of violations of the Deed of Trust Act. He is specifically requesting that those items be ruled as unlawful. The damages from the DOTA violations are covered in his CPA claim as they all constitute and unfair and deceptive act as discussed below and in his MSJ.

**1.A.2** Pfau v. Wash. Mutual, Inc, NO CV-08-00142-jlw, 2009 WL 484448, at 12 (E.D. Wash. 2009)

In Pfau, the Plaintiff utilized a wrongful foreclosure claim. This case began with property taxes in arrears and confusion over who was supposed to pay them occurred, which led to a default.  He also claimed Emotional Distress, CPA Violations, FCRA, Unjust Enrichment and Slander of Title. Pfau made no claims of violations of the process of foreclosure as Plaintiff has, nor pointed to any fraudulent or deceptive documents within the process. The Judge primarily ruled in favor of the Defendants, "The Plaintiff has waived any and all claims related to the foreclosure of 201 N. Napa, including any wrongful initiation of foreclosure claims." As far as his ruling on a wrongful foreclosure claim, the Judge based his entire opinion on Krienke, which as discussed supra was a very poorly handled case.

In Plaintiff's case, in the present litigation, he has identified several material facts and violations of the Deed of Trust Act. There is a significant difference in these cases and therefore Pfau does not work as a basis of comparison.

**1.A.3** Vawter v. Quality Loan Service Corporation of Washington, 2010 WL 1629355 at 5 (W.D. Wash. 2010)

The Complaint was for claims of: Temporary and Permanent Restraining Order, Infliction of Emotional Distress, Breach of Fiduciary/Quasi-Fiduciary Duty, Violations of the CPA and

Violations of TILA. It was removed from WA Superior Court to the US District Court. Vawter won their claims against the Mortgage Broker(s) involved. Judge Robard utilizes Krienke as his basis for dismissing the Complaint against Chase and QLS. While Vawter came closer to making specific claims, they never fully address violations of the DOTA.

This case again differs from the litigation before this Court in that Plaintiff has specifically shown violations of the DOTA and shown them to be unfair and deceptive acts in violation of the CPA as discussed in his MSJ.

**1.A.4** Henderson v GMAC Mortgage Corp., No. C05-5781RBL, 2008 WL 1733265 at 5 (WD Wash 2008)

The Henderson case relied almost entirely on an "oral agreement" between the Hendersons and GMAC. This agreement appears to be a short term to long term modification or forbearance. The basis of their case relied upon GMAC not honoring the agreement and moving to foreclose on their residence. In the complaint, the Hendersons did not request the Court to restrain the sale and invoke the Washington Deed of Trust Act (RCW 61.24 *et al*), which provides a path for victims of an unlawful foreclosure to seek the Courts' assistance in halting the foreclosure process. Further, the Hendersons make no allegations of any wrong doing in the foreclosure process other than an oral contract was broken. That is not the case in the present litigation before this Court and therefore this case has no resemblance to Plaintiff's case.

**1.B     The "testimonial evidence" Defendants utilize is largely hearsay.**

**1.B.1** Charles Boyle, the Declarant in both of the Defendants' Motions for Summary Judgment:

> "familiar with business records maintained by OneWest Bank for the purpose of **servicing** mortgage loans (Not own, not holding). These records (which include data compilations, electronically imaged documents, and others) are made at or near the time by, or information provided by persons with knowledge of the activity and transactions reflected in such manner…" (Dkt. 123).

However, Mr. Boyle is aware that these records are not truly trustworthy, nor are the executed documents in relation to OWB's foreclosure procedures. On May 26, 2011, Judge Fabre of the US Bankruptcy Court filed a Memorandum Decision on *OneWest Bank, FSB v Arizmendi* BK Case 09-19263-PB13. In this case, there are multiple discrepancies that clearly reflect the case at hand. Brian Burnett, who signed the Assignment of Deed of Trust in Plaintiff's case, executed a Declaration that stated OneWest Bank was the "real party of interest" and the "current beneficiary". However at the hearing, Charles Boyle admitted that OneWest was not the beneficiary, thereby showing Brian Burnett made a false sworn statement under the penalty of perjury. Further, though he had *reviewed the records* as he claims to have in Plaintiff's case, he was unaware of some payments that had been made. The Judge concluded, "OneWest's handling

of this issue was sloppy at best and **illustrates the problem with any reliance on its witnesses. To put it bluntly, the right hand does not know what the left hand is doing at OneWest** (emphasis added)." The Judge also stated, "Thus, MERS' purported assignment of the Trust Deed **and the related note** as nominee for the Original Lender and without a reference to Indymac Bank, FSB or Freddie Mac appears designed to disguise rather than to illuminate the facts…OneWest failed to tell the true and complete story in the OneWest Declaration and the Claim." The Court then ruled to deny the Stay Motion, stating, "The Court will not participate in a process where OneWest increases its profits by disobeying the rules of this Court and by providing the Court with erroneous information." The Judge also ordered a show cause "why OneWest should not be held in contempt and/or otherwise sanctioned."

As shown in the Arizmendi case, Charles Boyle is an unreliable witness who bases his testimony on unreliable data entries. Further, the same governing documents that the Defendants attempt to utilize in this litigation would have governed Arizmendi case as both cases involved DBNTC as custodian, OneWest as alleged servicer and Freddie Mac as the original investor. While Arizmendi did not dig deeply enough to show that Freddie Mac likely sold her loan as they did Plaintiff's (Exhibit 1), the standard business model of Freddie Mac (Exhibit 4) states that they would have. In the present litigation, Mr. Boyle provides no relevant or reliable evidence that specifically identifies Plaintiff's Note that conveys real authority to OneWest Bank to act in any capacity, let alone beneficiary and holder.

For the above reasons, Plaintiff **moves the Court to strike** Par. 4 Sentence 2, Par. 8, Par. 9, Par. 10, Par. 11, Par. 12, Par 13 and Par. 17 as hearsay. The Defendants have had ample opportunity (a full year) to present specific relevant evidence since Mr. Boyle first made a declaration in their original MSJ on March 30, 2011 (Dkt 49). They would need no discovery to do so as they would obviously have copies of any document that specifically relates to OWB if their claims were true.

**1.C**     Lack of "legal authority" in Plaintiff's Motion for Summary Judgment.

This claim made by the Defendants is only partially true. The primary reason Plaintiff does not utilize more case law from the State of Washington is that there is none to be used. This is a fairly new area of law. The original pioneers of these issues did not understand or did not plead cases correctly (See analysis of Krienke, Vawter, Henderson and Pfau supra). Other cases that better reflect Plaintiff's claims are still in the judicial process. However, the 9th Circuit Appeals Court

filed an authoritative opinion on March 26, 2012.  The Court ruled that violations of Hawaii's version of the Deed of Trust Act constituted an unfair and deceptive act as well as a breach of contract under the Deed of Trust as the "lender" must strictly comply with applicable law. (*Kanamu v Ameriquest et al*. HI-08-1166-JuPaD). In the present litigation that is the WA DOTA.

Other case law does exist in determining that the WA DOTA must be strictly complied with:

"In addition, because nonjudicial foreclosures lack the oversight inherent in judicial foreclosures, we strictly apply and interpret the Act in the borrower's favor" (Albice v. Premier Mortgage Services of WA, Inc., 239 P.3d 148 (2011) at page 1152, citing CHD, Inc. v. Boyles, 138 Wash.App. 131, 137, 157 P.3d 415 (2007)).  The federal court also acknowledged the dangers of the unsupervised process, stating that it is "mindful that lenders must strictly comply with the DOTA because the non-judicial foreclosure process removes many protections borrowers and grantors have under a mortgage". (*Vawter*, supra). Further, "Washington's Deed of Trust Act has been consistently construed to further three basic objectives. First, the nonjudicial foreclosure process should remain efficient and inexpensive. Peoples Nat'l Bank v. Ostrander, 6 Wn. App. 28, 491 P.2d 1058 (1971). Second, the process should provide an adequate opportunity for interested parties to prevent wrongful foreclosure. Third, the process should promote the stability of land titles." Plein v. Lackey, 149 Wn.2d 214, 225-26 (2003); Cox v. Helenius, 103 Wn.2d 383, 387, 693 P.2d 686 (1985).

Plaintiff has filed this litigation, not as a bandaid with a temporary restraining order, but for a complete accounting of the Defendants' unlawful actions.

**1.D    As a mater of law, OneWest is not the Note Holder or Beneficiary and has no legal authority to enforce the promissory note.**

**1.D.1** In §III.C.1.b of the Defendants response, the Defense asserts that there is a dispute that "OneWest was never the holder, owner, or beneficiary of Plaintiff's Note, such all allegation is simply untrue, and the testimonial evidence set forth by Defendants proves as such." However there is no relevant evidence or fact that supports Defendants' dispute. OneWest has admitted they are not nor have ever been the Note Owner. As discussed supra, the knowledge of Charles Boyle's testimony is untrustworthy and is nothing more than hearsay as it is not supported by actual evidence related specifically to Plaintiff's Note. The Defense's own evidence, the Custodial

Agreement (Exhibit 5) states clearly that OWB has NO BENEFIT (i.e. not the beneficiary) of any notes in possession of the Document Custodian or any notes released to OWB. Further, they have not documented the real "chain of title". The Defendants evidence relies solely upon purchase agreements and assumption agreements which in no way specifically identify the chain of the Note. The Defendants admit that the Note was sold by Indymac Bank, FSB prior to the takeover of IMB by the FDIC which created Indymac Federal Bank, FSB. Therefore all the purchase agreement exhibits, as discussed supra, are irrelevant and seek to confuse the matter at hand in violation of FRE 403 as discussed in §II.2. Again Plaintiff **moves the Court to strike the documents as irrelevant.**

The ACTUAL chain of title follows thus: Indymac Bank, FSB funded the loan. Indymac Bank, FSB sold the loan to Freddie Mac. Freddie Mac securitized the loan into IN070227 and sold the securitization to unknown certificate holders on or about February 27, 2007 (Exhibit 1).

Miss Buck is correct when she asserts that RCW 61.24.005 makes beneficiary synonymous with "holder". However, if a party has no benefit to the Note as shown in the Custodial Agreement (Exhibit 5) it cannot then claim to be the beneficiary and holder. As revealed in *Azrimendi*, OneWest admitted through Charles Boyle's testimony that it was NOT the beneficiary. This directly relates to Plaintiff's case as DBNTC, OWB and Freddie Mac are all named in the Custodial Agreement and the wording of that Agreement validates Plaintiff's claim (Exhibit 5). The Defense argues Plaintiff is fixated on a portion yet they offer no direct quote to counter his stated fact. Therefore they had no "constructive possession" at the time these violations occurred, or anytime thereafter as discussed below. Not only was the Custodian another party's custodian, OneWest had no "dominion" (Black's Law, Page 314) over the Note. While they could request the Note (which will be discussed in more detail below) by terms of the Agreement that does not specify Plaintiff's Note, they had no benefit or dominion of it.

**1.D.2 Defense states a completely separate fact pattern in their Response Page 11, line 8.**
The Defense changes fact patterns when it attempts to bring in the Federal Doctrine of Holder-In-Due Course (HDC) as their defense on why they are the holder of the Note. As discussed above, the Defendants admit that Indymac Bank, FSB sold the Note prior to being taken over by the FDIC. The HDC therefore does not apply. The HDC, like RCW 62A.3-302, states that to qualify as the HDC one must have taken the instrument **for value** U.C.C. §3-302(1). As the Defense admitted, Indymac Bank sold the Note prior to the FDIC Receivership. There is no evidence or

claims by any party that the FDIC purchased the Note during the year it was the Receiver. As Indymac Bank, FSB had already sold Plaintiff's Note, it was not the HDC at the time of the takeover. The Defense's attempt to utilize the FDIC's immunity is either a deliberate attempt to confuse and mislead this Court or is proof of a lack of knowledge of the HDC. Wherefore the Plaintiff **moves the Court to hold a show cause hearing as allowed by FCRP 11(c)(3)** to understand which is the case here.

**1.D.3**   The alleged promissory note in possession of Counsel for the Defense is unauthenticated. Plaintiff believes the "note" in possession of the Counsel of the Defense is not the original Note. This belief is based upon the evidence before the Court record and personal inspection which he made on July 13, 2011 in the presence of the Defense's Counsel (Declaration of JM).

First, the Subpoenaed information (Exhibit 1), and quite likely why the Defense is pushing to exclude it, shows a complete inventory of the file DBNTC had in relation to Plaintiff's loan. According to Page 2 of the document, DBNTC received the Mortgage (Deed of Trust not Note) on March 27, 2007. It also received the Title (Lenders Title Policy) on April 9, 2007. According to the records **DBNTC never received the Note**. While DBNTC sent documents to OWB when OWB requested the file on 10/1/10 (8 months after the foreclosure proceedings started), they did not have the Note to send. So while Charles Boyle provides already questionable testimony as discussed supra OWB received the Note on or about October 5, 2010 (which he never personally witnessed or received), the authenticated data from the Custodian shows otherwise.

Further, as stated above, Plaintiff viewed the "note" in the presence of Heidi Buck on July 13, 2011. While Plaintiff is not a forensic document expert, he did notice that the document looked basically untouched and that no trace of where the pen he used could be felt on the paper. Further, as a former Indymac employee, Plaintiff is aware of the process and the large number of hands that the Note would have gone through, yet the pages were in near pristine condition (Dec. of JM).

Plaintiff is therefore convinced this is not, in fact, the original Note. As the "note" is unauthenticated and the Defense has had over a year to authenticate it, **Plaintiff moves to strike the unauthenticated "Note" from use in this proceeding**.

**1.D.4** Even if the Note were proven authentic, OneWest Bank is still not the holder by possession.

**1.D.4.a** The fact is the Note, authentic or not, is not a negotiable instrument. Attorney Max Gardner III[2] wrote a truly brilliant article that provides great education on this matter. Included in this pleading are the following excerpts.

"NEGOTIABLE INSTRUMENTS

First:

Uniform Covenant 2 of the standard Fannie and Freddie mortgages and deeds of trust provides that "all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3 (escrow). Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note." This Covenant further provides that to the extent payments are misapplied the borrower is entitled to a proper credit on the outstanding principal balanced owed." Under 3-104(a)(3) of the UCC, a promissory note cannot be an instrument if it contains such an undertaking; the rules of negotiability apply only to promises to pay money, not to other, non-monetary understandings such as principal reductions for the misapplication of payments.

Second:

Section 4 of the standard Fannie and Freddie fixed rate mortgage note and Section 5 of their standard adjustable rate notes provide that the borrower has "the right to make payments of principal at any time before they are due. A payment of principal only is known as a 'prepayment.' *When I make a prepayment, I will tell the Note Holder in writing that I am doing so.*" The Italicized sentence of this Section constitutes an undertaking to do an act in addition to the payment of money. Under 3-104(a)(3) of the UCC, a promissory note cannot be an instrument if it contains such an undertaking; the rules of negotiability apply only to promises to pay money, not to other, non-monetary understandings. Sending a notice certainly is an act "in addition to the payment of money," and the note's language clearly constitutes an "undertaking" to perform that act. Thus, the standard Fannie-Freddie Uniform instrument is not negotiable and thus the rules of Article 3 of the UCC (including the holder-in-due-course protections) do not apply.

Third:

Uniform Covenant 14 of the Uniform Freddie and Fannie mortgages and deeds of trust provides that with respect to loan charges the "Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law. If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge." Sections 3-104(a) and 3-106(a) of the UCC clearly provide that a negotiable instrument must constitute an "unconditional" promise to pay and that the obligation to pay must be "unconditional." Under 3-106(a), an express condition in a note creates a complete bar to negotiability. Uniform Covenant 14, by expressly justifying the borrower in withholding a portion of the stated principal amount of the note, or by demanding a credit on the stated amount due, creates such an express condition.

Since these notes are not negotiable instruments, the transfer and sale of the notes are subject to the Provisions of Article 9 rather than Article 3 of the U.C.C.

**A VERY BRIEF ARTICLE 9 ANALYSIS**

Presuming a real estate secured note is a non-negotiable instrument (which it is) AND the originator of a given non-negotiable note opts to sell the same THEN UCC Article 9 applies (as it applies both to Sales of secured instruments and secured transactions).

---

[2] For a biography and list of qualifications and credentials visit: http://www.maxgardner.com/max/

1   In such a case the note must be assigned by the originator/assignor to the assignee AND the assignee MUST pay good and valuable consideration to the assignor in exchange for the assignment.

2   Thereafter, any further assignment of the non-negotiable note would require full compliance with Article 9 –that is each subsequent assignee must pay good and valuable consideration to the assignor.

3   In securitized transactions the Pooling and Servicing Agreements (PSAs) constitute such an Article 9 assignment between the Depositor and Trust/Trustee and it includes conditions in addition to those set forth by Article 9 which

4   would represent a threshold requirement in all cases. For example, since the PSAs require an unbroken chain of indorsements on the note from the originator to the custodian for the trust along with actual delivery of the note for

5   each sale in the chain the notes cannot be acquired simply by the contract of assignment. The drafters of the PSAs have thus imposed a sort of "hybrid Article 3" rule on how the notes must be transferred and delivered with an

6   "unbroken chain of indorsements from the originator to all intervening parties with the final indorsement to the Trustee for the named trust." Such additions to the Law of Assignments provided for by Article 9 are specifically allowed by Section 1-302 of the UCC.

7   Put simply, there can be no mere HOLDER of a non-negotiable note, one is either a proper assignee or not. The requirement for good and valuable consideration is set forth in UCC section 9-203:

8   (a) A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment.

9   (b) Except as otherwise provided in subdivisions (c) to (i), inclusive, a security interest is enforceable against the debtor and third parties with respect to the collateral only if each of the following conditions is satisfied:

10  (1) Value has been given.

11  (2) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party.
    (3) One of the following conditions is met:

12  (A) The debtor has authenticated a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned.

13  (B) The collateral is not a certificated security and is in the possession of the secured party under Section 9-313 pursuant to the debtor's security agreement.

14  (C) The collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under Section 8301 pursuant to the debtor's security agreement.

15  (D) The collateral is deposit accounts, electronic chattel paper, investment property, letter-of-credit rights, or electronic documents and the secured party has control under Section 7-106, 9-104, 9-105, 9-106, or 9-107 pursuant

16  to the debtor's security agreement.

17  It should also be noted that assignment law means a transfer of ownership that does not occur under Article 3. And, it should likewise be noted that the recent draft report of the Permanent Editorial Board of the Uniform Commercial

18  Code specifically states that "the following discussion analyzes the application of these rules to that determination in the case of mortgage notes that are negotiable instruments. The law other than Article 3, including contract law, governs this determination for non-negotiable mortgage notes. That law is beyond the scope of this Report."

19  Section 2.01 of the standard PSA provides that the loan notes and the mortgages must be transferred by assignment. The standard parties are the Seller, Depositor and the Trust. The Seller assigns all rights to the Depositor and the

20  Depositor in turn assigns all rights to the Trustee. The typical language provides that each party transfers "all right, title and interest in and to the mortgages and mortgage notes" to the transferee. However, in addition to the law of

21  assignments, Section 2.01 of the standard PSA incorporates the "hybrid Article 3" otherwise agreed provisions by requiring that the "original mortgage notes" must also be transferred and delivered and indorsed by all of these

22  parties-the Seller, the Sponsor and the Depositor. The standard PSA language provides that the original note must have a complete and unbroken chain of indorsements from the originator through a specified chain of parties,

23  including all intervening indorsements.  The PSA terms trump the normal Article 3 and 9 Rules as an otherwise agreed provision under 1-302 of the UCC and therefore the notes in a securitized trust are transferred by assignment

24  and by Negotiation. Section 1-302(a) of the UCC states that "except as otherwise provided in subsection (b) or elsewhere in (the Uniform Commercial Code), the effect of the provisions of (the Uniform Commercial Code) may be

25  varied by agreement." Sub-Section (b) of Section 1-302 then states that the "obligations of good faith, diligence, reasonableness, and care prescribed (the Uniform Commercial Code) may not be disclaimed by agreement. The

26  parties, by agreement, may determine the standard by which the performance of those obligations is measured if those standards are not manifestly unreasonable. Whenever (the Uniform Commercial Code) requires an action to be taken

27  within a reasonable time, a time that is not manifestly unreasonable may be fixed by the agreement." Finally, 1-302(c) provides that "the presence in certain  provisions of (the Uniform Commercial Code) of the phrase 'unless otherwise

28  agreed', or words of similar import, does not imply that the effect of the other provisions may not be varied by agreement under this section." The Comments to 1-302 provide among other things that this Section "addresses the

Reply to Opposition Plaintiff's MSJ            -13-                    James McDonald
                                                        14840 119th PL NE, Kirkland, WA 98034
                                                                   Phone: (425) 210-0614

effectiveness of contractual provisions that select an exclusive or a non-exclusive" form of transfers and negotiation of instruments." Also, these Comments also make it clear that the parties by agreement may not make an instrument "negotiable" unless it otherwise complies with Section 3-104 of the UCC. Similarly, the Comments state that the parties by agreement may not avoid the applications of UCC Article 9 to a transaction that falls within its scope (See Comments to 9-109). And, the Assignment Rules are set and structured by the PSA and the collateral Mortgage Loan Sales Agreements as the same relate to the PSA.

**WHAT DOES ALL OF THIS MEAN?**

In order to establish standing and comply with the real party in interest rules, including the legal right to enforce a residential mortgage note, the party seeking such status must prove-up the following:

1. That the Sponsor acquired rights in the mortgage note for valid consideration pursuant to a mortgage loan purchase agreement that referenced the specific mortgage note subject to enforcement. This obligation in many cases could encompass proof of many such contracts that would establish a complete and unbroken chain of true sales and assignments from the originator to all intervening parties and finally to the Sponsor.

2. That the Depositor acquired rights in the mortgage note for valid consideration pursuant to a mortgage loan purchase agreement that referenced the specific mortgage note subject to enforcement.

3. That the Trustee for the Residential Mortgage-Backed Securitized Trust acquired rights in the mortgage note for valid consideration pursuant to the Pooling and Servicing Agreement that the PSA referenced the specific mortgage note subject to enforcement.

4. That the Trustee has actual possession of the original mortgage note.

5. That the original mortgage note includes a complete and unbroken chain of indorsements from the entity that originated the note with the final indorsement to the Trust either in blank or to the specifically named Trustee (e.g., an order endorsement to Deutsche Bank as Trustee without naming the vintage year and name for the Trust would not be legally sufficient).

6. If an Allonge was used for any of the required indorsements, then the Allonge would have to include a specific reference to loan level date (e.g., name of borrower, property address and location, and original amount of the note) and would have to be permanently affixed to the original note.

7. All of these documents are not "business records" that can be authenticated by a "business record affidavit" but rather would have to be proved-up by an individual with actual personal knowledge as to the facts necessary to establish the "authenticity" of each document in the required unbroken chain of assignment contracts and indorsements." (*Obstacles to Negotiability of Residential Mortgage Notes.* O. Max Gardner III. June 27, 2011)[3]

In the present case, Plaintiff has identified the exact items that Mr. Gardner refers to in his article. Rather than reiterate everything stated in the Gardner article, Plaintiff presents to this Court a copy of the Note (Exhibit 7) and Deed of Trust (Exhibit 8) and has highlighted the appropriate sections for the Court's convenience on the Judge's Copy. In Section 11 of the Note it is shown that the DOT conditions the debtor on payments to the Note. Based on the education above and the applicable law of Articles 3 and 9 of the UCC which has been adopted by the State of Washington in RCW 62A, Plaintiff's Note cannot be considered a negotiable instrument, therefore possession alone, whether the Note is authentic or not, is not grounds to become a holder. OWB never purchased the Note and never received an Assignment as required by Article 9, therefore has no power to enforce the Note due to mere possession.

**1.D.5** As shown in 1.D.1-1.D.4 above, OneWest has no standing as holder, beneficiary or owner of the Note. The evidence and the law leave no room for dispute.

---

[3] The entire Max Gardner article can be found at http://mattweidnerlaw.com/blog/wp-content/uploads/2012/03/Obstacles-to-Negotiability-of-Residential-Mortgage-Notes.pdf

**1.D.6** Miss Buck's claim that the focus on the Note ownership is irrelevant and material is completely untrue. As described in **1.D.4**, the only party that would have legal authority over the Note under Article 9 is the owner of the Note. Further, the DOTA specifically states in RCW 61.24.030(7)(a): "That, for residential real property, before the notice of trustee's sale is recorded, transmitted, or served, the trustee shall have proof that **the beneficiary is the owner of any promissory note** or other obligation secured by the deed of trust." Therefore the WA DOTA requires that the beneficiary of the Deed of Trust be the **owner of the Note!!** And again, RCW 61.24.030(8)(l) specifically states that the Notice of Default, in order to be valid, must state, "the name and address of the owner of any promissory notes or other obligations secured by the deed of trust." The Notice of Default was executed on behalf of a party who was not the beneficiary, as described above, and did not contain the name of the owner of the Note.

While Defense cites *In Re Reinke*, Judge Overstreet made no mention of these requisites to a trustee sale nor did the Plaintiff in the Adversary Action appear to educate her on the requirements of the law. RCW 61.24.030(7)(a) shows that it is not permissible for the beneficiary of the DOT to be someone other than the owner of the Note. It says that the beneficiary of the DOT must also be the owner of the Note. Again, OneWest admitted it is not the owner as it claimed to be in both the Notice of Default and the Appointment of Successor Trustee.

There is no "hypertechnical error" in pretending to be something that you're not. A hypertechnical error is something that is excessively specific. An example of a hypertechnical error is when Miss Buck referred to the Plaintiff as "her" twice in her MSJ. A claim of defamation against Miss Buck for that would be based on a hypertechnical error. The violations depicted by Plaintiff are plain deception and an unethical attempt to avoid the law and fool unsuspecting homeowners that are supposed to be able to trust banks, trustees and servicers. Does OWB and NWTS truly expect us to believe, when they have Routh Crabtree Olsen on speed dial, that they accidentally claimed to be something they are not **multiple times** when those deceptions are what allowed them to move forward in foreclosure in the first place? The Defendants' attempts to play these off as simply hypertechnical errors are frivolous at best and likely fraud on the Court.

1   Miss Buck also attempts to utilize *Lamb v MERS* 2011 WL 5827813 (W.D. Wash 2011) to
2   prove her point. The Lamb case was dismissed <u>on the pleadings</u> not the law. One of the Lamb's
3   claims was for "wrongful foreclosure for failure to file a tax return.." The Judge dismissed the case
4   based on, "These causes of action fail to state a claim." That is not the case here.

**1.D.7** Plaintiff will not waste the Court's time by fully responding to the Defense's commentary
on MERS. Plaintiff is not disputing that MERS was listed as the **nominal** beneficiary for the
**principal** Indymac Bank, FSB on the Deed of Trust. Plaintiff is more than happy to leave the
question of MERS' ability to even be the beneficiary to the WA Supreme Court who is deciding
that very matter now in *Bain v Metropolitan Mortgage.* However, Plaintiff does prove that the
Assignment of the Deed of Trust (Exhibit 7) to OWB is invalid and does show that it is deceptive.
First, under Agency Law, the agent (nominee) would need to be directed by the principal (actual
beneficial owner) to execute the Assignment. OWB is not the principal, HDC, holder, beneficiary
or owner. The certificate holders of the MBS that the Note was sold into would have become the
successor principal as described in the DOT when Plaintiff became, under novation, a surety rather
than the Principle Debtor. Second, MERS claimed not only to assign the DOT but also the Note!
"Together with the Note or Notes therein described or referred to, the money due and to become
due thereon, with interest, and all rights accrued or to accrue under said Deed of Trust." This is no
"art of language" as Defense tries to color it, but another deceptive act trying to manufacture rights
OWB does not have to foreclose on Plaintiff's home. Further, Brian Burnett signed the ADOT. As
discovered in his Declaration in the *Arizmendi* case discussed above, he has a pattern of deceptive
declarations and sworn statements. Assigning the Note that MERS never owned **is deceptive**.
Further, at the time Burnett made this false statement under the penalty of perjury, he was not even
authorized to sign on behalf of MERS on January 27, 2010 as he is not listed on the Corporate
Resolution the Defendants provided to Plaintiff (Exhibit 2) dated June 11, 2009. Yet MERS did
nothing about it. By their negligence or assistance they are culpable.

**1.D.8 Plaintiff has established violations committed by NWTS**

NWTS is nothing more than a vendor for alleged lenders and servicers. Their business model is,
"we are uniquely positioned to be a one-stop shop for lenders with holdings in the Western United
States." Nowhere on their About Us page do they tell borrowers and grantors what they do for
them. They are the "one-stop shop for lenders". While the mutually agreed upon Pacific Northwest

Title Co was an unbiased trustee between the parties, NWTS is all about the "lenders". As the "one-stop shop" they don't just provide trustee foreclosure services, they are the lender's vendor for the creation and deliverance of Notices of Default, filing and recording Assignments and Appointments, and send their sister company, FEI, knocking on homeowners' doors at least once a month to harass them.

In this case, NWTS admits to being the agent of OWB. OWB used them, not only in the capacity of alleged trustee, but as their agency vendor. When they received the Assignment DOT and saw that MERS was purporting to transfer ownership of a Note, when MERS never owns notes as they are well aware of, that didn't give them pause. When Plaintiff contacted them both by phone and in writing, as stated in his Dec to the MSJ and alerted them to the fact that OWB had falsely stated they were the owner and holder, NWTS did not cancel the sale. They ignored Plaintiff. When Plaintiff continued to give them further evidence, they remained as OWB's "one-stop shop" instead of obeying their duty of good faith to the borrower/grantor as RCW 61.24.010(5) requires of them. NWTS does not dispute that Plaintiff brought to their attention the falsities Plaintiff discovered on the paperwork as described in Plaintiff's MSJ.

Black's Law defines "good faith" as

In common usage this term is ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation. Efron v. Kalmanovitz, 249 Cal.App. 187, 57 Cal.Rptr. 248, 251.

RCW 62A.3-103 defines "good faith" as, "honesty in fact and the observance of reasonable commercial standards of fair dealing." There is nothing honest or fair about NWTS' actions. In this case, NWTS assisted OWB in filing and recording (RCW 40.16.030) documents it knew or should have known to be false. When Plaintiff alerted NWTS that he discovered their falsity, they continued anyway. This is different from *Mickelson v Chase.* Plaintiff brought the discovery to them so they would not be a party to wrongdoing (Plaintiff didn't realize at the time they were part of the wrongdoing). They **knowingly proceeded in the foreclosure** knowing that it was all based on deception. That certainly doesn't count as "honesty of purpose" or "freedom from intention to defraud". They violated their duty of good faith to Plaintiff as described in his MSJ.

Miss Buck is incorrect about the violations being "moot". Whether the Notices have expired or not is immaterial. The violations committed have still been committed. Also in the Defendants' Response P17 Footnote 29: Miss Buck is incorrect. Whether or not NWTS was legally appointed

does not excuse the fact that they acted as the trustee and were complicit in the other violations. Good faith still applies.

The Defense brings up *Klinger v Wells Fargo* in their Response for some reason. Klinger claimed a violation of good faith, but argued that NWTS was responsible for validating the debt in question. That's not NWTS' job, but the "lender's" responsibility. NWTS duty of good faith is not to defraud the homeowner or allow the homeowner to be defrauded as discussed above.

**2.A Consumer Protection Act Argument and Rebuttal**

Plaintiff would like to refresh the Court's memory on *Kunamu* described above where the 9th District Court of Appeals ruled that violations of a state's Deed of Trust Act constitute unfair and deceptive acts.

Also Plaintiff will point out here rather than individually that the Defense incorrectly replaces injury with damage. The 5th Element of proving a CPA claim is, "which causes injury to Plaintiff". Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 790 (1986).

**2.A.1** OneWest Bank (Pages 23-24 of Defendants Response to MSJ)

**2.A.1.1**: Deceptive Act: Once again Miss Buck claims that ownership of the Note has no bearing on foreclosure. However as discussed supra 61.24.030(7)(a) requires the beneficiary be the Note Owner. OWB made false statements sworn under the penalty of perjury TWICE that they were the Note Owner. Once might be a mistake, but twice is a pattern.

**2.A.1.2**: Public Interest Impact: Plaintiff performed a public records search (Exhibit 9) in Snohomish County and Pierce County for Indymac Bank in real estate transactions. There were 7,486 records in Snohomish and 7,089 records in Pierce. Over 14,000 entries combined. As OWB claims to have succeeded in servicing interest to all Indymac Bank loans, there are thousands of potential victims. OWB does not currently have a retail or wholesale presence in Washington, yet they appear by name in 1,445 records in Snohomish and 1,285 records in Pierce, which indicates they have conducted or attempted to conduct over 2,000 foreclosures in 2 years in those 2 counties. That compilation only takes into account two of the dozens of counties in this state. When you extrapolate that to consider all the other counties in this state, the prospect of the sheer amount of violations they likely committed is gut wrenching as it is improbable Plaintiff was singled out for their deception.

**2.A.1.3** Injury to Plaintiff:

James McDonald
14840 119th PL NE, Kirkland, WA 98034
Phone: (425) 210-0614

A. Foreclosing on the property removes the security to Plaintiff's loan. The real party of interest is still out there. Without the DOT as security the real party of interest will still want to get paid. According to RCW 62A.3-309, "The court may not enter judgment in favor of the person seeking enforcement unless it finds that the person required to pay the instrument is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument." Further, clouding the title with false statements recorded in public records in violation of RCW 40.16.030 harms Plaintiff's ability to execute his rights to sell the property.

B. Plaintiff has a second mortgage. By illegally depriving Plaintiff of his property he is liable for a $95,000 deficiency judgment as the second mortgage owner will no longer have a secured loan.

C. OWB, as discussed in the First Amended Complaint, has listed for over two years that Plaintiff is in Foreclosure on his credit report. OWB is not a creditor of Plaintiff. Plaintiff is in the finance industry and cannot find a better paying position partially as a result of this illegal foreclosure and partially because of the sheer amount of time spent on this case.[4]

D. Plaintiff has had to spend the last two years dealing with the Defendants violations of the DOTA which as described above and in his MSJ are unfair and deceptive acts. The Defense is incorrect stating that Plaintiff has the "unilateral power: when it is the Defendants who had the unilateral power to obey the law and not cause this in the first place. As Pro se, Plaintiff doesn't have access to the legal resources at the disposal of the Defendants. Therefore it takes Plaintiff an inordinate amount of time to litigate his case. As of writing this sentence, Plaintiff has spent 38 hours over three days working on this reply alone, in both the writing and research required to litigate properly. Plaintiff will still be working on it for the next two days in reviewing and rewording his writing until he has to submit it on March 30, 2012. Considering he has been working on this issue almost full time for two years to remediate these violations of his civil rights, which is most definitely an injury that the Defendants could have prevented by never breaking the law.

"Injury may be presumed when the consumer has to take time or expend money when the consumer has to remediate his status due to a CPA violation." *Panag v Farmers Ins. Co. of Washington, 166 Wn.2d 27, 204 P.3d 885 (2009).*

**2.A.2 NWTS CPA**

**2.A.2.1** Deceptive Act: *Leingang* only applies if there was no violation of good faith. In this case, Plaintiff has shown that NWTS violated their duty of good faith by being complicit in the filing of

---

[4] http://www.foxbusiness.com/personal-finance/2011/09/20/dont-let-bad-credit-keep-from-landing-job/

records containing false statements (that it knew or should have known to be false before Plaintiff advised them of it) and by continuing to foreclose after Plaintiff showed NWTS that OneWest was not the owner or legal beneficiary (which the NWTS does not contest Plaintiff did).

**2.A.2.2** Public Interest Impact: Plaintiff also performed a public records search on NWTS in Snohomish and Pierce Counties. NWTS only performs foreclosure duties and does not act as a title trustee in non-foreclosure cases according to their website[5]. There are 70,171 records in Snohomish and 74,492 records in Pierce County in the search for NWTS (Exhibit 9). A combined record search of 144,663. As stated supra, it is implausible that Plaintiff was singled out as the sole target of these deceptive acts. Adding in the rest of the counties in this state could effect well over 500,000 Washington residents.

**2.A.2.3** Injury: In order not to simply reiterate, injuries listed in 2.A.1.3 Items A, B and D apply in the same fashion against NWTS. They also had the opportunity to refuse to be party to violating Plaintiff's civil rights and chose not to. Their actions cause the same injuries as noted above. The fact that Plaintiff is still in his house is immaterial. We are looking at the element of injury. None of the parties involved are the real party of interest as discussed at length above.

**2.A.3 MERS CPA**:

**2.A.3.1:** Deceptive Act: Defense included MERS in her argument for OWB so please refer to 2.A.1.1.

**2.A.3.2:** Public Interest Impact: Defense makes no argument about MERS in her statement therefore it appears that the Defense concedes the Public's Interest is Impacted. Regardless, as of last year MERS claimed to be the beneficiary of 60 million deeds of trust.[6] Their actions and/or negligence definitely have a public impact.

**2.A.3.3** Injury: Defense makes no argument about Plaintiff's claims to injury against MERS, only mentioning OWB in the argument. However, A, B and D in §2.A.1.3 supra applies.

**3. Declaratory Relief; Lack of Standing**

**3.A MERS**

Plaintiff did not state that MERS had **initiated** a non-judicial foreclosure. Plaintiff stated that MERS does not have standing **to** initiate foreclosure. What they DID do was assign beneficial interest in a Note they did not own to OWB as discussed supra. And again, OneWest Bank is neither the owner, beneficiary nor holder.

---

[5] http://www.northwesttrustee.com/Services.aspx
[6] http://www.nytimes.com/2011/03/06/business/06mers.html?pagewanted=all

**3.B OWB**

As shown above in RCW 61.24.030(7)(a) the beneficiary of the deed of trust needs to also be the owner of the Note as a requisite to a trustee sale. The Defense actually quotes and ignores that on Page 17 Line 8 of their Response. Moreover Plaintiff has shown that OWB is not the owner (by their own admission), beneficiary or holder (by the law, Plaintiff's exhibits and the Custodial Agreement they utilize as evidence) above.

**3.C NWTS**

NWTS was not legally appointed Successor Trustee as OWB has no legal benefit as detailed in great lengths above. Further OWB claimed to be the OWNER of the Note in the Appointment.

**4. Permanent Injunction**

There was no "blatant defiance" of the Preliminary Injunction. Plaintiff called the office of the Court and advised that he was unable to make the payment due to the inordinate amount of time he had to spend litigating the case (See CPA Injuries). The Defense's painting of the Plaintiff as blatantly defiant is scandalous and defamatory. **Plaintiff moves to strike** under FRCP 12(f). "A scandalous matter includes allegations that cast a cruelly derogatory light on a party or other person." *California Dept. of Toxic Substances Control v Alco Pacific, Inc* 217 F.Supp.2d 1028 1032-33 (C.D.Cal.2002).

As proven herein Plaintiff is entitled to relief as all of Plaintiff's allegations are supported by the evidence before the Court and the rule of law.

Again, the Counsel for the Defense makes a scandalous and defamatory comment! "Not only is Plaintiff's argument nothing more than a veiled attempt to obtain a permanent injunction that will allow him to continue living in the Property rent free…". How dare the Defense claim to know Plaintiff's intentions and defame him in such a manner! Plaintiff is not the party who has committed numerous violations against the law, the Defendants are. The Defense cannot purport to know Plaintiff's intentions. Further, this is not a landlord-tenant dispute and Plaintiff owes no one "rent". **Plaintiff moves to strike and moves the Court for a show cause hearing and sanctions against the Counsel for the Defense.**

**IV. Conclusion and Relief Requested**

**Wherefore,** based on the foregoing, Plaintiff moves the Court on the following:

Grant Plaintiff's Motion for Summary Judgment, Declaratory Relief and Permanent Injunction

Order a Show Cause Hearing Against Miss Buck as described on Pages 12 and 23, Line 20.

Order Sanctions against Miss Buck as requested on Page 23 Line 20.

Order to Strike for the reasons noted supra Defense Exhibits 3, 4, 5, 6, 7 and 9

Order that Sections of the Declaration of Charles Boyle Par. 4 Sentence 2,  Par. 8, Par. 9, Par. 10, Par. 11, Par. 12, Par 13 and Par. 17 be stricken as discussed above.

**/s/ James McDonald -**
**James McDonald**
**Pro Se**

**Certificate of Service**

I hereby certify that on the 30th day of March, 2012 the foregoing was electronically filed with the Clerk of the Court using the ECF system, which sent notification and therefore served the following:
Heidi Buck
Routh Crabtree Olsen
13555 SE 36th ST Suite 300
Bellevue, WA 98006

**  /s/ James McDonald    -**
**James McDonald**
**Pro Se**