# Appendix A
# Table of Authorities

The Honorable Robert S Lasnik
C10-1952-RSL

**Appendix "A"**
**Table of Authorities**

**Cases**

*In Re: OneWest Bank, FSB v Arizmendi*
    BK Case 09-19263-PB13 (2011)..................................................................7, 21, 23, 24, 33, 37, 42,

*In re Doble*
    BK Case No 10-11296..........................................................................8, 21, 24, 33, 37, 42,

*In re Carter*
    BK Case No 10-10257-MM13..................................................................8, 21, 33, 37, 42,

*In Re Telebrico*
    Bk. No. 10-07643-LA13...................................................................8, 21, 25, 33, 37, 42,

*Bain v. Metropolitan Mortgage Group Inc*
    2010 WL 891585 (W.D. 2010)..................................................................................24,

*Krienke v. Chase Home Fin*
    Wn. App. 1032, 2007 WL 2713737 at 5 (Wash. Ct. App. 2007).............................12,

*Pfau v. Wash. Mutual, Inc,*
    NO CV-08-00142-jlw, 2009 WL 484448, at 12 (E.D. Wash. 2009)........................13,

*Vawter v. Quality Loan Service Corporation of Washington*
    2010 WL 1629355 at 5 (W.D. Wash. 2010)......................................................13, 14

*Henderson v GMAC Mortgage Corp.,*
    No. C05-5781RBL, 2008 WL 1733265 at 5 (WD Wash 2008)..............................14

*Albice v. Premier Mortgage Services of WA, Inc*
    239 P.3d 148 (2011)..........................................................................................14, 21,

*Peoples Nat'l Bank v. Ostrander*
    6 Wn. App. 28, 491 P.2d 1058 (1971)..................................................................14

*Plein v. Lackey*
    149 Wn.2d 214, 225-26 (2003)..............................................................................14

*Cox v. Helenius*
    103 Wn.2d 383, 387, 693 P.2d 686 (1985)......................................................14, 20

*O'Melveny & Myers v. FDIC*
    , 87..........................................................................................................................16

*Atherton v FDIC*
    (95-928), 519 U.S. 213 (1997)...............................................................................16,

1   *Koegel v Prudential Mut. Savings Bank*
2       51 Wn. App. 108,. 752 P.2d 385 (1988)................................................................20
    *Kanamu v Ameriquest et al*
3       HI-08-1166-JuPaD (2012)................................................................................21
4   *Indymac Mortgage Services v Machado*
        Case No. 50 2008 CA 037322XXXX MB................................................23, 24, 42
5   *In Re Agard*
6       US BK No. 810-77338-reg (2011)............................................................24, 28,
7   *Udall v Escrow Services Inc*
        159 Wn.2d 903, 909, 154 P.3d 882 (2007)..............................................25,
8   *Lamb v MERS*
9       2011 WL 5827813 (W.D. Wash 2011)...........................................................26,
10  *US Bank v Ibanez*
        458 Mass. 637 (2011).............................................................................26
11  *Efron v. Kalmanovitz*
12      249 Cal.App. 187, 57 Cal.Rptr. 248, 251...................................................27,
13  *Mickelson v Chase*
        2:11-cv-01445...................................................................................28, 42,
14
    *Klinger v Wells Fargo*
15      3:2010cv05546 (2010)........................................................................28
16  *Joern v OcWen Loan Servicing, LLC*
        cv-10-0134-JLQ, 2010..........................................................................29,
17
    *Catalan v GMAC*
18      7th Circuit of Appeals. 09-2182 (2011)....................................................29,
19  *Bhatti v Guild Mortgage Co*
        C:11-0480JLR, 2011............................................................................30,
20
    *Segle v PNC Mortgage*
21      10-5655-RJB (2011)...........................................................................30,
22  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co*
        105 Wn.2d 778, 790 (1986)...................................................................32,
23
    *Panag v Farmers Ins. Co. of Washington*
24      166 Wn.2d 27, 204 P.3d 885 (2009)..........................................................34,
25  *Leingang v. Pierce County Med.*
        131 Wn.2d 133, 930 11 P.2d 288 (1997).....................................................35,
26
    *Hulse v Ocwen Fed. Bank, FSB*
27      195 F.Supp.2d 1188, 1208 (2002)............................................................38,
28

*Carpenter v Longan*

      83 U.S. 16 Wall. 271 271 (1872)......................................................................40,

*Mize v Chase*

      2:11–cv-01245 (2011)...............................................................................42,

*Reinke v NWTS*

      Bankruptcy No. 09–19609.Adversary No. 09–01541.Oct. 26, 2011....................42,

**Statutes**

RCW 61.24.030(8)(l)................................................................................3, 21

RCW 61.24.031.....................................................................................3, 22

RCW 40.16.030.........................................................................4, 5, 23, 25, 36, 37, 38, 41,

RCW 61.24.030(7)(a)..........................................................4, 5, 19, 22, 32, 36,

RCW 19.86..........................................................................................14

RCW 61.24.130......................................................................................14

UCC §3-302..........................................................................................15

**RCW 62A.3-301**.....................................................................................**17, 18,**

UCC §3-104(a)....................................................................................18, 19

UCC §3-106(a)....................................................................................18, 19

RCW 62a.3-309.............................................................................25, 37, 40,

RCW 61.24.010(5)..................................................................................27,

USC §2605(e)(B)(i)&(ii)..........................................................................29, 30

**USC §1692(f)(6)(A)**..................................................................................**31, 32**

RCW 9A.82.........................................................................................41,

**Other Authorities**

*Blacks Law Dictionary*, 6th Ed., West 2009.............................2, 11, 12, 15, 20, 27, 38,

http://voices.washingtonpost.com/political-economy/2010/09/onewest_bank_employee_not_more.html ...................3

http://www.nolo.com/dictionary/investor-term.html .......................................................5

http://mattweidnerlaw.com/blog/wp-content/uploads/2012/03/Obstacles-to-Negotiability-of-Residential-Mortgage-Notes.pdf ...........................................................................................19

http://www.lsnj.org/NewsAnnouncements/Foreclosure/materials/EXHIBITGIndyMacDepositionIndymacvMachado.pdf .........................................................................................23,

http://www.northwesttrustee.com/profile.aspx ...............................................23, 35,

http://legal-dictionary.thefreedictionary.com/Term+of+Art ...........................................24,

*Bank Delays in the Resolution of Delinquent Mortgages: The Problem of Limbo Loans*....................25,

http://atg.wa.gov/uploadedFiles/Home/News/Press_Releases/2010/Trustee%20Letter.pdf .............................28,

http://www.nytimes.com/2011/03/06/business/06mers.html?pagewanted=all ...............................34,

http://www.pasadenanow.com/main/federal-reserves-to-slap-fines-on-onewest-bank-seven-others .........................39,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Appendix "B"

# Damages
# Breakdown

The Honorable Robert S Lasnik
C:10-1952-RSL

**Appendix "B"**
**List of Damages**

## DOTA/CPA Violation Damages Breakdown

| Section | No. of violations | Statutory Damage | Treble Damage | Party |
|---|---|---|---|---|
| 3.1.1 | 1 | 2,000 | 6,000 | OneWest |
| 3.1.2 | 1 | 2,000 | 6,000 | OneWest |
| 3.1.3 | 1 | 2,000 | 6,000 | OneWest |
| 3.1.4 | 1 | 2,000 | 6,000 | MERS |
| 3.1.5 | 2 | 4,000 | 12,000 | NWTS |
| 3.1.6 | 1 | 2,000 | 6,000 | NWTS |
| 3.1.6 | 1 | 2,000 | 6,000 | OneWest |
| 3.1.7 | 1 | 2,000 | 6,000 | NWTS |
| 3.1.8 | 2 | 4,000 | 12,000 | NWTS |
| 3.1.9 | 2 | 4,000 | 12,000 | NWTS |
| 3.1.10 | 1 | 2,000 | 6,000 | OneWest |
| 3.1.11 | 1 | 2,000 | 6,000 | OneWest |
| | Total Damages: | 30,000 | 90,000 | |
| | Total OneWest: | 12,000 | 36,000 | |
| | Total MERS: | 2,000 | 6,000 | |
| | Total NWTS: | 16,000 | 48,000 | |

*Amount based on precedent set by WA AG in *State of Washington v Recontrust* 2:2011cv01460 (2011)

**FDCPA Damages**

| Cause | Statutory Damage | Party |
|---|---|---|
| NOD | $1,000 | OneWest |
| NOD | $1,000 | NWTS |
| RCO Letter | $1,000 | OneWest |
| NOTS | $1,000 | OneWest |
| NOTS | $1,000 | NWTS |
| ANOTS | $1,000 | OneWest |
| ANOTS | $1,000 | NWTS |
| Total | $7,000 | |
| Total OWB | $4,000 | |
| Total NWTS | $3,000 | |

**RESPA - OneWest Bank**

| Violation | Statutory Damage |
|---|---|
| Time spent on RESPA | $20,000 |
| Failure to provide information | $2,000 |
| Reporting to Experian 1st month | $2,000 |
| Reporting to Experian 2nd month | $2,000 |
| Reporting to Equifax 1st month | $2,000 |
| Reporting to Equifax 2nd month | $2,000 |
| Reporting to Transunion 1st month | $2,000 |
| Reporting to Transunion 2nd month | $2,000 |
| Total | $34,000 |

| **Slander of Title** | Amount Claimed | Party |
|---|---|---|
| Assignment DOT | $5,000 | OneWest |
| Assignment DOT | $5,000 | MERS |
| Assignment DOT | $5,000 | NWTS |
| Appointment ST | $5,000 | OneWest |
| Appointment ST | $5,000 | NWTS |
| NOTS | $5,000 | OneWest |
| NOTS | $5,000 | NWTS |
| ANOTS | $5,000 | OneWest |
| ANOTS | $5,000 | NWTS |

| | |
|---|---|
| Total | $45,000 |
| Total OneWest | $20,000 |
| Total MERS | $5,000 |
| Total NWTS | $20,000 |

| **Fraud Claims** | | |
|---|---|---|
| Section | Amount Claimed | Party |
| 3.7.3 | $25,000 | OneWest |
| 3.7.4 | $25,000 | NWTS |
| 3.7.5 | $25,000 | NWTS |
| 3.7.6 | $25,000 | NWTS |
| 3.7.7 | $25,000 | MERS |
| 3.7.8 | $25,000 | OneWest |

| | |
|---|---|
| Total | $150,000 |
| Total OWB | $50,000 |
| Total MERS | $25,000 |
| Total NWTS | $75,000 |

**Civil Conspiracy**

| | |
|---|---|
| OneWest | $25,000 |
| NWTS | $25,000 |
| MERS | $25,000 |
| Total | $75,000 |

**Lost Wages Calculation/Time Spent on Case**

| | |
|---|---|
| Average Annual Income | $98,075 |
| Depressed Market Adjustment | -30% |
| Adjusted Income | $69,652.50 |
| Monthly Adjusted Income | $5,721.04 |
| 18 months Total | $102,979 |

**Court and Supply Costs**

| Item | Amout | Cost | Total Cost |
|---|---|---|---|
| Filing Fee | 1 | $300.00 | $300.00 |
| Service Fee | 3 | $25.00 | $75.00 |
| Printer Ink | 5 | $35.03 | $175.15 |
| Paper | 5 | $4.92 | $24.60 |
| Card Stock | 2 | $16.20 | $32.40 |
| Binders 3" | 5 | $14.78 | $73.90 |
| Binders 2" | 1 | $10.94 | $10.94 |
| Post It Flags | 3 | $6.01 | $18.03 |
| Mailings | 17 | $6.50 | $110.50 |
| Parking | 10 | $10.00 | $100.00 |
| | | Total | $955.55 $920.52 |

| Total Claimed Damages | | OneWest Claimed Damages | | NWTS Claimed Damages | |
|---|---|---|---|---|---|
| DOTA/CPA | $90,000.00 | DOTA/CPA | $36,000.00 | DOTA/CPA | $48,000.00 |
| FDCPA | $7,000.00 | FDCPA | $4,000.00 | FDCPA | $3,000.00 |
| RESPA | $34,000.00 | RESPA | $34,000.00 | RESPA | |
| Slander of Title | $45,000.00 | Slander of Title | $20,000.00 | Slander of Title | $20,000.00 |
| Fraud | $150,000.00 | Fraud | $50,000.00 | Fraud | $75,000.00 |
| Civil Conspiracy | $75,000.00 | Civil Conspiracy | $25,000.00 | Civil Conspiracy | $25,000.00 |
| Wage/Litigation | $102,979.00 | Wage/Litigation | | Wage/Litigation | |
| Costs | $920.52 | Costs | | Costs | |
| Total: | $504,934.55 $504,899.52 | Total: | $169,000.00 | Total: | $171,000.00 |

$504,934.55

**Joint Claimed Damages**

| | |
|---|---|
| Lost Wages | $102,979.00 |
| Costs | $920.52 |
| Total | $103,899.52 |

$103,934.55..corrected amount

# Appendix "C"

# Declaration of James McDonald

The Honorable Robert S Lasnik

1

2      JAMES MCDONALD
       14840 119th PL NE
3      Kirkland, WA 98034
       Phone (425) 210-0614
4      In Pro Per

5                              UNITED STATES DISTRICT COURT

6                            WESTERN DISTRICT OF WASHINGTON

7                                      AT SEATTLE

8

9      In Re:                           )      NO.:  C10-1952RSL
                                        )
10                                      )      Second Declaration of James McDonald
       JAMES MCDONALD                   )      In Support of Plaintiff's Motion for
11                 Plaintiff            )      Partial Summary Judgment
                 v                      )
12     ONEWEST BANK, FSB, et al.,       )
                   Defendants.          )
13     -------------------------------------------------

14     James McDonald declares as follows:

15        1.  I am the Plaintiff, acting as Pro Se, in the present litigation. I am above the age of 18 and

16            am competent to testify at trial. I have direct, personal knowledge of the matters referred to

17            herein.

18        2.  Every document I am including in this Reply is as received or discovered, unaltered.

19        3.  I met the counsel for the Defense, Heidi Buck, at her office on July 13, 2011 to view the

20            alleged promissory note in her possession. Upon examining the Note I noticed that it was

21            in pristine condition as if it had recently come off the printer ready to be signed. There was

22            no wear on the paper from the multiple hands it had passed through. Also, there was no

23            trace of where the pen I used actually touched the paper. I advised Miss Buck at that time

24            that I believed the Note appeared to be a recreated document.

25        4.  On May 13 I requested the Clerk of the Court to issue two subpoenas, one of which was to

26            Deutsche Bank National Trust Company, the "Custodian" in the Custodial Agreement used

27            as evidence by the Defendants. I then mailed the subpoena which was received on May 16,

28            2011 (Exhibit 3). I received the response from DBNTC on May 23, 2011 (Exhibit 1). At no

       2nd Declaration of James McDonald           -1-                      James McDonald
       In Support of Plaintiff's MSJ                            14840 119th PL NE, Kirkland, WA 98034
                                                                         Phone: (425) 210-0614

1   time prior to receiving the document had I been informed of the transfer of the file from

2   the Custodian to the alleged servicer.

3   I declare under the penalty of perjury under the laws of the State of Washington that the foregoing is true

4   and correct. This declaration was executed on the 29th day of March, 2012.

5

6

7

8

9                                                            /s/ James McDonald -
                                                             James McDonald
10                                                               Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2nd Declaration of James McDonald                -2-                        James McDonald
In Support of Plaintiff's MSJ                              14840 119th PL NE, Kirkland, WA 98034
                                                                    Phone: (425) 210-0614

1                                                                    The Honorable Robert S Lasnik

2    JAMES MCDONALD
     14840 119th PL NE
3    Kirkland, WA 98034
     Phone (425) 210-0614
4    In Pro Per

5                              UNITED STATES DISTRICT COURT

6                            WESTERN DISTRICT OF WASHINGTON

7                                       AT SEATTLE

8

9    In Re:                              )        NO.:  **C10-1952RSL**
                                         )
10                                       )
     JAMES MCDONALD                      )
11                 Plaintiff             )
                                         )        **Declaration of James McDonald**
       v                                 )        **in Support of Plaintiff's Motion**
12   ONEWEST BANK, FSB, *et al.,*        )        **for Summary Judgment**
                   Defendants.           )
13   -------------------------------------)

14

15   **James McDonald declares as follows:**

16       1.  I am the Plaintiff in the above action and am appearing Pro Se. I am above the age of 18 and am competent to

         testify in the course of the litigation. I have direct, personal knowledge of the matters referred to herein.

17       2.  Every document that I am including in this Motion for Partial Summary Judgment is as I originally received

18          it, unaltered, provided by the Defendants through their counsel, Heidi Buck, P.S.

19       3.  The necessity to pursue litigation after several unsuccessful attempts to administratively halt the Defendants

            from violating my civil rights has resulted in a severe loss in income over the past two years. The action has

20          significantly impaired my ability to work and find new clients, in addition to hindering my ability to

21          effectively maintain the clients I have had. I have spent hundreds of hours researching the rampant fraud that

22          the Defendants and companies like the Defendants have been committing, as well as learning how to

            competently advocate for myself as a pro se in this case, with no legal background. Were it not for the

23          necessity to protect my civil rights against the abuses of the Defendants, my income would not have suffered.

24          Therefore, I am requesting $102,979.00 in damages as an accurate reflection of the income I have lost as a

25          result of this lawsuit. This is a weighted figure calculated by averaging three years of income, including my

            income in 2009 when I was unable to work for the majority of the year. I removed 30% of the calculated

26          gross income to reflect the recessed economy and industry conditions. Rather than ask for a full 24 months in

27          lost income, I have only requested 18 months, totaling $102,979.00. I believe that this figure is more than

28          reasonable as the unweighted amount would be $196,150.08.

As stated in §3.1.9 of Plaintiff's Motion for Partial Summary Judgment, I made several attempts to speak directly with NWTS and inform them of OneWest's lack of standing. These were written attempts made through documents including, but not limited to, my Objection to Trustee Sale. Verbal attempts were also made through several phone calls to Vonnie McElligott. Most of these attempts were unsuccessful as many calls were left unanswered. In the rare instances in which I actually spoke with Ms. McElligott, it was apparent that she was unwilling to assist me in halting the unjust actions OneWest was taking.

Plaintiff submits to the Court the following exhibits:

| | |
|---|---|
| Exhibit 1 | Response by Deutsche Bank National Trust Company |
| Exhibit 2 | Declaration of JC San Pedro |
| Exhibit 3 | Declaration of Charles Boyd |
| Exhibit 4 | Custodial Agreement |
| Exhibit 5 | Request for Admissions |
| Exhibit 6 | Freddie Mac's Website- Single Family |
| Exhibit 7 | Assignment of Deed of Trust |
| Exhibit 8 | MERS Corporate Resolution |
| Exhibit 9 | Notice of Default |
| Exhibit 10 | NWTS Business License & SOS Filing |
| Exhibit 11 | RCO Business License & SOS Filing |
| Exhibit 12 | Letter to Trustees from WA Attorney General |
| Exhibit 13 | Notice of Trustee Sale |
| Exhibit 14 | Amended Notice of Trustee Sale |
| Exhibit 15 | Objection to Trustee Sale |
| Exhibit 16 | Appointment of Successor Trustee |

I declare under the penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. This declaration was executed on the 28th day of February, 2012.

/s/ James McDonald -
James McDonald
Pro Se

Declaration of JM in Support Motion Sum. Judg.    -2-

James McDonald
14840 119th PL NE, Kirkland, WA 98034
Phone: (425) 210-0614

# Appendix "D"

# Max Gardner Article

# Obstacles to Negotiability of Residential Mortgage Notes

O. Max Gardner III

June 27, 2011

Article 3 of the Uniform Commercial Code carries forward and codifies venerable commercial law rules developed over several centuries during which negotiable instruments played a much different role in commerce than they do today. As stated by Grant Gilmore, Article 3 is not unlike a "museum of antiquities — a treasure house crammed full of ancient artifacts whose use and function have long since been forgotten." Grant Gilmore, Formalism and the Law of Negotiable Instruments, 13 Creighton L. Rev. 441, 461 (1979). His following quotation is apt and often-repeated: "codification . . . preserve[d] the past like a fly in amber".

In addition, Article 3 does not purport to govern completely the manner in which those ownership interests are transferred. For the rules governing those types of property rights, Article 9 provides the substantive law.17 UCC § 9-109(a)(3) (Article 9 "applies to . . . a sale of . . . promissory notes").  Article 9 includes rules, for example, governing the effect of the transfer of a note on any security given for that note such as a mortgage or a deed of trust. As a consequence, Article 9 must be consulted to answer many questions as to who owns or has other property interest in a promissory note. From this it follows that the determination of who holds these property interests will inform the inquiry as to who is a real party in interest in any action involving that promissory note.

Unlike Article 3, Article 9 is a relatively recent innovation which attempts, among other things, to regularize nonpossessory financing. It was last completely revised in 1999, although there are currently amendments to that version being offered for adoption by the states.

UCC § 9-109(a)(3) states that Article 9 applies to any sale of a "promissory note," which is defined in § 9-102(a)(65) as "an instrument that evidences a promise to pay a monetary obligation, [or] does not evidence an order to pay . . . ." In turn, an "instrument" under Article 9 is defined as "a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment." UCC § 9-102(a)(47). See UCC § 9-203(g) ("The attachment of a security interest in a right to payment or performance secured by a security interest or other lien on personal or real property is also attachment of a security interest in the security interest, mortgage, or other lien.").

With very few exceptions, the same rules that apply to transactions in which a payment right serves as collateral for an obligation also apply to transactions in which a payment right is sold outright. See UCC § 9-203. Rather than contain two parallel sets of rules – one for transactions in which payment rights are collateral and the other for sales of payment rights –Article 9 uses nomenclature conventions to apply one set of rules to both types of transactions. This is accomplished primarily by defining the term "security interest," found in UCC § 1-201(b)(35), to include not only an interest in property that secures an obligation, but also the right of a purchaser of a payment right such as a promissory note. UCC § 1-201(b)(35) (The term "security interest" also "includes any interest of a consignor and a buyer of accounts, chattel paper, a payment

intangible, or a promissory note in a transaction that is subject to Article 9."). That is, it transfers a note in a manner not contemplated by Article 3. Article 9 explicitly incorporates definitions found in Article 1. UCC § 9-102(c).

Even if the Note is not a "negotiable instrument," and thus Article 3 would not directly apply, it may "be appropriate, consistent with the principles stated in § 1-102(2) [now § 1-103], for a court to apply one or more provisions of Article 3 to the writing by analogy, taking into account the expectations of the parties and the differences between the writing and an instrument governed by Article 3." Comment 2 to UCC § 3-104. See also Fred H. Miller & Alvin C. Harrell, The Law of Modern Payment Systems § 1.03[1][b] (2003).

First:

Uniform Covenant 2 of the standard Fannie and Freddie mortgages and deeds of trust provides that "all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3 (escrow)." Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note." This Covenant further provides that to the extent payments are misapplied the borrower is entitled to a proper credit on the outstanding principal balanced owed. Under 3-104(a)(3) of the UCC, a promissory note cannot be an instrument if it contains such an undertaking; the rules of negotiability apply only to promises to pay money, not to other,"

non-monetary understandings such as principal reductions for the misapplication of payments.

Second:

Section 4 of the standard Fannie and Freddie fixed rate mortgage note and Section 5 of their standard adjustable rate notes provide that the borrower has "the right to make payments of principal at any time before they are due.  A payment of principal only is known as a 'prepayment.'  *When I make a prepayment, I will tell the Note Holder in writing that I am doing so*."  The Italicized sentence of this Section constitutes an undertaking to do an act in addition to the payment of money.   Under 3-104(a)(3) of the UCC, a promissory note cannot be an instrument if it contains such an undertaking; the rules of negotiability apply only to promises to pay money, not to other, non-monetary understandings.  Sending a notice certainly is an act "in addition to the payment of money," and the note's language clearly constitutes an "undertaking" to perform that act.  Thus, the standard Fannie-Freddie Uniform instrument is not negotiable and thus the rules of Article 3 of the UCC (including the holder-in-due-course protections) do not apply.

Third:

Uniform Covenant 14 of the Uniform Freddie and Fannie mortgages and deeds of trust provides that with respect to loan charges the "Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a

specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.  If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note).  Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge."  Sections 3-104(a) and 3-106(a) of the UCC clearly provide that a negotiable instrument must constitute an "unconditional" promise to pay and that the obligation to pay must be "unconditional."  Under 3-106(a), an express condition in a note creates a complete bar to negotiability.  Uniform Covenant 14, by expressly justifying the borrower in withholding a portion of the stated principal amount of the note, or by demanding a credit on the stated amount due, creates such an express condition.

Fourth:
The Uniform Freddie and Fannie fixed rate mortgage note includes a "usury savings clause" that provides, "interest paid or agreed to be

paid shall not exceed the maximum amount permissible under applicable law and, in any contingency whatsoever, if the Lender shall receive anything of value deemed interest under applicable law which would exceed the maximum amount of interest permissible under applicable law, the excessive interest shall be applied to the reduction of the unpaid Amount of Note or refunded to the maker." Because this provision expressly conditions the maker's obligation to repay the stated principal and interest on the lawfulness of the negotiated payment terms, it deprives the note of negotiability.  In short, this language renders the obligation to pay conditional because the borrower is obligated to pay the fixed "stated amount only if the amount is consistent with applicable law."  Section 3-104(a) of the UCC requires that the note state a "fixed amount of money" due in order to render it a negotiable instrument.

Fifth:
The representations and warranties provided by the Sponsors, the Sellers and the Depositors in the typical securitized transactions effectively do not treat the residential mortgages notes as completely sold due to the continuing repurchase obligations arising out of such representations and warranties.  The EPDs (early payment default) covenants are simple examples of such provisions. These conditions render the notes non-negotiable under Section 3-302(a)(2)(iii) and (a)(2) (vi) of the UCC.

Sixth
The so-called Multiple Option Adjustable Rate Mortgage (MOARM) is yet another example of a non-negotiable mortgage note.  Under these mortgage notes, the borrower has multiple options for the first 2, 3, 4 or 5 years of the 30 year mortgage.  The available options

include but are not limited to making no payments, making half the interest due that month, making the full interest payment due that month, making the principal payment due that month, etc.  Of course, if the borrower elects option one (no payment) or option two (half the contractual interest due) then the principal balance owed on the note goes up.  And, if such options are elected during the first month, then the loan quickly converts to a negative amortization loan since the total amount owed is greater than the original amount loaned.  Since Section 3-104(a) of the UCC requires that the note state a "fixed amount of money" due in order to render it a negotiable instrument, the MOARM simply fails this test as does any other note subject to any similar negative-amortization feature.

Since these notes are not negotiable instruments, the transfer and sale of the notes are subject to the provisions of Article 9 rather than Article 3 of the UCC.  The following is a Brief Analysis of Article 9:

Presuming a real estate secured note is a non-negotiable instrument (which it is) AND the originator of a given non-negotiable note opts to sell the same THEN UCC Article 9 applies (as it applies both to Sales of secured instruments and secured transactions).
In such a case the note must be assigned by the originator/assignor to the assignee AND the assignee MUST pay good and valuable consideration to the assignor in exchange for the assignment.
Thereafter, any further assignment of the non-negotiable note would require full compliance with Article 9 –that is each

subsequent assignee must pay good and valuable consideration to the assignor.

In securitized transactions the Pooling and Servicing Agreements (PSAs) constitute such an Article 9 assignment between the Depositor and Trust/Trustee and it includes conditions in addition to those set forth by Article 9 which would represent a threshold requirement in all cases.  For example, since the PSAs require an unbroken chain of indorsements on the note from the originator to the custodian for the trust along with actual delivery of the note for each sale in the chain the notes cannot be acquired simply by the contract of assignment.  The drafters of the PSAs have thus imposed a sort of "hybrid Article 3" rule on how the notes must be transferred and delivered with an "unbroken chain of indorsements from the originator to all intervening parties with the final indorsement to the Trustee for the named trust."  Such additions to the Law of Assignments provided for by Article 9 are specifically allowed by Section 1-302 of the UCC.

Put simply, there can be no mere HOLDER of a non-negotiable note, one is either a proper assignee or not.  The requirement for good and valuable consideration is set forth in UCC section 9-203:

   (a) A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment.

   (b) Except as otherwise provided in subdivisions (c) to (i), inclusive, a security interest is enforceable against the debtor and third parties with respect to the collateral only if each of the following conditions is satisfied:

       (1) Value has been given.

(2) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party.

(3) One of the following conditions is met:

(A) The debtor has authenticated a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned.

(B) The collateral is not a certificated security and is in the possession of the secured party under Section 9-313 pursuant to the debtor's security agreement.

(C) The collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under Section 8301 pursuant to the debtor's security agreement.

(D) The collateral is deposit accounts, electronic chattel paper, investment property, letter-of-credit rights, or electronic documents and the secured party has control under Section 7-106, 9-104, 9-105, 9-106, or 9-107 pursuant to the debtor's security agreement.

It should also be noted that assignment law means a transfer of ownership that does not occur under Article 3.  And, it should likewise be noted that the recent draft report of the Permanent Editorial Board of the Uniform Commercial Code specifically states that "the following discussion analyzes the application of these rules to that determination in the case of mortgage notes that are negotiable instruments.  The law other than Article 3, including contract law, governs this determination for non-negotiable mortgage notes.  That law is beyond the scope of this Report." Section 2.01 of the standard PSA provides that the loan notes and the mortgages must be transferred by assignment.  The standard

parties are the Seller, Depositor and the Trust. The Seller assigns all rights to the Depositor and the Depositor in turn assigns all rights to the Trustee. The typical language provides that each party transfers "all right, title and interest in and to the mortgages and mortgage notes" to the transferee. However, in addition to the law of assignments, Section 2.01 of the standard PSA incorporates the "hybrid Article 3" otherwise agreed provisions by requiring that the "original mortgage notes" must also be transferred and delivered and indorsed by all of these parties-the Seller, the Sponsor and the Depositor. The standard PSA language provides that the original note must have a complete and unbroken chain of indorsements from the originator through a specified chain of parties, including all intervening indorsements.

The PSA terms trump the normal Article 3 and 9 Rules as an otherwise agreed provision under 1-302 of the UCC and therefore the notes in a securitized trust are transferred by assignment and by Negotiation. Section 1-302(a) of the UCC states that "except as otherwise provided in subsection (b) or elsewhere in (the Uniform Commercial Code), the effect of the provisions of (the Uniform Commercial Code) may be varied by agreement." Sub-Section (b) of Section 1-302 then states that the "obligations of good faith, diligence, reasonableness, and care prescribed (the Uniform Commercial Code) may not be disclaimed by agreement. The parties, by agreement, may determine the standard by which the performance of those obligations is measured if those standards are not manifestly unreasonable. Whenever (the Uniform Commercial Code) requires an action to be taken within a reasonable time, a time that is not manifestly unreasonable may be fixed by the agreement." Finally, 1-302(c) provides that "the presence in certain

provisions of (the Uniform Commercial Code) of the phrase 'unless otherwise agreed', or words of similar import, does not imply that the effect of the other provisions may not be varied by agreement under this section."  The Comments to 1-302 provide among other things that this Section "addresses the effectiveness of contractual provisions that select an exclusive or a non-exclusive" form of transfers and negotiation of instruments."  Also, these Comments also make it clear that the parties by agreement may not make an instrument "negotiable" unless it otherwise complies with Section 3-104 of the UCC.  Similarly, the Comments state that the parties by agreement may not avoid the applications of UCC Article 9 to a transaction that falls within its scope (See Comments to 9-109).  And, the Assignment Rules are set and structured by the PSA and the collateral Mortgage Loan Sales Agreements as the same relate to the PSA.

In order to establish standing and comply with the real party in interest rules, including the legal right to enforce a residential mortgage note, the party seeking such status must prove-up the following:

1.  That the Sponsor acquired rights in the mortgage note for valid consideration pursuant to a mortgage loan purchase agreement that referenced the specific mortgage note subject to enforcement.  This obligation in many cases could encompass proof of many such contracts that would establish a complete and unbroken chain of true sales and assignments from the originator to all intervening parties and finally to the Sponsor.

2. That the Depositor acquired rights in the mortgage note for valid consideration pursuant to a mortgage loan purchase agreement that referenced the specific mortgage note subject to enforcement.

3. That the Trustee for the Residential Mortgage-Backed Securitized Trust acquired rights in the mortgage note for valid consideration pursuant to the Pooling and Servicing Agreement that the PSA referenced the specific mortgage note subject to enforcement.

4. That the Trustee has actual possession of the original mortgage note.

5. That the original mortgage note includes a complete and unbroken chain of indorsements from the entity that originated the note with the final indorsement to the Trust either in blank or to the specifically named Trustee (e.g., an order endorsement to Deutsche Bank as Trustee without naming the vintage year and name for the Trust would not be legally sufficient).

6. If an Allonge was used for any of the required indorsements, then the Allonge would have to include a specific reference to loan level date (e.g., name of borrower, property address and location, and original amount of the note) and would have to be permanently affixed to the original note.

7. All of these documents are not "business records" that can be authenticated by a "business record affidavit" but rather would have to be proved-up by an individual with actual personal knowledge as to the facts necessary to establish the "authenticity" of each document in the required unbroken chain of assignment contracts and indorsements.