# Exhibit 1:

# Deed of

# Trust

After recording please return to:
IndyMac Bank, F.S.B. c/o Document
Management
*[Name of Natural Person]*
901 E. 104th Street Building B
Suite 400/500
Kansas City, MO 64131
*[City, State Zip Code]*.



**2007011 0002077**
PACIFIC NW TIT DT          57.00
PAGE001 OF 025
01/10/2007 15:53
KING COUNTY, WA

Assessor's Property Tax Parcel or Account Number:  328830018003
Abbreviated Legal Description:
Lot 18, High Woodlands Div. 3, V85/P30 32

_____ *[Space Above This Line For Recording Data]* _____

## DEED OF TRUST

25|57

FILED BY PNWT

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11,
13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**     **"Security Instrument"** means this document, which is dated          January 8, 2007             ,
together with all Riders to this document.

**(B)**     **"Borrower"** is  James B McDonald a single man

126049243-7N

. Borrower is the trustor under this Security Instrument.

**(C)**     **"Lender"** is  IndyMac Bank, F.S.B., a federally chartered savings bank

Lender is a         Federal Savings Bank            organized and existing under the laws of
United States of America         . Lender's address is  155 North Lake Avenue, Pasadena,
CA 91101

**(D)**     **"Trustee"** is  Pacific Northwest Title Insurance Co., Inc.

**(E)**     **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns.  **MERS is the beneficiary under this Security**

Loan No:

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                        Page 1 of 14                               14301WA 08/00 Rev. 11/06
www.compliancesource.com                                                                        ©2006, The Compliance Source, Inc.

Exhibit B

**Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F)** "**Note**" means the promissory note signed by Borrower and dated   January 8, 2007   . The Note states that Borrower owes Lender   three hundred eighty nine thousand four hundred eighty one and 60/100ths   Dollars (U.S. $ 389,481.60   ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   February 1, 2037   .

**(G)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)** "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)** "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

☒ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☒ Planned Unit Development Rider    ☐ Biweekly Payment Rider
☐ 1-4 Family Rider    ☐ Revocable Trust Rider
☐ Other(s) *[specify]*

**(J)** "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)** "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)** "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)** "**Escrow Items**" means those items that are described in Section 3.

**(N)** "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)** "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)**    **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of King :

    *[Type of Recording Jurisdiction]*      *[Name of Recording Jurisdiction]*
See Exhibit A attached hereto and made a part hereof

which currently has the address of            14840 119th Pl NE

                            *[Street]*

KIRKLAND            ,   Washington      98034           ("Property Address"):

      *[City]*                     *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Loan No:

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.  Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.  Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender

Loan No: ▉▉▉▉▉▉▉

receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.    **Charges; Liens.**    Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower:  (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.    **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right

shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Loan No: V████████

**7.   Preservation, Maintenance and Protection of the Property; Inspections.**   Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.   Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.   Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.   If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.   Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.   If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property.   If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.   Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.   Borrower's Loan Application.**   Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.   Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**   If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.   Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.   Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.   It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9, shall become additional debt of Borrower secured by this Security Instrument.   These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.   If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.   Mortgage Insurance.**   If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.   If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.   If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.   Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance.   Such loss reserve shall be

Loan No:

non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be

Loan No: ▮▮▮▮▮▮▮▮

reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not

be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such

Loan No: ~~████████~~

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                         Page 10 of 14                14301WA 08/00 Rev. 11/06
www.compliancesource.com                                                                  ©2006, The Compliance Source, Inc

other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Loan No: ▆▆▆▆▆▆▆▆

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

24. Substitute Trustee. In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Use of Property. The Property is not used principally for agricultural purposes.

Loan No: ▮▮▮▮▮▮▮▮▮

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                    Page 12 of 14
www.compliancesource.com

MERS Modified Form 3048 01/01
14301WA 08/00 Rev. 11/06
©2006, The Compliance Source, Inc.

**26. Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees", whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                                                        -Borrower
                                        James B McDonald
                                                                        *[Printed Name]*

_____        _____ (Seal)
                                                                        -Borrower
                                                                        *[Printed Name]*

                                        _____ (Seal)
                                                                        -Borrower
                                                                        *[Printed Name]*

                                        _____ (Seal)
                                                                        -Borrower
                                                                        *[Printed Name]*

_____ [Acknowledgment on Following Page] _____

Loan No: ███████████

State of Washington &
&  ss.:
County of Snohomish &

I certify that I know or have satisfactory evidence that        James B McDonald

*[name of person]* is the person who appeared before me, and said person(s) acknowledged that (he/she/they) signed this instrument and acknowledged it to be (his/her/their) free and voluntary act for the uses and purposes mentioned in the instrument.

Dated: 01-08-07

(Signature)

(Seal)



Notary Public, Michael Angelo
(Title of Office)                          Castaneda
                                              [Printed Name]

Liake Stevens.
Place of Residence of Notary Public)

Loan No: ▮▮▮▮▮▮▮

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                     Page 14 of 14
www.compliancesource.com

MERS Modified Form 3048 01/01
14301WA 08/00 Rev. 11/06
©2006, The Compliance Source, Inc.

Order No. ███████

A.L.T.A. COMMITMENT
SCHEDULE A
Page 3

The land referred to in this commitment is situated in the State of
Washington, and described as follows:

> Lot 18, The High Woodlands Addition Div. No. 3, according to the
> plat thereof recorded in Volume 85 of Plats, pages 30 through 32,
> inclusive, in King County, Washington.

END OF SCHEDULE A

NOTE FOR INFORMATIONAL PURPOSES ONLY:

The following may be used as an abbreviated legal description on the
documents to be recorded, per amended RCW 65.04.  Said abbreviated
legal description is not a substitute for a complete legal description
within the body of the document.

> Lot 18, High Woodlands Div. 3, Vol. 85, pgs. 30-32

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this  8th  day of  January,   2007  , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to   IndyMac Bank, F.S.B., a federally chartered savings bank
                                                            (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

14840 119th Pl NE, KIRKLAND, WA 98034

*[Property Address]*

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in Declaration of Covenants, Conditions, and Restrictions (the "Declaration").  The Property is a part of a planned unit development known as:

**Kirkland/Kingsgate**

*[Name of Planned Unit Development]*

(the "PUD").  The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.**  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
  **A.  PUD Obligations.**   Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents.  The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association.  Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.
  **B.  Property Insurance.**  So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire,

Loan No: ▊▊▊▊▊▊▊▊▊▊                              MIN: ▊▊▊▊▊▊▊▊▊▊▊▊
Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.—                        Page 1 of 3                             14501MU 08/00 Rev. 11/04
www.compliancesource.com                                                                  ©2004, The Compliance Source, Inc.

hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then:

(i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender.  Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C.  Public Liability Insurance.**  Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D.  Condemnation.**  The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.  Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E.  Lender's Prior Consent.**  Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i)  the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii)  any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii)  termination of professional management and assumption of self-management of the Owners Association; or (iv)  any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F.  Remedies.**  If Borrower does not pay PUD dues and assessments when due, then Lender may pay them.  Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument.  Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

*[Signatures on Following Page]*

Loan No: █████████

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                   Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.—                                      Page 2 of 3                                    14501MU 08/00 Rev. 11/04
www.compliancesource.com                                                                                              ©2004, The Compliance Source, Inc.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)      _____ (Seal)
James B McDonald     -Borrower                                     -Borrower

_____ (Seal)      _____ (Seal)
                                      -Borrower                                       -Borrower

*[Sign Original Only]*

Loan No: ███████████

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.—                 Page 3 of 3            14501MU 08/00 Rev. 11/04
www.compliancesource.com                                            ©2004, The Compliance Source, Inc.

# FIXED/ADJUSTABLE RATE RIDER
## INTEREST ONLY PERIOD
(1-Year LIBOR Index - Rate Caps)
(Assumable after Initial Period)
(    10 Year Interest Only Period)

Loan # ▓▓▓▓▓▓▓                                    MIN: ▓▓▓▓▓▓▓

THIS ADJUSTABLE RATE RIDER is made this 8th   day of  January,   2007        ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to
IndyMac Bank, F.S.B., a federally chartered savings bank

(the "Lender") of the same date and covering the property described in the Security
Instrument and located at:

14840 119th Pl NE, KIRKLAND, WA 98034

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of :        5.875        %. The Note
provides for changes in the interest rate and the monthly payments as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   (A) Change Dates
The interest rate I will pay may change on the first day of     February,   2012
and may change on that day every 12th month thereafter. Each date on which my interest
rate could change is called a "Change Date."

IndyMac Bank
Fixed/Adjustable Rate Rider - WSJ 1 Yr. Libor - Interest Only Period -
Multistate

Page 1 of 5                                          Form 5601
8480831 (0506)        VMP Mortgage Solutions, Inc.  (800)521-7291              6/05

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **two and 750/1000ths** percentage point(s) ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.875 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **two and NO/1000ths** percentage point(s) ( 2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 10.875 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.



**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

   **1. UNTIL BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE IN EFFECT AS FOLLOWS:**

     **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

     If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

     If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

   **2. AFTER BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1 ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND THE PROVISIONS OF UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE AMENDED TO READ AS FOLLOWS:**

     **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Loan No: ███████████
8480831 (0506)                          Page 3 of 5

Form 5601
6/05

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)                    _____ (Seal)
James B McDonald          -Borrower                                                    -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                                    -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                                    -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                                    -Borrower

Loan No: ███████████
8480831 (0506)                      Page 5 of 5                        Form 5601
                                                                        6/05

## ADDENDUM TO FIXED/ADJUSTABLE RATE RIDER

Loan #: ████████

THIS ADDENDUM to the Fixed/Adjustable Rate Rider is made this 8th   day of January,  2007    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") and Fixed/Adjustable Rate Rider of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to   IndyMac Bank, F.S.B., a federally chartered savings bank

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

14840 119th Pl NE, KIRKLAND, WA 98034

[Property Address]

ADDITIONAL COVENANTS. In Addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. Section 4(D) of the Fixed/Adjustable Rate Rider is modified as follows:

The interest rate I am required to pay at the first Change Date will not be greater than 10.875    % or less than    2.750     %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than two and NO/1,000ths              percentage point(s) (    2.000     %) from the rate of interest I have been paying for the preceding  12    months. My interest rate will never be greater than    10.875    % or less than    2.750    %.

IndyMac Bank
ARM Addendum to Fixed/Adjustable Rate Rider
Multistate

Page 1 of 2
8480345 (0602)              VMP Mortgage Solutions, Inc.

I075
2/06

2. All other provisions of the Fixed/Adjustable Rate Rider are unchanged by this Addendum and remain in full force and effect.

Dated: _1/8/07_____

_____ (Seal)                    _____ (Seal)
James B McDonald          -Borrower                                          -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                          -Borrower

8480345 (0602)                        Page 2 of 2                                    I075
                                                                                    2/06

# Exhibit 2

# Promissory Note

# FIXED/ADJUSTABLE RATE NOTE
## INTEREST ONLY PERIOD
(1-Year LIBOR Index - Rate Caps)
(Assumable after Initial Period)
( 10  Year Interest Only Period)

Loan # ██████████                    MIN: ████████████

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

January  8, 2007              Everett                  Washington
   [Date]                        [City]                      [State]

14840 119th Pl NE, KIRKLAND, WA 98034

[Property Address]

**1.  BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. $  389,481.60   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is          IndyMac Bank, F.S.B., a federally chartered savings bank
I will make all payments under this Note in the form of cash, check or money order.
    I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**
    Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      5.875    %. The interest rate I will pay will change in accordance with Section 4 of this Note.
    The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.  PAYMENTS**
    **(A) Time and Place of Payments**
    I will make a payment every month on the first day of the month beginning on          March  1, 2007            .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and if the payment consists of both principal and interest, it will be applied to interest before Principal. If, on    February  1, 2037   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at       IndyMac Bank, F.S.B., P.O. Box 78826, Phoenix, AZ 85062-8826
or at a different place if required by the Note Holder.
    **(B) Amount of My Initial Monthly Payments**
    Before the first fully amortizing principal and interest payment due date stated in subsection (C) below (the "First P&I Payment Due Date"), my monthly payments will be only for the interest due on the unpaid principal of this Note.
    Each of my initial monthly payments will be in the amount of U.S. $     1,906.84        . This amount may change in accordance with subsection (C) below.

IndyMac Bank
Fixed/Adjustable Rate Note - 1 Yr. Libor Index - Interest Only Period - Multistate
Initial: 

8480830 (0508)            VMP Mortgage Solutions, Inc. (800)521-7291                    6/05

Exhibit A

**(C) Monthly Payment Changes**

The First P&I Payment Due Date is    MARCH 1, 2017 .

Prior to the First P&I Payment Due Date, my monthly payment may change to reflect changes in the interest rate I must pay in accordance with Section 4 of this Note or to reflect changes in the unpaid principal of my loan in accordance with Section 5 of this Note. Notwithstanding the provisions of Section 4(C) of this Note to the contrary, prior to the First P&I Payment Due Date the Note Holder will not include in the monthly payment any amount to repay the unpaid principal. Before the effective date of any change in my monthly payment, the Note Holder will deliver or mail to me a notice of the change in accordance with Section 8 of this Note. The notice will include the title and telephone number of a person who will answer any question I may have regarding the notice.

Beginning with the First P&I Payment Due Date, my monthly payment will change to an amount sufficient to repay the principal and interest at the rate described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Sections 4 and 5 of this Note.

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of    FEBRUARY, 2012 , and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

**(B) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding    two and 750/1000ths    percentage point(s) (    2.750    %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Interest Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Interest Change Date will not be greater than    10.875    % or less than    2.750    %. Thereafter, my interest rate will never be increased or decreased on any single Interest Change Date by more than    two and NO/1000ths    percentage point(s) (    2.000    %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than    10.875    %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to the changes.

Loan No: ███████

8480830 (0506)

Form 5600

6/05

If I make a partial Prepayment during the period ending with the due date of my last interest only monthly payment, my partial Prepayment will reduce the amount of my monthly payment. If I make a partial Prepayment after the last interest only monthly payment, my partial Prepayment may reduce the amount of my monthly payments beginning with the monthly payment due after the Interest Change Date following the partial Prepayment. After the first Interest Change Date, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest during the period when my payment is interest only, and of principal and interest after that. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**(A) UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**(B) AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
James B McDonald          -Borrower                                              -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                                              -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                                              -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                                              -Borrower

*[Sign Original Only]*


Pay To The Order Of

Without Recourse
IndyMac Bank, F.S.B.
By:

Sam Lindstrom
Vice President


Loan No: ███████████

8480830 (0506)                                   Page 5 of 5                     Form 5600



                                                                                6/05

# ADDENDUM TO ADJUSTABLE RATE NOTE

Loan #: ██████████

THIS ADDENDUM is made this        8th      day of       January,   2007        , and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

**1. Section 4(D) of the Adjustable Rate Note is modified as follows:**

The interest rate I am required to pay at the first Change Date will not be greater than        10.875       % or less than        2.750       %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than   two and NO/1000ths   percentage point(s) (        2.000        %) from the rate of interest I have been paying for the preceding     12      months. My interest rate will never be greater than        10.875       % or less than        2.750       %.

**2. All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.**

Dated: 1/8/07

_____ (Seal)          _____ (Seal)
James B McDonald                             -Borrower                                                      -Borrower

_____ (Seal)          _____ (Seal)
                                             -Borrower                                                      -Borrower

_____ (Seal)          _____ (Seal)
                                             -Borrower                                                      -Borrower

_____ (Seal)          _____ (Seal)
                                             -Borrower                                                      -Borrower

IndyMac Bank
ARM Note Addendum - Multistate
8480344 (0602)                          VMP Mortgage Solutions, Inc.                          1074
(2/06)

# Exhibit 3:

# Freddie Mac

# Website

# Our Business

In 1970, Congress created Freddie Mac with a few important goals in mind:

- Make sure that financial institutions have mortgage money to lend
- Make it easier for consumers to afford a decent house or apartment
- Stabilize residential mortgage markets in times of financial crisis

To fulfill this mission, Freddie Mac conducts business in the U.S. secondary mortgage market —
meaning we do not originate loans — and works with a national network of mortgage lending customers.
We have three business lines: a Single Family Credit Guarantee business for home loans; a Multifamily
business for apartment financing; and an investment portfolio.

- Single-Family Credit Guarantee Business
- Multifamily Business
- Investment Business

Learn more about the benefits of our mortgage funding.

## Single-Family Credit Guarantee Business

In our Single-Family business, we use mortgage securitization to fund millions of home loans every year.
Securitization is a process by which we purchase those home loans that lenders originate, put these loans
into mortgage securities that are sold in global capital markets, and recycle the proceeds back to
lenders. This recycling is designed to ensure that lenders have mortgage money to lend.

In the first nine months of 2010, Freddie Mac purchased or guaranteed $261 billion in single-family
home loans — funding one out of every four mortgages originated in the market. At the end of the third
quarter 2010, our total outstanding obligations of mortgage-backed securities stood at $1.8 trillion.

What makes the securitization process work? Families paying their mortgages every month. Because
once a family moves into their home, their monthly payments of mortgage principal and interest are
transferred ultimately to securities investors. When a family stops making payments — often due to loss
of income — Freddie Mac steps in and makes those payments to securities investors. Managing this risk,
known as credit risk, is how we generate revenue. Each time we fund a loan, we collect a credit
guarantee fee from the lender selling us the loan. This fee is intended to protect us in case of loan
default.

Other features of this business line:

- We guarantee mortgages exclusively in the conventional conforming market, where we purchase
  loans only up to a certain dollar amount (for 2011, $417,000 for most of the nation and $729,750 in
  certain high-cost areas)
- The vast majority of the loans we fund are long term, fixed rate mortgages
- We generally require third-party mortgage insurance on loans with low downpayments
- We have loan servicing operations that work with lenders to avoid foreclosure, where possible, for
  families in financial difficulty

## Multifamily Business

Since not everyone owns their own home, Freddie Mac supports renters, too. Through our Multifamily
business, we work with a network of lenders to finance apartment buildings around the country. Like
single-family loans, these lenders originate and close loans that Freddie Mac later purchases; lenders
then use the proceeds to originate additional loans.

Unlike single-family loans, which are relatively small in dollar amount and standardized in their
composition and underwriting, multifamily loans typically are several million dollars in size, have
underwriting characteristics that vary from property to property, and require custom examination such as
on-site property inspections and verification of income cash flows (i.e., rents). One other difference:
while single-family borrowers are individual consumers, multifamily borrowers are property developers.

# Exhibit 4:

# DBNTC Subpoena Information

Deutsche Bank



Shawn T. Hynes, Counsel
Deutsche Bank AG, New York Branch
Legal Department
60 Wall Street
New York, NY 10005
Tel: (212) 250-3138
Shawn.hHynes@db.com

May 20, 2011

**VIA FEDERAL EXPRESS**
James McDonald
14840 119th Street PLPlace NE
Kirkland, WA 98034

Re: **James MacDonald v. OneWest Bank**

Dear Mr. McDonald:

I write on behalf of Deutsche Bank National Trust Company ("DBNTC") in response to the above-referenced subpoena directed to "Deutsche Bank" dated May 13, 2011 (the "Subpoena").

Enclosed please find documents stamped CONFIDENTIAL and bearing Bates number DBNTC 00001-DBNTC 00002 containing information about the loans for James B. McDonald. Please note that DBNTC does not have any information pertaining to Form 1034 or 1036 authorizing documents to be released to OneWest, nor do we have a list of identification numbers associated with the note.

Please also note that DBNTC acted as the Custodian for several trusts, of which these loans were a part of, and DBNTC's role with respect to these trusts is very limited. Please find information below setting forth regarding the relevant trust, and the respective servicer to with whom the loan files are serviced with, and the contact for the servicer.

| Property Address | Borrower | Loan Number | Servicer | Servicer Contact | DB's Role |
|---|---|---|---|---|---|
| 14840 119th Pl NE Kirkland WA, 98034 | James B. McDonald | 125049243 | OneWest Bank/Freddie Mac | 888 E Walnut St. 4th Fl Pasadena CA 91101 Maria Sykes | Custodian |



Please be advised that, based on DBNTC's limited role, we believe that the servicer would be more able to provide further information regarding the above-referenced loan and/or trust, if necessary.

Please call me or my paralegal, Haleh Rashidi at (904) 520-5230, if you wish to discuss this matter further.  Thank you.

Sincerely,

Shawn T. Hynes

Enclosure

## Complete Loan File Information

| | | | | |
|---|---|---|---|---|
| Loan Number: | 00000000000125049243 | Issue: | IN010C | Subpool: | IN070227 |
| Secondary Loan Number: | 00000000000332479455 | | | |

Borrower: JAMES B MCDONALD
Address: 14840 119TH PL NE          MIN:   100055401250492438
KIRKLAND WA 98034          MOM IND:

### Loan File Withdrawal Information

Loan Number:  00000000000125049243          Item:  FILE          Issue:  IN010C

Current Withdrawal Information:          Sent To:

Reason:          FORECLOSURE          ONEWEST BANK
Withdrawn on:  10/5/2010          by tedhan          888 E WALNUT ST, 4TH FL
Air Bill Number:  1ZR4A6911350860453          MS: HQ-04-06
Transmittal:          1255752          PASADENA, CA 91101
Transmitted on:  10/5/2010          Attention:   MARIA SYKES
Comment:          Authorized by:  SANDRA SCHNEIDER

### Alternate Numbers

| Alternate Loan Number | Delivery Company | Loan Delivery Date |
|---|---|---|
| 00000000000332479455 | | 1/11/2007 00:00:00 |
| 00000000001009111244 | | 1/11/2007 00:00:00 |

### Classification Attribute Changes

| Classification Attribute | Previous Value | Changed By | Changed On |
|---|---|---|---|
| loan_type | | bionreg | 1/11/2007 08:43:44 |
| loan_state | | bionreg | 1/11/2007 08:43:44 |
| group_code | | bionreg | 1/11/2007 08:43:44 |
| product_type | | bionreg | 1/11/2007 08:43:44 |
| loan_delivery_date | Jan 11 2007 8:42:3( | bionreg | 1/11/2007 08:44:05 |
| loan_type | | bionreg | 1/11/2007 08:46:16 |
| loan_state | WET | bionreg | 1/11/2007 08:46:16 |
| group_code | ELGBL | bionreg | 1/11/2007 08:46:16 |
| product_type | RES | bionreg | 1/11/2007 08:46:16 |
| issue_id | IMIMOC | bionreg | 1/11/2007 08:48:17 |
| issue_id | IMMSOC | nguymar | 1/11/2007 10:02:50 |
| issue_id | IMMLOC | nguymar | 1/16/2007 10:48:17 |
| loan_type | | bionreg | 1/16/2007 11:28:15 |
| loan_state | WET | bionreg | 1/16/2007 11:28:15 |
| group_code | ELGBL | bionreg | 1/16/2007 11:28:15 |
| product_type | RES | bionreg | 1/16/2007 11:28:15 |
| issue_id | IMIMOC | nguymar | 1/16/2007 11:55:20 |
| loan_type | | gimaraf | 1/17/2007 08:40:56 |
| loan_state | DRY | gimaraf | 1/17/2007 08:40:56 |
| group_code | ELGBL | gimaraf | 1/17/2007 08:40:56 |
| product_type | RES | gimaraf | 1/17/2007 08:40:56 |
| issue_id | IN06GW | nguymar | 1/17/2007 11:02:17 |
| issue_id | IMIMOC | gimaraf | 1/17/2007 12:30:16 |
| loan_type | NLF | gimaraf | 1/18/2007 12:57:21 |
| loan_state | DRY | gimaraf | 1/18/2007 12:57:21 |
| group_code | ELGBL | gimaraf | 1/18/2007 12:57:21 |
| product_type | RES | gimaraf | 1/18/2007 12:57:21 |
| loan_type | | nguymar | 2/22/2007 09:36:58 |
| loan_state | DRY | nguymar | 2/22/2007 09:36:58 |
| group_code | ELGBL | nguymar | 2/22/2007 09:36:58 |
| product_type | RES | nguymar | 2/22/2007 09:36:58 |
| issue_id | IN051C | gimaraf | 2/27/2007 13:41:49 |
| issue_id | IN051C | gimaraf | 2/27/2007 13:43:46 |
| loan_type | s09 | YOSHTOM | 6/6/2007 07:30:17 |
| loan_state | DRY | YOSHTOM | 6/6/2007 07:30:17 |
| group_code | ELGBL | YOSHTOM | 6/6/2007 07:30:17 |
| product_type | RES | YOSHTOM | 6/6/2007 07:30:17 |
| issue_id | IN010C | nguymar | 9/24/2007 12:17:50 |
| loan_type | | YOSHTOM | 3/31/2009 08:26:19 |

CONFIDENTIAL

## Complete Loan File Information

### Classification Attribute Changes

| Classification Attribute | Previous Value | Changed By | Changed On |
|---|---|---|---|
| loan_state | DRY | YOSHTOM | 3/31/2009 08:26:19 |
| group_code | ELGBL | YOSHTOM | 3/31/2009 08:26:19 |
| product_type | RES | YOSHTOM | 3/31/2009 08:26:19 |

### Loan File Inventory History

| Change Type | Attribute Item | Attribute Status | Changed By | Changed On | Current Attribute Status |
|---|---|---|---|---|---|
| C | MORTG | CU | orozmar | 3/27/2007 08:38:27 | O |
| C | TITLE | PTR | monther | 4/9/2007 11:46:50 | O |

### Loan File Transactions

| Transaction Issue | Attribute Item | Transaction | Transaction Date | Billable Amount | Created By | Billed |
|---|---|---|---|---|---|---|
| INMLOC | FILE | INITIAL LOAN REVIEW | 1/16/2007 07:17:30 | | madrdor | |
| IN010C | MORTG | TRAILING DOCS FILE | 3/27/2007 08:38:27 | | orozmar | |
| IN010C | TITLE | TRAILING DOCS FILE | 4/9/2007 11:46:50 | | monther | |
| IN010C | FILE | WITHDRAWAL OF FILE FOR SERVICING | 10/6/2010 12:11:17 | $0.00 | tedtnan | |

### Loan File Request History - eRequest Version 2

| Request ID | Request Type | Item | Requested by/on | Item Status | Trans ID | Tracking Num | Completed by/on | Reject Reason |
|---|---|---|---|---|---|---|---|---|
| 131549247 | Withdrawal | FILE | GARCIAC 10/05/2010 1:22:41 PM | Completed | 1255752 | 1ZR4A6911350660453 | tedtnan 10/06/2010 | |

CONFIDENTIAL

DBNTC 00002

# Exhibit 5:

# Custodial

# Agreement

Custodian Number  1000409       1
Custodial Agreement Number   000015  ¹
Seller/Servicer Number  153845  ¹

Self ___  Affiliated 3ʳᵈ Party ___
Unaffiliated    X²

## CUSTODIAL AGREEMENT: SINGLE-FAMILY MORTGAGES  ✶ 153984

THIS CUSTODIAL AGREEMENT, dated as of ~~March 19~~ May 12th A.D. , 200̶2³ (the "Agreement"), is by and among Freddie Mac, __Deutsche Bank__ , as custodian ("Custodian"), and __OneWest Bank, FSB__ ⁵, as seller and/or servicer ("Seller/Servicer").

### WITNESSETH:

WHEREAS, Freddie Mac and Seller/Servicer are parties to certain Purchase Documents pursuant to which Seller/Servicer sells and/or agrees to sell Mortgages to Freddie Mac, or services and/or agrees to service Mortgages for Freddie Mac;

WHEREAS, pursuant to the Purchase Documents, Seller/Servicer will, on or before each Delivery Date, deliver or cause to be delivered to Custodian (i) the Notes relating to such Mortgages, endorsed in blank as required by Freddie Mac's *Single-Family Seller/Servicer Guide* (the "Guide"), (ii) the Assignments relating to such Mortgages, (iii) certain data, using either Freddie Mac's Selling System or MIDANET®, and  (iv) for Mortgages delivered through MIDANET®, a completed Form 1034, or for Mortgages delivered through the Selling System, a completed Form 1034 or Cover Sheet for Selling System;

WHEREAS, Custodian shall accept delivery of the Notes and any Assignments on Freddie Mac's behalf in accordance with the terms and conditions of this Agreement;

WHEREAS, Freddie Mac, Seller/Servicer and Custodian desire to set forth the terms and conditions for the deposit and custodianship of the original Notes for Mortgages sold to and serviced for Freddie Mac.

NOW, THEREFORE, in consideration of the premises, the covenants herein set forth, and other good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, Freddie Mac, Custodian and Seller/Servicer agree as follows:

Section 1:  Definitions.  Capitalized terms used herein have the meanings ascribed to them in the Purchase Documents, including (without limitation) the Guide; provided

---

¹ Freddie Mac will complete this blank or, if Custodian has been assigned a Custodian Number, Custodian must insert this number when it executes this Agreement.

² Seller/Servicer, indicate a relationship with Custodian by initialing the appropriate space; Custodian, confirm the relationship by initialing the appropriate Section 2(b) below.

³ Freddie Mac will complete this blank.

⁴ Insert the complete legal name of Custodian.

⁵ Insert the complete legal name of Seller/Servicer and its Freddie Mac Seller/Servicer number.

**Exhibit 8**
**Page 2 of 14**

that the following terms are defined for purposes of the custodial relationship contemplated by this Agreement:

"Assignments" means all intervening assignments and instruments necessary to assign the security instruments to Freddie Mac; if, pursuant to Section 18.1 of the Guide, the Seller/Servicer has elected to hold the Assignments in its Mortgage files, it need not deliver Assignments to the Custodian but must provide Custodian with evidence of that election.

"Form 1034" means a Custodial Certification Schedule in any format (hardcopy or electronic), including without limitation Forms 1034, 1034A, 1034B, 1034E, 1034S, 1034SM, or Form 1034T, which identifies the Notes delivered to Custodian.

"Notes", for purposes of this Agreement, means the original notes and any other instruments evidencing the indebtedness secured by the security instruments, along with the original riders, powers of attorney, and/or other modifying instruments to the original notes (e.g., modification, conversion, assumption of indebtedness or release of liability agreements); references to "Notes" may also include Assignments and any supplemental or additional documents required to be maintained in the Custodian's Note file, as the context requires or permits.

"Form 1036" means a Request for Release of Documents authorizing Seller/Servicer to obtain Notes from Custodian and Custodian to release them to Seller/Servicer.

**Section 2.   Custodian Eligibility, Functions and Duties.**
(a)   *Eligibility requirements and general duties.*   Custodian hereby represents and warrants to, and covenants with, Seller/Servicer and Freddie Mac that Custodian will perform the functions and fulfill the duties set forth in Sections 18.6, 18.7, 56.9 and other relevant portions of the Guide.   Custodian shall also:

(1)   in addition to satisfying the requirements of Section 18.6(a)4, make available evidence of compliance with the requirements, terms, standards, and responsibilities referred to in subparagraph (2) immediately below;

(2)   comply with all of the terms of this Agreement, and with:
- all Guide requirements pertaining to Notes held for Freddie Mac;
- any other requirements that Freddie Mac may specify to ensure the safety, security and/or enforceability of its Notes; and
- such standards for custodial performance and fiduciary duties as Freddie Mac may prescribe in its discretion from time-to-time;

all as amended from time-to-time by Freddie Mac;

(3)   notify Freddie Mac and Seller/Servicer if, at any time, Custodian fails to meet any applicable eligibility requirement;

(4)   meet the eligibility requirements of Section 18.2(b):

Exhibit 8
Page 3 of 14

[CUSTODIAN: INITIAL[6] THE APPLICABLE SECTION BELOW AND
CROSS-OUT THE SECTIONS THAT DO NOT APPLY]

_____ ~~Section 18.2(c), for a Seller/Servicer acting as its own Custodian~~

_One_ Section 18.2(d), for a third-party Custodian that is not affiliated with
Seller/Servicer

_____ ~~Section 18.2(e), for a third-party Custodian that is affiliated with
Seller/Servicer~~

[CUSTODIAN: EITHER INITIAL[6] THE FOLLOWING SECTION OR CROSS IT OUT]

_____ ~~Section 18.2(f), for a Custodian that is also a warehouse lender~~

(5)    not be in receivership, conservatorship or liquidation, nor shall any parent
of Custodian be in receivership, conservatorship or liquidation;

(6)    maintain, at its sole cost and expense, insurance coverage under a
financial institution bond or equivalent policy that provides, at a minimum,
fidelity and lost instrument coverages, errors and omissions insurance
coverage for the custody of documents, and other coverages and
requirements in the amounts as set forth in Section 18.2(b)8 of the Guide;

(7)    complete the Annual Document Custodian Eligibility Certification Report
(the "ADCEC") and submit it to Freddie Mac by March 31st each year,
together with any other information that Freddie Mac may request,
pursuant to Sections 14 and 16 below; and

(8)    maintain document custodial operations that are independently and
separately managed from any functional area within its institution that
performs mortgage origination, selling or servicing; maintain separate
records, files and operations; and ensure that the duties set forth in this
Agreement will be performed only by personnel not engaged in mortgage
origination, sales or servicing.

[CUSTODIAN: INITIAL[6] THE PARA. (b) BELOW THAT _DOES_ APPLY and
CROSS-OUT THE PARA. (b) THAT _DOES NOT_ APPLY]

(b)    Additional eligibility requirements for Custodian that is not affiliated
with Seller/Servicer.  Custodian hereby represents, warrants and covenants
with Freddie Mac that it is not affiliated with Seller/Servicer.

_____
initial

OR

(b)    ~~Additional eligibility requirements for Custodian that is a self-Custodian or
is affiliated with Seller/Servicer.  Custodian hereby represents, warrants and
covenants with Freddie Mac that its custodial operations are conducted by a
trust department that is established and operated under fiduciary powers
granted by its state or federal regulator.~~

_____
initial

_____
[6] Officer of Custodian executing this Agreement must initial in ink.

(c) Verifications. ~~Upon receipt of the Notes held in custody for Freddie Mac,~~ Custodian shall review and examine them and conduct the verification as set forth in Section 18.6(b) of the Guide. In fulfilling that function, Custodian shall:

(1) review the terms of the Notes to verify that the information contained therein conforms with the Selling System or Form 1034 data; and

(2) determine that each Note is original and has an endorsement as required in ~~Section 16.4 of the Guide.~~

(d) Responsibility as a transferee Custodian. Upon a transfer of servicing that results in a transfer of custody, Custodian as transferee must perform the verifications specified in Section 18.7 of the Guide with respect to each Note transferred to it.

Upon a transfer of servicing, Custodian as transferee must verify that a copy of Freddie Mac Form 960 or Form 981, as applicable, evidencing Freddie Mac's approval of the servicing transfer accompanies the Notes. For each transfer of servicing that results in a transfer of custody, Seller/Servicer as transferee must deliver to Freddie Mac a Custodial Certification Schedule, executed by the transferor seller/servicer and Custodian as transferee.

(e) Responsibility as a transferor Custodian. Upon a transfer of custody or a transfer of servicing resulting in a transfer of custody, the transferor Custodian shall verify that either Freddie Mac's Document Custodial Operations Department (DCO) or a new custodian has been selected in accordance with Freddie Mac's requirements and must confirm the transferee custodian with Freddie Mac. The transferor Custodian shall cooperate with Seller/Servicer and DCO or the transferee custodian to effect an orderly transfer of the Notes and to prepare a Form 1034 for those Notes, all as provided in the Guide.

It is the responsibility of the Custodian and Seller/Servicer to work with DCO or the transferee custodian, prior to certification of the Notes by DCO or the transferee custodian, to cure all document deficiencies that are unresolved upon transfer. Custodian shall not be released or discharged from the liabilities, duties and obligations hereunder until after Seller/Servicer and DCO or the transferee custodian to which the Notes have been moved have certified or accounted for all the Notes.

(f) Duties to Freddie Mac; Relationship of the Parties. Custodian should contact DCO with any questions that might arise in conjunction with the discharge of the duties imposed on Custodian by this Agreement and as set forth in Section 18.6(d) of the Guide, particularly regarding the verification and certification processes.

By executing this Agreement, Custodian represents and warrants that it has no, and covenants that it shall hold no, adverse interest, by way of security or

**Exhibit 8**
**Page 5 of 14**

otherwise, in any Note and hereby waives and releases any such interest which it may have or acquire in any such Note.

The parties each hereby acknowledge that neither title, ownership nor right of alienation with respect to the Notes, nor any books and records relating to the Notes, is hereby transferred to, or conferred upon, Custodian.

(g)     Release of Documents. Custodian shall release Notes only pursuant to Section 18.6(e) of the Guide. Absent manifest error, Custodian may rely on information received from Seller/Servicer in the Form 1036. Seller/Servicer shall hold in trust and for the sole benefit of Freddie Mac all Notes released to it.

(h)     Supplemental deliveries. If Seller/Servicer supplements a delivery with additional documents, such as original modifying instruments, Custodian must place the supplemental documentation with the applicable original Notes.

Section 3.  Miscellaneous.

(a)     Audit. Freddie Mac and/or its auditors may perform, with or without any prior notice, on-site reviews or audits of:

(1) all records and documents held by Custodian that relate to the Notes; and

(2) Custodian's policies and procedures and its compliance with its own internal controls and with Freddie Mac's requirements.

Custodian shall promptly provide copies of any Notes requested by Freddie Mac or its auditor.

(b)     Custodial Charges. Pursuant to Section 18.1 of the Guide, compensation for Custodian's services, including (without limitation) any action taken at the request or demand of Freddie Mac, is the sole responsibility of Seller/Servicer. Seller/Servicer and Custodian shall enter into a written agreement regarding Custodian's charges and fees for certifying, holding, releasing, copying, and other activities with respect to the Notes; provided, however, that such agreement may not contain terms that relate to the substance of this Agreement, including (without limitation) Freddie Mac's ability to gain access to or remove the Notes without the Seller/Servicer's consent and provided further that, in the event of a conflict between any such agreement and this Agreement, this Agreement shall govern.

Custodian shall (i) take no action that might adversely affect Freddie Mac or its interests, or (ii) not fail to perform in accordance with this Agreement or any Freddie Mac requirement because Custodian has not been compensated by Seller/Servicer. If Freddie Mac should elect, in its sole discretion, to assume or transfer the duties and obligations of Seller/Servicer and terminate the custodial relationship established by this Agreement, Custodian shall continue to perform its obligations hereunder for a reasonable time on the same terms and conditions as set forth herein, provided that Freddie Mac shall not be obligated to pay any compensation or fee for holding or releasing any Notes during such period.

Exhibit 8
Page 6 of 14

(c)   Indemnifications.

   (1)   In performing its functions and duties under this Agreement, Custodian
         agrees to act with reasonable care, using that degree of skill and care that
         it exercises with respect to similar notes and assignments owned and/or
         serviced by it and with at least such skill and care as is customary in the
         industry.  Custodian hereby indemnifies Freddie Mac from, and holds
         Freddie Mac harmless against, any and all liabilities, obligations, losses,
         damages, payments, costs or expenses of any kind whatsoever
         (including, without limitation, reasonable fees and expenses of counsel),
         which may be imposed on, incurred by or asserted against Freddie Mac
         as the result of any breach of this Agreement or negligence by Custodian
         in the performance of the functions and duties of Custodian required by
         the sections of the Guide pertaining to Notes held for Freddie Mac and by
         this Agreement.

   (2)   Seller/Servicer indemnifies Freddie Mac as set forth in Section 18.4(a) of
         the Guide.

Section 4.   Seller/Servicer Responsibilities.  Seller/Servicer is responsible for the
following and hereby represents and warrants to, and covenants with, Freddie Mac as
follows:

(a)   Seller/Servicer shall promptly notify Freddie Mac in writing if Seller/Servicer
      becomes aware that Custodian has failed to comply with any Freddie Mac
      operational requirement and/or any of the terms of this Agreement.

(b)   Seller/Servicer shall comply with the transit insurance requirements set forth in
      Section 18.4(c) of the Guide.  The Guide insurance requirements do not
      diminish, restrict or otherwise limit Custodian's responsibilities and obligations as
      stated herein.

(c)   Seller/Servicer shall provide Custodian with copies of such confirmations,
      agreements, assignments, documents, opinions, instructions and information
      relating in any way to this Agreement as Custodian may from time to time
      reasonably request in writing.

(d)   Seller/Servicer shall promptly notify Custodian of the occurrence of any default
      or event of default by Seller under the Purchase Documents, specifying the
      nature thereof and the action being taken or proposed to be taken by
      Seller/Servicer to remedy the same (notwithstanding the foregoing terms of this
      subsection 4(d), nothing herein shall be construed as creating any right on the
      part of Seller/Servicer to a cure period in connection with any such default or
      event of default or as a waiver by Freddie Mac of any right or remedy under the
      Purchase Documents).

Exhibit 8
Page 7 of 14

Section 5.  Transfers of Servicing.

(a)  In the event that Seller/Servicer transfers servicing of some or all of the Mortgages, such transfer shall be subject to approval under, and conducted pursuant to, Section 18.4(d) and other relevant sections of the Guide.

(b)  If Seller/Servicer transfers the servicing for some or all of the Mortgages for which Custodian holds the Notes, then Custodian shall cooperate with Seller/Servicer and DCO or the transferee seller/servicer's custodian to transfer custody of the Notes and any Assignments pursuant to the Guide and Section 2(d) above.

(c)  No later than 30 days after the effective date of a transfer of servicing, the Notes and any Assignments relating to the affected Mortgages must be moved.  If the transferee seller/servicer uses a document custodian, the Notes and Assignments must be moved to the transferee seller/servicer's custodian.  If the transferee seller/servicer does not use a document custodian, the Notes must be moved to DCO and the Assignments moved to the transferee seller/servicer.

Section 6.  Termination and Transfer of Custody.

(a)  Termination by Freddie Mac.  At its sole discretion, Freddie Mac may, upon 30 days written notice to Seller/Servicer and Custodian, terminate this Agreement and require Seller/Servicer to transfer all Notes and Assignments to another custodian or to transfer the Notes to DCO and the related Assignments to Seller/Servicer within 30 days of the date of such notice.

Notwithstanding any other right of Freddie Mac to require Seller/Servicer to discontinue the use of a custodian, Freddie Mac may give notice that it will terminate this Agreement and require that all Notes and Assignments to be transferred immediately to another custodian, or the Notes to Freddie Mac and the related Assignments to Seller/Servicer, immediately upon occurrence of any of the following:

(1)  disqualification or suspension of Seller/Servicer pursuant to the Guide, or upon a determination by Freddie Mac that Seller/Servicer's performance has been unsatisfactory, or that Seller/Servicer has failed to meet eligibility standards;

(2)  failure of Custodian to meet Freddie Mac's document custodian eligibility requirements or any criteria for note custody;

(3)  Freddie Mac's determination that Custodian's performance with respect to the Notes has been unsatisfactory;

(4)  any other circumstance with respect to Custodian, the Notes or any Assignments that adversely affects the Notes or the interests of Freddie Mac;

(5)  Freddie Mac's modification of its requirements for the custody of Notes and Assignments; or

(6)  Freddie Mac's notice to Custodian that a default or event of default has occurred under, or in connection with, the Purchase Documents, or Freddie

Exhibit 8.
Page 8 of 14

Mac's determination for any reason that the safety or security of the Notes is in jeopardy.

In such event, Custodian shall comply with Freddie Mac's Instructions.

(b)  Termination by Seller/Servicer.  Seller/Servicer may terminate this Agreement upon 30 days prior notice to Custodian and to Freddie Mac.  Upon giving such notice, Seller/Servicer must, in accordance with the Guide, designate a new custodian for Mortgages serviced for Freddie Mac and require Custodian transfer the Notes for those Mortgages to the new custodian within 30 days of Freddie Mac's approval of the transfer, provided that Freddie Mac may require the Notes be transferred immediately.  If Seller/Servicer elects to transfer the Notes to DCO, then, prior to the termination date of this Agreement, all Notes for Mortgages serviced for Freddie Mac and held by Custodian must be moved to DCO, and the Assignments moved to Seller/Servicer.

(c)  Termination by the Custodian.  Custodian may terminate this Agreement upon 30 days prior written notice to Seller/Servicer and to Freddie Mac.  In such event, Seller/Servicer must transfer the Notes and the Assignments to a new custodian or transfer the Notes to DCO and obtain any Assignments from Custodian as provided in Section 18.1 of the Guide.  In no event may Custodian refuse or fail to fulfill its custodial obligations pursuant to this Agreement until the Notes and Assignments have been properly transferred.

(d)  Responsibilities of the transferor Custodian.  Upon termination of this Agreement and transfer of custody of the Notes, Custodian shall cooperate with Seller/Servicer and DCO or the transferee custodian pursuant to the Guide and Section 2(d) hereinabove.

Section 7.  Representations, Warranties and Covenants re: execution.
(a)  Custodian represents and warrants to, and covenants with, Seller/Servicer and Freddie Mac as follows:
    (1)  This Agreement has been authorized and approved by all requisite corporate action on the part of Custodian and, when executed and delivered by Custodian, Seller/Servicer and Freddie Mac, will constitute a legal, valid and binding obligation of Custodian, enforceable against Custodian in accordance with its terms.
    (2)  Custodian has not executed and will not execute any agreement or obligation inconsistent herewith or with any of the transactions contemplated hereby.
    (3)  Custodian has complied, and at all times shall comply, with all applicable laws and regulations in connection with the transactions contemplated hereby.

(b)  Seller/Servicer represents and warrants to, and covenants with, Freddie Mac and Custodian as follows:
    (1)  This Agreement has been authorized and approved by all requisite corporate action on the part of Seller/Servicer and, when executed and

Custodial Agreement: Single-Family Mortgages                          Page 8 of 13
Freddie Mac Form 1035 (rev. 2/08.2)

Exhibit 8
Page 9 of 14

delivered by Custodian, Seller/Servicer and Freddie Mac, this Agreement will constitute the legal, valid and binding obligation of Seller/Servicer, enforceable against Seller/Servicer in accordance with its terms.

(2)    Seller/Servicer has not executed and shall not execute any agreement or obligation inconsistent with this Agreement or with the transactions contemplated hereby.

(3)    Seller/Servicer has complied, and at all times shall comply, with all applicable laws and regulations in connection with the transactions contemplated hereby.

Section 8.  Amendments.  Freddie Mac may at any time, in its sole discretion, upon notice to Custodian and Seller/Servicer, modify or supplement any provision or requirement set forth in this Agreement, including but not limited to Freddie Mac's Document Custodian eligibility requirements, Custodian or Seller/Servicer obligations, custodial duties, delivery requirements, and/or Freddie Mac forms referenced herein.

If the Guide's defined terms or requirements pertaining to Document Custodian eligibility, Custodian or Seller/Servicer obligations, custodial duties, delivery requirements, Freddie Mac forms referenced herein or any requirements relating to the Notes are amended, then this Agreement is deemed to have been simultaneously amended to the extent necessary to conform this Agreement with such amended Guide provisions. If any Freddie Mac forms are revised or superseded subsequent to the date of this Agreement, references to such forms in this Agreement shall be deemed to refer to such forms as revised or, if superseded, to such other forms as Freddie Mac may require.

No amendment or waiver of any provision of this Agreement shall be effective unless in writing signed by an authorized representative of Freddie Mac, and then such waiver or consent shall be effective only in that instance and for the reason specified therein.

Section 9.  Notices.  All demands, notices, instructions and other communications hereunder shall be in writing (unless specifically authorized to be delivered using another means) and shall be personally delivered or mailed, addressed as set forth below.

      If to Freddie Mac:      Freddie Mac Counterparty Credit Risk Management
                                       1551 Park Run Drive, MS  D3A
                                       McLean, VA  22102
                                       (571) 382-3936; facsimile (866) 743-0087

      with a copy to:        Freddie Mac Document Custodial Operations
                                       21550 Beaumeade Circle, MS 570
                                       Ashburn, VA  20147
                                       (703) 724-3000

Exhibit 8
Page 10 of 14

If to Custodian (*indicate if your vault location is different from your mailing address and identify a contact person for eligibility matters as well as operations*)[7]:

> Christopher P Corcoran
> Deutsche Bank
> 1761 East St Andrew Place
> Santa Ana, CA  92705-4934
>
> tel. # (714) 247  6045

If to Seller/Servicer[7]:

> Aaron Wade
> OneWest Bank, FSB
> 888 E. Walnut  Street
> Pasadena, CA  91101
>
> tel. # ( 626) 535  8852

or to such other address and person as Freddie Mac, Custodian or Seller/Servicer may hereafter designate in writing as required herein.

Section 10.  Binding Effect.  This Agreement shall become effective as of the date above first written upon execution by Freddie Mac, Seller/Servicer and Custodian, and shall be binding upon and inure to the benefit of the parties and their respective successors and assigns and shall continue in full force and effect so long as Custodian shall hold, as custodian hereunder, any of the Notes, or until the Agreement is terminated.  If Freddie Mac executes this Agreement, Freddie Mac shall provide Seller/Servicer and Custodian with copies of the fully executed Agreement. Freddie Mac shall retain the original Agreement.

Section 11.  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the United States.  If there is no applicable precedent and to do so would not frustrate the purposes of this Agreement or the transactions governed hereby, the laws of the Commonwealth of Virginia shall be deemed to reflect the laws of the United States.  Notwithstanding the immediately preceding sentence, the legal effectiveness, validity and enforceability of electronic contracts and signatures and other Electronic Records used in connection with any transaction engaged in by the parties to this Agreement shall be governed by the federal Electronic Signatures in Global and National Commerce Act.

Unless otherwise expressly agreed in writing among Seller/Servicer, Custodian and Freddie Mac, neither this Agreement nor any portion of any electronic transaction will be governed by the Uniform Computer Information Transactions Act as enacted in any jurisdiction.

---

[7] Insert the name, title, mailing address, e-mail address, telephone number and fax number of the person to whom notices should be sent.

Custodial Agreement: Single-Family Mortgages                     Page 10 of 13
Freddie Mac Form 1035 (rev. 2/08.2)

Exhibit 8
Page 11 of 14

Section 12.  Construction of Agreement.  This Agreement shall not be construed against Freddie Mac as the drafter hereof.

Section 13.  Headings.  The section headings herein are for convenience only and shall not affect the construction of this Agreement.

Section 14.  Acknowledgment and Consent to Electronic Transactions.
Seller/Servicer and Custodian consent and agree to engage in electronic transactions with Freddie Mac and each other in connection with their respective duties and obligations under this Agreement, as follows:

(1)   Seller/Servicer acknowledges and agrees that it is bound by the provisions of Sections 1.3 and A1.7 of the Guide; and

(2)   Custodian acknowledges and agrees that it is bound by the provisions of Sections 1.3 and A1.7 of the Guide as if each reference to the term "Seller/Servicer" referred to "Custodian," except where replacing the term "Seller/Servicer" with the word "Custodian" is logically inconsistent with the duties and obligations of Custodian set forth herein.

Custodian further agrees to adopt as its Electronic Signature for such electronic transactions its Freddie Mac custodian number and/or such other confidential passwords, user identification codes, other symbols or procedures as required by Freddie Mac. Custodian and Seller/Servicer acknowledge and agree that electronic transactions not expressly required or permitted by Freddie Mac are prohibited.

Section 15.  Certifying Mortgages in the Selling System.  Seller/Servicer, Custodian and Freddie Mac agree that for Mortgages sold using the Selling System, Custodian will certify such Mortgages using the following online certification options: single loan certification, batch certification and importation of Mortgage loan data certified in the Custodian's system into the Selling System. The option used must comply with the instructions in the Selling System, the applicable provisions of Chapter 18 of the Guide, the Document Custody Procedure Handbook and the section in the Selling System User Guide entitled "Certifying Mortgages for Freddie Mac," located on the Web at www.freddiemac.com/learn/pdfs/deliver/sscertmort.pdf, all of which are hereby incorporated herein by reference and made a part hereof.

Section 16.  Delivery of the ADCEC.  Seller and Freddie Mac agree that Custodian may deliver the ADCEC, executed by a duly authorized officer of Custodian, to Freddie Mac as an electronic record attached to an email or as a facsimile transmission; provided that, if the ADCEC is delivered to Freddie Mac:

(a)   as an electronic record attached to an email, the ADCEC must be submitted as a Portable Document Format ("PDF") file attached to the email; and

(b)   as a facsimile transmission, the facsimile of ADCEC must include a cover sheet identifying the name and telephone number of the person sending the facsimile and stating its total number of pages.

Each email or facsimile transmission of the ADCEC must be sent to the Freddie Mac email address or telephone number specified in the form, and copies or representations of signatures or electronic signatures attached to or associated with the ADCEC will be governed by and must comply with the applicable provisions of Section 1.3 of the Guide.

Section 17.  Financing Statements.  Seller/Servicer and Custodian each hereby (i) authorizes Freddie Mac to file Uniform Commercial Code (UCC) financing statements (together with any related amendments and continuation statements) deemed necessary or desirable by Freddie Mac to perfect or otherwise evidence Freddie Mac's ownership interest in the Notes (including, without limitation, Freddie Mac's exclusive ownership interest in any and all servicing rights related to the Mortgages) purchased by Freddie Mac from Seller/Servicer and held by Custodian on behalf of Freddie Mac, and (ii) agrees to execute, deliver and/or file such UCC financing statements and other documents and perform such acts as may be reasonably necessary to fully perfect or otherwise evidence Freddie Mac's ownership interest in the Notes.  Seller/Servicer shall pay the costs for any financing statements filed pursuant to this section and Freddie Mac's costs in preparing such financing statements and/or searching UCC records to confirm that no other party claims an interest in the Notes.

Section 18.  Confidentiality and Notice of Waivers.  Freddie Mac hereby identifies, and Seller/Servicer and Custodian jointly and severally agree to treat, all modifications or waivers granted by Freddie Mac regarding the duties and obligations of Seller/Servicer and/or Custodian under this Agreement, the Guide and/or the Purchase Documents as "confidential information" under Section 2.16 of the Guide, and Custodian agrees to be bound by the confidentiality provisions of Section 2.16.

Under certain circumstances and on occasion, Freddie Mac may modify the Seller/Servicer's Purchase Documents in a manner that would affect Custodian's duties and obligations under this Agreement.  The parties hereto agree that Seller/Servicer shall promptly give Custodian a written copy of any such modification, and Custodian shall periodically request updated information on such modifications from Seller/Servicer.  Seller/Servicer will not be deemed by Freddie Mac to have violated the confidentiality imposed by Section 2.16 of the Guide by providing copies of such updated information or modifications. Freddie Mac has no duty or obligation to notify Custodian under this Agreement or under the Guide, although it may provide such notice.

[this space intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be executed in its name and on its behalf by a duly authorized officer (or other duly authorized representative, in the case of Freddie Mac), and delivered as of the date first stated above.

Deutsche Bank National Trust Co <sup>8</sup> (Custodian)

ATTEST: _____    By: _____
Signature                         Signature

Tom Yoshida                       Christopher Corcoran
Name                              Name

AVP                               Vice President
Title                             Title:

OneWest Bank, FSB _____ <sup>8</sup> (Seller/Servicer)

ATTEST: _____    By: _____
Signature                         Signature

JACK HILL                         Aaron Wade
Name                              Name

ASSISTANT
CORPORATE SECRETARY               Senior vice President
Title                             Title

FEDERAL HOME LOAN MORTGAGE CORPORATION:

ATTEST: Amy Odiorne      By: Pam Williams
Amy Odiorne                       Pam Williams
Risk Analyst                      Director, Counterparty Credit Risk Management

_____

<sup>8</sup> Insert complete legal names and titles; signatures must be attested by a duly authorized officer.

Custodial Agreement: Single-Family Mortgages          Page 13 of 13
Freddie Mac Form 1035 (rev. 2/08.2)

Exhibit 8
Page 14 of 14

# Exhibit 6:

# Notice of

# Default

## Notice of Default

To:

James B. McDonald
14840 119th Place Northeast
Kirkland, WA 98034

Unknown Spouse and/or Domestic Partner
of James B. McDonald
14840 119th Place Northeast
Kirkland, WA 98034

Regarding the real property "Property" located at:

**Property Address:**
14840 119th Place Northeast
Kirkland, WA 98034

If you are the owner of this property and you occupy it as your residence, you should take care to protect your interest in your home. This notice of default (your failure to pay or otherwise perform) is the first step in a process that could result in you losing your home. You should carefully review your options. For example:

**Can you pay and stop the foreclosure process?**
**Do you dispute the failure to pay?**
**Can you sell your property to preserve your equity?**
**Are you able to refinance this loan or obligation with a new loan or obligation from another lender with payments, terms, and fees that are more affordable?**
**Do you qualify for any government or private homeowner assistance programs?**
**Do you know if filing for bankruptcy is an option? What are the pros and cons of doing so?**

Do not ignore this notice; because if you do nothing, you could lose your home at a foreclosure sale. (No foreclosure sale can be held any sooner than ninety days after a notice of sale is issued and a notice of sale cannot be issued until thirty days after this notice.) Also, if you do nothing to pay what you owe, be careful of people who claim they can help you. There are many individuals and businesses that watch for the notices of sale in order to unfairly profit as a result of borrowers' distress.

You may feel you need help understanding what to do. There are a number of professional resources available, including home loan counselors and attorneys, who may assist you. Many legal services are lower-cost or even free, depending on your ability to pay. If you desire legal help in understanding your options or handling this default, you may obtain a referral (at no charge) by contacting the county bar association in the county where your home is located. These legal referral services also provide information about lower-cost or free legal services for those who qualify. You may contact the Department of Financial Institutions or the statewide civil legal aid hotline for possible assistance or referrals.

A) Property description:

   Lot 18, The High Woodlands Addition Div. No. 3, according to the Plat thereof recorded in Volume 85 of Plats, Pages 30 through 32, inclusive, in King County, Washington.

B) **Deed of Trust information:** King County Auditor's File No.: 20070110002077; Recording Date: 01/10/07

C) **Declaration of payment default:** The beneficiary declares you in default for failing to make payments as required by your note and deed of trust.

**D) Itemized account of the arrears:**

| | |
|---|---|
| Delinquent monthly payments beginning with the 10/01/09 installment. | $9,575.44 |
| Late charges: | |
| Lender's Fees and Costs | $286.02 |
| Trustee's fees | $22.00 |
| Costs | $508.00 |
| Title report (estimate) | $951.00 |
| Recording | $30.00 |
| Certified mail | $14.00 |
| Posting | $70.00 |
| Sale Costs | $0.00 |
| **Total arrears and costs due today** | **$11,426.46** |

**E)  Itemized account of all other specific charges, costs or fees that grantor or borrower is or may be obliged to pay to reinstate the deed of trust before the recording of the notice of sale.**

| | |
|---|---|
| Additional monthly payment | $2,393.86 |
| Additional late charge | $95.34 |

**F)  Amount required to cure payment defaults before notice of sale recorded:** $13,915.66

In addition, grantor or borrower must timely cure all other defaults before the note and deed of trust are deemed reinstated.

*Payments and late charges continue to accrue and additional advances may be made.  **The sums stated above are estimates only.**  Before attempting to reinstate the loan, call us at 425-586-1900 to learn the exact amounts of monetary defaults and actions required to cure possible other defaults.*

**G) Effect of failure to cure:**  Failure to cure all alleged defaults within 30 days of mailing/personal service of this notice may lead to recordation, transmittal and publication of a notice of sale and the Property may be sold at public auction no less than 120 days from the date of this notice.

**H) Effect of recording, transmitting and publication of the notice of sale:**  The effect of the recordation, transmittal and publication of the notice of sale will be to (i) increase the costs and fees and (ii) publicize the default and advertise the Property for sale.

**I) Effect of sale of the Property:**  The Trustee's sale of the Property will deprive the borrower, grantor and any successor in interest of all their interest in the Property.

**J) Recourse to courts:**  The borrower, grantor, any guarantor or any successor in interest has recourse to the courts pursuant to RCW 61.24.130 to contest the default(s) on any proper ground.

**K) Contact Information for Beneficiary (Note Owner) and Loan Servicer.**

The beneficiary of the deed of trust is **OneWest Bank, FSB**, whose address and telephone number are:

888 East Walnut Street
Pasadena, CA 91101
800-669-2300

The loan servicer for this loan is OneWest Bank FSB, whose address and telephone number are:

888 East Walnut Street

Pasadena, CA  91101
800-669-2300

**L)  Notice pursuant to the Federal Fair Debt Collection Practices Act:**  If you are the consumer who originally
contracted the debt or if you assumed the debt, then you are notified that:

1.  As of the date of this notice you owe $398,736.08.  Because of interest, late charges, and other charges that may vary
    from day to day, the amount due on the day you pay may be greater.  Hence, if you pay the amount shown above, an
    adjustment may be necessary after we receive your check.  For further information, write to the address provided in
    Section 5 below or call us at 425-586-1900.
2.  The creditor to whom the debt is owed OneWest Bank, FSB/OneWest Bank FSB.
3.  Unless within 30 days after receipt of this notice you dispute the debt or any portion of it, we will assume the debt to be
    valid.
4.  If you notify us in writing within 30 days after receipt of this notice that you dispute the debt or any part of it, we will
    request that the creditor obtain verification of the debt and mail it to you.
5.  If you request in writing within 30 days after receipt of this notice, we will request that the creditor provide you with the
    name and address of the original creditor, if different from the current creditor.
6.  Written requests should be addressed to Northwest Trustee Services, Inc., Post Office Box 997, Bellevue, WA 98009-
    0997.

**Dated:  January 12, 2010**                              OneWest Bank, FSB
                                                          By Northwest Trustee Services, Inc., its duly authorized agent


**This is an attempt to collect a debt and any information obtained will be used for that purpose.**


**NORTHWEST TRUSTEE SERVICES, INC.**
P.O. BOX 997
BELLEVUE, WA 98009-0997                    File No: 7523.21352
                                          Borrower: McDonald, James B.
                                          Client: OneWest Bank, FSB

VONNIE MCELLIGOTT
425-586-1900
FAX 425-586-1997

## BENEFICIARY DECLARATION PURSUANT TO CHAPTER 61.24 RCW (SB 5810) AND "FORECLOSURE LOSS" MITIGATION FORM

Borrower(s):        McDONALD, JAMES
Beneficiary:        OneWest Bank, FSB
Loan Servicer:      OneWest Bank FSB
Property:           14840 119th Place Northeast, Kirkland, WA 98034
Loan No.:           1009111244

The undersigned beneficiary or authorized agent for the beneficiary hereby represents and declares under the penalty of perjury that [check the applicable box and fill in any blanks so that the trustee can insert, on the beneficiary's behalf, the applicable declaration in the notice of default required under chapter 61.24 RCW as specified in SB 5810/Chapter 292, 2009 Laws ("the act")]:  Regarding the above-referenced loan (check applicable box – only ONE choice should apply):

[✓] (1) The beneficiary or beneficiary's authorized agent has contacted the borrower under, and has complied with, section 2 of the act (contact provision to "assess the borrower's financial ability to pay the debt secured by the deed of trust and explore options for the borrower to avoid foreclosure").

[ ] (2) The beneficiary or beneficiary's authorized agent has exercised due diligence to contact the borrower as required in section 2(5) of the act and, after waiting fourteen days after the requirements in section 2 of this act were satisfied, the beneficiary or the beneficiary's authorized agent sent to the borrower(s), by certified mail, return receipt requested, the letter required under section 2 of the act.

[ ] (3) The borrower has surrendered the secured property as evidenced by either a letter confirming the surrender or by delivery of the keys to the secured property to the beneficiary, the beneficiary's authorized agent or to the trustee.

[ ] (4) Under section 2 of the act, the beneficiary or the beneficiary's authorized agent has verified information that, on or before the date of this declaration, the borrower(s) has filed for bankruptcy, and the bankruptcy stay remains in place, or the borrower has filed for bankruptcy and the bankruptcy court has granted relief from the bankruptcy stay allowing the enforcement of the deed of trust."

**SB 5810 Does NOT apply because, regarding the above-referenced loan:**

[  ] The deed of trust was made before January 1, 2003 or after December 31, 2007, inclusive; or

[  ] The property is not owner occupied as the principal residence of the borrower(s); or

[  ] The deed of trust secures a commercial loan; or

[  ] The deed of trust secures obligations of a grantor who is not the borrower or a guarantor; or

[  ] The deed of trust secures a purchaser's obligations under a seller-financed sale.

Dated _January 7, 2010_

_____
(Beneficiary's Authorized Agent's signature)

Erica A. Johnson-Seck   ,   Vice President
**Print Name**

# Exhibit 7:

# Assignment

# Of Deed of Trust

After Recording  Return to:
OneWest Bank FSB
888 East Walnut Street
Pasadena, CA  91101

```
201002040000502
                14.00
TITLE COURT SE AGT
PAGE-001 OF 001
02/04/2010 12:13
KING COUNTY, WA
```

7523.21352/McDONALD, JAMES B.

## Assignment of Deed of Trust

For Value Received, the undersigned as Beneficiary, hereby grants, conveys, assigns and transfers to **OneWest Bank, FSB**, whose address is 888 East Walnut Street, Pasadena, CA  91101, all beneficial interest under that certain deed of trust, dated 01/08/07, executed by James B. McDonald, a single man, Grantors, to Pacific Northwest Title Insurance Co., Inc., Trustee, and recorded on 01/10/07, under Auditor's File No. 20070110002077, records of King County, Washington.

Together with note or notes therein described or referred to, the money due and to become due thereon, with interest, and all rights accrued or to accrue under said Deed of Trust.

Dated _Jnuery 27_, 20_10_

Mortgage Electronic Registration Systems, Inc. "MERS"

By: _____
Title:  Brian Burnett     Assistant Vice President

STATE OF _Texas_

                                      ) ss.
COUNTY OF ____Travis____

I certify that I know or have satisfactory evidence that:  ____Brian Burnett____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the  ___Assistant Vice President___  of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. "MERS" to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: _Jan. 27, 2010_

NOTARY PUBLIC in and for the State of _____
_Texas_
Residing at ___Travis___
My commission expires ___11/10/10___

ALEX MCBRIDE
Notary Public, State of Texas
My Commission Expires
November 10, 2010

01

# Exhibit 8: MERS Corporate Resolution

## CORPORATE RESOLUTION

Be it Resolved that the attached list of candidates are officers of **OneWest Bank, FSB** a Member of Mortgage Electronic Registration Systems, Inc. (MERS), and are hereby appointed as assistant secretaries and vice presidents of MERS, and, as such, are authorized to:

(1) release the lien of any mortgage loan registered on the MERS System that is shown to be registered to the Member;

(2) assign the lien of any mortgage loan naming MERS as the mortgagee when the Member is also the current promissory note-holder, or if the mortgage loan is registered on the MERS System, is shown to be registered to the Member;

(3) execute any and all documents necessary to foreclose upon the property securing any mortgage loan registered on the MERS System that is shown to be registered to the Member, including but not limited to (a) substitution of trustee on Deeds of Trust, (b) Trustee's Deeds upon sale on behalf of MERS, (c) Affidavits of Non-military Status, (d) Affidavits of Judgment, (e) Affidavits of Debt, (f) quitclaim deeds, (g) Affidavits regarding lost promissory notes, and (h) endorsements of promissory notes to VA or HUD on behalf of MERS as a required part of the claims process;

(4) take any and all actions and execute all documents necessary to protect the interest of the Member, the beneficial owner of such mortgage loan, or MERS in any bankruptcy proceeding regarding a loan registered on the MERS System that is shown to be registered to the Member, including but not limited to: (a) executing Proofs of Claim and Affidavits of Movant under 11 U.S.C. Sec. 501-502, Bankruptcy Rule 3001-3003, and applicable local bankruptcy rules, (b) entering a Notice of Appearance, (c) vote for a trustee of the estate of the debtor, (d) vote for a committee of creditors, (e) attend the meeting of creditors of the debtor, or any adjournment thereof, and vote on behalf of the Member, the beneficial owner of such mortgage loan, or MERS, on any question that may be lawfully submitted before creditors in such a meeting, (f) complete, execute, and return a ballot accepting or rejecting a plan, and (g) execute reaffirmation agreements;

(5) take any and all actions and execute all documents necessary to refinance, subordinate, amend or modify any mortgage loan registered on the MERS System that is shown to be registered to the Member.

(6) endorse checks made payable to Mortgage Electronic Registration Systems, Inc. to the Member that are received by the Member for payment on any mortgage loan registered on the MERS System that is shown to be registered to the Member;

(7) take any such actions and execute such documents as may be necessary to fulfill the Member's servicing obligations to the beneficial owner of such mortgage loan (including mortgage loans that are removed from the MERS System as a result of the transfer thereof to a non-member of MERS).

I, William C. Hultman, being the Corporate Secretary of Mortgage Electronic Registration Systems, Inc., hereby certify that the foregoing is a true copy of a Resolution duly adopted by the Board of Directors of said corporation effective as of the **19th day of March, 2009** which is in full force and effect on this date and does not conflict with the Certificate of Incorporation or By-Laws of said corporation.

_____
William C. Hultman, Secretary

<u>As of 6/11/09</u>

## <u>OneWest Bank, FSB</u>
ORG ID 1008171

## <u>Mortgage Electronic Registration Systems, Inc.</u><br><u>Certifying Officers</u>

Friedman, Eric

Jancarz, Kenneth

Parres, John

Stotts, Roger D

Brewton, Connie

Mastro, Karen

Stanford, Mike

Kirkpatrick, Dennis

Spencer, Kelly Cooper

Lerud, Bart

Johnson-Seck, Erica

JC San Pedro

Chamagne Williams

Suchan Murray

Charles Boyle

Cotton, Betty

Prees, Cyndi

Nix, Sheila

Maria Camarillo

Kira Cleary

Bobbitt, Sean

Treichler, Judy

Engel, Claudia

North, Sue

Schneider, Sandy

# Exhibit 9:

# Response First Request to Produce

1

2

3

4

5

6

7

8

The Honorable Judge Robert Lasnik

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

9    JAMES MCDONALD,

10                        Plaintiff,                    No.  C10-1952 RSL

11            v.                                        **DEFENDANTS ONEWEST BANK,**
                                                       **FSB, MORTGAGE ELECTRONIC**
12    ONEWEST BANK, FSB, NORTHWEST                      **REGISTRATION SYSTEMS, INC.,**
      TRUSTEE SERVICES, INC., MORTGAGE                  **AND NORTHWEST TRUSTEE**
13    ELECTRONIC REGISTRATION SYSTEMS,                  **SERVICES, INC.'S**
      INC., INDYMAC BANK FSB, DOES 1-50,                **SUPPLEMENTAL RESPONSE TO**
                                                       **PLAINTIFF'S FIRST REQUEST**
14                        Defendants.                   **FOR PRODUCTION OF**
                                                       **DOCUMENTS**
15

16

17

18        COME NOW Defendants OneWest Bank, FSB ("OneWest"), Mortgage Electronic

19    Registration Systems Inc. ("MERS"), and Northwest Trustee Services, Inc. ("NWTS")

20    (collectively "Defendants") and responds to Plaintiff James McDonald's First Set of

21    Interrogatories and Request for Production of Documents ("Requests") as follows:

                            I.     PRELIMINARY STATEMENT

22        These responses are made solely for the purpose of this action.  Each response and each

23    document produced is subject to all appropriate objections (including, but not limited to,

24    objections concerning competency, relevancy, materiality, propriety and admissibility) which

25    would require the exclusion of any statement contained herein or in any of the documents

26

DEFENDANTS' SUPPLEMENTAL RESPONSE          ROUTH          13555 SE 36th St., Ste 300
TO PLAINTIFF'S FIRST REQUEST FOR           CRABTREE        Bellevue, WA 98006
PRODUCTION OF DOCUMENTS                    OLSEN, P.S.     Telephone: 425.458.2121
– PAGE 1 OF 7, CASE NO. C10-1952 RSL                       Facsimile: 425.458.2131

1  produced, if any such document or documents were sought to be introduced into evidence in

2  Court. All such objections and grounds are reserved and may be interposed at the time of trial.

3          Defendants have not completed their investigation of facts, witnesses, or documents

4  related to this action; have not completed its analysis of available data; have not yet completed

5  its discovery in this action; and have not completed preparation for trial. Thus, although a good

6  faith effort has been made to supply pertinent information when it has been requested, it is not

7  possible in many instances for unqualified responses to be made. Further, the responses are

8  necessarily made without prejudice to Defendants' right to produce any subsequently discovered

9  facts, witnesses, or documents, as well as any new theories or contentions that Defendants may

10  adopt. These responses are given without prejudice to Defendants' right to provide facts,

11  witnesses or documents omitted from these responses by oversight, inadvertent or good faith

12  error or mistake. Defendants have furnished information that is presently available, which may

13  include hearsay and other forms of evidence that are neither reliable nor admissible.

14          **II.    GENERAL OBJECTIONS**

15          Each of the general objections stated below are continuing objections which Defendants

16  will incorporate into specific responses as appropriate:

17          A.  Not Reasonably Calculated Objection:

18                Many of the requests, in whole or in part, seek information or documents that are

19                neither relevant to the subject matter of the lawsuit nor reasonably calculated to lead

20                to the discovery of admissible evidence in respect thereto.

21          B.  Ambiguity Objection:

22                Many of the specific requests are phrased in language that is so vague, ambiguous,

23                and uncertain that Defendants are unable to ascertain what information is requested.

24          C.  Burden Objection:

25                Many of the specific requests are materially overbroad in whole or in part, or are

26                burdensome and oppressive on the grounds that they seek information that is equally

DEFENDANTS' SUPPLEMENTAL RESPONSE
TO PLAINTIFF'S FIRST REQUEST FOR
PRODUCTION OF DOCUMENTS
– PAGE 2 OF 7, CASE NO. C10-1952 RSL

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

accessible to or already within the possession of the plaintiff, or information that is
not relevant to the subject matter of the dispute herein, or, if relevant, so remotely
relevant as to have no practical benefit to the plaintiff, while placing an inordinate
burden and expense on Defendants to respond.

D.  <u>Duplicative Request Objection</u>:

Many of the specific requests are duplicative in that that they request information that
is requested by more than one Interrogatory.

### III.    SPECIFIC RESPONSES TO REQUESTS

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1:**

**RESPONSE:**  Defendants incorporate by reference all previous objections to this
Request. After diligent search, Defendants have found nothing that is responsive to this Request.
In the event material that is responsive to this Request is located, Defendants will supplement
these responses.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2:**

**RESPONSE:**  Defendants have provided all documents responsive to this Request.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:**

**RESPONSE:**  Defendants incorporate by reference all previous objections to this
Request. After diligent search, Defendants have found nothing that is responsive to this Request.
In the event material that is responsive to this Request is located, Defendants will supplement
these responses.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:**

**RESPONSE:**  Defendants have provided all documents responsive to this Request.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:**

**RESPONSE:**  Defendants object to this Request on the basis that the information
requested is neither relevant to the subject matter of the lawsuit nor reasonably calculated to lead
to the discovery of admissible evidence in respect thereto.

DEFENDANTS' SUPPLEMENTAL RESPONSE
TO PLAINTIFF'S FIRST REQUEST FOR
PRODUCTION OF DOCUMENTS
– PAGE 3 OF 7, CASE NO. C10-1952 RSL

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

1   **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6:**

2       **RESPONSE:**  Defendants have provided all documents responsive to this Request.

3   **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 7:**

4       **RESPONSE:**   Defendants incorporate by reference all previous objections to this

5   Request. Without waiving any objection, Defendant MERS provides the attached copy of the

6   MERS Membership Application for IndyMac Mortgage Holdings, Inc.

7   **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 8:**

8       **RESPONSE:**   Defendants incorporate by reference all previous objections to this

9   Request. Without waiving any objection, Defendant MERS provides the attached copy of the

10  Membership Agreement between Freddie Mac and MERS.

11  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 9:**

12      **RESPONSE:**  Defendants have provided all documents responsive to this Request.

13  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 10:**

14      **RESPONSE:**   Defendants incorporate by reference all previous objections to this

15  Request. After diligent search, Defendants have found nothing that is responsive to this Request.

16  In the event material that is responsive to this Request is located, Defendants will supplement

17  these responses.

18  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 11:**

19      **RESPONSE:**  Defendants have provided all documents responsive to this Request.

20  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 12:**

21      **RESPONSE:**  Defendants have provided all documents responsive to this Request.

22  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 13:**

23      **RESPONSE:**  Defendants incorporate by reference all previous objections to this

24  Request. Without waiving any objection, please see the attached Form 1034.

25

26

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

1  <u>**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 14:**</u>

2      <u>**RESPONSE:**</u> Defendants incorporate by reference all previous objections to this

3  Request. Without waiving any objection, please see the attached Form 1036.

4  <u>**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 15:**</u>

5      <u>**RESPONSE:**</u> Defendants incorporate by reference all previous objections to this

6  Request. After diligent search, Defendants have found nothing that is responsive to this Request.

7  In the event material that is responsive to this Request is located, Defendants will supplement

8  these responses.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' SUPPLEMENTAL RESPONSE
TO PLAINTIFF'S FIRST REQUEST FOR
PRODUCTION OF DOCUMENTS
– PAGE 5 OF 7, CASE NO. C10-1952 RSL

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

1

## ATTORNEY CERTIFICATION

2     The undersigned, as attorney for Defendants OneWest Bank, MERS, and NWTS,

3 certifies to the best of her knowledge, information and belief, formed after a reasonable inquiry

4 that the responses and objections are: (1) consistent with the Civil Rules and warranted by

5 existing law or a good faith argument for the extension, modification or reversal of existing law;

6 (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or

7 needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or

8 expensive, given the needs of the case, the discovery already had in the case, the amount in

9 controversy and the importance of the issues at stake in the litigation.

10     DATED this _____ day of February, 2012.

11

12                              ROUTH CRABTREE OLSEN, P.S.

13

14                              _____
                                Heidi E. Buck, WSBA No. 41769
15                              Of Attorneys for Defendants OneWest
                                Bank, Mortgage Electronic Registration
16                              Systems, Inc., and Northwest Trustee
                                Services, Inc.

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' SUPPLEMENTAL RESPONSE
TO PLAINTIFF'S FIRST REQUEST FOR
PRODUCTION OF DOCUMENTS
– PAGE 6 OF 7, CASE NO. C10-1952 RSL

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

## PARTY CERTIFICATION

The undersigned, under penalty of perjury of the laws of the State of Washington declares that I am authorized to sign on behalf of Defendant, that I have read the foregoing Requests, and swear that the Responses are true and complete to the best of my knowledge and belief.

DATED this ___9th___ day of February, 2012.


ONEWEST BANK, FSB


By: _Rebecca Marks_____
    Rebecca Marks

NORTHWEST TRUSTEE SERVICES, INC.


By: _____


MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.


By: _JC SnPedro_____

    _JC SAN PEDRO_____

DEFENDANTS' SUPPLEMENTAL RESPONSE
TO PLAINTIFF'S FIRST REQUEST FOR
PRODUCTION OF DOCUMENTS
-- PAGE 7 OF 7, CASE NO. C10-1952 RSL

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

# Exhibit 10: OneWest Admissions Plaintiff's 1st RFA

The Honorable Judge Robert Lasnik

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

JAMES MCDONALD,

            Plaintiff,

    v.

ONEWEST BANK, FSB, NORTHWEST
TRUSTEE SERVICES, INC., MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS,
INC., INDYMAC BANK FSB, DOES 1-50,

            Defendants.

No.  C10-1952 RSL

**DEFENDANT ONEWEST BANK,**
**FSB'S RESPONSE TO**
**PLAINTIFF'S FIRST REQUEST**
**FOR ADMISSION**

COMES NOW Defendant OneWest Bank, FSB ("OneWest") and responds to Plaintiff James McDonald's First Set of Request for Admissions ("Requests") as follows:

## I.    PRELIMINARY STATEMENT

These responses are made solely for the purpose of this action.  Each response and each document produced is subject to all appropriate objections (including, but not limited to, objections concerning competency, relevancy, materiality, propriety and admissibility) which would require the exclusion of any statement contained herein or in any of the documents produced, if any such document or documents were sought to be introduced into evidence in Court. All such objections and grounds are reserved and may be interposed at the time of trial.

Defendant has not completed their investigation of facts, witnesses, or documents related to this action; has not completed its analysis of available data; has not yet completed its

DEFENDANT ONEWEST'S RESPONSE
TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS
-- PAGE 1 OF 5, CASE NO. C10-1952 RSL

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

1   discovery in this action; and has not completed preparation for trial. Thus, although a good faith

2   effort has been made to supply pertinent information when it has been requested, it is not

3   possible in many instances for unqualified responses to be made. Further, the responses are

4   necessarily made without prejudice to Defendant's right to produce any subsequently discovered

5   facts, witnesses, or documents, as well as any new theories or contentions that Defendant may

6   adopt. These responses are given without prejudice to Defendant's right to provide facts,

7   witnesses or documents omitted from these responses by oversight, inadvertent or good faith

8   error or mistake. Defendant has furnished information that is presently available, which may

9   include hearsay and other forms of evidence that are neither reliable nor admissible.

10                          **II.    GENERAL OBJECTIONS**

11          Each of the general objections stated below are continuing objections which Defendant

12   will incorporate into specific responses as appropriate:

13          A.  Not Reasonably Calculated Objection:

14                  Many of the requests, in whole or in part, seek information or documents that are

15                  neither relevant to the subject matter of the lawsuit nor reasonably calculated to lead

16                  to the discovery of admissible evidence in respect thereto.

17          B.  Ambiguity Objection:

18                  Many of the specific requests are phrased in language that is so vague, ambiguous,

19                  and uncertain that Defendants are unable to ascertain what information is requested.

20          C.  Burden Objection:

21                  Many of the specific requests are materially overbroad in whole or in part, or are

22                  burdensome and oppressive on the grounds that they seek information that is equally

23                  accessible to or already within the possession of the plaintiff, or information that is

24                  not relevant to the subject matter of the dispute herein, or, if relevant, so remotely

25                  relevant as to have no practical benefit to the plaintiff, while placing an inordinate

26                  burden and expense on Defendant to respond.

DEFENDANT ONEWEST'S RESPONSE
TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS
– PAGE 2 OF 5, CASE NO. C10-1952 RSL

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

D. <u>Duplicative Request Objection:</u>

Many of the specific requests are duplicative in that that they request information that is requested by more than one Interrogatory.

### III.   SPECIFIC RESPONSES TO REQUESTS

**REQUEST FOR ADMISSION NO. 1:**  Admit Marcos Flores, Asst. VP of OneWest Bank, was given the task to act as a negotiator for a settlement conference for the above litigation.

**RESPONSE:**   Defendant OneWest objects to RFA No. 1 on the basis that it is not reasonably calculated to lead to admissible evidence. Without waiving this objection, OneWest ADMITS to this request.

**REQUEST FOR ADMISSION NO. 2:**  Admit that prior to attending the settlement conference, Marcos Flores did not have complete authority to make or accept any settlement offer, including acceptance of a principal reduction to equate plaintiff's claimed damages, without approval from a separate entity, individual or other party that is not employed by OneWest and is not an officer thereof.

**RESPONSE:**  Defendant OneWest objects to RFA No. 2 on the basis that it is not reasonably calculated to lead to admissible evidence, is vague, and ambiguous. Without waiving these objections, OneWest ADMITS to this request.

**REQUEST FOR ADMISSION NO. 3:**  Admit that OneWest does not have the ability to reduce the principal balance of the mortgage without following the guidelines of, or receiving approval from, an individual, entity or other party that is not employed by, or an office of OneWest.

DEFENDANT ONEWEST'S RESPONSE
TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS
-- PAGE 3 OF 5, CASE NO. C10-1952 RSL

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

1

**RESPONSE:**  Defendant OneWest objects to RFA No. 3 on the basis that it is not

2

reasonably calculated to lead to admissible evidence, is vague, ambiguous, OneWest is unable to

3

ascertain what information is being requested, and it is overbroad and burdensome. Without

4

waiving these objections, OneWest ADMITS to this request.

5

6

**REQUEST FOR ADMISSION NO. 4:** Admit that OneWest does not have the ability to

7

modify the terms of the mortgage without following the guidelines of, or receiving approval

8

from, an individual, entity or other party that is not employed by, or an office of OneWest.

9

**RESPONSE:** Defendant OneWest objects to RFA No. 4 on the basis that it is not

10

reasonably calculated to lead to admissible evidence, is vague, ambiguous, OneWest is unable to

11

ascertain what information is being requested and it is overbroad and burdensome. Without

12

waiving these objections, OneWest ADMITS to this request.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT ONEWEST'S RESPONSE
TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS
– PAGE 4 OF 5, CASE NO. C10-1952 RSL

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

1

### ATTORNEY CERTIFICATION

2        The undersigned, as attorney for Defendants OneWest Bank, MERS, and NWTS,

3   certifies to the best of her knowledge, information and belief, formed after a reasonable inquiry

4   that the responses and objections are: (1) consistent with the Civil Rules and warranted by

5   existing law or a good faith argument for the extension, modification or reversal of existing law;

6   (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or

7   needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or

8   expensive, given the needs of the case, the discovery already had in the case, the amount in

9   controversy and the importance of the issues at stake in the litigation.

10       DATED this _____3rd_____ day of February, 2012.

11

12                                              ROUTH CRABTREE OLSEN, P.S.

13

14                                              _____
                                                Heidi E. Buck, WSBA No. 41769
15                                              Of Attorneys for Defendants OneWest
                                                Bank, Mortgage Electronic Registration
16                                              Systems, Inc., and Northwest Trustee
                                                Services, Inc.

17

18

19

20

21

22

23

24

25

26

DEFENDANT ONEWEST'S RESPONSE
TO PLAINTIFF'S FIRST REQUEST FOR
ADMISSIONS
– PAGE 5 OF 5, CASE NO. C10-1952 RSL

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

# Exhibit 11:

# Appointment of Successor Trustee

After Recording Return to:
Vonnie McElligott
Northwest Trustee Services, Inc.
P.O. Box 997
Bellevue, WA 98009-0997



**20100204000503**

```
TITLE COURT SE AST          14.00
PAGE-001 OF 001
02/04/2010 12:13
KING COUNTY, WA
```

## Appointment of Successor Trustee

File No. 7523.21352

James B. McDonald, a single man is/are the grantor(s), Pacific Northwest Title Insurance Co., Inc. is the trustee and Mortgage Electronic Registration Systems, Inc. "MERS" is the beneficiary under that certain deed of trust dated 01/08/07 and recorded on 01/10/07 under King County, Washington Auditor's File No. 20070110002077.

The present beneficiary under said deed of trust appoints Northwest Trustee Services, Inc., a Washington corporation, whose address is P.O. Box 997, Bellevue, WA 98009-0997, as successor trustee under the deed of trust with all powers of the original trustee.

The undersigned present beneficiary warrants and represents that, as of the date this Appointment of Successor Trustee has been executed and acknowledged, it is the owner and holder of the obligation secured by the subject deed of trust and is not holding the same as security for a different obligation.

OneWest Bank, FSB

By_____
        Suchan Murray
        Authorized Signatory

STATE OF_____Texas_____ )
                                                          )ss
COUNTY OF_____Travis_____ )

I certify that I know or have satisfactory evidence that _____Suchan Murray_____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the Authorized Signatory of ONEWEST BANK, FSB to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: **01/27/10**

_____
Notary Public in and for the State of ____Texas____
Residing at: ___Travis_____
My appointment expires _____

Anna Elizabeth Ramsey
Notary Public
State of Texas
Comm. Exp. 12-15-13

01