**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| JAMES MCDONALD, | |
| Plaintiff, | No. C10-1952 RSL |
| v. | **DECLARATION OF CHARLES BOYLE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| ONEWEST BANK, FSB, NORTHWEST TRUSTEE SERVICES, INC., MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., INDYMAC BANK FSB, DOES 1-50, | |
| Defendants. | |

I, Charles Boyle, hereby declare:

1.     I am Vice President for OneWest Bank, FSB ("OneWest"), Defendant herein. This Declaration is made in support of Defendants' Motion for Summary Judgment ("Defendants' Motion"). In the regular performance of my job functions, I am familiar with business records maintained by OneWest Bank for the purpose of servicing mortgage loans. These records (which include data compilations, electronically imaged documents, and others) are made at or near the time by, or from information provided by, persons with knowledge of the activity and transactions reflected in such records, and are kept in the course of business activity conducted regularly by OneWest Bank.  It is the regular practice of OneWest Bank's mortgage servicing business to make these records.  In connection with making this declaration, I have personally examined these business records. If called as a witness, I could testify competently thereto.

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

2.    On or about January 8, 2007, Plaintiff James B. McDonald received a loan in the amount of $389,481.60. The loan was evidenced by a promissory note ("Note"), which was signed by James B. McDonald. A true and correct copy of the Note is attached to Defendants' Motion as Exhibit 1.

3.    To secure repayment of the Note, Plaintiff granted to Mortgage Electronic Registration Systems as nominee for the original lender, Indymac Bank, F.S.B. and its successors and assigns, a deed of trust (the "Deed of Trust"). The Deed of Trust encumbers the real property commonly known as 14840 119th PL NE, Kirkland, Washington 98034 (the "Property"). The Deed of Trust was recorded on January 10, 2007, under King County Auditor's File No. 20070110002077. A true and correct copy of the Deed of Trust is attached to Defendants' Motion as Exhibit 2.

4.    After origination, Indymac Bank, F.S.B. sold Plaintiff's Note to Federal Home Loan Mortgage Company ("Freddie Mac"). Indymac Bank, F.S.B. retained the servicing rights and serviced the loan on behalf of Freddie Mac. Freddie Mac has remained the investor and owner of the Note.

5.    IndyMac Bank F.S.B. was closed by the Office of Thrift Supervision ("OTS") in July 2008, and the Federal Deposit Insurance Corporation ("FDIC") was appointed as Receiver. A true and correct copy of the OTS Order No. 2008-24 (July 11, 2008) is attached to Defendants' Motion as Exhibit 3.[1]

6.    Thereafter, IndyMac Federal Bank, FSB ("IMFB") was created and the FDIC was appointed Conservator. A true and correct copy of excerpts from the Purchase and Assumption Agreement is attached to Defendants' Motion as Exhibit 4.[2]

---

[1] The Office of Thrift Supervision Order No. 2008-24, dated July 11, 2008, can be found, in entirety, online at http://www.ots.treas.gov/_files/680018.pdf.
[2] The Purchase and Assumption Agreement, in entirety, can be found online at http://www.fdic.gov/bank/individual/failed/IndyMac_P_and_A.pdf.

DECLARATION OF CHARLES BOYLE
IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT – PAGE 2 OF 4
CASE NO. C10-1952 RSL

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

7.     On March 19, 2009, the FDIC was appointed as Receiver for IMFB and sold a substantially all of the assets including the rights to service the loan presently at issue to OneWest Bank, FSB. True and correct copies of excerpts from the Master Purchase Agreement,[3] Loan Sale Agreement,[4] and Servicing Business Asset Purchase Agreement[5] are attached to Defendants' Motion as Exhibits 5, 6 and 7, respectively.

8.     OneWest Bank is the current servicer; IndyMac Mortgage Services is a division of OneWest Bank. OneWest services the loan on behalf of Freddie Mac in accordance with Freddie Mac's Single-Family Seller/Servicer Guide (the "Freddie Mac Servicer Guide").[6]

9.     As part of the Freddie Mac Servicer Guide, OneWest has possession of the blank endorsed Note through a document custodian, Deutsche Bank National Trust Co. ("Custodian"). A true and correct copy of the Custodial Agreement is attached to Defendants' Motion as Exhibit 8.

10.     OneWest is entitled to collect payments, initiate foreclosure upon borrower's default, and review Plaintiff's loan for possible modification in accordance with investor guidelines.

11.     OneWest has been in possession of the Note and therefore the holder since on or about March 19, 2009. OneWest has held the Note through the Custodian since on or about May 12, 2009.

12.     On or about October 1, 2009, Plaintiff defaulted by failing to make the payment due for October 1, 2009, and every payment thereafter due.

---

[3] The Master Purchase Agreement, in entirety, is available online at
http://www.fdic.gov/about/freedom/IndyMacMasterPurchaseAgrmt.pdf.
[4] The Loan Sale Agreement, in entirety, is available online at
http://www.fdic.gov/about/freedom/IndyMacLoanSaleAgrmt.pdf.
[5] The Servicing Business Asset Purchase Agreement, in entirety, is available online at
http://www.fdic.gov/bank/individual/failed/ServicingBusinessAssetPurchaseAgreement.pdf.
[6] The Freddie Mac Servicer Guide is available, in entirety, at http://www.allregs.com/tpl/Main.aspx.

DECLARATION OF CHARLES BOYLE
IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT – PAGE 3 OF 4
CASE NO. C10-1952 RSL

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

13.     On or about November 2, 2009 and November 16, 2009, IndyMac Mortgage Services, a division of OneWest Bank, FSB mailed to Plaintiff via first class mail letters (the "November 2009 Letters") which satisfied the requirements set forth in RCW 61.24.031(b). True and correct copies of the November 2009 Letters are attached to Defendants' Motion as Exhibit 9.

14.     On or about January 27, 2010, Mortgage Electronic Registration Systems, Inc. executed an assignment of deed of trust (the "Assignment") whereby MERS assigned its interest under the Deed of Trust to OneWest Bank, FSB. The Assignment was recorded February 4, 2010, under King County Auditor's File No. 20100204000502. A true and correct copy of the Assignment is attached to Defendants' Motion as Exhibit 11.

15.     On or about February 4, 2010, OneWest recorded an appointment of successor trustee (the "Appointment") naming Northwest Trustee Services, Inc. the successor trustee. The Appointment was recorded under King County Auditor's File No. 20100204000503. A true and correct copy of the Appointment is attached to Defendants' Motion as Exhibit 12.

16.     On or about October 1, 2010, OneWest requested that the Custodian deliver the Note to OneWest. The Note was released to OneWest on or about October 5, 2010.

17.     The Note is currently stored at the office of counsel for Defendants'.

I declare under penalty of perjury and the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge.

SIGNED this 15 day of March, 2012.

**ONEWEST BANK, FSB**

Charles Boyle, Declarant

DECLARATION OF CHARLES BOYLE
IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT – PAGE 4 OF 4
CASE NO. C10-1952 RSL

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

# Exhibit 1

# FIXED/ADJUSTABLE RATE NOTE
# INTEREST ONLY PERIOD
### (1-Year LIBOR Index - Rate Caps)
### (Assumable after Initial Period)
### (  10  Year Interest Only Period)

Loan #          9243                                          MIN: 100055401250492438

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

January  8, 2007                    Everett                         Washington
[Date]                               [City]                           [State]

14840 119th Pl NE, KIRKLAND, WA 98034

[Property Address]

**1.   BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $     389,481.60     (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is          IndyMac Bank, F.S.B., a federally chartered savings bank
I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          5.875     %. The interest rate I will pay will change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**
**(A) Time and Place of Payments**
I will make a payment every month on the first day of the month beginning on          March  1, 2007          .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and if the payment consists of both principal and interest, it will be applied to interest before Principal. If, on     February  1, 2037     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at          IndyMac Bank, F.S.B., P.O. Box 78826, Phoenix, AZ 85062-8826
or at a different place if required by the Note Holder.
**(B) Amount of My Initial Monthly Payments**
Before the first fully amortizing principal and interest payment due date stated in subsection (C) below (the "First P&I Payment Due Date"), my monthly payments will be only for the interest due on the unpaid principal of this Note.
Each of my initial monthly payments will be in the amount of U.S. $     1,906.84     . This amount may change in accordance with subsection (C) below.

**IndyMac Bank**
**Fixed/Adjustable Rate Note - 1 Yr. Libor Index - Interest Only Period - Multistate**

Initials 

Form 5600

8480830 (0506)                 VMP Mortgage Solutions, Inc. (800)521-7291                                  6/05

**(C) Monthly Payment Changes**

The First P&I Payment Due Date is   March 1, 2017   .

Prior to the First P&I Payment Due Date, my monthly payment may change to reflect changes in the interest rate I must pay in accordance with Section 4 of this Note or to reflect changes in the unpaid principal of my loan in accordance with Section 5 of this Note. Notwithstanding the provisions of Section 4(C) of this Note to the contrary, prior to the First P&I Payment Due Date the Note Holder will not include in the monthly payment any amount to repay the unpaid principal. Before the effective date of any change in my monthly payment, the Note Holder will deliver or mail to me a notice of the change in accordance with Section 8 of this Note. The notice will include the title and telephone number of a person who will answer any question I may have regarding the notice.

Beginning with the First P&I Payment Due Date, my monthly payment will change to an amount sufficient to repay the principal and interest at the rate described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Sections 4 and 5 of this Note.

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of   February, 2012   , and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

**(B) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding   two and 750/1000ths   percentage point(s) (   2.750   %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Interest Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Interest Change Date will not be greater than   10.875   % or less than   2.750   %. Thereafter, my interest rate will never be increased or decreased on any single Interest Change Date by more than   two and NO/1000ths   percentage point(s) (   2.000   %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than   10.875   %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to the changes.

If I make a partial Prepayment during the period ending with the due date of my last interest only monthly payment, my partial Prepayment will reduce the amount of my monthly payment. If I make a partial Prepayment after the last interest only monthly payment, my partial Prepayment may reduce the amount of my monthly payments beginning with the monthly payment due after the Interest Change Date following the partial Prepayment. After the first Interest Change Date, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.   BORROWER'S FAILURE TO PAY AS REQUIRED
### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  15              calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000         % of my overdue payment of interest during the period when my payment is interest only, and of principal and interest after that. I will pay this late charge promptly but only once on each late payment.

### (B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**(A) UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**(B) AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)                        _____ (Seal)
James B McDonald              -Borrower                                               -Borrower


_____ (Seal)                        _____ (Seal)
                             -Borrower                                               -Borrower


_____ (Seal)                        _____ (Seal)
                             -Borrower                                               -Borrower


_____ (Seal)                        _____ (Seal)
                             -Borrower                                               -Borrower

*[Sign Original Only]*


Pay To The Order Of

Without Recourse
IndyMac Bank, F.S.B.
By:
Sam Lindstrom
Vice President


Loan No:     .9243

Form 5600
6/05



# ADDENDUM TO ADJUSTABLE RATE NOTE
## (Prepayment)

Loan #:      9243

THIS ADDENDUM is made this   8th   day of   January, 2007   , and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

1.   Section 5 of the Adjustable Rate Note is modified to provide that I have the right to make payments of principal at any time before they are due. A Prepayment of all of the unpaid principal is known as a "Full Prepayment." A Prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

Except as provided below, I may make a Full Prepayment or a Partial Prepayment at any time without paying any Prepayment charge. If within the first   three   ( 3   ) year(s) I make a Partial Prepayment or Partial Prepayment(s) of less than twenty percent (20%) of the original principal amount in any twelve (12) month period, I will not pay a Prepayment penalty. However, if within the first   three   ( 3   ) year(s), I make a Full Prepayment, Partial Prepayment or Partial Prepayments of more than twenty percent (20%) of the original principal amount in any 12-month period, I will pay a Prepayment charge in an amount equal to the payment of six (6) months' advance interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount.

If I make a Partial Prepayment equal to one or more of my monthly payments, the due date of my next scheduled monthly payment may be advanced no more than one month. If I make a Partial Prepayment in any other amount, I must still make all subsequent monthly payments as scheduled.

2.   All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.

Dated: _1/8/07_____

_James B McDonald_____ (Seal)
James B McDonald            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

IndyMac Bank and Federally Exempted Seller Use Only
Hard Prepayment Addendum (1-3 yrs) - ARM
First Mortgages - Multistate, Arkansas (loans over $150,000)

8480279 (0407)               VMP Mortgage Solutions, Inc. (800)521-7291               SPD #084
                                                                                     (08/04)

## ADDENDUM TO ADJUSTABLE RATE NOTE

Loan #:     9243

THIS ADDENDUM is made this     8th     day of     January, 2007     , and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

**1. Section 4(D) of the Adjustable Rate Note is modified as follows:**

The interest rate I am required to pay at the first Change Date will not be greater than 10.875     % or less than     2.750     %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than  two and NO/1000ths percentage point(s) (     2.000     %) from the rate of interest I have been paying for the preceding 12     months. My interest rate will never be greater than     10.875     % or less than 2.750     %.

**2. All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.**

Dated:  1/8/07

_____ (Seal)          _____ (Seal)
James B McDonald          -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                        -Borrower

IndyMac Bank
ARM Note Addendum - Multistate
8480344 (0602)

VMP Mortgage Solutions, Inc.

I074
(2/06)

# Exhibit 2

20070110002077.00

After recording please return to:
IndyMac Bank, F.S.B. c/o Document
Management
*[Name of Natural Person]*
901 E. 104th Street Building B
Suite 400(500)
Kansas City, MO 64131
*[City, State Zip Code]*



20070110002077
PACIFIC NW TIT DT
PAGE001 OF 025          57.00
01/10/2007 15:53
KING COUNTY, WA

Assessor's Property Tax Parcel or Account Number:  328830018003
Abbreviated Legal Description:
Lot 18, High Woodlands Div. 3, V85/P30 32

——————————— *[Space Above This Line For Recording Data]* ———————————

# DEED OF TRUST

25/57

FILED BY PNWT

**DEFINITIONS**                      MIN 100055401250492438

PNWT 634468-4

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)      "**Security Instrument**" means this document, which is dated          January 8, 2007
together with all Riders to this document.

(B)      "**Borrower**" is  James B McDonald a single man

. Borrower is the trustor under this Security Instrument.

(C)      "**Lender**" is  IndyMac Bank, F.S.B., a federally chartered savings bank

Lender is a          Federal Savings Bank          organized and existing under the laws of
United States of America          . Lender's address is  155 North Lake Avenue, Pasadena,
CA 91101

(D)      "**Trustee**" is  Pacific Northwest Title Insurance Co., Inc.

(E)      "**MERS**" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  **MERS is the beneficiary under this Security**

Loan No:      9243
Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**          MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—          Page 1 of 14          14301WA 08/00 Rev. 11/06
www.compliancesource.com          ©2006, The Compliance Source, Inc.

**Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F)    **"Note"** means the promissory note signed by Borrower and dated    January 8, 2007.
The Note states that Borrower owes Lender    three hundred eighty nine thousand four hundred eighty one and 60/100ths                                                  Dollars
(U.S. $ 389,481.60    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    February 1, 2037

(G)    **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(H)    **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)    **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | | |
|---|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] 1-4 Family Rider | [ ] Revocable Trust Rider | |
| [ ] Other(s) [specify] | | |

(J)    **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)    **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)    **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)    **"Escrow Items"** means those items that are described in Section 3.

(N)    **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)    **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)    **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Loan No:    9243

**(Q)** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)** "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of King :
        *[Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]*
        See Exhibit A attached hereto and made a part hereof

which currently has the address of          14840 119th Pl NE
                                                     *[Street]*
KIRKLAND                    ,    Washington        98034              ("Property Address"):
              *[City]*                          *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Loan No:      9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                        Page 3 of 14                    14301WA 08/00 Rev. 11/06
www.compliancesource.com                                                         ©2006, The Compliance Source, Inc.

20070110002077.::

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.   **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—        Page 4 of 14        14301WA 08/00 Rev. 11/06
www.compliancesource.com        ©2006, The Compliance Source, Inc.

2007011002077 ⁞⁞⁞⁞

receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.**   Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.**   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right

2007011002077

shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Loan No:        9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT              MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                                          Page 6 of 14                                          14301WA 08/00 Rev. 11/06
www.compliancesource.com                                                                                                      ©2006, The Compliance Source, Inc.

2007011002077

7.   **Preservation, Maintenance and Protection of the Property; Inspections.**   Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   **Borrower's Loan Application.**   Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**   If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.   **Mortgage Insurance.**   If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be

Loan No: _____9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3048  01/01
—THE COMPLIANCE SOURCE, INC.—                                                        Page 7 of 14                                         14301WA 08/00 Rev. 11/08
www.compliancesource.com                                                                                                                  ©2006, The Compliance Source, Inc.

20070110002077

non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a)  Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b)  Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.  Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be

Loan No:      9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                      MERS Modified Form 3048  01/01
—THE COMPLIANCE SOURCE, INC.—                                                   Page 8 of 14                                              14301WA  08/00 Rev. 11/06
www.compliancesource.com                                                                                                              ©2006, The Compliance Source, Inc.

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 8 of 25
Order: k Comment:

2007011002077

reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 9 of 25
Order: k Comment:

20070110002077.⸺

be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such

Loan No:        9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                                Page 10 of 14                    14301WA 08/00 Rev. 11/06
www.compliancesource.com                                                                     ©2005, The Compliance Source, Inc.



20070110002077.0i

other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21.  Hazardous Substances.**  As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Loan No:       9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                                   Page 11 of 14                                   14301WA 08/00 Rev. 11/06
www.compliancesource.com                                                                                   ©2006, The Compliance Source, Inc.

2007011002077.0î

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

24. Substitute Trustee. In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Use of Property. The Property is not used principally for agricultural purposes.

Loan No: _____ 9243
Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                                    Page 12 of 14          14301WA 08/00 Rev. 11/06
www.compliancesource.com                                                                ©2006, The Compliance Source, Inc.

**26. Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees", whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                                     James B McDonald            -Borrower
                                                                 *[Printed Name]*

_____     _____ (Seal)
                                                                 -Borrower
                                                                 *[Printed Name]*

                                     _____ (Seal)
                                                                 -Borrower
                                                                 *[Printed Name]*

                                     _____ (Seal)
                                                                 -Borrower
                                                                 *[Printed Name]*

———————————— *[Acknowledgment on Following Page]* ————————————

Loan No:        9243

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                        Page 13 of 14                        14301WA 08/00 Rev. 11/04
www.compliancesource.com                                                                  ©2006, The Compliance Source, Inc.

20070110002077.01

State of _Washington_
County of _Snohomish_

§
§ ss.:
§

I certify that I know or have satisfactory evidence that    James B McDonald

*[name of person]* is the person who appeared before me, and said person(s) acknowledged that (he/she/they) signed this instrument and acknowledged it to be (his/her/their) free and voluntary act for the uses and purposes mentioned in the instrument.

Dated: 01-08-07

(Seal)



(Signature)

_Notary Public, Michael Angeley_
(Title of Office)                          *[Printed Name]*
                                            Castaned

_Lake Stevens_
Place of Residence of Notary Public

Loan No:       9243
Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                                                                                  14301WA 08/00 Rev. 11/06
www.compliancesource.com                     Page 14 of 14                                          ©2005, The Compliance Source, Inc.

20070110002077.0--

Order No. 634468

A.L.T.A. COMMITMENT
SCHEDULE A
Page 3

The land referred to in this commitment is situated in the State of
Washington, and described as follows:

   Lot 18, The High Woodlands Addition Div. No. 3, according to the
   plat thereof recorded in Volume 85 of Plats, pages 30 through 32,
   inclusive, in King County, Washington.


                        END OF SCHEDULE A



NOTE FOR INFORMATIONAL PURPOSES ONLY:

The following may be used as an abbreviated legal description on the
documents to be recorded, per amended RCW 65.04.  Said abbreviated
legal description is not a substitute for a complete legal description
within the body of the document.

   Lot 18, High Woodlands Div. 3, Vol. 85, pgs. 30-32

2007011002077.

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this   8th  day of  January,   2007 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to     IndyMac Bank, F.S.B., a federally chartered savings bank
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

14840 119th Pl NE, KIRKLAND, WA 98034

*[Property Address]*

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in Declaration of Covenants, Conditions, and Restrictions (the "Declaration").  The Property is a part of a planned unit development known as:

**Kirkland/Kingsgate**

*[Name of Planned Unit Development]*

(the "PUD").  The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS.  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.  PUD Obligations.**  Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents.  The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association.  Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B.  Property Insurance.**  So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire,

Loan No:      9243                                            MIN: 100055401250492438

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.—                                   Page 1 of 3                        14501MU 08/00 Rev. 11/04
www.compliancesource.com                                                                           ©2004, The Compliance Source, Inc.

2007011000Z077:01

hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then:

(i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

———————————[Signatures on Following Page]———————————

Loan No:      9243

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.—                    Page 2 of 3              14501MU 08/00 Rev. 11/04
www.compliancesource.com                                             ©2004, The Compliance Source, Inc.

20070110002077.3

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_(signature)_____ (Seal)     _____ (Seal)
James B McDonald            -Borrower                              -Borrower

_____ (Seal)     _____ (Seal)
                            -Borrower                              -Borrower

*[Sign Original Only]*

Loan No:      9243

Multistate PUD Rider—Single Family —Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.—                         Page 3 of 3                        14501MU 08/00 Rev. 11/04
www.compliancesource.com                                                                ©2004, The Compliance Source, Inc.

2007011000207.·

# FIXED/ADJUSTABLE RATE RIDER
# INTEREST ONLY PERIOD
### (1-Year LIBOR Index - Rate Caps)
### (Assumable after Initial Period)
### (   10 Year Interest Only Period)

Loan #        .9243                    MIN:    100055401250492438

THIS ADJUSTABLE RATE RIDER is made this 8th    day of January,   2007           ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to
IndyMac Bank, F.S.B., a federally chartered savings bank

(the "Lender") of the same date and covering the property described in the Security
Instrument and located at:

14840 119th Pl NE, KIRKLAND, WA 98034

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of          5.875      %. The Note
provides for changes in the interest rate and the monthly payments as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
The interest rate I will pay may change on the first day of    February,  2012         ,
and may change on that day every 12th month thereafter. Each date on which my interest
rate could change is called a "Change Date."

IndyMac Bank
Fixed/Adjustable Rate Rider - WSJ 1 Yr. Libor - Interest Only Period -
Multistate

8480831 (0506)          Page 1 of 5                          Form 5601
                VMP Mortgage Solutions, Inc. (800)521-7291              6/05

2007011002077

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and 750/1000ths                             percentage point(s) (        2.750        %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.875  % or less than        2.750        %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two and NO/1000ths                             percentage point(s) (        2.000        %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than        10.875 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.



Loan No:        9243
8480831 (0506)

Page 2 of 5

Form 5601
6/05

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

    **1.** UNTIL BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE IN EFFECT AS FOLLOWS:

      **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

      If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

      If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

    **2.** AFTER BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1 ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND THE PROVISIONS OF UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE AMENDED TO READ AS FOLLOWS:

      **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Loan No: 9243
8480831 (0506)

Page 3 of 5

Form 5601
6/05

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 21 of 25
Order: k Comment:

20070110002077 02

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Loan No:        9243
8480831 (0506)

Page 4 of 5

Form 5601
6/05

20070110002077

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
James B McDonald          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

Loan No:      9243
8480831 (0506)              Page 5 of 5              Form 5601
                                                     6/05

20070110002077.02

# ADDENDUM TO FIXED/ADJUSTABLE RATE RIDER

Loan #:         9243

THIS ADDENDUM to the Fixed/Adjustable Rate Rider is made this  8th     day of
January,  2007       , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument")
and Fixed/Adjustable Rate Rider of the same date given by the undersigned (the "Borrower")
to secure Borrower's Note to  IndyMac Bank, F.S.B., a federally chartered
savings bank

(the "Lender") of the same date and covering the property described in the Security
Instrument and located at:

14840 119th Pl NE, KIRKLAND, WA 98034

[Property Address]

**ADDITIONAL COVENANTS.** In Addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

1. Section 4(D) of the Fixed/Adjustable Rate Rider is modified as follows:

The interest rate I am required to pay at the first Change Date will not be greater than
10.875   % or less than     2.750      %. Thereafter, my interest rate
will never be increased or decreased on any single change Date by more than
two and NO/1000ths              percentage point(s) (    2.000      %)
from the rate of interest I have been paying for the preceding   12    months. My interest
rate will never be greater than       10.875     % or less than    2.750      %.

IndyMac Bank
ARM Addendum to Fixed/Adjustable Rate Rider
Multistate

8480345 (0602)

Page 1 of 2
VMP Mortgage Solutions, Inc.

1075
2/06

Description: King,WA Document - Year.Month.Day.DocID 2007.110.2077 Page: 24 of 25
Order: k Comment:

20070110002077

**2. All other provisions of the Fixed/Adjustable Rate Rider are unchanged by this Addendum and remain in full force and effect.**

Dated: 1/8/07

_____ (Seal)
James B McDonald        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

8480345 (0602)              Page 2 of 2                      1075
                                                            2/06

# Exhibit 3

**OFFICE OF THRIFT SUPERVISION**

**Pass-Through Receivership Of A Federal Savings Association
Into A De Novo Federal Savings Association
That is Placed Into Conservatorship
With the FDIC**

**Date:  July _//_, 2008**

**Order No.: 2008-24**

The Director of the Office of Thrift Supervision ("OTS"), or his designee, in cooperation with the Federal Deposit Insurance Corporation ("FDIC"), has determined: (1) to appoint the FDIC as receiver for the savings association specified below ("OLD THRIFT"); (2) to approve the FDIC's request for the issuance of a new federal mutual savings association charter ("NEW THRIFT") as a successor to OLD THRIFT; (3) to approve the transfer of such assets and liabilities of OLD THRIFT to its successor NEW THRIFT, as the FDIC has determined to be appropriate; and  (4) to appoint the FDIC as conservator of NEW THRIFT.  Collectively, numbers 2 through 4 of the foregoing are referred to herein as the "APPLICATIONS."

"OLD THRIFT," refers to:

| Name | Location | OTS No. |
|------|----------|---------|
| IndyMac Bank, F.S.B. | Pasadena, California. | 03970 |

**I.  GROUNDS FOR ACTIONS TAKEN IN THIS ORDER:**

**RECEIVERSHIP:
GROUNDS FOR APPOINTMENT OF FDIC AS
RECEIVER FOR OLD THRIFT**

The Director, or his designee, based upon the administrative record finds and determines that:

OLD THRIFT has insufficient cash and liquid assets convertible to cash necessary to pay the expected withdrawal demands of its depositors.  OLD THRIFT has suffered significant deposit outflows, exceeding $1 billion since June 26, 2008, in part because of adverse publicity.  Further, because OLD THRIFT is not well capitalized, it cannot renew its large volume of brokered deposits, which will create an additional deposit outflow.  In addition, OLD THRIFT has limited and diminishing liquidity sources available to it. There has been significant disruption in the markets for the types of assets, mortgage backed securities and mortgage servicing rights, held by OLD THRIFT.  Therefore, those

assets that are not already subject to liens may not be marketable or only can be sold at prices that would result in OLD THRIFT failing to meet its capital requirements. Moreover, OLD THRIFT's mortgage servicing rights are the major source of OLD THRIFT's current earnings. In addition, the consequences of OLD THRIFT's top-tier holding company's July 7, 2008 public disclosure of adverse information, and the curtailment of forward mortgage lending and resulting downsizing, place OLD THRIFT in a precarious position and OLD THRIFT has been unable to find anyone who is willing and able to invest sufficient capital to alleviate its problems.

OLD THRIFT has suffered losses amounting to approximately $842 million from the third quarter of 2007 to the first quarter of 2008 and projects to report another $354 million loss for the second quarter of 2008. OLD THRIFT is in an unsafe and unsound condition as a result of its severe liquidity strain, deteriorating asset quality, continuing significant negative operating earnings, and declining capital with no realistic prospects for raising capital to ensure that it can repay all of its liabilities, including deposits.

OLD THRIFT has been unsuccessful in its attempts to find investors who are willing and able to recapitalize OLD THRIFT, given OLD THRIFT's current financial condition, ongoing deposit outflows, lack of liquidity, and continued asset quality deterioration. Further, OLD THRIFT projected that it would be undercapitalized as of June 30, 2008. In addition to other asset write-down's which OLD Thrift should be taking, OLD THRIFT is likely to be unable to meet its depositors' demands and other obligations in the normal course of business, and therefore, OLD THRIFT should immediately recognize additional losses on assets held for sale. The losses OLD THRIFT should recognize will result in OLD THRIFT being classified as undercapitalized. Moreover, because efforts to raise capital have proven unsuccessful, there is no reasonable prospect of OLD THRIFT becoming adequately capitalized without Federal assistance.

Therefore, the Director, or his designee, has concluded that:

(a) OLD THRIFT is likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business because it does not have sufficient liquid assets to fund expected withdrawals;

(b) OLD THRIFT is in an unsafe and unsound condition to transact business due to its lack of capital and its illiquid condition;

(c) OLD THRIFT is undercapitalized as defined in section 38(b) of the FDIA, and has no reasonable prospect of becoming adequately capitalized as defined in section 38(b) of the FDIA.

The Director, or his designee, therefore, has determined that grounds for the appointment of a receiver for OLD THRIFT exist under section 5(d)(2) of the Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1464(d)(2) and section 11(c)(5) of the FDIA, 12 U.S.C. § 1821(c)(5).

3                        OTS ORDER No.: 2008-24

**TRANSFER INTO A NEW FEDERAL CHARTER:**
**GROUNDS FOR ISSUANCE OF NEW FEDERAL CHARTER AND**
**APPROVAL OF TRANSFER OF ASSETS AND LIABILITIES OF**
**OLD THRIFT TO NEW THRIFT**

The FDIC, as receiver of OLD THRIFT, has applied for authority to organize a new Federal mutual savings association, NEW THRIFT, that is to take over such assets and such liabilities of OLD THRIFT as the FDIC has determined to be appropriate, pursuant to section 11(d)(2)(F)(i) of the FDIA, 12 U.S.C. §1821(d)(2)(F)(i).  The FDIC would insure the accounts of NEW THRIFT.

The Director, or his designee:  (i) has considered the factors set forth in section 5(e) of HOLA, 12 U.S.C. § 1464(e), with regard to granting a new federal savings association charter, has determined that the charter should be issued, that NEW THRIFT is authorized to transact business as a savings association, and that the charter and bylaws to be issued for NEW THRIFT are in a form consistent with the material provisions of the applicable regulations; and  (ii) has considered the factors set forth in section 18(c) of the FDIA, 12 U.S.C. § 1828(c), and 12 C.F.R. § 563.22 with respect to the acquisition of certain assets and assumption of certain liabilities of OLD THRIFT by NEW THRIFT. Immediate action is necessary given the seriously adverse financial condition of OLD THRIFT and in order to permit NEW THRIFT to acquire certain assets and assume certain liabilities of OLD THRIFT and continue to serve OLD THRIFT's community and customers.

For the foregoing reasons, the Director, or his designee, has determined that, pursuant to 12 C.F.R. §§ 563.22 (e) and 543.7-1, public notice of the APPLICATIONS shall not be required.  In addition, the Director, or his designee, finds that OTS must act immediately in order to prevent the probable default of OLD THRIFT.  Therefore, the publication of notice required by section 18(c)(3) of the FDIA, the reports on the competitive factors of the acquisition required by section 18(c)(4) of the FDIA, and the delayed consummation required by section 18(c)(6) of the FDIA, shall be dispensed with. Accordingly, NEW THRIFT may immediately acquire the assets and assume the liabilities determined to be appropriate by the FDIC.

**CONSERVATORSHIP:**

**GROUNDS FOR APPOINTMENT OF FDIC AS**
**CONSERVATOR FOR NEW THRIFT**

The FDIC has indicated that, immediately upon the completion of the organization of NEW THRIFT (which will be federally chartered) and completion of the transfer of the aforesaid assets and liabilities of OLD THRIFT to NEW THRIFT, it will, in the exercise of its authority to act as the board of directors of NEW THRIFT pursuant to section 11(d)(2)(B) of the FDIA, 12 U.S.C. § 1821(d)(2)(B), consent to the OTS

4                      OTS ORDER No.: 2008-24

appointing the FDIC as conservator for NEW THRIFT.  Moreover, NEW THRIFT will
have virtually the same capital and liquidity as OLD THRIFT had immediately prior to
the appointment of a receiver for OLD THRIFT and, therefore, the grounds set forth in
Section I above for appointment of the receiver for OLD THRIFT, are also applicable as
grounds for the appointment of a conservator for NEW THRIFT.

## II. ACTIONS ORDERED OR APPROVED:

### APPOINTMENT OF A RECEIVER

The Director, or his designee, hereby appoints the FDIC as receiver for OLD
THRIFT, for the purpose of liquidation, pursuant to section 5(d)(2) of HOLA, 12 U.S.C.
§1464(d)(2), and section 11(c)(6)(B) of the FDIA, 12 U.S.C. § 1821(c)(6)(B).

### ISSUANCE OF A FEDERAL CHARTER AND
### APPROVAL OF THE PASS-THROUGH OF ASSETS AND LIABILITIES

The Director, or his designee, hereby approves:  (1) the application of the FDIC to
organize NEW THRIFT as a federal mutual savings association (and hereby authorizes
the issuance of an appropriate charter and bylaws for NEW THRIFT in form and content
approved by the Chief Counsel's Office); (2) the transfer of such assets and liabilities of
OLD THRIFT to its successor, NEW THRIFT, as the FDIC has determined to be
appropriate;  and (3) the retention of the home and branch offices of OLD THRIFT by its
successor, NEW THRIFT.  Prior to the appointment or election of a board of directors for
NEW THRIFT, the FDIC may, in addition to any other powers granted by applicable
law, exercise the powers of the board of directors pursuant to section 11(d)(2)(B) of the
FDIA, 12 U.S.C. § 1821(d)(2)(B).

### APPOINTMENT OF A CONSERVATOR
### FOR NEW THRIFT

The Director, or his designee, hereby appoints the FDIC as conservator for NEW
THRIFT pursuant to sections 5(d)(2)(A) and (E) of the HOLA, 12 U.S.C. §§
1464(d)(2)(A), 1464(d)(2)(E), effective upon receipt of the consent of NEW THRIFT to
such appointment.  That consent must be contained in a resolution of its board of
directors issued by the FDIC in exercise of its power, as the organizer of NEW THRIFT,
to act as its interim board of directors pursuant to section 11(d)(2)(B) of the FDIA, 12
U.S.C. § 1821(d)(2)(B).

5          OTS ORDER No.:  2008-24

## DELEGATION OF AUTHORITY TO ACT FOR OTS

The Director, or his designee, hereby authorizes the OTS West Region Director, or his designee, and the Deputy Chief Counsel for the Business Transactions Division of the Chief Counsel's office, or his designee, to:  (1) certify orders; (2) sign, execute, attest or certify other documents of OTS issued or authorized by this Order; (3) designate the person or entity that will give notice of the appointment of a receiver for OLD THRIFT and serve OLD THRIFT with a copy of this Order pursuant to 12 C.F.R. § 558.2; (4) designate the person or entity that will give notice of the appointment of a conservator for NEW THRIFT and serve NEW THRIFT with a copy of this Order pursuant to 12 C.F.R. § 558.2; and (5) perform such other functions of OTS necessary or appropriate for implementation of this Order.  All documents to be issued under the authority of this Order must be first approved, in form and content, by the Chief Counsel's Office.  In addition, the Director, or his designee, hereby authorizes the Deputy Chief Counsel for the Business Transactions Division of the Chief Counsel's office, or his designee, to make any subsequent technical corrections, that might be necessary, to this Order or any documents issued under the authority of this Order.

By Order of the Director of OTS, effective July _11_, 2008.


John M. Reich
Director

Exhibit 4

**AMENDED AND RESTATED**
**INSURED DEPOSIT**
**PURCHASE AND ASSUMPTION AGREEMENT**

**AMONG**

**FEDERAL DEPOSIT INSURANCE CORPORATION,**
**RECEIVER OF INDYMAC BANK, FSB**
**PASADENA, CALIFORNIA, USA**

**FEDERAL DEPOSIT INSURANCE CORPORATION**

**and**

**FEDERAL DEPOSIT INSURANCE CORPORATION**
**AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB**
**PASADENA, CALIFORNIA**

**DATED AS OF**

**JULY 11, 2008**

# AMENDED AND RESTATED
## INSURED DEPOSIT PURCHASE AND ASSUMPTION AGREEMENT

**THIS AMENDED AND RESTATED AGREEMENT**, made and entered into as of July 11, 2008, by and among the **FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER of INDYMAC BANK, FSB,** Pasadena, California USA (the "Receiver"), **FEDERAL DEPOSIT INSURANCE CORPORATION AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB**, organized under the laws of the United States of America, and having its principal place of business in Pasadena, California, USA, (the "Assuming Bank"), and the **FEDERAL DEPOSIT INSURANCE CORPORATION**, organized under the laws of the United States of America and having its principal office in Washington, D.C., acting in its corporate capacity (the "Corporation").

## WITNESSETH:

**WHEREAS**, on Bank Closing, the Chartering Authority closed IndyMac Bank, FSB (the "Failed Bank") pursuant to applicable law and the Corporation was appointed Receiver thereof; and

**WHEREAS**, pursuant to 12 U.S.C. § 1821(d)(2)(F)(i), with respect to savings banks and by application to the OTS, the Receiver may organize a new Federal savings association to take over such assets or liabilities as the Corporation may determine to be appropriate; and

**WHEREAS**, the Assuming Bank is unwilling to assume the Failed Bank's liabilities to certain creditors in consideration for the acquisition by it of certain of the Failed Bank's assets as provided in this Agreement, having concluded that the value of such assets is less than the amount of the liabilities assumed hereunder, and the Assuming Bank has therefore required as a condition to entering into this Agreement that the Corporation (i) agree to undertake the obligations of the Corporation as provided in this Agreement, and (ii) provide indemnification pursuant to Article XII; and

**WHEREAS**, the Assuming Bank desires to acquire certain assets and assume certain deposit and other liabilities of the Failed Bank on the terms and conditions set forth in this Agreement; and

**WHEREAS**, pursuant to 12 U.S.C. Section 1823(c)(2)(A), the Corporation may provide assistance to the Assuming Bank to facilitate the transactions contemplated by this Agreement, which assistance may include indemnification pursuant to Article XII; and

**WHEREAS**, the Board of Directors of the Corporation (the "Board") has determined to provide assistance to the Assuming Bank on the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS**, the Board has determined pursuant to 12 U.S.C. Section 1823(c)(4)(A) that such assistance is necessary to meet the obligation of the Corporation to provide insurance coverage for the insured deposits in the Failed Bank and is the least costly to the deposit insurance fund of all possible methods for meeting such obligation.

**NOW THEREFORE**, in consideration of the mutual promises herein set forth and other valuable consideration, the parties hereto agree as follows:

# ARTICLE I
# DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth in this Article I, or elsewhere in this Agreement. As used herein, words imparting the singular include the plural and vice versa.

"**Accounting Records**" means the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances.

"**Acquired Subsidiaries**" has the meaning provided in Section 3.1.

"**Adversely Classified**" means, with respect to any Loan or security, a Loan or security which, as of the date of the Information Package, has been designated in the most recent report of examination as "Substandard," "Doubtful" or "Loss" by the Failed Bank's appropriate Federal or State Chartering Authority or regulator.

"**Affiliate**" of any Person means any director, officer, or employee of that Person and any other Person (i) who is directly or indirectly controlling, or controlled by, or under direct or indirect common control with, such Person, or (ii) who is an affiliate of such Person as the term "affiliate" is defined in Section 2 of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. Section 1841.

"**Affiliated Funding**" means any form of secured or unsecured funding made to the Failed Bank by the Failed Bank's holding company or by any Subsidiary or Affiliate of the Failed Bank's holding company as of Bank Closing.

"**Agreement**" means this Amended and Restated Insured Deposit Purchase and Assumption Agreement by and among the Assuming Bank, the Corporation and the Receiver, as amended or otherwise modified from time to time.

2

(ii) passbooks of depositors held by the Failed Bank, deposit slips, cancelled checks and withdrawal orders representing charges to accounts of depositors;

and the following Records pertaining to the Assets:

(iii) records of deposit balances carried with other banks, bankers or trust companies;

(iv) Loan and collateral records and Credit Files and other documents;

(v) deeds, mortgages, abstracts, surveys, and other instruments or records of title pertaining to real estate or real estate mortgages;

(vi) signature cards, agreements and records pertaining to Safe Deposit Boxes, if any; and

(vii) records pertaining to the credit card business, trust business or safekeeping business of the Failed Bank, if any.

(b)     The Receiver, at its option, may assign and transfer to the Assuming Bank by a single blanket assignment or otherwise, as soon as practicable after Bank Closing, any other Records not assigned and transferred to the Assuming Bank as provided in this Agreement, including but not limited to loan disbursement checks, general ledger tickets, official bank checks, proof transactions (including proof tapes) and paid out loan files.

**6.2     Delivery of Assigned Records**. The Receiver shall deliver to the Assuming Bank all Records described in (i) Section 6.1(a) as soon as practicable on or after the date of this Agreement, and (ii) Section 6.1(b) as soon as practicable after making any assignment described therein.

**6.3     Preservation of Records**. The Assuming Bank agrees that it will preserve and maintain for the joint benefit of the Receiver, the Corporation and the Assuming Bank, all Records of which it has custody for such period as either the Receiver or the Corporation in its discretion may require, until directed otherwise, in writing, by the Receiver or Corporation. The Assuming Bank shall have the primary responsibility to respond to subpoenas, discovery requests, and other similar official inquiries with respect to the Records of which it has custody.

**6.4     Access to Records; Copies**. The Assuming Bank agrees to permit the Receiver and the Corporation access to all Records of which the Assuming Bank has custody, and to use, inspect, make extracts from or request copies of any such Records in the manner and to the extent requested, and to duplicate and provide to Receiver, in the discretion of the Receiver or the Corporation, any Record electronic records pertaining to Deposit account relationships.  The party requesting a copy of any Record shall bear the cost (based on standard accepted industry charges to the extent applicable, as determined by the Receiver) for providing such duplicate Records. A copy of each Record requested shall be provided as soon as practicable by the party having custody thereof.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**FEDERAL DEPOSIT INSURANCE CORPORATION,**
**RECEIVER OF INDYMAC BANK, FSB**
**PASADENA, CALIFORNIA, USA**

BY: *Mitchell L. Glassman*
Mitchell Glassman

TITLE:  Director, Division of Resolutions and Receiverships


**FEDERAL DEPOSIT INSURANCE CORPORATION**

BY: *Mitchell L. Glassman*
Mitchell Glassman

TITLE:  Director, Division of Resolutions and Receiverships


**FEDERAL DEPOSIT INSURANCE CORPORATION**
**AS CONSERVATOR FOR INDYMAC FEDERAL BANK,**
**FSB**

BY: *Mitchell L. Glassman*
Mitchell Glassman

TITLE:  Director, Division of Resolutions and Receiverships

42

# Exhibit 5

**Execution Copy**

**MASTER PURCHASE AGREEMENT**

**BY AND AMONG**

**THE FEDERAL DEPOSIT INSURANCE CORPORATION
AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB,**

**IMB HOLDCO LLC, and**

**ONEWEST BANK GROUP LLC**

**Dated as of March 18, 2009**

## MASTER PURCHASE AGREEMENT

THIS MASTER PURCHASE AGREEMENT (as the same shall be amended or supplemented, this "**Agreement**") is made and entered into as of the 18th day of March, 2009 (the "**Effective Date**") by and among THE FEDERAL DEPOSIT INSURANCE CORPORATION AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB (including its successors and assigns, the "**Seller**"), IMB HOLDCO LLC ("**HoldCo**") and ONEWEST BANK GROUP LLC ("**Intermediate HoldCo**").

### RECITALS

WHEREAS, on July 11, 2008, the FDIC (as defined below) was appointed receiver for IndyMac Bank, FSB (the "**Failed Thrift**") and certain assets and obligations of the Failed Thrift were transferred to a newly-formed thrift, IndyMac Federal Bank, FSB ("**IndyMac Federal**"), for which the FDIC was appointed conservator;

WHEREAS, under the Federal Deposit Insurance Act, as amended, the FDIC is authorized to sell or otherwise dispose of the assets of thrift institutions for which it serves as conservator or receiver;

WHEREAS, HoldCo desires to purchase certain specified assets and assume certain specified liabilities of IndyMac Federal on the terms and subject to the conditions set forth herein and in the other Definitive Agreements (as defined below);

WHEREAS, in order to facilitate the purchase of the assets and assumption of the liabilities by HoldCo, Intermediate HoldCo, a newly formed direct wholly owned subsidiary of HoldCo, will form a new federally chartered, FDIC insured, stock form savings association or savings bank to be known as OneWest Bank, FSB (the "**Purchaser**");

WHEREAS, in order to facilitate the transactions provided for herein and in the other Definitive Agreements, on the Closing Date (as defined below), the FDIC shall be appointed receiver of IndyMac Federal;

WHEREAS, on the Closing Date, each of the Purchaser and the FDIC, as receiver for IndyMac Federal, shall become a party to this Agreement by executing a joinder hereto, and shall thereafter be subject to and bound by all of the terms and conditions applicable to it hereunder, respectively, and each of the Purchaser (or a subsidiary of the Purchaser) and the FDIC, as receiver for IndyMac Federal, shall also enter into the other Definitive Agreements to which it is named as a party;

WHEREAS, pursuant to this Agreement and the other Definitive Agreements, the Seller shall sell, assign, convey and transfer to the Purchaser or a subsidiary of the Purchaser and, in connection with Group 3 and Group 4, as defined below, cause certain subsidiaries of IndyMac Federal to sell, assign, convey and transfer to the Purchaser or a subsidiary of the Purchaser, the following:

- certain assets and liabilities of IndyMac Federal's retail bank business (referred to herein as "**Group 1**");

- IndyMac Federal's servicing advances and servicing rights with respect to certain mortgage loans and the related platform (referred to herein as "**Group 2**");

- certain assets and liabilities of IndyMac Federal's reverse mortgage business (referred to herein as "**Group 3**");

- substantially all of IndyMac Federal's securities portfolio (referred to herein as "**Group 4**");

- substantially all of IndyMac Federal's residential mortgage loan portfolio (referred to herein as "**Group 5**"); and

- substantially all of IndyMac Federal's consumer construction loan portfolio, homebuilder loan portfolio and lot loan portfolio (referred to herein as "**Groups 6-8**");

WHEREAS, concurrently with the execution and delivery of this Agreement, as an inducement to HoldCo to enter into this Agreement and incur the obligations set forth herein, the FDIC is executing and delivering to HoldCo the FDIC Guaranty (as defined below); and

WHEREAS, the parties desire to memorialize their agreements relating to the transactions described above and certain other matters as set forth in this Agreement and the other Definitive Agreements.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements hereinafter contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01   Definitions.  For purposes of this Agreement, the following terms shall have the meanings and definitions hereinafter respectively set forth:

"**Accounting Records**" means the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances.

"**Accrual Period**" means the period beginning on the day immediately following a Measurement Date and ending on the immediately succeeding Measurement Date, except the first Accrual Period shall begin on the day immediately following the Closing Date and end on the second Measurement Date following the Closing Date and the last Accrual Period shall end on the Termination Date.

"**Acquired Subsidiary**" means IndyMac Financial Services, a California corporation and a wholly owned subsidiary of IndyMac Federal.

- 2-

**IN WITNESS WHEREOF**, the parties hereto have caused this Master Purchase Agreement to be executed by their duly authorized representatives as of the date first above written.

**FEDERAL DEPOSIT INSURANCE**
**CORPORATION AS CONSERVATOR FOR**
**INDYMAC FEDERAL BANK, FSB**

By: *Mitchell L. Glassman*
Name: Mitchell L Glassman
Title: Director, DRR-FDIC

**IMB HOLDCO LLC**

By: _____
    Steven T. Mnuchin
    Chief Executive Officer

**ONEWEST BANK GROUP LLC**

By: _____
    Steven T. Mnuchin
    Chief Executive Officer

IN WITNESS WHEREOF, the parties hereto have caused this Master Purchase Agreement to be executed by their duly authorized representatives as of the date first above written.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS CONSERVATOR FOR
INDYMAC FEDERAL BANK, FSB

By: _____
Name:
Title:

IMB HOLDCO LLC

By: _____
Steven T. Mnuchin
Chief Executive Officer

ONEWEST BANK GROUP LLC

By: _____
Steven T. Mnuchin
Chief Executive Officer

## JOINDER

By its execution and delivery of this signature page, the undersigned hereby joins in and agrees to be bound by the terms and conditions of the Master Purchase Agreement, dated as of March 18, 2009, by and among the Federal Deposit Insurance Corporation as conservator for IndyMac Federal Bank, FSB, IMB HoldCo LLC and OneWest Bank Group LLC as the "Purchaser" thereunder and authorizes this signature page to be attached to the Master Purchase Agreement or counterparts thereof.

**ONEWEST BANK, FSB**

By: _Terrence Laughlin_

Name: Terrence P. Laughlin
Title:   Chief Executive Officer and President

**JOINDER**

By its execution and delivery of this signature page, the undersigned hereby joins in and agrees to be bound by the terms and conditions of the Master Purchase Agreement, dated as of March 18, 2009, by and among the Federal Deposit Insurance Corporation as conservator for IndyMac Federal Bank, FSB, IMB HoldCo LLC and OneWest Bank Group LLC as the "Seller" thereunder and authorizes this signature page to be attached to the Master Purchase Agreement or counterparts thereof.

FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By: *Mitchell L. Glassman*
Name: Mitchell L. Glassman
Title: Director, DRR - FDIC

**JOINDER**

By its execution and delivery of this signature page, the undersigned hereby joins in and agrees to be bound by the terms and conditions of the Master Purchase Agreement, dated as of March 18, 2009, by and among the Federal Deposit Insurance Corporation as conservator for IndyMac Federal Bank, FSB, IMB HoldCo LLC and OneWest Bank Group LLC, solely with respect to Section 11.04 thereunder and authorizes this signature page to be attached to the Master Purchase Agreement or counterparts thereof.

**INDYMAC RESOURCES, INC.**

By: _____

Name:  George Alexander
Title:    Attorney-in-Fact

Exhibit 6

Execution Copy

# LOAN SALE AGREEMENT

## BY AND BETWEEN

## THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB

## AND

## ONEWEST BANK, FSB

## Dated as of March 19, 2009

#10100294v38

## LOAN SALE AGREEMENT

THIS LOAN SALE AGREEMENT (as the same shall be amended or supplemented, this "**Agreement**") is made and entered into as of the 19th day of March, 2009 by and between THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB (the "**Seller**") and ONEWEST BANK, FSB (the "**Purchaser**").

### RECITALS

WHEREAS, on July 11, 2008, the FDIC (as defined below) was appointed Receiver for IndyMac Bank, FSB (the "**Failed Thrift**") and certain assets and obligations of the Failed Thrift were transferred to a newly-formed thrift, IndyMac Federal Bank, FSB ("**IndyMac Federal**"), for which the FDIC was appointed Conservator (the "**Conservator**"), and, on the date hereof, the FDIC was appointed Receiver for IndyMac Federal (the "**Receiver**");

WHEREAS, under the Federal Deposit Insurance Act, as amended, the FDIC is authorized to sell or otherwise dispose of the assets of thrift institutions for which it serves as conservator or receiver;

WHEREAS, the Seller owns the Loans (as defined below) described on the Loan Schedule (as defined below) attached hereto as **Attachment A**;

WHEREAS, IMB HoldCo LLC ("**HoldCo**") has agreed to purchase the Assets (as defined below) and assume certain specified liabilities of IndyMac Federal on the terms and subject to the conditions set forth herein and in the Master Purchase Agreement (as defined below);

WHEREAS, in order to facilitate the transactions provided for herein, HoldCo formed the Purchaser as a federally-chartered, insured savings association, all of the stock of which will be acquired by OneWest Bank Group LLC ("**OneWest Bank Group**"), a newly-formed direct wholly-owned subsidiary of HoldCo; and

WHEREAS, the parties desire to memorialize their agreements relating to the transactions described above and certain other matters as set forth in this Agreement and the Master Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements hereinafter contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows.

### ARTICLE I

### DEFINITIONS AND CONSTRUCTION

Section 1.01   Definitions.  For purposes of this Agreement, the following terms shall have the meanings and definitions hereinafter respectively set forth:

(f)      Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(g)      The words "include" and "including" and words of similar import are not limiting, and shall be construed to be followed by the words "without limitation," whether or not they are in fact followed by such words.

(h)      The word "during" when used with respect to a period of time shall be construed to mean commencing at the beginning of such period and continuing until the end of such period.

(i)      Unless the context otherwise requires, singular nouns and pronouns when used herein shall be deemed to include the plural and vice versa and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

## ARTICLE II

## PURCHASE AND SALE OF LOANS

Section 2.01   Terms and Conditions of Sale.

(a)      Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement and in the Ancillary Documents, the Seller hereby sells, transfers, conveys, assigns and delivers to the Purchaser, and the Purchaser hereby purchases, accepts and assumes from the Seller, without representation or warranty, express or implied, except as set forth in this Agreement and the Master Purchase Agreement, all of the Seller's rights, title and interests in, to and under the Assets (other than the Excluded Assets).  "Assets" means the following assets, whether owned, leased, licensed or otherwise contracted by, or otherwise available to, the Seller, and no others (except that, as set forth below, the schedules described in this Section 2.01 shall be updated as of the Closing Date and assets included in such updated schedules shall constitute Assets):

(i)      all of the Seller's rights, title and interests in, to and under the Loans (including all Notes, the other Loan Documents and Related Agreements) identified on the Loan Schedule attached hereto as Attachment A, endorsed without recourse, on a servicing-released basis;

(ii)      all of the Seller's rights in, to and under the Collateral pursuant to the Collateral Documents;

(iii)      all rights of and benefits accruing to the Seller under the servicing agreements listed on Schedule 2.01(a) (the "LSBO Servicing Agreements") pursuant to which the LSBOs are being serviced by third parties, including all rights to assert claims and to take other rightful actions in respect of breaches, defaults and other violations of such LSBO Servicing Agreements;

- 11 -

       (iv)    all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by or for the benefit of the Seller with respect to the Assets or the ownership, use, function, value of or other rights pertaining thereto, whether arising by way of counterclaim or otherwise, other than any claims retained by the Seller pursuant to Section 2.14; and

       (v)    all guaranties, warranties, indemnities and similar rights in favor of the Seller with respect to any of the Assets.

To the extent that any party discovers, within 180 days following the Closing Date, that there were assets of the Seller that all parties hereto intended to be transferred in connection with the purchase and assumption contemplated in this Agreement, but that were omitted from the schedules to this Agreement, the Seller shall or shall cause its Affiliates promptly to assign and transfer to the Purchaser all right, title and interest in such asset.

Each schedule referenced above shall be updated as of the Closing Date and delivered to the Purchaser in accordance with Section 2.07.

       (b)    Excluded Assets.  The Assets shall not include, and the Purchaser shall not purchase or otherwise acquire, the Excluded Assets.

       (c)    Assumption of Liabilities.  On the terms and subject to the conditions contained herein and in the Ancillary Documents, and effective as of the Closing Date, (including the retention of all rights and remedies under Article XVII of the Master Purchase Agreement and under Articles VI and VII hereto), the Purchaser shall assume and agree to pay, perform and discharge in accordance with their terms all of the following obligations, debts and liabilities of the Seller and no others (collectively, the "**Assumed Liabilities**"):

       (i)    the Obligations, including the Unfunded HELOC Commitments;

       (ii)    all obligations of the Seller under LSBO Servicing Agreements from and after the Closing Date; and

       (iii)    all obligations of the Seller with respect to (i) the lawsuits, judgments, claims and demands listed on Schedule 2.01(c), and (ii) any additional lawsuit, judgment, claim or demand involving foreclosures, bankruptcies, liens, title disputes, property condition, forfeiture, partition, easement, condemnation and eminent domain, probate, tax sale, mechanic's liens and stop notice claims with respect to any of the Assets, but only to the extent any such additional lawsuit, judgment, claim or demand is comparable in nature, scope and substance to those listed on Schedule 2.01(c), as determined by the Seller in its reasonable judgment (as evidenced by written notice thereof given to the Purchaser), if such determination is made (and such notice is provided) within sixty (60) days after the Closing Date, or by the mutual agreement of the Purchaser and the Seller, if such determination is after such sixty (60)-day period.

       (d)    Excluded Liabilities.  Notwithstanding anything to the contrary in this Section 2.01, it is understood and agreed that the Seller shall not assign and the Purchaser shall

not, pursuant to this Agreement, assume or be liable for any Excluded Liabilities that the Seller has or may have now or in the future, including the following:

      (i)    any liabilities and obligations with respect to any claims expressly retained by the Seller pursuant to Section 2.14;

      (ii)    any liabilities or obligations of the Seller arising under this Agreement or any of the Ancillary Documents;

      (iii)    any legal and accounting fees and expenses incurred by the Seller in connection with the consummation of the transactions contemplated by this Agreement, except as provided in the Master Purchase Agreement;

      (iv)    any indebtedness of the Seller for borrowed money;

      (v)    any liability or indebtedness of the Seller for contingent liabilities or liabilities in respect of any injury to any Person or property;

      (vi)    any liabilities or obligations of the Seller attributable to an act, omission or circumstances that occurred or existed prior to the Closing Date, other than the Assumed Liabilities;

      (vii)    all liabilities and obligations arising out of or with respect to the Excluded Assets;

      (viii)    all obligations of the Seller with respect to any lawsuits, judgments, claims or demands of any nature existing on or prior to the Closing Date that are not listed on Schedule 2.01(c) or otherwise described in Section 2.01(c)(iii);

      (ix)    any claim against or liability of the FDIC in its capacity as receiver for IndyMac Bank, FSB or the FDIC as receiver for IndyMac Federal that, under and in accordance with applicable Law, was, is or will be subject to the receivership administrative claims processes administered by the FDIC in its capacity as receiver for IndyMac Bank, FSB or the FDIC as receiver for IndyMac Federal pursuant to 12 U.S.C. §1821(d)(3) through (13), including claims and liabilities that are affirmative or defensive, now existing or arising in the future, contingent or fixed, monetary or non-monetary, equitable or legal, or declarative or injunctive; and

      (x)    any claim against or liability based on any alleged act or omission of IndyMac Bank, FSB or IndyMac Federal which is not provable or allowable, or is otherwise barred against the FDIC as receiver for IndyMac Bank, FSB or the FDIC as receiver for IndyMac Federal, under applicable Law, including claims and liabilities that are barred under 12 U.S.C. §§1821(c), (d), (e) (including §1821(e)(3)), (i), or (j); 12 U.S.C. §1822; 12 U.S.C. §1823; or 12 U.S.C. §1825.

      (e)    <u>Loans Subject to Shared-Loss Agreement</u>.  The Seller and the Purchaser agree that the Loans sold and purchased hereunder shall be subject to the terms of the Shared-Loss Agreement.

(ii)     four originals of the Assignment and Assumption of Interests and Obligations executed by the Seller;

(iii)    four originals of this Agreement executed by the Seller;

(iv)    four originals of the Shared-Loss Agreement executed by the Seller; and

(v)     one original Limited Power of Attorney granted by the Seller pursuant to Section 3.04 below.

## ARTICLE III

## TRANSFER OF LOANS, COLLATERAL DOCUMENTS AND SERVICING

Section 3.01   Transfer of Documents.  The Seller and the Purchaser shall cooperate with each other in the physical or other transfer to the Purchaser or the custodian or other designee on the Closing Date of the Notes, the Loan Files, the Loan Documents, the Collateral Documents and the Related Agreements.

Section 3.02   MERS Mortgage Loans.  If any of the Mortgages are registered on the MERS® System (the "**MERS Registered Mortgages**"), the Purchaser shall cause the MERS Registered Mortgages to be transferred on the MERS® System on or within a reasonable time after the Closing Date.  The costs imposed by MERS with respect to the transfer of the MERS Registered Mortgages shall be allocated between the Purchaser and the Seller in accordance with Section 19.03 of the Master Purchase Agreement.

Section 3.03   Forwarding Post-Closing Date Items.  With respect to any checks or other funds in respect of any Loan which are received by the Seller within thirty (30) calendar days after the Closing Date, the Seller shall, to the extent no Limited Power of Attorney is granted to the Purchaser in accordance with Section 3.04(a), promptly endorse without recourse and send the same to the Purchaser via overnight mail.  Any checks or other funds in respect of any Loan which are received by the Seller after such thirty (30) day period shall be endorsed without recourse by the Seller to the Purchaser and sent by first class mail to the Purchaser promptly after receipt.  Except as otherwise provided herein, the Seller shall promptly forward to the Purchaser all correspondence, Tax bills or any other correspondence or documentation related to any of the Loans or the other Assets which is received by the Seller after the Closing Date.

Section 3.04   Delivery of Loans.

(a)     The Seller will grant a Limited Power of Attorney to the Purchaser in the form attached hereto as Attachment F.  The Purchaser will prepare and execute on behalf of the Seller, within a reasonable time after the Closing Date, all Transfer Documents not delivered by the Seller to the Purchaser at Closing, and the Purchaser shall perform all acts required to be performed by the Seller pursuant to Section 3.03.  The Seller shall cooperate with the Purchaser with respect to the Purchaser's obligation to prepare and record (if applicable) such Transfer Documents.  All Transfer Documents prepared by the Purchaser shall be in appropriate form suitable for filing or recording (if applicable) in the relevant jurisdiction and otherwise subject to

- 17 -

the limitations set forth herein, and the Purchaser shall be solely responsible for the preparation, contents and form of such documents. The Purchaser hereby releases the Seller from any loss or damage incurred by the Purchaser due to the contents or form of any documents prepared pursuant to this Section 3.04 and shall indemnify and hold the Seller harmless from and against any claim, action or cause of action asserted by any Person, including the Purchaser, arising out of the contents or form of any Transfer Document, including any claim relating to the adequacy or inadequacy of any such document or instrument for the purposes thereof, and the use (or purported use) by the Purchaser of the Limited Power of Attorney in any way not expressly permitted by its terms.   All expenses incurred by the Purchaser in compliance with this Section 3.04 shall be allocated between the Purchaser and the Seller in accordance with Section 19.03 of the Master Purchase Agreement.

(b)      The parties hereby agree that all Notes evidencing Loans shall be endorsed without recourse, and without representation or warranty by the Seller, express or implied, except (as to the Purchaser) as set forth in this Agreement.   The form of any endorsement of Notes or allonge to the Notes is as follows:

> Pay to the order of
> OneWest Bank, FSB
> Without Recourse
>
> Federal Deposit Insurance Corporation as Receiver
> for IndyMac Federal Bank, FSB
>
> By: _____
>     Name: _____
>     Title:   Attorney-in-Fact

All other documents of assignment, conveyance or transfer shall contain the following sentence: "This assignment is made without recourse, representation or warranty, express or implied, by the FDIC in any capacity."

(c)      As to Foreign Loans, the Purchaser must retain counsel licensed in the Foreign Jurisdictions involved with the Foreign Loans. Such foreign counsel shall draft the documents necessary to assign the Foreign Loans to the Purchaser. Documents presented to the Seller to assign Foreign Loans to the Purchaser must be accompanied by a letter on the foreign counsel's letterhead, signed by the foreign counsel preparing those documents, certifying that those documents conform to the Law of the Foreign Jurisdiction. Each such document shall be delivered to the Seller in the English language, provided, however, that any document required for its purposes to be executed by the Seller in a language other than the English language shall be delivered to the Seller in such language, accompanied by a translation thereof in the English language, certified as to its accuracy by an executive officer or general counsel of the Purchaser and, if such executive officer or general counsel shall not be fluently bilingual, by the translator thereof.

(d)      Nothing contained herein or elsewhere in this Agreement shall require the Seller to make any agreement, representation or warranty or provide any indemnity in any

- 18 -

document or instrument or otherwise, nor is the Seller obligated to obtain any consents or approval to the sale or transfer of the Loans or the related servicing rights, if any, or the assumption by the Purchaser of the Assumed Liabilities.

      Section 3.05   Recordation of Documents.   The Purchaser shall promptly submit all Transfer Documents for recordation or filing in the appropriate land, chattel, Uniform Commercial Code, and other records of the appropriate county, state or other jurisdictions (including any Foreign Jurisdiction) to effect the transfer of the Assets to the Purchaser, and to render legal, valid and enforceable the obligations of the Borrowers to the Purchaser and the assumption by the Purchaser of Assumed Liabilities.   The Purchaser shall be responsible for following up on the status of all Transfer Documents submitted for recordation.

      Section 3.06   Additional Actions; Transaction Costs.   The Seller shall, if such is affirmatively required under applicable Law, take such actions as are necessary to effect the purposes of this Article III. All Taxes, fees, costs and expenses incurred in connection therewith shall be allocated between the Purchaser and the Seller in accordance with Section 19.03 of the Master Purchase Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

      The representations and warranties made by the Purchaser to the Seller with respect to the transactions contemplated hereby are as set forth in the Master Purchase Agreement.

## ARTICLE V

## COVENANTS, DUTIES AND OBLIGATIONS

      Section 5.01   Servicing of Loans.   From and after the Closing Date, the Purchaser shall comply with all applicable Law with respect to the ownership and/or servicing of the Servicing-Released Loans, including (if applicable), the Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq., as amended) and similar state Laws, and shall comply with all of the terms and conditions of the Guidelines, the Collateral Documents and any other instruments and documents governing or relating to the Servicing-Released Loans and/or the servicing rights and other rights thereunder.

      Section 5.02   Collection Agency/Contingency Fee Agreements.   Subject to Section 2.04, the Purchaser acknowledges and agrees that it accepts and acquires the Servicing-Released Loans subject to the agreements with collection agencies and contingency fee agreements with attorneys (all of which are listed on Schedule 4.01(f) of the Master Purchase Agreement) (in either case that are outstanding and in effect as of the Closing Date) that relate to any of the Servicing-Released Loans and are assignable, and assumes and agrees to fulfill all Obligations of the Seller thereunder.   The Purchaser shall indemnify and hold the Seller harmless from and against any and all claims, demands, losses, damages, penalties, forfeitures or judgments made or rendered against the Seller or any legal fees or other costs, fees or expenses incurred by the Seller arising out of or based upon such agreements with collection agencies or contingency fee

Section 7.01 with respect to any Loan for which the Purchaser or a Related Party is the Borrower pursuant to Article VII of this Agreement. At the Purchaser's request, and upon preparation of appropriate documentation by the Purchaser in conformance with Section 2.15(a), the Seller will release and discharge a Loan for which the Purchaser is the Borrower in lieu of assigning the same to the Purchaser. In any event, the Seller will issue a Form 1099 to report any discharge of indebtedness in connection with the sale or release of the Loan to the Borrower or a Related Party in accordance with Internal Revenue Service regulations and FDIC policy. Notwithstanding the foregoing, any failure by the Seller to issue a Form 1099 does not relieve the Purchaser of its responsibility to report the discharge of indebtedness in accordance with applicable federal tax law.

Section 5.18    HELOCs.

(a)    From and after the Closing Date, (i) the Purchaser will be obligated to fund all Disbursements of Principal with respect to the Unfunded HELOC Commitments, and (ii) the Seller will be obligated to reimburse the Purchaser for such Disbursements of Principal in exchange for participation interests in the HELOCs underlying such Unfunded HELOC Commitments, in each case as set forth in the term sheet attached hereto as Attachment H and the more detailed definitive documentation executed pursuant thereto. For the avoidance of doubt, the obligations, terms and commitments set forth in the term sheet attached hereto as Attachment H are binding obligations of the parties hereto as if they were set forth in full herein, notwithstanding any delay in executing or failure to execute more detailed definitive documentation as contemplated therein.

(b)    Notwithstanding anything to the contrary in this Agreement, on and after the Closing Date, the Purchaser shall (i) to the extent permitted by applicable Law, terminate or suspend each HELOC purchased hereunder with respect to which there is a decline in the value of the Mortgaged Property or the credit score of the Borrower, as and to the extent permitted under the related credit line agreement, and will assist with any refinancing program (or voluntary termination or freeze program) proposed by the Seller with respect to such HELOC. The Purchaser acknowledges and agrees that if at any time after the Closing Date the Purchaser opens any line of credit with respect to any HELOC which the Seller has suspended or terminated future Unfunded HELOC Commitments, any obligation to advance funds under any such reopened HELOC shall at such time and thereafter be the obligation solely of the Purchaser, and the Seller shall have no obligation to reimburse the Purchaser therefor. The Purchaser shall comply with all terms under the related Mortgage Note and shall freeze, modify or terminate any undrawn lines of credit only in a manner consistent with the terms of the related Mortgage Note and the policies set forth in the Guidelines.

Section 5.19    Repurchase of Charged-Off Loans.    The Seller may, at its option, repurchase any Charged-Off Loan with respect to which a loss share payment has been made pursuant to the Shared-Loss Agreement at a repurchase price equal to the unpaid principal balance on such Loan less the amount charged-off.

Section 5.20    Loan Modification Program. Notwithstanding anything to the contrary in Section 5.16, the Purchaser shall complete the processing of all Servicing-Released Loan Modifications in process pursuant to the Program as of the Closing Date and shall honor all

offers of Modifications for which processing has not yet commenced in accordance with the terms of the Program. The Purchaser shall comply with the Program as it may be amended by the FDIC from time to time, provided, however, that, unless otherwise required by Law, the Purchaser shall not be required to comply with any changes to the Program after January 2, 2009 if such changes would (i) require the Purchaser to take any action in violation of applicable Law or the terms of any servicing agreement then in effect or (ii) result in the net present value of the estimated cash flows on the related Loan, discounted at the Then-Current Interest Rate, after any such change being less than the net present value of the estimated cash flows on the related Loan, discounted at the Then-Current Interest Rate, prior to such change. The Seller hereby acknowledges that a loss suffered with respect to any Loan modified in accordance with the Program will be covered by the Shared-Loss Agreement. The Purchaser acknowledges and agrees that it will be required to comply with reporting requirements with respect to the Program that are acceptable to the FDIC in order to allow the FDIC to monitor compliance with, and the results of, the Program. Notwithstanding any of the foregoing, the Purchaser shall be obligated to comply with the Program only for so long as any financing provided by the Seller remains outstanding or, if later, for so long as any of the Loans are subject to the Shared-Loss Agreement. If the Purchaser receives any fees under any government-sponsored, or government-sponsored entity's, program relating to loan modifications, the Purchaser shall use any such fees for purposes that enhance or further the expressed intentions of such program or the Program.

Section 5.21   Loans in Process.  The Purchaser shall continue to process all pending loan applications as they exist at IndyMac Federal as of the Closing Date; provided, however, that the Purchaser shall have no obligation to enter into commitments with respect thereto.

Section 5.22   Cooperation.

(a)     The Seller and the Purchaser shall mutually cooperate in order to facilitate an orderly transition of the Assets and Assumed Liabilities to the Purchaser. Each party will cooperate in good faith with the other and will take all appropriate action that may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder. From and after the Closing Date, the Seller will promptly refer all inquiries with respect to the Assets (including ownership thereof) and Assumed Liabilities to the Purchaser, and the Purchaser will promptly refer all inquires with respect to the Excluded Assets (including ownership thereof) and Excluded Liabilities to the Seller.

(b)     The Seller acknowledges that the Purchaser may, after the Closing Date, enter into a financing with a Federal Home Loan Bank or with another third party related to, or consummate a securitization transaction in respect of, the Loans. The Seller will, at the Purchaser's expense, cooperate with the Purchaser and any prospective counterparty in connection with any such financing or securitization transaction and provide such reasonable assistance, information or verification of information as may be reasonably requested by the Purchaser or such counterparty and reasonably available to the Seller and its Affiliates.

Section 5.23   Additional Title Documents.  The Seller and the Purchaser each agree, at any time, and from time to time, upon the request of any party hereto, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the Purchaser its full legal or equitable title in and to the Assets. The Purchaser shall

insolvency, reorganization, moratorium or similar laws affecting or relating to the enforcement of creditors' rights generally and (ii) general principles of equity.

(g)   Ownership/Good Title.  The Seller is the sole owner of the Loans.  The Seller has good and marketable title thereto, and will transfer and sell its rights, title and interest in and to the Loans to the Purchaser free and clear of any Lien, other than any lien in favor of the Federal Home Loan Bank of San Francisco in connection with the Assumed FHLB Financing Balance.

(h)   Title Insurance.  Each Loan is covered by either (i) an attorney's opinion of title and abstract of title, or (ii) an ALTA lender's title insurance policy or other form of policy of insurance, insuring the Seller and its successors and assigns as to the first priority lien, with respect to Loans identified as first lien loans on the Loan Schedule, with such lien being subject only to the following exceptions:

(i)   the lien of current real property taxes and assessments not yet due and payable;

(ii)   covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Loan and (i) referred to or otherwise considered in the appraisal made for the originator of the Loan or (ii) which do not adversely affect the appraised value of the Mortgaged Property set forth in such appraisal; and

(iii)   other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property.

(i)   Predatory Lending Regulations.  Notwithstanding the statements in Section 6.09(d) above, as of the date of origination, no Loan was (i) subject to the requirements of the Home Ownership and Equity Protection Act of 1994, as amended, or (ii) a "high cost," "threshold," "covered," "abusive" or "predatory" loan or a similar loan under any state, federal or local law applicable to the originator of such Loan as of the date of origination (or similarly classified loan using different terminology under a law enacted to combat predatory lending).

(j)   Escrow Accounts; Escrow Payments.  The information provided to the Purchaser as of the Initial Calculation Date with respect to escrow accounts and escrow payments in connection with the Loans is true and correct in all material respects.

(k)   No Condemnation.  There is no proceeding pending or, to Seller's knowledge, threatened for the total or partial condemnation of any Mortgaged Property relating to the Loan.

(l)   Delinquent Taxes and Insurance Premiums.  With respect to each Loan which is indicated on the Loan Schedule as being a first lien that is less than thirty (30) days delinquent, there are no delinquent taxes or hazard insurance premiums (in each case, after

- 30 -

application of any applicable grace periods) with respect to the Mortgaged Properties relating to the Loan.

(m)   Principal Advances.  With respect to each HELOC, all draws required to be funded have been funded in compliance with the terms and provisions of the Mortgage, Note and related loan agreement, if any.

(n)   Servicing.  Each Servicing-Released Loan has been serviced in material compliance with the terms of the related Mortgage and Note.

## ARTICLE VII

## REMEDIES FOR DEFECTIVE LOANS

Section 7.01   Remedy.  In the event a Defect is discovered with respect to any Loan (a "Defective Loan"), then, subject to the terms and conditions of this Article VII, the Seller shall, at the Seller's sole option, take any of the following actions: (i) if the Seller determines that the Defect is curable using commercially reasonable means, either cure the Defect (which may include, among other things, a purchase price adjustment) or require the Purchaser to cure the Defect and then reimburse the Purchaser for reasonable amounts paid by the Purchaser to effect such cure or (ii) repurchase the Defective Loan at the Repurchase Price (each, a "Remedy").  IN NO EVENT SHALL ANY DEFECT OR THE OBLIGATION TO PROVIDE A REMEDY HEREUNDER WITH RESPECT TO A DEFECTIVE LOAN BE EVIDENCE OF ANY BAD FAITH, MISCONDUCT OR FRAUD ON THE PART OF THE SELLER, THE FAILED THRIFT OR THE FDIC EVEN IF IT IS SHOWN THAT THE SELLER, THE FAILED THRIFT OR THE FDIC, OR ANY AFFILIATE THEREOF, OR ANY OF THEIR RESPECTIVE DIRECTORS, EMPLOYEES, OFFICERS, CONTRACTORS OR AGENTS, (A) KNEW OR SHOULD HAVE KNOWN OF THE EXISTENCE OF ANY FACTS RELATING TO SUCH DEFECT, (B) CAUSED SUCH DEFECT OR (C) FAILED TO MITIGATE SUCH DEFECT OR ANY OF THE LOSSES RESULTING THEREFROM.

Section 7.02   Conditions Precedent to Remedy.  The obligation of the Seller to provide a Remedy for any Defective Loan is contingent upon the satisfaction (as determined by the Seller in its sole discretion) or waiver (which may be granted by the Seller in its sole discretion) of each of the following conditions:

(a)   the Purchaser has delivered the Defect Notice (as defined below) and any supporting evidence required by Section 7.03 to the Seller on or prior to the Claims Termination Date, and has provided the Seller with all additional supporting evidence requested by the Seller pursuant to, and within the timeframe set forth in, Section 7.03;

(b)   the Purchaser has demonstrated to the Seller's satisfaction that the Defect materially and adversely affects the value, the marketability or the saleability of the Defective Loan;

(c)   neither the Purchaser nor the Purchaser's servicer has caused the Defect or has taken any action or omitted to take any action (other than as required by Section 7.02(d)) with respect to the Defective Loan that (x) materially and adversely affects the Seller's ability to

- 31 -

IN WITNESS WHEREOF, the parties hereto have caused this Loan Sale Agreement to be executed as of the day and year first above written.

SELLER:

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By: _George C. Alfred_

Name: George C. Alexander

Title: Manager, Structured Transactions

PURCHASER:

ONEWEST BANK, FSB

By: _____

    Name: Joshua P. Eaton
    Title: Authorized Signatory

*Group 5 - Loan Sale Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Loan Sale Agreement to be executed as of the day and year first above written.

**SELLER:**

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By: _____
     Name:
     Title:

**PURCHASER:**

ONEWEST BANK, FSB

By: _____
     Name: Joshua P. Eaton
     Title: Authorized Signatory

*Group 5 - Loan Sale Agreement*

# Exhibit 7

Execution Copy

# SERVICING BUSINESS ASSET PURCHASE AGREEMENT

## BY AND BETWEEN

## THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB

## AND

## ONEWEST BANK, FSB

## Dated as of March 19, 2009

10069838 v41

## SERVICING BUSINESS ASSET PURCHASE AGREEMENT

THIS SERVICING BUSINESS ASSET PURCHASE AGREEMENT (as the same shall be amended or supplemented, this "**Agreement**") is made and entered into as of the 19th day of March, 2009 by and between THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB (the "**Seller**") and ONEWEST BANK, FSB (the "**Purchaser**").

RECITALS

WHEREAS, on July 11, 2008, the FDIC (as defined below) was appointed Receiver for IndyMac Bank, FSB (the "**Failed Thrift**") and certain assets and obligations of the Failed Thrift were transferred to a newly-formed thrift, IndyMac Federal Bank, FSB ("**IndyMac Federal**"), for which the FDIC was appointed Conservator (the "**Conservator**"), and on the date hereof, the FDIC was appointed Receiver for IndyMac Federal (the "**Receiver**");

WHEREAS, under the Federal Deposit Insurance Act, as amended, the FDIC is authorized to sell or otherwise dispose of the assets of thrift institutions for which it serves as conservator or receiver;

WHEREAS, IndyMac Federal, among other things, engaged in the business of servicing mortgage loans with primary operations in Austin, Texas, Kalamazoo, Michigan and Kansas City, Missouri (the "**Business**");

WHEREAS, IMB HoldCo LLC ("**HoldCo**") has agreed to purchase certain specified assets and assume certain specified liabilities of IndyMac Federal on the terms and subject to the conditions set forth herein and in the Master Purchase Agreement (as defined below);

WHEREAS, in order to facilitate the transactions provided for herein, HoldCo formed the Purchaser as a new federally-chartered insured savings bank, all of the stock of which will be acquired by OneWest Bank Group LLC, a newly-formed direct wholly-owned subsidiary of HoldCo;

WHEREAS, pursuant to this Agreement, the Seller shall sell, assign, convey and transfer to the Purchaser certain specified assets and certain specified liabilities of the Seller related to the Business; and

WHEREAS, the parties desire to memorialize their agreements relating to the transactions described above and certain other matters as set forth in this Agreement and the Master Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements hereinafter contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

(d)     Accounting terms shall have the meanings assigned to them by GAAP applied on a consistent basis by the accounting entity to which they refer.

(e)     References to any document, instrument or agreement (i) shall be deemed to include all appendices, exhibits, schedules and other attachments thereto and all documents, instruments or agreements issued or executed in replacement thereof, and (ii) shall mean such document, instrument or agreement, or replacement thereto, as amended, modified and supplemented from time to time in accordance with its terms and as the same is in effect at any given time.

(f)     Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(g)     The words "include" and "including" and words of similar import are not limiting, and shall be construed to be followed by the words "without limitation," whether or not they are in fact followed by such words.

(h)     The word "during" when used with respect to a period of time shall be construed to mean commencing at the beginning of such period and continuing until the end of such period.

(i)     Unless the context otherwise requires, singular nouns and pronouns when used herein shall be deemed to include the plural and vice versa and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

## ARTICLE II

## THE PURCHASE AND SALE

Section 2.01    Purchase and Sale of Assets.  On the terms and subject to the conditions contained herein and in the Ancillary Documents, the Seller hereby sells, transfers, conveys, assigns and delivers to the Purchaser, and the Purchaser hereby purchases, accepts and assumes from the Seller, without representation or warranty, express or implied, except as set forth in this Agreement or the Master Purchase Agreement, all of the Seller's rights, title and interests in, to and under the Assets (other than the Excluded Assets).  "**Assets**" means the following assets, whether owned, leased, licensed or otherwise contracted by, or otherwise available to, the Seller, and no others (except that, as set forth below, the Schedules described in this Section 2.01 shall be updated as of the Closing and assets included in such updated Schedules shall constitute Assets):

(a)     all Servicing Rights accruing to the Seller under the Servicing Agreements, including all rights to assert claims and take other rightful actions in respect of breaches, defaults and other violations of such Servicing Agreements;

(b)     all unreimbursed Servicing Advances listed on Schedule 2.01(b);

(c)     all Servicing Fee receivables listed on Schedule 2.01(c), including all accrued interest;

(d)     [Reserved];

(e)     all guarantees, warranties, indemnities and similar rights in favor of the Seller with respect to any of the Assets;

(f)     the Escrow Accounts listed on Schedule 2.01(f);

(g)     all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by or for the benefit of the Seller with respect to the Business or the ownership, use, function, value of or other rights pertaining to any Asset, whether arising by way of counterclaim or otherwise, other than any claims retained by the Seller pursuant to Section 2.05; and

(h)     all of the outstanding stock of the Acquired Subsidiary.

To the extent that any party discovers, within 180 days following the Closing Date, that there were assets of the Seller used primarily in the Business that all parties hereto intended to be transferred in connection with the purchase contemplated in this Agreement, but that were omitted from the schedules to this Agreement, the Seller shall or shall cause its Affiliates promptly to assign and transfer to the Purchaser all right, title and interest in such asset.

Each Schedule referenced above shall be updated as of the Closing Date and delivered to the Purchaser in accordance with Section 2.10.

Section 2.02    Excluded Assets.    Notwithstanding anything to the contrary in Section 2.01, the Assets shall not include, and the Purchaser shall not purchase or otherwise acquire, the Excluded Assets.

Section 2.03    Assumption of Liabilities.    On the terms and subject to the conditions contained herein and in the Ancillary Documents (including the retention of all rights and remedies under Article XVII of the Master Purchase Agreement and under Articles VII and VIII hereto), the Purchaser shall assume and agree to pay, perform and discharge in accordance with their terms all of the following obligations, debts and liabilities of the Seller and no others (collectively, the "**Assumed Liabilities**"):

(a)     all accounts payable and other accrued expenses (other than any intracompany accounts payable) as of the Closing Date, in each case that relate to the Assets, as reflected on the Accounting Records;

(b)     with respect to Mortgage Loans acquired by Fannie Mae, Freddie Mac or Ginnie Mae from the Seller, the Failed Thrift or IndyMac Federal ("**GSE Mortgage Loans**"), all obligations of the Seller under the Servicing Agreements from and after the Closing Date;

(c)     with respect to Mortgage Loans other than GSE Mortgage Loans, all obligations imposed on the servicer under the Servicing Agreements from and after the Closing Date; and

(d)     all obligations of the Seller with respect to (i) the lawsuits, judgments, claims or demands listed on Schedule 2.03(c), and (ii) any additional lawsuits, judgments, claims or

demands involving foreclosures, bankruptcies, fraud and misrepresentation, contract and mortgage disputes, liens, title disputes, regulatory agency/fair lending, property condition, forfeiture, partition, easement, condemnation and eminent domain, probate, contested foreclosures, tax sale, mechanic's liens, elder abuse and stop notice claims with respect to any of the Assets, but only to the extent any such additional lawsuit, judgment, claim or demand is comparable in nature, scope and substance to those listed on Schedule 2.03(c), as determined by the Seller in its reasonable judgment (as evidenced by written notice thereof given to the Purchaser), if such determination is made (and such notice is provided) within sixty (60) days after the Closing Date, or by the mutual agreement of the Purchaser and the Seller, if such determination is after such sixty (60)-day period.

Section 2.04  Excluded Liabilities.  Notwithstanding anything to the contrary in Section 2.03, it is understood and agreed that the Seller shall not assign and the Purchaser shall not, pursuant to this Agreement, assume or be liable for any Excluded Liabilities that the Seller has or may have now or in the future, including the following:

(a)  any liabilities and obligations of the Seller arising under this Agreement or any of the Ancillary Documents;

(b)  any liabilities or obligations of the Seller arising under or in connection with any Employee Plan or any liability or obligation of the Seller relating to salaries, wages, bonuses, vacation or severance pay or other compensation, payments or benefits earned, accrued or arising through the end of the Closing Date;

(c)  any liabilities or obligations of the Seller under any Contracts relating to the Excluded Assets or under any Excluded Contracts;

(d)  any legal and accounting fees and expenses incurred by the Seller in connection with the consummation of the transactions contemplated by this Agreement, except as provided in the Master Purchase Agreement;

(e)  any Tax liabilities and obligations of the Seller with respect to the Business for any taxable period (or portion thereof) ending on or before the Closing Date;

(f)  any indebtedness of the Seller for borrowed money;

(g)  any liability or indebtedness of the Seller for contingent liabilities or liabilities in respect of any injury to any Person or property;

(h)  any liabilities or obligations of the Seller resulting from violations of any Laws (including any Laws relating to Taxes, immigration, employment or labor matters, or environmental matters);

(i)  any liabilities or obligations of the Seller attributable to an act, omission or circumstances that occurred or existed prior to the Closing Date, other than the Assumed Liabilities;

(j)  all liabilities and obligations arising out of or with respect to the Excluded Assets;

(k)     all obligations of the Seller with respect to any lawsuits, judgments, claims or demands of any nature existing on or prior to the Closing Date that are not listed on Schedule 2.03(c) or otherwise described in Section 2.03(c);

(l)     any liabilities or obligations imposed on the seller of loans under the Servicing Agreements with respect to Mortgage Loans other than GSE Mortgage Loans, including, without limitation, any repurchase obligations for breaches of loan level representations, any indemnities relating to origination activities or securities laws or any seller indemnity;

(m)     any claim against or liability of the FDIC in its capacity as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal that, under and in accordance with applicable Law, was, is or will be subject to the receivership administrative claims processes administered by the FDIC in its capacity as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal pursuant to 12 U.S.C. §1821(d)(3) through (13), including claims and liabilities that are affirmative or defensive, now existing or arising in the future, contingent or fixed, monetary or non-monetary, equitable or legal, or declarative or injunctive;

(n)     any claim against or liability based on any alleged act or omission of the Failed Thrift or IndyMac Federal which is not provable or allowable, or is otherwise barred against the FDIC as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal under applicable Law, including claims and liabilities that are barred under 12 U.S.C. §§1821(c), (d), (e) (including §1821(e)(3)), (i), or (j); 12 U.S.C. §1822; 12 U.S.C. §1823; or 12 U.S.C. §1825; and

(o)     any stand-alone insurance and indemnity agreements or similar agreements between the Failed Thrift or IndyMac Federal and any Bond Insurer with respect to any Securitization Transaction and all liabilities and obligations thereunder.

Section 2.05     Retained Claims and Release.   Notwithstanding anything to the contrary contained in this Agreement, the Purchaser and the Seller hereby agree that the sale and transfer of the Servicing Rights pursuant to this Agreement will exclude the transfer to the Purchaser of all right, title and interest of the Seller in and to any and all claims of any nature whatsoever that might now exist or hereafter arise, whether known or unknown, that the Seller has or might have against any of the following: (a) officers, directors, employees, insiders, accountants, attorneys, other Persons employed by the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest, underwriters or any other similar Persons who have caused a loss to the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest in connection with the origination, servicing or administration of a Mortgage Loan, (b) any appraisers, accountants, auditors, attorneys, investment bankers or brokers, loan brokers, deposit brokers, securities dealers or other Persons who performed services for the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest relative to a Mortgage Loan, (c) any third parties involved in any alleged fraud or other misconduct relating to the making or servicing of a Mortgage Loan or (d) any appraiser or other Person with whom the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest or any servicing agent contracted for services or title insurance in connection with the making, insuring or servicing of a Mortgage Loan.

    (c)     four originals of this Agreement executed by the Seller;

    (d)     executed Affidavit of Lost Certificate for the Acquired Subsidiary;

    (e)     an original Limited Power of Attorney granted by the Seller pursuant to Section 5.04 hereof;

    (f)     executed resignations from each director and officer of the Acquired Subsidiary;

    (g)     a copy of the articles of incorporation of the Acquired Subsidiary, certified by the secretary or another authorized officer of the Acquired Subsidiary; and

    (h)     a copy of the bylaws of the Acquired Subsidiary, certified by the secretary or another authorized officer of the Acquired Subsidiary.

Section 4.02    Purchaser's Deliverables.   In addition to any other documents to be delivered under other provisions of this Agreement or the Master Purchase Agreement, the Purchaser shall deliver and release, subject to and in accordance with this Section, to the Seller the following on or prior to the Closing:

    (a)     the Group 2 Closing Payment in accordance with the Master Purchase Agreement;

    (b)     four originals of the Assignment and Assumption Agreement executed by the Purchaser; and

    (c)     four originals of this Agreement executed by the Purchaser.

## ARTICLE V

## TRANSFER OF MORTGAGE RELATED ASSETS

Section 5.01    Transfer of Documents, etc.   The Seller and the Purchaser shall cooperate with each other in the physical or other transfer to the Purchaser or its designee on the Closing Date of the Servicing Rights and the Servicing Files in respect of the Mortgage Loans.

Section 5.02    Unremitted Collections; Escrow Accounts and Custodial Accounts. Escrow funds, custodial funds and other amounts or balances related to the Mortgage Loans on deposit in Escrow Accounts, Custodial Accounts or other accounts held or controlled by the Seller shall be transferred by the Seller, along with the related accounts, to the Purchaser on the Closing Date.  It is intended that the Seller will use commercially reasonable efforts to cause such Escrow Accounts, Custodial Accounts and other accounts to be retitled in the name of the Purchaser.  All such funds and related accounts shall become the responsibility of the Purchaser when transferred by the Seller.  Any negative escrow balances shall be netted against the amount of any positive escrow balances held in the Escrow Accounts transferred to the Purchaser.  On and after the Closing Date, if a shortfall is discovered in an Escrow Account or reserve fund established under a Servicing Agreement or advances are required to be made and the servicer is required pursuant to the terms of the applicable Servicing Agreement either to fund such Escrow

Account or reserve fund shortfall or to make advances, the Purchaser shall fund such shortfall or make such advances, as applicable (to the extent such amounts have not been accounted for in the calculation of the Group 2 Final Payment pursuant to <u>Section 2.11</u>) .

    Section 5.03   <u>Invoices</u>.  All invoices (including Tax and insurance invoices) pertaining to the servicing of the Mortgage Loans or any other Contracts and which are in the Seller's possession on or prior to the Closing Date and due and payable within fifteen (15) Business Days after the Closing Date shall be paid by the Seller in accordance with applicable Investor Requirements and Contract requirements on or prior to the Closing Date.  Notwithstanding the foregoing, amounts so paid by the Seller shall be pro rated between the Seller and the Purchaser and may be netted against amounts otherwise payable by or due to the Purchaser, as applicable, pursuant to <u>Section 2.07</u>.  All other invoices, transmittal lists or any other information used to pay such invoices which are received after the Closing Date shall be forwarded by the Seller to the Purchaser in accordance with <u>Section 5.05</u>.  All penalties and interest due as a result of the Seller's failure to pay invoices which are in the Seller's possession on or prior to the Closing Date and due and payable within fifteen (15) Business Days after the Closing Date or where the Seller failed to forward invoice information to the Purchaser in accordance with <u>Section 5.05</u> shall be borne by the Seller.

    Section 5.04   <u>Notice to Mortgagors</u>.   The Purchaser shall, on a timely basis in accordance with RESPA, Investor Requirements and any other applicable Laws, and pursuant to the Limited Power of Attorney granted by the Seller to the Purchaser, in the form attached hereto as <u>Exhibit E</u>, prepare and transmit to each Mortgagor a joint "hello" and "goodbye" letter, at the Purchaser's expense.   The form of such letter shall be subject to the review and reasonable approval of the Seller.

    Section 5.05   <u>Forwarding Post-Closing Date Items</u>.  With respect to any checks or other funds in respect of any Mortgage Loan which are received by the Seller within thirty (30) calendar days after the Closing Date, the Seller shall, to the extent no Limited Power of Attorney is granted to the Purchaser in accordance with <u>Section 5.04</u>, promptly endorse without recourse and send the same to the Purchaser via overnight mail.  Any checks or other funds in respect of any Mortgage Loan which are received by the Seller after such thirty (30) day period shall be endorsed without recourse by the Seller to the Purchaser and sent by first class mail to the Purchaser promptly after receipt.  Except as otherwise provided herein, the Seller shall promptly forward to the Purchaser all Mortgagor, Investor and Insurer correspondence, Tax bills or any other correspondence or documentation related to any of the Mortgage Loans, the Servicing Rights or the other Assets which is received by the Seller after the Closing Date.

    Section 5.06   <u>Misapplied and Returned Payments</u>.  Misapplied and returned payments with respect to the Mortgage Loans shall be processed as follows:

        (a)     Both parties shall cooperate in correcting misapplication errors;

        (b)     The party receiving notice of a misapplied payment shall promptly notify the other party;

(c)     If a misapplied payment has created an improper Group 2 Closing Payment or Group 2 Final Payment as the result of an inaccurate outstanding principal balance or escrow balance, respectively, a check shall be issued to the party shorted by the improper payment application within ten (10) Business Days after notice thereof by the other party;

(d)     Any check issued under the provisions of this Section 5.06 shall be accompanied by a statement indicating the purpose of the check, the Mortgagor and property address involved, and the corresponding Seller and Purchaser account number; and

(e)     If any Mortgagor's check presented to the Seller prior to the Closing Date is returned unpaid to the Seller for any reason subsequent to the Closing Date, the Seller shall promptly forward the original unpaid check to the Purchaser and, upon the Seller's demand, (i) if the final settlement of the Group 2 Final Purchase Price pursuant to Section 2.12 has not yet occurred, such returned amount will be reflected in the Group 2 Final Purchase Price when calculated or (ii) if the final settlement has already occurred, depending on the category of payment that was returned, such reimbursement shall be calculated by application of the relevant percentage listed on Schedule 2.06.

Section 5.07     Notice to Insurers, Tax Authorities and Bankruptcy Trustees.     Within fifteen (15) days after the Closing Date, the Purchaser shall, in accordance with applicable Insurer requirements, provide written notice of the transfer to any Insurer requiring such notice; provided, however, that the Purchaser may give aggregate notice whenever possible.     The Purchaser shall notify tax-bill services of the transfer.     The form of all notices pursuant to this Section 5.07 shall be subject to the review and reasonable approval of the Seller.

Section 5.08     Tax and Flood Contracts.     The Seller shall cooperate with the Purchaser to assign and transfer to the Purchaser, at the Seller's expense, within a reasonable period of time following the Closing Date, and in no event more than sixty (60) days after the Closing Date, (i) any "life-of-loan" assignable tax contracts with respect to the Mortgage Loans, and (ii) any assignable flood zone certification contracts with respect to the Mortgage Loans.

Section 5.09     Custodial Agreements.     On the Closing Date, the Seller, with the cooperation of the Purchaser, shall assign and transfer to the Purchaser any document custodial agreements between the Seller and any document custodian that relate to the Mortgage Loans. In the event there exist document custodial agreements that are not assigned, the Purchaser shall be responsible for entering into new document custodial agreements and for obtaining any necessary Agency approvals regarding any new custodial arrangements required as a result of this transaction on the Closing Date.     Any fees charged by the Seller's document custodians due to termination of custodial agreements by the Seller on or prior to the Closing Date shall be borne by the Seller.     The Purchaser shall pay all document custodial fees of any custodian engaged by the Purchaser.     In addition, any and all fees charged for termination of a custodial arrangement after the Closing Date and all fees and other charges incurred to transfer files to or from a custodian in connection with this transaction (whether before or after the Closing Date) shall be paid by the Purchaser.

Section 5.10     Servicing of REO Property.     To the extent the Seller holds title to an REO Property solely as nominee for the benefit of the owner of the Mortgage Loan, with respect to

**IN WITNESS WHEREOF,** the parties hereto have caused this Servicing Business Asset Purchase Agreement to be executed as of the day and year first above written.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By: _George C. Abyal_
Name: George C. Alexander
Title: Manager, Structured Transactions

ONEWEST BANK, FSB

By: _____
Name: Joshua P. Eaton
Title: Authorized Signatory

Servicing Rights Asset Purchase Agreement

**IN WITNESS WHEREOF**, the parties hereto have caused this Servicing Business Asset Purchase Agreement to be executed as of the day and year first above written.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By: _____
    Name:
    Title:

ONEWEST BANK, FSB

By: _____
    Name: Joshua P. Eaton
    Title:  Authorized Signatory

Servicing Rights Asset Purchase Agreement

# Exhibit 8

**Freddie Mac**

We make home possible℠

May 12, 2009

Mr. Aaron Wade
Onewest Bank, FSB
888 E. Walnut Street
Pasadena, CA 91101

Re:     **Onewest Bank, FSB**
        **Custodian Assignment Notification**
        **Freddie Mac Seller/Servicer Numbers 153845 & 153984**

Dear Mr. Wade:

This letter will serve as confirmation that your application for custodian services from the below listed entity has been completed.  Please use the Custodian Number and Agreement Number provided below on all correspondence and deliveries to Freddie Mac beginning May 12, 2009.

| **Third-Party Custodian/** | **Custodian** | **Agreement** |
|---|---|---|
| **Seller/Servicer's Trust Department** | **Number** | **Number** |
| Deutsche Bank National Trust Company | 1000409 | 000015 |
| 1761 East Saint Andrews Place | | |
| Santa Ana, CA 92705-4934 | | |

Your custodian must subscribe to the Freddie Mac Seller/Servicer Guide and adhere to its requirements as well as the Document Custody Procedure Handbook, which may be accessed at www.freddiemac.com/cim.  If you have any questions regarding the instructions contained within this letter, you may contact Amy Odiorne at the address and telephone number below.

Freddie Mac
Document Safekeeping Administration
1551 Park Run Drive, MS D3A
McLean, VA 22102
(571) 382-3936
amy_odiorne@freddiemac.com

Sincerely,

Pam Williams
Director
Counterparty Credit Risk Management

cc: Christopher Corcoran, custodian copy

Custodian Number  1000409        [1]
Custodial Agreement Number  OOOO15  [1]
Seller/Servicer Number  153845  [1]
Self ____  Affiliated 3rd Party ____
Unaffiliated ___X___[2]

CUSTODIAL AGREEMENT:  SINGLE-FAMILY MORTGAGES   ＊ 153984

THIS CUSTODIAL AGREEMENT, dated as of ~~March 19~~ May 12th AND, 2009[3] (the "Agreement"), is by and among Freddie Mac, ___DeutscheBank___[4], as custodian ("Custodian"), and ___OneWest Bank, FSB___[5], as seller and/or servicer ("Seller/Servicer").

## W I T N E S S E T H :

WHEREAS, Freddie Mac and Seller/Servicer are parties to certain Purchase Documents pursuant to which Seller/Servicer sells and/or agrees to sell Mortgages to Freddie Mac, or services and/or agrees to service Mortgages for Freddie Mac;

WHEREAS, pursuant to the Purchase Documents, Seller/Servicer will, on or before each Delivery Date, deliver or cause to be delivered to Custodian (i) the Notes relating to such Mortgages, endorsed in blank as required by Freddie Mac's *Single-Family Seller/Servicer Guide* (the "Guide"), (ii) the Assignments relating to such Mortgages, (iii) certain data, using either Freddie Mac's Selling System or MIDANET®, and (iv) for Mortgages delivered through MIDANET®, a completed Form 1034, or for Mortgages delivered through the Selling System, a completed Form 1034 or Cover Sheet for Selling System;

WHEREAS, Custodian shall accept delivery of the Notes and any Assignments on Freddie Mac's behalf in accordance with the terms and conditions of this Agreement;

WHEREAS, Freddie Mac, Seller/Servicer and Custodian desire to set forth the terms and conditions for the deposit and custodianship of the original Notes for Mortgages sold to and serviced for Freddie Mac.

NOW, THEREFORE, in consideration of the premises, the covenants herein set forth, and other good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, Freddie Mac, Custodian and Seller/Servicer agree as follows:

Section 1:  Definitions.  Capitalized terms used herein have the meanings ascribed to them in the Purchase Documents, including (without limitation) the Guide; provided

---

[1] Freddie Mac will complete this blank or, if Custodian has been assigned a Custodian Number, Custodian must insert this number when it executes this Agreement.

[2] Seller/Servicer, indicate a relationship with Custodian by initialing the appropriate space; Custodian, confirm the relationship by initialing the appropriate Section 2(b) below.

[3] Freddie Mac will complete this blank.

[4] Insert the complete legal name of Custodian.

[5] Insert the complete legal name of Seller/Servicer and its Freddie Mac Seller/Servicer number.

that the following terms are defined for purposes of the custodial relationship contemplated by this Agreement:

"Assignments" means all intervening assignments and instruments necessary to assign the security instruments to Freddie Mac; if, pursuant to Section 18.1 of the Guide, the Seller/Servicer has elected to hold the Assignments in its Mortgage files, it need not deliver Assignments to the Custodian but must provide Custodian with evidence of that election.

"Form 1034" means a Custodial Certification Schedule in any format (hardcopy or electronic), including without limitation Forms 1034, 1034A, 1034B, 1034E, 1034S, 1034SM, or Form 1034T, which identifies the Notes delivered to Custodian.

"Notes", for purposes of this Agreement, means the original notes and any other instruments evidencing the indebtedness secured by the security instruments, along with the original riders, powers of attorney, and/or other modifying instruments to the original notes (e.g., modification, conversion, assumption of indebtedness or release of liability agreements); references to "Notes" may also include Assignments and any supplemental or additional documents required to be maintained in the Custodian's Note file, as the context requires or permits.

"Form 1036" means a Request for Release of Documents authorizing Seller/Servicer to obtain Notes from Custodian and Custodian to release them to Seller/Servicer.

Section 2.  Custodian Eligibility, Functions and Duties.
(a)   Eligibility requirements and general duties.  Custodian hereby represents and warrants to, and covenants with, Seller/Servicer and Freddie Mac that Custodian will perform the functions and fulfill the duties set forth in Sections 18.6, 18.7, 56.9 and other relevant portions of the Guide.  Custodian shall also:
   (1)   in addition to satisfying the requirements of Section 18.6(a)4, make available evidence of compliance with the requirements, terms, standards, and responsibilities referred to in subparagraph (2) immediately below;
   (2)   comply with all of the terms of this Agreement, and with:
      • all Guide requirements pertaining to Notes held for Freddie Mac;
      • any other requirements that Freddie Mac may specify to ensure the safety, security and/or enforceability of its Notes; and
      • such standards for custodial performance and fiduciary duties as Freddie Mac may prescribe in its discretion from time-to-time;
      all as amended from time-to-time by Freddie Mac;
   (3)   notify Freddie Mac and Seller/Servicer if, at any time, Custodian fails to meet any applicable eligibility requirement;
   (4)   meet the eligibility requirements of Section 18.2(b):

**[CUSTODIAN: INITIAL[6] THE APPLICABLE SECTION BELOW AND CROSS-OUT THE SECTIONS THAT DO *NOT* APPLY]**

_____ ~~Section 18.2(c), for a Seller/Servicer acting as its own Custodian~~

_One_ Section 18.2(d), for a third-party Custodian that is not affiliated with Seller/Servicer

_____ ~~Section 18.2(e), for a third-party Custodian that is affiliated~~ with ~~Seller/Servicer~~

**[CUSTODIAN: EITHER INITIAL[6] THE FOLLOWING SECTION OR CROSS IT OUT]**

_____ ~~Section 18.2(f), for a Custodian that is also a warehouse lender~~

(5)  not be in receivership, conservatorship or liquidation, nor shall any parent of Custodian be in receivership, conservatorship or liquidation;

(6)  maintain, at its sole cost and expense, insurance coverage under a financial institution bond or equivalent policy that provides, at a minimum, fidelity and lost instrument coverages, errors and omissions insurance coverage for the custody of documents, and other coverages and requirements in the amounts as set forth in Section 18.2(b)8 of the Guide;

(7)  complete the Annual Document Custodian Eligibility Certification Report (the "ADCEC") and submit it to Freddie Mac by March 31st each year, together with any other information that Freddie Mac may request, pursuant to Sections 14 and 16 below; and

(8)  maintain document custodial operations that are independently and separately managed from any functional area within its institution that performs mortgage origination, selling or servicing; maintain separate records, files and operations; and ensure that the duties set forth in this Agreement will be performed only by personnel not engaged in mortgage origination, sales or servicing.

**[CUSTODIAN: INITIAL[6] THE PARA. (b) BELOW THAT *DOES* APPLY and CROSS-OUT THE PARA. (b) THAT *DOES NOT* APPLY]**

(b)  Additional eligibility requirements for Custodian that is **not affiliated** with Seller/Servicer.  Custodian hereby represents, warrants and covenants with Freddie Mac that it is not affiliated with Seller/Servicer.

initial

**OR**

(b)  ~~Additional eligibility requirements for Custodian that is a **self**-Custodian or is **affiliated** with Seller/Servicer.  Custodian hereby represents, warrants and covenants with Freddie Mac that its custodial operations are conducted by a trust department that is established and operated under fiduciary powers granted by its state or federal regulator.~~

initial

_____

[6] Officer of Custodian executing this Agreement must initial in ink.

(c)  Verifications.  Upon receiving Notes to be held in custody for Freddie Mac, Custodian shall review and examine them and conduct the verification as set forth in Section 18.6(b) of the Guide. In fulfilling that function, Custodian shall:

  (1)  review the terms of the Notes to verify that the information contained therein conforms with the Selling System or Form 1034 data; and

  (2)  determine that each Note is original and has an endorsement as required in Section 16.4 of the Guide.

(d)  Responsibility as a transferee Custodian.  Upon a transfer of servicing that results in a transfer of custody, Custodian as transferee must perform the verifications specified in Section 18.7 of the Guide with respect to each Note transferred to it.

  Upon a transfer of servicing, Custodian as transferee must verify that a copy of Freddie Mac Form 960 or Form 981, as applicable, evidencing Freddie Mac's approval of the servicing transfer accompanies the Notes.  For each transfer of servicing that results in a transfer of custody, Seller/Servicer as transferee must deliver to Freddie Mac a Custodial Certification Schedule, executed by the transferor seller/servicer and Custodian·as transferee.

(e)  Responsibility as a transferor Custodian.  Upon a transfer of custody or a transfer of servicing resulting in a transfer of custody, the transferor Custodian shall verify that either Freddie Mac's Document Custodial Operations Department (DCO) or a new custodian has been selected in accordance with Freddie Mac's requirements and must confirm the transferee custodian with Freddie Mac.  The transferor Custodian shall cooperate with Seller/Servicer and DCO or the transferee custodian to effect an orderly transfer of the Notes and to prepare a Form 1034 for those Notes, all as provided in the Guide.

  It is the responsibility of the Custodian and Seller/Servicer to work with DCO or the transferee custodian, prior to certification of the Notes by DCO or the transferee custodian, to cure all document deficiencies that are unresolved upon transfer.  Custodian shall not be released or discharged from the liabilities, duties and obligations hereunder until after Seller/Servicer and DCO or the transferee custodian to which the Notes have been moved have certified or accounted for all the Notes.

(f)  Duties to Freddie Mac; Relationship of the Parties.  Custodian should contact DCO with any questions that might arise in conjunction with the discharge of the duties imposed on Custodian by this Agreement and as set forth in Section 18.6(d) of the Guide, particularly regarding the verification and certification processes.

  By executing this Agreement, Custodian represents and warrants that it has no, and covenants that it shall hold no, adverse interest, by way of security or

otherwise, in any Note and hereby waives and releases any such interest which it may have or acquire in any such Note.

The parties each hereby acknowledge that neither title, ownership nor right of alienation with respect to the Notes, nor any books and records relating to the Notes, is hereby transferred to, or conferred upon, Custodian.

(g) Release of Documents. Custodian shall release Notes only pursuant to Section 18.6(e) of the Guide. Absent manifest error, Custodian may rely on information received from Seller/Servicer in the Form 1036. Seller/Servicer shall hold in trust and for the sole benefit of Freddie Mac all Notes released to it.

(h) Supplemental deliveries. If Seller/Servicer supplements a delivery with additional documents, such as original modifying instruments, Custodian must place the supplemental documentation with the applicable original Notes.

Section 3. Miscellaneous.
(a) Audit. Freddie Mac and/or its auditors may perform, with or without any prior notice, on-site reviews or audits of:
   (1) all records and documents held by Custodian that relate to the Notes; and
   (2) Custodian's policies and procedures and its compliance with its own internal controls and with Freddie Mac's requirements.
   Custodian shall promptly provide copies of any Notes requested by Freddie Mac or its auditor.

(b) Custodial Charges. Pursuant to Section 18.1 of the Guide, compensation for Custodian's services, including (without limitation) any action taken at the request or demand of Freddie Mac, is the sole responsibility of Seller/Servicer. Seller/Servicer and Custodian shall enter into a written agreement regarding Custodian's charges and fees for certifying, holding, releasing, copying, and other activities with respect to the Notes; provided, however, that such agreement may not contain terms that relate to the substance of this Agreement, including (without limitation) Freddie Mac's ability to gain access to or remove the Notes without the Seller/Servicer's consent and provided further that, in the event of a conflict between any such agreement and this Agreement, this Agreement shall govern.

Custodian shall (i) take no action that might adversely affect Freddie Mac or its interests, or (ii) not fail to perform in accordance with this Agreement or any Freddie Mac requirement because Custodian has not been compensated by Seller/Servicer. If Freddie Mac should elect, in its sole discretion, to assume or transfer the duties and obligations of Seller/Servicer and terminate the custodial relationship established by this Agreement, Custodian shall continue to perform its obligations hereunder for a reasonable time on the same terms and conditions as set forth herein, provided that Freddie Mac shall not be obligated to pay any compensation or fee for holding or releasing any Notes during such period.

(c)   Indemnifications.

(1)   In performing its functions and duties under this Agreement, Custodian agrees to act with reasonable care, using that degree of skill and care that it exercises with respect to similar notes and assignments owned and/or serviced by it and with at least such skill and care as is customary in the industry.  Custodian hereby indemnifies Freddie Mac from, and holds Freddie Mac harmless against, any and all liabilities, obligations, losses, damages, payments, costs or expenses of any kind whatsoever (including, without limitation, reasonable fees and expenses of counsel), which may be imposed on, incurred by or asserted against Freddie Mac as the result of any breach of this Agreement or negligence by Custodian in the performance of the functions and duties of Custodian required by the sections of the Guide pertaining to Notes held for Freddie Mac and by this Agreement.

(2)   Seller/Servicer indemnifies Freddie Mac as set forth in Section 18.4(a) of the Guide.

Section 4.  Seller/Servicer Responsibilities.  Seller/Servicer is responsible for the following and hereby represents and warrants to, and covenants with, Freddie Mac as follows:

(a)   Seller/Servicer shall promptly notify Freddie Mac in writing if Seller/Servicer becomes aware that Custodian has failed to comply with any Freddie Mac operational requirement and/or any of the terms of this Agreement.

(b)   Seller/Servicer shall comply with the transit insurance requirements set forth in Section 18.4(c) of the Guide.  The Guide insurance requirements do not diminish, restrict or otherwise limit Custodian's responsibilities and obligations as stated herein.

(c)   Seller/Servicer shall provide Custodian with copies of such confirmations, agreements, assignments, documents, opinions, instructions and information relating in any way to this Agreement as Custodian may from time to time reasonably request in writing.

(d)   Seller/Servicer shall promptly notify Custodian of the occurrence of any default or event of default by Seller under the Purchase Documents, specifying the nature thereof and the action being taken or proposed to be taken by Seller/Servicer to remedy the same (notwithstanding the foregoing terms of this subsection 4(d), nothing herein shall be construed as creating any right on the part of Seller/Servicer to a cure period in connection with any such default or event of default or as a waiver by Freddie Mac of any right or remedy under the Purchase Documents).

Section 5.  Transfers of Servicing.
(a)  In the event that Seller/Servicer transfers servicing of some or all of the
     Mortgages, such transfer shall be subject to approval under, and conducted
     pursuant to, Section 18.4(d) and other relevant sections of the Guide.

(b)  If Seller/Servicer transfers the servicing for some or all of the Mortgages for
     which Custodian holds the Notes, then Custodian shall cooperate with
     Seller/Servicer and DCO or the transferee seller/servicer's custodian to transfer
     custody of the Notes and any Assignments pursuant to the Guide and Section
     2(d) above.

(c)  No later than 30 days after the effective date of a transfer of servicing, the Notes
     and any Assignments relating to the affected Mortgages must be moved.  If the
     transferee seller/servicer uses a document custodian, the Notes and
     Assignments must be moved to the transferee seller/servicer's custodian.  If the
     transferee seller/servicer does not use a document custodian, the Notes must be
     moved to DCO and the Assignments moved to the transferee seller/servicer.

Section 6.  Termination and Transfer of Custody.
(a)  Termination by Freddie Mac.  At its sole discretion, Freddie Mac may, upon 30
     days written notice to Seller/Servicer and Custodian, terminate this Agreement
     and require Seller/Servicer to transfer all Notes and Assignments to another
     custodian or to transfer the Notes to DCO and the related Assignments to
     Seller/Servicer within 30 days of the date of such notice.

     Notwithstanding any other right of Freddie Mac to require Seller/Servicer to
     discontinue the use of a custodian, Freddie Mac may give notice that it will
     terminate this Agreement and require that all Notes and Assignments to be
     transferred immediately to another custodian, or the Notes to Freddie Mac and
     the related Assignments to Seller/Servicer, immediately upon occurrence of any
     of the following:
     (1)  disqualification or suspension of Seller/Servicer pursuant to the Guide, or
          upon a determination by Freddie Mac that Seller/Servicer's performance
          has been unsatisfactory, or that Seller/Servicer has failed to meet eligibility
          standards;
     (2)  failure of Custodian to meet Freddie Mac's document custodian eligibility
          requirements or any criteria for note custody;
     (3)  Freddie Mac's determination that Custodian's performance with respect to
          the Notes has been unsatisfactory;
     (4)  any other circumstance with respect to Custodian, the Notes or any
          Assignments that adversely affects the Notes or the interests of Freddie
          Mac;
     (5)  Freddie Mac's modification of its requirements for the custody of Notes and
          Assignments; or
     (6)  Freddie Mac's notice to Custodian that a default or event of default has
          occurred under, or in connection with, the Purchase Documents, or Freddie

Mac's determination for any reason that the safety or security of the Notes is in jeopardy.

In such event, Custodian shall comply with Freddie Mac's instructions.

(b) Termination by Seller/Servicer. Seller/Servicer may terminate this Agreement upon 30 days prior notice to Custodian and to Freddie Mac. Upon giving such notice, Seller/Servicer must, in accordance with the Guide, designate a new custodian for Mortgages serviced for Freddie Mac and require Custodian transfer the Notes for those Mortgages to the new custodian within 30 days of Freddie Mac's approval of the transfer, provided that Freddie Mac may require the Notes be transferred immediately. If Seller/Servicer elects to transfer the Notes to DCO, then, prior to the termination date of this Agreement, all Notes for Mortgages serviced for Freddie Mac and held by Custodian must be moved to DCO, and the Assignments moved to Seller/Servicer.

(c) Termination by the Custodian. Custodian may terminate this Agreement upon 30 days prior written notice to Seller/Servicer and to Freddie Mac. In such event, Seller/Servicer must transfer the Notes and the Assignments to a new custodian or transfer the Notes to DCO and obtain any Assignments from Custodian as provided in Section 18.1 of the Guide. In no event may Custodian refuse or fail to fulfill its custodial obligations pursuant to this Agreement until the Notes and Assignments have been properly transferred.

(d) Responsibilities of the transferor Custodian. Upon termination of this Agreement and transfer of custody of the Notes, Custodian shall cooperate with Seller/Servicer and DCO or the transferee custodian pursuant to the Guide and Section 2(d) hereinabove.

Section 7. Representations, Warranties and Covenants re: execution.

(a) Custodian represents and warrants to, and covenants with, Seller/Servicer and Freddie Mac as follows:
    (1) This Agreement has been authorized and approved by all requisite corporate action on the part of Custodian and, when executed and delivered by Custodian, Seller/Servicer and Freddie Mac, will constitute a legal, valid and binding obligation of Custodian, enforceable against Custodian in accordance with its terms.
    (2) Custodian has not executed and will not execute any agreement or obligation inconsistent herewith or with any of the transactions contemplated hereby.
    (3) Custodian has complied, and at all times shall comply, with all applicable laws and regulations in connection with the transactions contemplated hereby.

(b) Seller/Servicer represents and warrants to, and covenants with, Freddie Mac and Custodian as follows:
    (1) This Agreement has been authorized and approved by all requisite corporate action on the part of Seller/Servicer and, when executed and

delivered by Custodian, Seller/Servicer and Freddie Mac, this Agreement will constitute the legal, valid and binding obligation of Seller/Servicer, enforceable against Seller/Servicer in accordance with its terms.

(2)   Seller/Servicer has not executed and shall not execute any agreement or obligation inconsistent with this Agreement or with the transactions contemplated hereby.

(3)   Seller/Servicer has complied, and at all times shall comply, with all applicable laws and regulations in connection with the transactions contemplated hereby.

Section 8.  Amendments.  Freddie Mac may at any time, in its sole discretion, upon notice to Custodian and Seller/Servicer, modify or supplement any provision or requirement set forth in this Agreement, including but not limited to Freddie Mac's Document Custodian eligibility requirements, Custodian or Seller/Servicer obligations, custodial duties, delivery requirements, and/or Freddie Mac forms referenced herein.

If the Guide's defined terms or requirements pertaining to Document Custodian eligibility, Custodian or Seller/Servicer obligations, custodial duties, delivery requirements, Freddie Mac forms referenced herein or any requirements relating to the Notes are amended, then this Agreement is deemed to have been simultaneously amended to the extent necessary to conform this Agreement with such amended Guide provisions.  If any Freddie Mac forms are revised or superseded subsequent to the date of this Agreement, references to such forms in this Agreement shall be deemed to refer to such forms as revised or, if superseded, to such other forms as Freddie Mac may require.

No amendment or waiver of any provision of this Agreement shall be effective unless in writing signed by an authorized representative of Freddie Mac, and then such waiver or consent shall be effective only in that instance and for the reason specified therein.

Section 9.  Notices.  All demands, notices, instructions and other communications hereunder shall be in writing (unless specifically authorized to be delivered using another means) and shall be personally delivered or mailed, addressed as set forth below.

| If to Freddie Mac: | Freddie Mac Counterparty Credit Risk Management 1551 Park Run Drive, MS  D3A McLean, VA  22102 (571) 382-3936; facsimile (866) 743-0087 |
| --- | --- |
| with a copy to: | Freddie Mac Document Custodial Operations 21550 Beaumeade Circle, MS 570 Ashburn, VA  20147 (703) 724-3000 |

If to Custodian (*indicate if your vault location is different from your mailing
address and identify a contact person for eligibility matters as well as
operations*)[7]:

Christopher P Corcoran
Deutsche Bank
1761 East St Andrew Place
Santa Ana, CA 92705-4934

tel. # (714) 247  6045

If to Seller/Servicer[7]:

Aaron Wade
OneWest Bank, FSB
888 E. Walnut Street
Pasadena, CA 91101

tel. # (626) 535  8852

or to such other address and person as Freddie Mac, Custodian or Seller/Servicer
may hereafter designate in writing as required herein.

Section 10. Binding Effect. This Agreement shall become effective as of the date
above first written upon execution by Freddie Mac, Seller/Servicer and Custodian,
and shall be binding upon and inure to the benefit of the parties and their respective
successors and assigns and shall continue in full force and effect so long as
Custodian shall hold, as custodian hereunder, any of the Notes, or until the
Agreement is terminated. If Freddie Mac executes this Agreement, Freddie Mac shall
provide Seller/Servicer and Custodian with copies of the fully executed Agreement.
Freddie Mac shall retain the original Agreement.

Section 11. Governing Law. This Agreement shall be governed by and construed in
accordance with the laws of the United States. If there is no applicable precedent
and to do so would not frustrate the purposes of this Agreement or the transactions
governed hereby, the laws of the Commonwealth of Virginia shall be deemed to
reflect the laws of the United States. Notwithstanding the immediately preceding
sentence, the legal effectiveness, validity and enforceability of electronic contracts
and signatures and other Electronic Records used in connection with any transaction
engaged in by the parties to this Agreement shall be governed by the federal
Electronic Signatures in Global and National Commerce Act.

Unless otherwise expressly agreed in writing among Seller/Servicer, Custodian and
Freddie Mac, neither this Agreement nor any portion of any electronic transaction will
be governed by the Uniform Computer Information Transactions Act as enacted in
any jurisdiction.

---

[7] Insert the name, title, mailing address, e-mail address, telephone number and fax number of
the person to whom notices should be sent.

Section 12. Construction of Agreement. This Agreement shall not be construed against Freddie Mac as the drafter hereof.

Section 13. Headings. The section headings herein are for convenience only and shall not affect the construction of this Agreement.

Section 14. Acknowledgment and Consent to Electronic Transactions.
Seller/Servicer and Custodian consent and agree to engage in electronic transactions with Freddie Mac and each other in connection with their respective duties and obligations under this Agreement, as follows:
(1)   Seller/Servicer acknowledges and agrees that it is bound by the provisions of Sections 1.3 and A1.7 of the Guide; and
(2)   Custodian acknowledges and agrees that it is bound by the provisions of Sections 1.3 and A1.7 of the Guide as if each reference to the term "Seller/Servicer" referred to "Custodian," except where replacing the term "Seller/Servicer" with the word "Custodian" is logically inconsistent with the duties and obligations of Custodian set forth herein.
Custodian further agrees to adopt as its Electronic Signature for such electronic transactions its Freddie Mac custodian number and/or such other confidential passwords, user identification codes, other symbols or procedures as required by Freddie Mac. Custodian and Seller/Servicer acknowledge and agree that electronic transactions not expressly required or permitted by Freddie Mac are prohibited.

Section 15. Certifying Mortgages in the Selling System. Seller/Servicer, Custodian and Freddie Mac agree that for Mortgages sold using the Selling System, Custodian will certify such Mortgages using the following online certification options: single loan certification, batch certification and importation of Mortgage loan data certified in the Custodian's system into the Selling System. The option used must comply with the instructions in the Selling System, the applicable provisions of Chapter 18 of the Guide, the Document Custody Procedure Handbook and the section in the Selling System User Guide entitled "Certifying Mortgages for Freddie Mac," located on the Web at www.freddiemac.com/learn/pdfs/deliver/sscertmort.pdf, all of which are hereby incorporated herein by reference and made a part hereof.

Section 16. Delivery of the ADCEC. Seller and Freddie Mac agree that Custodian may deliver the ADCEC, executed by a duly authorized officer of Custodian, to Freddie Mac as an electronic record attached to an email or as a facsimile transmission; provided that, if the ADCEC is delivered to Freddie Mac:

(a)   as an electronic record attached to an email, the ADCEC must be submitted as a Portable Document Format ("PDF") file attached to the email; and

(b)   as a facsimile transmission, the facsimile of ADCEC must include a cover sheet identifying the name and telephone number of the person sending the facsimile and stating its total number of pages.

Each email or facsimile transmission of the ADCEC must be sent to the Freddie Mac email address or telephone number specified in the form, and copies or representations of signatures or electronic signatures attached to or associated with the ADCEC will be governed by and must comply with the applicable provisions of Section 1.3 of the Guide.

Section 17.  Financing Statements.  Seller/Servicer and Custodian each hereby (i) authorizes Freddie Mac to file Uniform Commercial Code (UCC) financing statements (together with any related amendments and continuation statements) deemed necessary or desirable by Freddie Mac to perfect or otherwise evidence Freddie Mac's ownership interest in the Notes (including, without limitation, Freddie Mac's exclusive ownership interest in any and all servicing rights related to the Mortgages) purchased by Freddie Mac from Seller/Servicer and held by Custodian on behalf of Freddie Mac, and (ii) agrees to execute, deliver and/or file such UCC financing statements and other documents and perform such acts as may be reasonably necessary to fully perfect or otherwise evidence Freddie Mac's ownership interest in the Notes.  Seller/Servicer shall pay the costs for any financing statements filed pursuant to this section and Freddie Mac's costs in preparing such financing statements and/or searching UCC records to confirm that no other party claims an interest in the Notes.

Section 18.  Confidentiality and Notice of Waivers.  Freddie Mac hereby identifies, and Seller/Servicer and Custodian jointly and severally agree to treat, all modifications or waivers granted by Freddie Mac regarding the duties and obligations or Seller/Servicer and/or Custodian under this Agreement, the Guide and/or the Purchase Documents as "confidential information" under Section 2.16 of the Guide, and Custodian agrees to be bound by the confidentiality provisions of Section 2.16.

Under certain circumstances and on occasion, Freddie Mac may modify the Seller/Servicer's Purchase Documents in a manner that would affect Custodian's duties and obligations under this Agreement.  The parties hereto agree that Seller/Servicer shall promptly give Custodian a written copy of any such modification, and Custodian shall periodically request updated information on such modifications from Seller/Servicer.  Seller/Servicer will not be deemed by Freddie Mac to have violated the confidentiality imposed by Section 2.16 of the Guide by providing copies of such updated information or modifications.  Freddie Mac has no duty or obligation to notify Custodian under this Agreement or under the Guide, although it may provide such notice.

[this space intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be executed in its name and on its behalf by a duly authorized officer (or other duly authorized representative, in the case of Freddie Mac), and delivered as of the date first stated above.

Deutsche Bank National Trust Co. [8] (Custodian)

ATTEST: _____   By: _____
Signature                        Signature

Tom Yoshida                      Christopher Corcoran
_____                  _____
Name                             Name

AVP                              Vice President
_____                  _____
Title                            Title:


OneWest Bank, FSB _____ [8] (Seller/Servicer)

ATTEST: _____   By: _____
Signature                        Signature

JAcK Hell                        Aaron Wade
_____                  _____
Name                             Name

Associate                        Senior vice President
Corporate Secretary
_____                  _____
Title                            Title


FEDERAL HOME LOAN MORTGAGE CORPORATION:

ATTEST: Amy Odiorne  By: Pam Williams
Amy Odiorne                      Pam Williams
Risk Analyst                     Director, Counterparty Credit Risk Management


_____
[8] Insert complete legal names and titles; signatures must be attested by a duly authorized officer.

Exhibit 9

12-05-09    REG LETTERWRITER_ACCOUNT FOR 3 MONTH    PAGE144,544

```
LOAN= 1009111244    DATE=11-03 USER=CPI KEY=XC099 VERS=049 TITLE=LOSS MIT SOLICIT/PAYTECH (REG) lc FORM=    PRINTER=JISY SECURITY=2
LINES-PER-PAGE=NO CONDITIONS=1
  668/1009111244/XC099/1/2/0000000000000
```

November 02, 2009

James B McDonald
14840 119th Pl NE
Kirkland WA 98034

RE: Loan No  1009111244

In reviewing our records, we have determined that you have fallen behind
on your mortgage payments.  Financial distress can happen to anyone and
Indymac Mortgage Services, a division of OneWest Bank, FSB wants to
find a way to help you through this financial challenge. Our goal is to
help you maintain ownership of your property.

Depending upon your financial circumstances, there are several
alternatives that we can pursue in order to assist you in keeping you in
your home.

Based on information that you provide to us, we may be able to qualify
you for one of the following loss mitigation options:

*    Repayment Plan
If you now have sufficient income, this plan allows you to pay an
increased amount on a monthly basis toward the delinquency and
eventually catch up.  You must be willing to sign a Repayment Plan
agreement and will be subject to foreclosure if the plan is broken.

*    Loan Modification
Your loan may be modified to re-amortize the unpaid principal balance
over the remaining loan term, capitalize past due payments, or in some
instances, reduce the interest rate.

*    Pre-Foreclosure Sale or Short Payoff
If you would consider selling your property but do not feel there
would be enough to pay off the loan in full, we still may be able to
work with you by accepting less than what you owe.  This is not a choice
for people who want to stay in their home, and can afford to do so.  If
we agree to take a loss by accepting a short payoff, you may be required
to pay some or all of the loss with a low or no interest loan.e required

LOAN= 1009111244    DATE=11-03 USER=CPI KEY=XC099 VERS=049 TITLE=LOSS MIT SOLICIT/PAYTECH (REG) 1c FORM=      PRINTER=JISY SECURITY=2
LINES-PER-PAGE=NO CONDITIONS=1

*   Deed in Lieu of Foreclosure
If you cannot afford to continue payments and are unable to sell the
property, we may be able to accept the deed to your property instead of
foreclosure, and reduce the negative impact to your credit.  This may
not be feasible if there are junior liens or other encumbrances that
would prevent us from obtaining clear title.

Help us in helping you by calling an Indymac representative today at
1-866-706-8647.

Additionally, you may also contact a HUD-approved housing counseling
agency toll-free at 1-800-569-4287 or TDD 1-800-877-8339 for the housing
counseling agency nearest you.  These services are usually free of
charge.

It is important to meet this financial challenge head on. You have more
alternatives and are less likely to lose your home if we work together
now.  Please contact us immediately and work with us to see if we can
set up a program to bring your payments up to date.

Para ciertos prestamos que atendemos somos requeridos por la ley
federal a informar a los prestatarios que este es una tentativa
de colectar una dueda y cualquier informacion obtenida sera
utilizada para ese proposito. Si usted tiene cualquier pregunta
con respecto a esta carta, por favor nos contacta en
877-908-4357.


Sincerely,


IndyMac Mortgage Services, a division of OneWest Bank, FSB

Loan Resolution
_____

(This company is a debt collector. We are attempting to collect a debt
and any information obtained will be used for that purpose. However, if
your debt has been discharged pursuant to the Bankruptcy laws of the
United States, this communication is intended solely for informational
purpose.)ates, this communication is intended solely for informational

12-05-09

MSP LETTERWRITER ACTIVITY FOR MONTH OF 12-09

LOAN= 1009111244   DATE=11-17 USER=CPI KEY=XC410 VERS=019 TITLE=Project Lifeline         1c FORM=       PRINTER=JISY SECURITY=2
LINES-PER-PAGE=NO CONDITIONS=4
 668/1009111244/XC410/1/2/0000000000000


November 16, 2009



James B McDonald
14840 119th Pl NE
Kirkland WA 98034




Re:  Project Lifeline

Dear IndyMac Customer:

You have fallen behind on your mortgage payments and IndyMac Mortgage
Services, a division of OneWest Bank, FSB wants to find a way to help.
There are several options that we can pursue to keep you in your home.

IndyMac Mortgage Services, a division of OneWest Bank, FSB has
partnered with HOPE NOW\s Project Lifeline, to assist our customers who
are at risk of foreclosure and help them stay in their homes. Through
Project Lifeline, IndyMac Mortgage Services may be able to temporarily
suspend the foreclosure process for 30 days while your mortgage loan is
renegotiated or refinanced.

To take advantage of Project Lifeline, please contact IndyMac Mortgage
Services, a division of OneWest Bank, FSB at 1-877-908-4357 or the
Homeowner\s HOPE Hotline at 1-888-995-HOPE immediately.  When you call
please advise the Loan Counselor that you received a Project Lifeline
letter and are interested in exploring the available options to stay in
your home.

The Loan Counselor will ask you for your monthly household income and
expenses. This will help IndyMac Mortgage Services understand your current
financial situation and allow us to find a solution that is best suited
for your situation.

Please contact us today and speak to a Loan Counselor. By contacting us,
any pending foreclosure process may be temporarily stopped for up to 30
days while we review your situation and prepare a plan to keep you in
your home. We cannot help you, unless we hear from you. Our Loan
Counselors are available to assist you Monday through Friday, 8:00 am
until 9:00 pm Eastern Standard Time at 1-877-908-4357.

Additionally, you may also contact a HUD-approved housing counseling
agency toll-fee at 1-800-569-4287 or TDD 1-800-877-8339 for the housing
counseling agency nearest you. These services are usually free of
charge.ing agency nearest you. These services are usually free of

12-05-09

MSF LETTERWRITER ACTIVITY FOR MONTH OF 11-09

LOAN= 1009111244   DATE=11-17 USER=CPI KEY=XC410 VERS=019 TITLE=Project Lifeline         1c FORM=        PRINTER=JISY SECURITY=2
LINES-PER-PAGE=NO CONDITIONS=4


Para ciertos prestamos que atendemos somos requeridos por la ley federal
a informar a los prestatarios que este es una tentativa de colectar
una dueda y cualquier informacion obtenida sera utilizada para ese
proposito. Si usted tiene cualquier pregunta con respecto a esta carta,
por favor nos contacta en 877-908-4357.



Sincerely,
IndyMac Mortgage Services, a division of OneWest Bank, FSB
Home Loan Servicing

This company is a debt collector. We are attempting to collect a debt
and any information obtained will be used for that purpose.  However, if
your debt has been discharged pursuant to the Bankruptcy laws of the
United States, this communication is intended solely for informational
purposes.


XC410 019 CPI

Exhibit 11

d.

After Recording Return to:
OneWest Bank FSB
888 East Walnut Street
Pasadena, CA 91101

```
20100204000502      14.00
TITLE COURT SE ADT
PAGE-001 OF 001
02/04/2010 12:13
KING COUNTY, WA
```

7523.21352/McDONALD, JAMES B.

## Assignment of Deed of Trust

For Value Received, the undersigned as Beneficiary, hereby grants, conveys, assigns and transfers to **OneWest Bank, FSB**, whose address is 888 East Walnut Street, Pasadena, CA 91101, all beneficial interest under that certain deed of trust, dated 01/08/07, executed by James B. McDonald, a single man, Grantors, to Pacific Northwest Title Insurance Co., Inc., Trustee, and recorded on 01/10/07, under Auditor's File No. 20070110002077, records of King County, Washington.

Together with note or notes therein described or referred to, the money due and to become due thereon, with interest, and all rights accrued or to accrue under said Deed of Trust.

Dated _January 27_, 20_10_

**Mortgage Electronic Registration Systems, Inc. "MERS"**

By: _____
Title: __Brian Burnett_____ __Assistant Vice President__

STATE OF ___Texas___ )
                       ) ss.
COUNTY OF ___Travis___ )

I certify that I know or have satisfactory evidence that ___Brian Burnett___ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the __Assistant Vice President__ of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. "MERS" to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: _Jan. 27, 2010_

_____
NOTARY PUBLIC in and for the State of ___Texas___
Residing at ___Travis___
My commission expires ___11/10/10___

ALEX MCBRIDE
Notary Public, State of Texas
My Commission Expires
November 10, 2010

# Exhibit 12

After Recording Return to:
Vonnie McElligott
Northwest Trustee Services, Inc.
P.O. Box 997
Bellevue, WA 98009-0997



**201002040000503**
TITLE COURT SE AST          14.00
PAGE-001 OF 001
02/04/2010 12:13
KING COUNTY, WA

## Appointment of Successor Trustee

File No. 7523.21352

James B. McDonald, a single man is/are the grantor(s), Pacific Northwest Title Insurance Co., Inc. is the trustee and Mortgage Electronic Registration Systems, Inc. "MERS" is the beneficiary under that certain deed of trust dated 01/08/07 and recorded on 01/10/07 under King County, Washington Auditor's File No. 20070110002077.

The present beneficiary under said deed of trust appoints Northwest Trustee Services, Inc., a Washington corporation, whose address is P.O. Box 997, Bellevue, WA 98009-0997, as successor trustee under the deed of trust with all powers of the original trustee.

The undersigned present beneficiary warrants and represents that, as of the date this Appointment of Successor Trustee has been executed and acknowledged, it is the owner and holder of the obligation secured by the subject deed of trust and is not holding the same as security for a different obligation.

OneWest Bank, FSB

By _____
         Suchan Murray
         Authorized Signatory

STATE OF _____Texas_____ )
                              )ss
COUNTY OF _____Travis_____ )

I certify that I know or have satisfactory evidence that _____Suchan Murray_____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the _____Authorized Signatory_____ of ONEWEST BANK, FSB to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: __01/27/10__

_____
Notary Public in and for the State of _____Texas_____
Residing at _____Travis_____
My appointment expires _____

Anna Elizabeth Ramsey
Notary Public,
State of Texas
Comm. Exp. 12-15-13