```
                    UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

JAMES MCDONALD,                   )
                                  )
                 Plaintiff,       ) CASE NO. C10-1952RSL
                                  )
v.                                ) SEATTLE, WASHINGTON
                                  ) January 31, 2013
ONEWEST BANK, FSB; NORTHWEST      )
TRUSTEE SERVICES, INC.;           ) EVIDENTIARY HEARING
MORTGAGE ELECTRONIC               )
REGISTRATION SYSTEMS, INC.;       )
INDYMAC BANK FSB; DOES 1-50,      )
                                  )
                 Defendants.      )
                                  )
_____

                  VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE ROBERT S. LASNIK
                 UNITED STATES DISTRICT JUDGE
_____


APPEARANCES:

 For the Plaintiff:     HA THU DAO



 For the Defendants:    JULIE R. VACURA
                        HEIDI BUCK MORRISON
                        CHARLES ELLIOT KATZ
                        JOSEPH D. MUELLER



 Reported by:           NANCY L. BAUER, CCR, RPR
                        Federal Court Reporter
                        700 Stewart Street, Suite 17205
                        Seattle, WA 98101
                        (206) 370-8506
                        nancy_bauer@wawd.uscourts.gov
```

EXAMINATION INDEX

| EXAMINATION OF | | PAGE |
|---|---|---|
| CHARLES BOYLE | DIRECT EXAMINATION BY MS. VACURA | 4 |
| | CROSS-EXAMINATION BY MS. DAO | 35 |
| CHRISTOPHER CORCORAN | DIRECT EXAMINATION BY MS. VACURA | 57 |
| | CROSS-EXAMINATION BY MS. DAO | 67 |
| CHARLES BOYLE | CROSS-EXAMINATION CONTINUED BY MS. DAO | 74 |


EXHIBIT INDEX

| EXHIBITS ADMITTED | PAGE |
|---|---|
| 1 | 83 |
| 2 | 83 |
| A-1 THROUGH A-16 | 86 |

```
1    JANUARY 31, 2013                              9:00 A.M.
                          PROCEEDINGS
2    ─────────────────────────────────────────────────────

3            THE CLERK:  C10-1952L, James McDonald v. OneWest

4    Bank, et al.

5       Counsel, please make your appearances for the record.

6            MS. DAO:  Ha Dao on behalf of James McDonald, who is

7    present with me, Your Honor.

8            MR. KATZ:  Charles Katz, co-counsel for Northwest

9    Trustee Services.

10           MS. BUCK MORRISON:  Heidi Buck Morrison for OneWest

11   Bank and Northwest Trustee Services.

12           MR. MUELLER:  Joseph Mueller, counsel for OneWest and

13   MERS.

14           MS. VACURA:  Julie Vacura, Your Honor, counsel for

15   OneWest Bank and MERS, and we have Mr. Boyle with us from

16   OneWest Bank.

17           THE COURT:  Thank you.  So what I want to do is take

18   the testimony, and let's get right to it, and then I know

19   there are some issues about protective orders and timing and

20   things like that.  But we have people who I want to hear from

21   that we're going to do first and foremost, and, certainly

22   Mr. Boyle, and then on the phone we have Mr. Corcoran, and

23   I'm not sure where we go from there.  There were a couple who

24   may testify as witnesses.  I don't want to have Ms. Morrison

25   testify as a witness.  She's an officer of the court, and she
```

1  can make representations to me.  But Mr. Boyle and

2  Mr. Corcoran are the main people.  And then I don't know if

3  there is a need to hear from the other OneWest Bank

4  employees.  We'll worry about that later.

5       So which -- are we going to do Mr. Boyle first?

6            MS. VACURA:  Yes, Your Honor.

7            THE COURT:  Okay.  And that's your witness?

8            MS. VACURA:  Yes, it is, Your Honor.

9            THE COURT:  Great.  All right.  You can call Mr.

10  Boyle to the witness stand, and we'll swear him in.

11       Mr. Boyle, if you'll come forward, my clerk will

12  administer the oath to you.

13  CHARLES BOYLE,            HAVING BEEN FIRST DULY SWORN,
                             TESTIFIED AS FOLLOWS:
14

15            THE CLERK:  Please state your full name for the

16  record, and spell your last name for the court reporter.

17            THE WITNESS:  Charles John Boyle, B-o-y-l-e.

18            THE COURT:  You may inquire.

19            MS. VACURA:  Thank you, Your Honor.

20                         DIRECT EXAMINATION

21  BY MS. VACURA:

22  Q   Mr. Boyle, will you please tell the court what you do for

23  a living?

24  A   Yes.  I'm a vice president of our default risk management

25  and litigation department for OneWest Bank.

1   Q    And what does that job entail?

2   A    As part of my duties, I manage a team of litigation

3   specialists, managers, supervisors, team leads, as well as

4   manage litigation, help with litigation strategies, obviously

5   signing documents, reviewing documents and files in general.

6   Q    How long have you been with OneWest?

7   A    I've been with OneWest since its inception, March 19th,

8   2009.

9   Q    What did you do prior to your time at OneWest?

10  A    Prior to OneWest, I worked with IndyMac Federal Bank from

11  July 11th of 2008 through March of 2009.  Prior to that I

12  worked with IndyMac, Inc. from July of 2001 through the

13  takeover by the FDIC.

14  Q    Could you please quickly tell the court, not in any great

15  detail, what your jobs were when you were at IndyMac Bank and

16  its predecessor?

17  A    When I was with IndyMac Bank, I first began as a temporary

18  financing clerk for a couple of months, and then I became a

19  full-time employee in the bankruptcy department.  I worked as

20  a bankruptcy specialist for a few years, and then I was

21  promoted to a special assets specialist and analyst dealing

22  with a lot of the bankruptcy adversary matters, and

23  bankruptcy cash issues.

24       I then was moved over to the contested foreclosure title

25  resolution and special assets group.  I then became a

1  supervisor of that group and assumed other duties such as

2  foreclosure referral review, as well as --

3  Q    What is that?

4  A    That was reviewing files that were to be referred to

5  foreclosure to ensure that they were properly being referred

6  by our vendor.

7       I would then -- I was then transferred to Austin, Texas --

8  this was in Pasadena, California.  I was transferred to

9  Austin, Texas, in 2007, and became a manager of the default

10  risk management litigation group, and then was the manager up

11  until July of 2008.

12  Q    And that's when -- what happened in July of 2008?

13  A    In July of 2008, I was in the OTS, in the FDIC's IndyMac

14  bank, and created IndyMac Federal Bank.

15  Q    All right.  And so did your job duties remain essentially

16  the same through the transition of the takeover and then the

17  sale of IndyMac Bank?

18  A    The sale of IndyMac Federal Bank?

19  Q    Yes.

20  A    Essentially -- I mean, there was different, you know,

21  reporting requirements for the FDIC and stuff, but generally

22  it was pretty much the same.

23  Q    Tell the court, please, in terms of your servicing

24  systems, your servicing platform, did much of that change

25  between IndyMac Bank, IndyMac Federal Bank, and OneWest Bank?

A    Many of the services platforms were, you know, I think maintained to allow for further continuity of the servicing of the loans.  Obviously, the names were changed within the applications.  You know, significant upgrades were made, but pretty much -- the standard platforms pretty much remained the same.

Q    And are you familiar with the various applications and servicing reports that come from those applications?

A    Yes.

Q    And how is it that you're familiar with them?

A    Just in my everyday course of business, you know, I have to review -- when I'm reviewing documents, or if I'm reviewing a file, I will have to look at the servicing applications to ensure -- you know, to do research, to verify facts and verify statements.

Q    What are the databases or platforms that you access most often in order to do your job?

A    There are several, but mainly I think I accessed our MSP, which is --

Q    What does that mean?

A    I believe it stands for Mortgage Servicing Platform.  It is basically our main system of record where we record many of our servicing activities.

     I also occasionally will use Web Extender, which is our images repository.  I also use our litigation database quite

1   often, as well as, you know, emails, and in certain cases, I

2   will have to go into other applications, like AllRegs, which

3   is the application I'll go to look at GSE standard servicing

4   issues -- or servicing guidelines.

5   Q    What is GSE?

6   A    Oh, sorry.  Government Sponsored Entity.

7   Q    Do you have on your system agreements with, for example,

8   Freddie Mac for servicing loans?

9   A    Well, I can access those through the Internet very easily.

10   Q    And so are most of the agreements that one -- if not all

11   of the agreements with Freddie Mac at OneWest Bank -- needs

12   to refer to on the Internet?

13   A    Yes, most of the servicing are on AllRegs.

14   Q    Can you give the court a feel for how many pages might be

15   encompassed in those servicing guidelines?

16   A    I'd hate to venture a guess, but I would say several

17   hundreds.

18   Q    All right.  Do you refer to them?

19   A    Yeah, often.

20   Q    Are there other kinds of guidelines or agreements online

21   that you, in your job, access?

22   A    Yeah.  We have the master purchase agreement, the loan

23   sale agreement, the servicing business asset purchasing

24   agreement.  Those are the documents that were really the main

25   documents that effectuated the sale of OneWest -- of the

1    assets held by the FDIC that were sold to OneWest Bank.

2    Q   All right.  And just, generally, if you could tell the

3    court, were the servicing rights that IndyMac Bank had sold

4    the OneWest Bank?

5    A   Generally, yes, there were assets.

6    Q   Were there other -- were there actual loans sold to

7    OneWest Bank by the FDIC from IndyMac?

8    A   Yes.

9    Q   All right.  So does OneWest Bank both own some loans and

10   service other loans?

11   A   Yes.

12   Q   You, in this case, Mr. Boyle, that you're here to testify

13   about today, signed some declarations, correct?

14   A   Correct.

15   Q   Do you have in front of you a binder that says at the

16   front, "Declarations of Charles Boyle"?

17   A   I do.

18        MS. VACURA:  Your Honor, I'm going to refer to docket

19   numbers, and I can either provide a notebook similar to what

20   Mr. Boyle has --

21        THE COURT:  I'll take the notebook.  Thank you.

22        MS. VACURA:  All right.

23   Q   (By Ms. Vacura)  In your binder, it's tabbed, and there's

24   a document at the top.  It says, "Document No. 49-3," and it

25   is at Tab No. 2.  If you could refer to that, please.

1   A    Okay.

2   Q    All right.  Do you know, Mr. Boyle, the term "30(b)(6)

3   witness"?

4   A    Yes, I do.

5   Q    How do you know that term?

6   A    I've been designated as a 30(b)(6) witness in other cases.

7   Generally, I understand it to mean that I am the person most

8   knowledgeable about the case.

9   Q    So can you give the court more detail about what your

10  understanding is when you are acting -- what it means to act

11  as a 30(b)(6) witness for your business, OneWest Bank?

12  A    Basically, I'm going to be the one that will verify

13  certain information, will be the person to, you know, review

14  the file and make sure that I understand everything that's

15  going on in it, and to verify facts and statements.

16  Q    Do you know everything about everything at OneWest Bank?

17  A    I would like to think that I did, but I don't.

18  Q    All right.  Do you, in signing -- and now I want to talk

19  just generally about a declaration that you might sign on

20  behalf of OneWest Bank as a 30(b)(6) witness.

21       Generally, when you are asked to sign a declaration,

22  do you find you ever have to go elsewhere to verify

23  information in declarations?

24  A    Yes.

25  Q    And do you find sometimes that you need to actually get

1   educated about some aspect of the business from someone else?

2   A   Yes.

3   Q   And do you do that when you need to sign a declaration

4   that has a statement in it that you're not really sure is

5   accurate?

6   A   Yes, I do.

7   Q   All right.  You have in this declaration, at page 2, a

8   statement that says that, "Mr. McDonald, in order to secure

9   repayment" -- this is paragraph 2 -- "in order to secure

10  repayment of the promissory note in the amount of $389,481.60

11  executed a deed of trust," and you say that true and correct

12  copies are attached.

13       How do you know that the deed of trust that's attached

14  is a true and correct copy of Mr. McDonald's deed of trust?

15  A   Well, when I'm reviewing the declaration, I will ensure

16  that, you know, this is -- I know because this is a business

17  record that we keep in our normal course of everyday

18  activities.

19      I will actually go and look at the deed of trust and the

20  note.  I'll verify that, you know, the dates are correct, the

21  names are correct.  If there's recording information, I'll

22  verify that.

23  Q   And, Mr. Boyle, do you recall, as you're sitting here

24  today, what bank database you would go to to find this deed

25  of trust?

1   A    There would be several places I could find this

2   information.  In this specific case, I don't know where

3   exactly.  It could be located in my litigation file.  Often

4   they're located in our imaging system, Web Extender.  I could

5   also contact -- you know, look at county information if I

6   need to, or contact our custodian.

7   Q    Do you know who is your custodian for this particular

8   loan?

9   A    I believe it's Deutsche National Bank.

10  Q    You also say in this declaration that, "After origination,

11  IndyMac Bank sold plaintiff's note to Freddie Mac," and that

12  "IndyMac Bank retained the servicing rights and serviced the

13  loan on behalf of Freddie Mac."  You also say, "Freddie Mac

14  remains the investor and owner of the note."  How did you

15  know all that?

16  A    Well, again, there's several places I could look in the

17  servicing system.  You know, I believe the -- if I can just

18  look at the deed of trust.

19       MS. VACURA:  May the witness have A-15?  It's a

20  separate binder.

21       THE WITNESS:  Thank you.

22  A    As to origination, I believe the deed of trust would have

23  said that IndyMac originated it.  I'd have to look at it.

24  Q    (By Ms. Vacura)  Please take a look at Tab 2 in A-15.

25       MS. DAO:  Your Honor, we would object to this

1    particular document that counsel is referring to, because it

2    was not ever disclosed to us until very late.

3             THE COURT:  I understand your objection.  For

4    purposes of the evidentiary hearing, I'm going to allow it.

5             MS. VACURA:  Your Honor, I'd like to clarify that

6    this document was actually produced to Mr. McDonald on

7    June 27, 2011.  There is an email at the front of Tab 2 that

8    shows this document was transferred to Mr. McDonald on that

9    date.

10   Q   (By Ms. Vacura)  Mr. Boyle, could you explain to the court

11   what this document is?

12   A   Yes.  This is a screenshot -- the first page is the

13   screenshot of the MSP system that I discussed earlier.  It's

14   the DLQ1 screen, and it has various information about the

15   loan.

16   Q   What does DLQ1 mean?

17   A   I believe it's just the delinquent -- it's a Delinquent 1

18   screen.

19   Q   Meaning that this loan is delinquent?

20   A   Correct.

21   Q   All right.

22            Now, at the bottom of this, it says, Investor header

23   info."  Do you see that?

24   A   Yes, I do.

25   Q   Tell the court what that means.

1   A    That just identifies to me who the investor of the loan

2   is.

3   Q    And it has who as the investor?

4   A    Federal Home Loan Mortgage Company, often referred to as

5   Freddie Mac.

6   Q    And it says, "Sale date:  2/07."  What does that mean?

7   A    To me that indicates that in February of 2007, that is

8   when the loan was sold to Freddie Mac.

9   Q    And it has below that, "Loan date."  What does that mean?

10  A    Generally, that's the date the loan was originated.

11  Q    All right.  Now, how do you know that -- by looking at

12  this or otherwise, how do you know that it was IndyMac that

13  sold this loan to Freddie Mac in February of 2007?

14  A    You know, obviously, I could also look at what we call the

15  MERS milestones, which would let me know what were the

16  different transfers and sale of the asset, including

17  beneficial rights as well as servicing rights.

18  Q    And if you could please go to the fourth-to-the-last page

19  of this Tab 2.  It says, "Milestones."  Do you see that?

20  A    Yes, I do.

21  Q    Is this the document that you were just referring to?

22  A    Yes.

23  Q    And where does this document come from?

24  A    This can be obtained from the MERS -- I believe from the

25  MERS website.

1    Q    And how do you gain access to the MERS website?

2    A    You have to have a login and a password.

3    Q    All right.  Does OneWest have a login and password?

4    A    Yes.

5    Q    All right.  Tell the court what this document reflects

6    about Mr. McDonald's loan.

7    A    Well, at the -- the way you read it, it's the most current

8    activity is listed at the top.

9    Q    Let's go to the bottom.

10   A    At the bottom of the sheet, it states that it was

11   registered with MERS, the servicer at the time.  Now, it says

12   FDIC is receiver for IndyMac Federal Bank, and the reason it

13   states that is because the FDIC just assumes IndyMac Bank's

14   registration number, and when they went and updated the

15   system, it updated every IndyMac Bank entry with the FDIC

16   IndyMac Federal Bank.

17   Q    All right.

18   A    But that's when -- to me it would be the date of -- around

19   the origination date.

20   Q    The origination date of what?

21   A    Of the loan.

22   Q    All right.

23   A    The second line would indicate --

24   Q    I'm sorry.  Back up.

25   A    Sorry.

1   Q    Let me get you over to the last column, and it says, "MIN

2   status:  Active," "Servicer:  FDIC as receiver for IndyMac."

3   What does that mean?

4   A    That means IndyMac Bank was the servicer.

5   Q    In January --

6   A    Of --

7   Q    January of 2007?

8   A    Correct.

9   Q    All right.  Go ahead and tell the court what the next

10  entry up means.

11  A    The next entry identifies, basically, the sale of the

12  asset to Freddie Mac Bank.  It's -- the description is

13  entitled, "Transfer of beneficial rights Option 1," and as

14  you'll see, it says, "New Investor" -- in the far-hand

15  column, "New investor, Federal Home Loan Mortgage

16  Corporation."  Old investor, FDIC is receiver for IndyMac

17  Federal Bank, and then it has the transfer date of February

18  of 2007.

19  Q    Do you know, does OneWest Bank have an original or even a

20  copy of a document wherein IndyMac says, Freddie Mac, I'm

21  selling you Mr. McDonald's loan?

22  A    I don't believe so.  I believe all those documents are in

23  the possession of the FDIC.

24  Q    Has OneWest done a search of its own records to determine

25  whether it's in its own records?

A    Yes, I believe we have.

Q    Now, if you look up at the next entry of which is dated March 29, 2009, can you tell the court what this entry is telling us?

A    This entry is telling us that the servicing rights have been transferred and were sold to OneWest Bank from the FDIC.

Q    And is that information contained in the third column?

A    Yes, that's correct.

Q    All right.  And it says, "New servicer, OneWest Bank," right?

A    Correct.

Q    Okay.

      The next entry is dated January 27, 2010.  Can you tell the bank (sic) what that says?

A    Generally, it says it's a foreclosure status update, and it just states that the foreclosure is pending.

Q    Of Mr. McDonald's property?

A    Yes, this would be...

Q    All right.  Let me have you go back to the DLQ1, which is the document we were looking at initially, which is the second page of Tab 2.

A    Okay.

Q    Are you there?

A    Yes.

Q    Tell the court how this information that is at the bottom

1   that says "Investor header info," tell the court how this

2   information gets entered into the DLQ1, if you know.

3   A    The DLQ1 is a screenshot, so when you go to -- the DLQ1

4   screen is a general screen.  You see there is a line right

5   next to the loan number.  In that line you would put in INVE,

6   and that will show you each investor header information.

7   Q    Do you know how that information gets populated into the

8   DLQ1, if you know?

9   A    No.

10  Q    Does it come from another database?

11  A    I believe so.  I'm not...

12  Q    Let me ask you this:  Do you find in conducting your

13  business and doing your job on behalf of OneWest Bank that

14  the information that you find in the DLQ1 is generally

15  reliable?

16  A    Yes.

17  Q    And I want to ask you that same question about the MERS

18  milestone.  Do you use the MERS milestone to gather

19  information about the various cases?

20  A    Yes.

21  Q    And do you find, in your experience doing the work that

22  you do for OneWest Bank, that the MERS milestone information

23  is generally reliable?

24  A    Yes.

25  Q    I'd like to take you back to your declaration.  Paragraph

1   4 of your declaration, it says IndyMac Bank was closed by the

2   Office of Thrift Supervision in July of 2008, and the FDIC

3   was appointed receiver, and you attached a true and correct

4   copy of the order.

5       How do you know that IndyMac Bank was closed and the

6   FDIC was appointed receiver?

7   A   The order -- I would have looked at the order that was

8   attached, but I was actually present during the seizure, so.

9   Q   Were you physically present in the office?

10  A   I was physically present in one of IndyMac Bank's offices,

11  yes.

12  Q   And you understood what was going on when the Office of

13  Thrift Supervision took over?

14  A   Yes.

15  Q   Your next paragraph is that IndyMac Bank was created --

16  or -- yes, IndyMac Federal Bank was created by the FDIC, and

17  the FDIC was appointed conservator.  How do you know that?

18  A   Again, I was there at this time.  We were told, you know,

19  the FDIC was going to come in.  They were going to be the

20  new, basically, management -- management entity, and that we

21  were all now employees of IndyMac Federal Bank.

22  Q   Okay.  If you would look at your declaration.  There's

23  three footnotes at the bottom, and these footnotes are

24  directing the reader of your declaration to websites.

25      Do you go to these websites and look at these documents

1  that are reflected in these footnotes?

2  A   Yes, I have.

3  Q   And for what purpose?

4  A   Well, I mean, just to verify that, you know, the

5  information that we're providing is the information that's

6  there.

7  Q   Does OneWest rely on the information at those websites to

8  know what its responsibilities are as the servicer?

9  A   Generally, yes.

10 Q   Can you tell the court specifically which document it

11 would look at to know what its rights and obligations are as

12 a servicer?

13 A   I would say the master purchase agreement is the operative

14 document.

15 Q   And that's online?

16 A   Yes.

17 Q   In paragraph 6 of your declaration, you say that on March

18 19th, 2009, the FDIC was appointed as receiver for IndyMac

19 Federal Bank and sold most of the assets, including the

20 rights to service the loan presently at issue, to OneWest

21 Bank FSD.  How do you know that the servicing rights for this

22 loan were sold to OneWest Bank?

23 A   Again, you know, the loan is active on our system.  When I

24 became an employee at OneWest Bank, if a loan was not sold by

25 the FDIC, it would not have been something that would have

1    been in our inventory, or at least it would have been flagged

2    as to being service released to another entity.

3    Q    I'm going to ask you to look at Exhibit A-15 again.  You

4    should have an exhibit book in front of you.  If you could

5    look at Defense Exhibit A-5.  Do you have that in front of

6    you?

7    A    I do.

8    Q    Can you tell the court what this is?

9    A    Yes.  This is a line entry from one of the schedules that

10   was identified as mortgage loans in the servicing business

11   asset purchase agreement.

12   Q    And what loan does it identify?

13   A    It identifies Loan No. 1009111244, with the property

14   address being, I believe, 14840-119th Place Northeast,

15   Kirkland, Washington 98034, and then it has various loan

16   information.

17   Q    Is that Mr. McDonald's loan?

18   A    Yes.

19   Q    So Mr. McDonald's loan was attached to a schedule, or was

20   part of a schedule that was attached to the agreement that

21   sold servicing rights to OneWest Bank?

22   A    Correct.

23   Q    All right.  Now, tell the court, is this -- what is this?

24   Is this -- is there a single page for each and every loan in

25   the attachment?

1    A    No.  This is a redacted version.  There is -- the file is

2    very large.  It contains thousands and thousands of loans,

3    and they have, you know, personal identifying information of

4    other borrowers.  So often when we create, you know, these

5    documents for litigation, we'll just provide the single line

6    with the headers.

7    Q    All right.  Now, you spent some time yesterday in

8    preparation for testifying before the court today.  You spent

9    some time with documents, yes?

10   A    Correct.

11   Q    Okay.  And did you look at this document?

12   A    I did.

13   Q    And did you look at the header?

14   A    I did.

15   Q    Is it correct?

16   A    No.  Actually, it looks as if there might have been a

17   slight typo.

18   Q    Well, it's an error in what schedule it refers to, right?

19   A    Correct.

20   Q    All right.  What schedule should it refer to?

21   A    It should refer to 1.01A.

22   Q    All right.  So whoever put this together, this excerpt

23   from this schedule, one-point -- I'm sorry.  Say it again?

24   A    1.01A.

25   Q    Just put the wrong header?

A    Yeah.

Q    Did we -- did we ever figure out who at OneWest Bank put this together?

A    We tried.  You know, I asked the litigation specialist that was handling this case, even talked to one of the counsel -- to both counsels that were handling it, and just it wasn't -- we couldn't confirm how -- how the error occurred.

Q    Did you bring the entire schedule with you today?

A    I did.

Q    And can you tell the court how many pages it is, approximately?

A    Well, originally there's nine tabs that, again, contain several thousand loans on each tab.  So we brought the tab that -- or I brought the tab that had contained this loan along with the various other loans.

Q    And is it on your laptop computer?

A    Yeah.  It is something that I can access on my computer, but I did send it to my counsel, to Heidi.

Q    The tab in --

A    In its entirety.

Q    All right.  And we didn't print it out?

A    No.

Q    Please go to Tab 15 in Exhibit 15-A, which is that notebook, and let me know when you're there.

1    A    Tab 15?

2              MS. DAO:  I don't have that.

3              MS. VACURA:  I'm sorry.  Let me get you one.

4    Q    (By Ms. Vacura)  It's a separate notebook.  Tab 15 in that

5    notebook, and if you'd look at the last page of that tab.

6    A    Oh.

7    Q    Is this the same document we've been discussing?

8    A    Yes.

9    Q    All right.  And if you could please look at the first page

10   of this Tab 15, which is a pleading, defendant OneWest and

11   others' second supplemental response to plaintiff's first

12   request for production of documents.  If you could go to the

13   party's certification that's attached to this pleading.  Do

14   you see it?

15   A    Yes.  Is it dated the 1st of May?

16   Q    Yes.  Is that your certification?

17   A    Yes.

18   Q    All right.  And it's dated May 1st of 2012?

19   A    Correct.

20   Q    All right.  Thank you.

21              Mr. Boyle, I want to take you back to your declaration,

22   please.  Do you have that in front of you?

23   A    I do.

24   Q    It says in paragraph 10 -- paragraph 9, "OneWest has been

25   in possession of the note and therefore the holder since on

1    or about March 19, 2009."  Do you see that?

2    A    I do.

3    Q    And how do you know that?

4    A    Because it's part of the transferring of the servicing

5    rights from the FDIC, there was also the rights to hold the

6    note by our custodian.  So I could have, on that date,

7    contacted Deutsche Bank and said, "I need a copy of the

8    original note, please send it to me," and they would have.

9    Q    All right.  In the same notebook that has your declaration

10   that you're looking at --

11   A    Uh-huh.

12   Q    -- if you would go to Tab 5, and it says Exhibit 7, that

13   first page of one, and then the second page says, "Servicing

14   business asset purchase agreement between FDIC and OneWest

15   Bank." Is this the document that you're referring to -- that

16   you just referred to?

17   A    Yes.

18   Q    And it's dated March 19, 2009?

19   A    Correct.

20   Q    All right.  Then paragraph 10 says, "On or about October

21   1, 2009, plaintiff defaulted by failing to make payment due

22   for October 1, 2009, and every payment thereafter due."

23        So in other words, the bank -- OneWest Bank has not

24   received a payment from McDonald since October 1 of 2009?

25   A    Correct.

1    Q    And that's still true today?

2    A    Correct.

3    Q    And how do you know that statement is accurate?

4    A    Because I would have actually gone to the DLQ1 screen to

5    verify when the next payment due date was, and I would have

6    looked at the payment history.

7    Q    And did you -- is that the -- again, if you refer to

8    Exhibit 15A, which is the notebook, Tab 2, is that

9    information that you just talked about reflected in that

10   DLQ1?

11   A    Yes, it is.

12   Q    Then you say, "On or about January 12, 2010, as an agent

13   for OneWest Bank, Northwest Trustee Services mailed and

14   posted a notice of default in response to plaintiff's

15   default."  Do you see that?

16   A    Yes, I do.

17   Q    Again, how do you know that's true?

18   A    Again, I would have looked at our servicing system.  I

19   would have looked at the notice of default.  And, you know,

20   once I looked at the notice of default, I would have

21   confirmed that Northwest Trustee Services was, in fact, the

22   agent of OneWest Bank, and, you know, by virtue of it, the

23   available -- I would assume it's mailed, because that is our

24   regular business practice, to generate these letters once

25   they're mailed.

1    Q    All right.

2    A    Or rely on our trustees to ensure that they're mailed.

3    Q    All right.  Do you have in front of you, Mr. Boyle,

4    defendant's exhibits, this little, skinny notebook?

5    A    Yes.

6    Q    If you could please look at Tab 9.

7    A    Okay.

8    Q    Does this reflect the information that you have in your

9    declaration?

10   A    Um...

11   Q    First of all, tell the court what this is.

12   A    This is a printout of our consolidated notes log.  It is

13   the notes log that is kept just in our -- again, in the

14   normal course of business.  Once, you know, customer service

15   or a foreclosure specialist or even our outside counsel

16   enters in information, it shows up on this log.  So that --

17   you know, the information is usually entered in, you know, at

18   the time, or it shows up at the time the information is

19   entered.

20   Q    All right.  And is that a document that you would go to to

21   gather information about a loan?

22   A    Yes.

23   Q    And did you use that document in this case at any point to

24   gather information about Mr. McDonald's loan in order to

25   attest to the facts that are in your declarations?

A    It's possible, yes.

Q    Then paragraph 12, you talk about MERS executing an
assignment of deed of trust, where it assigns its interest to
OneWest Bank.  Do you see that?

A    Yes.

Q    All right.  And you refer to Exhibit 10 to your
declaration, and you're talking about a true and correct copy
of that, right?

A    Correct.

Q    Where do you normally get your true and correct copies of
documents like this?

A    They -- again, they can be found in multiple places.  They
can be found in the imaging system.  It could be uploaded in
my litigation file, as well as we can go to the county
website and access it, if we needed to, or, generally, it
would be in the foreclosure servicing application as well.

Q    And do you generally find that if you're looking for
something like this on the imaging system or in the
litigation file, that it is a reliable document?

A    Yes.

Q    And that it, in fact, is a true and correct copy of the
original?

A    Yes.

Q    And are these business records that are kept by OneWest
for purposes of doing business like this?

1   A    Yes.

2   Q    I want to take you back for one moment to paragraph 11.

3   If you could look at Exhibit 9 to your declaration.  Are you

4   there?

5   A    Where is that located?

6   Q    It's right behind your declaration we're talking about.

7   Your declaration that we're talking about right now, behind

8   it in Exhibit 9.

9           THE COURT:  Tell him the tab.

10          MS. VACURA:  It's Tab 2.

11          THE COURT:  So Tab 2, and then behind your

12  declaration is something that says, "Exhibit 9."

13          MS. VACURA:  Yeah, and that's not accurate.

14          THE WITNESS:  Oh, okay.

15          MS. VACURA:  Sorry.  We'll come back to it.

16  Q   (By Ms. Vacura)  If you would please look at Exhibit 13.

17  It says Brian Burnett was an employee of OneWest.  Brian

18  Burnett also has authority granted by MERS to execute

19  documents on behalf of MERS, and a true and correct copy of

20  the MERS corporate resolution granting Burnett signing

21  authority is attached to defendant's motion as Exhibit 11.

22      How do you know that Brian Burnett is an employee of

23  OneWest Bank?

24  A    He was an employee of OneWest Bank.  I used to work with

25  Brian Burnett.

1   Q    And that's how you know?

2   A    Yes.

3   Q    And how do you know he had signing authority from MERS?

4   A    I knew that he often signed on behalf of MERS, and I --

5   previously I was a MERS signer, so I knew that in order to be

6   a MERS signer, you had to be certified, you know, by MERS

7   itself.

8   Q    All right.  Did you ever see a document with his --

9   authorizing him to act as an agent for MERS?

10  A    Yes.

11          THE COURT:  Counsel, I don't need to know every

12  source of every piece of information.  I think I understand

13  now where Mr. Boyle is getting his information from.  Let's

14  go to the actual physical possession and location of the

15  original note.

16          MS. VACURA:  All right.  That is, Your Honor, going

17  to be mostly testimony from Mr. Corcoran.

18          THE COURT:  Sure.  And I take it, then, that the

19  times that Mr. Boyle referred to "OneWest has the note," he

20  always meant to say, "through our agent Deutsche Bank."

21          MS. VACURA:  Yes, until a certain date when it was

22  physically sent to counsel for OneWest, and at that point

23  counsel for OneWest had the origin al note.

24      But, yes, up until that time, when at any point that

25  Mr. Boyle would have said in a declaration that it was

1   possessed by OneWest, it would have actually been in the

2   actual physical possession of Deutsche Bank.

3             THE COURT:  And then for purposes of the relationship

4   between Deutsche Bank and OneWest, in terms of authority or

5   agency or anything, do we have the documents that establish

6   the contractual relationship and the responsibilities in here

7   already?

8             MS. VACURA:  Yes, we do, Your Honor, and Mr. Corcoran

9   can speak to that.

10            THE COURT:  So then the only thing we really need to

11   get from Mr. Boyle from my order of December 6 was the

12   apparent contradiction between the lack of notice of the

13   dispute form from Experian and OneWest's file and what

14   Experian supposedly told the plaintiff?

15            MS. VACURA:  Yes.  Thank you, and we will go to that.

16   Q   (By Ms. Vacura)  Mr. Boyle, you signed a declaration, and

17   I'll direct you to it.  If you could look at Tab 9 of the

18   notebook that says, "Declarations of Charles Boyle."

19   A   Okay.

20   Q   In this declaration, you state that -- at paragraph 21,

21   the last page of the declaration, "To date, OneWest has not

22   received dispute resolution relating to plaintiff's loan from

23   Experian," correct?

24   A   Correct.

25   Q   And at the time you signed this declaration, why did you

1    say that?

2    A    Because at that time we didn't have an ACDV available.

3    The only ACDVs that we had available in our imaging system

4    were from the other two credit bureaus.  So at that time

5    there was just, you know -- I believe the litigation

6    specialist verified with our customer service group, and, you

7    know, asked if they could find the -- you know, an ACDV for

8    this actual -- from -- I'm sorry -- from Experian.

9    Q    Let's back up a minute, Mr. Boyle, and let's just give the

10   court, quickly and generally, an idea of how it is these

11   records are kept by OneWest.

12        So a complaint comes from a customer to the credit

13   bureau.  What does the credit bureau do with that complaint?

14   A    The credit bureau will then send it to the bank in an

15   electronic form as a complaint, or, like, a dispute form.

16   The customer service group is responsible for handling these

17   matters.  They will review the information and review the

18   dispute, verify certain information in the dispute, and, you

19   know, what the allegations are.

20        If they find that there is something that needs to be

21   corrected, they'll make a correction.  If there is no

22   correction, they say no corrections are needed, everything

23   was validated.

24        Generally, what they then will do is they print it out to

25   our imaging system, which, as it states, will create a draft

1   watermark, and then it's kept in our image repository system

2   for, you know, as long as -- the life of the loan.

3   Q    All right.  Go to Exhibit A, please, of your declaration,

4   and this at the top says, "TransUnion LLC," and it has a

5   date, and then it has a bunch of information in it.  Is this

6   the document that is returned to TransUnion?

7   A    I believe so, yes.

8   Q    And is this the document that you make a copy of on your

9   imaging system?

10  A    Correct.

11  Q    When you say you make a copy, are you talking about a

12  paper copy?

13  A    No.  It's just -- a print to PDF, so it's an electronic

14  copy.

15  Q    And it's saved on what system?

16  A    Our imaging system.

17  Q    And that's Web Ex?

18  A    Web Extender, yes.

19  Q    At the time you prepared this declaration, was there a

20  copy of a document like this one that says TransUnion at the

21  top, was there a copy of a similar document for Experian in

22  the Web Ex system?

23  A    No, there wasn't.

24  Q    All right.

25       Could you have said there is no document from Experian

1  in the Web Ex system in your declaration?

2  A    Yes, I could have.

3  Q    Now, you know that Mr. McDonald has since provided the

4  court with a response from Experian that reflects that, in

5  fact, Experian did send an ACDV to OneWest, yes?

6  A    Correct.

7  Q    All right.  What has OneWest done since the time

8  Mr. McDonald provided that to the court to determine whether

9  it got an ACDV from Experian?

10 A    Well, we contacted our customer service group that

11 manages -- that handles this process, and we asked them to

12 actually contact Experian to try and get a copy.  We tried on

13 multiple occasions, I believe three, to get a copy, but we

14 were being told that we couldn't obtain a copy.  In fact, a

15 lot of times they said it was company policy that they would

16 only provide it with a court order.

17 Q    All right.  And did anyone look back in the Web Extender

18 file for an electronic copy within OneWest's documents?

19 A    Yes.

20 Q    And was one found?

21 A    No.

22 Q    Have you come to any conclusion as to why that is?

23 A    We don't know.  I mean, it could have been -- it is a

24 manual process.  It could have just been human error.

25 Q    All right.

1      MS. VACURA:  And then, Your Honor, I think the other

2  question that you had in your order for an evidentiary

3  hearing related to the pulling of the credit report, and I

4  believe that the record reflects that it was pulled, and

5  counsel is going to address that issue.  So I don't believe

6  that he has any more to offer.

7      THE COURT:  Great.  I think that's enough testimony

8  from Mr. Boyle.

9      MS. VACURA:  All right.

10     THE COURT:  Was there anyone on the defense side that

11 had any additional questions for Mr. Boyle?

12     MR. KATZ:  No, Your Honor.

13     THE COURT:  Ms. Dao?

14     MS. DAO:  Thank you, Your Honor.

15                     CROSS-EXAMINATION

16 BY MS. DAO:

17 Q   Good morning, Mr. Boyle.  I'm going to go backward from

18 the most recent discussion that your counsel has asked you,

19 and then we'll go back.

20     But with regards to your testimony that you make a

21 statement in your declaration at the time, and then you found

22 out later that there was an error.

23     When you made the declaration, you swore under penalty

24 of perjury that you had personal knowledge, correct, of the

25 matters you're declaring?

```
 1    A    I just want to look at the declaration.
 2         I believe what I said is, "I declare under penalty of
 3    perjury that the foregoing is true and correct to the best of
 4    my knowledge."
 5    Q    Okay.  And your testimony is that you did not do the
 6    verification yourself?  Somebody else did in OneWest?
 7    A    I don't know.  I definitely looked at the ACDVs and
 8    confirmed the information that was in them.  I did not
 9    produce them.
10    Q    When did you ask Experian for a copy?
11    A    I don't recall offhand when we -- when the first
12    initiation with Experian was, but as recently as, I believe,
13    yesterday.
14    Q    As recently as yesterday?
15    A    Uh-huh.
16    Q    So we don't have anything that your counsel produced in
17    the discovery relating to the activities that you're
18    testifying to here today, especially with regards to
19    yesterday your checking to see whether you had a copy or not?
20    A    Well, I mean, I -- you know, I personally spoke with the
21    customer service representative.  I don't know what kind of
22    evidence we would produce to evidence that.
23    Q    Would there be any notes by the customer service
24    department as to any activities?
25    A    Possibly.
```

1   Q   Including your inquiry?

2   A   Possibly.

3   Q   But we don't have a record of that, is what I'm asking

4   you.

5   A   I don't believe so.

6   Q   Now, I want to go to the question of the pulling of

7   Mr. McDonald's credit.  Who decided to do that?

8          MS. VACURA:  Your Honor, I'm objecting to the extent

9   that this question is asking for attorney-client privileged

10  communications.  I think it's clear that counsel had the

11  credit report pulled.

12         THE COURT:  Well, we may be getting into some of that

13  area here, but there's certainly no waiver of the

14  attorney-client privilege if he just says, "My lawyer or

15  counsel asked me to do it."  Go ahead and answer.

16  A   I believe it was from the request of my attorney.

17  Q   (By Ms. Dao)  And at the time that you pulled the report,

18  did you have permission from Mr. McDonald?

19  A   Did we have specific authorization to pull his credit

20  report?  I don't believe so.

21  Q   Did you inform him before you pulled his credit?

22  A   I don't know.

23  Q   Did you, or did you not?

24         THE COURT:  Well, it's not really the issue that I

25  wanted the evidentiary hearing about, so I'm going to rule

1   that question beyond the scope here.

2   Q   (By Ms. Dao)  Let me move on and ask you some questions

3   back on your declaration about -- this would be Tab 2 of the

4   large notebook of declarations.  Let me go from the bottom,

5   which is the last page, paragraph 13, where you said Brian

6   Burnett was an employee of OneWest.

7   A   Yes.

8   Q   And that he had authority granted by MERS to execute

9   documents, and in particular you're referring to the

10  assignment of the deed of trust in this case, correct?

11  A   Correct.

12  Q   So here at paragraph 13 and 12, you indicate there exists

13  a resolution or authority for Mr. Burnett to do that?

14  A   Yes.

15  Q   And then you provided a copy of that authority; is that

16  correct?

17  A   That was one of the copies.

18  Q   Okay.  And that would be Exhibit 11, which would be right

19  in front of that tab, Mr. Boyle?  The number -- the exhibit

20  number is on the bottom right-hand corner, right in front of

21  Tab 2.

22  A   Yes.

23  Q   Do you see that?

24  A   I don't have the exhibit in front of me.  I don't know

25  which one you're talking about.

1    Q    How about try Tab 1 in the same notebook.

2              THE COURT:  You can put it on the ELMO, if you know

3    how to use that.

4              MS. DAO:  I don't, Your Honor.  Sorry.

5    Q    (By Ms. Dao)  These are the exhibits that were attached to

6    Tab 1.

7              THE COURT:  What exhibit number are you asking about?

8              MS. DAO:  Exhibit 11, Your Honor, the bottom

9    right-hand corner, page 1 of 3.

10             THE WITNESS:  Yes, I see.

11   Q    (By Ms. Dao)  Can you tell me the date of that?

12   A    This is dated August 19, 2010.

13   Q    Okay.  And when was the assignment executed by

14   Mr. Burnett?

15   A    It was executed in January, I believe, of 2010.

16   Q    So that was prior to this authority?

17   A    Well, there was also -- I believe I have looked at another

18   resolution, which said his signing authority was effective as

19   of November of 2009.

20   Q    But at the time that you swore out this declaration and

21   referred to the exhibits, this particular exhibit did not

22   match the signing date of when Mr. Burnett executed the

23   assignment?

24   A    Well, it just had a different date, but I knew at that

25   time he did have authority.

1    Q    At which time?

2    A    As of January of 2010.

3    Q    But my question is that you did not produce a document to

4    verify that?

5    A    This document just has -- yes, it is dated in August.

6    Q    Okay.  You testified that Northwest Trustee acted as agent

7    for OneWest for purposes of foreclosing on Mr. McDonald's

8    home?

9    A    I believe it said it was for purposes of sending the

10   notice of default.

11   Q    Okay.  So let me take you to the notice of default, which

12   is Exhibit 9, right before Exhibit 10 and 11, same area.

13   A    It's Exhibit 9?

14   Q    Yes.  Do you see it?

15   A    Yes, I've got it.

16   Q    If I could refer you to the last page of Exhibit 9,

17   paragraph 2, under "L."  Do you see that?

18   A    Yes.

19   Q    What does it say?

20   A    I'm sorry?  Paragraph?  Which portion?

21   Q    Two.

22   A    "The creditor to whom the debt is owed, OneWest Bank FSB."

23   Q    And what date is that notice of default?

24   A    January 12th, 2010.

25   Q    Is that an accurate statement of the nature of OneWest's

```
 1   interests on that date?
 2            MS. VACURA:  Objection to the extent it's calling for
 3   a legal conclusion.
 4            THE COURT:  Yes.  It's just your understanding.
 5   A   My understanding is we were the servicer at the time,
 6   acting on behalf of Freddie Mac Bank.
 7   Q   (By Ms. Dao)  Which is different than the creditor to whom
 8   the debt is owed?
 9   A   I mean, I -- I don't want to guess as to what the legal
10   meaning of "creditor" is.
11   Q   Okay.  You're not denying that the statement says what it
12   is?
13   A   Yeah, that's what the sentence states.
14   Q   And can we assume from your testimony that when Northwest
15   acted as agent for OneWest, that OneWest did furnish accurate
16   information for the agent to act?
17            MS. VACURA:  Objection.
18            THE COURT:  It's not helpful to my analysis here.  Go
19   ahead.  Asked another question, counsel.
20   Q   (By Ms. Dao)  With regard to the January 12, 2010, do you
21   know what possession -- what control that OneWest had with
22   regards to the note?
23            THE COURT:  The original note?
24   Q   (By Ms. Dao)  The original note.
25   A   That was my understanding.  I'd have to look in my
```

1    records, but it was my understanding it was held by the

2    custodian at the time.

3    Q   So in order to furnish the trustee or Mr. McDonald with a

4    copy of the note, how did you go about doing that?

5    A   I'm sorry.  Repeat the question.

6    Q   At that time, in January of 2010, did OneWest provide

7    Northwest Trustee with a copy of the original note?

8    A   You know, I'd have to look at my records, but I believe a

9    copy was supplied.  I don't know exactly when the original

10   was requested.

11   Q   Are you familiar with the contents -- let me ask you this

12   question:  Do you keep a paper copy of the litigation that is

13   currently being discussed?

14           THE COURT:  I don't understand the question.

15   Q   (By Ms. Dao)  Do you have a hard copy of all the pleadings

16   and documents that were filed in this case?

17           THE COURT:  He himself?

18           MS. DAO:  Yes.

19   A   I mean, I have a binder that I looked at that had some

20   pleadings.

21           MS. DAO:  All right.  I'm going to show you this

22   particular letter that I will represent to the court and to

23   counsel that it was given to my client as part -- as a

24   response to his qualified written request, and it was

25   attached to his amended complaint, and that would be

1    Docket 68.

2        May I approach, Your Honor?

3            THE COURT:  Yes.

4    Q   (By Ms. Dao)  Mr. Boyle, I'd like you to take a moment and

5    look through that document that I've handed you, which I'll

6    have marked and entered into as an exhibit from the

7    plaintiff.

8        I would like for you to review it, and tell me whether it

9    resembles or appears to be something that came from OneWest.

10           MS. VACURA:  Objection; beyond the scope.

11           THE COURT:  Well, I don't know what it is.  May I

12   take a look at it?

13           MS. DAO:  I apologize, Your Honor.  I have a copy

14   here.

15           THE COURT:  Well, you can certainly ask him if he

16   recognizes it, but I don't think he should be in a position

17   to be authenticating the document if he's never seen it

18   before or anything like that.

19       Does it look familiar to you?

20           THE WITNESS:  I believe I have seen this.

21           THE COURT:  Okay.  Then you can ask him questions

22   about it.

23   Q   (By Ms. Dao)  I would like you to pay particular attention

24   to the copy of the note that is attached to that letter,

25   Mr. Boyle.

1  A    Okay.

2  Q    Does that look to you to be a true and exact copy of the

3  original note?

4        MS. VACURA:  I'd like a continuing objection to this

5  line of questioning being beyond the scope of the direct

6  examination.

7        THE COURT:  Overruled.  This is appropriate.

8  A    I'd have to look at the original note again, but I believe

9  it does look similar already.

10       THE COURT:  Well, similar --

11 A    It looks as though it is a copy of the note.

12       THE COURT:  This is marked as Plaintiff's Exhibit 1

13 for identification.

14       MS. DAO:  Thank you, Your Honor.

15 Q    (By Ms. Dao)  Mr. Boyle, do you recall in this case that

16 Mr. McDonald filed for bankruptcy Chapter 11?

17 A    I don't know.

18 Q    I'm sorry.  Chapter 7.

19 A    Chapter 7?  I believe so.

20 Q    And are you aware that OneWest had requested the law firm

21 of Routh Crabtree to represent them in a motion for relief

22 from stay in that particular case?

23 A    I don't know.

24 Q    Let me go back to Tab 2 of your declaration, Mr. Boyle.

25       In paragraph 2, you said that Mr. McDonald executed a

1    deed of trust and a note, and you also declared that true and

2    correct copies of the note and deed of trust are attached to

3    the defendant's motion as Exhibits 1 and 2.  Do you see that?

4    A    Yes.

5    Q    And that is your declaration?

6    A    Yes.

7    Q    So if we go back to Tab 1 and look at Exhibit 1 and 2, and

8    this is the area where you were looking at Exhibit 9 and 11,

9    so towards the front, right after the pleadings.

10            THE COURT:  It looks like page 17 in the top corner.

11   He's there.

12            THE WITNESS: Yes.

13   Q    (By Ms. Dao)  Can you look at Exhibit 1 and tell me if

14   that appears to be a true and exact copy of the original

15   note?

16       Let me ask one question to lay the foundation.

17       Have you personally inspected or examined the original

18   note at any time during the course of this litigation?

19   A    Yes.

20   Q    How many times would you say that you have done that?

21   A    I don't recall.

22   Q    And can you tell the court the occasions on which you

23   reviewed or inspected the original note?

24   A    I looked at it as recently as yesterday.

25   Q    Okay.  How about before yesterday?

1   A    I don't know.

2   Q    And when you looked at it yesterday, whose custody was it

3   in?

4   A    My counsel's.

5   Q    And do you recall an occasion when you looked at it before

6   yesterday?

7   A    I don't know.

8   Q    So let me refer you to Exhibit 1 -- back to Exhibit 1.

9   Take a moment and look at that note, and I want you to pay

10  particular attention to the signature page with the blank

11  endorsement.

12          MS. VACURA:  Your Honor, I object to the attachments

13  to this letter.  He has authenticated or said he has seen

14  before the letter that's headed "OneWest Bank."  She has not

15  asked him about the attachments or whether he's seen them

16  before, so I don't believe, therefore, that she can properly

17  ask him questions about that document.

18          THE COURT:  Okay.  Mr. Boyle, do you still have the

19  plaintiff's exhibit that Ms. Dao gave you?  Look at the last

20  page of the note on that one and compare it to the last page

21  of the note in Exhibit 1.

22      Do you see how the signature line, "Pay to the order of

23  without recourse" has moved from the far left on one

24  document, and it's on sort of the center right on the other

25  document?

1          THE WITNESS:  Yes, I see that.

2          THE COURT:  Do you have any explanation for how that

3   might have happened in the copying, or anything like that?

4          THE WITNESS:  I don't know.

5          THE COURT:  Okay.

6          MS. DAO:  Thank you, Your Honor.

7   Q   (By Ms. Dao)  So your testimony is that Exhibit 1 is a

8   true and exact copy of the original note, as you're sitting

9   here on the stand today?

10  A   Yes.  That was my testimony in the declaration.

11         THE COURT:  You looked at it yesterday.  Do you

12  remember where this line was?

13         THE WITNESS:  No, I didn't compare the two.

14         THE COURT:  Counsel, as an officer of the court,

15  could you represent to me where the signature is on the

16  original?

17         MS. VACURA:  Yes, Your Honor.

18         THE COURT:  It's on the center right?

19         MS. VACURA:  Yes.

20         MS. DAO:  Thank you, Your Honor.

21  Q   (By Ms. Dao)  Now, you indicated that there was an error

22  in the attachments of one of the documents that were produced

23  to the plaintiff with regards to the servicing schedule.  Do

24  you remember that testimony?

25  A   Correct.

Q    And my understanding is that OneWest had control of these

documents, and when the redaction occurred, it was

actually -- it was done by OneWest?

A    Again, we tried to confirm who did the redaction.  I could

never do that, or I could never confirm if it was by counsel

or if it was by my litigation specialist.  But when I went

and independently looked at the schedule, I was able to find

the exact same information.  It was just the way it was

titled -- the schedule, the way it was titled, it was just a

different title.

Q    How did you account for that?

A    Sorry?

Q    How did you account for the error that occurred?

A    Again, I think it was human error.  It's a spreadsheet

that's created.

Q    Created by whom?

A    By -- again, it could have been the litigation specialist,

my counsel.

Q    And so as far as the different positions of the blank

endorsement here, you can't explain that either?

A    I can't, not right now.

Q    I recall that your testimony was that there isn't any

document in the possession of OneWest that would speak to the

sales by IndyMac Bank and the original lender to Freddie Mac,

correct?

1   A    I believe so.

2   Q    And I believe that your testimony was that the documents

3   would be within the FDIC control?

4   A    If they existed.

5   Q    And can you tell me why that would be?  Why would it be

6   under the FDIC control?

7   A    Because the FDIC became the receiver for IndyMac Bank and

8   IndyMac Federal Bank, and any assets that they possess, the

9   FDIC would be in control of.

10  Q    But you're just speculating.  You don't know for sure?

11       We're talking about a document that evidences the sale

12  of Mr. McDonald's note by the original lender to Freddie Mac.

13  A    Again, if it existed, yeah, it would be in the possession

14  of the FDIC.

15  Q    Are you aware in this case that Mr. McDonald was advised

16  that his loan was securitized into a mortgage-backed

17  securities pool?

18  A    I'm not aware of that.

19  Q    Do you have any reason to believe otherwise?

20  A    Believe otherwise that it was securitized?

21  Q    Yes.

22  A    I just don't know.

23  Q    Do you have any knowledge of whether it was a direct sale

24  from IndyMac to Freddie Mac?

25  A    I don't know.

1    Q    You don't know whether or not it was a single sale or a

2    wholesale group of loans?

3    A    Off the top of my head, I don't know.

4    Q    Is it fair to say you really don't have any knowledge with

5    regard to that sale, the sale of Mr. McDonald's loan to

6    Freddie Mac by IndyMac?

7    A    No.

8    Q    The documents in this litigation have contained two

9    separate references.  Now, in your declaration, you said that

10   Freddie Mac is the investor and owner; is that correct?

11   A    I don't --

12   Q    Well, let's look at your declaration again, which is

13   Tab 2, paragraph 3.

14   A    Correct, yes.

15   Q    Okay.  So what is your understanding as someone who has

16   experience working with several banks, including OneWest,

17   what does it mean by "an investor"?

18   A    It's someone who is holding beneficial rights to the loan,

19   someone who is entitled to payments that are collected from

20   the borrower.

21   Q    So that entity would be acting in a trust capacity?

22   A    I don't necessarily know that this was ever put into a

23   trust.

24   Q    But -- all right.  So that is -- that's your understanding

25   of what an "investor" means?

```
 1            THE COURT:  He answered that question.
 2   Q   (By Ms. Dao)  And how about "owner"?  What's the
 3   difference between an investor and an owner?
 4   A   To me, I believe they are similar terms.  I wouldn't want
 5   to opine as to what the legal, you know, definitions are,
 6   but, generally, an investor and an owner is similar.
 7   Q   I'm trying to ascertain as to paragraph 3, here in your
 8   declaration, what is the basis of your actual knowledge or
 9   information that led you to conclude or to write that Freddie
10   Mac is the owner and investor?
11            THE COURT:  Was part of the declaration done by the
12   lawyers for you?
13            THE WITNESS:  Yes.
14            THE COURT:  So you didn't write every word yourself?
15            THE WITNESS:  No.
16            THE COURT:  That's not the first time that's
17   happened.
18            MS. DAO:  If I could have a moment, Your Honor.
19            THE COURT:  Sure.
20   Q   (By Ms. Dao)  I want to ask you about your duties as vice
21   president of OneWest.  What are the duties that you perform
22   in a typical day?
23   A   Again, on a typical day, I will review documents, will
24   have several meetings.  They could be low-level meetings,
25   they can be management meetings.
```

1   Q   Do you review -- is it part of your duty as VP to be

2   involved -- obviously, your duty is specifically to be

3   involved in litigation?

4   A   Correct.

5   Q   And both in civil cases and bankruptcy cases?

6   A   Yes.

7   Q   And normally you would not review any files unless it's

8   relating to a litigation of some sort?

9   A   Not necessarily.

10  Q   Okay.  So can you tell us how you would be involved as a

11  declarant in a particular litigation or in a particular case?

12  A   Many times I have -- as an officer of the bank, I have

13  signing authority for the bank.  So if there is a document

14  that requires an officer of the bank to sign, then I will

15  sign it.  And also as just the head of the department, I am

16  one of the senior managers, and so I will sign documents.

17  Q   Documents as in particular declarations and affidavits?

18  A   Declarations, affidavits, settlement agreements.

19  Q   Focus on declarations and affidavits only.  How many of

20  those would you execute in any given day?

21  A   In any given day, I mean, it could be anywhere from none

22  to possibly six.

23  Q   And when you have the need to do that, what steps do you

24  take in order to swear out declarations?

25  A   I will obviously get the document.  I will read through

1    it.  I will ensure that the exhibits are appropriate that are

2    attached.  I will verify facts such as default dates by going

3    to the system, reviewing the loan file, and just verifying

4    that the information is correct.

5    Q   So with regards to your declaration at Tab 2, have you

6    done the same?  Have you taken those steps?

7    A   If I signed it, I would assume, yes, I did.

8    Q   And just to clarify, when Judge Lasnik referred to the

9    lawyer prepared it for you, was it this case in Tab 2?

10   These were not your words, these are what the lawyer drafted

11   for you to sign?

12   A   I help, obviously, with some of the construction.  If

13   there is an error in the document or a misstatement, I will,

14   you know, contact counsel or let my litigation specialist

15   know that this needs to be changed; that, you know, in order

16   for me to sign it, you know, corrections may need to be made.

17   Not in every case, but in some cases, yes.

18   Q   Logistically speaking, do you draft it out and give it to

19   the lawyer, or in this case did the lawyer draft it and then

20   give it to you?

21   A   You know, yes, I think normally our attorneys will draft

22   the declarations.

23   Q   Normally?  What about this particular declaration in

24   Tab 2?

25   A   I believe so.

1    Q    Are there employees or corporate officers of OneWest that

2    have functions similar to yours, that you can think of?

3    A    Sorry.  Repeat the question.

4    Q    Are there -- is there any of your counterparts, people who

5    have similar functions as you do?

6    A    Yes.

7    Q    Who?

8    A    You know, I have a manager that reports directly to me.

9    She signs some declarations.  There are --

10   Q    What is her name?

11   A    Her name is Rebecca Marks.

12   Q    And are you familiar with JC San Pedro?

13   A    Yes.

14   Q    And who is he?  I assume it is a he.

15   A    Yes, it is a he.  He works at OneWest Bank.

16   Q    Does he have similar functions as you do?

17   A    Honestly, I don't recall exactly what his functions are

18   until right now.  But, yes, you know, any officer of the bank

19   has signing authority.

20   Q    Do you know who Charmagne Williams is?

21   A    I do.

22   Q    And who is she?

23   A    Again, she's an assistant vice president with the bank.

24   Q    And does she have similar duties that you do?

25   A    No, she doesn't.

1    Q    Do you know whether she has submitted declarations,

2    affidavits in this particular case?

3    A    I don't believe she has, but I don't recall offhand.

4    Q    Do you know who Erica Johnson-Seck is?

5    A    Yes.

6    Q    Who is she?

7    A    She's a first vice president in the default servicing

8    group.

9    Q    How many vice presidents are in your group?

10   A    In my group, specifically in the litigation group, there

11   is myself, and then we have three in-house counsel.  I report

12   to a senior counsel, and she's an FVP, first vice president.

13   Q    Is it your testimony that Ms. Erica Johnson-Seck is in the

14   same department as you are?

15   A    No.  She's in the default servicing group.

16   Q    And the title of vice president, does it carry with it a

17   premium pay?

18   A    I don't know.

19            MS. VACURA:  Your Honor, beyond the scope.

20            THE COURT:  Yes, beyond the scope.

21       We're going to take a break now.  Ms. Dao, I don't know

22   how much more you have, but it's time to move on to other

23   areas, if you have other areas.

24       When we come back, we're actually going to do

25   Mr. Corcoran, so let's arrange for him to be ready to go at

```
 1    10:45.
 2        How long of a direct do you have of Mr. Corcoran?
 3            MS. VACURA:  At the outside, a half-hour, Your Honor.
 4            THE COURT:  And how much cross do you need for
 5    Mr. Corcoran?
 6            MS. DAO:  Not much, but I'd like to have the
 7    opportunity to put my client on the stand, briefly.
 8            THE COURT:  We'll see where we are at that point.
 9    Mr. Boyle, you can stay.
10            THE WITNESS:  I have a flight at 2:40.
11            THE COURT:  We'll be done by noon, absolutely done by
12    noon.  We'll be back at 10:45.
13                            (A RECESS WAS TAKEN.)
14            THE COURT:  Kerry, you have Mr. Corcoran on the
15    phone.  Mr. Corcoran, could you please acknowledge that you
16    are here?
17            THE WITNESS:  I am here.
18            THE COURT:  And would you please stand up and raise
19    your right hand, and my clerk is going to swear you in.
20            THE WITNESS:  I'm standing, and I have my right hand
21    raised.
22    CHRISTOPHER CORCORAN,       HAVING BEEN FIRST DULY SWORN,
                                   TESTIFIED AS FOLLOWS:
23
24            THE COURT:  You may be seated, and you are first
25    going to be questioned by an attorney from the defendant's
```

1   side, that is your side.  Ms. Vacura?

2           MS. VACURA:  Your Honor, I'll be referring to Docket

3   205.  I have a hard copy.

4           THE COURT:  Okay.

5                       DIRECT EXAMINATION

6   BY MS. VACURA:

7   Q   Mr. Corcoran, this is Julie Vacura.  We have spoken prior

8   to today, right?

9   A   Correct.

10  Q   All right.  So, Mr. Corcoran, could you please start by

11  telling the court, generally, what your -- where you work and

12  what your job entails?

13  A   I work at Deutsche Bank National Trust Company.  We are

14  the document custodians -- of my division, document custodian

15  trustee for mortgage-backed security transactions and other

16  transactions.

17      My job specifically entails working in the document

18  custody group, and I am a supervisor for a team of client

19  services, for people where we have kind of main day-to-day

20  contact with mortgage companies and Wall Street firms, with

21  reporting and coordinating the shipping of files, receipt of

22  files, review of files, reporting of positions, and things

23  like that.

24  Q   And do you work with mortgage loan servicers?

25  A   Yes, we do work with mortgage loan servicers.

Q    And is any of the work that you do as a custodian of

records governed by the Seller/Servicer Guide?

A    We work with the agencies, and we have guides that govern

our responsibilities.

Q    And does Deutsch work with Freddie Mac?

A    Yes, we do.

Q    All right.  And when working with Freddie Mac, do you

refer to the Seller/Servicer Guide that's online with regard

to your relationship with Freddie Mac?

A    Yes, we do.

Q    All right.  I'm going to ask you, do you have in front of

you your declaration that you signed on November 13, 2012?

A    Yes, I do.

Q    All right.  I'm going to ask you, please, to look at the

first exhibit.  It says at the bottom, "Exhibit A, page 1 of

13."  Can you tell the court what this document is?

A    I have that document.  This is a custodial agreement,

Deutsche Bank and Freddie Mac and OneWest Bank, where

Deutsche Bank acts as a document custodian for pools of loans

with Freddie Mac and OneWest Bank as the seller/servicer.

Q    And what do you mean by "pools of loans"?

A    Loans are pooled in mortgage security-backed transactions.

When I say "pooled," they're grouped together with loans of

similar characteristics, and bonds are sold and backed by the

payments of these loans.

1    Q    And what is your role with regard to these pooled loans

2    and Freddie Mac and this servicer?

3    A    We are the document custodian.  We're holding the mortgage

4    loan collateral files.

5    Q    All right.  This agreement is dated May 12, 2009, correct?

6    A    That is correct, yes.

7    Q    And if you look at the very last page, it's got a

8    signature by Tom Yoshida, and then a signature by you on

9    behalf of Deutsche Bank, yes?

10   A    That is correct.

11   Q    All right.  Now, have you actually read this agreement?

12   A    I have not read every page of this agreement, no.

13   Q    Does it, to the extent that you have reviewed it, is it a

14   typical custodial agreement for Deutsche Bank?

15   A    It's a standard custodial agreement for Deutsche Bank and

16   Freddie Mac.

17   Q    After the date of this agreement, May 12, 2009, would you

18   have sent any loan file that was being held by you pursuant

19   to this custodial agreement to OneWest if it had asked for

20   it?

21   A    If asked and we received the proper request form, we would

22   send the file to OneWest, correct.

23   Q    And why would you do that?

24   A    They are the servicer under this agreement, and they have

25   the ability to request a file from us.

1    Q    All right.  Now, how do you know that this custodial

2    agreement -- well, let me ask you this first:  If you could

3    please go to Exhibit B attached to your declaration, and at

4    the top it says, "Complete loan file information."

5    A    Okay.

6    Q    Tell the court, please, what this is.

7    A    This is a snapshot of a screen from Deutsche Bank's

8    document custody system, and it just shows kind of a quick

9    snapshot of some of the transactions and the history of this

10   loan file -- this particular loan file.

11   Q    And in this case is it the loan of Mr. McDonald?

12   A    Yes.  It says James B. McDonald is the borrower.

13   Q    And at the top it has a loan number.  Do you know what

14   that is?

15   A    The loan number is the loan number assigned to it by

16   OneWest.

17   Q    All right.  And then there's a secondary loan number.  Do

18   you know what that number is?

19   A    That's a secondary loan number that OneWest assigned it.

20   I believe it's the Freddie Mac loan number.

21   Q    And loan file withdraw information, what is this telling

22   you?

23   A    That section tells me that the file is no longer -- it was

24   requested from -- from the servicer, OneWest, and we shipped

25   it out.  And there is information as to who we shipped it to,

1    when we shipped it, where we shipped it, how we shipped it,

2    et cetera, and the file had been shipped out to OneWest.

3    Q    Can you tell what date it was shipped?

4    A    October 6th, 2010.

5    Q    Now, in your experience in dealing with -- well, let me

6    back up.

7         Do you very often refer to these complete loan file

8    information sheets to find information about loan files in

9    the possession of Deutsche Bank?

10   A    We use this screen often to find out if the loan is in our

11   possession and where it is.  It's a screen that we use often.

12   Q    And in your experience, is the information that's on this

13   screen reliable?

14   A    Yes.

15   Q    So let me ask you again specifically about the loan file

16   withdrawal information section of this.  How is the

17   information that is in here, how does it get in here?  How is

18   it populated?

19   A    It is populated by someone here through -- a request would

20   come in for the file, and we would populate these fields

21   through a drop-down list, mostly, you know, or they're

22   automatically updated when transactions occur.

23        So the reason a file is withdrawn is a drop-down list they

24   send to the attention of the "authorized by," those are all

25   drop-down lists, when someone chooses -- you know, when the

1    person requested it who it was supposed to go to per the

2    request.

3        The date fields are automatically populated when the

4    transaction takes place, and the transmittal number is

5    automatically assigned, and the loan number is actually typed

6    in by a Deutsche Bank representative.

7    Q    All right.  Can you tell by looking at this document when

8    Deutsche Bank received this loan file?

9    A    Deutsche Bank received -- I can tell, yes.

10   Q    And where are you looking?

11   A    I am looking on the second page, under the

12   second-to-the-last section, it says, "Loan file

13   transactions."

14   Q    All right.  And what does it tell you?

15   A    Under that section, the top -- basically, the first line,

16   it says, "Initial loan review," and there's a date of

17   1/16/2007.  That tells me we received the file on or about

18   1/16/2007.

19   Q    Let me stop you there.  What happens when a loan file is

20   received by Deutsch Bank?  What happens within the bank when

21   the bank receives an original loan file?

22   A    We would review it against data we would have received

23   from the client.  So we would receive data from a client for

24   loan files, and then once we received the files, we would

25   review the files against that data.

Q    And does the data tell you what is being sent in the original file?

A    No.  It says -- it basically says -- the data points on the note to confirm that we have the right file, the right note.

Q    Okay.  How do you know that this particular file contained the original note?

A    Can you repeat that?

Q    Sure.  How do you know -- or I'll ask you this:  Do you know whether the file that we're talking about here, the McDonald file, contained the original note?

A    From this screen, it doesn't specifically say the original note is in the file.  But I can tell from -- you know, I can tell from my system if we have the original note, and I can tell if any updates were ever -- ever logged in, you know, to change the status of the note to see if -- what it is now versus what it was before.

     And looking at this, whatever note -- whatever document came in for the note, we had the whole time.  But looking at this, I can't tell if it was an original note or not unless I looked at another screen on my system.

Q    Do you have another screen on your system that would tell you whether the original note was in the file?

A    Yes.

Q    And what is that?

1    A    That would be the file inventory screen.

2    Q    All right.

3         You talked about how -- I think you said something just

4    now in your testimony about how you can tell if something

5    changed about the file.  Can you explain that a little bit

6    more to the court?

7    A    Yes.  If you look at that same -- that same area we were

8    just in, page 2, second-to-the-last section, loan file

9    transactions, you will see the first transaction was the

10   initial loan review.  Look and follow the next two

11   transactions.  They were updates to the mortgage and title.

12   That would tell me that there was some change in the status

13   of the documents received, subsequent documents for the

14   mortgage and title from the initial delivery.  So those

15   changed, but it looked like nothing else changed, other than

16   those two updates.

17   Q    All right.  So if I'm understanding you correctly, you got

18   the original file shortly after that -- well, on the 27th of

19   March you got something from the mortgage company, and then

20   on April 9th you got something from the title company?

21   A    Well, not a document updating the mortgage.  We received a

22   document updating the title.

23   Q    Okay.  So in this case, Mr. Corcoran, do you know whether

24   Deutsche Bank sent to OneWest the original note -- well,

25   whether OneWest was sent the -- excuse me -- Deutsche Bank

1    sent the original note to OneWest?

2    A    Deutsche Bank sent the entire file to OneWest.  Looking at

3    the specific document, this doesn't say the original note was

4    in that document -- was in that file.  Again, I'd have to

5    look at my inventory screen to see if the original note was

6    here at Deutsche Bank and in the file that we sent out.

7    Q    Is that something that you can do as you're sitting here

8    testifying right now?

9    A    Yes, I can do that.

10   Q    Can you do that, please?

11   A    Yes.

12   Q    And tell the court whether the original note was in the

13   file that Deutsche Bank had in its custody?

14   A    Yes.  Deutsche Bank's system shows the original note was

15   in the file when it was shipped to OneWest on 10/6/2010.

16   Q    Does that same inventory page that you're looking at or

17   the screenshot that you're looking at show whether the

18   original note came with the file when the file was first

19   received by Deutsche Bank?

20   A    Looking at this screen and in conjunction with the

21   exhibits, I can tell that the original note came in when the

22   file was first delivered, and it's never changed.  So we've

23   had the original note the whole time, until the 10/6/2010

24   date.

25   Q    All right.  Tell the court how you keep these original

1    files, physically.  Literally, how does Deutsche Bank keep

2    these original files?

3    A    They are kept in a two-hour fire-rated facility.  Meaning

4    if there is a fire on the outside of the room, it's going to

5    take two hours to get through the special wall, if you will.

6    And they're kept in mostly numerical order by client.  So the

7    client here would be OneWest/Freddie Mac, so those loans are

8    kept in a group segregated in loan number order, and they're

9    kept on shelving.  And, again, it's a huge room with the

10   shelving, and the files are by loan number order on these

11   metal shelves.

12   Q    All right.  Let me ask you, just so I have covered all of

13   what I think I need to in terms of my basis.

14        How do you know that this particular custodial

15   agreement governs this McDonald loan?

16   A    How do I know -- I'm sorry.  Can you repeat that?

17   Q    Sure.  How do you know that the custodial agreement that's

18   Exhibit A to your declaration covers the McDonald loan, which

19   is reflected in Exhibit B to your declaration?

20   A    So transactions are given transaction codes here at

21   Deutsche Bank.  If you look at page 1 of Exhibit B, at the

22   very top it says, "Complete loan file information," and the

23   first line is the loan number.  The next item over to the

24   right says, "Issue," and that issue is IN010C.  That's a code

25   that we've given to Freddie Mac -- the Freddie Mac

1    transaction with OneWest/IndyMac, so I know that that loan is

2    part of that agreement.

3            THE COURT:  Are you just about done, counsel?

4            MS. VACURA:  I am done, Your Honor.  Thank you very

5    much, Mr. Corcoran.

6            THE COURT:  Mr. Corcoran, you're now going to get

7    questions from Ms. Dao.

8                          CROSS-EXAMINATION

9    BY MS. DAO:

10   Q   Mr. Corcoran, I'd like to ask you a few questions based on

11   that exhibit.

12           When you submitted this declaration, why did you not

13   attach the information that you're now referring to as being

14   checked by you to verify that the original note was, in fact,

15   in the loan file?

16   A   That was not requested.

17   Q   And do you know -- and let me ask you again:  Is this

18   Exhibit B the Form 1034, as it's known, or not?

19   A   Exhibit B is not Form 1034.

20   Q   And do you have that in your records, as far as that

21   document, Form 1034?

22   A   The specific 1034 for this loan?

23   Q   Yes.

24   A   I don't know.  I wasn't asked to research this, but I

25   don't know.

1    Q    Okay.  If you could refer to Exhibit B on the top of the

2    page under the heading of "Complete loan file information,"

3    what -- under "Issue," do you see that, the very first

4    portion?

5    A    Yes.

6    Q    What does that code represent?

7    A    That code represents -- it says, "INO1OC," and that

8    represents the relationship we have -- we assign all our

9    transactions a code, and that code represents the

10   relationship we have with Freddie Mac, slash,

11   OneWest/IndyMac.

12   Q    Okay.  Is it true that you received the loan -- according

13   to your testimony, you received the loan file and created

14   this or started this complete loan file information back in

15   2007?

16   A    Correct.

17   Q    Okay.  And then the agreement that you referred to, as far

18   as the relationship with OneWest, was only entered into as of

19   May 2009?

20   A    Correct.

21   Q    Okay.  So this particular code that you testified to, when

22   was it assigned?  Upon the agreement being created?

23   A    It was signed upon -- yes, a relationship started.

24   Q    Okay.  And prior to that, what agreement, if any, and who

25   were the parties?

```
1    A    I'm not sure I follow your question.

2    Q    Okay.  Before the agreement between -- this is a three-way

3    agreement between Freddie, OneWest, and Deutsch, correct?

4    A    Uh-huh.

5    Q    And that agreement only came into being as of May 12,

6    2009.

7    A    Okay.

8    Q    Prior to that, are you aware of any agreement governing

9    your relationship or your contract as custodian?

10   A    Yes.  There is a previous agreement with Deutsche Bank,

11   Freddie Mac, and IndyMac.

12   Q    Okay.  And you testified that Deutsche Bank keeps records

13   for various entities, and they're mostly mortgage-backed

14   security pools?

15   A    Well, we have different relationships -- different

16   transactions, different relationships.  That's one type of

17   transactional relationship.

18   Q    Do you know whether the McDonald loan was part of a

19   securitized trust?

20   A    I don't know.  I know that we're holding it for Freddie

21   Mac.

22   Q    What about this next section over, "subpool," and then

23   there's another code.  Do you see that?

24   A    Yes, I do.

25   Q    What does that mean?
```

1   A    That's -- Deutsche Bank assigns a code, if you will, and

2   it generally involves a date.  I couldn't say for 100 percent

3   sure, but it's some sort of date, probably February 27th,

4   2007, and it's just a way -- it's an internal code, a thing

5   we use for reporting purposes.

6   Q    Okay.  In this case my client was told that there was a

7   CUSIP number assigned to this loan.  Does that help at all in

8   identifying whether or not the loan was actually securitized?

9   A    I wouldn't have a CUSIP number.

10  Q    Do you even know what that is?

11  A    I've heard the term, yes.

12  Q    But that has no relevance or significance to you?

13  A    No, not to me, no.

14  Q    You were checking some -- some parts of your system to

15  assure the court that the original note made it into Deutsche

16  Bank's custody on the date that it shows on this Exhibit B,

17  correct?

18  A    Could you repeat that?

19  Q    The information that you were checking for us just moments

20  ago to ascertain that the original note did come in, these

21  are screenshots you're talking about.

22  A    Yes.

23  Q    Okay.  And, again, are they coded so that you would be the

24  person that would decide for us?

25  A    Let me look at it.  There are codes there, yes.

1    Q    Okay.  On the second page of Exhibit B, you mentioned that

2    there were changes under the loan file transactions?

3    A    Uh-huh.

4    Q    And relating to the mortgage or the deed of trust on

5    3/27/2007, March 27, 2007?

6    A    Yes, I see that.

7    Q    What changes are you referring to?

8    A    The changes, meaning we received an original recorded

9    mortgage on or about that day, so our system was updated from

10   having just a copy of the mortgage to the original reported

11   mortgage.

12   Q    I'm sorry.  Is the note the original mortgage that came

13   in, or a copy of the original mortgage?

14   A    It denotes the original mortgage that came in.

15   Q    So does the notation that trails "documents" mean that it

16   came after the file was shipped to you?

17   A    That's correct.

18   Q    And then, again, the next transaction with the reference

19   of title trailing docs, what is the change there for April 9,

20   2007?

21   A    It was a change from -- we originally received a

22   preliminary title report, and then on April -- you know, on

23   or about April 9, 2007, we received a final original title

24   policy.

25   Q    So the original file that was shipped to you did not have

1  an original deed of trust and mortgage and did not have the

2  original policy?

3  A   Correct.

4  Q   And there's nowhere on Exhibit B that we can see any

5  information relating to the original note?

6  A   No.  Correct.

7  Q   Under the agreement that you referred to, Exhibit A, who

8  was your client?

9  A   In this case, we had both Freddie Mac and OneWest.

10  Q   Can OneWest be replaced, according to the terms of the

11  custodian agreement?

12  A   I haven't looked at it that closely, but I know -- I don't

13  know if it's under this agreement, but I know they can be

14  replaced.

15  Q   In this case we've learned that -- let me ask you this

16  question:  When you shipped the original loan file, did you

17  ship the entire file?

18  A   Yes, correct, the entire file was shipped.

19  Q   So after you -- before you shipped the original loan file,

20  did you retain a copy of the contents?

21  A   Not that I'm aware of.

22  Q   Do you retain an electronic image of the original note or

23  any of the documents in the original file?

24  A   There are cases where, upon request, we would do that.

25  Q   What about this case, Mr. Corcoran?

1    A    This case, I do not know specifically.

2    Q    Okay.  So you don't happen to have a copy of the original

3    note that was shipped out to OneWest?

4    A    I do not have one in front of me or handy, no.

5    Q    Okay.  And you don't know whether you've retained an

6    electronic copy, either?

7    A    I do not know, correct.

8    Q    Under the terms of the agreement, does the beneficial

9    interest of the notes remain with Freddie Mac?

10   A    I do not know.

11   Q    Do you have -- you referred to a request made by OneWest

12   for the shipment of the loan file.  Do you have a copy of

13   that request handy?

14   A    I do not, no.

15   Q    Do you know if one existed?

16   A    I do not -- I do not know.

17   Q    Mr. Corcoran, if I could refer you to Exhibit A, page 5,

18   and it will be Section G.  Do you see that, sir?

19   A    I see that, yes.

20   Q    So does that paragraph require you to have a request in

21   the form of a 1036 in order to release the note in this case?

22   A    Yes, it says I need a Form 1036.

23   Q    And you don't have that?

24   A    I don't have it in front of me.  I don't have it handy.  I

25   don't know where it is.

1  Q   Okay.

2           MS. DAO:  I don't have anything further.  Thank you.

3           THE COURT:  Thanks, counsel.  Anything else, counsel?

4           MS. VACURA:  Just, Your Honor, if -- not from this

5  witness.

6           THE COURT:  Okay.  Thank you, Mr. Corcoran, for

7  making yourself available.  We are saying good-bye now.

8           THE WITNESS: Thank you.

9           MS. VACURA:  If it would be helpful for the court, I

10 learned about this other screenshot the day before yesterday.

11 If it would be helpful for the court, I'd be happy to provide

12 a copy.

13          THE COURT:  Well, provide a copy to counsel.

14          MS. VACURA:  I don't have a copy, but will provide

15 one.

16          THE COURT:  And you can send me one, also.  Just copy

17 me on what you send her.

18     Let's put Mr. Boyle back on the witness stand.  You're

19 still under oath, sir.  Ms. Dao, you have a few more

20 questions for Mr. Boyle?

21 CHARLES BOYLE,              HAVING BEEN PREVIOUSLY SWORN,
                              TESTIFIED AS FOLLOWS:
22

23                  CROSS-EXAMINATION continued

24 BY MS. DAO:

25 Q   Mr. Boyle, I'm going to ask you to refer to Defense

1   Exhibit A-7, which is in the smaller notebook, I believe, the

2   smallest one.

3            THE COURT:  "Corporate resolution," do you see it?

4            THE WITNESS:  Yes, I do.

5   Q   (By Ms. Dao)  Earlier you testified that you believed

6   there was a corporate resolution applicable to the date that

7   Mr. Burnett signed the assignment of deed of trust, correct?

8   A   Correct.

9   Q   And you had also furnished that resolution to your

10  counsel?

11  A   I believe they have a copy.

12  Q   And is A-7 the particular corporate resolution you

13  referred to earlier?

14  A   No.  This isn't the one that has Brad Burnett's name on

15  it.

16  Q   So is there another one that we are missing?

17  A   Yes.  There's several corporate resolutions that the

18  company maintains.  For whatever reason, I don't see the one

19  that we have with the effective date with Brian Burnett's

20  name on it.

21  Q   When did you give Exhibit A-7 to your counsel?

22  A   I don't know.

23           MS. VACURA:  Objection, Your Honor.

24           THE COURT:  He answered, "I don't know."  We'll leave

25  it at that.

1   Q   (By Ms. Dao)  We have discovered today that there are two

2   versions of the original note.  Are you now aware of that?

3            THE COURT:  Well, you can leave the preamble out.

4   You're talking about the last page in the moving --

5            MS. DAO:  Yes.

6            THE COURT:  Okay.  Do you have any explanation for

7   that?

8            THE WITNESS:  I know that in certain cases at

9   origination there's a copy of the note that's made.  You

10  know, there's several copies of the original note that are

11  made, and sometimes, you know, it can be endorsed.

12     What I know is that the original note that Deutsch was

13  holding was the one that we produced as the correct and true

14  copy.

15           THE COURT:  With the center right signature?

16           THE WITNESS:  Yes, correct.

17  Q   (By Ms. Dao)  So you really can't account for -- well, let

18  me ask you this question:  Can the court be assured that

19  whenever there's a document that has been represented either

20  by you or by your counsel that it is a true and exact copy,

21  the court can rely upon that representation?

22  A   Yes.

23           MS. DAO:  Nothing further, Your Honor.

24           THE COURT:  Anything else further for this witness?

25           MS. VACURA:  No.

1          THE COURT:  Okay.  If you want to leave now, it's

2     okay with me, but check with them.

3          THE WITNESS:  Okay.  Thank you.

4          THE COURT:  Okay.  So do you want to make any

5     additional representations as officers of the court, either

6     you or Ms. Morrison, or anything like that?

7          MS. VACURA:  Yes, Your Honor.  We would like to

8     address -- just so we have a clear record.

9         We referenced in our pre-evidentiary hearing documents,

10    the pleadings that we filed with the court, that there seems

11    to be some confusion about what Mr. Boyle verified in the

12    last round of discovery.  We have for the court as exhibits

13    for the court to review the two separate pleadings that were

14    sent to Mr. McDonald when he was pro se from Ms. Buck

15    Morrison's office.  One is verified by her, and then the next

16    day a pleading is sent that's verified by Mr. Boyle, and it

17    is different in its answer to Interrogatory No. 7 -- Request

18    For Production No. 7, which you had indicated was a concern

19    to you in terms of how the defendants responded to those

20    inquiries.

21        And so I do want to -- we can talk about them at this very

22    moment, or you can take note in chambers later when you're

23    reviewing exhibits, but I want to note that what Mr. Boyle

24    verified -- what was changed and what Mr. Boyle verified was

25    a response to only objections.  Mr. Boyle did not say, "We

1    don't have anything responsive to this," which is what was

2    verified by Ms. Buck Morrison the day before.  I think that's

3    important in the context of a couple of things that are going

4    on here today.

5         One is that we've sought this protective order so that we

6    can provide additional documents.  Those additional

7    documents, Your Honor, are only being offered in order to

8    assure this court that OneWest has given the plaintiff

9    everything it possibly can that might have been asked for

10   that might be responsive.  So in other words, these documents

11   may not even be directly responsive, but because the court

12   indicated it had concerns about the responses that were made

13   during that time, we decided that we wanted to bring these to

14   the court's attention and to Mr. McDonald's attention but

15   pursuant to a protective order.

16        Now, the time at which Mr. Boyle verified his pleading and

17   said that we object, it is because Ms. Buck Morrison and my

18   firm and the parties believed that that was, in good faith,

19   the appropriate response, because what was being asked for

20   was not relevant to the issues that are in this case.  And so

21   at the time that that objection was interposed and Mr. Boyle

22   verified it, because we, to this day, maintained that those

23   things they were being asked for are not relevant to the

24   case.  We're not relying on them, we're not asking to submit

25   them pursuant to a protective order so we can use them.  We

1    are simply doing it to assure the court that what may be out

2    there is being given to Mr. McDonald.

3        In the context of when all of this occurred, Mr. McDonald

4    asked for these documents.  The objections were interposed.

5    Mr. McDonald did not come back and say, "Let's talk about

6    this.  I want these."  He did ask this court for an extension

7    of the discovery deadline, I imagine, perhaps, maybe to

8    pursue some of these things.  The court said no, that a

9    sufficient amount of time has passed and discovery should be

10   concluded.  And so for us, for OneWest Bank and the other

11   defendants and for Mr. Boyle, that was the end of the matter.

12   It was not until we received the order for an evidentiary

13   hearing that we decided in order to make a full -- you know,

14   a good-faith showing, that we're making our very best efforts

15   that these documents have now been offered.

16       And, again, it's my understanding from reading the

17   response to our motion for a protective order, Mr. McDonald

18   doesn't want them, and if Mr. McDonald doesn't want them,

19   then we don't need a protective order, and we won't offer

20   them.

21           THE COURT:  Well, I take it counsel didn't say she

22   didn't want them.  She said it's too late and there's nothing

23   we can do with them now.  We would have liked them back then,

24   but not now.

25       Now, what do you need a protective order for?  What is the

1   basis for that?

2          MS. VACURA:  The documents that are being offered are

3   ones that come from proprietary platforms.  They contain

4   information that may or may not be something that an outside

5   party could look at and make use of in a competitive manner.

6   They have loan information on them.  They are also -- one of

7   them shows payments to Freddie Mac, and sort of how that --

8   how that relationship works and the software that's used, and

9   so they're basically business proprietary records that

10  OneWest would prefer to have a protective order for.  It's

11  basically for the same reasons companies ask for any

12  protective order when it's proprietary software and platform.

13         MS. DAO:  Could I respond briefly, Your Honor?

14         THE COURT:  Yes.

15         MS. DAO:  I am mindful of the fact that counsel just

16  stepped into the case within the last couple of months and

17  may not have the complete history.

18     But I recall Docket 136, which is your order, and the

19  order came about after Mr. McDonald, as a pro se litigant,

20  had moved to compel, not once but twice.  And I think this is

21  a good demonstration with regards to how the plaintiff is

22  held hostage by the defendants' decision unilaterally to

23  decide what is important and what is relevant.

24     And as I was waking up this morning at 6:00 in the

25  morning, I found more documents that were filed with this

1    court as far as for purposes of this hearing.  And I think

2    that the rules of law should apply, Your Honor.  We should be

3    able to vet the authenticity of these documents and decide at

4    the time that we ask for them.  Now we're rendered helpless.

5    There's nothing for us to do, and I think it's a little

6    outrageous, you know, for the defendants to make that

7    decision by themselves after the court has ordered.  And to

8    me it looked like they didn't come forth until you ordered.

9              THE COURT:  You indicated you wanted to put

10   Mr. McDonald on the witness stand.  This evidentiary hearing

11   was limited for certain purposes, but if you want to make an

12   offer of proof to me as an officer of the court about what

13   Mr. McDonald would have testified to so I understand, go

14   right ahead.

15             MS. DAO:  Sure.  Yeah, I would, Your Honor.  I would

16   ask that the document that was submitted or filed with the

17   bankruptcy court in Mr. McDonald's Chapter 7 case be admitted

18   because it does have another affidavit from an employee from

19   OneWest attesting to the authenticity of the note they

20   attached, so I'm going to ask that the court either take

21   judicial notice or accept it as our offer of proof.

22             THE COURT:  This is, again, going to that page, the

23   last page?

24             MS. DAO:  That's correct, Your Honor.

25             THE COURT:  Your point on that, Ms. Dao, is what?

1   That there are two documents and we don't know which is the

2   original?

3           MS. DAO:  That's correct.

4           THE COURT:  Okay.

5           MS. DAO:  And not just that they exist, but that they

6   have been submitted to different courts for purposes of the

7   defendants' reliance on their theory of the case.  And it is

8   the crux of our case as well with regards to the path that

9   the note has traveled and what might have happened to it.

10  And so I think the court would be well advised to have the

11  additional -- you know, obviously these are -- and I would

12  also point out that the timing of the production of the notes

13  are important, because the court's question is, at the time

14  that the notice of default was issued, did the defendant

15  have -- the holder/owner have any kind of legal authority to

16  do what they did?  So I would ask the court to accept this as

17  our offer.  And then the other document was the letter that

18  Mr. McDonald received.

19          THE COURT:  Sure.  That's Plaintiff's 1, and what

20  you're handing to Kerry now is Plaintiff's 2?

21          MS. DAO:  That's correct, Your Honor.

22          THE COURT:  Okay.  So do you have -- Mr. Vacura, do

23  you have any objection to 1 or 2 for purposes of this

24  evidentiary hearing?

25          MS. VACURA:  We do not, Your Honor.

1          THE COURT:  Okay.  We'll admit those exhibits.

2                  (Exhibit 1 and 2 admitted.)

3          MS. DAO:  That's all I have, Your Honor.

4          THE COURT:  Okay.  Thanks very much.

5      The court has -- can I take a look at the original?

6          MS. VACURA:  Of course.

7          THE COURT:  And earlier in the briefing, there was an

8  allegation from Mr. McDonald that, "I don't think this is the

9  original because it doesn't have wear and tear and it doesn't

10 have this or that."  Is that still his position about this

11 document, too?  Have you seen the actual original?

12         THE PLAINTIFF:  Yes, Your Honor --

13         THE COURT:  Well, I was just asking Ms. Dao.

14         MS. DAO:  Your Honor, that is still his contention,

15 and I believe that's the same original that he was given an

16 opportunity to inspect prior.

17         THE COURT:  Even though there's, like, blue ink on

18 there and everything?

19         MS. DAO:  That's correct, Your Honor.  That's our

20 contention.

21         THE COURT:  Okay.  Well, this was helpful for me, to

22 answer some of my questions.  Unfortunately, I don't have a

23 lot of time right now to go any further, but I will return to

24 where I was when I ordered the evidentiary hearing, and then

25 we'll issue some rulings in that regard.  And also sort of a

1    roadmap of where we go from here.  And if there are more

2    dates we need to schedule, I will talk to counsel on a

3    conference call to try to deal with that going forward.

4        I just want to remind Mr. McDonald, you know, before

5    Ms. Dao was here, that we're dealing with issues here, here,

6    and here, but ultimately that loan has to be paid off to

7    somebody.  It's not like it's going to disappear into the

8    ether.

9        The question is, are they allowed to go forward with their

10   nonjudicial foreclosure through the Deed of Trust Act now, or

11   do they need to start it over with new material or anything

12   like that?  But it isn't like, you know, somebody is going to

13   wave a magic wand.

14        MS. DAO:  We've never expected that, Your Honor.  We

15   know better.

16        THE COURT:  Great.  So I will be back in touch with

17   you.  Thanks very much, counsel, on the defense side for

18   getting the witnesses available to us, and, Ms. Dao, for your

19   cooperation and keeping us within our timeframe.

20        MS. VACURA:  Your Honor, may I ask for clarification

21   on one issue, and that is, it is the court's directive that

22   we either provide -- explain our responses to plaintiff's

23   inquiries, or bring documents, and I guess I'm not clear.

24        We had brought some documents that I just talked to the

25   court about.  There is no protective order in place, so

1    I'm --

2          THE COURT:  I'm not inclined to issue the protective

3    order, but I am inclined to require you to turn them over.

4          MS. VACURA:  All right.

5          THE COURT:  And that will be in the order.  You can

6    wait until you get it, and take a look at it.

7       I think it would also make sense for you -- and I totally

8    understand how this happened.  Mr. Corcoran made reference to

9    another file inventory screen and a screenshot.  Let's get

10   that over to them.

11      I understand that sometimes you talk to your witnesses and

12   you find out things you didn't know.  "I thought it was all

13   on this piece of paper."  "No, it's not.  There's actually

14   another screenshot," et cetera, et cetera.  I'm kind of

15   interested in is there a Form 1034, is there a Form 1036?

16   Maybe people can look around for those, too, and if you have

17   them, you know, turn them over.  Whether it's too late or not

18   is a separate issue, but your taking them doesn't waive any

19   objections you have --

20         MS. VACURA:  I understand.

21         THE COURT:  -- and whether it was timely and whether

22   the court should sanction the defendants for not producing

23   them sooner.  But let's get them all over there so we're not

24   in a situation at trial, if there is a trial, or for any

25   other reason, where people say, "Oh, we just found this

1    document that we said we didn't know where it was," and we

2    will take it from there.  All right?

3        We'll be adjourned.  Thanks.

4        I've admitted all the exhibits for purposes of the

5    evidentiary hearing.

6                  (Exhibits A-1 through A-16 admitted.)

7                    (A-10 and A-11 were withdrawn.)

8

9                    (PROCEEDINGS CONCLUDED.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


          I, Nancy L. Bauer, CCR, RPR, Court Reporter for
the United States District Court in the Western District of
Washington at Seattle, do hereby certify that I was present
in court during the foregoing matter and reported said
proceedings stenographically.

          I further certify that thereafter, I have caused
said stenographic notes to be transcribed under my direction
and that the foregoing pages are a true and accurate
transcription to the best of my ability.



          Dated this 21st day of February 2013.



                         /S/  Nancy L. Bauer

                         Nancy L. Bauer, CCR, RPR
                         Official Court Reporter